1    **IN THE UNITED STATES DISTRICT COURT**
     **FOR THE NORTHERN DISTRICT OF ILLINOIS**
2                    **WESTERN DIVISION**

3    UNITED STATES OF AMERICA,      )      Docket No. 11 CR 50062
                                    )
4              Plaintiff,           )      Rockford, Illinois
                                    )      Friday, August 31, 2012
5         v.                        )      2:30 o'clock p.m
                                    )
6    DAYTON POKE,                   )
                                    )
7              Defendant.           )

8              **TRANSCRIPT OF PROCEEDINGS**
        **BEFORE THE HONORABLE FREDERICK J. KAPALA**

9

**APPEARANCES:**
10

For the Government:           HON. PATRICK J. FITZGERALD
11                            United States Attorney
                              (308 West State Street,
12                             Rockford, IL 61101) by
                              MR. MARK T. KARNER
13                            Assistant U.S. Attorney

14   For the Defendant:        BYRD & TAYLOR
                              (308 West State Street,
15                             Suite 450,
                               Rockford, IL 61101) by
16                            MR. MARK A. BYRD

17   Court Reporter:           Mary T. Lindbloom
                              211 South Court Street
18                            Rockford, Illinois 61101
                              (815) 987-4486
19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1    THE CLERK:  11 CR 50062, U.S.A. v. Dayton Poke.

2    MR. KARNER:  Good afternoon, your Honor.  Mark Karner

3    on behalf of the United States.

4    MR. BYRD:  Good afternoon, your Honor.  Mark Byrd on

5    behalf of defendant Dayton Poke, who's present.

6    THE COURT:  Good afternoon.  The case comes before the

7    court for hearing on the defendant's motion to quash arrest and

8    suppress physical evidence.  Parties ready to proceed?

9    MR. KARNER:  We are, Judge.

10   MR. BYRD:  Yes, your Honor.

11   THE COURT:  Before we go, let me ask you, Mr. Byrd.

12   Are you contesting the propriety of the traffic stop itself?

13   MR. BYRD:  As far as the traffic stop being for failing

14   to signal turning into a residential driveway, no.

15   THE COURT:  Right.  Okay.  Let's go.

16   MR. KARNER:  We call Officer Pruitt.

17   MR. BYRD:  Judge, I believe we're going to have to have

18   an issue resolved.  This being a motion to quash and suppress, I

19   believe it's my burden, and it was my intent to call witnesses

20   first.

21   MR. KARNER:  That's fine.  I thought you were kidding

22   about that.

23   THE COURT:  Go ahead.

24   MR. BYRD:  It's the way we did it on the last motion to

25   suppress.

Stevens - Direct

1        THE COURT:  That's fine.

2        MR. BYRD:  Okay.  Thank you.

3        At this time, Judge, I'm going to call Sergeant Joe

4    Stevens.

5        (Witness duly sworn.)

6        JOSEPH STEVENS, DEFENDANT'S WITNESS, SWORN

7        DIRECT EXAMINATION

8    BY MR. BYRD:

9    Q.   Good afternoon, sir.  Would you state your name, please?

10   A.   Joseph Stevens, S-t-e-v-e-n-s.

11   Q.   And, Mr. Stevens, how are you employed?

12   A.   I'm a detective-sergeant with the Rockford City Police

13   Department.

14   Q.   Sergeant Stevens, were you so employed on July 6th of 2011?

15   A.   Yes.

16   Q.   And you would have been on duty in the evening hours?

17   A.   Yes.

18   Q.   Did you have occasion to have any involvement in the arrest

19   or subsequent charging of an individual by the name of Dayton

20   Poke?

21   A.   Yes.

22   Q.   Are you familiar with Mr. Poke outside of the scope of your

23   involvement in this case?

24   A.   I'm familiar with who he is.

25   Q.   And you see him in court?

Stevens - Direct

1    A.   Yes.

2    Q.   You were not at the scene, correct?

3    A.   Not initially, no.

4    Q.   Okay.  Did you have occasion to go to the scene at some

5    point?

6    A.   Yes.

7    Q.   And can you tell me why you were dispatched to the scene?

8    A.   I wasn't dispatched to the scene.  My officers were working

9    that night, and I know they conducted a traffic stop, and I went

10   to that location to check on them, see if they needed

11   assistance.

12   Q.   Okay.  And during your involvement on the case, did you have

13   occasion to issue or draft a document known as a Rockford Police

14   Department probable cause statement?

15   A.   No.

16   Q.   Did you have occasion to review and sign off on such a

17   document for Dayton Poke that day?

18   A.   Yes.

19   Q.   I want to show you what's been marked as Defendant's Exhibit

20   Number 5 and ask you if you'd take a look at this exhibit.  Do

21   you recognize that document?

22   A.   Yes.

23   Q.   And can you tell us what it is?

24   A.   It's a photocopy of the Rockford Police Department probable

25   cause statement that was filled out by Detective Pruitt.

Stevens - Direct

1  Q.   So, this was actually prepared by Detective Pruitt?

2          MR. BYRD:   Yes.

3          MR. KARNER:   Judge, I object to going into the PC

4  statement.   This is hearsay and it's relevant.

5          MR. BYRD:   Probable cause is the entire issue on a

6  motion to quash and suppress, Judge.

7          MR. KARNER:   Well, except they've agreed that the

8  traffic stop was justified prior to the evidence.   Detective

9  Stevens wasn't here until long after the defendant was in

10  custody.   So, he has no relevant firsthand testimony to give on

11  the issue of probable cause.

12          MR. BYRD:   Judge, we have the issue of whether or not

13  there was probable cause not to stop the vehicle, but rather to

14  conduct the search that led to the discovery of the evidence.

15          MR. KARNER:   Again, the vehicle was searched long

16  before Detective Stevens arrived, and Detective Stevens had no

17  firsthand involvement in the search.

18          MR. BYRD:   I was just planning on authenticating the

19  probable cause statement, and the reason I did that, Judge, is

20  because it's not clear from the face of the statement whether it

21  was drafted by Sergeant Stevens or Detective Pruitt.

22          THE COURT:   Will Detective Pruitt be here?

23          MR. BYRD:   Yes.

24          THE COURT:   Okay.   Why don't we just go into the

25  contents of the probable cause statement through Detective

### Stevens - Direct

1      Pruitt.

2              MR. BYRD:  That's fine.  I'll withdraw that question

3      then, Judge.

4              THE COURT:  Okay.

5      BY MR. BYRD:

6      Q.  Detective Stevens, does this document that's marked in front

7      of you as Defendant's Exhibit Number 5 truly and accurately

8      reflect the probable cause statement that you reviewed and

9      signed off on as supervisor in this case?

10             MR. KARNER:  I object again.  It's not relevant, Judge.

11             THE COURT:  Overruled.  I'll let that question stand.

12     BY THE WITNESS:

13     A.  I'm sorry.  Could you repeat it?

14     BY MR. BYRD:

15     Q.  Does Exhibit 5 truly and accurately reflect the probable

16     cause statement that you signed off on as supervisor as to

17     Dayton Poke?

18     A.  Yes.

19     Q.  Sergeant Stevens, with respect to that vehicle, did you have

20     occasion to authorize the impound of that vehicle?

21     A.  Yes.

22     Q.  And can you tell me what the basis was for the impound of

23     that vehicle?

24     A.  Well, there were several reasons.  The main reason was

25     because we felt the vehicle was evidence in the crimes we were

**Stevens - Direct**

1　charging Dayton Poke with.

2　Q.　Okay.　And can you tell me specifically which of the crimes

3　that he was charged with at the point that you authorized the

4　impound of the vehicle justified the impound?

5　A.　The drug possession, the gun possession.

6　Q.　Do you know whether or not the vehicle was properly

7　inventoried once it was brought back to the station or prior to

8　this impounding?

9　A.　We have a policy to inventory a vehicle before we impound it

10　to secure any valuables inside the vehicle.

11　Q.　And were you present for the inventory search in the case?

12　A.　I don't remember if I was there when they inventoried or

13　not.

14　Q.　Do you know whether or not an inventory report was prepared

15　for this vehicle?

16　A.　There is no specific inventory report.

17　Q.　When you inventory a vehicle, there's some record maintained

18　of its contents, correct?

19　A.　If we take anything out of it, yes.

20　Q.　What is the purpose for inventorying a vehicle?

21　A.　Like I said before, to secure any valuables because

22　depending on where we place the vehicle, there's a risk the car

23　could be broken into, and we want to safeguard the contents of a

24　vehicle against any theft or burglary.

25　Q.　And does it also have the side effect of protecting the

PDF created with pdfFactory trial version www.pdffactory.com

Stevens - Direct

1   police department from claims that items turned up missing or

2   things like that?

3   A.   Sure.

4   Q.   You mentioned that there's a policy on inpounding and towing

5   motor vehicles.  Is that policy in writing, if you know?

6   A.   Yes.  It's General Order 40.06.

7   Q.   I want to show you what's marked as Defendant's Exhibit

8   Number 6 and ask you if you could take a look at that exhibit.

9   And do you recognize that exhibit?

10  A.   I'm sorry.

11  Q.   Do you recognize that exhibit?

12  A.   Yes.

13  Q.   I have marked a page in that exhibit with a sticky Post-It

14  note.  Can you turn to Bates Page 263, please?

15              THE COURT:  Can you tell me what the exhibit is?

16              MR. BYRD:  Yes, I'm sorry.

17  BY MR. BYRD:

18  Q.   Can you tell us what the exhibit is?

19  A.   It's the Rockford Police Department General Order Number

20  40.06.  The title of it is inpounding or towing motor vehicles.

21  Q.   And that's the policy that you spoke of for inpounding?

22  A.   Yes.

23  Q.   Could you turn to Page 263, Bates stamp 263 of that exhibit?

24  A.   Yes.

25  Q.   And looking at Section C, there's a list of one through

Stevens - Direct

1    eight items.  Can you tell us what Section C on Page 263 is?

2    A.   You want me to read it?

3    Q.   No.  Just what it generally is, what it states.

4    A.   It describes situations in which vehicles may be impounded.

5    Q.   And those are the situations that the policy for City of

6    Rockford Police Department authorizes a vehicle to be impounded?

7    A.   Yes.

8    Q.   And looking at those exhibits, if you were to take away --

9    you mentioned that the authorizations were -- that the vehicle

10   was being seized as evidence because of the gun and because of

11   the drugs; is that correct?

12   A.   Yes.  I indicated that the vehicle was evidence in the

13   crimes we were charging, yes.

14   Q.   And specifically those two items?

15   A.   Yes.

16   Q.   Now, you're familiar with all of the charges that were

17   brought against the defendant in this case?

18   A.   I don't remember every one of them, but, yes, I am familiar

19   with them

20   Q.   And there was possession of crack cocaine, correct?

21   A.   I'd have to refer to the probable cause to verify the

22   specific charge, but there was a drug charge, yes.

23   Q.   All right.  So, there was a drug charge.  There was also a

24   gun charge.

25   A.   Yes.

Stevens - Direct

1   Q.   And are you familiar with the other charges that the

2   defendant had?

3   A.   Not off the top of my head, no.

4   Q.   Okay.  I'd ask you to accept that the other charges were

5   failing to signal turning into a residential driveway and

6   driving on a revoked or suspended license for DUI, a previous

7   DUI.

8         Would either of those two charges, the failure to

9   signal turning into a residential driveway or the driving on a

10   suspended or revoked license based on a prior DUI, would those

11   offer a justification under any of those provisions of the

12   Rockford Police Department policy for impounding this particular

13   vehicle?

14   A.   Are you asking me in this case or hypothetically?

15   Q.   Well, at the time you reviewed this, he had already had the

16   gun found and the drugs found, correct?

17   A.   Yes.

18   Q.   Assuming that there had not been drugs or guns found, would

19   there have been a justification for impounding the vehicle based

20   upon the charges of failing to signal turning into a residential

21   driveway and driving on a revoked or suspended license based on

22   a prior DUI?

23         MR. KARNER:  I object to the hypothetical.

24         MR. BYRD:  Judge, one of the issues that I have to

25   address in sustaining my burden of proof is eliminating other

Stevens - Direct

1  possible reasons that the vehicle could have been impounded to

2  avoid inevitable discovery arguments by the government.  I think

3  that I would need to explore had there not been drugs or guns,

4  could the vehicle have been impounded under a different basis

5  for his stop --

6          THE COURT:  All right.

7          MR. BYRD:  -- in order to do that.

8  BY MR. BYRD:

9  Q.  You can answer.

10 A.  Well, seeing as how that wasn't the case, I guess I would

11 have a hard time with that situation.  There were numerous

12 reasons we impounded that vehicle, and the reasons I cited were

13 because there were guns and drugs in it or a gun and drugs in

14 it, and in addition to there were other reasons.  But under your

15 scenario, I guess I would have to think about that for awhile.

16 I don't know that the revoked alone would be a reason.

17 Q.  I'm sorry?

18 A.  I don't know if driving after revocation alone would be a

19 reason.  But, you know, very rarely do we have an incident where

20 driving after revocation is the only incident occurring when we

21 have a traffic stop.  So, I mean, it's hard to answer a

22 hypothetical in the situation.

23 Q.  Well, if I could take that exhibit back from you.  Is the

24 vehicle typically impounded when an individual fails to signal

25 when turning within the City of Rockford?

**Stevens - Direct**

1    MR. KARNER:   Objection as to what is typical.

2    MR. BYRD:   All right.   I'll rephrase.   That could be

3    better worded.

4    BY MR. BYRD:

5    Q.   Under the procedure C, section one through eight of this

6    exhibit, the Rockford policy, if an individual is ticketed for

7    failing to signal when turning left and the vehicle is otherwise

8    lawfully parked and not posing a risk to traffic, does it

9    typically -- I'm sorry -- under this policy does it get

10   impounded?

11   A.   Given your specific example with no other factors involved.

12   Q.   Yes.

13   A.   A normal traffic violation.   I mean, do they have insurance?

14   I mean, just because we write a signal violation doesn't mean

15   that there -- I mean, we may not write the insurance -- there's

16   a lot of reasons why we would impound it, and it's difficult to

17   answer in a hypothetical that way.

18   Q.   Assuming that it was just failing to signal.

19   A.   That's it?

20   Q.   Yes.

21   A.   No, we would not.

22   Q.   And if an individual is stopped and it's determined that

23   they are operating the vehicle with a suspended or revoked

24   license and the vehicle is otherwise lawfully parked and not

25   imposing a hazard to traffic, does the vehicle get impounded?

Stevens - Direct

1      MR. KARNER:  Judge, I object.  Again, that doesn't

2  match up with the facts of this case.  In this case the vehicle

3  wasn't lawfully parked.

4      THE COURT:  Well, it doesn't match up with the facts of

5  this case I think as the government expects those facts to

6  unfold, but I believe Mr. Byrd is just excluding other

7  possibilities if, in fact, we find out that the facts do not

8  unfold the way the government anticipates.  I think the question

9  is appropriate.  I'll allow it to stand.

10  BY THE WITNESS:

11  A.  I'm sorry.  Could you repeat it again then?

12  BY MR. BYRD:

13  Q.  Sure.  If an individual is stopped for operating a motor

14  vehicle while his license is suspended or revoked and the

15  vehicle is otherwise lawfully parked and not posing a hazard on

16  the roadway, does the vehicle get impounded under the Rockford

17  Police Department policy?

18  A.  Given your specific example and no other factors involved,

19  no.

20  Q.  Now, while you were at the scene, can you describe where the

21  vehicle was parked when you arrived?

22  A.  It was in a driveway.

23  Q.  A residential driveway?

24  A.  Yes.

25  Q.  And did you examine the vehicle at all?

**Stevens - Direct**

1  A.  I looked at it.

2  Q.  And you were familiar with the facts from talking to

3  Detective Pruitt and Detective Nordberg, who were on scene?

4  A.  Yes.

5  Q.  Was there anything about that vehicle that you were aware of

6  that would have made it illegal to drive that vehicle?  And by

7  that, I mean expired registration, broken taillight, any type of

8  equipment violation that would have rendered it in a manner

9  where it could not be operated lawfully on the streets of

10  Rockford?

11  A.  Not that I recall now, no.

12  Q.  And the vehicle was not blocking the sidewalk or sticking

13  into the roadway in any way that would have caused a safety

14  issue?

15  A.  No.

16      MR. BYRD:  May I have just a moment, your Honor?

17     (Brief pause.)

18  BY MR. BYRD:

19  Q.  Sergeant Stevens, were you present at the time that the

20  vehicle was searched?

21  A.  Yes.

22  Q.  And approximately how long after the defendant was stopped

23  did you have occasion to be on the scene?

24  A.  Several minutes, probably.

25  Q.  All right.

Stevens - Direct

1    A.   Less than several minutes.

2    Q.   So, you were there within a matter of minutes?

3    A.   Yes.

4    Q.   And did you give authorization to search the vehicle?

5    A.   I didn't have to.

6    Q.   So, that would be no, you did not give a go-ahead?

7    A.   Well, everyone saw that there was a gun on the floorboard.

8    So, I don't know if there was a formal discussion about whether

9    we had probable cause to search.  I think everyone felt we did.

10   Q.   And can you describe how that search unfolded?

11   A.   My role in it?

12   Q.   No, just what you observed in terms of the search.

13   A.   We knew there was a handgun on the floorboard.

14   Q.   Do you know who conducted the search?

15   A.   I think there were several officers who assisted in it.

16   Q.   Okay.  So, you wouldn't know necessarily who found what?

17   A.   No, not without going back over the reports.

18   Q.   Was the vehicle locked?

19   A.   I don't believe so, no.

20   Q.   Did one of the officers have the keys to the vehicle?

21   A.   Yes, at some point they did.

22   Q.   And it's your recollection that the vehicle was able to be

23   entered without using the keys to gain entry?

24   A.   Yes.

25   Q.   Thank you, Detective Stevens.

**Stevens - Cross**

1     MR. BYRD:  I'll pass the witness, your Honor.

2                    CROSS EXAMINATION

3  BY MR. KARNER:

4  Q.  So, describe for the court all the reasons that would have

5  justified impounding this car.

6  A.  Well, like I said, the main reason why is because evidence,

7  but there are several scenarios where we would have to impound

8  the vehicle.  One was that the -- and given the circumstances in

9  this traffic stop, the defendant was in our opinion abandoning

10  the vehicle because of the situation, and that vehicle was

11  parked in a driveway which we determined was not his driveway.

12          The homeowner, to my recollection, we were not able to

13  locate, and that vehicle would then be blocking a private

14  residence or driveway or garage door.  We wouldn't allow that

15  vehicle to block that.  We would take it to prevent any further

16  problems between the person leaving the vehicle there and the

17  owner obviously being blocked in their own house.  So, that

18  would be one reason.

19          The second reason, in addition to our first reason

20  being the evidence, is that once we recover narcotics, there's a

21  process in which a vehicle may be considered for seizure.

22  Normally, I am not involved in that process.  It's normally a

23  process where the narcotics supervisor is involved in it, and

24  there's a formal review process, usually with the secretary in

25  narcotics and the narcotics supervisor, over whether the vehicle

Stevens - Cross

1    would be -- one, whether the vehicle was able to be seized

2    according to the evidence and the laws which they deal with

3    every day, and, second, if there's a lien on the vehicle,

4    there's an amount on which we would accept to pay off the lien

5    and take the vehicle for seizure, and then there's usually an

6    amount that the department will not be willing to pay.  So,

7    there's an analysis of that vehicle to see if it's even able to

8    be seized, but it starts with seizing the vehicle and impounding

9    it so that the process can begin.

10   Q.   Okay.  And you were aware that the defendant said he did not

11   live at the address at which this car was parked?

12   A.   Correct.

13   Q.   And the registration came back to an address other than the

14   address that the driveway was attached to that this car was

15   parked?

16   A.   Correct.

17   Q.   And no one was at home to tell you, yeah, the car could be

18   parked there?

19   A.   Correct.  In addition, there's another reason is that the

20   information we had, which indicated Dayton Poke was with another

21   individual named Clifford Horton, who in January of '11 we had a

22   murder.  That information indicated that the murder suspect was

23   in that vehicle, possibly with Dayton.

24          Once we recovered the .40 caliber handgun in the car --

25   there was information that the murder in January of 2011 had

Stevens - Cross

1    .40 caliber casings involved in it.  We didn't know if possibly

2    Dayton was involved in it, the vehicle was involved in it.  So,

3    we would also have taken it as evidence potentially on that case

4    until we could determine it wasn't evidence.  So, I think

5    there's generally four reasons why we would do that.

6    Q.   Now, you said that you were aware that there was a gun in

7    the car.  Could you see that gun from a position outside the

8    car?

9    A.   Yes.

10   Q.   Was the gun in plain view?

11   A.   Yes.

12           MR. KARNER:   Nothing further.

13                    REDIRECT EXAMINATION

14   BY MR. BYRD:

15   Q.   Detective Stevens, in light of some of Mr. Karner's

16   questions, I want to show you some additional exhibits.  I want

17   to show you what's marked as Defendant's Exhibits 1, 2, 3 --

18           MR. KARNER:   Excuse me, counsel.  May I see the ones

19   you're going to show the witness?

20           MR. BYRD:   Yes, one through four.

21           MR. KARNER:   May I see those?

22           MR. BYRD:   Oh, sure.  These are the copies, if you'd

23   like.

24           MR. KARNER:   All right.  Thanks.

25

Stevens - Redirect

1  BY MR. BYRD:

2  Q.   You said that the driveway was blocked, and that was an

3  issue that would have led or justified the impounding of the

4  vehicle.  I want to show you first what's marked as Defendant's

5  Exhibits 1 and 2.

6       MR. BYRD:  And, your Honor, if you'd like, I have a

7  copy of those for you to look at, as well.

8       THE COURT:  Thank you.

9       MR. BYRD:  And I'll just give you 3 and 4, as well,

10 because those are next.

11 BY MR. BYRD:

12 Q.   Do you recognize those exhibits?

13 A.   Yes.

14 Q.   And those exhibits appear to be the vehicle that we're

15 talking about here, a silver Chevy Impala?

16 A.   Yes.

17 Q.   And looking at those exhibits, isn't it true that that

18 vehicle is parked in a three-car-wide driveway?

19 A.   Yes.

20 Q.   And you can see the three stalls in Defendant's Exhibit --

21 and by stalls, I mean garages -- in Defendant's Exhibit

22 Number 1?

23 A.   Yes.

24 Q.   So, how is it that it would have been blocking the driveway

25 such that vehicles for that residence couldn't get in or out?

PDF created with pdfFactory trial version www.pdffactory.com

## Stevens - Redirect

1  A.  It would prevent the owner from the use of the driveway and

2  cause a situation where the owner would have to navigate around

3  the vehicle, which in our minds would be blocking.

4  Q.  Did anybody ever check with the owners to see if the owners

5  had any problem with Mr. Poke's vehicle being parked in the

6  driveway?

7  A.  I don't recall if they did that night.  I know we did at a

8  later time.

9  Q.  So, rather than saying that it would have blocked the owners

10  from ingress and egress into their garage, it would have created

11  a situation where they would have just have had to go around, an

12  inconvenience; isn't that fair?

13  A.  In my 18 years of police work, I have never had a homeowner

14  not mind someone's car in their driveway that doesn't belong

15  there.  And so, to avoid any potential scenario after we leave

16  the area, we would on a routine basis take that vehicle out of

17  that area as to not cause a problem

18  Q.  So, if I'm correct then, nobody ever spoke to the owner?

19  A.  That night I'm not aware of, no.

20  Q.  So, you would not know whether or not the owner is a

21  relative of Mr. Poke's or the vehicle's owner?

22  A.  We knew he didn't live there.

23  Q.  Okay.  But do you know whether or not or have any

24  information that the owners would have disapproved of that

25  vehicle being there?

Stevens - Redirect

1    A.   That night, no.

2    Q.   Any night after that?

3    A.   Yes.

4    Q.   Okay.   But at the time the vehicle was impounded, you did

5    not know how the owners would have felt about it?

6    A.   No, but like I said, that's not the reason we impounded it,

7    but it would have been one we considered.

8    Q.   Okay.   You said that you learned later that the owners would

9    have had a problem with it.   Tell me about that.

10   A.   I didn't talk to the owner.   It was Detective Pruitt.   But I

11   know that he had talked to the resident of the building.

12   Q.   Okay.   Was it one resident for the entire three garages?

13   A.   I don't remember, no.

14   Q.   You don't remember?   Okay.

15          I next want to show you -- did I give you 3 and 4?

16   A.   I just have 1 and 2.

17   Q.   All right.   Let me show you Defendant's Exhibits 3 and 4 and

18   ask you to take a look at those exhibits.   Do you recognize

19   them?

20   A.   Yes.

21   Q.   And just so the record's clear before we move into those

22   exhibits, do Defendant's Exhibits 1 and 2 fairly and accurately

23   reflect the premises as you observed it on the date in question?

24   A.   Yes.

25   Q.   And the location of the vehicle is fairly and accurately

**Stevens - Redirect**

1    depicted in these exhibits?

2    A.    Yes.

3    Q.    Okay.    Now, Exhibits 3 and 4, what do those show?

4    A.    Three is a photo of the driver's interior compartment, and

5    very clearly you can see just below the driver's seat next to a

6    green towel the barrel of a handgun, black in color, and

7    Exhibit 4 is a closer photo of the black handgun with the towel.

8    Q.    And you said that you yourself observed the handgun as it's

9    depicted in those exhibits?

10    A.    Yes.

11    Q.    Where were you standing when you saw that handgun sticking

12    out from the front seat?

13    A.    I recall viewing it both with the driver's door shut looking

14    in the window and also when it was open.

15    Q.    And with respect to -- let's go back to Exhibit 2, which is

16    the side view of the driver's side of that vehicle.    Can you

17    tell me approximately where you would have been standing when

18    you saw the gun through the window when the door was closed?

19    A.    By the A pillar.    Right here.

20    Q.    The A pillar is the approximate area where the rear view

21    mirror on the outside of the car is?

22    A.    Yes.

23    Q.    So, you would have been looking, you would agree, from a

24    front angle down into the vehicle or front side angle?

25    A.    Yes.

Stevens - Redirect

1    Q.   And how else did you look at the gun?

2    A.   When the driver's door was open.

3    Q.   Okay.   And where would you have been standing when the

4    driver's door was open?

5    A.   Inside the driver's area when you enter the vehicle.

6    Q.   Near the A pillar again?

7    A.   No, when the door's open, more towards the side.

8    Q.   Okay.   And would you have leaned over to look to see the

9    gun?

10   A.   I don't believe I needed to on this situation, no.

11   Q.   Do Exhibits 3 and 4 fairly and accurately depict the

12   condition and location of the handgun at the time you observed

13   then?

14   A.   Yes.

15   Q.   Based upon your experience, do you have any reason to

16   believe that any of the items depicted in Exhibit 3 or 4 were

17   manipulated prior to these photographs being taken?

18   A.   Not to my knowledge, no.

19   Q.   And similarly you wouldn't have any reason to believe they

20   were manipulated before you looked at the scene?

21   A.   Correct.

22   Q.   And why is that?

23   A.   Well, it's standard policy that once we find evidence, we

24   leave it in place to photograph it before we recover it.

25   Q.   Okay.   And that's the policy of the City of Rockford?

### Stevens - Redirect

1  A.  I think it's a best practice in evidence collection.  I

2  don't know if it's necessarily a formal policy.

3  Q.  Are you familiar with Rockford Department General Order

4  60.02 entitled crime scene processing?

5  A.  Yes.

6  Q.  I want to show you what's marked as Defendant's Exhibit 8.

7          THE COURT:  This is 8.

8          MR. BYRD:  Number 8, yes.

9          MR. KARNER:  What exhibit number?

10          MR. BYRD:  Eight.

11  BY MR. BYRD:

12  Q.  I want to show you what's been marked as Defendant's Exhibit

13  Number 8 and ask you to take a look at that exhibit.  Do you

14  recognize that exhibit?

15  A.  Yes.

16  Q.  And can you tell us what it is?

17  A.  It's the Rockford Police Department General Order Number

18  60.02 titled crime scene processing.

19  Q.  And attached to that exhibit is Appendix A, correct?

20  A.  Yes.

21  Q.  And that's the page that I've marked with a sticky note,

22  Bates Number 387?

23  A.  Yes.

24  Q.  Letter A, Appendix A, is entitled protecting the crime

25  scene, correct?

Stevens - Redirect

1    A.   Correct.

2    Q.   Item C.  Can you read what item C says?

3    A.   You want me to read it?

4    Q.   Yes, please.

5    A.   Do not disturb.  Nothing at the scene should be moved,

6    touched, walked on, or otherwise disturbed unless there is a

7    valid officer safety issue involved.  Describing a crime scene

8    should be limited to a search for suspects and an examination of

9    injured or deceased persons.  Parenthesis, deceased persons

10   allow only one fire paramedic to examine an obviously deceased

11   victim

12   Q.   That's fine, Sergeant.

13   A.   Okay.

14   Q.   The main point of that is you don't disturb the crime scene,

15   correct?

16   A.   No, not generally.

17   Q.   You don't manipulate the evidence prior to photographing it

18   unless there's an issue of officer safety --

19   A.   Correct.

20   Q.   -- that requires it?

21   A.   Correct.

22   Q.   And does Exhibit 8 fairly and accurately reflect this

23   general order in Appendix A that we talked about?

24   A.   Yes.

25   Q.   And is this order and the philosophy of good police work

### Stevens - Redirect

1    what led you to state a few moments ago that you did not believe

2    that the scene was manipulated at all?

3    A.   Yes.

4    Q.   Do you recall there being a black Sanyo cell phone, a

5    Cricket cell phone, that was found at the scene?

6               MR. KARNER:   I object.   This is beyond the scope.   I

7    believe it goes to the issue of whether or not the crime scene

8    was manipulated.

9               THE COURT:   Overruled.

10   BY THE WITNESS:

11   A.   I know there was a phone recovered.   I don't know when or

12   where it was at, no.

13   BY MR. BYRD:

14   Q.   Okay.   Is there anything that would refresh your

15   recollection as to where the cell phone was recovered?

16   A.   I don't know.   There may be a report indicating where they

17   recovered it from

18   Q.   Is it possible it could be in the probable cause statement?

19   A.   It may.

20   Q.   I want to show you again Defendant's Exhibit 5 and direct

21   your attention to the third line from the bottom of the first

22   paragraph.

23   A.   Yes.

24   Q.   And can you tell us about the black Cricket or the Cricket

25   Sanyo cell phone, where it was located?

### Stevens - Redirect

1    A.    The probable cause statement indicates it was on the front

2    driver floorboard.

3    Q.    I want to show you Exhibits 3 and 4 again and ask you if you

4    can point to the Cricket Sanyo cell phone in those photographs.

5    A.    In these photos it's not here.

6              MR. KARNER:    I'm sorry.    Which exhibits were those?

7              MR. BYRD:    Three and four.

8    BY MR. BYRD:

9    Q.    You don't see them in these photographs, do you?

10   A.    No.

11   Q.    And did you see them when you looked into the vehicle,

12   either with the door closed or with the door open?

13   A.    I don't recall a phone, no.

14   Q.    Any reason you could think of why they would not be depicted

15   in Defendant's Exhibits 3 or 4?

16   A.    Yeah.    I don't know that the photos are an accurate, total

17   view of the driver's area, number one, and number two is it's

18   possible there's a typo in the probable cause statement.    I just

19   don't know.

20   Q.    Okay.    And that would have been drafted by Detective Pruitt?

21   A.    Yes.

22   Q.    But you agree that 3 and 4 does not show anywhere in those

23   photographs any Cricket Sanyo cell phone in the driver's side

24   floorboard?

25   A.    These two photos do not show it, no.    There is a cord, it

PDF created with pdfFactory trial version www.pdffactory.com

### Stevens - Redirect

1    looks like, for a cell phone, though.

2    Q.   I'm sorry?

3    A.   There is a cord here that looks like for a cell phone.

4    Q.   Okay.

5    A.   But not the phone.

6    Q.   And would you agree that one of the reasons we don't see a

7    Cricket Sanyo cell phone in Defendant's Exhibit 3 is that it was

8    removed prior to the photograph being taken?

9    A.   I don't know that for sure.

10   Q.   If, in fact, that happened, that would be a horrendous

11   breach of the protocol reflected in the order we just looked at,

12   correct?

13   A.   I wouldn't characterize it as a horrendous breach, but it

14   could be.  I don't know.

15   Q.   Can you think of any reason implicating officer safety if

16   the Cricket Sanyo cell phone was left in the driver's seat or

17   driver's front floorboard in this case?

18   A.   I don't know.

19   Q.   It could?

20   A.   I don't know.  I wasn't there.  I don't know.

21   Q.   Okay.  I'm just asking you in general would the presence of

22   a cell phone near a firearm in a floorboard pose a risk in and

23   of itself to officer safety such that that cell phone should be

24   removed?

25            MR. KARNER:  Objection as to what's in general, Judge.

Stevens - Redirect

1  That's not relevant here.

2         THE COURT:  Why isn't it relevant?  He's talking about

3  what the procedures are for searching a car, and one of the

4  considerations in that procedure is officer safety, and he's

5  focusing in on that particular component.

6         MR. KARNER:  I think what's relevant here is what the

7  officers saw and did here on this date, period.

8         THE COURT:  No.  We're talking about violation of

9  60.02.

10        MR. KARNER:  But that's -- hypotheticals about what

11  could and could not violate this are not relevant.  What's

12  relevant is what the officers saw and did here on this date.

13        THE COURT:  Well, I think the basic assumption is that

14  a cell phone was moved, and we're determining whether it

15  violates 60.02.  I'll allow the question to stand.

16  BY MR. BYRD:

17  Q.  You can go ahead and answer.

18  A.  I don't remember the question.

19  Q.  Sure.  Is there anything inherently risky to officer safety

20  for a cell phone to be left at a crime scene near a gun until

21  when the scene is secured?  And you would agree the scene is

22  secured here, correct, at this point in time?

23  A.  I don't know -- I mean, I'm assuming he's in custody at this

24  point in the car, which I believe he was.  But off of a photo I

25  can't tell you what was going on behind the person taking the

PDF created with pdfFactory trial version www.pdffactory.com

## Stevens - Redirect

1  photo.   Would a cell phone normally be moved?  I wouldn't think

2  so.

3  Q.   And you would agree it doesn't pose any risk to officer

4  safety by virtue of being in the same floorboard with a handgun?

5  A.   No.   Not in your scenario, no.

6  Q.   Okay.   Thank you.

7        MR. BYRD:   If I could have just one minute.

8     (Brief pause.)

9  BY MR. BYRD:

10  Q.   Was there any other reason that you gave that would have

11  justified the impound of the vehicle that we haven't talked

12  about during my redirect?

13  A.   I think I covered all four of them, I think.

14  Q.   Okay.   You mentioned an individual by the name of Clifford

15  Horton?

16  A.   Yes.

17  Q.   Okay.   That was one I think that I may have missed.   You

18  said that Clifford Horton was alleged to have been driving

19  around with Dayton Poke at some point?

20  A.   The information that detectives that worked for me obtained

21  was that Clifford Horton was possibly with Dayton Poke driving

22  around in a silver Chevy Impala.

23  Q.   Now, at the time that this vehicle was stopped, is it your

24  understanding or do you know whether the defendant was the only

25  occupant of the vehicle?

### Stevens - Redirect

1  A.   He was the only occupant.

2  Q.   So, Clifford Horton wasn't at the scene?

3  A.   Once we had the vehicle stopped, we determined he wasn't,

4  no.

5  Q.   And so, Clifford Horton was not arrested that day as part of

6  this investigation into Dayton Poke?

7  A.   Correct.

8  Q.   Now, do you know whether or not Clifford Horton was alleged

9  to have been riding around with Dayton Poke on that day or some

10  day prior to that?

11  A.   I don't know.

12  Q.   Are you familiar or how familiar are you with the Clifford

13  Horton investigation?

14  A.   I did not work on it.  I know based off of the officer

15  safety flyers that went out general information.

16  Q.   And that was a murder investigation?

17  A.   Yes.

18  Q.   Was it a murder or based on a drive-by shooting or any other

19  action involving a vehicle?

20  A.   Yes, there were vehicles involved.

21  Q.   How were the vehicles in the Clifford Horton case involved?

22  A.   I don't know specifics.  I know it was in the street on

23  Sherman, I believe, and that there were numerous guns and

24  numerous shots fired.

25  Q.   Was it a party going on?

Stevens - Redirect

1    A.   I don't know.

2    Q.   All right.   You're not that familiar with it?

3    A.   Right.

4    Q.   Do you know who the detectives were that worked the Clifford

5    Horton investigation?

6    A.   Not off the top of my head, no.

7    Q.   But one of the justifications was that the vehicle you said

8    might be evidence in that shooting?

9    A.   Yes.

10   Q.   Do you know whether or not the vehicle that we're talking

11   about here, the silver Chevy Impala, was, in fact, evidence in

12   the Clifford Horton case?

13   A.   I don't know that.

14   Q.   Do you know if the vehicle was ever processed for gunshot

15   residue or anything like that?

16   A.   I don't know that.   We still have it.

17   Q.   The Chevy Impala?

18   A.   Yes.

19   Q.   Now, the handgun, was that taken into custody as part of

20   Clifford Horton's investigation?   I know it would have been

21   taken --

22        MR. KARNER:   Objection.   We're really getting far

23   afield here, Judge.

24        MR. BYRD:   I'm not so sure that we are, Judge.   I mean,

25   one, I didn't get to finish the question.   So, how can you rule?

PDF created with pdfFactory trial version www.pdffactory.com

Stevens - Redirect

1    MR. KARNER:  Well, whether or not the gun was taken in

2    any connection with the Clifford Horton murder case doesn't bear

3    on any of the issues raised in his pretrial motion.

4    MR. BYRD:  I'll withdraw the question.

5    BY MR. BYRD:

6    Q.  You do not have any reason to believe that the handgun that

7    was found in the silver Impala that day was the handgun used in

8    the murder case involving Clifford Horton, do you?

9    MR. KARNER:  Objection to foundation.  If they had

10   reason to believe at the time or now.

11   THE COURT:  Okay.

12   BY MR. BYRD:

13   Q.  Do you have reason to believe at the time that that was the

14   handgun used in the Clifford Horton shooting?

15   A.  I didn't know.

16   Q.  Okay.  It was a possibility?

17   A.  Yes.

18   Q.  And that would have provided a justification for taking the

19   handgun into custody to check ballistics, correct?

20   A.  I would have taken the vehicle in, also.

21   Q.  Okay.  But you don't know whether or not that vehicle was

22   involved.

23   A.  No.  And that would be the reason why I would take it

24   because it could be and I wouldn't know.

25   Q.  Are you familiar with whether or not Dayton Poke at the time

Stevens - Recross

1    of his arrest was a suspect in the Clifford Horton case or the

2    murder that led to Clifford Horton having an active warrant?

3    A.   I know that the detectives that had worked it had identified

4    several people involved in the incident.  I know there were

5    numerous handguns fired during the incident, and I know that

6    they didn't know everyone that was involved.  So, was his name

7    specifically mentioned to my knowledge at that time?  No.   But

8    he very well could have been.

9    Q.   Do you know whether or not that is the reason that two

10   Rockford detectives executed a traffic stop for failing to

11   signal on the day in question?

12              MR. KARNER:   Objection.  He's now asking this witness

13   to speculate on the motive of two other officers when that's not

14   even relevant.

15              THE COURT:   I agree.  I'll sustain the objection.

16              MR. BYRD:   Just one moment, Judge.

17        (Brief pause.)

18   BY MR. BYRD:

19   Q.   Thank you, Sergeant Stevens.

20              MR. BYRD:   I have no further questions, Judge.

21              MR. KARNER:   Can I see Defendant's Exhibit 3?

22                        RECROSS EXAMINATION

23   BY MR. KARNER:

24   Q.   Showing you Defendant's Exhibit 3, do you know what this

25   object is right below the gearshift lever?

### Stevens - Further Redirect

1    A.   It looks like a radio, but I'm not sure.

2    Q.   You don't know what that object is?

3    A.   No.

4    Q.   Okay.

5              MR. KARNER:   I have nothing further.

6              THE COURT:   You may step down.

7              MR. BYRD:   Can I just ask one more question?

8                    FURTHER REDIRECT EXAMINATION

9    BY MR. BYRD:

10   Q.   Detective, looking at Defendant's Exhibit 3, is there

11   anything that would lead you to believe that the object

12   Mr. Karner just asked you about is the Sanyo Cricket cell phone?

13   A.   I don't know what it is.

14   Q.   It certainly -- as depicted in this photograph, it's not

15   laying in the floorboard, correct?

16   A.   It doesn't appear to be, but I don't know what it is.

17   Q.   It appears to be mounted to the side of the vehicle right

18   under the steering wheel?

19   A.   Yes.

20   Q.   Thank you.   That's all I have.

21              MR. BYRD:   Thank you, Judge.

22              THE COURT:   You may step down.

23        (Witness excused.)

24              THE COURT:   Next witness, please.

25              MR. BYRD:   Judge, at this time I would call Detective

Nordberg - Direct

1   Kevin Nordberg.

2        (Brief pause.)

3        (Witness duly sworn.)

4            THE COURT:   Please take a seat at the witness stand.

5            KEVIN NORDBERG, DEFENDANT'S WITNESS, SWORN

6                        DIRECT EXAMINATION

7   BY MR. BYRD:

8   Q.   Good afternoon, sir.   Can you state your name, please?

9   A.   Kevin Nordberg.

10  Q.   And how are you employed, sir?

11  A.   City of Rockford Police Department.

12  Q.   And in what capacity?

13  A.   Detective.

14  Q.   And were you so employed on July 6th of 2011?

15  A.   Yes, I was.

16  Q.   On that day did you have occasion to be dispatched to the

17  area of 7th and 12th Street in the City of Rockford?

18  A.   I was not dispatched there, no.

19  Q.   Okay.   Was there a communication that came in regarding an

20  armed robbery or a robbery at the Quik Mart store at 7th and

21  12th?

22  A.   Yes, there was.

23  Q.   And did you have occasion to go to that scene?

24  A.   That's correct.

25  Q.   And who were you with?

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1   A.   Detective Pruitt.

2   Q.   In addition to Detective Pruitt in this particular dis --

3   well, you said you weren't dispatched, but your occasion to go

4   to the Quik Mart store, did you guys go to that store?

5   A.   No, we did not.

6   Q.   And why did you not go there?

7   A.   There was information that the suspects had left, and we

8   were in the area looking for them

9   Q.   Okay.  Were you and Detective Pruitt looking for them?

10  A.   That's correct.

11  Q.   And at that time did you have an occasion to believe that

12  the individual that was involved in the Quik Mart robbery was a

13  man by the name of Dayton Poke?

14  A.   No, I did not.

15  Q.   In fact, those individuals were alleged -- those individuals

16  that allegedly committed the robbery at Quik Mart left on foot,

17  correct?

18  A.   That's correct.

19  Q.   Did you have descriptions of those individuals?

20  A.   There were some put out.  I don't remember the details of

21  it, but yes.

22  Q.   But nothing in your mind at the time indicated that it could

23  have been or was Dayton Poke based on those descriptions?

24  A.   That's correct.

25  Q.   At the time were you also in your capacity as a detective

Nordberg - Direct

1   working a case involving a suspect by the name of Clifford

2   Horton?

3   A.   That's correct.

4   Q.   And can you tell us what your involvement was with

5   Mr. Horton?

6   A.   I was one of the investigating officers on the murder that

7   he was a possible suspect in.

8   Q.   And can you tell me about that murder investigation?  Where

9   it occurred, what was involved in the murder?

10  A.   It was on Sherman Street.   There was a -- Charles Spivey was

11  shot and killed at the time, along with several others were

12  shot, and the suspects -- during the course of the

13  investigation, we developed several suspect names, including

14  Clifford Horton.

15  Q.   And did the shooting occur inside a building, outside a

16  building?

17  A.   It was outside.

18  Q.   Was it a drive-by shooting?

19  A.   No, it was not.

20  Q.   Were there any vehicles involved in the shooting?

21  A.   The victim was driving a vehicle at the time he was shot.

22  Q.   Okay.   So, the vehicles that were involved was the vehicle

23  that the victim was in at the time he was shot?

24  A.   That's correct.

25  Q.   Do you know whether or not he was firing from the vehicle at

Nordberg - Direct

1   suspects who fired back at him?

2   A.   He was not.

3   Q.   You said several suspects were developed during that

4   investigation.   Was one of those suspects Dayton Poke?

5   A.   He was not.

6   Q.   So, at the time that you were dispatched -- or I'm sorry.   I

7   keep saying dispatched.

8         At the time that you and Detective Pruitt went to the

9   Quik Mart to investigate this armed robbery, Dayton Poke was not

10  a suspect in the Clifford Horton case involving the shooting of

11  Mr. Spivey?

12  A.   That is correct.

13  Q.   While you were driving around, did you have conversation

14  with Detective Pruitt regarding your surveilling Mr. Poke -- I'm

15  sorry -- surveilling a silver Chevy Impala the night before?

16  A.   Not until we saw the vehicle.

17  Q.   I'm sorry?

18  A.   Not until we saw that vehicle.

19  Q.   Okay.   But did you have occasion to be surveilling a silver

20  Chevy Impala the night before?

21  A.   Yes, I did.

22  Q.   And that was along with Detectives Schroeder and Posley?

23  A.   That is correct.

24  Q.   They were also working the Clifford Horton investigation?

25  A.   That is correct.

Nordberg - Direct

1  Q.   Can you tell me why the three of you would have been

2  surveilling the silver Chevy Impala that you saw Mr. Poke

3  driving that day?

4  A.   Information had been coming in, an anonymous tip, that

5  Mr. Poke was with Mr. Horton and they were using that vehicle.

6  Q.   Now -- and this was the night before?

7  A.   That's correct.

8  Q.   And while the three of you surveilled, were you able to

9  determine -- and this is the night before Dayton Poke's

10  arrest -- were you able to determine if Dayton Poke was driving

11  that silver Chevy Impala?

12  A.   The vehicle never moved.

13  Q.   I'm sorry?

14  A.   The vehicle did not move that night.

15  Q.   Oh.   Did it have any occupants in it while you were

16  surveilling it?

17  A.   No, it did not.

18  Q.   So, you were just watching the silver Chevy Impala that was,

19  parked, I assume, somewhere?

20  A.   That's correct.

21  Q.   How long did you surveil the vehicle?

22  A.   Approximately three hours.

23  Q.   And what exactly was it you were hoping to uncover?

24  A.   Somebody to return to the vehicle.

25  Q.   Specifically Clifford Horton?

Nordberg - Direct

1    A.   That's correct.

2    Q.   So, back to July 6th, 2011.   Once you received notification

3    that the individuals had left the Quik Mart, what, if anything,

4    did you and Detective Pruitt do?

5    A.   We were in the area just looking for suspects.

6    Q.   Suspects in the Quik Mart robbery?

7    A.   That's correct.

8    Q.   And what, if anything, did you observe involving a silver

9    Chevy Impala at that time?

10   A.   Actually observed it approaching us as we were heading down

11   the one street.   It was coming directly at us, and we both came

12   to a stop sign, where it was facing the intersection in front of

13   us.

14   Q.   And are you familiar with the individual known as Dayton

15   Poke?

16   A.   Just by name.

17   Q.   You wouldn't recognize him by sight?

18   A.   No, I would not.

19   Q.   And how about Clifford Horton?

20   A.   No.   Just again by name.

21   Q.   And what, if anything, happened after you saw the silver

22   Chevy Impala?

23   A.   I recognized the registration on the car as being the one

24   that we had been watching the night before.

25   Q.   While you were at the intersection, did Detective Pruitt

Nordberg - Direct

1    make any comments as to whether or not he knew the individual

2    that was driving the silver Chevy Impala?

3    A.   No, he did not.

4    Q.   And do you know whether or not Detective Pruitt worked the

5    Clifford Horton case at all?

6    A.   I do not know that.

7    Q.   What happened after that?

8    A.   I informed Detective Pruitt that that was the vehicle that

9    possibly Clifford Horton might be in, informed him that we had

10   watched it the night before, and that was the registration on

11   the silver Impala we'd been watching.

12   Q.   Did your intelligence regarding Clifford Horton driving

13   around with Dayton Poke in that silver Chevy Impala at some time

14   prior to July 6th of 2011 indicate whether or not -- I'm sorry.

15   I'll strike that question.

16            After you saw the vehicle, what happened?

17   A.   The vehicle made what would have been a left-hand turn in

18   front of us, and we turned right in behind it.

19   Q.   Okay.  You say you turned in -- was it into a parking lot?

20   A.   No.  It was traveling on -- I believe it would have been 8th

21   Avenue or 9th Avenue.  I'm not sure.  My report would have to

22   show the exact street.

23   Q.   Okay.  So, you proceeded to follow the vehicle?

24   A.   That's correct, as it headed east.

25   Q.   And at that time do you know were you driving, or was

## Nordberg - Direct

1    Detective Pruitt driving?

2    A.    Detective Pruitt was driving.

3    Q.    And was there any conversation between the two of you

4    regarding your intent with respect to this vehicle?

5              MR. KARNER:  Objection.  Their intent is irrelevant.

6              THE COURT:  How is it relevant?

7              MR. BYRD:  I believe it goes to the issue of why he was

8    pulled over.  It may, it may not.  I don't know what the answer

9    would be.

10             THE COURT:  I don't think their intent makes any

11   difference.

12             MR. BYRD:  Okay.

13             THE COURT:  You can certainly ask the officer what they

14   did, what they saw, but what was in their mind I don't think --

15             MR. BYRD:  I guess what I'm getting at, Judge, is if

16   the detective -- and I don't know -- were to say that there was

17   conversation to the effect of we need to pull this vehicle over

18   and see if it's Clifford Horton driving, that would go against

19   the idea that it was pulled over for turning into a residential

20   driveway without signaling.

21             MR. KARNER:  No, it wouldn't.

22             THE COURT:  I agree.

23             MR. BYRD:  All right.

24             THE COURT:  I'll sustain the objection.

25

Nordberg - Direct

1   BY MR. BYRD:

2   Q. Detective, so, you proceeded to follow the vehicle. What

3   happened after that?

4   A. When we turned in behind the vehicle, it made a quick turn

5   into a driveway just to the south off the avenue.

6   Q. When you say made a quick turn, can you tell me how much

7   time elapsed between your proceeding to follow the vehicle and

8   it making the turn?

9   A. Within less than half a block.

10   Q. So, it wasn't an instantaneous --

11        THE COURT: I've got to stop. The question that I

12   sustained an objection to, can you give me that question again?

13        MR. BYRD: Sure. It was whether or not you and

14   Detective Pruitt had any discussion about whether or not the

15   vehicle should be pulled over to determine whether or not

16   Clifford Horton was driving.

17        THE COURT: Okay. I'll sustain the objection.

18   BY MR. BYRD:

19   Q. So, I think my last question was it wasn't an instantaneous

20   as soon as you're behind him he whips into the driveway without

21   signaling, but rather it happened within a half a block?

22   A. Within a few seconds, yes.

23   Q. And you said that you met at an intersection facing each

24   other?

25   A. That's correct.

## Nordberg - Direct

1   Q.   And he proceeded through the intersection, or did he turn?

2   A.   He turned.

3   Q.   Okay.  So, he turned, and then you turned after him, got

4   right behind him?

5   A.   That is correct.

6   Q.   And about a half a block or so or within a half a block, he

7   made the left turn into the driveway?

8   A.   It would have been a right turn, but correct.

9   Q.   A right turn into the driveway.  And what, if anything, did

10  you do at that point?

11  A.   The vehicle didn't signal, and we activated -- well,

12  Detective Pruitt activated the emergency lights, and we

13  initiated a traffic stop on the vehicle.

14  Q.   Now, at the point in which that happened, did you receive

15  any communication indicating that the individuals that were on

16  foot after the armed robbery at the Quik Mart store had been

17  apprehended?

18  A.   No, we did not.

19  Q.   So, at the time you stopped this vehicle for a minor traffic

20  offense, two armed robbery suspects were still in the area, as

21  far as you knew?

22  A.   As far as we knew, yes.

23  Q.   Was there any concern about abandoning your search for two

24  armed robbery suspects in order to execute a petty traffic stop

25  for failing to signal?

Nordberg - Direct

1    MR. KARNER:  I object to this.  Any concern the

2    officers has goes to their subjective intentions, which is

3    irrelevant.

4    THE COURT:  I think it's irrelevant.  I'll sustain the

5    objection.

6    BY MR. BYRD:

7    Q.  So, you executed the traffic stop for failing to signal

8    turning in a residential driveway.  Can I ask you in the last

9    year how many traffic stops of that nature have you as a

10    detective had occasion to handle?

11    MR. KARNER:  I object.  That's irrelevant.

12    MR. BYRD:  It goes to his experience in executing

13    traffic stops.

14    MR. KARNER:  Experience in traffic stops is not

15    relevant here.

16    MR. BYRD:  It may come in when we get to the issue of

17    the evidence on the floorboard.

18    THE COURT:  All right.  Overruled.

19    BY THE WITNESS:

20    A.  In the last year?

21    BY MR. BYRD:

22    Q.  Yes.

23    A.  I would have to say -- I mean, well, you're asking turning

24    into a driveway for failure to signal?

25    Q.  For failing to signal.

Nordberg - Direct

1   A.   Five maybe.

2   Q.   Five in the last year.  Okay.  And after the -- all right.

3   The vehicle turned into the driveway and you activated your

4   lights, or how did that happen?

5   A.   It was Detective Pruitt driving.  So, I didn't.

6   Q.   And how did your vehicle position itself to execute the

7   traffic stop?

8   A.   A slight angle behind the vehicle where it was parked in the

9   driveway.

10  Q.   So, you would have been somewhat perpendicular to the

11  vehicle in order to block it from trying to escape?

12  A.   Well, it was pulled in behind it.  The intent wasn't to

13  block it.  It was just to pull in behind it.  Normal traffic

14  stop.

15  Q.   So, your vehicle was directly behind the vehicle in the

16  residential driveway facing the same direction?

17  A.   The driveway was short.  We're not in the driveway.  On the

18  street, but angled.

19  Q.   I'm sorry?

20  A.   The driveway was short -- we're not in the driveway.  We're

21  angled slightly behind it, partially on the street, partially on

22  the like curb.

23  Q.   All right.  And that would have put you closest to the back

24  end of that Chevy Impala, would it not?

25  A.   Yes, I suppose so.  Yes.

Nordberg - Direct

1    Q.   And I want to show you what's marked as Defendant's Exhibits

2    1 and 2 and ask you to take a look at those exhibits, and I'll

3    ask you if you recognize them

4    A.   I do recognize them

5    Q.   And what are they?

6    A.   The photographs of the silver Chevy Impala that was stopped.

7    Q.   And do those photographs fairly and accurately depict the

8    location that the vehicle came to a stop in that residential

9    driveway when the traffic stop was executed?

10   A.   Yes, it does.

11   Q.   And you cannot see your vehicle that you were driving or

12   that Detective Pruitt was driving and you were a passenger in

13   depicted in either of those two exhibits, can you?

14   A.   That's correct.

15   Q.   And you're saying it was an angle behind the vehicle?

16   A.   Correct.

17   Q.   And after the vehicle stopped, what did you do?

18   A.   I exited the squad, and I went to more the trunk on the

19   passenger side of the Impala.

20   Q.   And at the time that you stopped the vehicle, you can see

21   from Defendant's Exhibit 1 that there's some -- as well as two,

22   that there's some tinting on the windows?

23   A.   That's correct.

24   Q.   And looking at Exhibit 1, you can still make out,

25   notwithstanding the tint, the top part of the steering wheel in

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    that vehicle?

2    A.   That is correct.

3    Q.   So, it would still be possible to see silhouettes and

4    determine how many people might be in the front seat?

5    A.   That's correct.

6    Q.   And at the time the vehicle was stopped -- before it was

7    stopped, I should say, did you yourself determine how many

8    occupants were in the vehicle?

9    A.   Yes.

10   Q.   And how many were there?

11   A.   Just the driver.

12   Q.   All right.  And so, you approached up the passenger side?

13   A.   That's correct.

14   Q.   Just out of curiosity, why would you go to the passenger

15   side, as opposed to the driver's side?

16            MR. KARNER:   Objection as to his reasons.  Again, any

17   thought processes are irrelevant.

18            THE COURT:   I don't believe I can make that blanket

19   statement that any thought processes are irrelevant.  I'll

20   overrule the objection.

21   BY THE WITNESS:

22   A.   I approached as a cover officer.

23   BY MR. BYRD:

24   Q.   All right.  And a cover officer is to prevent escape or

25   provide protection to the other officer?

Nordberg - Direct

1    A.   That's correct.

2    Q.   That I assume is approaching the driver's side?

3    A.   Correct.

4    Q.   And that would have been Detective Pruitt?

5    A.   That is correct.

6    Q.   Can you tell me what happened as you approached the

7    passenger side?

8    A.   The driver attempted to get out.  Detective Pruitt told him

9    to get back in the car, and the driver continued to get out.  He

10   put up the window on the driver's side.  I was at the trunk

11   side, and he ended up -- the driver ended up standing completely

12   out of the vehicle, and that's when Detective Pruitt said 1032,

13   which means gun, police code.

14          And so, then I went around to the car, and the driver

15   had closed the door, Mr. Poke had closed the door and was

16   attempting to lock it with his key.  Detective Pruitt got ahold

17   of him, and that's when I attempted to grab his other hand and

18   pull away, but he was clenched up real tight --

19   Q.   Now, as you are the cover officer approaching the passenger

20   side of the vehicle, are you watching Detective Pruitt, as well

21   as keeping an eye on the individual in the vehicle?

22   A.   More so watching the vehicle, what's going on inside the

23   vehicle.

24   Q.   Meaning the individual that you testified to is trying to

25   get out of the vehicle?

## Nordberg - Direct

1    A.   That's correct.

2    Q.   Now, when that individual was trying to get out of the

3    vehicle, he would have been -- did he actually get out of the

4    vehicle, if you know?

5    A.   He did eventually, yes.

6    Q.   And if I understood correctly, you said that you heard

7    Detective Pruitt yell 1032?

8    A.   That's correct.

9    Q.   And you know that to be a gun?

10   A.   That's correct.

11   Q.   And do you know what the defendant or the driver of that

12   vehicle, what his position was at the time that Detective Pruitt

13   yelled 1032?

14   A.   I don't remember that exactly.

15   Q.   You said that right at the time he yelled 1032, he had ahold

16   of the defendant, meaning Detective Pruitt?

17   A.   The driver was getting out of the car, and I know Detective

18   Pruitt told him to get back in, and the driver was getting out,

19   and he had closed the door, and that's when Detective Pruitt

20   took ahold of him, as the driver was attempting to lock the

21   door.

22   Q.   All right.

23   A.   And he had already said 1032 then.

24   Q.   Okay.   So, the defendant was out of the vehicle?

25   A.   That's correct.

## Nordberg - Direct

1    Q.   And at the very least was in the process of getting out of

2    the vehicle when you heard 1032?

3    A.   Correct.

4    Q.   Where was Detective Pruitt, looking at Defendant's Exhibit

5    Number 2, when you saw the defendant get out of the vehicle and

6    Detective Pruitt had his hands on the individual?

7    A.   The driver's door had been opened, so kind of like a V, and

8    he was standing there at the V part of it.

9    Q.   Right at the --

10   A.   Like the door was fully opened.  So, you know, he had been

11   standing right in that area of the door where like the door --

12   end of the door is.

13   Q.   Okay.  So, the door would have been open, and Detective

14   Pruitt would have been at the backside of the door?

15   A.   Well, I don't know.  The outside hitch side of the door.

16   Q.   All right.

17   A.   The latch part of it.

18   Q.   Okay.  So, where the handle is.

19   A.   That's correct.

20   Q.   All right.  Looking at Defendant's Exhibit Number 2,

21   Detective Pruitt would have been standing near the handle to

22   open the front driver's side door?

23   A.   Correct.

24   Q.   But the door would have been open in a V?

25   A.   Yes.

Nordberg - Direct

1    Q.   And the defendant would have been standing up in that V

2    between the car and Detective Pruitt?

3    A.   Briefly he was, yes.

4    Q.   And Detective Pruitt had his hands on him?

5    A.   Not at the time.  It's when the defendant got out and closed

6    the door completely, and that's when he took hold of him

7    Q.   But they would have both still been standing near the back

8    of the door.

9    A.   That's correct.

10   Q.   Did you ever see Detective Pruitt prior to the defendant

11   getting out of the vehicle go up near what's called, based on

12   the last detective's testimony, the A pillar or the area of the

13   door near the rear view mirror?

14   A.   I don't recall him doing that.  I didn't pay total attention

15   to it.

16   Q.   It's your understanding, if I understand your testimony --

17   and I'm not trying to characterize it.  If I'm misstating,

18   please correct me.

19        Detective Pruitt would have approached from the rear of

20   the vehicle on the driver's side and would have encountered the

21   defendant, based on what you saw, somewhere near the back of the

22   door near the handle to open the passenger side door.

23   A.   As it appeared from my view, yes.

24   Q.   All right.  And you never saw him go to the front of the

25   vehicle or approach the vehicle from the front or go near the

## Nordberg - Direct

1   front wheel well or anything like that?

2   A.   I was not watching the whole time, but I did not see him go

3   that way.

4   Q.   All right.   After the individual got out of the car, you

5   heard 1032.   Maybe you heard it before he got out of the car.

6   What, if anything, happened after that?

7   A.   That's when I came around and met with Detective Pruitt, and

8   we were taking ahold of Mr. Poke.

9   Q.   And it was just you and Detective Pruitt there at that time?

10   A.   That's correct.

11   Q.   And the defendant was taken into custody?

12   A.   Yes, he was.

13   Q.   Now, at the time he was taken into custody, do you recall

14   him yelling anything about, you know, "Go easy on me, I've been

15   shot," or anything like that?

16   A.   He said he had been shot with an AK-47.

17   Q.   And do you know when or what was happening to him when he

18   said that?

19   A.   I do not.

20   Q.   What is the process that you and Detective Pruitt went

21   through when you went around to Detective Pruitt's side and

22   assisted him in securing the defendant?

23   A.   Mr. Poke is very tense, very tight, and we were trying to

24   put his hands and secure them behind his back.

25   Q.   All right.   So, the two of you were kind of wrestling to get

PDF created with pdfFactory trial version www.pdffactory.com

## Nordberg - Direct

1    his arms behind his back.  Is that about the time that he

2    yelled, "I've been shot with an AK-47"?

3    A.   That's correct.

4    Q.   And that was the statement, "I've been shot with an AK-47"?

5    A.   Yes.  Very close to that, at least.

6    Q.   Did you understand him to be protesting about the way his

7    arm was being pulled behind his back, and that's why he notified

8    you that he had been shot with the AK-47, so maybe you would go

9    easier on him?

10   A.   That's a possibility, yes.

11   Q.   All right.  After he was cuffed, at that point -- I'm sorry.

12   Strike that.

13          What was going on in the area at the time that you and

14   Detective Pruitt were taking the defendant into custody?  And by

15   that I mean was there other people that were on the scene,

16   civilians, anything like that?

17   A.   No, there was nobody in the driveway around the car or

18   anything at that time.

19   Q.   All right.  Nobody in the yard, nobody posing a threat to

20   officer safety, or anything like that?

21   A.   No.

22   Q.   It was just you, Detective Pruitt, and the defendant?

23   A.   Correct.

24   Q.   And it was, in fact, the defendant?

25   A.   Yes, it was.

Nordberg - Direct

1    Q.   Do you recognize him?

2    A.   Yes.

3    Q.   Do you see him in court today?

4    A.   Yes.

5    Q.   And he's the gentleman over there in the orange, isn't he?

6    A.   Yes, he is.

7           MR. BYRD:   Judge, can the record reflect the

8    identification?

9           THE COURT:   Yes.

10   BY MR. BYRD:

11   Q.   Okay.   So, does anybody call for backup?

12   A.   Detective Pruitt asked for more officers.

13   Q.   And approximately how long did it take for additional

14   officers to arrive?

15   A.   Less than a minute, I believe.

16   Q.   And do you know how many additional officers arrived on the

17   scene to assist in this arrest?

18   A.   There was two of the tac officers, and then I believe a

19   squad showed up.

20   Q.   The squad would have had one individual?

21   A.   One officer, yes.

22   Q.   And that's a squadrol van?

23   A.   No, it's a squad car.

24   Q.   A squad car.   So, at the time then that the defendant was

25   being arrested, there was at least three other officers there

PDF created with pdfFactory trial version www.pdffactory.com

**Nordberg - Direct**

1    besides you and Detective Pruitt.

2    A.   After he was in custody -- well, he was secured in handcuffs

3    at the time, and then they showed up.

4    Q.   And what happened to the defendant after he was placed in

5    handcuffs?

6    A.   He was placed in the back of the marked squad.

7    Q.   And in this situation would the squad car have been locked?

8    A.   Yes.

9    Q.   So, he would have been handcuffed and in the back of a

10   locked squad car?

11   A.   Correct.

12   Q.   Was there any individuals on the scene, civilians, that

13   would have posed any risk to officer safety at that point?

14   A.   No, there were not.

15   Q.   And you would agree that at that point there were five

16   officers on the scene.  Each of you would have had sidearms,

17   correct?

18   A.   That's correct.

19   Q.   And the defendant was locked in the back of the vehicle, the

20   squad vehicle?

21   A.   That's correct.

22   Q.   In cuffs?

23   A.   (Nodding.)

24   Q.   What, if anything, did you do after that?

25   A.   That's when we called for a camera.  The camera -- I don't

PDF created with pdfFactory trial version www.pdffactory.com

## Nordberg - Direct

1    remember how the camera got to the scene.   I believe a

2    supervisor had a camera and came to the scene.   Maybe it was

3    Sergeant Stevens, but I don't remember.

4    Q.   You remember Sergeant Stevens coming to the scene?

5    A.   Yes.

6    Q.   And do you know whether an individual by the name of Officer

7    Eric Jones came to the scene?

8    A.   Yes, he did.   He was one of the tac officers.

9    Q.   And do you know whether or not he was the one who took the

10   photographs?

11   A.   Yes, he did.

12   Q.   And these are the photographs that we're looking at today,

13   correct?

14   A.   That's correct.

15   Q.   I want to show you next what's marked as Defendant's

16   Exhibits 3 and 4 and ask you to take a look at those exhibits.

17   Do you recognize those?

18   A.   Yes, I do.

19   Q.   And can you tell us what Defendant's Exhibits 3 and 4 show?

20   A.   Three is a far shot looking underneath the driver's seat of

21   the Chevy Impala, and it shows the front barrel of the handgun,

22   along with a green towel.

23   Q.   And the front barrel is sticking out from underneath the

24   driver's front seat?

25   A.   That is correct.

Nordberg - Direct

1    Q.   And did you view the weapon yourself?

2    A.   Yes, sir, I did.

3    Q.   Did you take the weapon into possession yourself?

4    A.   Yes, I did.

5    Q.   Looking at Defendant's Exhibit 3, would you agree that

6    there's approximately three inches of the front barrel of that

7    handgun sticking out from under the seat?

8    A.   Approximately.

9    Q.   And you can also see a little bit of the trigger area?

10   A.   That is correct.

11   Q.   And there's also a green towel?

12   A.   Correct.

13   Q.   And it looks like some type of cord?

14   A.   Yes.

15   Q.   Were you the individual that conducted the search in this

16   case?

17   A.   Yes, I was.

18   Q.   Now, Defendant's Exhibit 3 is taken from a vantage point of

19   above the floorboard, seat, gun, towel, and cord, correct?

20   A.   Correct.

21   Q.   And it's a more wide angle view of the front floorboard?

22   A.   That is correct.

23   Q.   Exhibit Number 4 is more of a side view of the gun and

24   towel, and you can see the cord in there, as well?

25   A.   More of a -- kind of a front on looking underneath the front

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    driver's seat.

2    Q.   Now, did you watch Officer Jones take these photographs?

3    A.   No, I did not.

4    Q.   But looking at the photographs, would you agree that

5    Defendant's Exhibit 3 was taken from above by leaning into the

6    car and snapping the photo whereas Defendant's Exhibit 4 would

7    have required the photographer to get down low and take it at an

8    angle from a front-on view?

9    A.   Yes, I would.

10   Q.   When you went -- when did you go to retrieve the gun and

11   conduct the search?

12   A.   After the pictures taken.

13   Q.   After the pictures were taken.  Prior to the pictures being

14   taken, did you or anyone else at the scene manipulate the scene

15   in any way?  Move the gun, move the towel, anything like that?

16   A.   No, we did not.

17   Q.   That would be an absolute breach of department policy, would

18   it not?

19   A.   Yes, it would.

20   Q.   It would be a breach of department policy to manipulate the

21   scene in any way unless it was necessary for officer safety;

22   isn't that true?

23   A.   That's correct.

24   Q.   Now, do you recall there being a Sanyo Cricket cell phone

25   recovered from the front floorboard of that vehicle?

### Nordberg - Direct

1    A.   I know there was a cell phone recovered.  I don't know from

2    where.

3    Q.   Do you see that cell phone depicted anywhere in Defendant's

4    Exhibit 3 or 4?

5    A.   No, I do not.

6    Q.   Did you recover the cell phone?

7    A.   I do not recall.

8    Q.   Looking at Defendant's Exhibit 3, do you see this little

9    silver box that appears to be mounted on the dashboard?

10    A.   Yes, I do.

11    Q.   Do you know whether or not that's the Cricket Sanyo cell

12    phone?

13    A.   I do not know.

14    Q.   Does it appear to be from what you can see in the

15    photograph?

16    A.   It does not.

17    Q.   It does not look like a cell phone, correct?

18    A.   It does not.

19    Q.   And it's not on the floorboard?

20    A.   Correct.

21    Q.   So, you do not know where that Cricket Sanyo cell phone is,

22    but you know it's not in Defendant's Exhibit 3 or 4.

23    A.   I do not see it in the picture.

24    Q.   Do you know whether or not you saw it on the floorboard as

25    you were conducting the search of the vehicle?

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    A.   I do not recall seeing the phone in the car.

2    Q.   Okay.  And what was Detective Pruitt doing between the time

3    in which the stop was made and the defendant secured and the

4    time in which Officer Jones showed up to take these photographs?

5    A.   I do not know what his actions were.

6    Q.   Do you know if he was in the vehicle?

7    A.   He was not in the vehicle, but I don't know what his actions

8    were.

9    Q.   You don't know whether he was messing around with anything,

10   do you?

11   A.   He was not in the vehicle, no.

12   Q.   So, what happened after the photographs were taken?  You

13   began your search?

14   A.   And then recovery of the evidence.

15   Q.   And tell us what you did and what you recovered.

16   A.   I wore gloves and recovered the firearm and secured it in a

17   plastic bag.  Then I also during the search located several

18   baggies in the front center console with an off-white rocklike

19   substance that I also recovered.  They were all photographed.

20   Q.   At the time that the vehicle was stopped, did you believe

21   that that vehicle was involved in the shooting involving

22   Clifford Horton?

23   A.   Not the vehicle, no.

24   Q.   At the time that you located the firearm that's depicted in

25   Defendant's Exhibit 3 and 4, did you have reason to believe that

### Nordberg - Direct

1  that was the firearm used in the shooting involving Clifford

2  Horton?

3  A.   Other than it being a .40 caliber, no other connection.

4  Q.   Had a weapon been secured to match the bullets or the bullet

5  casings found at the scene of that murder?

6  A.   No, they were not.

7  Q.   Okay.  So, there was still a .40 caliber gun at large?

8  A.   That's correct.

9  Q.   And it could have been this gun?

10  A.   Yes.

11  Q.   But you had no reason to believe that the car was in any way

12  involved?

13  A.   Not at that time, no.

14  Q.   Okay.  After you located -- you said you found some white

15  rock substance in the center console?

16  A.   That's correct.

17  Q.   And you found the gun, obviously, that was recovered?

18  A.   Correct.

19  Q.   Any other contraband or items located in the vehicle at that

20  time?

21  A.   I do not believe so, no.

22  Q.   Now, at the time that Detective Pruitt yelled -- was it

23  1032?

24  A.   That's correct.

25  Q.   You said that you then immediately came around.  Did you

Nordberg - Direct

1   come around the front or the back of the vehicle?

2   A.   The back of the vehicle.

3   Q.   And that's when the defendant was taken into custody?

4   A.   That's correct.

5   Q.   After the evidence was recovered from the vehicle, what, if

6   anything, happened after that?

7          MR. KARNER:   Judge, I object.   This is irrelevant.

8   This is post-seizure.

9          MR. BYRD:   This gets into the time frame of the

10  impoundment.

11         MR. KARNER:   How is that relevant?

12         MR. BYRD:   Same reason it was relevant with the last

13  witness.

14         THE COURT:   It goes to any alternate theory that may be

15  generated by the evidence.   I'll overrule the objection.

16  BY MR. BYRD:

17  Q.   At the time that -- what happened after you completed your

18  search of the vehicle?

19  A.   After recovering the items from the vehicle, I know the

20  vehicle was impounded by another officer, and then we went down

21  to the Public Safety Building to process the evidence.

22  Q.   Do you know if yourself -- well, did you yourself ever go to

23  check with the owners of the residence to determine if it would

24  have been okay for that vehicle to be left there in the

25  driveway?

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    A.   I did not.

2    Q.   Do you know whether Detective Pruitt or any other officer

3    did?

4    A.   I do not know that.

5    Q.   Okay.  Did you have occasion to -- we know that you observed

6    the vehicle and had watched it the night before and then

7    searched through the vehicle.  My question is is there anything

8    about that vehicle that you noticed that led you to believe that

9    the vehicle was in any way incapable of being operated lawfully?

10   By that I mean expired registration, broken taillight, any type

11   of equipment violation that would have made it a violation of

12   the Illinois Vehicle Code to be driven on the roadway?

13   A.   No, I do not.

14   Q.   And the defendant was charged with what offenses, if you

15   know?

16   A.   I do not know exactly what his charges were.

17   Q.   You had nothing to do with the charging decision?

18   A.   No, it was not mine.

19   Q.   And after the defendant was -- did you remain on the scene

20   until he was taken by the squadrol back to the station?

21   A.   Very close to the same time, yes.

22           MR. BYRD:   May I have just a moment, Judge?

23       (Brief pause.)

24   BY MR. BYRD:

25   Q.   Thank you, Detective Nordberg.

Nordberg - Cross

1      MR. BYRD:  I'll pass the witness, your Honor.

2                    CROSS EXAMINATION

3  BY MR. KARNER:

4  Q.  When the car pulled into the driveway, it was your partner,

5  Detective Pruitt, who approached the driver's side?

6  A.  That's correct.

7  Q.  You remained at the back of the car?

8  A.  Correct.

9  Q.  So, Detective Pruitt was in a position to see whether or not

10  the defendant made a motion to reach underneath the driver's

11  seat?

12           MR. BYRD:  Objection, your Honor, as to his ability to

13  know what Detective Pruitt was in a position to see.

14           THE COURT:  He can testify as to his position.  He's

15  not testifying as to what he saw.  I'll overrule the objection.

16  BY THE WITNESS:

17  A.  Yes, he was in that position.

18  BY MR. KARNER:

19  Q.  Okay.  And he was also in a position to see the driver, the

20  defendant, roll up the driver's side window when you guys

21  approached?

22  A.  That's correct.

23  Q.  Did you see that?

24  A.  Yes, I did.

25  Q.  Did you see him reach underneath the seat?

## Nordberg - Cross

1  A.  I saw him reaching down, yes, I did.

2  Q.  Okay.  And then that's when the defendant opened the door

3  and tried to get out of the car?

4  A.  That's correct.

5  Q.  Officer Pruitt, he was wearing clothing that identified

6  himself as a police officer, was he not?

7  A.  That is correct.

8  Q.  What type of clothing?

9  A.  It's a police raid vest or a large raid bulletproof vest

10  that says police on it.  It has the large police on the back and

11  a badge symbol.

12  Q.  And, of course, your squad car lights were activated at the

13  time, too?

14  A.  That's correct.

15  Q.  And when the defendant tried to get out of the car,

16  Detective Pruitt ordered him to get back in the car?

17  A.  That's correct.

18  Q.  And the defendant did?

19  A.  No, he did not.

20  Q.  He refused that command?

21  A.  That's correct.

22  Q.  He continued to get out of the car?

23  A.  That is correct.

24  Q.  And was Detective Pruitt standing alongside the driver's

25  side looking down in the passenger compartment when the

Nordberg - Cross

1    defendant got out of the car?

2    A.    That is correct.

3    Q.    Detective Pruitt asked the defendant why he wouldn't stay

4    inside the car?

5    A.    That's correct.

6    Q.    Defendant said that he was getting ready to go inside his

7    house and started to step out of the car again?

8    A.    That is correct.

9    Q.    And then it's at this point when Detective Pruitt yelled out

10   to you 1032?

11   A.    That's about the right time, yes.

12   Q.    And that's the code for there's a gun here?

13   A.    That's correct.

14   Q.    The defendant was able to quickly shut the driver's side

15   door?

16   A.    Yes, he did.

17   Q.    Did it appear to you that the defendant was trying to

18   conceal something from you?

19   A.    I've never seen anybody do that before.  So, yes.

20   Q.    It was at this time Detective Pruitt ordered the defendant

21   to turn around and place his hands behind his back?

22   A.    Correct.

23   Q.    And that's when the defendant said, "Look, man.  I was shot

24   by an AK-47"?

25   A.    Well, at the time we were trying to get his hands behind his

PDF created with pdfFactory trial version www.pdffactory.com

## Nordberg - Cross

1    back, and he was very resistive.

2    Q.   And the defendant said, "Look, man.  I was shot by an

3    AK-47"?

4    A.   That's correct.

5    Q.   And he tensed up and refused to place his hands behind his

6    back, right?

7    A.   That is correct.

8    Q.   The defendant is a large man, isn't he?

9    A.   Yes, he is.

10   Q.   Based on his refusal to be handcuffed, did you take any

11   action to summon more police officers to the scene so you could

12   be safe?

13   A.   Detective Pruitt had done that.

14   Q.   What did he do?

15   A.   Used his radio and asked for more units.

16   Q.   Okay.  And then it took both you and Pruitt, both of you, to

17   get the defendant finally subdued into handcuffs?

18   A.   Correct.

19   Q.   After that, he refused to hand over the driver's side key

20   when asked to do so?

21   A.   That is correct.

22   Q.   Or I should say the car key.

23   A.   The car key, yes.

24   Q.   But he eventually released the key from his hand after being

25   ordered to do so several times?

Nordberg - Cross

1    A.   Correct.

2    Q.   Now, if a phone was on the floorboard and determined

3    initially to be personal property, would it necessarily have had

4    to be kept in place along with the gun?

5    A.   No, not necessarily.

6    Q.   Okay.  And that wouldn't necessarily run afoul of

7    departmental policy?

8    A.   I don't see where it would if it's not evidentiary.

9    Q.   Later on do you recall the defendant saying that the car did

10   not belong to him?

11   A.   Yes, I did.

12   Q.   Pardon?

13   A.   Yes, I do.

14   Q.   Okay.  And did he also tell you he did not know anything

15   about what was inside the car?

16   A.   That's correct.

17   Q.   And he refused to tell you officers who the car belonged to

18   or who he borrowed the car from?

19   A.   That is correct.

20   Q.   Now, did he make those statements to you before or after you

21   searched the car?

22   A.   After.

23   Q.   Pardon?

24   A.   It was after.

25   Q.   And did he admit to you that he did not live at the address

Nordberg - Redirect

1    where the car was parked?

2    A.   That's correct.

3              MR. KARNER:   I have nothing further.

4                       REDIRECT EXAMINATION

5    BY MR. BYRD:

6    Q.   Detective Nordberg, if I understood you correctly, you said

7    that a cell phone would not be evidentiary in a drug case?

8    A.   At the time I didn't know it was a drug case.

9    Q.   I thought you had recovered drugs?

10   A.   Well, he was asking at the time the pictures were taken.

11   Q.   Okay.  You said that you weren't aware of any procedural

12   policy that removing the cell phone from the crime scene would

13   have violated.  Are you familiar with General Order 60.02,

14   entitled crime scene processing?

15   A.   Yes.

16   Q.   I'm going to show you what's marked as Defendant's Exhibit

17   Number 8 and ask you if you recognize that exhibit as being

18   General Order 60.02.

19   A.   Yes, it is.

20   Q.   If you could turn to the Post-It note marked page.  This is

21   the appendix that discusses a portion of that policy on

22   preservation of evidence and property?

23   A.   Yes.

24   Q.   Both evidence and property, correct?

25   A.   Correct.

Nordberg - Redirect

1   Q.   And if you look at C -- I'm sorry.   "A" discusses protecting

2   the crime scene.   Subletter C, do not disturb.   Isn't it true,

3   and feel free to read through that, that the department policy

4   is not to remove anything from the scene that does not pose a

5   valid officer safety issue?

6   A.   As a guide, yes, it is.

7   Q.   It's not just a guide.   That's a policy, isn't it?

8   A.   But this is the guide part of the policy.

9   Q.   Okay.

10  A.   There's always exceptions.   As it says here, it's a guide to

11  identification.

12  Q.   Okay.   But it's incorporated into the general order.

13  A.   As the appendix, yes.

14  Q.   And is there anything about the presence of a Sanyo Cricket

15  cell phone located in the floorboard of a secure crime scene

16  that would have posed a safety issue --

17  A.   No, there's not.

18  Q.   -- requiring the cell phone to be removed?

19  A.   No, there's not.

20  Q.   So, would you agree then that if, in fact, that gun -- I'm

21  sorry.   Not the gun.   If, in fact, the cell phone had been

22  removed, it would be a violation of the General Order 60.02?

23  A.   I don't know that for sure.   I don't know why it was

24  removed.

25  Q.   Okay.   Do you know if it was removed?

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Redirect

1   A.   No, I do not know.

2   Q.   But you agree it's not depicted in the photographs that were

3   taken before the search?

4   A.   It is not in those photographs.  That's correct.

5   Q.   And you don't recall from your search of the vehicle where

6   it was?

7   A.   I do not recall.  It would be in Pruitt's report, but I do

8   not recall it.

9   Q.   You didn't remove the cell phone, did you?

10  A.   Not that I recall, no.

11  Q.   Did you see Detective Pruitt remove the cell phone?

12  A.   I do not recall that.

13  Q.   After the gun was recovered -- at the time that the gun was

14  recovered, you had probable cause to believe that the offense of

15  unlawful use of weapons had been committed, correct?

16  A.   Correct.

17  Q.   Because it's always, no matter whether you have a FOID card

18  or not, unlawful to drive with a gun stuck up under your seat.

19  A.   That's correct.

20  Q.   And you recovered the gun, I assume, first?

21  A.   Yes, I did.

22  Q.   I'm sorry?

23  A.   Yes, I did.

24  Q.   So, that would have been the first step you took is to

25  recover that gun?

Nordberg - Redirect

1    MR. KARNER:   Judge, this is beyond the scope.

2    MR. BYRD:   I believe it's going to link up to the issue

3    of whether or not the cell phone's evidence at the time that he

4    initiates the search.

5    MR. KARNER:   I don't know how discussion of the handgun

6    has anything probative to do with the cell phone.

7    MR. BYRD:   My next question is why after the gun was

8    recovered did he continue to search the vehicle, and my guess is

9    an answer might be to see if there's any drugs or other evidence

10   of a crime.   We've all heard in numerous -- just about every

11   case that involves cell phone and drugs that the two go hand in

12   hand.   I just want to establish that for the record, if I can.

13   I think it's relevant.

14   THE COURT:   All right.   I agree.

15   BY MR. BYRD:

16   Q.   After you secured the handgun, why did you continue to

17   search if the defendant was secure in a squad car and there was

18   no one else around to get into the passenger compartment of the

19   car?

20   A.   It's a search incident to arrest.   Once you recover the gun,

21   you can search the area.

22   Q.   Okay.   And you're familiar with the search incident to

23   arrest exception?

24   A.   Yes.

25   Q.   And are you familiar with United States v. Gant?

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Redirect

1 A. I know the name.

2 Q. All right. Do you know whether or not in a search incident

3 to arrest you are only allowed to search an unoccupied vehicle

4 if, in fact, that search is expected to yield results or fruits

5 of a crime?

6 A. Okay.

7 Q. And, in particular, after Gant, the crime of arrest.

8 A. Sure.

9 Q. You had the gun. Do you know if the gun was loaded?

10 A. I do not recall at this time.

11 Q. You don't know. Is there anything that would refresh --

12 A. My report. Or Detective Pruitt's report would have it.

13 Q. Okay. You didn't author Detective Pruitt's report, though?

14 A. I'm sorry?

15 Q. You didn't author Detective Pruitt's report?

16 A. No, I did not.

17 Q. I'll take a stab at it. I'll show you what's been marked as

18 Defendant's Exhibit Number 9 and ask you if you recognize that

19 exhibit.

20 A. That's a copy of Detective Pruitt's report.

21 Q. Okay. Please take a look at it and let me know if and when

22 your recollection is refreshed.

23 A. It's refreshed.

24 Q. Is your recollection refreshed?

25 A. Yes.

Nordberg - Redirect

1    Q.   Was the gun loaded?

2    A.   Yes.

3    Q.   So, it had a clip and rounds in the clip?

4    A.   Yes, it did.

5    Q.   At that point you had stopped the defendant for turning into

6    a residential driveway, and you had located and secured a

7    firearm that would have been an unlawful use of weapons.   The

8    scene was secure.   You agree with all of that?

9    A.   Yes.

10   Q.   Why did you need to search the vehicle?   What were you

11   hoping to discover?

12   A.   Well, the vehicle was going to be impounded.   So, we'd

13   probably search it for that reason then, too, its impound

14   search.

15   Q.   Well, you said probably.

16         MR. KARNER:   Judge, again, the officer's subjective

17   intentions on why he continued to search are irrelevant here.

18         MR. BYRD:   Well, I guess now it's relevant to the issue

19   of whether or not he was conducting an inventory search or, as

20   he testified to a moment ago, search incident to lawful arrest.

21   There's a difference in how far they can go in each of those

22   situations.

23         MR. KARNER:   Except the defendant's testimony -- or I'm

24   sorry -- the witness' testimony about what he chose is not

25   controlling.   That's the court's determination to make, whether

## Nordberg - Redirect

1    or not it was objectively legally justified, and his subjective

2    ideas are irrelevant.

3              MR. BYRD:  Then it's relevant on the issue of whether

4    or not the cell phone was or was not evidence, depending on

5    whether or not his reason to continue to search was to look for

6    drugs.

7              THE COURT:  I'll allow the question to stand.

8    BY MR. BYRD:

9    Q.   You can go ahead and answer.

10   A.   Please repeat the question.

11   Q.   You had the gun in your possession.  You had the ammo and

12   the clip in the gun.  The defendant was secure.  The scene was

13   secure.  Why did you continue to search?

14   A.   Probably the next step would be as an inventory search.

15   Q.   Okay.  You said probably.  You're the one searching.  It

16   either was or wasn't an inventory search.

17   A.   Well, the next step would be an inventory search then.

18   Q.   So, your earlier answer that you were searching incident to

19   lawful arrest really wasn't the correct answer?  It was an

20   inventory search?

21   A.   Well, it started out once we see the gun, we recover that as

22   a search.  He's secured.  The crime scene is secured.  So, then

23   we're going to impound the vehicle, and it will be an inventory

24   search.

25   Q.   So, you're saying that the decision had been made to impound

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Redirect

1   the vehicle at that point?

2   A.   Well, if Sergeant Stevens was on scene, he would have

3   decided that, yes.

4   Q.   And did you hear him decide that and say conduct an

5   inventory search now that you've secured the gun?

6   A.   Well, he wouldn't have told me to do that, but that's just

7   standard procedure.

8   Q.   Would he have told you, "I've made the decision to impound

9   this vehicle.  Do an inventory search"?

10  A.   No.   He would have said impound the vehicle.

11  Q.   All right.   So, from the point where you recovered the gun,

12  your testimony is the rest of the search, in particular the

13  search that led to the discovery of the cocaine, was conducted

14  as an inventory search because Detective Stevens had authorized

15  the vehicle to be impounded?

16  A.   That's correct.

17  Q.   You said that the defendant is a large man.   You testified

18  in Mr. Karner's cross examination that the defendant's a large

19  man?

20  A.   That's correct.

21  Q.   And if I understood from your earlier testimony, the large

22  man, the defendant, would have been standing in that V between

23  Detective Pruitt and the handgun that had maybe three inches of

24  the barrel sticking out from under the driver's seat on the

25  floorboard, correct?

Nordberg - Redirect

1    A.   At one point it would have been, yes.

2    Q.   And if I understood, you said earlier that you never saw

3    Detective Pruitt go to the front of the vehicle or near the A

4    pillar or the rear view side mirror?

5    A.   I didn't see where exactly he was each time, no.

6    Q.   But when you heard 1032, he was standing, if I understood

7    your testimony, at the back of the door near the handle with the

8    defendant standing in the V, which would have put Detective

9    Pruitt -- or would have put the defendant between Detective

10   Pruitt and the handgun?

11   A.   That's correct.

12   Q.   You said that --

13           MR. KARNER:   Judge, again, this is going beyond the

14   scope.

15           MR. BYRD:   I'm directing him to the very questions

16   Mr. Karner asked him in cross.   He said he was a large man.

17           MR. KARNER:   Well, the fact that I used those words

18   doesn't necessarily mean he can re-go into the --

19           THE COURT:   I think it has to do with the same issues.

20   BY MR. BYRD:

21   Q.   Detective Nordberg, Mr. Karner asked you about seeing the

22   defendant reach down.   Do you remember that?

23   A.   Yes.

24   Q.   And when exactly did you see him reach down?   Was it after

25   he turned into the driveway?

### Nordberg - Redirect

1    A.   Well, yes.

2    Q.   So, would it have been when you were getting out and

3  approaching the passenger side?

4    A.   That's correct.

5    Q.   And then you said, you testified that as he was trying to

6  get out of the car, he rolled his window up?

7    A.   That's correct.

8    Q.   There would be nothing unusual about an individual rolling

9  their window up if, in fact, they intend to go into the house,

10  would there?

11    A.   At a traffic stop it's a little unusual, but no, not in

12  general.

13    Q.   And the defendant did, in fact, tell you that he was

14  planning on going inside the house?

15    A.   Correct.

16    Q.   And at the time that the search was conducted, the defendant

17  was arrested, you didn't have any information to believe that he

18  wasn't welcome inside that house, did you?

19    A.   No.

20    Q.   He refused -- you testified he refused to tell you who owned

21  the vehicle.

22    A.   Correct.

23    Q.   Now, that didn't hamper your investigation any, did it?

24    A.   No, it did not.

25    Q.   Because you were able to run his plates and get the

Nordberg - Redirect

1   registered owner of the vehicle through LEADS?

2   A.   That's correct.

3   Q.   And if I understood your testimony when Mr. Karner was

4   asking you questions, you said that the defendant, after he got

5   out of the car, appeared as if he was trying to conceal

6   something?

7   A.   Yes.

8   Q.   Did I understand that correctly?

9   A.   Yes.

10  Q.   That was after he got out of the car?

11  A.   That's correct.

12  Q.   And do you know what, if anything, he was trying to conceal?

13  A.   I do now, yes.

14  Q.   What was it?

15  A.   That gun.

16  Q.   What was it he was doing after he was out of the car that

17  would be indicative of trying to conceal something?

18  A.   Close the door and secure the vehicle.

19  Q.   If an individual is going into the house, would it be common

20  for him to leave the door open?

21  A.   No.

22  Q.   The window down?

23  A.   He wasn't allowed in the house, not during a traffic stop.

24  Q.   Now, this traffic stop, were you in an unmarked or a marked

25  vehicle?

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Redirect

1   A.   Unmarked.

2   Q.   Are there lights?

3   A.   Yes.

4   Q.   Were the lights activated?

5   A.   Yes, they were.

6   Q.   But he wasn't trying to conceal anything on his person?

7        MR. KARNER:   Objection.   He's asking him to speculate

8   as to what the defendant was trying to do.

9        MR. BYRD:   Let me rephrase.   I'll withdraw the

10  question.

11  BY MR. BYRD:

12  Q.   The defendant wasn't making any actions once he was out of

13  the vehicle that would have led you to believe he was trying to

14  conceal something on his person, was he?

15  A.   He had clenched fists.   I didn't know what was inside each

16  fist.

17  Q.   You never found out what was inside of his fists?

18  A.   Afterwards, yes.   The car keys were inside one.

19  Q.   But you didn't find anything on the defendant that would

20  constitute contraband?

21  A.   No.

22  Q.   So, you don't have any reason to believe he was trying to

23  conceal contraband on his person?

24       MR. KARNER:   Objection.   Calls for speculation.

25       MR. BYRD:   I'll withdraw the question.   One moment,

Nordberg - Redirect

1   please.

2       (Brief pause.)

3   BY MR. BYRD:

4   Q.  Detective Nordberg, based on your surveillance of that

5   silver Chevy Impala the night before, you were fully aware at

6   the time of the defendant's arrest who that car belonged to,

7   were you not?

8   A.  Not at the time of his arrest, but afterwards, yes.

9   Q.  So, during the surveillance the night before, you didn't run

10   plates?

11   A.  Oh, I apologize.  Yes, I was aware then of the registered

12   owner of the vehicle, yes.

13   Q.  All right.  So, you would have been aware, even probably

14   before you pulled the vehicle over that day, who it belonged to?

15   A.  Yes, I would have known on the 5th.

16   Q.  All right.  So, you were asking the defendant for what

17   reason?  Just to see if he's cooperative?

18   A.  Well, he's not -- does he know who the car is.  We don't

19   know if it's stolen or not.  So, you ask who is the owner of

20   this car, since it's not coming back to him or any relation to

21   him

22   Q.  You didn't have any reason to believe that the car had been

23   reported stolen.

24   A.  No, I did not.

25   Q.  That would have been come back on a LEADS check?

Nordberg - Recross

1   A.   It would have, yes.

2   Q.   And just so the record's clear, LEADS is the law enforcement

3   data system that allows you to route to Springfield with the

4   license plate number and get back all the registration

5   information?

6   A.   That's correct.

7   Q.   Thank you, Detective.

8        MR. BYRD:   I'll pass the witness, your Honor.

9                    RECROSS EXAMINATION

10  BY MR. KARNER:

11  Q.   Well, the presence of the gun would have led you to look for

12  other evidence in the car, correct?

13  A.   That's correct.

14  Q.   Like bullet evidence?

15  A.   Yes.

16  Q.   Like a holster?

17  A.   Correct.

18  Q.   Like documents with Dayton Poke's name on it?

19  A.   Yes.

20  Q.   You also know from your experience that guns and drugs go

21  together, don't they?

22  A.   Yes, they do.

23  Q.   So, the presence of a gun in the car would lead a reasonably

24  prudent officer to believe there might be drugs in the car, too?

25  A.   That's correct.

## Nordberg - Further Redirect

1  Q.   Okay.

2          MR. KARNER:   Nothing further.

3          MR. BYRD:   Just one question.  Or two, actually.

4                    FURTHER REDIRECT EXAMINATION

5  BY MR. BYRD:

6  Q.   So, if you saw the presence of the gun to be probable cause

7  to believe there might be drugs in the car, you know that -- to

8  take Mr. Karner's last question one step further, drugs and guns

9  go hand in hand, but so do cell phones, correct?

10 A.   Correct.

11 Q.   So, that would, in fact, at the time you first saw the

12 weapon would lead you to conclude that the cell phone might, in

13 fact, be evidence in this case?

14 A.   Well, that would be correct, yes.

15 Q.   Because if there are drugs, you might get contacts off of

16 that cell phone?

17 A.   That's correct.

18 Q.   And that might lead you to bigger dealers or people being

19 dealt to?

20 A.   Correct.

21 Q.   So, was this -- based upon your last answer to Mr. Karner's

22 question, your continued search, was it an inventory search, or

23 was it a search incident to lawful arrest?

24          MR. KARNER:   Objection as to asking the witness to

25 characterize a legal theory.  That's for the court to decide.

1    That's a legal conclusion.

2            MR. BYRD:  Well, Judge, he already gave the answer --

3    well, he gave both answers.  First it was a search incident to

4    lawful arrest.  Then later it became an inventory search after

5    Sergeant Stevens.  Now it seems he's back to search incident to

6    lawful arrest.  I'm just trying to nail it down.

7            MR. KARNER:  Well, nailing it down, it doesn't matter

8    what this witness' theory was.  It's what the court determines

9    the legal justification was.

10           THE COURT:  I agree.  The officer's subjective intent

11   is not relevant.

12           MR. BYRD:  All right.  Then thank you.  That's all I

13   have.

14           MR. KARNER:  I have nothing further.

15           THE COURT:  You may step down.

16       (Witness excused.)

17           THE COURT:  How many more witnesses do you have?

18           MR. BYRD:  I'm sorry?

19           THE COURT:  How many more witnesses do you have?

20           MR. BYRD:  I believe I have four -- or no.  Three.  But

21   I don't know that I'll need to get to all three of them  My

22   next witness is Detective Pruitt.

23           THE COURT:  All right.  Let's take 15 minutes.  Let's

24   start again at 20 after 4:00.

25           MR. BYRD:  Thank you, your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

Jones - Direct

1    (Brief recess.)

2          MR. BYRD:   Judge, when they bring the defendant out, if

3    I could speak to him for one second.   I may have two witnesses,

4    but there are also two other witnesses who are detectives that

5    if he authorizes I'd like to release so they can get out of

6    here.

7          THE COURT:   Sure.

8    (Brief pause.)

9          MR. BYRD:   Judge, my next witness is going to be

10   Officer Eric Jones.

11   (Brief pause.)

12   (Witness duly sworn.)

13         THE COURT:   Please take a seat at the witness stand.

14         ERIC JONES, DEFENDANT'S WITNESS, SWORN

15              DIRECT EXAMINATION

16   BY MR. BYRD:

17   Q.   Good afternoon, sir.   Can you state your name, please?

18   A.   Sure.   It's Eric Jones.

19   Q.   And how are you employed?

20   A.   Rockford Police Department.

21   Q.   And were you employed with the Rockford Police Department on

22   July 6th, 2011?

23   A.   Yes, I was.

24   Q.   Did you have occasion to be dispatched to a scene in order

25   to take photographs of a silver Chevy Impala?

PDF created with pdfFactory trial version www.pdffactory.com

**Jones - Direct**

1    A.   Yes.

2    Q.   And did you, in fact, go to the scene and take photographs?

3    A.   Yes.

4    Q.   I want to show you what's marked as Defendant's Exhibits 1,

5    2, 3, and 4 and ask you if you could take a look at those

6    exhibits.  Do you recognize those exhibits?

7    A.   Yes, I do.

8    Q.   And can you tell us what those exhibits are?

9    A.   Exhibit 1 is a Chevy Impala with license plates of L,

10   Lincoln, 215852.  Exhibit Number 2 is the same vehicle taken

11   from the driver's side of the same Chevy Impala.  Exhibit 3 is

12   the interior driver's side of the Chevy Impala with a black

13   handgun sticking out in the driver's side seat by a green towel.

14   And Exhibit 4 is a closer shot of the handgun with a green

15   towel.

16   Q.   And are these photographs that you took on the evening of

17   July 6th, 2011?

18   A.   Yes.

19   Q.   Do you recall specifically taking these photographs?

20   A.   Yes.

21   Q.   Do they fairly and accurately depict the scene as you

22   observed them at the time you took the photographs that day?

23   A.   Yes.

24   Q.   I'm going to talk about first Defendant's Exhibits 3 and 4.

25   And you would agree that those are two shots that you took of

PDF created with pdfFactory trial version www.pdffactory.com

## Jones - Direct

1   the driver's side floorboard of that Chevy Impala?

2   A.   Yes.

3   Q.   And specifically Defendant's Exhibit 3 would have been

4   somewhat of an overhead shot showing the few inches of the

5   handgun barrel and trigger area sticking out from under the

6   front driver's seat?

7   A.   Yes.

8   Q.   So, at the time you took that photograph, can you tell us

9   how you positioned yourself to take it?

10  A.   I don't recall my exact position, but --

11  Q.   Would you agree that given what's depicted in the

12  photograph, you would have leaned in and taken the shot from

13  above?

14  A.   Oh, yes, I was above.

15  Q.   Does Defendant's Exhibit 3 depict the majority or all of the

16  front driver's seat floorboard area?

17  A.   Except where the pedal area is that -- you can't see that in

18  the picture, but yes.

19  Q.   Now, you were sent to the scene to photograph evidence,

20  correct?

21  A.   No.

22  Q.   Okay.   Once you arrived, you were asked to photograph

23  evidence?

24  A.   Yes.

25  Q.   And this would have been an example of you photographing

**Jones - Direct**

1    evidence.  In this particular situation the gun?

2    A.  Yes.

3    Q.  Defendant's Exhibit 4 is the same firearm, and you would

4    agree that to take that photograph, the vantage point appears to

5    be you would have knelt down or stooped down near the door area

6    and shot the photograph from a side angle?

7    A.  Yes, that's correct.

8    Q.  Do you recall taking any photographs of a Cricket Sanyo cell

9    phone that evening?

10   A.  I don't recall.  I took several photos that evening of the

11   vehicle and the evidence that Detective Nordberg pointed out to

12   me.

13   Q.  Did you see a Cricket Sanyo cell phone, if you recall?

14   A.  I don't recall.

15   Q.  You would agree that there does not appear to be a Cricket

16   Sanyo cell phone depicted in Defendant's Exhibit 3 in that

17   driver's side floorboard, correct?

18   A.  Yes, I do not see one in 3.

19   Q.  And you do see a silver boxlike item mounted -- it appears

20   to be mounted on the dashboard somewhere?  Specifically that

21   item?

22   A.  Yes, I do.

23   Q.  And does that appear to be a Cricket Sanyo cell phone?

24   A.  I don't know what that is.

25   Q.  You would agree that it is not laying in the floorboard?

Jones - Direct

1  A.   No.   It's attached to the dash.

2  Q.   At the time that you were at the scene, did you manipulate

3  any of the items prior to taking photographs of the scene?

4  A.   No, I did not.

5  Q.   So, you did not move or remove a Cricket Sanyo cell phone?

6  A.   No, sir.

7  Q.   You did not pull that gun just a little bit out from under

8  the seat, did you?

9  A.   No, sir.

10  Q.   That's not something you would ever do?

11  A.   No, sir.

12  Q.   And in Defendant's Exhibit 4, do you see any Cricket Sanyo

13  cell phone in there?

14  A.   No, sir.

15  Q.   And in case I forgot, if I asked this question, these fairly

16  and accurately depict the photos, four of the photos, that you

17  took that night?

18  A.   Four of the photos I took that night.   That's correct.

19          MR. BYRD:   Thank you, Officer.   I'll pass the witness

20  your Honor.

21          MR. KARNER:   No questions.

22          THE COURT:   You may step down.   Thank you for your

23  help.

24      (Witness excused.)

25          THE COURT:   Next witness.

### Pruitt - Direct

1    MR. BYRD:  Your Honor, at this time I would call

2  Detective Maurice Pruitt.

3      (Brief pause.)

4      (Witness duly sworn.)

5        MAURICE PRUITT, DEFENDANT'S WITNESS, SWORN

6           DIRECT EXAMINATION

7  BY MR. BYRD:

8  Q.  Good afternoon, sir.  Would you state your name, please?

9  A.  Maurice Pruitt.

10 Q.  And how are you employed?

11 A.  Detective, City of Rockford Police.

12 Q.  Detective Pruitt, were you so employed on July 6th of 2011?

13 A.  Yes.

14 Q.  On that day did you have occasion sometime in the area of

15 5:25 in the evening to get dispatched or travel to the scene of

16 an armed robbery at the Quik Mart store on 7th Street and 12th

17 Avenue in the City of Rockford?

18 A.  Yes.

19 Q.  And who were you with?

20 A.  I was with Detective Kevin Nordberg.

21 Q.  And were you driving the squad car?

22 A.  Yes.

23 Q.  And he was your passenger?

24 A.  Yes.

25 Q.  You're a plainclothes detective, correct?

Pruitt - Direct

1    A.   At that time, yes.

2    Q.   That means you would have just been in -- how were you

3    dressed?

4    A.   I was dressed in -- it would have been jeans, casual shirt.

5    I was wearing also a protective bulletproof vest.

6    Q.   And do you remember how Detective Nordberg was dressed?

7    A.   It would have been similar.

8    Q.   Similar.  And so, you're in street clothes, but you have the

9    protective vest.  Is that because you're en route to investigate

10   an armed robbery?

11   A.   That was because we were actively patroling the streets that

12   day.  Regardless of the call, we were out patroling.

13   Q.   All right.  Now, at the time that you and Detective Nordberg

14   are -- do you recall were you dispatched to the Quik Mart or --

15   A.   We heard the broadcast of the armed robbery at Quik Mart

16   store, and we responded to the area.

17   Q.   All right.  So, detectives don't get dispatched like street

18   officers do.  You just made the decision to go to the scene and

19   help?

20   A.   That's correct.

21   Q.   And what specifically were you and Detective Nordberg doing

22   to assist in the Quik Mart armed robbery investigation?

23   A.   At that time we were just driving around the area to see if

24   we -- it was a broadcast two black males.  So, we were just

25   driving around the area, see if we saw anything that matched

PDF created with pdfFactory trial version www.pdffactory.com

Pruitt - Direct

1    whatever the broadcast was as far as descriptions.

2    Q.   And the broadcast included that those individuals fled the

3    area on foot?

4    A.   That's correct.

5    Q.   Are you familiar with an individual by the name of Dayton

6    Poke?

7    A.   Yes.

8    Q.   At the time that you were involved in the Quik Mart store

9    investigation, were you aware of Mr. Poke from previous contacts

10   you've had with him?

11   A.   Not from -- I was aware of him from past police

12   investigations, but not directly.

13   Q.   You knew what he looked like?

14   A.   I didn't know what he -- I did not know what he looked like

15   at the time.

16   Q.   Okay.  So, you knew the name, but not the individual?

17   A.   Yes, that's correct.

18   Q.   Was there any reason that you had to believe that Dayton

19   Poke was involved in the Quik Mart store armed robbery that day?

20   A.   No.

21   Q.   Was there any reason you had to believe that Dayton Poke was

22   involved in a murder investigation involving Clifford Horton?

23   A.   No.

24   Q.   Did you yourself work the Clifford Horton investigation?

25   A.   No.

### Pruitt - Direct

1   Q.  What, if anything, happened while you and Detective Nordberg

2   were in the Quik Mart store vicinity?

3   A.  We were checking the area in my police vehicle.  We were

4   stopped on 8th Street facing northbound at the stop sign at 8th

5   Street and 10th Avenue.  That's when we noticed a silver Chevy

6   Impala facing southbound on 8th Street and 10th Avenue at the

7   stop sign.  Detective Nordberg brought to my attention that the

8   vehicle matched the same vehicle -- the license plate of the

9   same vehicle that he and other detectives had performed

10   surveillance on the night before.  He told me that the

11   information was that Dayton Poke and Clifford Horton were

12   seen -- supposed to be driving around in his car, were seen

13   together in his car matching that same description.

14   Q.  When you saw the individual in the silver Chevy Impala, if I

15   understood correctly, you were facing each other at a four-way

16   intersection?

17   A.  That's correct.

18   Q.  And were you able to see inside the interior of that vehicle

19   as you faced it?

20   A.  Yes, but I don't really recall paying too much attention to

21   the driver at the time.  I was just -- you know, not until he

22   had started talking about what had happened the day before, as

23   far as surveillance.

24   Q.  That's when he said something to the effect of hey, I

25   recognize that car.  We were surveilling that the other night

PDF created with pdfFactory trial version www.pdffactory.com

Pruitt - Direct

1    because Clifford Horton was supposed to be riding around in it

2    with Dayton Poke?

3    A.   That's correct.

4    Q.   He used the name Dayton Poke and the name Clifford Horton?

5    A.   He used the nicknames.

6    Q.   Day-Lo?

7    A.   Day-Lo.

8    Q.   That would be for Dayton Poke?

9    A.   Dayton Poke and Flip.

10   Q.   Flip is Clifford Horton?

11   A.   Yes.

12   Q.   Do you know Dayton Poke by the name of Day-Lo based on what

13   you had heard or knew of him prior to that?

14   A.   Yes.

15   Q.   Okay.   When you looked into the vehicle, do you recall

16   whether or not you could tell that there was only one occupant,

17   that being the driver?

18   A.   Yes.

19   Q.   And what happened after you made that observation at the

20   four-way?

21   A.   Well, at that point the car had already made a left turn

22   eastbound on 10th Avenue.

23   Q.   Was there anything unusual about that left turn?  Did he

24   peel out, or could you see -- well, let me just ask that.  Did

25   he peel out or anything unusual about the way he executed that

Pruitt - Direct

1  turn?

2  A.  No.

3  Q.  Did he appear to speed up as if to try to evade you after he

4  made that left turn?

5  A.  No.

6  Q.  And could you see his face when you were at that four-way

7  intersection?

8  A.  No, not clearly.

9  Q.  Just a silhouette?

10  A.  Yes.

11  Q.  All right.  So, he made the turn.  Then what did he do?

12  A.  At that time I also made a right turn eastbound onto 8th

13  Avenue.

14  Q.  Let me ask you to stop right there.  At that point had you

15  made the decision to pull that vehicle over based on what

16  Detective Nordberg had told you about surveilling it the night

17  before?

18  A.  No, not at that time.

19  Q.  Was there any discussion about trying to ascertain from the

20  driver of that vehicle where Clifford Horton might be?

21          MR. KARNER:  Objection.

22          THE COURT:  What's the objection?

23          MR. KARNER:  Your Honor, it's the same objection I had

24  with Detective Nordberg.  This goes again into their mental

25  impressions and their thoughts and processes.

Pruitt - Direct

1    THE COURT:  You know, I understand that I don't have to

2  make -- or that my decision, my determination in this case, is

3  not based upon the mental process or the intent of the officers,

4  but that doesn't mean that any ideas or any thoughts that they

5  have are irrelevant.

6    MR. KARNER:  Well, certainly their conversations,

7  though.  What's at issue is their conduct and their

8  observations, not the conversations between the officers, your

9  Honor.

10    MR. BYRD:  I'll withdraw the question and move on,

11  Judge.

12  BY MR. BYRD:

13  Q.  Detective Pruitt, with respect to that vehicle, did you at

14  any point believe that it was Clifford Horton driving that

15  vehicle?

16  A.  I did not know who was driving the vehicle.  I was just --

17  like I said, based on the information he had told me, I knew

18  that -- my thoughts were that we should probably ask for other

19  officers to maybe conduct a stop to possibly see who was in the

20  vehicle since this vehicle was being surveilled the night before

21  for a possible murder suspect.

22  Q.  And that was your state of mind prior to --

23    MR. KARNER:  Objection.

24  BY MR. BYRD:

25  Q.  (Continuing) -- pulling the vehicle over?

Pruitt - Direct

1          MR. KARNER:   Objection.

2          THE COURT:   I'll allow that question to stand.   I'll

3    assure the government that I will not use the subjective intent

4    of the officers in making my determination as to the lawfulness

5    of the search.

6          MR. KARNER:   Yes, sir.

7    BY THE WITNESS:

8    A.   I'm sorry.   Can you repeat your question?

9    BY MR. BYRD:

10   Q.   Sure.   You just went through your thought process of maybe

11   having another officer come stop the vehicle because it had been

12   surveilled, and my question is was all that your state of mind

13   prior to stopping the vehicle that night?

14   A.   I guess I don't understand exactly what you mean by that.   I

15   mean, my thought was that we needed to -- I thought we needed to

16   verify who the driver was, but, you know, it wasn't our plan to

17   stop the vehicle at that particular moment, not until we knew we

18   had backup.

19   Q.   Okay.   But it was your plan to stop the vehicle --

20   A.   Yeah.

21   Q.   -- once you had backup?

22   A.   Yeah.   Based on information that I received, I thought --

23   yeah, I thought that --

24   Q.   From Detective Nordberg --

25   A.   Right.

Pruitt - Direct

1  Q.  -- about the night before?

2  A.  Exactly.

3  Q.  And you didn't have to wait for backup because the defendant

4  broke a traffic law, correct?

5  A.  Well, once again, my vehicle got close to the vehicle, and

6  it made an immediate right turn into the driveway without using

7  his turn signal.  At that point we were forced to, you know,

8  just initiate the stop at that point.

9  Q.  If he had not made that turn and broke the traffic law of

10  failing to signal, was it your intent to follow him until backup

11  arrived, then pull him over?

12  A.  Yes.

13        MR. KARNER:  Objection, Judge.  That's really

14  irrelevant, though.

15        THE COURT:  I agree.

16        MR. BYRD:  All right.

17  BY MR. BYRD:

18  Q.  And, Detective Pruitt, at that point you would agree that

19  you and Detective Nordberg were no longer concerned about the

20  armed robbery at the Quik store?

21  A.  At that point, yes.

22  Q.  Because this appeared to be something more important?

23  A.  Yes.

24  Q.  So, that vehicle pulled over -- or I'm sorry -- turned into

25  the residential driveway without signaling.  What, if anything,

Pruitt - Direct

1   did you do at that point?

2   A.   I exited my car and started to approach the driver's side

3   window of the vehicle.  As I'm approaching the vehicle, I saw

4   the driver.  He was rolling up the window quickly, and he was

5   leaning over in front of the seat.

6   Q.   Okay.  How did you position the vehicle that you were

7   driving in relation to his vehicle in that driveway?

8   A.   Directly behind the vehicle.

9   Q.   With your nose facing the rear end?

10  A.   That's correct.

11  Q.   Or was it sideways?

12  A.   It was more facing the rear of the vehicle.

13  Q.   Okay.  And that would have put both you and Detective

14  Nordberg about equidistant from the Impala?

15  A.   Yes, I would say so.

16  Q.   Did you pull into the driveway itself, or did you stop in

17  the street?

18  A.   Pulled into the driveway.

19  Q.   I want to show you what's marked as Defendant's Exhibits 1

20  through 4.  I'll start first with 1 and 2 and ask you to take a

21  look at those exhibits.

22  A.   Okay.  Yes.

23  Q.   Do you recognize them?

24  A.   Yes.

25  Q.   And does that appear to be the Impala we're talking about?

Pruitt - Direct

1  A.  Yes.

2  Q.  At the scene?

3  A.  Yes.

4  Q.  And at that point it is -- the Impala is in the residential

5  driveway?

6  A.  That's correct.

7  Q.  We can't see your squad car, can we, in those photos?

8  A.  No.

9  Q.  But you believe you were behind it facing the same direction

10  in the driveway?

11  A.  That's correct.

12  Q.  These Exhibits 1 and 2 fairly and accurately depict the

13  vehicle once it came to rest in that driveway?

14  A.  Yes.

15  Q.  I'll come back to 3 and 4 in a minute.

16        You said that as you were approaching the vehicle, the

17  driver was rolling up the window and reaching down.  What, if

18  anything, happened after that?

19  A.  At that point I was by the window, and he had started to

20  open up the door, and I said -- I told him no, to stay inside

21  the car, and at the point he said, well, I want to, you know,

22  get out because I live here, something to that effect.  I'm

23  going inside my house.

24  Q.  He said he was going to go inside the house or his house?

25  A.  His house.

Pruitt - Direct

1    Q.    Okay.   And what's Detective Nordberg doing at the time, if

2    you know?

3    A.    I don't know.   I was totally focused on the driver because

4    of his actions when I was walking up to the vehicle.

5    Q.    Had you drawn your sidearm at that point?

6    A.    No.

7    Q.    So, you're still holstered.   Do you know if Detective

8    Nordberg had drawn his sidearm?

9    A.    I don't believe so.   I wasn't paying attention to him    I

10   was totally focused on the driver.

11   Q.    And the driver was attempting to get out of the vehicle?

12   A.    Yes.

13   Q.    How far had he gone toward trying to get out of the vehicle?

14   Had he actually stepped out and stood up or --

15   A.    No.   He just -- to the point where the door started to open

16   and I hold it shut for a second, and then when he said, well,

17   I'm going to get out and go inside my house, the way I was

18   positioned then, he was able -- he stepped out of the car, fully

19   out of the car.

20   Q.    Okay.   And I want to show you again -- I should have left

21   Defendant's Exhibit 2 with you because it shows the driver's

22   side of the car.   Do you agree?

23   A.    Yes.

24   Q.    You would have been approaching from the rear on the

25   driver's side?

Pruitt - Direct

1    A.   That's correct.

2    Q.   And you said that the defendant started to get out, was

3    rolling his window up fast, and reached down.   Can you show on

4    that photograph or tell approximately where you would have been

5    when he started rolling up the window and reaching down?

6    A.   I would have been right up by the front driver's side window

7    near the door handle.

8    Q.   Okay.   So, it would have been right about where the front

9    driver's side door meets the back driver's side door?

10   A.   Yes.

11   Q.   And when he tried to open the door, you wouldn't have been

12   standing at the handle, or the door would have hit you, correct?

13   A.   That's correct.

14   Q.   And so, you would have been actually more behind the rear

15   passenger door?

16   A.   No.   At the time I came closer towards the outside mirror,

17   the front of the door, because because of his actions, I was

18   trying to maintain sight of what he was doing exactly.

19   Q.   So, you would have been at the front of the driver's side

20   door?

21   A.   That's correct.

22   Q.   And if you were inclined to get out, wouldn't that have put

23   you at risk of having a big steel door in between the two of

24   you?

25   A.   That's correct.

Pruitt - Direct

1  Q.   And that would have made it extremely difficult to secure

2  him?

3  A.   At that time, yes.

4  Q.   Did you at some point move?  You said back by the handle of

5  the door -- handle to open the front driver's side door.

6  A.   After the second time when he actually did get out of the

7  car, yes, I did move back away from the door where I was more

8  positioned to be closer to him

9  Q.   So, when he got out of the car, you're saying that you were

10 actually -- had the door between the two of you, and you were

11 more toward the front and not back by the handle?

12 A.   That's correct.  I was actually in a back position, but

13 because of the circumstances of what I observed, I felt that was

14 the -- I wanted to maintain exactly what -- I wanted to maintain

15 eyesight of his hands and exactly what he was doing at the time.

16 Q.   Now, if the person who's in the driver's side driving that

17 vehicle gets out of the vehicle to close the door, they would

18 have to walk away from you then, would they not?

19 A.   I don't think I quite understand.

20 Q.   Sure.  Okay.  If you're positioned with the doorway between

21 you and the driver, the driver steps up out of that vehicle, you

22 would agree it's driver, doorway, you?

23 A.   Yes.

24 Q.   And the door would be open, creating a sort of wedge or a V?

25 A.   That's correct.

Pruitt - Direct

1    Q.   To close the door, as the defendant would have done, he

2    would have had to walk forward toward the back of the vehicle to

3    clear the door to close it?

4    A.   Well, he kind of stepped forward at that time to attempt to

5    close it.

6    Q.   And by forward you mean toward the back of the vehicle?

7    A.   That's correct.

8    Q.   Because if he was to walk forward facing the front, he's

9    just going to walk into the door?

10   A.   Right.

11   Q.   So, he would have had to clear the door and close it?

12   A.   Yes.

13   Q.   So, he would have been moving away from the vehicle.   How

14   would your position on the other side of that door have given

15   you a better view of his hands if he's walking away from you to

16   close the door?

17   A.   Well, at the point he was stepping out, I had already

18   started to reposition myself.   I was at the front of the vehicle

19   from the moment that -- the first time when he was trying to get

20   out the first time.   I told him no, stay in the car.   Then it

21   was after that point when he told me, well, I'm getting out to

22   go inside my house and he actually opened the door to step out

23   was when I repositioned myself.

24   Q.   Okay.   So, when he went to step out of the vehicle, you were

25   no longer in a position where the door was between you.   You had

Pruitt - Direct

1    moved more toward the back of the vehicle?

2    A.   That's correct.

3    Q.   Okay.  So, the door couldn't have hit you then if he had

4    decided to open it violently?

5    A.   Well, from where I was standing, it could have, had he have

6    done it that way.

7    Q.   But he didn't.

8    A.   Right.

9    Q.   Instead he created the wedge, and you had moved back to

10    where -- you were behind the handle of the door near the back

11    passenger side door, and he's in the wedge, correct?

12    A.   That's correct.

13    Q.   And would you agree that the defendant is a rather big guy?

14    A.   Yes.

15    Q.   Tall and kind of wide?  Though, I'm no one to talk.  But

16    he's a big guy?

17    A.   Yes.

18    Q.   Do you recall if he threw the door all the way open, or did

19    he just open it enough to where he could stand up and get out of

20    the car?

21    A.   Just enough for him to get out, get out of the car.

22    Q.   All right.  And you were focused on his hands.

23    A.   Yes, I was, pretty much.

24    Q.   And he appeared to have something in his hands, correct?

25    You later learned he had something in his hands?  You wrestled

PDF created with pdfFactory trial version www.pdffactory.com

Pruitt - Direct

1    him for it?  Keys maybe?

2    A.   Yes, he had his hands balled up.  And, yeah, we later

3    learned that was keys he had in his hands.

4    Q.   And as he stood up out of the car, you're looking at his

5    hands, focusing on his hands, facing him as gets out and stands

6    in this wedge.

7    A.   Yes.

8    Q.   With the door not opened all the way, but just creating an

9    angle that he's blocking.

10   A.   Yes.

11   Q.   And what happened after that?

12   A.   Prior to him getting out the second time, fully getting out

13   of the car, when I was by the front of the mirror, I had already

14   looked down where he was leaning over because that was my main

15   concern.  It was a red flag for me from him the way he was

16   leaning over, and I could see the barrel of the black handgun

17   next to a green towel, just the barrel of the gun.

18   Q.   Okay.  You saw the barrel of the handgun while the defendant

19   was still seated in the vehicle?

20   A.   No, sir.  I saw it while he had -- the second time while he

21   had actually started to get out of the car.  That's when I saw

22   the barrel of the gun underneath the seat.

23   Q.   Okay.  This would have been back where you were in between

24   the defendant and the door?

25   A.   While I was still by the front mirror here right in front of

Pruitt - Direct

1    the door, yes.

2    Q.  Right.  Before he had created a wedge --

3    A.  Yes.

4    Q.  -- and you had moved to the back?

5    A.  Yes.

6    Q.  You had said that one of the reasons that you moved to the

7    front was to try to keep him in the car?

8    A.  No.  The first time when he tried to get out of the car, I

9    told him to stay in the car.  The second time once he got out of

10   the car, and this is after I saw the barrel of the gun here,

11   yeah, I positioned myself towards the rear of the door there so

12   I can -- at that point is when I grabbed ahold of him

13   Q.  How much time elapsed between when you say you saw the gun

14   the first time he started to get out of the car and then him

15   actually getting out of the car and you moving to the back area

16   where this wedge is created with the door?  Approximately how

17   long?

18   A.  I saw the gun the second time while he was getting out of,

19   not the first time.  It was while he was stepping out of the

20   car, my attention was still focused on where he had been leaning

21   over, and it was at that point when I moved towards the side of

22   the door.

23   Q.  So, but you saw the gun -- and I don't want to beat a dead

24   horse.  I just want to be clear.  You said you saw the gun when

25   he -- the first time when he started to get out of the car while

Pruitt - Direct

1    you were near the front by the mirror?

2    A.   No.   I saw the gun -- the first time he tried to get out of

3    the car, I kept him in there, and then when he said he was

4    getting out to go inside his house, he actually started to step

5    out of the car, and that's when I was still focused in on the

6    area where he had been leaning over, and that's when I saw the

7    gun.   The second time when he actually fully stepped out of the

8    car.

9    Q.   Okay.   So, the first time when you saw the gun, he did not

10   fully step out of the car, but he had started to?

11   A.   That's correct.

12   Q.   And you were in the front driver's side door area by the

13   mirror?

14   A.   Yes.

15   Q.   And he opened the door.   How far did he try to go to get

16   out?

17   A.   He just created enough space for him to, you know, get out.

18   Q.   So, had he swung his legs over and started to stand up?

19   A.   Yes.

20   Q.   Or was that the second time?

21   A.   The second time he actually fully got out.

22   Q.   Okay.   What did he do exactly the first time?  And by that I

23   mean, what did his legs do?  Did he stand up?  Please tell us.

24   A.   The first time I never allowed him to even move his legs.   I

25   mean, he opened the door with his hands and then started to open

PDF created with pdfFactory trial version www.pdffactory.com

### Pruitt - Direct

1    the door, and that's when I kept it shut with my hands like, you

2    know, don't get out of the car yet.

3    Q.    Okay.   I want to show you Defendant's Exhibit 3.   Do you

4    recognize that exhibit?

5    A.    Yes.

6    Q.    That's the interior driver's side floorboard of the car?

7    A.    That's correct.

8    Q.    And that photo shows about three inches of the handgun

9    barrel sticking out from under the driver's side seat?

10   A.    Yes.

11   Q.    And if I understood your previous answer to my question, you

12   never let him swing his legs out to get out of that car?

13   A.    Not the first time, no.

14   Q.    And the first time is when you saw the gun?

15   A.    No.   No, the second time when he actually stepped out of the

16   car is when I saw the gun.

17   Q.    So, it wasn't when you were near the front near the mirror.

18   It was after you had gone back to the back door area so that he

19   could swing it open and create the wedge.

20   A.    No.   I was still -- I'm sorry.

21   Q.    No, that's okay.

22   A.    Just like I explained, I was by the mirror here the second

23   time when he actually fully got out of the car is when I saw the

24   gun.

25   Q.    But I thought you said that before he fully got out of the

Pruitt - Direct

1    car, you had moved to the back.

2    A.   No, I did not say that, sir.  I said that as he got out of

3    the car, I stepped towards the rear -- the side of the door.  I

4    repositioned myself as he got out of the car because this is

5    after I already observed the gun.

6    Q.   And that was the point, if I understood your earlier

7    testimony, where you were focusing on his hands when he got out

8    of the car?

9    A.   Yes.

10   Q.   So, when did you see the gun?

11   A.   I saw the gun as he was stepping out of the car.

12   Q.   So, you didn't focus on his hands until after he got out of

13   the car?

14   A.   Well, I still did not -- I saw the gun there as he was

15   stepping out of the car.  I didn't know what he was going to do

16   from that point.  I mean, his actions -- from my experience I

17   mean, it was -- for me, I was being cautious.  It was a red

18   flag.  And I saw the gun.  He was stepping out of the car.  I

19   didn't know what he was going to do next.  So, yeah, I was

20   focusing on his hands.

21   Q.   And you're absolutely sure that you went to the front near

22   the mirror?

23   A.   Positive.

24   Q.   After he got out of the car, what happened -- strike that.

25          At what point -- was there a point where you yelled

Pruitt - Direct

1   1032?

2   A.  Yes.  After he stepped -- fully stepped out of the car the

3   second time, I positioned myself by the door where I was able to

4   grab onto his arm, and I yelled 1032.  That's police code for

5   man with gun.  And Kevin was right there, and he came over.  I

6   mean, he was pretty much right there.  And he also took ahold of

7   his arm, his right arm, and I had his left.

8   Q.  Okay.  So, just so I have the sequence of events right,

9   you're near the mirror on the front driver's side door.  He

10   steps out of the car, stands up.  You see the firearm depicted

11   in Defendant's Exhibit 3.  You then step back to the car, grab

12   him, and then yell 1032?

13   A.  I see the -- I saw the gun as he was stepping out of the

14   car.  At that point he tries to -- he turns as he steps out.  He

15   gets fully out of the car.  He turns and tries to shut the door

16   so he can lock it.  I grabbed his left arm  I said 1032.  That

17   was what I said.

18   Q.  Was that the point where you said 1032?

19   A.  1032, yeah, when I grabbed --

20   Q.  So, after he had closed the door, went back, and you grabbed

21   ahold of his arm

22   A.  No.  As he tried to slam -- to shut the door, I say 1032,

23   and at that point Detective Nordberg had took hold of his right

24   arm

25   Q.  Okay.  Can you tell me why you didn't say 1032 the second

Pruitt - Direct

1    you saw that gun?

2              MR. KARNER:   Objection.   Why doesn't matter here,

3    Judge.

4              THE COURT:   Well, he's testing his recollection.   He's

5    testing the logic of his actions based upon what was in his

6    mind.   I don't think there's anything wrong with that.   I'll

7    allow the question to stand.

8    BY THE WITNESS:

9    A.   Because he was stepping out of the car.   I knew the gun was

10   right there on the floorboard.   My main concern was getting

11   custody of him at that point and told him to turn around.   Like

12   I say, when I got the 1032, my main concern was to just take

13   custody of him at that point.

14   BY MR. BYRD:

15   Q.   Looking at Defendant's Exhibits 3 and 4 -- well, before

16   that.

17              Defendant was secured, put in cuffs, and locked into

18   the squad car, correct?

19   A.   That's correct.

20   Q.   No other people around compromising officer safety?

21   A.   No.

22   Q.   No other passengers in the vehicle?

23   A.   No.

24   Q.   And you and Detective Nordberg at that point had called for

25   backup?

Pruitt - Direct

1    A.   Yes.

2    Q.   Did you tell Detective Nordberg to conduct a search?

3    A.   After -- yes.  After Mr. Poke was secured, he searched the

4    car.

5    Q.   Do you remember if that was before or after Sergeant Stevens

6    arrived?

7    A.   I want to say it was before Sergeant Stevens arrived, I

8    believe.

9    Q.   Defendant's Exhibits -- did you look into the car yourself

10   other than when you first saw the gun depicted in Defendant's

11   Exhibit 3?

12   A.   At that point after -- no, after that point, I was with

13   Mr. Poke.

14   Q.   Okay.  Now, at the time you saw that -- is Defendant's

15   Exhibit 3 what you saw?

16   A.   Yes.

17   Q.   The defendant would have been stood up and standing in

18   between you and that gun, wouldn't he?

19   A.   No.  From where I was positioned, like I say, when he first

20   stepped out of the car is when I observed the gun.  Like I say,

21   my mindset was still focused in what he was doing, his actions,

22   when I approached the car.  So, when he -- the second time when

23   he fully stepped out of the car, I was still looking in that

24   area, you know, and I saw the gun, and then from there I

25   directed myself to his actions.  So, I was looking at his hands

PDF created with pdfFactory trial version www.pdffactory.com

Pruitt - Direct

1    because I didn't know what he was going to do.  In my mind I'm

2    assuming that he had to know that I saw the gun there.  So,

3    yeah, I'm thinking safety at that point.

4    Q.   Okay.  And when you looked into the driver's side

5    floorboard, did you see a Cricket Sanyo cell phone?

6    A.   I don't recall seeing no cell phone at that point.

7    Q.   Do you recall whether or not you indicated in your report

8    that there was a -- or your probable cause statement that there

9    was a black -- not a black, but a Cricket Sanyo cell phone that

10   was recovered from the front driver's side floorboard of this

11   vehicle?

12   A.   That's what it says in the PC statement; however, I did not

13   write that PC statement.

14   Q.   You did not?

15   A.   No.

16   Q.   Who wrote the PC statement?

17   A.   I want to say Sergeant Stevens.  But I did not write that PC

18   statement.

19   Q.   Would it surprise you to know that Sergeant Stevens says you

20   wrote it?

21          MR. KARNER:  Objection.  That's an improper question.

22          MR. BYRD:  Why?

23          THE COURT:  Why is it improper?

24          MR. KARNER:  Judge, a question that asks this witness

25   to pass on the credibility of another witness is improper.

Pruitt - Direct

1      MR. BYRD:  I'm not asking him to pass on his

2  credibility.  I'm asking if he's surprised at the detective's

3  answer.  That's all.

4      MR. KARNER:  Whether or not he's surprised or not,

5  that's also irrelevant.

6      MR. BYRD:  I'll withdraw the question.

7  BY MR. BYRD:

8  Q.  Did you review the probable cause statement that indicates

9  that you were the officer that prepared it?

10  A.  After the fact, yes.

11  Q.  Okay.  I want to show you Defendant's Exhibit 5 and ask you

12  if you recognize it.

13  A.  Yes, I recognize it.

14  Q.  And that is the probable cause statement?

15  A.  That's the probable cause statement.

16  Q.  And the probable cause statement states that you were the

17  officer, Detective Pruitt, Star 154?

18  A.  Yes.

19  Q.  And that the reviewing supervisor is Sergeant Stevens?

20  A.  Yes.

21  Q.  At the very least, you'll grant me that you reviewed this

22  report for accuracy?

23  A.  After the fact, you know, at the time because a lot of times

24  during investigations, we've got two or three officers involved

25  in the same case.  Another officer may write the PC statement.

Pruitt - Direct

1  Q.  Well, the only way that Sergeant Stevens could have wrote

2  the PC statement would have been based on information he

3  received from you, correct?

4  A.  Not exactly from me.  It would have been -- yeah, it could

5  have been from me.  It could have been from Detective Nordberg.

6  It could have been -- yeah, anyone at the scene.

7  Q.  Detective Nordberg's name doesn't appear anywhere on that

8  statement, does it?

9  A.  No.

10  Q.  Only your name.

11  A.  Yes.

12  Q.  So, you're saying you did not provide Sergeant Stevens with

13  the information for the probable cause statement?

14  A.  I'm sure I provided some information.  I think it was a

15  compilation of everyone saying what happened at the time of the

16  incident.  I can't even say for sure.  I don't know for sure if

17  he was the one that wrote the PC.  I can just tell you for sure

18  that I did not write the PC.

19  Q.  Okay.  But you can also tell me for sure that you reviewed

20  the PC for accuracy.

21  A.  I don't remember if I reviewed it the night that it was

22  wrote.

23  Q.  So, in effect, if I understand what you're saying, even

24  though it says Detective Pruitt is the officer named for the

25  probable cause statement, Sergeant Stevens is the reviewing

PDF created with pdfFactory trial version www.pdffactory.com

Pruitt - Direct

1    supervisor, you can't tell me who drafted this statement or
2    whether or not you reviewed it for accuracy?
3    A.   I cannot tell you who drafted the PC.  All I can tell you,
4    sir, is that I did not do it because I would not have wrote the
5    PC -- I would have wrote it in the first person.
6    Q.   Can you authenticate it?  Does this appear to be the PC
7    statement for this case?
8    A.   Yes.
9    Q.   And you don't know if you've ever seen it before this
10   moment?
11   A.   I reviewed it after, you know, I knew the case was coming
12   up.
13   Q.   You did review it?
14   A.   I did review it afterwards.
15   Q.   But you don't know if you reviewed it anywhere near July 6th
16   of 2011?
17   A.   Well, I'm not saying that because I just don't recall.  I
18   don't recall specifically, you know.
19   Q.   Okay.  Third line from -- fourth line from the bottom says a
20   Cricket Sanyo cell phone was located on the front driver
21   floorboard.
22   A.   Yes.
23   Q.   And the front driver's side floorboard you would agree is
24   where the gun was located?
25   A.   That's correct.

PDF created with pdfFactory trial version www.pdffactory.com

Pruitt - Direct

1    Q.   And the green towel?

2    A.   Yes.

3    Q.   Do you see a green -- or I'm sorry.  Do you see a Cricket

4    Sanyo cell phone in the floorboard in Defendant's Exhibit 3 or

5    4?

6    A.   No.

7    Q.   Do you dispute the accuracy of that statement in the

8    probable cause statement that the cell phone was located in the

9    front driver's side floorboard?

10   A.   I don't dispute the accuracy.  I mean, if it was put in

11   there, I don't know whether someone else had recovered it there

12   or not, but --

13   Q.   Well, you said that the defendant also tried to get out of

14   the vehicle twice --

15   A.   Yes.

16   Q.   -- with you discouraging him from doing that.

17   A.   Once.

18   Q.   Did you ask him to get out of the vehicle?

19   A.   The second time when he said he was getting out to go inside

20   his house, at that point, yeah, he -- I allowed him to fully get

21   out of the car.

22   Q.   Okay.  My question is did you ask him to get out of the car?

23   A.   He already made the motion to get out on his own.

24   Q.   So, that's no?

25   A.   That's correct.

Pruitt - Direct

1  Q.   The probable cause statement says right here, about the

2  middle of the paragraph, the driver was asked to step out of the

3  Impala by Detective Pruitt.   Is that accurate?

4  A.   I can't say that's totally accurate.   I can't say.

5  Q.   All right.   You don't independently remember seeing a Sanyo

6  cell phone in the car near the gun that day?

7  A.   I don't recall seeing the cell phone that day on the

8  floorboard.

9  Q.   If there was a Cricket Sanyo cell phone in the floorboard

10  that day, would you or any other detective that you observed

11  move that cell phone prior to these photographs being taken?

12  A.   If there was a cell phone, it would have been taken as

13  personal property at the time.   That's the only thing I can

14  think that could have happened with the cell phone.   That was

15  taken as personal property, and, therefore, it wouldn't have

16  been in the photos because it was put in his personal property

17  at the time.

18  Q.   So, do you know whether or not the scene was manipulated by

19  the removal of the cell phone prior to these photos being taken?

20  A.   I know for sure nothing was manipulated.   I said if the cell

21  phone was removed, it would have been taken because that's his

22  personal property.

23  Q.   Well, it can also be evidence, can't it?

24  A.   Well, we didn't know that was going to be considered as

25  evidence until the charges were authorized for the particular

Pruitt - Direct

1   charge for armed violence.

2   Q.   What about the drugs?  Cell phones and drugs are often used

3   hand in hand, correct?

4   A.   Yes, that's correct.

5   Q.   And at the time you see a gun, guns and drugs and cell

6   phones are kind of like the unholy trinity of drug trafficking,

7   right?

8   A.   They can be, yes.

9   Q.   And prior to -- well, I don't want to talk in hypotheticals.

10  Did you remove the cell phone prior to these photos being taken?

11  A.   No, I did not remove the cell phone.

12  Q.   Did you see Detective Nordberg remove the cell phone prior

13  to --

14  A.   I did not -- I did not know who removed the cell phone, like

15  I said.

16  Q.   Do you know if anyone removed a cell phone?

17  A.   Someone must have removed a cell phone, and the only

18  thing -- I can't sit here and guess.  I mean, it had to been

19  taken as personal property at the time.

20  Q.   So, in order for the cell phone to have been removed from

21  the driver's side floorboard, someone would have had to have

22  been down in there near that gun, near that towel to remove the

23  cell phone.

24          MR. KARNER:  Calls for speculation, Judge.  Objection.

25          THE COURT:  I don't think it calls for speculation.

### Pruitt - Direct

1   The witness can testify as to what he knows based upon the facts

2   that exist in the case.

3   BY THE WITNESS:

4   A.  I don't know anything about the cell phone.  All I know is

5   that, you know, what my observations were from the point seeing

6   the gun, and after that, I did not do any interior search of the

7   car.

8   BY MR. BYRD:

9   Q.  Okay.  But you know that the probable cause statement says

10   it was in the front driver's side floorboard, and you know that

11   Defendant's Exhibit 3 doesn't show it.

12         MR. KARNER:  Judge, this has been asked and answered.

13         THE COURT:  I agree.  I think we've wrung about as much

14   information as we can as to these facts.

15         MR. BYRD:  Well, can I just ask about the silver box?

16         THE COURT:  Sure.

17   BY MR. BYRD:

18   Q.  You see in Defendant's Exhibit 3 a silver box mounted on the

19   dashboard?

20   A.  Yes.

21   Q.  That doesn't appear to be a Sanyo Cricket cell phone, does

22   it?

23   A.  No.

24   Q.  Okay.  And it's not on the floorboard?

25   A.  No.

Pruitt - Direct

1  Q.  Okay.  So, after the gun's observed, Detective Nordberg does

2  a search, you believe, before Sergeant Stevens gets there?

3  A.  I believe so.

4  Q.  And the defendant's handcuffed and secured in the back seat

5  of the squad car?

6  A.  Yes.

7  Q.  There's no threat of officer safety.  Other officers arrive

8  on the scene?

9  A.  Yes.

10  Q.  Did you have anything to do with the decision to impound the

11  car?

12  A.  No.

13  Q.  Did you have anything to do with any inventory search or

14  search of the vehicle at all?

15  A.  No.

16  Q.  That was conducted by Detective Nordberg?

17  A.  Yes.

18  Q.  Do you know whether or not Detective Nordberg was conducting

19  a search incident to arrest or an inventory search?

20      MR. KARNER:  Objection.  That's a legal conclusion for

21  the court to make.

22      MR. BYRD:  Okay.  I'll withdraw the question.

23  BY MR. BYRD:

24  Q.  After the defendant was taken into custody, would you have

25  had any occasion to be present at his booking process?

Pruitt - Direct

1    A.    No.

2    Q.    Would you have had in the course of your investigation any

3    occasion to review his medical inmate acceptance form at the

4    Winnebago County Justice Center?

5              MR. KARNER:    Judge, I object.    This is post seizure.

6    This cannot possibly be relevant.

7              MR. BYRD:    Oh, if I can explain how it is.    This

8    document that's entitled Winnebago County Justice Center medical

9    intake acceptance form under the observation section indicates

10   that the defendant has limited use of his right arm due to

11   multiple scars.    I think that would go directly to the issue of

12   whether or not he was reaching under his seat with his right arm

13   at the time.

14             MR. KARNER:    That document's a comment made by the

15   defendant after the fact.    Number one, that's hearsay.    That's

16   information provided by the defendant.    And, number two, it's

17   not relevant because what's relevant is what the officer

18   observed at the time that he engaged with the defendant.

19             MR. BYRD:    The document has two parts.    One is

20   observations made by the intake officer.    The other is inquiries

21   of the defendant.    The limited use of right arm due to multiple

22   scars is --

23             THE COURT:    I believe that the defense attorney has the

24   right to confront the witness with alleged discrepancies and the

25   consistency of the evidence.    I think this goes to that.    I'll

Pruitt - Direct

1    allow the question to stand.

2    BY MR. BYRD:

3    Q.   Were you present at the -- or did you have occasion to

4    review his medical intake acceptance form as part of your

5    investigation in this case?

6    A.   No.

7    Q.   He did at the scene complain of immobility of his right arm,

8    correct?

9    A.   At the point where we were trying to handcuff him, he had

10   made the remark that he was shot by an AK-47.

11   Q.   And did you have occasion to see the scarring on his arm

12   from that wound?

13   A.   No.

14   Q.   Did you make any effort to check with the owners of that

15   residence to determine if they had any problem with the vehicle

16   being present in their driveway?

17   A.   At the time of the stop?

18   Q.   Yes.

19   A.   No.

20   Q.   At any point prior to the vehicle being impounded?

21   A.   No.

22          MR. BYRD:   May I have a moment, your Honor?  I'm almost

23   done.

24          THE COURT:   Sure.

25      (Brief pause.)

Pruitt - Cross

BY MR. BYRD:

Q.   Thank you, Detective Pruitt.

     MR. BYRD:   I'll pass the witness, Judge.

                    CROSS EXAMINATION

BY MR. KARNER:

Q.   When you approached the driver's side of the car, you saw defendant making a movement as if he was moving something around on the driver's side floorboard; is that correct?

A.   That's correct.

Q.   And he tried to get out of the car?

A.   Yes.

Q.   And you told him to get back in the car?

A.   Yes.

Q.   Actually, you ordered him to stay inside the car?

A.   That's correct.

Q.   And he did not obey that order, correct?

A.   No.

     MR. KARNER:   Nothing further.

     MR. BYRD:   I have nothing further, your Honor.

     THE COURT:   You may step down, Detective Pruitt.

     (Witness excused.)

     MR. BYRD:   Your Honor, at this time I would move to admit Defendant's Exhibits 1, 2, 3, 4, 5, 6, and 8.

     THE COURT:   Any objection?

     MR. KARNER:   No, not for the purposes of this hearing.

1          THE COURT:  They will be admitted.

2      (Defendant's Exhibits 1, 2, 3, 4, 5, 6, and 8 were offered

3      and received in evidence.)

4          THE COURT:  May I have those?

5          MR. BYRD:  Yes, Judge.  I left the sticky marks on

6  Exhibits 6 and 8, just so you know where the page is.  Is that

7  all right?

8          THE COURT:  Fine.

9          MR. BYRD:  And I'll give you 5, 6, and 8.  You already

10 have 1 through 4.  And I have no further witnesses.

11         THE COURT:  Does the government have any witnesses?

12         MR. KARNER:  I don't believe so, Judge.

13         THE COURT:  I'll ask the parties to prepare

14 post-hearing briefs.  One issue that immediately occurs to me is

15 why this isn't a classic example of the automobile exception.

16         MR. BYRD:  Judge, because at the time that the search

17 was conducted -- and I'll address this further in the memo.

18         THE COURT:  Right.

19         MR. BYRD:  At the time the search was conducted -- I

20 guess it depends on whether or not the court finds Detective

21 Pruitt to be credible as to the plain view.

22         THE COURT:  Isn't that the critical factual question

23 here?

24         MR. BYRD:  Yes.

25         THE COURT:  Whether Officer Pruitt actually saw the

PDF created with pdfFactory trial version www.pdffactory.com

1    barrel of the gun sticking out of the front of the driver's

2    seat.

3              MR. BYRD:  Right.  And whether or not --

4              THE COURT:  And if I do find that, then it appears to

5    be an automobile exception case.  If I don't find it, then the

6    rest of your argument flows from that.

7              MR. BYRD:  I don't disagree with your Honor.  I'll

8    address that in the memo.

9              THE COURT:  Okay.  Thank you.  How much time do you

10   need?

11             MR. BYRD:  Judge, I would ask that the court allow a

12   transcript to be prepared for purposes of preparing post-hearing

13   memo, and assuming I can get that in the next seven to ten days,

14   I'd ask for 21 days from today.

15             MR. KARNER:  I'd ask for 28 days, Judge.  I have a

16   brief that is due to be filed with the Seventh Circuit on

17   September 14th.

18             MR. BYRD:  I'm quite all right with that.  I have a

19   sentencing memorandum due to your Honor next week.

20             THE COURT:  All right.  Do you want 28 days after his

21   21 days?

22             MR. KARNER:  No, not 28 after his, but if I could have

23   mine 28 days from today.

24             MR. BYRD:  And I'll ask for 28.  Just do them at the

25   same time, if that's all right.

1       THE COURT:  All right.  That's fine.  28 days after the

2   transcript.

3       MR. KARNER:  If that's okay.

4       MR. BYRD:  That's fine with me.

5       THE COURT:  I'll ask you to get the briefs to me by the

6   close of business on October 5th.

7       MR. KARNER:  October 5th?

8       THE COURT:  Will that work for you, Mr. Byrd?

9       MR. BYRD:  Yes, your Honor.

10      THE COURT:  See you then.  Thank you for your help.

11      MR. KARNER:  Judge, I move to toll the period of time

12  from today through and including October 5th, 2012 -- well,

13  actually, to the next court date, through and including the next

14  court date, from calculation of the speedy trial period pursuant

15  to 18 U.S.C. 3161(h)(1)(D) as this is a delay from the filing of

16  the pretrial motion through prompt disposition, prompt hearing

17  and disposition.

18      THE COURT:  All right.  I don't see any problems with

19  that, except I don't think the rule contemplates suspending the

20  period to the next court date.  It's suspended until I decide

21  the case.

22      MR. KARNER:  Okay.

23      THE COURT:  And so, is there any objection to excluding

24  from the speedy trial period the time from now until the time

25  that I issue an opinion?

1        MR. BYRD:  No, your Honor.

2        THE COURT:  All right.  Time will be excluded.

3        MR. KARNER:  Thank you.

4        THE COURT:  Have a good weekend.

5        MR. BYRD:  Thank you, Judge.

6    (Which were all the proceedings had in the above-entitled

7    cause on the day and date aforesaid.)

8    I certify that the foregoing is a correct transcript from

9  the record of proceedings in the above-entitled matter.

10

11

12  _____
   Mary T. Lindbloom
   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25