1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
     WESTERN DIVISION

3    UNITED STATES OF AMERICA,        )        Docket No. 11 CR 50062
                                      )
4                    Plaintiff,       )        Rockford, Illinois
                                      )        Monday, March 25, 2013
5              v.                     )        8:45 o'clock a.m
                                      )
6    DAYTON POKE,                     )
                                      )
7                    Defendant.       )

8                 TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE FREDERICK J. KAPALA

9

     APPEARANCES:

10

11   For the Government:         HON. GARY S. SHAPIRO
                                 Acting United States Attorney
                                 (327 S. Church Street,
12                                Rockford, IL 61101) by
                                 MR. MARK T. KARNER
13                               MR. JOSEPH C. PEDERSEN
                                 Assistant U.S. Attorneys

14

     For the Defendant:          BYRD & TAYLOR
15                               (308 West State Street,
                                  Suite 450,
16                                Rockford, IL 61101) by
                                 MR. MARK A. BYRD

17

     Also Present:               DANIEL IVANCICH
18                               Special Agent, ATF

19   Court Reporter:             Mary T. Lindbloom
                                 327 S. Church Street
20                               Rockford, Illinois  61101
                                 (815) 987-4486

21

22

23

24

25

1   THE COURT:   Good morning.   Any Cistrunk sightings?

2   MR. BYRD:   No, sir.

3   MR. KARNER:   I didn't see you come in, Judge.

4   THE COURT:   That's all right.   I snuck in.

5   All right.   Let's call the case, Susan.

6   THE CLERK:   11 CR 50062-1, U.S.A. v. Dayton Poke.

7   MR. KARNER:   We need the defendant, right?

8   THE COURT:   Pardon me?

9   MR. KARNER:   The defendant has to be here.

10   THE COURT:   Right.   Show Mr. Karner, Mr. Pedersen

11   appear on behalf of the government.   Mr. Byrd appears for the

12   defendant.   We're waiting for the defendant to be brought up

13   from the jail.   You haven't heard from Mr. Cistrunk?

14   MR. BYRD:   No, sir.   We tried to call him Friday,

15   Mr. Karner, myself, Agent Ivancich, and it appears the phone's

16   been turned off.   All we were getting was a rapid busy signal.

17   THE COURT:   There was a representation to me the last

18   time we were in court that somebody from the government was

19   going to contact Mr. Cistrunk and tell him to be here at 8:45.

20   MR. KARNER:   I said we were going to try, and that's

21   what we tried to do on Friday, Judge, in the presence of

22   Mr. Byrd.   Agent Ivancich dialed the contact number that we have

23   for Mr. Cistrunk while his phone was on speaker phone in the

24   presence of Mr. Byrd, and he tried it twice, and all we had was

25   a rapid busy tone, leading us to believe that the phone's no

PDF created with pdfFactory trial version www.pdffactory.com

1    longer in operation.  So, we tried to do as we told the court

2    that we would do.

3                THE COURT:  All right.  Well, let's wait 'til Mr. Poke

4    comes in.

5                MR. BYRD:  Judge, do we maybe want to have the marshals

6    alerted at the front door that if Mr. Cistrunk arrives, we're

7    notified?

8                THE COURT:  Right.  Tim, would you let the marshals at

9    the front door alert us when Mr. Cistrunk appears?  I don't know

10   how they would know who Mr. Cistrunk is.

11               MR. BYRD:  C-i-s.  He would have to produce an ID to

12   come in the building.

13               THE COURT:  It's on the witness list as S-i-s.

14               MR. BYRD:  It should be C-i-s.

15               Judge, also, while we're on the subject of the witness

16   list, I believe based on my conversations with Mr. Karner that,

17   if needed, we'll have a stipulation as to medical records from

18   SwedishAmerican Hospital.  In the event we're not going to be

19   able to get that stipulation, there is a record-keeper by the

20   name of Teresa Jones that we would be calling to authenticate

21   medical records, if that issue should become necessary.  And

22   that's spelled T-e-r-e-s-a Jones.

23               THE COURT:  You want me to add that onto the civilian

24   list then?

25               MR. BYRD:  Yes, sir.

1          THE COURT:  From Rockford, Illinois?

2          MR. BYRD:  Yes.

3          THE COURT:  I've received the potential witness list

4 and also a joint proposed statement of the case.  There's a

5 mistake on the statement.  It says with intent to distribute

6 marijuana.  I think that should be cocaine base.

7          MR. KARNER:  Yes.

8          THE COURT:  You agree that I should change it?

9          MR. KARNER:  Yes.  Judge, Sarah Anderson is here.

10 She's our chemist.  She's here to produce some notes.  Can she

11 come before the court and turn those notes over?

12          THE COURT:  Yes.

13          MR. KARNER:  Judge, apparently, she needs a subpoena.

14 I'll get that for her later.  Will the court order that she turn

15 those over to us and with a subpoena to issue later this

16 morning?

17          THE COURT:  Yes.  Sarah, will you be able to do that

18 for us?

19          MS. ANDERSON:  I can, yes.

20          THE COURT:  Okay.  Thank you.

21          Show Mr. Poke appears.  What's your position as far as

22 Mr. Cistrunk?

23          MR. BYRD:  Judge, it would be my intent to ask for a

24 contempt warrant for Mr. Cistrunk if he fails to appear and that

25 the trial be continued until such time as he can be located and

PDF created with pdfFactory trial version www.pdffactory.com

1    secured and interviewed by myself and the government.

2              MR. KARNER:  I think the proper procedure would be for

3    a material witness, that he be taken into custody as a material

4    witness, and once he's taken into custody we have the

5    opportunity to depose him as a fallback in case he's not

6    available.

7              THE COURT:  All right.  Well, I'll do both.  I'll show

8    he's failed to appear.  I'll issue a warrant for his arrest.  If

9    you provide me with the material witness warrant, I'll sign

10   that.

11             MR. KARNER:  Will that be Mr. Byrd's responsibility?

12             THE COURT:  Yes.

13             MR. BYRD:  Do you have a form I can look up that you've

14   noticed before?  Or I can try to put one together.

15             MR. KARNER:  I can work with you on it.  I don't have a

16   form

17             MR. BYRD:  I've never had the occasion to do this.

18   I'll be happy to try and prepare it.

19             THE COURT:  All right.  Then I'll do that right now.

20   You'll prepare the warrant for me or the bench warrant,

21   Mr. Karner?

22             MR. KARNER:  Yes, sir, we'll do that.

23             THE COURT:  All right.  I'd like that to issue --

24             MR. BYRD:  What would I then --

25             THE COURT:  Pardon me?

1    MR. BYRD:  What would I then be preparing?

2    THE COURT:  I'm going to do both.  I'm going to issue a

3    bench warrant because he failed to respond to the subpoena, and

4    I'm going to ask Mr. Byrd to prepare a material witness warrant

5    to have him arrested or taken into custody on a material

6    witness -- as a material witness.

7         And I suppose the best course of action would be to go

8    ahead, pick the jury.  Hopefully, he'll be arrested or

9    apprehended by the time the jury is sworn, and we'll hold him

10   until he's called.  I'll have him brought in front of me.  I'll

11   examine him as far as why he didn't appear in response to the

12   subpoena, and also I'll conduct an examination pursuant to the

13   material witness warrant, and I'll find out whether he should be

14   held or not.

15   MR. KARNER:  Well, there's another issue, too.  If he

16   were to testify as at least one time he's indicated that he

17   would, we believe -- I don't think there's any question that

18   he's got a Fifth Amendment privilege against self-incrimination,

19   too, Judge.  So, there is an issue of whether or not he should

20   be informed of his Miranda rights before he testifies and

21   whether or not he should be appointed counsel to consult with in

22   connection with his testimony here.

23   THE COURT:  I agree.  I'll review that with him

24   MR. BYRD:  Judge, obviously, unless there's a

25   substantial break during the day, I'm not going to be able to

1    prepare a material witness warrant.

2          THE COURT:  Can't you do it now?

3          MR. BYRD:  If there's a form, I'd be happy to fill it

4    out.  I don't have my computer with me.  I'd have to go back to

5    my office.

6          THE COURT:  Okay.  Well, why don't you do what you need

7    to do, but I need to get that out before we bring the jury in.

8          MR. KARNER:  So, how much time is your Honor going to

9    give us we should report back?

10         THE COURT:  Come back as soon as you can.

11         MR. KARNER:  Okay.  And we're responsible for preparing

12    the bench warrant.

13         THE COURT:  The bench warrant, right.  And I'd like to

14    sign both of those before we call the jury in.

15         MR. KARNER:  Yes, sir.

16         MR. BYRD:  Then, Judge, at the end of the day, once we

17    get a jury, would it be the court's intent then to prior to

18    swearing them send them home and they'll be called when

19    Mr. Cistrunk's apprehended?

20         THE COURT:  I don't know.  It depends upon what we find

21    out between now and then.  I may just discharge the jury and

22    come back on another day.  But maybe we'll get some idea about

23    where he is.  Maybe he'll call.  Lots of things could happen

24    between now and the time that I swear in the jury.

25         MR. BYRD:  Understood.

1        MR. KARNER: Okay.

2        THE COURT: Yes. Mr. Poke.

3        DEFENDANT POKE: With all due respect, your Honor, I'm

4  still -- I mean, I couldn't prepare a motion to get counsel off

5  my case. It's the same thing. I can't get him to work with me.

6  I don't know nothing what's going on with this case. They

7  brought me back five days earlier for me to meet with him He

8  never show up.

9        I don't know how -- I don't know nothing about the

10  witnesses, how we going to prepare them for the bench. He just

11  informed me today that one of the witnesses he never talked to.

12  He sent the ATF agent to talk to him for what I don't know. I

13  mean, I understand you say Mark a good lawyer, but, man, Mark's

14  not working with me.

15        THE COURT: Well, my experience with Mr. Byrd is that

16  he's done an excellent job in court, but as I told you before,

17  if you file a motion, I will put everything I know about

18  Mr. Byrd aside, and I will --

19        DEFENDANT POKE: I don't know how.

20        THE COURT: -- consider the motion based upon what

21  information I receive during the hearing on the motion.

22        DEFENDANT POKE: I mean, I don't know how.

23        THE COURT: But you have to file the motion.

24        DEFENDANT POKE: I don't know how.

25        THE COURT: Well, you write -- I told you how. The

1    last time we were in court I told you how.

2              DEFENDANT POKE:  Yeah.  You told --

3              THE COURT:  Listen.  You're interrupting me, and I

4    don't like it.  I won't interrupt you if you promise you won't

5    interrupt me.  Is that a deal?

6              DEFENDANT POKE:  All right.

7              THE COURT:  All right.  The last time we were in court,

8    I told you to write a motion.  I told you to prepare a motion.

9    All you had to do is write down the things that Mr. Byrd's not

10   doing or is doing that makes him unqualified to represent you.

11   That was a simple request.  And now we have a jury coming in.

12   You know, we're set to go right now, and you're telling me you

13   want to file your motion.  I told you to file the motion in

14   writing and I would take care of it.

15             All right.  It's your turn.

16             DEFENDANT POKE:  I mean, I tried to get in contact with

17   him to let him know my situation and what's going on with me

18   trying to prepare a proper motion.  I mean, as him being my

19   counsel, he's supposed to be in contact with me.  I mean, he's

20   here.  You can ask him what he's doing and what he ain't doing.

21   I'm pretty sure he ain't going to lie.  I mean, it's simple.

22   He's not working, your Honor.

23             THE COURT:  All you have to do is write down the things

24   that you feel show that Mr. Byrd is falling short of what a

25   competent counsel should do to represent you.  You don't need

PDF created with pdfFactory trial version www.pdffactory.com

1  Mr. Byrd to do that.  You can write it on a piece of paper.

2            DEFENDANT POKE:   So, I can write it during recess?

3            THE COURT:   Yes.   You better write it right now.

4            MR.  BYRD:   Do you want some paper?

5            DEFENDANT POKE:   Yeah.

6            MR.  BYRD:   Is he allowed to have a pen?

7            THE MARSHAL:   We'll supply him with a pen.

8            DEFENDANT POKE:   You're a good actor, man.   You let the

9  judge know somebody died in your family?  That's why you

10 weren't --

11           MR.  BYRD:   Yes, I did.   He was aware of it from last

12 week.

13           Judge, just so the record's clear, I explained in my

14 attempt to meet with Mr. Poke this morning at 8:15 that part of

15 the reason I was not able to get down to see him last week -- I

16 wasn't even aware he was in McHenry County until Wednesday.   I

17 explained to him that I had a death in the family.   My sister

18 passed away.   That took a substantial amount of my time.   After

19 we had her memorial service late on Wednesday, I immediately

20 began getting ready -- continuing to get ready.   I don't want

21 the record to suggest that I haven't done anything to get ready

22 for this trial prior to that date.

23           In pulling together and organizing the file, I had

24 meetings with Mr. Karner and Mr. Ivancich on Friday to view the

25 physical evidence.   The weekend was largely spent shopping

1    trying to find clothes for Mr. Poke and continuing to put the

2    case together to get ready for trial.  Unfortunately, I was not

3    able to get out to Woodstock to meet with him

4              DEFENDANT POKE:  What about court after last time?

5              MR. BYRD:  After court last time?

6              DEFENDANT POKE:  Yeah.

7              MR. BYRD:  What do you want me to talk about?

8              DEFENDANT POKE:  I mean, why didn't you meet with me?

9    Why you ain't prepared nothing with me?  You know we had trial

10   on the 25th.

11             MR. BYRD:  I met with Mr. Poke after court last time.

12   We had an initial meeting that didn't go well.  As the court may

13   recall, he was unhappy with my efforts, and that was the whole

14   issue of preparing the motion to have me removed.  I was

15   asked -- after I had the plea hearing in front of your Honor at

16   10:00, court with Magistrate Mahoney at 11:00, I was advised

17   that Mr. Poke wanted to meet with me.  I met with him probably

18   close to a half hour, 45 minutes, and at that point in time I

19   felt that our relationship was doing much better, and there was

20   no indication that he wanted me to prepare a motion to withdraw

21   or anything like that.  Is that correct?

22             DEFENDANT POKE:  No, that's not correct.

23             MR. BYRD:  You wanted me to prepare a motion?

24             DEFENDANT POKE:  Yeah, I did.  Yeah.

25             MR. BYRD:  You didn't indicate that to me.

1    DEFENDANT POKE:  And I told him if he's willing on

2    cooperating with me to get through this trial, we can proceed

3    with the trial, but if he's not going to help me proceed through

4    the trial, then just withdraw from the case.  I'm not scared of

5    going to trial.  I understand what I'm facing.  But if I don't

6    got no help, it's no reason -- I mean, how can I go?

7    MR. BYRD:  Judge, after that day, there were numerous

8    e-mail communications between Mr. Poke and myself through the

9    system known as Corrlinks that is set up at MCC where we

10   continued to discuss what the strategy of the case would be,

11   what the plan was to be, and in none of those e-mails was I ever

12   asked to file a motion to withdraw.

13   DEFENDANT POKE:  No, because you just said you talked

14   to me for 45 minutes.  It wasn't through the e-mail.  It was

15   during the 45 minutes, right?

16   MR. BYRD:  But we had further communication about the

17   trial.

18   DEFENDANT POKE:  Because, your Honor, I addressed other

19   issues asking him -- telling him okay.  I'm willing on working

20   with you with the trial.  This is what I feel like we need to

21   do, why we need to do it, even my clothes size.

22   I'm not ducking trial, but if I don't got a counsel

23   that's in my best interests who's just trying to talk to me when

24   I get here to court and I don't know nothing, I can't go to

25   trial.  I mean, I don't know nothing.

1    THE COURT: Write down the reasons that you feel
2    Mr. Byrd is not qualified and able to adequately represent you,
3    and when you come back to court, I'll look at it, and we'll sort
4    it out.
5    DEFENDANT POKE: Okay. I got one more thing, your
6    Honor. I mean, I feel like we shouldn't even be at this point,
7    anyway, because my lawyer talked me into going into it with the
8    government, to sign the proffer, telling me it's in my best
9    interests. I disclosed an amount of information to the
10   government, you know what I'm saying, murders, drugs, people
11   selling guns, in return for a plea deal. And then at this point
12   they never -- I mean, I don't understand it. I don't understand
13   nothing. Because he got me doing one thing, and all this other
14   stuff going on. I don't know what's going on.
15   And then he got me thinking that I'm going to get a
16   fair plea deal or something. Now here he is. I'm dressed up.
17   They talking about trial. This was what? Thirty days ago? How
18   was you preparing for trial when you had me inside signing a
19   proffer and disclosing information about things in return for a
20   plea deal?
21   MR. BYRD: Does your Honor want me to address that?
22   THE COURT: Yes. I'll ask you both to address it.
23   MR. BYRD: Judge, a couple months ago -- I believe it
24   was probably when we were in here in late January for the final
25   pretrial. Though, I could be mistaken. That's my recollection.

1    Mr. Poke indicated to me that he -- we had discussions about the

2    possibility of a proffer.  As I tell all my clients, I explain

3    to them the proffer situation, that they get a letter explaining

4    that there are no promises or representations made until they

5    hear what the individual has to say and then have an opportunity

6    to evaluate that information.

7         In fact, Mr. Poke -- and I take no position.  I tell my

8    clients, every one of them, that I've had clients that it's

9    worked out wonderfully for.  I've also had clients that it

10   hasn't worked wonderfully for.  It's up to them, what they know.

11   They always have to be completely truthful, or the government is

12   not going to make any type of an offer on the case.

13        Mr. Poke provided me with several names of individuals

14   I had never heard of and asked me to go talk to Mr. Karner and

15   Agent Ivancich and give them those names.  I did give them those

16   names.  Agent Ivancich appeared somewhat interested.  I was

17   contacted a couple days later indicating that they'd like to set

18   that proffer up.  I spoke with Mr. Poke about it.  He agreed.

19   We had a nice long meeting here in this courtroom -- or not in

20   this courtroom -- in this courthouse, where numerous agents were

21   in attendance.  Agent Ivancich, Chief Deputy Mark Jurasek from

22   the -- or Detective Jurasek from the Winnebago County Sheriff's

23   Department, Special Agent Craig Smith from the FBI, myself,

24   Mr. Poke.  It was probably a two-hour long meeting where

25   Mr. Poke provided a lot of information.  As he indicated,

PDF created with pdfFactory trial version www.pdffactory.com

1    information about murders, drugs, guns, dealings, and all of

2    that in the Rockford area.  I told Mr. Poke that the protocol is

3    that we wait a couple of weeks or however long, a few days,

4    until the government has an opportunity to evaluate the

5    information.

6            The next thing that I heard was several days later,

7    Mr. Karner indicating that he had spoken with Mr. McKenzie.

8    They had reviewed the information, and there was no offer that

9    they were prepared to make Mr. Poke at this time.  When I

10   inquired a little bit further -- and I don't want to speak for

11   the government -- I was led to believe that they didn't believe

12   that Mr. Poke was truthful about his involvement in this case

13   that's pending before the court, and they felt that he was

14   holding back information regarding a relative of his who was a

15   former client of mine.  And as far as the government's position

16   beyond that, I'm not competent to speak to.

17           THE COURT:  Mr. Karner.

18           MR. KARNER:  I agree with -- first of all, I agree with

19   what Mr. Byrd says is accurate.  I did review the results or the

20   statements made by the defendant during his proffer-protected

21   interview.  And it's our position, number one, he was not

22   truthful about his involvement -- his description of his

23   involvement in this case, that he wasn't truthful in the

24   description of a murder that he discussed, based upon my

25   familiarity with the results of that investigation.

PDF created with pdfFactory trial version www.pdffactory.com

1    In addition, nothing provided -- even if we were to

2 accept the defendant's statements as true in the proffer, he

3 provided us with no information that would allow us to establish

4 provable criminal cases against third-parties.  So, based on

5 that, we were not in a position to offer him any percentage --

6 agree to any percentage reduction in the guideline range

7 sentence to the court.  I mean, we never have gotten to the

8 point of where we've actually discussed a plea agreement because

9 my understanding is -- and he can correct me if I'm wrong, but

10 my understanding is the defendant's not willing to plead guilty

11 unless we were to agree to a substantial percentage off of the

12 guideline range, and we're not willing to do that.

13          MR. BYRD:  Judge, part of Mr. Poke's concern --

14          DEFENDANT POKE:  Excuse me.  Excuse me, your Honor.

15          THE COURT:  Let Mr. Byrd talk, and I'll let you talk.

16          DEFENDANT POKE:  Yes, sir.

17          THE COURT:  We'll all take turns.

18          DEFENDANT POKE:  Yes, sir.

19          MR. BYRD:  Part of Mr. Poke's concern is that in that

20 proffer, notwithstanding the fact that the letter advises that

21 the information cannot be used against him unless he takes a

22 contrary position to what was stated in the proffer, either at

23 trial or at sentencing, that he made admissions during that

24 proffer that the government may very well intend to try to use

25 against him if he testifies in this case, which is in the

PDF created with pdfFactory trial version www.pdffactory.com

1    letter.  We discussed the letter.  We all signed the letter.  I
2    don't believe I forced Mr. Poke or did anything other than
3    explain to him what was involved in doing a proffer and how the
4    information can be used against him later.

5           Mr. Karner is correct.  We were looking to derive a
6    substantial benefit, and certainly I don't have the intelligence
7    of local crime in the area that the various agents that were
8    present or the U.S. Attorney's Office would have.  I left the
9    meeting feeling as though Mr. Poke, with great emotion,
10   explained a lot of information about several murders, about gun
11   trafficking, about drug trafficking in the Rockford area, but at
12   no point do I believe that I ever encouraged him or forced him
13   to go into this proffer meeting.  It was at his suggestion that
14   I first approached Mr. Karner and Agent Ivancich with names of
15   individuals I knew nothing about and had never heard of before.

16          If I could say one thing with respect to Mr. Poke's
17   earlier comments about a witness, Stonewall Jackson (sic), that
18   he wanted to have called, who I made numerous efforts to try to
19   contact via telephone, could not get a return call from him, I
20   did not at any point nor do I have the power to send an ATF
21   agent out to interview a witness.  He was disclosed, and I think
22   Mr. Poke doesn't understand that in order to be able to call
23   witnesses, we have to disclose them to the government as being a
24   potential witness in the case so that it can go on the witness
25   list and there are no surprises come trial time.  They happened

PDF created with pdfFactory trial version www.pdffactory.com

1    to get to Mr. Jackson -- or I mean Pittman -- and interview him

2    before I could get him to call me back.  Now he's not calling me

3    back.  That's why Mr. Pittman is not served in the case or is a

4    witness in the case at this point.

5             MR. KARNER:  May I add one thing, Judge?

6             THE COURT:  Yes.

7             MR. KARNER:  We have notified the defense that if they

8    pursue a defense of personal use that that would be inconsistent

9    with some of the statements -- potentially inconsistent with

10   some of the statements in the proffer interview, and we've put

11   them on notice that we do intend to present some of those

12   statements to the jury in rebuttal should they pursue a personal

13   use defense.

14            DEFENDANT POKE:  You see what I'm saying?  At the same

15   time, your Honor, my lawyer never broke all that down to me like

16   that.  All he told me is if I admit to this case, that's the

17   only way they was going to talk, and I told him I'm not going to

18   do that because that's not my gun, you know what I'm saying.  He

19   further asked me again to admit to it, and I told him, well, you

20   know, I ain't going to talk to them because I'm not going to

21   admit something that ain't mine.  Then he told me, "You might as

22   well go in there.  It can't hurt you.  All it can do is help

23   you," if he feel like he ain't convinced me, man.

24            And plenty of times while I was in there before we even

25   got started, once the government tried to force me to admit to

1    the gun, I'm in tears crying asking him to escort me out of

2    there, and they never did.  The government walked out and told

3    him to get me under control.  He sat me.  He smoothed me through

4    it.  And then as I agreed to continue to sit, thinking he's

5    going to help me out in there, they badger me in there, and he

6    never said nothing.  He never defended me one time.

7            So, at the same time -- and then from that point we

8    jumped right into trial.  I don't -- I mean, I don't --

9    honestly, I don't know what's going on.  And that's what I'm

10   trying to get to a point is either, man, I need to start over

11   with somebody who's going to help me and I know everything

12   what's going on, or I just see him let this man railroad me

13   through trial.  I at least want a fair chance.

14           THE COURT:  Well, wasn't there a letter that he showed

15   you, a proffer letter?

16           DEFENDANT POKE:  I just signed it.  He told me about

17   it.  He ain't -- he ain't running through me.  He just told me

18   anything I admit to the proffer can be used against me at trial.

19           THE COURT:  Didn't you read the letter?

20           DEFENDANT POKE:  No.  He never -- he just told me to

21   sign it.  He told me I don't have to worry about reading it.

22   They going to sign it or something once we get upstairs.  It's a

23   rush job with him  It wasn't like he sat down -- he sat down

24   with that piece of paper five minutes before it was time to go

25   upstairs and "Come on.  We need to hurry up," same thing as he

PDF created with pdfFactory trial version www.pdffactory.com

1   doing -- same thing he do every time I come to court.  He want

2   to sit down right there for five minutes and run me into court.

3   He never sat down with me and explained none of this stuff to

4   me.  And neither time have we ever been in that room anywhere

5   close to an hour.  Never.

6           THE COURT:  Mr. Karner?

7           MR. KARNER:  Judge, in response to what Mr. Poke just

8   said, while I don't know the conversation that occurred between

9   him and his lawyer, I do know the conversation that I had with

10  Mr. Poke in the presence of his lawyer and investigating agents,

11  and prior to questioning the defendant in the proffer, I

12  explained the terms of the proffer letter to Mr. Poke.

13          DEFENDANT POKE:  No.  No, he did not, sir.

14          THE COURT:  You're saying he did not?

15          DEFENDANT POKE:  No, he didn't.  They went in straight

16  into questioning me about my case.  He never -- this what he

17  explained to me.  The government saying here, to get over on me,

18  they're not trying to trick me or none of this.  We're going to

19  help you, and we promise you.  I mean, it was all a bunch of

20  lies.  They promised me a plea deal, and then here we is.  We

21  sitting here.  I don't even got no copy of the proffer, the

22  statements, or none of that stuff.  I mean --

23          THE COURT:  Mr. Karner, did the government ever promise

24  him a plea deal?

25          MR. KARNER:  No.  There was no -- we specifically said

1    there was no promises other than those contained in the

2    substance of the proffer, and that is if he told us the full and

3    complete truth, what he told us couldn't be used against him in

4    the guilt and innocence phase of trial or in aggravation of the

5    sentence.  We also explained the terms of the proffer, that

6    should he withhold information or deemed to be untruthful, then

7    all bets were off and that the substance of the proffer could be

8    used against him in a trial or in aggravation of his sentence.

9            THE COURT:  You mentioned, Mr. Poke, that it wasn't

10   your gun, but I think I'm correct in saying that ownership of

11   the gun isn't the critical fact.  It's possession of the gun.

12   In other words, you can possess somebody else's gun.

13           DEFENDANT POKE:  Let me rephrase that.  I didn't know

14   the gun was in the car.

15           THE COURT:  All right.

16           DEFENDANT POKE:  And he correct.  He didn't promise me

17   a plea.  He promised me -- he promised me -- he ain't promised

18   me how much they was going to help me.  He promised me I -- he

19   told me he couldn't tell me what they can do for me, but it

20   would be something did.  That's what he promised me.

21           THE COURT:  It would be some deal?

22           DEFENDANT POKE:  I mean, he ain't promised me a set

23   time, but he promised me something will be tooken care of.  I

24   gave him details.  We in there two hours.  I mean, if he can

25   bring somebody here that shows that I lied about anything -- he

PDF created with pdfFactory trial version www.pdffactory.com

1    wanted me to put somebody on the crime scene of a murder, and I

2    told him I'm not going to that.  He wanted the truth, and I gave

3    him the truth.  He wanted me to put somebody there that wasn't

4    there because it's somebody he got a vendetta with of prior

5    cases where he told me this guy got off with some things, and he

6    want him  And I told him no, he wasn't there.  I don't got no

7    knowledge of him being there, and I'm not going to put him

8    there.  So, that's what turned the whole thing against me

9    because he wanted me to lie on the guy, and I told him I

10   wouldn't do it, and I still ain't going to do it.

11           THE COURT:  Mr. Karner, did at any time you or anyone

12   else from the government tell Mr. Poke that if he talked, he

13   would get some kind of deal?

14           MR. KARNER:  No.

15           DEFENDANT POKE:  Look.  You think I was going to a

16   proffer talking for two hours, I been locked up two years, with

17   not an offer?  That don't even make no sense, your Honor.

18           THE COURT:  Well, it would make sense to me if there

19   was a hope by you that you could get some type of consideration.

20           And, by the way, at sentencing in the case, just

21   because the government doesn't make a motion under 5K1.1 for a

22   departure, that doesn't mean that I as the sentencing judge, if

23   it did go to sentencing, would not be able to consider in

24   mitigation your attempts to cooperate.  So, the benefit that you

25   do get by attempting to cooperate is not limited solely to what

PDF created with pdfFactory trial version www.pdffactory.com

1    the government's motion is.  You could present evidence in court

2    that you attempted to cooperate, and if I thought that that was

3    worthy of some mitigating consideration, I would give it to you.

4           But I need to get going here with these warrants.

5    Mr. Poke, you'll have to step out and put together your motion.

6    Mr. Byrd, you're going to have to prepare my material witness

7    warrant.  And, Mr. Karner, you're going to have to prepare my

8    bench warrant.

9           MR. KARNER:  Yes, sir.

10          MR. BYRD:  I'll do that and get back as quickly as I

11   can.

12          THE COURT:  Right now.  Yes, please.  As quickly as you

13   can.

14      (Brief recess.)

15          THE COURT:  All right.  Show all parties appear.

16          I've been presented with an arrest warrant prepared by

17   the government and a warrant for arrest of a witness or a

18   material witness in a pending criminal case.  I will sign both

19   of those.

20          All right.  Mr. Poke, do you have your motion for me?

21      (Said document was tendered to the court.)

22          THE COURT:  All right.  I suppose I should prepare a

23   copy.  Tim, can you ask somebody in my chambers to prepare a

24   copy?  We need two copies of this.  Why don't you have a seat

25   until we get those copies back.

PDF created with pdfFactory trial version www.pdffactory.com

1          (Brief pause.)

2               THE COURT:   All right.   Step up again, please.

3               All right.   Mr. Poke alleges five -- or seven grounds

4     which he feels entitles him to substitute counsel.   The first

5     one is he never sat down with me but one time to go over my

6     discovery.   How do you respond, Mr. Byrd?

7               MR. BYRD:   Judge, I disagree with that.   We've

8     discussed the discovery in at least initially one meeting that

9     we had at the MCC early in the case after I received the

10    discovery.

11              But it's been an ongoing discussion of the discovery

12    throughout the case.   We had an extensive motion to quash arrest

13    and suppress physical evidence that was heard by your Honor

14    where numerous officers were called.   There were several

15    discussions between myself and the defendant about those reports

16    and problems with those reports.   Many of the things that were

17    in the reports he alerted me to because I was not his first

18    attorney.   Mr. Gaziano had this case before that.   My

19    understanding was that the defendant had been provided with

20    discovery by Mr. Gaziano, and somewhere in the transmission of

21    him from Ogle County to MCC, that material was thrown out.

22              And after that, I answered requests from Mr. Poke to

23    send him copies of things.   I have letters and copies of

24    discovery and items that were sent to him  If I receive a

25    response for something, I get it out to the defendant.   We sent

1    him disks.   It's my understanding they have a computer down

2    there.

3              And we really do discuss elements of this case and the

4    discovery and strategy each and every time I see him here in

5    court and each and every time we communicate via e-mails.   I

6    believe the e-mails will bear that out.   Most recently within

7    the last week he e-mailed -- or ten days or so -- he e-mailed me

8    indicating he was stressing because he wasn't sure what the

9    strategy was.   I responded to him that the strategy was going to

10   be largely the same as it was in the motion to suppress hearing.

11   I disagree that there's only been one time that I've gone over

12   his discovery with him

13             THE COURT:   All right.   Let me say that if at any point

14   you feel that you are going to have to respond or either of you

15   are going to have to make representations that would prejudice

16   you during the trial of the case, I will ask the government to

17   leave the courtroom

18             All right.   Mr. Poke, how do you respond to what

19   Mr. Byrd said?

20             DEFENDANT POKE:   He only sat down with me with my

21   discovery one time.   Everything else he just said, yeah, we

22   mentioned it, but as far as him sitting down with my discovery,

23   going over everything with me, he only did it one time.

24             That's what he asking you.   How many times you sat down

25   with me with the paperwork.

1       THE COURT:   Why is Mr. Gaziano not on the case?

2       DEFENDANT POKE:   Because Mr. Gaziano did the same

3   thing.   He refused to sit down with me and go over my discovery,

4   and then information that I gave him, like my affidavit, I gave

5   him a copy of the affidavit, he gave the copy of the affidavit

6   to the government.   So, everything that I disclosed to him, he

7   gave it to Mark Karner.

8       THE COURT:   Did you ask that he be replaced?

9       DEFENDANT POKE:   Yes.

10      THE COURT:   And so, this is the second time you're

11  asking for your attorney to be replaced?

12      DEFENDANT POKE:   Yes.

13      THE COURT:   All right.   Anything more you want to say,

14  Mr. Byrd, about the first allegation?

15      MR. BYRD:   No, your Honor.

16      THE COURT:   The second allegation.   He never sent me

17  all my discovery and I asked several times.   Mr. Byrd?

18      MR. BYRD:   Judge, I believe I sent Mr. Poke numerous

19  disks containing his discovery.   He specifically after the

20  suppression hearing or before the suppression hearing -- I'm not

21  sure which -- requested copies of all the photographs and the

22  reports and a copy of Mr. Cistrunk's affidavit.   Again, because

23  it's my understanding he was in possession of all those items

24  prior to being moved from Ogle to -- from Ogle County Jail to

25  the Metropolitan Correctional Center, and it's my understanding

PDF created with pdfFactory trial version www.pdffactory.com

1    that those items were thrown out when he arrived at the

2    Metropolitan Correctional Center, and I have sent him everything

3    that he requested, I believe.

4         Just going through the discovery this weekend, I

5    encountered letters to him, "Enclosed please find this per your

6    request." Disks, photos, the affidavit, the reports. I'm not

7    sure what it is that he's lacking and wanted a copy of that he

8    didn't receive. That's all I know about that.

9         THE COURT: Is there anything that has been disclosed

10   to you by the government that you have not conveyed to Mr. Poke?

11        MR. BYRD: I don't believe so. I mean, the discovery

12   in this case is pretty well limited to the police reports, the

13   findings of various laboratory results, things like that. I

14   don't know that I've gotten him each and every one of those

15   things, but at least the reports. He's had the photographs that

16   were taken. The affidavit from Mr. Cistrunk he's had. And I

17   believe there are other items, as well, that was provided to

18   him

19        In fact, when we were in court earlier, I think it was

20   disclosed back in January, text messages that the government had

21   retrieved from the defendant's cell phone, as well as

22   transcripts that were prepared of conversations that Mr. Poke

23   had when he was being housed at the Winnebago County Jail before

24   this case became a federal matter. And I specifically recall

25   giving Mr. Poke copies of all of those in court or after court

1    down in the Marshal's Office and indicating to him that there

2    were certain things in there that caused me some concern that he

3    was going to have to be prepared to address if he testified.

4    That's my belief.  I don't believe there's any substantial

5    discovery that hasn't been provided once he's asked or if he's

6    asked.

7              THE COURT:  Okay.  And I'll let you respond, Mr. Poke,

8    but let's go back to this first allegation.  By the way, there

9    are nine allegations, not seven.  The last two are on the

10   opposite side of the page.

11             You say Mr. Byrd never sat down with you but one time

12   to go over your discovery.  What else do you need to go over

13   with him that you haven't gone over with him so far?

14             DEFENDANT POKE:  We never went over none of the jury

15   transcripts, the grand jury transcripts.  We never went over

16   none of that stuff.  We never went over the ATF agent, his grand

17   jury transcripts.  We never went over none of the phone

18   conversations.  We never went over the people who they had come

19   to the grand jury.  We -- I mean, I can go on and on.  We never

20   went over none of that stuff.

21             THE COURT:  Okay.  Well, I want you to tell me

22   everything.

23             DEFENDANT POKE:  You know, I don't know the name of all

24   the paperwork, but like as far as the grand jury transcripts and

25   people who they interviewed or phone conversation or supplement

PDF created with pdfFactory trial version www.pdffactory.com

1    reports, we went over none of that stuff.

2              THE COURT:   Did you review the grand jury transcripts?

3              MR. BYRD:   Judge, my understanding from what I've been

4    disclosed, there were essentially two witnesses in the grand

5    jury, Amy Favors and Special Agent Ivancich.   My recollection is

6    that we did discuss that information.   The very first meeting I

7    had with Mr. Poke we discussed Amy Favors' testimony and what

8    she had said in the case and how it might help or hurt him   As

9    far as Special Agent Ivancich's testimony, I believe we've

10   discussed that, as well.   Again, those transcripts would only be

11   necessary for impeachment purposes and possibly to call Special

12   Agent Ivancich as a substantive witness, which I believe we may

13   very well end up doing in this case.

14             There's certainly -- I don't recall there ever being a

15   request made by the defendant that we needed to sit down and

16   review Special Agent Ivancich's grand jury transcripts.   The

17   defendant had those in his possession originally when discovery

18   was provided.   We then provided additional discovery in the form

19   of the disks after he was moved to MCC.   Those were mailed to

20   him

21             And I don't see this as a big issue.   Again, if it had

22   been brought to my attention that he wanted to discuss something

23   in Special Agent Ivancich's transcript from the grand jury, I

24   certainly would have done that.   I'm not -- I don't have any

25   problem with Mr. Poke.   I'm not trying to sabotage his defense

PDF created with pdfFactory trial version www.pdffactory.com

1    here.  And I've attempted to respond to each and every request

2    that he's made of me, except for number three, and I can explain

3    that in a little more detail.

4              THE COURT:  Okay.  We'll get to that.

5              All right.  And as to two, what discovery is out there

6    that he hasn't sent you, Mr. Poke?

7              DEFENDANT POKE:  I never got the government response to

8    the post memorandum motion.

9              MR. BYRD:  Motion to suppress.

10             DEFENDANT POKE:  Yeah.  I never got that stuff.  I

11   asked him for all the motions the government put in against me.

12   I asked him for all the motions we put in, you know what I'm

13   saying.  They call it something like the Brady letter or

14   something.  I wanted to go over all these things before we set a

15   trial date.  The ATF agent, that grand jury report, we just got

16   that in September.  So, you never got a chance to go over that

17   with me.  So, you just told the judge you did.

18             MR. BYRD:  The only thing that the September grand jury

19   did was modify the amount from 4.3 grams of cocaine --

20             DEFENDANT POKE:  No.

21             MR. BYRD:  -- to 1.2 grams of cocaine.  It was a very

22   short transcript that has no --

23             DEFENDANT POKE:  No.

24             MR. BYRD:  The original Ivancich transcript was from

25   the time that the defendant was initially indicted on the

1   original indictment.

2          DEFENDANT POKE:  That's the whole new discovery where

3   they talked to the witness and all that stuff.  I never got a

4   chance to go over with him with the stuff that they interviewed

5   the witness over the phone.  We never talked about that stuff.

6          THE COURT:  Well, who has the -- do we have a second

7   grand jury transcript here?

8          MR. KARNER:  I disclosed it to Mr. Byrd, Judge.

9          THE COURT:  Do you have it?

10         MR. KARNER:  Not with me, but it's in my office.

11         DEFENDANT POKE:  I mean, it's so much stuff that we

12  ain't --

13         THE COURT:  Well, why don't we look at it?  Can you get

14  it for me?

15         MR. KARNER:  Yes, sir.

16         MR. BYRD:  I may have it.

17         THE COURT:  Could you look?

18         MR. BYRD:  I sure will.

19      (Brief pause.)

20         THE COURT:  Mr. Poke, what makes you think that there's

21  more than just reducing the amount of cocaine base?

22         DEFENDANT POKE:  Because I got a copy of it, and I read

23  it, and I told him -- I said I think we need to sit down and go

24  over some of these things that been talked about at the grand

25  jury.

1      THE COURT:  Well, wait, wait, wait.  You just -- what

2  we're talking about right now is he didn't give you all of your

3  discovery.

4      DEFENDANT POKE:  Oh.

5      THE COURT:  And I asked you what things he didn't give

6  you, and you said the second grand jury transcript, and now --

7      DEFENDANT POKE:  No.

8      THE COURT:  And now Mr. Byrd tells me --

9      DEFENDANT POKE:  I misunderstood.

10      THE COURT:  You're interrupting me.  Stop interrupting

11  me, and I won't interrupt you.

12      Mr. Byrd tells me, well, the only thing that was in

13  that second grand jury transcript was the reduction of the

14  amount of cocaine base, and I'm having him get it right now to

15  find out whether that's true or not, and now you told me, well,

16  I've reviewed it, and that's inconsistent with what we're

17  talking about right now.  First you tell me you didn't get it.

18  Now you tell me you did get it.

19      DEFENDANT POKE:  Your Honor, I misunderstood, because

20  you jumped back and forth from a couple of different things.

21  So, when I was talking about the motion stuff --

22      THE COURT:  We're not talking about the motion stuff.

23      DEFENDANT POKE:  That's what I was talking about when I

24  said -- you asked me what I didn't get.  You told me that.  And

25  you asked me what he ain't go over with me.  I was just naming

1    the things that we ain't went over.  I mean, I got confused.  I

2    mean, I went over it, but I didn't go over this stuff with him

3    This stuff we still need to go over before trial.

4             MR. BYRD:  Judge, this was disclosed back in January of

5    I believe this year.  It's eleven pages.  There is a little more

6    in it than the 1.2 grams, but my recollection is that is why it

7    was presented, and it's essentially the same testimony that

8    Mr. Poke and I discussed prior to the suppression hearing.

9             DEFENDANT POKE:  We got that after the suppression

10   hearing.

11            MR. BYRD:  Right.  I know.  But he did the original

12   grand jury, and it was essentially the same --

13            DEFENDANT POKE:  No.

14            MR. BYRD:  -- except for the change.

15            DEFENDANT POKE:  No, it's not.  It's not, see.

16            MR. BYRD:  Well, how do you know if you haven't seen

17   it?

18            DEFENDANT POKE:  No.  I told you I seen it.  I told you

19   we need to go over it.  They ain't never the same.  The grand

20   jury reports, the first one and the second, is totally

21   different.

22            THE COURT:  All right.  So, you did see the second

23   grand jury transcript.

24            DEFENDANT POKE:  Yeah, I did.

25            THE COURT:  All right.  As far as the response to the

1   motion to suppress?

2            MR. BYRD:   I'm sorry?

3            THE COURT:   The government's response to the motion to

4   suppress.   Mr. Poke says he never received that.

5            MR. BYRD:   I don't recall.   I'd have to look through my

6   notes and see if he did or not.   It was shortly after that

7   response was put in that your Honor ruled, and he was brought

8   back to court within a day or two after the ruling.   At that

9   point I don't recall if I provided him with that or not, but

10  your Honor had already ruled on it.   I'm not sure.

11           THE COURT:   Could you provide him with a copy?

12           MR. BYRD:   I'd be happy to.

13           DEFENDANT POKE:   I mean, everything that I'm asking

14  here, I knew it was going to come to this.   That's why I sent

15  all them e-mails prior before this court date so he can't say I

16  never talked to them things.   I mean, tomorrow he could bring a

17  copy of the e-mails that I sent to him about everything I was

18  asking for and everything that I was talking that I told him we

19  need to go over before trial and things that we ain't go over.

20           THE COURT:   Sounds to me that there's been quite a bit

21  of communication between you and Mr. Byrd.

22           DEFENDANT POKE:   No.   He ignore me, but I just keep

23  sending them so I can get it on record that I tried to

24  communicate with him about these things, why he wouldn't come in

25  here and say that I'm lying or any of this stuff, because I know

1    that's what it was going to come to.  And I'm pretty sure he got

2    copies in his master file of my e-mails.

3            MR. BYRD:  I should have a copy of all the e-mails.

4            DEFENDANT POKE:  Yeah.

5            THE COURT:  All right.  Let's go to number three.

6    Before trial I told him -- I can't read that word.  That looks

7    like --

8            MR. BYRD:  To put in some more motion before we set a

9    trial date.

10            THE COURT:  That's two?

11            MR. BYRD:  No, number three, sir.  Before trial --

12            THE COURT:  No.  I told him -- it likes like l-e-f, but

13    you say that means two?

14            DEFENDANT POKE:  I told him let's put in some more

15    motion.

16            THE COURT:  Oh, let's.

17            DEFENDANT POKE:  Yeah, let's.

18            THE COURT:  Put in some more motion before we set a

19    trial date.  What did you want him to put in?  What motion did

20    you want him to file?

21            DEFENDANT POKE:  The investigative detention and the

22    Terry stop.

23            THE COURT:  Well, those are the same thing.

24            DEFENDANT POKE:  Yeah.  I mean, yeah, that's what I'm

25    saying.

1    MR. BYRD:  Judge, if I can explain.  After Detective
2  Pruitt testified in the suppression hearing that it was his
3  intention to pull the defendant over whether he had failed to
4  signal or not, Mr. Poke wanted to explore filing a motion to
5  challenge the stop as being a pretextual stop.  I provided
6  him -- I did research.  I discussed that with him, told him that
7  I did not believe that that motion was well grounded in existing
8  law based upon a U.S. Supreme Court case back in 2010, the name
9  of which escapes me at the moment, which essentially -- as well
10  as numerous Law Review articles and treatises that I reviewed,
11  suggesting that there is essentially no such thing as a
12  pretextual traffic stop after that 2010 case.  I provided that
13  case and an explanation of it to Mr. Poke, and I believe his
14  next e-mail to me indicated that he was satisfied that that was
15  not, in fact, a valid motion.
16      Then he wanted to go back and file another motion to
17  challenge whether or not he, in fact, had failed to signal
18  before turning into the residential driveway.  Essentially, go
19  back and relitigate the suppression issue, but take on a new
20  dimension that he had, in fact, signaled.  I discussed with him
21  that I believed that that would be a horrendously bad idea for
22  several reasons, one of which he had the opportunity to present
23  that.  And we sat right in this very courtroom  Mr. Poke sat
24  there knowing where we were headed, and your Honor asked me
25  whether or not there was a challenge to the traffic stop.  I

1    believe we had discussed that.

2              DEFENDANT POKE:  I object to -- I object to any of

3    that.  I object to any of that.

4              THE COURT:  Stop interrupting.  I'll let you talk.

5    Please continue.

6              MR. BYRD:  May I have a moment?  What's the basis?

7              DEFENDANT POKE:  What you mean?  Because you sitting

8    here, you saying that -- you sitting here lying saying that you

9    told me all this stuff, and these the stuff I told you to

10   challenge before you even put the motion in.  You took this

11   stuff upon yourself what you wanted to do.  This is my life.  If

12   I ask him to do something -- I mean, I understand that the

13   government appointed you to me, but if I ask him to do

14   something, I don't want you to tell me after the fact that you

15   done did something that you already wanted to do.

16             I been screaming the pretextual stop from the time that

17   you been on the case.  If you would have did research and find

18   out that the warrant outlawed the pretextual stop, then we

19   wouldn't have got this far after the judge making his decision

20   for you to explain it to me.  Don't try to twist everything

21   around like I just don't know what I'm talking about.  I do my

22   own research.  I do my own reading.  They got NexisLexis in MCC.

23   So, everything that he got -- the majority of the stuff I

24   provided to you.  And you going to sit up here and tell the

25   judge like I don't -- basically I don't know what I'm talking

1    about.

2            MR. BYRD:    Judge, if anything -- and, again, I'm

3    somewhat uncomfortable with having to argue with Mr. Poke on the

4    record.    I don't want to say or do anything that's going to

5    prejudice him in the eyes of the court.    But one thing I think

6    we could all agree on is that Mr. Poke is a defendant who has no

7    problems voicing his displeasure with my efforts.    He has no

8    problem articulating to the court his complaints and his

9    problems with me.

10           And I specifically recall on the day that we had that

11   hearing your Honor asking me whether or not there was a

12   challenge to whether or not Mr. Poke had failed to signal

13   turning into the driveway, and I certainly would not say no and

14   prejudice my client if there was any inclination or discussion

15   that he had told me that he had not failed to signal and did, in

16   fact, signal.

17           Moreover, he heard me say, "No, your Honor, there is no

18   challenge to that."    If there was a challenge to that, that

19   would have been the appropriate time for Mr. Poke to then say,

20   "Judge, that is absolutely not correct.    I did signal.    He's

21   trying to prejudice me here, and I'm not going to allow it."

22   That, of course, did not happen.

23           DEFENDANT POKE:    Because at the time, your Honor, I

24   wanted to try to -- I wanted Mr. Byrd to fight the case as the

25   best he can without me interfering.    You walked right over there

to the table once I looked at you, and when you said you wasn't

challenging the stop, you told me -- you whispered to me and

told me this ain't the time to challenge this right now. That's

what you told me. And then afterwards when I told him why you

ain't challenged the stop -- because I wasn't going to interrupt

the courtroom because I wanted him to do what he do best, and

then he hold me afterwards -- what you tell me? Oh, we're going

to challenge that in appeal. And I say no, you --

MR. BYRD: No. I said we would challenge the judge's

ruling on the motion to quash and suppress on appeal. But more

importantly, too, the discussion that we had, I told him that --

and this was after the fact because, again, it wasn't an issue

prior to your Honor's ruling -- that, in fact, he was in a bad

position on that because, one, he would have to testify in the

hearing. He would have had to have testified.

DEFENDANT POKE: And I don't mind.

MR. BYRD: Second, it would have been his word as a

multiple convicted felon against the word of two detectives with

the Rockford Police Department with no independent witnesses out

there to corroborate his testimony. I believe that had he gone

that route, he would have lost, number one. Number two, he

would have picked up a perjury enhancement or obstruction

enhancement under Section 3C1.1 of the United States Sentencing

Guidelines. And, more importantly, I don't create issues if I'm

not instructed to, and I was never told that he had, in fact,

1    signaled.  And he had the opportunity.  He's not shy.

2            DEFENDANT POKE:  Your Honor, right.  So, you think I

3    care about getting on the stand and telling my testimony to save

4    my life?  Your reputation on the line.  My life is on the line.

5    And you sitting up here, and you lying to the judge, and you

6    plan -- I mean, listen.  If you not going to fight the case, you

7    sitting up here trying to fight to stay on the case --

8            MR. BYRD:  I'm not fighting to --

9            DEFENDANT POKE:  -- I mean, you might as well move on

10   and let somebody go on and fight this case and let us get this

11   case over with.  But at the same time I can't sit here and go to

12   trial with him and he not fighting.  I know what I'm facing.

13   I'm not running from this, you know what I'm saying.  But at the

14   same time what's going to hurt me is just letting him stroll me

15   through here without a fight.

16           THE COURT:  Let me explain something to you.  I don't

17   mean to speak for Mr. Byrd, but I think I'm pretty safe in

18   saying that Mr. Byrd would not mind it at all if I let him off

19   the case.  That's not his decision to make, though.  It's my

20   decision to make.  And I'm going to decide whether he stays on

21   the case or not.  All I'm doing is asking him questions and

22   eliciting from him information that will help me to decide

23   whether your motion should be granted.

24           DEFENDANT POKE:  Right.

25           THE COURT:  But don't be laboring under a false

1    impression that it's important to him to stay on this case, that

2    he's fighting to stay on the case.  He's just answering my

3    questions.

4            DEFENDANT POKE:  Right.  I mean, I don't know, but, you

5    know, I mean, it's upsetting me to sit here and listen to him

6    just put on -- why you couldn't talk to me same way you relaying

7    this stuff to the judge?  Why you couldn't talk to me like this?

8    Why didn't you let me know all these facts and details and stuff

9    like you're doing the judge?

10           MR. BYRD:  I believe, I had, number one.

11           DEFENDANT POKE:  Man, come on, man.  You in here

12   playing, man.  You a professional liar, man.  You a professional

13   liar, man.

14           MR. BYRD:  For the record, I am not lying about any of

15   this.  I'm trying to recall things that have happened over the

16   last two years or year and a half.  My concern now is whether or

17   not --

18           DEFENDANT POKE:  You don't even know how long you been

19   on the case.  Last two years, year and a half.

20           MR. BYRD:  You've been in since July 5th of 2011.

21           DEFENDANT POKE:  Oh, man.  When did you get on this

22   case?

23           THE COURT:  Let's go on to number four.  Mr. Poke says

24   you had not sit down and talked about no defense for trial.

25           MR. BYRD:  Judge, he provided me with his defense on

1    the 924(c) and the 922 gun charges the day he presented me or

2    told me about Daron Cistrunk's affidavit.  That is his defense.

3    That's his only defense.

4            These are difficult facts.  I have an individual

5    driving a car alone, no other people in the vehicle, with a

6    loaded firearm, he's a convicted felon, and crack cocaine

7    located in a center console of the vehicle.  The defenses here

8    are very limited.

9            On the very first day I told him that defending on the

10   drug charge was going to be very difficult because of the fact

11   that he is the only one in the vehicle and the vehicle has the

12   crack cocaine in the center console.  Later, after we obtained

13   information from his cell phone records and text messages, there

14   are problems with that because he appears to be -- and I know

15   the government's position on it is going to be that he's quoting

16   prices and offering to front somebody something.  That's a very

17   difficult case --

18           DEFENDANT POKE:  What price?  What price you heard me

19   quote on there?

20           MR. BYRD:  $20.

21           DEFENDANT POKE:  No.  That don't say nothing like --

22   no.

23           MR. BYRD:  I tried to discuss that this morning with

24   the defendant.

25           DEFENDANT POKE:  How?

PDF created with pdfFactory trial version www.pdffactory.com

1    MR. BYRD:  Ask him how that went.

2    DEFENDANT POKE:  How?  Because --

3    THE COURT:  Stop interrupting and let him talk.  Then

4    I'll let you talk.  Please continue, Mr. Byrd.

5    MR. BYRD:  I attempted to discuss that further with him

6    this morning, and the conversation lasted about a minute to a

7    minute and a half because he was so upset with me -- it wasn't

8    productive.  I'll leave it at that.  But I had to get up and

9    walk out.  It wasn't going anywhere.

10   THE COURT:  All right.  Anything else you want to say

11   about this point, Mr. Poke?

12   DEFENDANT POKE:  Man, I read the report.  It never said

13   nothing about no price or none of that.

14   MR. BYRD:  May I have a moment?

15   DEFENDANT POKE:  Yeah.  And today I got upset with him

16   because I asked him -- I don't even know did he contact the

17   witnesses.  I been having him -- from the time you left and told

18   me --

19   THE COURT:  That's the next point.  Let's wait before

20   we go on to that.

21   (Brief pause.)

22   DEFENDANT POKE:  Now, it's bad that we got to go over

23   my report here.  Why me and him couldn't do this someplace else

24   and go over the report?  Now we could have debated then what was

25   said and what wasn't said.  Man, this don't make no sense.

1    THE COURT:  Well, the issue is you said that there's
2    nothing in the report that mentions price.
3        DEFENDANT POKE:  Yeah.  Not that I remember, you know
4    what I'm saying.  If somebody asked me about --
5        THE COURT:  Well, here's where we're at.  He said
6    there's something in the report that does mention price.  You
7    deny that.  So, we're going to resolve it --
8        DEFENDANT POKE:  Yeah.
9        THE COURT:  -- and I don't have to rely on your
10   credibility --
11       DEFENDANT POKE:  No.  No.  I'm saying he said --
12       THE COURT:  Please stop interrupting me.  I'll let you
13   talk.  Please let me talk.
14       DEFENDANT POKE:  Right.  Right.
15       THE COURT:  We can resolve it by looking at the report.
16   Either he's right or you're right.
17       DEFENDANT POKE:  Right.  No.  He said that I gave a
18   price saying $20.  Somebody sent the e-mail.  I never responded
19   to no e-mail.  So, by him saying that me gave a price of $20,
20   that's absurd.  But if he would have sat down and went over the
21   paperwork with me and quit looking for everything that's against
22   me and start looking for things that can help me --
23       MR. BYRD:  These are text messages off your phone.
24       DEFENDANT POKE:  Right.  That I sent?
25       MR. BYRD:  There's some that are --

1          DEFENDANT POKE:   How long?  How long?  That I sent

2    saying it cost $20?

3          MR.  BYRD:   This purports to say just that.

4          DEFENDANT POKE:   Where?

5          MR.  BYRD:   Right here.

6          DEFENDANT POKE:   I sent?  Is it a sent, or is it from

7    somebody?

8          MR.  BYRD:   There are -- hang on.

9          DEFENDANT POKE:   You looking for the government to help

10   you.   You on my side.   You supposed to be on my side, and you

11   over there --

12         MR.  BYRD:   No.   I'm asking if this is the right

13   transcript.

14         DEFENDANT POKE:   How?  You went over this stuff?  How

15   you going to ask him if he the right -- you make yourself look

16   bad.

17         MR.  BYRD:   Well, I don't think so.

18         DEFENDANT POKE:   You going to go ask the government if

19   that's the right --

20         MR.  BYRD:   There's a message on June 27th inbox, which

21   my understanding is means you received it in your inbox on your

22   phone, that says, "Who is this?"  Approximately 17 seconds later

23   you respond -- it says type failed, but the body of the text was

24   Day Low, which is my understanding that's --

25         DEFENDANT POKE:   Get to the $20 thing.   Where the $20

1    thing at?  You want to hold them two different numbers.  Quit

2    trying to manipulate the courtroom here.

3              MR. BYRD:  I'm not trying -- on July 5th, okay, at

4    3:10 a.m you received an inbox from somebody's number that says,

5    "I get paid Friday.  You front me?"

6              DEFENDANT POKE:  That's not me.

7              MR. BYRD:  I know.  It's somebody saying, "Will you

8    front me?"

9              DEFENDANT POKE:  Right.  Right.

10             MR. BYRD:  And then three minutes and ten seconds

11   later, it says sent, which my understanding is somebody with

12   that phone then sent a response that says, "Yes, I got.  That's

13   cool."  Then at 3:15:51, approximately two minutes later,

14   there's an inbox to you that says, "You sure?  How much is the

15   prices?"  And then at 3:16:37, about 40 seconds later, it says

16   sent, and the body of it is 20 with a dollar sign.

17             DEFENDANT POKE:  But my name ain't on that.  And what

18   number is that?

19             MR. BYRD:  It's the number off the cell phone.

20             THE COURT:  Okay.  Thank you, Mr. Byrd.

21             Let's go to the next allegation.  It says we never

22   talked about what witnesses we were going to call.

23             DEFENDANT POKE:  Now, if you would have talked about

24   that with me instead of right here in the courtroom --

25             THE COURT:  Mr. Poke, you're not even listening to me.

PDF created with pdfFactory trial version www.pdffactory.com

1    We're going on to the next allegation.  We never talked about

2    what witnesses we going to call and why.

3              MR. BYRD:  Judge, we had Daron Cistrunk as a witness.

4    He provided me with the name of Stonewall Pittman as a witness

5    back in January when the witness was given to you.  Since then

6    and in the last week or so, he's listed several other witnesses

7    or at least one other witness that he wanted subpoenaed.  I

8    already explained my attempts to try to get ahold of

9    Mr. Pittman.  He won't return my calls.  The other witness is a

10   nurse down at the Ogle County Jail, who I have not had a chance

11   to talk to yet because the request came in late.

12             I had several e-mails sent to Mr. Poke, as well as

13   meetings earlier in this case, where I explained to him that I

14   needed to have the witnesses and what he expected they were

15   going to testify to earlier on so that they would have time to

16   be subpoenaed and they could be disclosed.

17             One of the problems I think that Mr. Poke has, and he

18   said it several times here, is that I take everything and then

19   run to Mr. Karner with it, and that's --

20             DEFENDANT POKE:  You just showed him

21             MR. BYRD:  I don't think he understands that there is a

22   requirement on the defendant to comply with their discovery

23   obligations and produce information to the government less we be

24   barred at trial from introducing it with a claim of unfair

25   surprise.

1          The witnesses that he had listed, first of all,

2     Stonewall Pittman, based on what Mr. Poke told me, is only

3     relevant as a witness if Daron Cistrunk shows up and contradicts

4     his affidavit.  And if that's the case, then our problems are a

5     lot worse than not having Mr. Pittman here to say -- do you have

6     a problem with me saying what you told me Pittman would testify

7     to?

8          DEFENDANT POKE:  I mean, you been giving the government

9     everything.  Go ahead.  You been giving them everything.  All he

10    did was ask you one single question.  You finish laying that

11    thing out for him, Mr. Bright.

12         MR. KARNER:  Judge, should we step out?

13         THE COURT:  Would you like the government to step out?

14         DEFENDANT POKE:  I mean, it's too late.  He been --

15         MR. BYRD:  That's why I'm stopping and asking.

16         DEFENDANT POKE:  Stopping now?  Sure.  Hey, go ahead.

17    Finish.

18         THE COURT:  Why don't you step out, Mr. Karner.

19         DEFENDANT POKE:  It's too late.  He done took very good

20    notes.

21         MR. BYRD:  Of what?

22         DEFENDANT POKE:  Everything.  He asked you one

23    question, and you off into breaking down our defense and what we

24    going to do in front of the government.

25         MR. BYRD:  What defense did I give then?

1    THE COURT:  No.  The question I'm asking is talk about
2    what witnesses we are going to call and why.
3    DEFENDANT POKE:  Exactly.  That's all he asked you.
4    All the extra stuff, he ain't asked you all the extra stuff.
5    MR. BYRD:  Well, the one part would encompass this.
6    THE COURT:  Show the government's outside the
7    courtroom
8    MR. BYRD:  Judge, my understanding from my conversation
9    with Mr. Poke is that the only reason Mr. Pittman would come in
10   to testify, he is apparently Mr. Cistrunk's uncle, and his
11   testimony supposedly would be that Daron Cistrunk owned a gun
12   and that he had left it around the house many times and that
13   Mr. Pittman had to yell at him to stop leaving the gun in the
14   house.
15   THE COURT:  All right.  How do you respond then,
16   Mr. Poke, to what Mr. Byrd has told me?
17   DEFENDANT POKE:  If he would have went and interviewed
18   the witness first -- because I gave him these names a long time
19   ago.  When I sent you that medical record, I wrote down a list
20   of witnesses, and I sent that in the mail.  Now -- and I sent it
21   legal mail.  Now, you don't put everything over the e-mail, you
22   know what I'm saying, because we don't know who read the e-mail.
23   We both came up today.  So, I try to send everything out legal
24   mail.  He been hearing these names months ago to go interview
25   these witnesses and see is these people going to come testify on

1    what they seen.  Instead of him just getting the names and

2    giving it to the government, do some work.  Do some homework.

3            MR.  BYRD:  Can I ask what names?

4            DEFENDANT POKE:  Well, I gave you Amy Favors.  I gave

5    you Cindy Morgan.  I gave you the --

6            MR.  BYRD:  Early in the case.

7            DEFENDANT POKE:  Early in the case.  These the same

8    witnesses.

9            MR.  BYRD:  You sent me Cindy Morgan ten days ago.

10           DEFENDANT POKE:  No.  I been telling you Cindy Morgan

11   to testify about my hand being messed up at the time, and there

12   wasn't no way that I can hold anything in that hand.  I told you

13   to subpoena her to the motion here when they saying they seen me

14   reach down, and I told him it was impossible.

15           MR.  BYRD:  I don't recall that at all.

16           DEFENDANT POKE:  You don't recall it?  That's a major

17   part of the motion.

18           MR.  BYRD:  Well, then I expect you'd be able to show

19   that I did.

20           DEFENDANT POKE:  They're saying they seen me use this

21   right arm when this right arm was almost severe shot off.  Ain't

22   that what I told you when the police grabbed my arm and you

23   asked the police?  I say have her come in and testify, same way

24   when you gave the judge that paper.  See, you just want to do

25   everything that you want to do.  It's my life.  Quit trying to

1     do everything short-cutted.

2              THE COURT:   What about Cindy Morgan?

3              DEFENDANT POKE:   That's the nurse who when I got to

4     Ogle County, I had a stress ball.   My right arm wasn't

5     functioning, and I'm going through therapy.   I told him to

6     subpoena her a long time ago when we had the motion hearing so

7     she could come testify and say my right arm wasn't functioning.

8              THE COURT:   Okay.   So, how does that help you in the

9     case if your right arm wasn't functioning?

10             DEFENDANT POKE:   Because the police saying that they

11    seen me reach down like I was putting something under the seat,

12    and that was going to show they lying right there because I

13    couldn't hold a book in this hand, let alone a big gun.   And if

14    you would have did all that -- don't act like -- I sent them to

15    you again.

16             MR. BYRD:   I'll have to review my notes.   I don't

17    recall that.

18             DEFENDANT POKE:   You always got to review your notes.

19    And like I said --

20             THE COURT:   Mr. Poke, you keep interrupting people.

21    Mr. Byrd starts to talk and then --

22             DEFENDANT POKE:   You asked --

23             THE COURT:   -- and then you interrupt him  Let

24    everyone say what they need to say.

25             DEFENDANT POKE:   You asked me what I think about it.

1    So, he's interrupting me, your Honor.

2            MR. BYRD:  I don't mean to interrupt anybody.  I would

3    have to go back and check my notes, but I don't recall.

4            DEFENDANT POKE:  I mean, the whole thing with the

5    witnesses --

6            MR. BYRD:  If I --

7            DEFENDANT POKE:  Can I finish?  Can I finish, your

8    Honor?  Because you was asking me.  The whole thing with the

9    witnesses is you heard the names in the beginning.  You could

10   have went and investigated and seen what they was going to say

11   and was we going to use them or not.  Today is trial.  I got to

12   get here at trial and talk to you and get to find out what my

13   witnesses going to do and what they're going to say and is we

14   going to use them or not.  By that time, you already gave them

15   to the government.  You just got the names and gave them to the

16   government, and they beat you to the interview.  And now they

17   saying that they don't want to come because the government

18   spooked them  Now, if you would have did your part, we would

19   have some witnesses, wouldn't we?

20           MR. BYRD:  All I know is that I was sending you

21   e-mails --

22           DEFENDANT POKE:  You the victim  Right.  I guess you

23   the victim

24           MR. BYRD:  No.  I was sending you e-mails over the last

25   month and a half telling you I needed a list of witnesses and

1    contact information for them, and the response was never you've

2    had this for months already.

3               DEFENDANT POKE:   No.   I sent them to you again because

4    the whole thing is me not to argue with you, and I tried to work

5    with you.

6               MR. BYRD:   You initially told me Stonewall was the only

7    witness you had other than Mr. Cistrunk.

8               DEFENDANT POKE:   Look.   Get your records.   Get your

9    records.

10              MR. BYRD:   I'll have to go back and --

11              DEFENDANT POKE:   Oh, man.   I should have -- I started

12   to bring them   Come on, man.   You know I sent you all this

13   stuff, just like a lot of stuff you ignored in the e-mail, and

14   the only reason he asked for the e-mail because I threatened to

15   call the RDC.

16              MR. BYRD:   I gave you their address.

17              DEFENDANT POKE:   Right.   After I threatened you, right,

18   because how long it took you to get an e-mail.   It took you to

19   answer one e-mail a week.   These go right to you in an hour.

20              MR. BYRD:   Yeah, but I don't always get them in an

21   hour.

22              DEFENDANT POKE:   They always come in an hour.   Man,

23   because -- your Honor, the man going to sit up here.   He going

24   to constantly keep saying he ain't had time for this.   We going

25   to trial.   That's the whole point.   We're getting ready for

1    trial.  I'm sorry to hear what happened to your family, you know

2    what I'm saying.  My life on the line.  I been here in McHenry

3    County for five days.  Now, if he would have came and seen and

4    sat down with me for them five days, I wouldn't even have came

5    here and did this.

6              THE COURT:  But you have to understand that he can't

7    give up everything else he's doing in his life and pay attention

8    to Dayton Poke.

9              DEFENDANT POKE:  No.  This is afterwards.  He went to

10   the funeral.  He did what he had to do.  Like he said, he ain't

11   find out I got there 'til when Wednesday.  That's when I got

12   there.

13             Now, I at least could have -- this trial I could -- we

14   still going to go ahead and go to trial, and I don't even get

15   like one day to talk to him about nothing?  I mean, that's what

16   I don't understand, your Honor.  I ain't telling him to give up

17   his life, but okay, if you ain't prepared for trial, come in

18   here and say that.  Don't just rush my life through the ringer

19   because you feel like, okay, well, I'm going to get to my life,

20   but dude last.  I mean --

21             MR. BYRD:  Judge --

22             DEFENDANT POKE:  -- take a continuance and tell the

23   judge your situation.

24             MR. BYRD:  Since Thursday I've put approximately 40

25   hours into this case.

1      DEFENDANT POKE:   With who?

2      MR. BYRD:   With meetings reviewing the physical

3  evidence on Friday, shopping and getting clothes for you so

4  you're not prejudiced by wearing orange in front of a jury.

5      DEFENDANT POKE:   And I don't care about wearing orange.

6      THE COURT:   Don't interrupt him  Mr. Poke, he lets you

7  talk, and you say everything you want to say, and then I ask him

8  to get a turn, he gets three words out, and you --

9      DEFENDANT POKE:   I apologize.

10     THE COURT:   -- interrupt him  You can't take turns.

11 It seems like it's impossible for you to heed what I'm telling

12 you.  We're not going to be able to get -- it's almost 10:30.

13 The jury's been sitting for an hour and a half while I take this

14 motion.  We're not going to be able to make any progress on it

15 if you keep interjecting your comments into what everybody else

16 is trying to say.

17     Please finish, Mr. Byrd.

18     MR. BYRD:   Judge, reviewing the discovery again and

19 getting preparation for trial was the way the weekend was spent.

20 I did not have a three, four-hour block of time available to go

21 out and meet with Mr. Poke in McHenry County, and prior to

22 Wednesday he was still at the MCC and I was dealing with the

23 death in my family.  That didn't resolve itself until late

24 Wednesday night.

25     THE COURT:   But you could still meet with Mr. Poke

1  before the government puts on its witnesses, couldn't you?

2          MR. BYRD:  Yes.  I attempted to do that this morning,

3  Judge, and it was very, very unproductive and offensive to me to

4  be there more than a minute and a half.

5          THE COURT:  All right.  Let's go on.  I think we've

6  already covered number six.  He's always telling me I can't do

7  something when the law says I can, like file the motion.  Let's

8  go to seven.  And everything I tell him he tell Mark Karner.

9  What's that about?

10         MR. BYRD:  I believe it's his displeasure with the

11 rules of discovery and my having to reveal witnesses and their

12 last known addresses.  And I think this gets back to the

13 Stonewall Pittman issue.  When he was disclosed to the

14 government prior to the witness list because he was on the

15 witness list, I had to turn that over to the government and to

16 the court to be on the witness list so that he could be called.

17 I did not get out to interview him   I was made aware on Friday

18 that the government had interviewed him right after court.

19         That proffer letter from Special Agent Ivancich

20 indicated that Mr. Pittman was very evasive, indicated that he

21 thought he might testify about a gun, but didn't remember

22 anything, and then said he had some kind of problem with his

23 memory and kept pointing to his head.

24         After I finally obtained the proper phone number for

25 Mr. Pittman, I've left at least four or five messages on that

PDF created with pdfFactory trial version www.pdffactory.com

1    voice mail, it's a generic voice mail, encouraging him, begging

2    him to call me so we could discuss whether he would be a witness

3    and what his testimony would be, and he has not done so.

4              THE COURT:  All right.  Is there anything else you want

5    to say, Mr. Poke, about this?

6              DEFENDANT POKE:  Mr. Byrd here is a liar.

7              THE COURT:  All right.  Number eight.  He won't answer

8    my phone calls or e-mails.  Mr. Byrd?

9              MR. BYRD:  Judge, when I'm there and the phone call

10   comes in, unless I'm with a client or something, I take the

11   phone call.  We've had numerous calls throughout my

12   representation.  In addition, there's this Corrlinks e-mail

13   system  I don't think that he can honestly say I don't answer

14   his e-mails because that is easily disproven.  He may be

15   frustrated that I don't sit at my computer waiting for them to

16   come in and immediately respond.

17             But right now I currently have -- I'm carrying eight

18   CJA cases in this court.  Three or four of them are in MCC or

19   the Federal Bureau of Prisons, and I am constantly getting

20   Corrlinks messages.  In addition to trying to run a practice, I

21   try to respond to those as quickly as I can get to them

22   Sometimes they have questions that require research.

23             All I can say is it's not true to say that I don't

24   answer my phone calls or e-mails with him  In fact, he stood

25   here and said he could produce the correspondence.

PDF created with pdfFactory trial version www.pdffactory.com

1    DEFENDANT POKE:  The last two weeks.  And it ain't

2    produced back and forth.  I sent you what?  Four e-mails?  And

3    you answered just one time?  Why you ain't telling him how me

4    and Bree be talking on the phone.  Me and Bree, I get ahold of

5    Bree fine, your secretary.  Me and her talk fine.

6         THE COURT:  All right.

7         DEFENDANT POKE:  Don't she tell you how we talk?

8         MR. BYRD:  Yes, she does.

9         DEFENDANT POKE:  Okay.  Yeah.

10        MR. BYRD:  And I probably should leave it at that.

11        DEFENDANT POKE:  Yeah.  Leave it at that, huh.  Tell

12    Bree I said hi.

13        THE COURT:  Okay.  Number nine.  He wait 'til the

14    last -- oh.  'Til the last minute to do.  I don't understand.

15        DEFENDANT POKE:  I didn't get a chance to finish

16    because I had to get up here.

17        THE COURT:  Okay.  Finish.

18        DEFENDANT POKE:  He wait to the last minute to do

19    anything, as you see with the meeting with me, with the

20    witnesses, with the going over the paperwork.  Everything it's

21    the last minute.  I ain't telling him to stop what he doing in

22    his life.  I'm just saying that he getting paid for this.

23        THE COURT:  All right.  Mr. Byrd.

24        MR. BYRD:  I'm not sure what he's talking about.  It

25    seems to encompass many of his other complaints.  I don't

1   believe I've waited to the last minute to get this case ready.

2   We certainly -- and I think notwithstanding the court's ruling,

3   I did a pretty good job on the motion to quash and suppress.

4        DEFENDANT POKE:  I think I did most of that work.

5        MR. BYRD:  Okay.

6        THE COURT:  All right.  Mr. Byrd, are you willing to

7   continue to communicate with Mr. Poke?

8        MR. BYRD:  I'll do my best, Judge.  If he's willing to

9   work with me --

10       DEFENDANT POKE:  No.

11       MR. BYRD:  -- it would be productive, if it can be.

12  I'm not going to try to prevent it from being productive.

13       DEFENDANT POKE:  No.

14       THE COURT:  Okay.  Is there any reason that occurs to

15  you why you cannot provide an adequate defense for Mr. Poke?

16       MR. BYRD:  Well, the only thing that would come to mind

17  is his behavior toward me.  The man obviously despises me and

18  doesn't have any confidence or faith in me whatsoever.  I think

19  that there appears to have been a breakdown in the relationship

20  that I believe is largely responsible for Mr. Poke, not myself.

21  But if he's prepared and willing to work with me, I would be

22  willing to continue on in the case.  But that's up to him  I

23  don't want to be swore at.  I don't want to be belittled.

24       DEFENDANT POKE:  And I don't got no respect for this

25  dude.  You a liar.

1    THE COURT:  All right.  Let's bring the government back

2    in.

3        (Brief pause.)

4        THE COURT:  All right.  Show the government appears.

5        I've reviewed the defendant's motion.  I have to

6    consider certain factors in determining or disposing of a motion

7    to substitute counsel.  One is the timeliness of the motion.

8    The second is the adequacy of the court's inquiry into the

9    defendant's motion.  Whether the conflict was so great that it

10   resulted in a total lack of communication preventing an adequate

11   defense.  And whether the attorney is doing or not doing

12   something that a minimally competent attorney would not do or

13   do.

14       As to the timeliness, I don't think it could be worse.

15   When we were in court on February 28th, I advised Mr. Poke, as I

16   recall, at least two times that what he had to do was prepare a

17   written motion and give it to the clerk, and I would respond to

18   it.  I'd put it on my call immediately thereafter.  He failed to

19   do that.  In fact, gave me the motion at my prodding after the

20   jury was ready to come into the courtroom

21       As to my inquiry into the defendant's motion, I think

22   I've made an adequate inquiry.  I credit Mr. Byrd's version of

23   the facts.

24       As to whether the conflict was so great that it

25   resulted in a total lack of communication preventing an adequate

1    defense, I do not find that.  In fact, I find that there's been

2    more than an adequate communication between the defendant and

3    his attorney, more than I've seen in many cases that have come

4    before me in this posture.

5            And as to whether Mr. Byrd is not doing or doing

6    something a minimally adequate or competent attorney would do, I

7    think he's well above providing Mr. Poke with an adequate

8    defense, and his preparation has been substantial.

9            I find that none of the complaints individually nor

10   cumulatively entitle the defendant to another attorney.  So,

11   I'll deny the defendant's motion.  Let's bring the jury in, and

12   we'll start choosing a jury.

13           Mr. Poke, if you're going to blame anybody for keeping

14   Mr. Byrd on the case, blame me.  I'm the one that made the

15   decision.  As I said, I think he would like to get off this

16   case, but I think he's discharging his duties.

17           DEFENDANT POKE:  And I'm not cooperating with him

18   Simple as that.

19           THE COURT:  Well, but you do so at your peril.  If you

20   don't cooperate with him, you're going to hurt yourself.  I

21   would suggest you take advantage of what he can offer you and do

22   what you need to do in order to get an adequate defense.  I want

23   justice to be served, and if the government doesn't prove what

24   they need to prove, then you should be acquitted.  You should

25   walk out of here.  If they do prove what they need to show as

PDF created with pdfFactory trial version www.pdffactory.com

1    they're required by the law to show beyond a reasonable doubt,

2    then I'm going to have to set it for sentencing if the jury

3    agrees with the government.  But what I want to urge you to do

4    is cooperate with Mr. Byrd, give yourself the best chance

5    possible to get an acquittal in this case.

6         MR. KARNER:  Judge, is the court finding then -- I'm

7    just asking for my own clarification -- that there has not been

8    an irreconcilable breakdown in the attorney-client relationship?

9         THE COURT:  Yes.  Let's bring the jury in.

10        MR. KARNER:  And --

11        DEFENDANT POKE:  Ain't no jury, man.  Ain't no

12   courtroom  I ain't going to do nothing.  Ain't no trial, man.

13   Ain't no trial.

14        THE COURT:  All right.  Let the record reflect that the

15   defendant reached in his shirt and pulled it apart, and all the

16   buttons went flying around the courtroom

17      (Whereupon, the defendant was removed from the courtroom)

18        THE COURT:  All right.  Let's bring the jury in.

19        MR. BYRD:  Judge, are we going to proceed without

20   Mr. Poke's presence?

21        THE COURT:  No.  We'll have to have him brought back

22   in.  It's going to take awhile for the jury to get up here.

23      (Brief pause.)

24        THE COURT:  All right.  Let's bring Mr. Poke in.

25        THE MARSHAL:  I'm sorry?

1          THE COURT:  Can we bring him in?

2          THE MARSHAL:  He's in his boxers.

3          THE COURT:  Bring him in.

4     (Brief pause.)

5          THE MARSHAL:  Your Honor, he's refusing to come out.

6          THE COURT:  All right.  Let's go on the record.  Show

7     Mr. Karner and Mr. Pedersen appear, along with Mr. Byrd.  I have

8     instructed the CSO to bring the jury up, to hold the jury out in

9     the hall until we can get Mr. Poke in the courtroom  The

10    marshal has advised me that Mr. Poke has disrobed?  Is this

11    right?  I saw him pull his shirt apart.  He's taken his pants

12    off, too?

13         THE MARSHAL:  Yes, sir.  He has stripped down to his

14    boxer shorts and is refusing to come out.

15         MR. KARNER:  Maybe, Judge, can I suggest this?  We take

16    some time to go down and allow us to research what our options

17    are here.  That might allow Mr. Poke time to come to his senses

18    and calm down.

19         THE COURT:  Rule 43 states that a defendant who is

20    initially present at trial or who had pleaded guilty or nolo

21    contendere waives the right to be present under the following

22    circumstances.  C says when the court warns the defendant that

23    it will remove the defendant from the courtroom for disruptive

24    behavior, but the defendant persists in conduct that justifies

25    removal from the courtroom

1      Can you -- he will not come into the courtroom?

2          THE MARSHAL:  Not willingly, your Honor.  We can get

3   him in here, but it's going to be against his will.

4          THE COURT:  Well, it would be easy for me to say bring

5   him in here, but I don't want to take a chance of the marshals

6   or anyone else in the courtroom being injured.  I'd like to talk

7   to him

8          THE MARSHAL:  If you'd like, your Honor, we could

9   perhaps talk to him a little more.

10          THE COURT:  Would you just tell him that I'd like to

11  talk to him, that I won't ask anything of him other than just to

12  listen to what I have to say?

13          THE MARSHAL:  Yes, sir.

14          THE COURT:  Mr. Karner, Mr. Pedersen, why don't you

15  have a seat back there.

16          MR. KARNER:  Okay.

17     (Brief pause.)

18          THE COURT:  Mr. Poke, just stand up to the podium

19  Show Mr. Poke appears in a jail jumpsuit.

20          I've asked the attorneys to sit back at their tables so

21  that I can talk to you.  I assure you that everybody in this

22  room wants to hold the government to its burden, and that is

23  right now as you stand there, you're presumed to be innocent of

24  this charge or these charges, and it's up to the government to

25  convince the people that we assemble for the jury that they have

1    proved their case by competent evidence beyond a reasonable

2    doubt.   Until that time, you're innocent.   If they, after

3    hearing all the evidence, decide that the government has not met

4    its burden of proof, then I'm going to enter judgment of

5    acquittal, and I'm going to order the marshals to release you.

6    You're only hurting yourself by failing to cooperate.

7            Now, let me suggest this to you.   If at the end of all

8    this you feel that Mr. Byrd has not given you adequate

9    representation, you're not just out of luck.   You can present

10   that contention to the Court of Appeals, and they'll review the

11   record, and they'll decide whether Mr. Byrd has adequately

12   represented you, and they'll decide whether I've made the right

13   choice in telling Mr. Byrd he has to stay on the case.

14           But by acting this way, you're only hurting yourself.

15   By acting this way, you're only diminishing your chances to get

16   an acquittal in this case.   It makes no difference to me one way

17   or the other whether you're convicted or not.   I just make

18   sure -- I want to make sure the process is right, the process is

19   fair.   I'm doing my best to make the best and the fairest

20   decisions that I can to make sure that the process that we put

21   in place to determine guilt or innocence is the way it should

22   be.   I'm making a personal appeal to you for your own best

23   interests to cooperate with Mr. Byrd and give yourself the best

24   chance possible.

25           Now, there's a rule that says when I warn you that I

PDF created with pdfFactory trial version www.pdffactory.com

1    will remove you from the courtroom for disruptive behavior and

2    you persist in disruptive behavior, we can proceed without you

3    here.  We can proceed without you in the courtroom  And I'll

4    try my best to put you in a room where you can observe the

5    proceedings or you can talk to Mr. Byrd remotely, but that's not

6    going to give you the best representation.  That's not going to

7    give you the best chance.  That's not going to give you the best

8    opportunity to hold the government to its burden of proof.

9           I just talk to you man to man, heart to heart about

10   what I think is in your best interests right now.  But you have

11   to make the decision.  And I will tell you that if you continue

12   disruptive behavior, I'm going to go ahead with this trial, but

13   I'm going to put you off in place where I know that you're not

14   going to hurt anybody or cause disruption to this proceeding.

15          My job is to make sure that this proceeding is fair.

16   My job is to make sure that this proceeding is orderly.  I've

17   got a jury sitting out in the hall right now ready to come in to

18   try this case.  I'm going to do my best to get you the fairest

19   jury that I can, I'm going to hold the government to its burden

20   of proof, and I'm going to leave it to the jury to decide

21   whether the government's sustained its burden of proof or not.

22   It's not my decision.  It's the jury's decision.  But I promise

23   you that I'll try as hard as I can to give you the fairest trial

24   that I can.

25          You and I have some disagreements.  You see things a

PDF created with pdfFactory trial version www.pdffactory.com

1    different way.  You disagree with my decision to keep Mr. Byrd

2    on the case.  I regret that.  I wish this case could go forward

3    smoothly, orderly.  It doesn't look like that's happened so far,

4    but it can still happen.  But you have to give yourself the best

5    chance possible.

6                All right.  I've said everything I want to say.  You

7    tell me what you want to say.

8                DEFENDANT POKE:  I mean, what hurt me is knowing

9    Mr. Byrd ain't doing all he can do to help me, and all I want is

10   a fair trial, and I know I ain't going to get no fair trial with

11   Mr. Byrd because we did no work.  So, if you want me to sit here

12   and agree to just going to trial blind without knowing what's

13   going on or how to proceed at trial with the help of my counsel,

14   you know what I'm saying, I can't do that.

15               THE COURT:  As I've said, if Mr. Byrd doesn't do an

16   adequate job, if he doesn't -- if he doesn't do what a minimally

17   competent attorney would do to represent you, you can take that

18   to the Court of Appeals.  They reverse cases and reverse

19   decisions and give defendants new trials that aren't adequately

20   represented by competent counsel in court.

21               What I'm telling you is that if you work with him,

22   maybe you won't even get to the Court of Appeals because you'll

23   get acquitted.  I don't know.  As far as I'm concerned, you're

24   innocent right now until the government proves you guilty.

25               All I'm telling you is I'm making a personal appeal to

PDF created with pdfFactory trial version www.pdffactory.com

1    you, for your best interests, to do what you need to do now to

2    give yourself the best chance to get an acquittal in this case.

3    But you're a grown man.  It's up to you.  You make decisions

4    what's in your best interests.  You make decisions what you

5    think is going to be best for you.  You can either come in the

6    courtroom and cooperate with Mr. Byrd and give yourself the best

7    defense you can at trial and then leave it up to the Court of

8    Appeals to do what they want to do, or you can continue to

9    disrupt the case, and then, even though I don't want to, even

10   though it's not preferenced, I'm going to hold you off in a

11   separate place where I know you won't hurt anybody, and you can

12   observe what's going on outside the courtroom  But, you know,

13   you decide.  You tell me.  Give yourself a chance right now.

14   Give yourself a chance at trial.  That's all I'm saying to you.

15           DEFENDANT POKE:  I mean, I don't even -- he ain't even

16   talked to me what evidence going to get let in.  I don't know

17   nothing, your Honor.

18           THE COURT:  Let me tell you this.  I don't think we'll

19   get to witnesses today.  I've told Mr. Byrd that we're going to

20   pick a jury.  If we can, I'm going to admonish the jury.

21   Mr. Byrd or the parties may give their opening statements, but

22   I'm not going to call any witnesses until tomorrow morning.  So,

23   you'll have the rest of the day and tonight to talk to Mr. Byrd

24   and do what you need to do to present your defense.

25           Why don't you just come in, try it, see how it works.

1    You're only hurting yourself by being -- I mean, I'm going to go

2    ahead with this case.   The jury is out there.   I'm going to

3    start it.

4              DEFENDANT POKE:   Okay.

5              THE COURT:   But I'd rather start it with you here than

6    with you in another room   That's what I'm telling you.

7              DEFENDANT POKE:   I'm going to let you all go ahead,

8    your Honor.

9              THE COURT:   Okay.   Fair enough.   That's a smart move, I

10   think.

11             MR. KARNER:   Judge, there's still the issue, though, if

12   the defendant is going to waive his right to be present at

13   sidebars, for example.

14             THE COURT:   Okay.   I'll bring that up to him

15             MR. BYRD:   Is he going to put on street clothes again?

16             THE COURT:   I guess so.

17             (Whereupon, the defendant left the courtroom)

18             MR. KARNER:   Judge, I believe what he said was that

19   I'll let you go ahead.   Basically, without me.

20             THE COURT:   Oh.   I thought he said he wanted to be

21   here.

22             THE MARSHAL:   That's the way I took it.   He said, "I'm

23   going to let you all go ahead."   Just interpretation, it sounded

24   like --

25             THE COURT:   All right.   Why don't you bring him back

1    then?

2            THE MARSHAL:  Just for clarification.

3            THE COURT:  Okay.  Thank you.

4            MR. PEDERSEN:  Then, Judge, this is -- I don't have the

5    cite for the Matthew Hale case, but I have a slip copy, and I

6    gave Mr. Byrd a copy of it, too.  That case involved a

7    discussion with the jurors in chambers, and the defendant didn't

8    go into chambers with the attorneys when the jurors were

9    questioned individually, but I think the same reasoning would

10   apply here.  If the defendant is choosing not to be present

11   while the jury is selected, he needs to waive that knowingly.

12          THE COURT:  I misunderstood then.  I thought he said he

13   was going to go ahead with him here.

14          MR. KARNER:  That's what I thought he said, too.

15    (Brief pause.)

16          THE COURT SECURITY OFFICER:  He's putting on his

17   civilian clothes.  He's coming.

18    (Brief pause.)

19          THE COURT:  All right.  Let the record reflect it's

20   11:09.  Let's call the jurors in.

21          MR. KARNER:  Judge, if we can address the matter of

22   defendant's presence at sidebars, though.

23          THE COURT:  Tim, hold on just a second.

24          Mr. Poke, during jury selection -- I don't know if

25   you've ever gone to a jury trial before or not, but during jury

1    selection sometimes it's necessary for me to talk to the

2    attorneys at sidebar, which is a conference right over here.

3    There's a microphone over here that picks up everything we say.

4         You have a right to be present during those sidebar

5    conferences.  It's rare that defendants do come up for the

6    sidebar conferences, but some do.  But it's your choice.  You

7    can either remain in your seat, we'll conduct the sidebar, and

8    Mr. Byrd will report to you what happened at the sidebar, or you

9    can come up with the parties and listen to what we do at sidebar

10   along with everyone else.

11        My point is it's your decision.  So, if I call a

12   sidebar and I ask the attorneys to meet me over here privately

13   out of the hearing of the jury and you don't come up, I'm going

14   to assume that you waive your right to be present at those

15   sidebar conferences.  If you do come up, then I assume you want

16   to be present, and we'll proceed that way.  Understand?

17             DEFENDANT POKE:  Yes, sir.

18             THE COURT:  Okay.

19             MR. KARNER:  And one other thing just for the record.

20   I know the court went over the items of the defendant's pro se

21   motion, but I don't know if the court ever elicited from

22   Mr. Byrd if he objected to the defendant's motion or agreed with

23   the motion and --

24             THE COURT:  Well, I assume since Mr. Byrd --

25             MR. BYRD:  I'm sorry.  I was speaking.

1    THE COURT:  -- addressed the motion that he's willing
2  to proceed.
3    MR. KARNER:  Well, I don't know that his position in
4  objecting or agreeing to the motion was ever made of record.
5    THE COURT:  What's your position, Mr. Byrd?
6    MR. BYRD:  As far as my remaining on the case?
7    THE COURT:  Yes.
8    MR. BYRD:  I had indicated that if Mr. Poke would work
9  with me, I believed I could continue to represent him on the
10  matter.
11    THE COURT:  Okay.  Thank you.
12    MR. BYRD:  He at least appears to be listening to me a
13  little bit as I'm talking to him about what to expect with the
14  jury.  It's difficult for me to say.
15    THE COURT:  So it's clear for everyone, I agree that
16  there's some friction here.  But what I told Mr. Poke is I want
17  him to give himself every chance he can to get an acquittal at
18  the trial phase of his proceeding in court.
19    MR. BYRD:  And I'll state for the record I agree with
20  that, and I want to try to give him his best opportunity at
21  trial.
22    THE COURT:  All right.
23    MR. BYRD:  Nothing that transpired here this morning
24  has changed that in my mind.
25    THE COURT:  I'll rely on you to do your level best to

1    do everything you can to get an acquittal for him in this case.

2              MR. BYRD:   I understand.

3              THE COURT:   All right.   Bring the jury in, please, Tim

4         (Whereupon, twelve jurors and two alternate jurors were

5         selected, but not sworn, to try the case herein, after which

6         the following proceedings were had:)

7              THE COURT:   All right.   Show all parties appear.

8              Mr. Ferguson, it's 5:02 by the courtroom clock.   Is

9    Mr. Cistrunk in the building?

10             THE COURT SECURITY OFFICER:   He is not in the building,

11   your Honor.

12             THE COURT:   All right.   Mr. Byrd.

13             MR. BYRD:   Your Honor, at this time, based upon

14   Mr. Cistrunk being an essential defense witness -- in fact, one

15   of the only witnesses on one of the major counts in this case --

16   and due to his unavailability or his refusal to obey the

17   subpoena, we do, I would note for the record, based on your

18   Honor's signature this morning, have a material witness warrant,

19   as well as a contempt warrant, out for Mr. Cistrunk since about

20   9:30 this morning.   It's my understanding that the U.S.

21   Marshal's Service in Indiana has diligently been expending great

22   efforts to try to get Mr. Cistrunk served with that warrant to

23   take him into custody, but that has not happened yet.

24             At this time I would be making a motion to discharge

25   the jury and continue this trial until such time as we have

PDF created with pdfFactory trial version www.pdffactory.com

1    allowed a reasonable period of time to try to effectuate

2    Mr. Cistrunk's arrest.

3             I make that motion under the ends of justice provision

4    of the Speedy Trial Act and would represent to the court that,

5    as the court's aware, I believe, Mr. Cistrunk is an essential

6    witness who appears to be in contempt of the court and evading

7    service.  To that extent, I believe that Mr. Poke's interests in

8    compulsory service of process, a fundamental Sixth Amendment due

9    process right, outweighs any speedy trial rights that the public

10   or government enjoy.

11            THE COURT:  Can the Marshal's Service inform me whether

12   Mr. Cistrunk's been arrested on either of the warrants that are

13   pending?

14            THE MARSHAL:  No, sir.

15            THE COURT:  He has not been arrested.

16            THE MARSHAL:  No.  Deputy LoMonaco is aware, and she

17   would interrupt proceedings to let you know if he had been

18   arrested.

19            THE COURT:  All right.  Mr. Karner.

20            MR. KARNER:  We have no objection.

21            THE COURT:  All right.  I'll grant the defendant's

22   motion for a continuance.  I will discharge the potential

23   members of the jury.  I'll set this case for trial the week of

24   May 6th.  I'll give you May 6th, 7th, 8th, and 9th.

25            MR. KARNER:  I don't think we'll need all four days,

PDF created with pdfFactory trial version www.pdffactory.com

1    but I thought we would have had this case tried by now, too.

2              THE COURT:   You think you can do it in three?

3              MR. KARNER:   I think we can do it in three.

4              MR. BYRD:   Mr. Karner underestimates my longwindedness.

5              THE COURT:   I think I'll give you four.

6              MR. BYRD:   Obviously, your Honor doesn't.

7              THE COURT:   All right.   I'll bring the jurors in, and

8    I'll excuse them   But before we get to that, I'm going to

9    revisit Mr. Poke's request for another attorney.

10             Mr. Poke, do you still wish another attorney to

11   represent you in this case?

12             MR. KARNER:   Judge, I'm sorry.   Before we get to that,

13   can I just make a motion to exclude the time period from today

14   through and including May 6th, 2013, pursuant to 18 U.S.C.

15   3161(h)(7)?

16             THE COURT:   Yes.   I'll find that to deny the

17   continuance would deny counsel for the defendant the reasonable

18   time necessary for effective preparation taking into account the

19   exercise of due diligence, that failure to grant a continuance

20   would result in a miscarriage of justice, and that it would be

21   unreasonable to expect adequate preparation for the trial itself

22   within the speedy trial period and that the ends of justice

23   served by taking such action outweigh the best interests of the

24   public and the defendant in a speedy trial.   Any objection,

25   Mr. Byrd?

1    MR. BYRD:  No, your Honor.

2    THE COURT:  All right.  Mr. Poke, do you still wish

3    another attorney to represent you --

4    DEFENDANT POKE:  Yes, I do.

5    THE COURT:  -- and Mr. Byrd to be substituted?

6    Since we're continuing this case, that takes one of the

7    factors that I have to consider, that is, the timeliness of the

8    motion, out of the equation.  It weighs in favor of the

9    defendant at this point.  So, I'm going to grant that motion.

10   I'll relieve Mr. Byrd of any further representation in this

11   case.  I'll ask the Clerk's Office to notify the Federal

12   Defender that we need another attorney appointed to represent

13   Mr. Poke.  That's it.  Let me bring the jurors in.

14   MR. KARNER:  And I know Mr. Byrd will do this, Judge,

15   but he'll turn over the discovery.

16   MR. BYRD:  Absolutely.

17   (The following proceedings were had in open court, in the

18   presence and hearing of the jury:)

19   THE COURT:  Please have a seat, folks.  Ladies and

20   gentlemen, I'm going to excuse you from further jury service in

21   this case.  You don't have to be concerned about the reason for

22   that.  Circumstances have converged in such a way that requires

23   me to discharge you.  And so, you won't be required to do

24   anything more on this case or any other case this week.  Thank

25   you for your time, effort, your attention, your willingness to

1   serve.   I think it's obvious to everyone here that we would not

2   be able to run the federal criminal justice system if it weren't

3   for people who were willing to take time away from their

4   families and their lives and their jobs in order to assist us.

5   You've admirably discharged your duty, your civic duty as

6   jurors.   It's been a pleasure to meet all of you, and I wish you

7   good evening.

8       (The following proceedings were had in open court, out of

9           the presence and hearing of the jury:)

10          THE COURT:   All right.   We'll see you at 8:45 May 6th.

11          MR. BYRD:   Judge, is it your expectation that I would

12   be here that morning?

13          THE COURT:   Pardon me?

14          MR. BYRD:   Is it your expectation that I will be here

15   that morning?

16          THE COURT:   No.   The new attorney will be here.

17          MR. BYRD:   Thank you.

18          THE COURT:   Court's in recess.

19      (Which were all the proceedings had in the above-entitled

20          cause on the day and date aforesaid.)

21

22

23

24

25

1    I certify that the foregoing is a correct transcript from

2    the record of proceedings in the above-entitled matter.

3

4

5    _____
     Mary T. Lindbloom
     Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25