1  **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE NORTHERN DISTRICT OF ILLINOIS**
2  **WESTERN DIVISION**

3  UNITED STATES OF AMERICA,   )    Docket No. 11 CR 50062
                           )
4            Plaintiff,   )    Rockford, Illinois
                           )    Monday, May 6, 2013
5          v.        )    8:45 o'clock a.m
                           )
6  DAYTON POKE,          )
                           )
7           Defendant.   )

8                      **VOLUME 1**
                   **TRANSCRIPT OF TRIAL**
9        **BEFORE THE HONORABLE FREDERICK J. KAPALA, and a jury**

10 APPEARANCES:

11 For the Government:      HON. GARY S. SHAPIRO
                           Acting United States Attorney
12                         (327 S. Church Street,
                            Rockford, IL 61101) by
13                         MR. MARK T. KARNER
                           MR. JOSEPH C. PEDERSEN
14                         Assistant U.S. Attorneys

15 For the Defendant:       LAW OFFICE OF BRENDAN W CAVER, LTD.
                           (308 West State Street,
16                         Suite 97,
                           Rockford, IL 61101) by
17                         MR. BRENDAN W CAVER

18 Also Present:           MR. DANIEL IVANCICH
                           Special Agent, ATF
19
                           MR. ALAN H. COOPER
20
   Court Reporter:        Mary T. Lindbloom
21                         327 S. Church Street
                           Rockford, Illinois 61101
22                         (815) 987-4486

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1        (The following proceedings were had in open court, out of

2        the presence and hearing of the jury:)

3              THE CLERK:   11 CR 50062-1, U.S.A. v. Dayton Poke.

4              MR. KARNER:   Good morning, your Honor.   Mark Karner and

5   Joe Pedersen on behalf of the United States.

6              MR. CAVER:   Brendan Caver on behalf of the defendant,

7   Dayton Poke, who's present in court, Judge.

8              THE COURT:   All right.   Case comes before the court for

9   a jury trial.   I specifically ordered Mr. Cistrunk to be here at

10  8:30.   Have you seen him, Mr. Caver?

11             MR. CAVER:   I have not, Judge.   I spoke with his aunt

12  on the telephone just a short while ago.   She advised that he

13  was at Blackhawk Housing.   He was at 1314 -- I'm blank on the

14  name right now.   But he was on his way immediately.   He was at

15  her residence.

16             THE COURT:   All right.   I'll issue a warrant for his

17  arrest.   It's to issue immediately.   He was supposed to be here

18  at 8:30.   I was here waiting.   You were here waiting.   I don't

19  see any reason why he's not here.

20             MR. CAVER:   Yes, Judge.   I tried to make phone contact

21  with him on several occasions using the information that I had

22  been previously provided for Mr. Cistrunk.   In addition, my

23  client provided me an alternate method by which to leave

24  Mr. Cistrunk a message.   He never returned my phone calls.   I

25  also contacted the attorney who the court had previously

PDF created with pdfFactory trial version www.pdffactory.com

1   appointed to represent Mr. Cistrunk, but because he could not

2   disclose any updated contact information, he was unable to give

3   me a new phone number.

4           THE COURT:  Do you have to prepare the warrant?  Who

5   prepares the warrant?

6           MR. KARNER:  I suppose since it's his witness that the

7   defense would.

8           MR. CAVER:  Judge, I can prepare a warrant.  I have a

9   computer and a printer here.

10          THE COURT:  All right.  Let's take care of any other

11  matters we have to address.  The only other thing that I noticed

12  is that the witness list says Daron Cistrunk is spelled, S-i-s.

13  I always was laboring under the impression it was C-i-s.

14          MR. CAVER:  It's C, Judge.  I apologize for any error.

15          THE COURT:  Do the jurors have a witness list that

16  says S on it?

17          MR. KARNER:  Yes.

18          THE COURT:  I'll correct that with them when I read the

19  witness list.  What else do we have?

20          MR. KARNER:  Judge, well, I'd ask that the parties not

21  be allowed to reference any potential testimony by Mr. Cistrunk

22  in opening statements until we know if Mr. Cistrunk is going to

23  assert his Fifth Amendment privilege not to testify.

24          When we were in court for the last time in Poke,

25  Mr. Cooper, his attorney then, informed us that it was likely --

1    I don't think he said it was 100 percent, but it was likely, and

2    at least Mr. Cistrunk's intention at that time was that he was

3    going to assert his Fifth Amendment privilege.

4            I think before he testifies, he ought to be sworn in

5    and presented outside the presence of the jury to determine

6    that, and based on the possibility of his not testifying, the

7    parties shouldn't reference that in opening statement.

8            MR. CAVER:  Judge, I don't believe that we have any

9    legal basis to mention in the opening statement any evidence

10   that we don't expect to be fleshed out by the testimony in the

11   case.  So, I don't think there's any legal basis for us to make

12   any objection to not mentioning Mr. Cistrunk if we know and if

13   he has expressed that his intention is to assert his right to

14   remain free from self-incrimination based on the Fifth

15   Amendment.

16           I think Mr. Karner is exactly correct.  Based on my

17   conversations -- and I had two of them with Mr. Cooper regarding

18   Mr. Cistrunk's expected testimony.  And I don't want to battle

19   over unnecessary semantics here, but it was Mr. Cooper's belief

20   that Mr. Cistrunk would take the stand and was likely to assert

21   his Fifth Amendment right.  At no time did Mr. Cooper ever tell

22   me that it was his client's intention to assert his Fifth

23   Amendment privilege, only that when he took the stand or was

24   inquired by the judge that he may assert that right.

25           THE COURT:  All right.  Well, I'll want him to decide

1    out of the presence of the jury.  So, one, if I get him here,

2    I'll admonish him

3              MR. CAVER:  Thank you, Judge.

4              THE COURT:  Tell him what his Fifth Amendment rights

5    are.  I hope we get him here sometime during the day.  You say

6    you think he's in town?

7              MR. CAVER:  Yes.  His aunt told me that he was on his

8    way here right now.  I had a cordial, yet firm conversation with

9    her on the phone.

10             THE COURT:  If he does show up and he claims his Fifth

11   Amendment right, I believe under 804(b)(3), that makes him

12   unavailable.  Then if you want to present the conversation he

13   had with Agent Ivancich and this affidavit that I have --

14             MR. CAVER:  That's correct.

15             THE COURT:  -- I'm going to have to have a hearing --

16             MR. CAVER:  That's correct.

17             THE COURT:  -- to determine whether the statements have

18   substantial indicia of reliability.

19             MR. CAVER:  Yes, sir.  Based on my written objection to

20   the prosecution's motion in limine, I believe that the other two

21   factors have been satisfied, and I don't want to have a hearing

22   now, unless the court is inviting argument.  But I believe that

23   it will come down to that issue.

24             THE COURT:  You look at me quizzically, Mr. Karner.

25             MR. PEDERSEN:  Your Honor, I don't believe the first

PDF created with pdfFactory trial version www.pdffactory.com

1    two have been met.  In our motion we argue that they haven't

2    established that the statement was against his penal interest at

3    the time he made it.  He has to know it was against his penal

4    interest.  He believed it was against the law for him, based on

5    his statement to Special Agent Ivancich, to possess a gun

6    without a permit.  As a State of Indiana resident, he wasn't

7    required to have a permit or an Illinois FOID card until he had

8    a driver's license for 60 days in Illinois.  He's never obtained

9    an Illinois driver's license.

10          Now, the fact that there may be some other crimes that

11   he could have been committing if he had a gun in the car, that

12   is irrelevant to whether or not he knew that it was illegal for

13   him to do that.  So, we're not conceding that point.

14          THE COURT:  What about if somebody is laboring under

15   the misapprehension that it's against the law, but it's really

16   not?

17          MR. PEDERSEN:  It's not a statement against penal

18   interests then.  It has to be against his penal interests at the

19   time he makes it, and he has to know that.

20          THE COURT:  All right.  I'll have to look into that.

21          As far as trustworthiness, the reason we have to have a

22   hearing is because there are certain things that you have

23   mentioned in your motion that need to be established.  For

24   example, I recall where somebody proffered that he misidentified

25   the gun and that it had a 17-round magazine, but it really is

1    not the gun he said it was and that it has a different capacity

2    magazine.  But the different capacity magazine is not in the

3    record anyplace, and those are the kinds of things that I have

4    to resolve at a hearing.

5             MR. PEDERSEN:  That's fine.

6             THE COURT:  Okay.

7             MR. KARNER:  So, just so I understand clearly, until we

8    have that hearing and the court makes a ruling, are we not to

9    make any reference to that in opening statement?

10            THE COURT:  That's correct.

11            MR. PEDERSEN:  And, your Honor, some of those issues

12    may be addressed during the testimony of other witnesses if we

13    don't have the hearing prior to -- or until after some of the

14    other witnesses have testified.  We anticipate when the gun is

15    introduced into evidence, it will --

16            THE COURT:  I want the hearing as soon as possible

17    because I need to work on it.  I don't want to go through the

18    testimony, have this hearing, and then have to spend some time

19    working on it.  I'd rather be working on it while we're working

20    on the trial.

21            MR. CAVER:  Judge, if I may.  I understand the court is

22    going to have the hearing at the court's pleasure.  I would ask

23    for it to be done as soon as possible.  If we can have the

24    hearing before opening statements, I would like to be able to

25    reference that statement.

1       THE COURT:  I agree.  As soon as we can.

2       MR. CAVER:  Thank you.

3       THE COURT:  As soon as I can get him here.

4       MR. CAVER:  I just wanted to make that clear.

5       THE COURT:  All right.  Ready to go?

6       MR. KARNER:  Well, a couple other issues.  On Friday we

7  made a Brady disclosure to the defense, because we just learned

8  it, about a statement made by the defendant to a nurse or nurse

9  practitioner up in the Winnebago County Jail to the effect that

10  he used cocaine.  I'm just alerting to the court we're going to

11  contest that admissibility, challenge that admissibility, as

12  well as the relevance of a blood test in June of 2010 where the

13  defendant tested positive for cocaine.  A different basis of

14  exclusion are going to be offered.  The defendant's statement to

15  the nurse ten days after his arrest we believe is hearsay, and

16  we're still researching that, Judge, and we'll have case law for

17  the court tonight on that.

18       THE COURT:  All right.  I'd like a written motion with

19  supporting authority as soon as possible.

20       MR. KARNER:  Okay.  I can get that to the court tonight

21  after court.  And then I just ask that no reference be made in

22  opening statements until that can be resolved.

23       THE COURT:  Do you have any intention on mentioning

24  that in opening statements?

25       MR. CAVER:  No, Judge.

1          THE COURT:  All right.

2          MR. KARNER:  The last thing, I just want to make sure I

3 don't run afoul of the court's -- I reread the court's order

4 after the final pretrial on the motions that we had.  Judge, am

5 I correct now that -- I think it's clear the defense to the

6 cocaine base charge is going to be simple possession, not intent

7 to distribute.  With that understanding, may I reference the

8 text messages the court's allowed into evidence in my opening

9 statement?

10          THE COURT:  Yes.

11          MR. KARNER:  Thank you.

12          MR. CAVER:  Judge, I don't believe we have any legal

13 basis to object to that.

14          THE COURT:  Let's get the jurors here, and we'll start.

15          MR. CAVER:  Thank you, Judge.

16          THE COURT:  By the way, you don't contest the fact that

17 if he takes the Fifth Amendment, he's unavailable.

18          MR. PEDERSEN:  No.

19          MR. KARNER:  No.

20          MR. PEDERSEN:  Your Honor, are these courtroom cameras

21 going to stay on the video monitors when the jury comes in?

22          THE COURT:  No.  I think we can turn those off.

23    (Brief pause.)

24          MR. KARNER:  Judge, Mr. Cistrunk is here.

25          MR. CAVER:  May I have a moment to go speak with

1    Mr. Cistrunk?

2            THE COURT:  As soon as he gets done being processed.

3            MR. CAVER:  Thank you, Judge.

4    (Brief pause.)

5            THE COURT:  Mr. Cistrunk, step up here.  Right up here

6    in front of the podium  I ordered you to be here at 8:30 this

7    morning.  I've issued a warrant for your arrest.  Tell me why

8    you weren't here.

9            MR. CISTRUNK:  I just got off the bus.  I was trying to

10   catch the bus, and I was on the bus.  I was waiting at the bus

11   stop waiting there, and the bus just arrived, and I just got off

12   the bus.  I just got off the bus.

13           THE COURT:  What bus?

14           MR. CISTRUNK:  The Blackhawk -- Meadow Court.  Over

15   there by Meadow Court.

16           THE COURT:  I'll vacate the warrant.

17           MR. KARNER:  Should our office stop preparing that

18   then?

19           THE COURT:  Yes, please.

20           Mr. Cistrunk, as you know, you've been summoned to give

21   testimony under oath as a witness in this trial.  From what I

22   know about the facts of this case, the answers you give may

23   subject you to criminal liability and prosecution.  It's not my

24   decision whether or not you will be prosecuted or charged, but I

25   have to tell you there's a possibility.

1          You have a right under the Fifth Amendment to refuse to

2     give testimony which may incriminate you, and all you have to do

3     to exercise that right is to tell me that you wish to claim your

4     Fifth Amendment privilege, or you may waive that right and

5     answer the questions put to you by the parties.

6          Prior to claiming your right which protects you against

7     compelled self-incrimination, you may discuss this matter with

8     an attorney.  If you do not have the funds to hire an attorney,

9     I will appoint an attorney to represent you at no cost to you.

10    Do you understand all those things?

11          MR. CISTRUNK:  Yes, sir.

12          THE COURT:  What's your preference?

13          MR. CISTRUNK:  Plead the Fifth.

14          THE COURT:  Do you want to talk to an attorney before

15    you do that?

16          MR. CISTRUNK:  Yes, sir.

17          THE COURT:  Do you have the funds to hire an attorney?

18          MR. CISTRUNK:  No, sir.

19          THE COURT:  Susan, I'll appoint an attorney to

20    represent Mr. Cistrunk.  Could you call the federal defender and

21    tell them we need someone over here to talk to him?

22          Mr. Cistrunk, have a seat in the back of the courtroom

23    behind your aunt.

24          MR. CISTRUNK:  Yes, sir.

25          THE COURT:  And don't leave.

1         MR. CISTRUNK:  I'm not.

2         MR. CAVER:  Judge, I apologize.  I don't mean to

3 interrupt.  I believe the government and the defense have a

4 joint motion.  I know you told Mr. Cistrunk not to leave, but I

5 would just ask that it be made an order of the court that

6 Mr. Cistrunk not leave the building until he is so released from

7 the court.

8         THE COURT:  Why don't you want him here?

9         MR. CAVER:  That he be ordered to remain in the

10 building until he is released.

11         THE COURT:  All right.  Well, I've ordered him to

12 remain in that seat back there.

13         MR. CAVER:  Yes.  I just wanted to make that clear.

14         THE COURT:  All right.

15         MR. CAVER:  Your Honor made it clear that he was

16 ordered to remain in the seat.  I just wanted to make sure that

17 there is an order that he not --

18         THE COURT:  Mr. Cistrunk, you're not allowed to leave

19 the building.  Do you understand that?

20         MR. CISTRUNK:  Yes, sir.

21         MR. CAVER:  Thank you, Judge.

22         MR. KARNER:  Judge, may I submit our stipulations to

23 the court?

24         THE COURT:  Yes.  Who is going to read the stipulation,

25 or how is it going to be presented to the jury?  Are you going

1    to do it sometime at the appropriate time during your case,

2    Mr. Karner?

3             MR. KARNER:  I'll do as the court directs me to do.  In

4    the past I thought the court read the stipulations at the

5    beginning of the case.

6             THE COURT:  The last jury I had the U.S. Attorney

7    wanted to read it during the appropriate time in the case.  So,

8    I don't know what your office's preference is.

9             MR. KARNER:  That's fine with me, Judge.  I can do that

10   first thing after opening statements.

11            THE COURT:  Okay.

12            MR. CAVER:  Judge, I believe with respect to the

13   defense stipulation that Mr. Karner has also agreed to, it's not

14   going to be an issue until after we have argument as to whether

15   or not the underlying facts to which the stipulation refers to

16   the records that contain them, until those facts are determined

17   by the court to be either admissible or inadmissible.  That is

18   to say, if the court --

19            THE COURT:  I'm not following you.

20            MR. CAVER:  Sorry.  That was inartfully phrased.  We

21   have medical records from the SwedishAmerican Hospital that

22   relate to a drug test that Mr. Cistrunk at one point tested

23   positive for the use of illegal narcotics.  Those facts we

24   obviously wish to argue toward a personal possession argument.

25   If the court deems that that is appropriate, then obviously the

1    stipulation will be relevant.

2            But at some point if the court rules that the drug test

3    itself is not relevant and should not be presented to the jury,

4    then our stipulation would become moot, anyway.  But we would

5    ask to present our stipulation at the appropriate time, if

6    necessary.

7            THE COURT:  So, you can present the other stipulations

8    right after opening statement, and then you'll hold off on the

9    medical records stipulation until you've discussed it with

10   Mr. Caver?

11           MR. KARNER:  If that's acceptable to the court.

12           THE COURT:  All right.

13           MR. CAVER:  Thank you, Judge.

14           THE COURT:  You're welcome.

15      (Brief pause.)

16           MR. KARNER:  Judge, I forget.  I made the corrections

17   dictated by the court on the jury instructions.  Does the court

18   have the corrected copy?

19           THE COURT:  No, not yet.

20           MR. KARNER:  I'll bring those up at the lunch hour

21   then.

22           THE COURT:  Thank you.

23      (The following proceedings were had in open court, in the

24       presence and hearing of the jury:)

25           THE CLERK:  11 CR 50062-1, U.S.A. v. Dayton Poke.

Voir Dire

1    THE COURT:  Is the government ready to proceed?

2    MR. KARNER:  Yes, sir.

3    THE COURT:  Defense ready to proceed?

4    MR. CAVER:  Yes, your Honor.

5    THE COURT:  Good morning, ladies and gentlemen.  I am

6  Judge Fred Kapala, and I will be presiding at this trial.  You

7  are called here today to answer questions concerning your

8  qualifications to act as jurors in this case.  Our objective is

9  to select twelve jurors and two alternate jurors who are fair

10  and impartial and can decide this case without prejudice or

11  sympathy for either side.

12    Is there any juror in the courtroom who is having

13  difficulty hearing what I'm saying?

14   (No response.)

15    THE COURT:  Would all of the prospective jurors stand

16  and be sworn to answer truthfully to all the questions I put to

17  you?  The oath is important.  You must be truthful in your

18  answers so that the parties can have a fair trial.  They are

19  entitled to a fair trial, just as you would be if you were on

20  trial.  Would you all raise your right hand?

21   (Jury panel duly sworn.)

22    THE COURT:  Thanks, folks.  You can retake your seat.

23    Please be very attentive to the things I say and the

24  questions that I ask.  This case is entitled the United States

25  of America v. Dayton Poke.  The defendant in this action is

**Voir Dire**

1    Dayton Poke.  He is seated at the counsel table to my right.

2    Mr. Poke, would you please stand and let the jury see who you

3    are and greet them

4            THE COURT:  Thank you.  With him at counsel table is

5    his attorney, Brendan Caver.

6            MR. CAVER:  Good morning, ladies and gentlemen.

7            THE COURT:  The government is represented by Assistant

8    United States Attorneys who are seated at the counsel table to

9    my left.  They are Assistant United States Attorney Mark Karner.

10            MR. KARNER:  Good morning, folks.

11            THE COURT:  And Assistant United States Attorney Joseph

12    Pedersen.

13            MR. PEDERSEN:  Good morning.

14            THE COURT:  Also at the counsel table are Daniel

15    Ivanich, who is a special agent with the Bureau of Alcohol,

16    Tobacco, Firearms & Explosives.

17            MR. IVANICH:  Good morning.

18            THE COURT:  And also Lisa Seck, who is a paralegal with

19    the United States Attorney's Office, who will provide technical

20    assistance from time to time during the course of the trial.

21            MS. SECK:  Good morning.

22            THE COURT:  The charges in this case are contained in

23    what is called a superseding indictment.  The superseding

24    indictment has three counts and alleges the following.

25            Count 1.  On or about July 6th, 2011, at Rockford, in

## Voir Dire

1   the Northern District of Illinois, Western Division, Dayton

2   Poke, defendant herein, knowingly and intentionally did possess

3   with intent to distribute a controlled substance, namely,

4   mixtures containing approximately 1.2 grams of cocaine base in

5   the form of crack cocaine, a Schedule II controlled substance,

6   in violation of Title 21, United States Code, Section 841(a)(1).

7           Count 2 alleges that on or about July 6th, 2011, at

8   Rockford, in the Northern District of Illinois, Western

9   Division, Dayton Poke, defendant herein, previously having been

10  convicted of a crime punishable by imprisonment for a term

11  exceeding one year, knowingly did possess a firearm, namely, a

12  Hi-Point model JCP 40 S&W .40 caliber handgun with serial number

13  X744976, which possession was in and affecting commerce in that

14  the firearm had previously been transported in interstate

15  commerce in violation of Title 18, United States Code, Section

16  922(g)(1) and 924(e)(1).

17          Count 3 alleges that on or about July 6th, 2011, at

18  Rockford, in the Northern District of Illinois, Western

19  Division, Dayton Poke, defendant herein, in furtherance of a

20  drug trafficking crime, namely, the offense described in Count 1

21  of this indictment, did knowingly possess a firearm, namely, a

22  Hi-Point model JCP 40 S&W .40 caliber handgun with serial number

23  X744976, in violation of Title 18, United States Code, Section

24  924(c)(1)(A).

25          You must remember that a superseding indictment is not

Voir Dire

1   to be considered as any evidence against the defendant nor does

2   the law allow you to infer any presumption of guilt against a

3   defendant simply because he has been indicted.  The superseding

4   indictment is merely the formal way in which a defendant is

5   placed on trial.  The defendant has pled not guilty to all of

6   the counts.

7           Similarly, the mere fact that a defendant has been

8   arrested is not any evidence of guilt.  Under the law a

9   defendant is presumed to be innocent of the charges against him

10  This presumption remains with the defendant throughout every

11  stage of the trial and during your deliberations on the verdict

12  and is not overcome unless from all the evidence in the case you

13  are convinced beyond a reasonable doubt that a defendant is

14  guilty.

15          The government has the burden of proving the guilt of a

16  defendant beyond a reasonable doubt, and this burden remains

17  with the government throughout the case.  A defendant is not

18  required to prove his innocence nor is he required to present

19  any evidence on his behalf.  He may simply rely on the

20  presumption of innocence.

21          Each count of the superseding indictment charges the

22  defendant with having committed a separate offense, and each

23  count should be considered by you separately.

24          You will determine the facts in this case.  You will

25  decide which witnesses to believe and how much weight to give to

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1   their testimony.  You will have to resolve any conflicts in the

2   evidence.  You should not draw any adverse inferences from the

3   race, national ancestry, ethnic background, color, or religion

4   of a defendant or a witness.

5           A witness' status, whether he or she is a law

6   enforcement officer, a public official, or in a position of

7   prominence in the community, does not make that witness any more

8   or less worthy of belief simply because of that status.  Jurors

9   must give the witnesses for both sides the same attention.

10          Because this case, like all others tried in this

11  building, is a serious one, it is absolutely essential that

12  those of you who are selected to serve as jurors are persons who

13  will be fair and impartial to each side, that is, persons who do

14  not have any opinion now as you sit here as to the defendant or

15  the charges against him, persons who will be able to decide the

16  case from the evidence that will be presented here and from the

17  law that I will provide to you.  It will be the duty of the jury

18  to accept the law as contained in my instructions on the law

19  whether you agree with it or not.  Do not allow sympathy,

20  prejudice, fear, or public opinion to influence you.

21          It is important to the selection of a fair and

22  impartial jury that a juror who finds that the government has

23  failed to sustain its burden of proof of beyond a reasonable

24  doubt have no reservations about returning a verdict of not

25  guilty.  It is equally important that a juror who finds that the

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1   government has sustained its burden of proof of beyond a

2   reasonable doubt have no reservations about returning a verdict

3   of guilty.   When you faithfully perform your duty as a juror,

4   you will fulfill that duty whether you find the defendant guilty

5   or not guilty.

6          If you have served as a juror before, please be mindful

7   that this is a separate case, and the rules of law and burden of

8   proof may well be different.   Therefore, please do not consider

9   the facts or the law in a previous case, but decide this case on

10  the facts and law applicable to it.

11         You will be asked questions by me concerning matters

12  reflecting on your qualifications to serve as jurors in this

13  case.   It is your duty to answer them truthfully and honestly.

14  Their purpose is not to pry into your personal affairs, but are

15  only to ensure that each side receives a fair and impartial

16  trial and a fair and impartial juror.

17         If the answer to a question is embarrassing to you or

18  would make you feel uncomfortable, please indicate that to me,

19  and we will accommodate your answer in a sidebar conference

20  outside the other jurors' hearing.

21         If any of are you excused, there will be no adverse

22  reflection on you in any way.   Not all jurors are equally suited

23  to hear all cases.   If you are excused, it only means that from

24  the examination we have undertaken, other jurors might better be

25  suited to try this case.

## Voir Dire

1    Jury service is a necessary and important function of

2    every citizen.  I hope each of you considers this your civic

3    duty and you will be willing to serve and not try to avoid this

4    duty just because you might wish to spend your time in some

5    other way.

6    I am going to direct my initial questions to all of the

7    prospective jurors in the courtroom as a group.  If you have an

8    affirmative answer to any of the following questions or if there

9    is something regarding the following questions that you wish to

10   bring to my attention, please raise your hand.  Wait until you

11   receive the microphone.  Then tell me your name.

12   First of all, do any of you disagree with or are they

13   any of you who cannot comply with any of the propositions or

14   principles I have just stated to you?

15   (No response.)

16   THE COURT:  Are any of you acquainted with the

17   defendant, Mr. Poke?

18   (No response.)

19   THE COURT:  Are any of you acquainted with Mr. Caver,

20   the defendant's attorney?

21   (No response.)

22   THE COURT:  Are any of acquainted with the Assistant

23   United States Attorneys or anyone else sitting at their counsel

24   table?

25   (No response.)

Voir Dire

1    THE COURT:  You have all received a list of possible

2    witnesses in this case.  The possible witnesses in this case are

3    from the Bureau of Alcohol, Tobacco, Firearms & Explosives,

4    Special Agent Ivancich, Special Agent John Richardson, and Carl

5    McClary.  The first two are in Rockford, Illinois.  The third

6    one is from Atlanta, Georgia.

7         From the Rockford City Police Department, all from

8    Rockford, Illinois, Sergeant Joseph Stevens, Detective Kevin

9    Nordberg, Detective Maurice Pruitt, Detective Bruce Voyles,

10   Detective Robert Reffett, Detective David Cone, Detective Jeff

11   Schroeder, Officer Richard Dodd, Officer Eric Jones, Officer

12   Mike Meehan, Officer Rob Hatfield.

13        From the Winnebago County Sheriff's Police Department,

14   all from Rockford, Illinois, Lieutenant David Huff, Nurse Tracy

15   Runyard.

16        From the Illinois State Police Crime Laboratory, Sarah

17   Anderson.

18        From Rockford, Illinois, these civilians.  Daron

19   Cistrunk from Gary, Indiana, Amy Favors from Rockford, Illinois,

20   Rachel Hogan from Rockford, Illinois, and Rebecca Hayes from

21   Rockford, Illinois.

22        My court reporter has ably reminded me that the

23   spelling for Mr. Cistrunk -- that's the first of the civilian

24   witnesses -- is C-i-s-t-r-u-n-k, not S-i-s-t-r-u-n-k.

25        Are any of you acquainted with any of these people?

Voir Dire

1    PROSPECTIVE JUROR:  My name is Ed Fujimoto.  And Mike
2  Meehan, I think I might have known him before he became an
3  officer.
4    THE COURT:  Who's that?
5    PROSPECTIVE JUROR:  Mike Meehan.
6    THE COURT:  Mike Meehan?  And how do you spell your
7  last name, sir?
8    PROSPECTIVE JUROR:  F, as in Frank, u-j-i-m-o-t-o.
9    THE COURT:  And that's Officer Meehan?
10    PROSPECTIVE JUROR:  Yes.
11    THE COURT:  Thank you, Edward.
12    Are any of you familiar with this case?
13    (No response.)
14    THE COURT:  Is there anything about the nature of this
15  case that would make it difficult for you to be fair to both
16  sides?
17    (No response.)
18    THE COURT:  Do any of you or your immediate family
19  members work in a law firm?
20    PROSPECTIVE JUROR:  My name is Luz Cortinez.  I have a
21  brother that's a retired detective and another one that works at
22  forensics in Joliet.  I don't know if that would have
23  anything --
24    THE COURT:  Do they work in a law firm?
25    PROSPECTIVE JUROR:  Oh, well, no.  One was a detective.

Voir Dire

1    THE COURT:  Okay.  They're connected with law

2  enforcement.  You have to listen very carefully to my questions.

3  I need to know if there's somebody that you know that works

4  either as a paralegal or an employee of a law firm  I will get

5  to that question.  I just have to take the questions in order.

6    There was somebody else that raised their right hand.

7    PROSPECTIVE JUROR:  Tom Wilson.  My brother's an

8  attorney in Orlando.

9    THE COURT:  Your brother's an attorney where?

10    PROSPECTIVE JUROR:  In Orlando, Florida.

11    THE COURT:  What kind of law does he practice?

12    PROSPECTIVE JUROR:  Right now it's family law.  It was

13  criminal law.  He was a prosecutor.

14    THE COURT:  Okay.  Thank you, Tom

15    Other than military service, have any of you or an

16  immediate family member ever been an officer or employee of the

17  United States Government?

18    PROSPECTIVE JUROR:  Mary Csenar, C-s-e-n-a-r.  My

19  father was a civil servant at the Air Force Academy.

20    THE COURT:  What did he do, Mary?

21    PROSPECTIVE JUROR:  He worked in the carpenter's shop.

22    THE COURT:  When was that?

23    PROSPECTIVE JUROR:  He probably retired in '90.  He's

24  deceased.

25    THE COURT:  Okay.  Thank you, Mary.

Voir Dire

1    PROSPECTIVE JUROR:  My name is Virginia Allen, and this
2    is in regards to the last question, sir.  My daughter works in
3    the State's Attorney's Office.  Would that be reflective to what
4    you were asking?
5    THE COURT:  Yes.
6    PROSPECTIVE JUROR:  Okay.  She works in the State's
7    Attorney's Office in Sycamore.
8    THE COURT:  What is that, DeKalb County?
9    PROSPECTIVE JUROR:  Yes, it is.
10   THE COURT:  Okay.  Thank you, Virginia.
11   PROSPECTIVE JUROR:  Okay.
12   THE COURT SECURITY OFFICER:  Your Honor, could you
13   repeat the question?
14   THE COURT:  Okay.  Other than military service, have
15   any of you or an immediate family member ever been an officer or
16   employee of the United States Government?
17   PROSPECTIVE JUROR:  Deb Patterson.  I work for the Post
18   Office part-time.
19   THE COURT:  What do you do for them?
20   PROSPECTIVE JUROR:  I just try to work two hours every
21   Saturday to get our mail through.
22   THE COURT:  Okay.  Thank you, Deborah.
23   PROSPECTIVE JUROR:  Sonia Davis.  And my sister is also
24   employed at the Post Office in Rock Falls.  She's a clerk.
25   THE COURT:  Could you spell your last name for me,

Voir Dire

1    please?

2            PROSPECTIVE JUROR:   Davis, D-a-v-i-s.

3            THE COURT:   And that's your sister?

4            PROSPECTIVE JUROR:   Um-hm

5            THE COURT:   Thank you, Sonia.

6            PROSPECTIVE JUROR:   Jennifer Sus.   My father was a mail

7    delivery person in Florida.

8            THE COURT:   Thank you.

9            PROSPECTIVE JUROR:   Thomas Dunn.   I've got a brother

10   that's a city carrier in Oregon, Wisconsin, retired rural

11   carrier brother from Oregon, Wisconsin, and my father was a

12   retired postal worker in Oregon, Wisconsin.

13           PROSPECTIVE JUROR:   Candy Sextonson.   1979 I was in the

14   state police.   A long time ago, very long time ago.

15           THE COURT:   But that wouldn't be the federal

16   government, would it?  It was Illinois State Police?

17           PROSPECTIVE JUROR:   Yes.

18           THE COURT:   I'm asking for an employee of the United

19   States Government right now.   I will get to that question, I

20   promise.

21           PROSPECTIVE JUROR:   Sorry.

22           THE COURT:   I just need to take them in order here.

23           PROSPECTIVE JUROR:   My name is Linda Grady, and my

24   brother is a mail carrier in Ohio, Illinois.

25           THE COURT:   All right.   I have never had a jury with so

Voir Dire

1   many postal connections.  There's somebody in back, Tim   If I

2   don't get my mail, I know who to call.

3              PROSPECTIVE JUROR:  Same thing.  Cathy McThenia.  And

4   sister-in-law is the postmaster in Keensburg, Illinois.

5              PROSPECTIVE JUROR:  Jeff Mickey.  My brother-in-law is

6   the U.S. Marshal for the District of Maine.  I don't know if

7   that's -- it's my brother-in-law, and I don't know if that

8   counts.

9              THE COURT:  First of all, how do you spell your last

10  name?

11             PROSPECTIVE JUROR:  Mickey, M-i-c-k-e-y.

12             THE COURT:  And this is your brother-in-law?

13             PROSPECTIVE JUROR:  Yes, correct.

14             THE COURT:  And he's a U.S. Marhsal in Maine?

15             PROSPECTIVE JUROR:  From Maine, yes.

16             THE COURT:  Is he -- all right.  Thank you, Jeff.

17             Have any of you or an immediate family member or any

18  close friends ever served as a law enforcement officer or ever

19  been employed by a law enforcement agency?

20             PROSPECTIVE JUROR:  My brother's a retired detective --

21             THE COURT:  Okay.

22             PROSPECTIVE JUROR:  -- about a year ago.

23             THE COURT:  You're Cortinez; is that right?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  You know, I don't know how to pronounce

Voir Dire

1   your first name.

2         PROSPECTIVE JUROR:  Luz.

3         THE COURT:  Luz.

4         PROSPECTIVE JUROR:  And then I have another brother.

5         THE COURT:  I didn't get that first one.  You said you

6   have a brother --

7         PROSPECTIVE JUROR:  A detective that retired about a

8   year ago, but he still does work.

9         THE COURT:  From what?

10         PROSPECTIVE JUROR:  The Rockford Police Department.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR:  And then my other brother works as

13   a forensic in Joliet.

14         THE COURT:  With the Department of Corrections or

15   with --

16         PROSPECTIVE JUROR:  Forensic fingerprinting at Illinois

17   State.

18         THE COURT:  Illinois State.  All right.  Got it.  Thank

19   you, Luz.

20         PROSPECTIVE JUROR:  My name is Linda Grady, and my

21   brother is a retired parole officer for the Department of

22   Corrections.

23         THE COURT:  For the State of Illinois?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Thank you, Linda.

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    PROSPECTIVE JUROR:  Hi.  I'm Theresa Jones.  My son is
2    a police officer in Clinton, Iowa.
3         THE COURT:  Thank you, Theresa.
4         PROSPECTIVE JUROR:  My name is Kandie Bott, B-o-t-t,
5    and I have two friends -- not what I call super close, but just
6    friends, and one is a retired policeman from the Rockford Police
7    Department, and the other one is my neighbor across the street,
8    who is a deputy sheriff.
9         THE COURT:  Thanks.
10        PROSPECTIVE JUROR:  You're welcome.
11        PROSPECTIVE JUROR:  Patricia Brees.  I have two friends
12   who are police officers in Rockford.
13        PROSPECTIVE JUROR:  Mary Volk, V-o-l-k.  I have a
14   family friend who is an officer in Elgin, Illinois.
15        PROSPECTIVE JUROR:  Candace Sextonson.  I was in the
16   State Police in 1979.
17        THE COURT:  Pardon me?
18        PROSPECTIVE JUROR:  I was in the State Police in 1979.
19        THE COURT:  Last name again?
20        PROSPECTIVE JUROR:  Sextonson.
21        THE COURT:  Were you on patrol?
22        PROSPECTIVE JUROR:  No.  I was a cadet for two months.
23        THE COURT:  Okay.  Thank you, Candace.
24        PROSPECTIVE JUROR:  Sonia Davis.  And my first husband,
25   who is deceased, was a police officer for three years, from '78

**Voir Dire**

1    -- '77 'til 80.  It was before we were married.  But he served

2    that short time.

3            THE COURT:  What department was he with?

4            PROSPECTIVE JUROR:  He was with the Rock Falls Police

5    Department in Illinois, the city.

6            THE COURT:  Okay.  Thank you, Sonia.

7            PROSPECTIVE JUROR:  Virginia Allen.  My husband is a

8    retired police officer about 15 years ago at Northern Illinois

9    University.

10           THE COURT:  What did he do there at Northern Illinois?

11           PROSPECTIVE JUROR:  He was a patrolman.

12           THE COURT:  Like a security officer?

13           PROSPECTIVE JUROR:  No, no, no.  A real policeman.

14           THE COURT:  And this is your husband?

15           PROSPECTIVE JUROR:  Yes.  And my son-in-law is a

16   retired lieutenant from the DeKalb Police Department.  He just

17   retired this year.

18           THE COURT:  From what department?

19           PROSPECTIVE JUROR:  DeKalb, Illinois.

20           THE COURT:  All right.  Thank you.

21           PROSPECTIVE JUROR:  Thomas Dunn.  I've got a nephew

22   that's a lead detective, Wisconsin DNR, out of Madison.

23           THE COURT:  That's who, Tom?

24           PROSPECTIVE JUROR:  It's my nephew.

25           THE COURT:  Your --

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    PROSPECTIVE JUROR:   My nephew.

2    THE COURT:   A detective for DNR?

3    PROSPECTIVE JUROR:   He's a lead detective with DNR,

4    Department of Natural Resources, up in Madison.

5    THE COURT:   What do detectives do for the DNR?

6    PROSPECTIVE JUROR:   He's an investigator.

7    THE COURT:   I'm just curious.   Does he investigate how

8    many fish you catch or --

9    PROSPECTIVE JUROR:   He investigates -- he'll back up

10   the warden's field in the field.   He goes out and investigates

11   if they --

12   THE COURT:   Like if --

13   PROSPECTIVE JUROR:   Citations.

14   THE COURT:   Like if somebody takes a deer they're not

15   supposed to take?

16   PROSPECTIVE JUROR:   That's more for the field people,

17   but he will investigate if there's any firearms or anything like

18   that that have been seized and stuff.

19   THE COURT:   Okay.   Thanks, Tom

20   PROSPECTIVE JUROR:   Jeff Mickey.   Aside from my

21   brother-in-law, I also have a friend who was an Illinois State

22   Police officer.

23   THE COURT:   Have any of you or an immediate family

24   member had any encounter with a law enforcement officer that

25   would affect your ability to be fair and impartial in this case?

## Voir Dire

1    And I mean a good or a bad encounter.  Some law enforcement

2    officer did something to you or somebody you know that you

3    thought was reprehensible and you don't like law enforcement

4    because of that or, on the other side, someone has done

5    something great for you, saved your life, and you feel that

6    everybody in law enforcement is wonderful and that you would

7    never disbelieve anything a law enforcement officer said.  So,

8    I'm looking for encounters both ways.

9        (No response.)

10            THE COURT:  Do any of you have any objections to or

11    disagreement with laws prohibiting a convicted felon from

12    possessing a firearm?

13        (No response.)

14            THE COURT:  Are any of you a member of any organization

15    that takes a position for or against gun control?

16            PROSPECTIVE JUROR:  I don't know if this -- Tom Wilson.

17    I'm an NRA member.  I don't know if that counts towards

18    anything.

19            THE COURT:  Yes, it does count.

20            PROSPECTIVE JUROR:  Thomas Dunn.  I am also an NRA

21    member.

22            PROSPECTIVE JUROR:  Virginia Allen.  Our family are

23    members of the NRA.

24            PROSPECTIVE JUROR:  Roger Naylor, and I'm also an NRA

25    member.

## Voir Dire

1    PROSPECTIVE JUROR:  David Swanson, NRA member.

2    THE COURT:  Do any of you own a firearm?

3    PROSPECTIVE JUROR:  I have the FOID card, and I have a

4    pistol.

5    THE COURT:  All right.  Could I have your name, please?

6    PROSPECTIVE JUROR:  Brenda Byrne Wilson.

7    PROSPECTIVE JUROR:  My name is Linda Grady, and I have

8    a FOID card.  My husband and I own some guns.

9    THE COURT:  Thank you.

10    PROSPECTIVE JUROR:  I'm Kathy Morris.  I have a FOID

11    card and a handgun, and my husband has another type of gun.  I

12    don't know what it is.

13    PROSPECTIVE JUROR:  Tom Wilson.  I also have a FOID

14    card, and I own several guns.

15    PROSPECTIVE JUROR:  Deb Patterson.  I have a FOID card,

16    and my husband and I have guns.  Not a lot.  Just guns.

17    PROSPECTIVE JUROR:  Martin Hadley.  And I have a few

18    guns.  I have a FOID card.

19    PROSPECTIVE JUROR:  Matthew Landis.  I have a FOID card

20    and several guns.

21    PROSPECTIVE JUROR:  Candy Sextonson.  I have a FOID

22    card, and my husband and I own several guns.

23    THE COURT:  I hope none of you have these guns with

24    you.

25    PROSPECTIVE JUROR:  David Swanson.  I own several guns.

### Voir Dire

1　　　　PROSPECTIVE JUROR:　Peggy Leverton, and I have had a

2　FOID card, and we have a few guns.

3　　　　THE COURT:　Was it Peggy?

4　　　　PROSPECTIVE JUROR:　Peggy.

5　　　　THE COURT:　And --

6　　　　PROSPECTIVE JUROR:　Leverton, L-e-v-e-r-t-o-n.

7　　　　THE COURT:　Thank you, Peggy.

8　　　　PROSPECTIVE JUROR:　Brenda Hoffman, and I have a FOID

9　card and several guns.

10　　　　PROSPECTIVE JUROR:　My name is Maurice L. Bowdry.　I

11　have a FOID card, and I own a handgun and a .20 gauge shotgun.

12　　　　THE COURT:　Could you spell your last name for me,

13　Maurice?

14　　　　PROSPECTIVE JUROR:　Yes.　B-o-w-d-r-y, like "bow dry."

15　　　　THE COURT:　Thank you, Maurice.

16　　　　PROSPECTIVE JUROR:　Roger Naylor.　Gun owner, FOID card

17　carrier, and concealed carry carrier.

18　　　　PROSPECTIVE JUROR:　Thomas Dunn.　FOID card holder,

19　handgun, shotguns, rifles.

20　　　　PROSPECTIVE JUROR:　Jeff Mickey.　I had two guns, and I

21　surrendered those to my brother.

22　　　　THE COURT:　Do any of you have any objections to or

23　disagreement with laws prohibiting the possession, use, and/or

24　distribution of controlled substances?

25　　　(No response.)

## Voir Dire

1    THE COURT:  Are any of you a member of any organization

2    that takes a position for or against the legalized use or

3    possession of controlled substances?

4    (No response.)

5    THE COURT:  Do any of you have any moral, religious, or

6    ethical belief that would prevent you from deciding the guilt or

7    innocence of another person?

8    (No response.)

9    THE COURT:  Have any of you or any member of your

10   immediate family had any experience with anyone from the Federal

11   Bureau of Alcohol, Tobacco, Firearms & Explosives or the

12   Rockford Police Department that would affect your ability to

13   consider the testimony of employees from those law enforcement

14   agencies in the same manner as you would any other credible

15   witness?

16   PROSPECTIVE JUROR:  Terry Easley.  My son when he was

17   13 rode with some boys that put a bomb in the principal's yard.

18   It was a joke, but they got in trouble.

19   THE COURT:  Okay.  Spell your last name.

20   PROSPECTIVE JUROR:  E-a-s-l-e-y.

21   THE COURT:  Thank you, Terry.

22   Have any of you or an immediate family member ever been

23   involved in a lawsuit or any other type of legal proceeding with

24   the federal government or with any federal agency?

25   (No response.)

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1    THE COURT:   Do any of you have any physical condition

2    which requires some special accommodation that will enable you

3    to serve as a juror in this case?

4    PROSPECTIVE JUROR:   Brenda Byrne Wilson.   I have

5    restless legs, and my workplace accommodates my need to stand.

6    So, I don't know if that can be accommodated here or not.

7    THE COURT:   Oh, certainly.   If you're in the jury box

8    and you need to stand up and move around -- in fact, Brenda, if

9    you're selected, we'll probably put you at the end.

10    PROSPECTIVE JUROR:   Okay.   Great.

11    THE COURT:   And so that way you can get up and move

12    around whenever you need to.

13    PROSPECTIVE JUROR:   All right.

14    THE COURT:   I want to make this experience as

15    comfortable as I can for all of you.

16    PROSPECTIVE JUROR:   All right.   Thank you.

17    THE COURT:   You're welcome.

18    Do any of you have any physical condition which would

19    prohibit your ability to serve as a juror in this case?

20    (No response.)

21    THE COURT:   Do any of you have any personal, moral, or

22    religious beliefs that would prevent you from determining the

23    guilt or innocence of a person accused of a crime?

24    (No response.)

25    THE COURT:   Is there any one of you who will not follow

Voir Dire

1    my instructions even if you disagree with them?

2        (No response.)

3            THE COURT:  We estimate the trial in this case may last

4    about three days.  Will this fact make it impossible for any one

5    of you to be fair to both sides or to serve as a juror?

6        (No response.)

7            THE COURT:  Is there any reason that any one of you can

8    think of now as you sit there why you could not be a fair and

9    impartial juror in this case?

10       (No response.)

11           THE COURT:  Have any of you served as a juror in the

12   past, either on a trial jury or on a grand jury?

13           PROSPECTIVE JUROR:  Thomas Dunn.

14           THE COURT:  You have the record for the person who I

15   talked to the most so far this morning.  Between you and

16   Virginia -- it's a race between you and Virginia.  We'll have to

17   see at the end who gets the award.

18           PROSPECTIVE JUROR:  I was a juror in Stephenson County.

19           THE COURT:  Was it a criminal or a civil case?

20           PROSPECTIVE JUROR:  A criminal.

21           THE COURT:  Okay.  Thank you.

22           PROSPECTIVE JUROR:  Betty Horn, H-o-r-n.  And I served

23   on the McHenry County as a juror about 20 years ago.  It was a

24   civil case.

25           PROSPECTIVE JUROR:  Jason Bresser.  I served as a grand

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    juror about maybe six years ago in McHenry County.

2              THE COURT:   Thank you.

3              PROSPECTIVE JUROR:   Teresa Smith.   And I served on a

4    jury in Ogle County about eight years ago.

5              THE COURT:   Teresa, was it a civil or criminal case?

6              PROSPECTIVE JUROR:   Criminal.

7              PROSPECTIVE JUROR:   Candy Sextonson.   I was a juror on

8    Boone County for a DUI.

9              THE COURT:   When was that?

10             PROSPECTIVE JUROR:   About six years ago.

11             THE COURT:   Criminal or civil case?

12             PROSPECTIVE JUROR:   Criminal.   DUI.

13             THE COURT:   That counts.

14             PROSPECTIVE JUROR:   DUI.   Okay.

15             THE COURT:   Okay.   Thank you.

16             All right.   Thanks, folks.   The clerk will randomly

17   call twelve of you as prospective jurors.   As your name is

18   called, please take a seat in the jury box in the order as

19   directed by the court security officer.   As jury selection

20   continues, remaining jurors will then be called to replace

21   excused jurors.   Whether or not you are in the jury box, please

22   listen to the questioning of the other jurors so that if you are

23   called to try the case, you will understand the nature of the

24   procedure.   After we have a jury of twelve persons, we will

25   proceed to select two alternate jurors.   I will talk to you more

Voir Dire

1    about that later.

2            Susan, with that in mind, would you please randomly

3    call twelve names?

4            THE CLERK:  Patricia Brees, B-r-e-e-s.  Maurice Bowdry,

5    B-o-w-d-r-y.  Thomas Wilson, W-i-l-s-o-n.  Luz Cortinez,

6    C-o-r-t-i-n-e-z.  Susan Burke, B-u-r-k-e.  Linda Grady,

7    G-r-a-d-y.  Elizabeth Talarico, T-a-l-a-r-i-c-o.  Roger Naylor,

8    N-a-y-l-o-r.  Celia Zimmerman, Z-i-m-m-e-r-m-a-n.  Cathy

9    McThenia, Mc-T-h-e-n-i-a.  Candace Sextonson,

10   S-e-x-t-o-n-s-o-n.  Matthew Landis, L-a-n-d-i-s.

11           THE COURT:  All right.  Patricia, I'm going to ask you

12   some individual questions.  First of all, can you tell me where

13   you were raised?

14           PROSPECTIVE JUROR:  Here in Rockford.

15           THE COURT:  And where do you live?  I don't want an

16   address.  Just tell me the city you live in.

17           PROSPECTIVE JUROR:  Rockford.

18           THE COURT:  Do you live in a house or apartment or

19   condominium?

20           PROSPECTIVE JUROR:  House.

21           THE COURT:  And who lives there with you?

22           PROSPECTIVE JUROR:  My husband.

23           THE COURT:  How long have you lived in that house?

24           PROSPECTIVE JUROR:  Over 30 years.

25           THE COURT:  Do you have children?

Voir Dire

1   PROSPECTIVE JUROR: Yes.

2   THE COURT: Tell me how many, their names, genders, and

3 occupations. I don't need to know their names.

4   PROSPECTIVE JUROR: I have three. A daughter who is a

5 CNA, a son who builds playgrounds, and a daughter who is a

6 preschool teacher and works in retail.

7   THE COURT: And what are their ages? The CNA?

8   PROSPECTIVE JUROR: She's 45.

9   THE COURT: Okay. And your son?

10   PROSPECTIVE JUROR: He's 42.

11   THE COURT: And the preschool teacher?

12   PROSPECTIVE JUROR: 40.

13   THE COURT: What do you do for a living?

14   PROSPECTIVE JUROR: I take care of my grandson.

15   THE COURT: Have you --

16   PROSPECTIVE JUROR: I've had daycare in my home, but I

17 just now have my grandson.

18   THE COURT: Okay. How long has it been since you've

19 had daycare?

20   PROSPECTIVE JUROR: Over 30 years.

21   THE COURT: So, you used to have daycare 30 years ago,

22 or you had it during the last 30 years.

23   PROSPECTIVE JUROR: The last 30 years.

24   THE COURT: The last what?

25   PROSPECTIVE JUROR: 30 years.

Voir Dire

1      THE COURT:   Does your husband work?

2      PROSPECTIVE JUROR:   No, he's retired.

3      THE COURT:   Retired from what?

4      PROSPECTIVE JUROR:   JL Clark.  He was a platemaker

5   there.

6      THE COURT:   And how long did he do that?

7      PROSPECTIVE JUROR:   40 years.

8      THE COURT:   How far have you gone in school?

9      PROSPECTIVE JUROR:   Through high school.

10      THE COURT:   Do you have any difficulty reading or

11   understanding English?

12      PROSPECTIVE JUROR:   No, hopefully.

13      THE COURT:   Have you or an immediate family member ever

14   served in the military?

15      PROSPECTIVE JUROR:   No.  Well, my father did.

16      THE COURT:   Okay.  What was that?

17      PROSPECTIVE JUROR:   Army Air Corps.

18      THE COURT:   What kind of job did he have?

19      PROSPECTIVE JUROR:   I have no idea.

20      THE COURT:   Have you or an immediate family member ever

21   been involved as a party, witness, or otherwise in a civil or

22   criminal case?

23      PROSPECTIVE JUROR:   My son was involved in a court

24   case.

25      THE COURT:   In what way?

Voir Dire

1    PROSPECTIVE JUROR:   He was the defendant.

2    THE COURT:   Defendant.   Can you tell me what the charge

3  was?

4    PROSPECTIVE JUROR:   I'm not real sure.

5    THE COURT:   Did you know whether it was a felony or a

6  misdemeanor?

7    PROSPECTIVE JUROR:   It was a felony, but he was not

8  charged with that.

9    THE COURT:   So, he was charged with a misdemeanor?

10    PROSPECTIVE JUROR:   Yes.

11    THE COURT:   Where was it?

12    PROSPECTIVE JUROR:   Here in Rockford.

13    THE COURT:   And what was the result of the case?   Was

14  he convicted?

15    PROSPECTIVE JUROR:   No.

16    THE COURT:   Found not guilty?

17    PROSPECTIVE JUROR:   Not guilty.

18    THE COURT:   Is there anything about the handling of

19  that case that causes you any resentment or bad feelings against

20  law enforcement or the court system?

21    PROSPECTIVE JUROR:   Just that it was a very long and

22  drawn out process that shouldn't have been.

23    THE COURT:   Would that in any way affect your ability

24  to be a fair and impartial juror in this case?

25    PROSPECTIVE JUROR:   If it drags out too long, probably.

**Voir Dire**

1       THE COURT: Well, it's not going to drag out too long.

2  I'll tell you that. This is federal court. We move fast. So,

3  if it doesn't draw out in a long process --

4       PROSPECTIVE JUROR: I think I could be fair.

5       THE COURT: All right. Well, I need some assurance

6  from you. What I need you to tell me, Patricia, you need to

7  tell me you will be fair or you won't be fair.

8       PROSPECTIVE JUROR: To the best of my ability, I'll be

9  fair.

10       THE COURT: All right. Have you or an immediate family

11  member ever been the victim of a crime, whether the person who

12  committed the crime was later charged or not?

13       PROSPECTIVE JUROR: Yes.

14       THE COURT: Tell me about that.

15       PROSPECTIVE JUROR: We had a car stolen out of East

16  High School parking lot, and we had our garage broken into.

17       THE COURT: Do you feel that those situations were

18  handled appropriately by the authorities?

19       PROSPECTIVE JUROR: Probably as well as could be.

20       THE COURT: Were the persons who did this ever caught?

21       PROSPECTIVE JUROR: I don't know.

22       THE COURT: But nobody has asked you to follow up on

23  any court --

24       PROSPECTIVE JUROR: No.

25       THE COURT: Do you belong to any clubs or

Voir Dire

1    organizations?

2                PROSPECTIVE JUROR:   No.

3                THE COURT:   Can you promise me that you'll give the

4    defendant and the government a fair trial?

5                PROSPECTIVE JUROR:   Yes.

6                THE COURT:   Okay.   Would you pass the microphone -- let

7    me ask you one more thing, Patricia.   Is there anything that I

8    haven't asked you that I should be asking you that bears upon

9    your ability to serve as a fair and impartial juror in this

10   case?   Nothing comes to mind?

11               PROSPECTIVE JUROR:   No.

12               THE COURT:   All right.   Maurice, let me talk to you.

13   How old are you?

14               PROSPECTIVE JUROR:   62.

15               THE COURT:   Patricia, I didn't ask you how old you

16   were.   Would you tell me?

17               PROSPECTIVE JUROR:   68.

18               THE COURT:   Okay.   Maurice, where were you raised?

19               PROSPECTIVE JUROR:   In Michigan.

20               THE COURT:   And where do you live now?

21               PROSPECTIVE JUROR:   In Machesney Park.

22               THE COURT:   Do you live in a house or an apartment?

23               PROSPECTIVE JUROR:   In a house.

24               THE COURT:   How long have you lived in that house?

25               PROSPECTIVE JUROR:   Three years.

Voir Dire

1      THE COURT:   Where did you live before that?

2      PROSPECTIVE JUROR:   In Rockford.

3      THE COURT:   Did you live in a house in Rockford?

4      PROSPECTIVE JUROR:   No.   An apartment.

5      THE COURT:   How long did you live in the apartment?

6      PROSPECTIVE JUROR:   Eleven years.

7      THE COURT:   What do you do for a living?

8      PROSPECTIVE JUROR:   I'm retired.

9      THE COURT:   Retired from where?

10     PROSPECTIVE JUROR:   State of Illinois.

11     THE COURT:   What did you do for Illinois?

12     PROSPECTIVE JUROR:   Psychiatric social work.

13     THE COURT:   Where did you work?

14     PROSPECTIVE JUROR:   Singer Mental Health Center.

15     THE COURT:   And what kind of work did you do?  I know

16     you said psychiatric social work, but tell me what specifically

17     you did.

18     PROSPECTIVE JUROR:   Specifically, assessments.   Did

19     group therapy sessions, attended to financial crisis, such as

20     disability, Social Security, things of that nature.

21     THE COURT:   Are you married?

22     PROSPECTIVE JUROR:   No.

23     THE COURT:   Have you ever been married?

24     PROSPECTIVE JUROR:   Yes.

25     THE COURT:   When was that?

## Voir Dire

1    PROSPECTIVE JUROR:  I was married in '78, divorced in

2    '83.

3    THE COURT:  What does your ex-wife do for a living

4    other than a homemaker?

5    PROSPECTIVE JUROR:  She's an administrator at Michigan

6    State University.

7    THE COURT:  Do you have children?

8    PROSPECTIVE JUROR:  I have a daughter.

9    THE COURT:  And how old is she?

10   PROSPECTIVE JUROR:  30.

11   THE COURT:  And what does she do for a living?

12   PROSPECTIVE JUROR:  She's a fashion -- she's a style

13   fashion designer and buyer in Fort Lauderdale.

14   THE COURT:  How far have you gone in school?

15   PROSPECTIVE JUROR:  Master's degree.

16   THE COURT:  In what?

17   PROSPECTIVE JUROR:  Social work.

18   THE COURT:  And where did you get that?

19   PROSPECTIVE JUROR:  At Aurora University in Aurora.

20   THE COURT:  Don't have any trouble reading or

21   understanding English?

22   PROSPECTIVE JUROR:  No.

23   THE COURT:  Have you or an immediate family member ever

24   served in the military?

25   PROSPECTIVE JUROR:  I have.

Voir Dire

1        THE COURT:   What capacity?

2        PROSPECTIVE JUROR:   U.S. Navy.

3        THE COURT:   And when was that?

4        PROSPECTIVE JUROR:   '68 to '73.

5        THE COURT:   What was your MOS?  What kind of job did

6    you have?

7        PROSPECTIVE JUROR:   I was chief petty officer.

8        THE COURT:   Did you have anything to do with law

9    enforcement or incarceration or corrections?

10       PROSPECTIVE JUROR:   No, sir.

11       THE COURT:   Maurice, you say you own some guns.

12       PROSPECTIVE JUROR:   Yes.

13       THE COURT:   What kind of guns do you have?

14       PROSPECTIVE JUROR:   I have a handgun, a

15   nine millimeter, and a .20 gauge Browning shotgun.

16       THE COURT:   And why do you have them?

17       PROSPECTIVE JUROR:   Protection.  Personal protection,

18   home.

19       THE COURT:   Have you or an immediate family member ever

20   been involved as a party, witness, or otherwise in a civil or

21   criminal case?

22       PROSPECTIVE JUROR:   No.

23       THE COURT:   Have you or an immediate family member ever

24   been the victim of a crime?

25       PROSPECTIVE JUROR:   Yes.  I have.

Voir Dire

1      THE COURT:   And what was that?

2      PROSPECTIVE JUROR:   Burglary to my car, garage broken

3  into, items taken.

4      THE COURT:   How long ago was that?

5      PROSPECTIVE JUROR:   Approximately eight years ago.

6      THE COURT:   Was the person or persons who did this ever

7  arrested?

8      PROSPECTIVE JUROR:   Yes.

9      THE COURT:   And what happened to them?

10     PROSPECTIVE JUROR:   They were convicted, as far as I

11 know.   I was contacted by the State's Attorney in Wisconsin.

12     THE COURT:   Do you know what the sentence was?

13     PROSPECTIVE JUROR:   I think it was like probation, more

14 or less.   Misdemeanor.

15     THE COURT:   Do you think that situation was handled

16 appropriately by the authorities?

17     PROSPECTIVE JUROR:   As best as could be, I think.

18     THE COURT:   Have you or an immediate family member ever

19 been arrested for a criminal offense other than a minor traffic

20 violation?

21     PROSPECTIVE JUROR:   No.

22     THE COURT:   Do you belong to any clubs or

23 organizations?

24     PROSPECTIVE JUROR:   No.

25     THE COURT:   Can you promise me that you'll give the

Voir Dire

1    defendant and the government a fair trial?

2           PROSPECTIVE JUROR:   Yes.

3           THE COURT:   Is there any question that I haven't asked

4    you that I should be asking you that bears upon your ability to

5    serve as a fair and impartial juror?

6           PROSPECTIVE JUROR:   Not that I can think of at this

7    moment.

8           THE COURT:   All right.   Thank you.   Nice talking to

9    you.

10          Thomas, how old are you?

11          PROSPECTIVE JUROR:   50.

12          THE COURT:   And where were you raised?

13          PROSPECTIVE JUROR:   Markesan, Wisconsin.

14          THE COURT:   And where do you live now?

15          PROSPECTIVE JUROR:   Harvard.

16          THE COURT:   Live in a house?

17          PROSPECTIVE JUROR:   Yes.

18          THE COURT:   How long have you lived in that house?

19          PROSPECTIVE JUROR:   Twelve years.

20          THE COURT:   Do you have any children?

21          PROSPECTIVE JUROR:   Yes.

22          THE COURT:   What are their genders, ages, and

23   occupations?

24          PROSPECTIVE JUROR:   I have a 22-year old daughter

25   that's a student, works part-time at a construction company and

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1   at an apartment complex.   I have a 20-year old son who's serving

2   a church mission.   And I have a 15-year old son in high school.

3           THE COURT:   15-year old son in school.

4           PROSPECTIVE JUROR:   In school.

5           THE COURT:   The 15-year old still lives with you then?

6           PROSPECTIVE JUROR:   Still lives with me.   My daughter

7   lives with me, as well.

8           THE COURT:   Where does she go to school?

9           PROSPECTIVE JUROR:   She goes to MCC, McHenry Community

10  College.

11          THE COURT:   When I hear MCC, I think of Metropolitan

12  Correction Center.   But she's in college, right?

13          PROSPECTIVE JUROR:   Yes.

14          THE COURT:   All right.   Are you married?

15          PROSPECTIVE JUROR:   Yes, I am

16          THE COURT:   And your wife lives at home?

17          PROSPECTIVE JUROR:   Lives with me, yes.

18          THE COURT:   Does she work outside the home?

19          PROSPECTIVE JUROR:   Yes, she does.   She's an office

20  manager at Tessler Construction.

21          THE COURT:   And what about you?   What do you do for a

22  living, Tom?

23          PROSPECTIVE JUROR:   I'm an IT project manager with

24  United Airlines.

25          THE COURT:   How long have you been doing that?

Voir Dire

1    PROSPECTIVE JUROR:   That particular job since '97.

2    THE COURT:   How about your wife?  How long has she been

3  an office manager?

4    PROSPECTIVE JUROR:   Probably 2000.

5    THE COURT:   Your brother's an Orlando attorney?

6    PROSPECTIVE JUROR:   Yes.

7    THE COURT:   And you say he's practicing family law now,

8  but in the past he was a prosecutor?

9    PROSPECTIVE JUROR:   Yes.  When he got out of law

10  school, he got a job in Miami working for the county.

11    THE COURT:   What is that?  Dade County down there?

12    PROSPECTIVE JUROR:   I don't know.  I'm not sure.  And

13  he was a prosecutor there.  Then he ended up moving up to

14  Orlando and then eventually started his own practice.

15    THE COURT:   Has he ever done criminal defense, do you

16  know?

17    PROSPECTIVE JUROR:   I think he may have done some

18  defense work.

19    THE COURT:   When you get together with him, do you talk

20  about his job?

21    PROSPECTIVE JUROR:   Yeah, I would say so.  Just -- I

22  mean, he'll volunteer details of things he's working on.

23    THE COURT:   Is there anything about those matters that

24  he's discussed with you that would impair your ability to be a

25  fair and impartial juror in this case?

Voir Dire

1       PROSPECTIVE JUROR:   No, I don't think so.

2       THE COURT:   You're an NRA member, and you own some
3   firearms.

4       PROSPECTIVE JUROR:   Yes, I do.

5       THE COURT:   And why do you own the firearms?

6       PROSPECTIVE JUROR:   Personal protection.   I enjoy
7   target practicing, used to hunt.   Haven't hunted in a few years.

8       THE COURT:   Have you or an immediate family member ever
9   been involved as a party, witness, or otherwise in a civil or
10   criminal case?

11       PROSPECTIVE JUROR:   No.

12       THE COURT:   Have you or an immediate family member ever
13   been the victim of a crime?

14       PROSPECTIVE JUROR:   Yes.

15       THE COURT:   Can you tell me about that?

16       PROSPECTIVE JUROR:   I had a motorcycle stolen in
17   probably '96 in California, and then I had my apartment broken
18   into when I lived in Phoenix in the late '80s.

19       THE COURT:   Was the person or persons who did this ever
20   apprehended?

21       PROSPECTIVE JUROR:   No, they weren't.

22       THE COURT:   Pardon me?

23       PROSPECTIVE JUROR:   No.

24       THE COURT:   Do you feel it was handled appropriately --
25   that both these situations were handled appropriately by the

Voir Dire

1    authorities?

2              PROSPECTIVE JUROR:  To the best of their abilities,

3    yeah.

4              THE COURT:  Have you or an immediate family member ever

5    been arrested for a criminal offense?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Do you belong to any clubs or

8    organizations?

9              PROSPECTIVE JUROR:  Harley Owners Group.

10             THE COURT:  Okay.  And the NRA?

11             PROSPECTIVE JUROR:  And NRA, yes.

12             THE COURT:  Can you promise me that you'll give the

13   defendant and the government a fair trial?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Anything I don't know about you that I

16   should that bears upon your ability to serve as a fair and

17   impartial juror?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Thanks.

20             Luz.

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Good morning.

23             PROSPECTIVE JUROR:  Good morning.

24             THE COURT:  Could you tell me how old you are, please?

25             PROSPECTIVE JUROR:  62.

**Voir Dire**

1    THE COURT:   Where do you live?

2    PROSPECTIVE JUROR:   In Rockford.

3    THE COURT:   You live in a house?

4    PROSPECTIVE JUROR:   Yes, I do.

5    THE COURT:   How long have you lived in that house?

6    PROSPECTIVE JUROR:   Eight years.

7    THE COURT:   Where did you live before that?

8    PROSPECTIVE JUROR:   An apartment in Rockford.

9    THE COURT:   In Rockford?

10   PROSPECTIVE JUROR:   Yes.

11   THE COURT:   Where were you raised?

12   PROSPECTIVE JUROR:   Here in Rockford.

13   THE COURT:   Do you have any children?

14   PROSPECTIVE JUROR:   Yes, two daughters.

15   THE COURT:   And what are their ages, and what do they

16   do for a living?

17   PROSPECTIVE JUROR:   My oldest daughter is 38, and she

18   works with the school, like a teacher's aide.

19   THE COURT:   Okay.  And the other one?

20   PROSPECTIVE JUROR:   Is 35 and she works at McDonald's

21   as a manager.

22   THE COURT:   What do you do for a living?

23   PROSPECTIVE JUROR:   I'm laid off right now.

24   THE COURT:   Laid off from where?

25   PROSPECTIVE JUROR:   Joseph Behr & Son.

Voir Dire

1    THE COURT:   And what did you do for Joseph Behr & Son?

2    PROSPECTIVE JUROR:   Housekeeping.

3    THE COURT:   How long did you do that?

4    PROSPECTIVE JUROR:   25 years.

5    THE COURT:   Are you married?

6    PROSPECTIVE JUROR:   Separated.

7    THE COURT:   How long have you been separated?

8    PROSPECTIVE JUROR:   Oh, for about three years.

9    THE COURT:   And then what does your husband do for a
10   living?

11   PROSPECTIVE JUROR:   He's retired.

12   THE COURT:   Where did he work?

13   PROSPECTIVE JUROR:   He was a laborer.

14   THE COURT:   For who?

15   PROSPECTIVE JUROR:   A lot of places, I guess.

16   THE COURT:   Was he a union laborer?

17   PROSPECTIVE JUROR:   No.

18   THE COURT:   Or he just --

19   PROSPECTIVE JUROR:   Just a regular laborer.

20   THE COURT:   Found work and worked.

21   PROSPECTIVE JUROR:   Um-hm

22   THE COURT:   Your brother is a detective for the
23   Rockford Police Department.

24   PROSPECTIVE JUROR:   Yes.   He retired about a year ago.

25   THE COURT:   What kind of work did he do, do you know?

Voir Dire

1    PROSPECTIVE JUROR:   No, I don't know what department.
2    He was just a detective.
3         THE COURT:   Do you ever talk to him about his work?
4         PROSPECTIVE JUROR:   Once in awhile he would say
5    something, but nothing really big.
6         THE COURT:   And you have another brother who's --
7         PROSPECTIVE JUROR:   That's forensic.   Fingerprinting in
8    Joliet.
9         THE COURT:   For the Illinois State Police?
10        PROSPECTIVE JUROR:   Yes.
11        THE COURT:   Does he work in a crime lab or something
12   like that?
13        PROSPECTIVE JUROR:   I guess like when you apply for a
14   job, they do the fingerprinting.   They send it to Joliet, and he
15   does that.
16        THE COURT:   Oh, I see.   How often do you have contact
17   with that brother?
18        PROSPECTIVE JUROR:   Well, about a month ago we were
19   together because my mother got sick.
20        THE COURT:   Does he talk about his job?
21        PROSPECTIVE JUROR:   He'll kind of say like -- well, he
22   sees a lot of different people's names that come up that he has
23   to check into.   Like my grandson, he needed fingerprinting for
24   college, and he says he saw the name and stuff like that.   Every
25   once in a while.

Voir Dire

1    THE COURT:  Never mentioned my name, did he?

2    PROSPECTIVE JUROR:  I don't think so.

3    THE COURT:  All right.  Good.

4    Is there anything about your relationship with your

5    brothers that would affect your ability to be a fair and

6    impartial juror for this case?

7    PROSPECTIVE JUROR:  No.

8    THE COURT:  How far did you go in school?

9    PROSPECTIVE JUROR:  Twelfth grade.

10    THE COURT:  High school in Rockford?

11    PROSPECTIVE JUROR:  I went to West High.

12    THE COURT:  Do you have any difficulty reading or

13    understanding English?

14    PROSPECTIVE JUROR:  No.

15    THE COURT:  Have you or an immediate family member ever

16    served in the military?

17    PROSPECTIVE JUROR:  I've got a nephew that's in the

18    Army right now.

19    THE COURT:  A who?

20    PROSPECTIVE JUROR:  A nephew.  It's kind of like he's

21    making it a career.  He's only got a few more years to go.

22    THE COURT:  Good for him

23    Other than -- let me ask you this.  Have you or an

24    immediate family member ever been involved as a party, witness,

25    or otherwise in a civil or criminal case?

Voir Dire

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you or an immediate family member ever

3  been the victim of a crime?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Have you or an immediate family member ever

6  been arrested for a criminal offense?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Do you belong to any clubs or

9  organizations?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Can you promise me that you'll give the

12  defendant and the government a fair trial?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Is there anything I don't know about you

15  that I should that bears upon your ability to serve as a fair

16  and impartial juror?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Thank you, Luz.

19  Susan.

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  How old are you?

22         PROSPECTIVE JUROR:  68.

23         THE COURT:  And how far have you gone in school?

24         PROSPECTIVE JUROR:  Twelve.

25         THE COURT:  Did you graduate?

PDF created with pdfFactory trial version www.pdffactory.com

**Voir Dire**

1    PROSPECTIVE JUROR:   Yes.

2    THE COURT:   From high school?

3    PROSPECTIVE JUROR:   High school.

4    THE COURT:   In Rockford?

5    PROSPECTIVE JUROR:   No.   I was raised in Burlington,

6  Wisconsin.

7    THE COURT:   Where do you live now?

8    PROSPECTIVE JUROR:   Harvard.

9    THE COURT:   How long have you lived there?

10    PROSPECTIVE JUROR:   Since I got married 48 years ago.

11    THE COURT:   Do you live in a house there?

12    PROSPECTIVE JUROR:   Yes.

13    THE COURT:   Do you have children?

14    PROSPECTIVE JUROR:   Two.   A boy, he's 47, and a

15  daughter that's 39.

16    THE COURT:   What does your son do for a living?

17    PROSPECTIVE JUROR:   He works for HSBC.

18    THE COURT:   What's that?

19    PROSPECTIVE JUROR:   A bank.

20    THE COURT:   And how about your daughter?

21    PROSPECTIVE JUROR:   My daughter is a stay-at-home mom

22    THE COURT:   What about your husband?  What does he do

23  for a living?

24    PROSPECTIVE JUROR:   He's retired.

25    THE COURT:   From where?

Voir Dire

1    PROSPECTIVE JUROR:   Dean Foods.

2    THE COURT:   And how long did he work there?

3    PROSPECTIVE JUROR:   Twenty some years.

4    THE COURT:   What did he do for Dean Foods?

5    PROSPECTIVE JUROR:   He worked in the cooler.

6    THE COURT:   What about you?  Do you work outside the

7    home?

8    PROSPECTIVE JUROR:   I did.  I retired -- it will be a

9    week tomorrow.

10   THE COURT:   Oh.  And you get to spend it with us.

11   PROSPECTIVE JUROR:   I know.  I'm so lucky.

12   THE COURT:   Where did you retire from?

13   PROSPECTIVE JUROR:   A bank in Harvard.

14   THE COURT:   How long did you do that?

15   PROSPECTIVE JUROR:   Almost 31 years.

16   THE COURT:   What did you do for the bank?

17   PROSPECTIVE JUROR:   Customer service.

18   THE COURT:   Have any difficulty reading or

19   understanding English?

20   PROSPECTIVE JUROR:   No.

21   THE COURT:   Have you or an immediate family member ever

22   been involved as a party, witness, or otherwise in a civil or

23   criminal case?

24   PROSPECTIVE JUROR:   No.

25   THE COURT:   Have you or an immediate family member ever

### Voir Dire

1    been the victim of a crime?

2            PROSPECTIVE JUROR:   In the early or late seventies, we

3    had a tavern in Wisconsin, and we were broke into.

4            THE COURT:   Was the person or persons who did this --

5            PROSPECTIVE JUROR:   I don't remember.

6            THE COURT:   Do you feel it was handled appropriately by

7    the authorities?

8            PROSPECTIVE JUROR:   I guess, yeah.

9            THE COURT:   Have you or an immediate family member ever

10   been arrested for a criminal offense?

11           PROSPECTIVE JUROR:   No.

12           THE COURT:   Do you belong to any clubs or

13   organizations?

14           PROSPECTIVE JUROR:   No.

15           THE COURT:   Can you promise me that you'll give the

16   defendant and the government a fair trial?

17           PROSPECTIVE JUROR:   Yes.

18           THE COURT:   Anything I should know about you that I

19   don't that bears upon your ability to serve as a fair and

20   impartial juror?

21           PROSPECTIVE JUROR:   No.

22           THE COURT:   Let me talk to Linda for a little bit.

23           Linda, how old are you?

24           PROSPECTIVE JUROR:   52.

25           THE COURT:   And where were you raised?

Voir Dire

1    PROSPECTIVE JUROR:  In Ohio, Illinois.

2    THE COURT:  Where do you live now?

3    PROSPECTIVE JUROR:  Amboy, Illinois.

4    THE COURT:  And how long have you lived there?

5    PROSPECTIVE JUROR:  About twelve years.

6    THE COURT:  Live in a house?

7    PROSPECTIVE JUROR:  Yes, we do.

8    THE COURT:  Who lives in the house with you?

9    PROSPECTIVE JUROR:  My husband Jim, my twin daughters

10   that are 14.

11   THE COURT:  Do you have any other children outside the

12   home?

13   PROSPECTIVE JUROR:  No.

14   THE COURT:  And they both go to high school, I assume.

15   PROSPECTIVE JUROR:  They're in junior high.  They're in

16   eighth grade.

17   THE COURT:  What's your husband do for a living?

18   PROSPECTIVE JUROR:  He works for Commonwealth Edison

19   and farms.

20   THE COURT:  What does he do for Com Ed?

21   PROSPECTIVE JUROR:  He's a crew leader now, cable

22   splicer.

23   THE COURT:  How long has he been doing that?

24   PROSPECTIVE JUROR:  About 25 years.

25   THE COURT:  What about you?  Do you work outside the

Voir Dire

1   home?

2   PROSPECTIVE JUROR:   Yes, I do.   I'm a teacher.

3   THE COURT:   What do you teach?

4   PROSPECTIVE JUROR:   In Amboy.

5   THE COURT:   Pardon me?

6   PROSPECTIVE JUROR:   In Amboy, Illinois.   Fourth grade

7   teacher.

8   THE COURT:   Okay.   How long have you been doing that?

9   PROSPECTIVE JUROR:   Teaching in Amboy about 25 years,

10  but teaching about 28 overall.

11  THE COURT:   Where did you get your degree?

12  PROSPECTIVE JUROR:   St. Ambrose in Davenport, Iowa.

13  THE COURT:   Do you have any difficulty reading or

14  understanding English?

15  PROSPECTIVE JUROR:   No.

16  THE COURT:   Have you or an immediate family member ever

17  served in the military?

18  PROSPECTIVE JUROR:   I have a sister who's retired from

19  the Air Force who's a recruiter, and my brother is retired.

20  THE COURT:   She was a what?

21  PROSPECTIVE JUROR:   She was a nurse and doctor

22  recruiter.

23  THE COURT:   Okay.

24  PROSPECTIVE JUROR:   And my brother's retired from the

25  Army.   I'm not sure what he did.   I know he played basketball.

Voir Dire

1    I think he had another job, but I don't know what it was.

2         THE COURT:   You say you have another brother then who

3    is a retired parole officer?

4         PROSPECTIVE JUROR:   Yes.

5         THE COURT:   Where was that?

6         PROSPECTIVE JUROR:   Well, he was Aurora, but he started

7    with the Department of Corrections as a prison guard in Dixon.

8         THE COURT:   Do you talk to him about his employment?

9         PROSPECTIVE JUROR:   In the past we did.   He's been

10   retired about a year and a half.

11        THE COURT:   Is there anything about that employment or

12   your conversations with him that would impair your ability to be

13   a fair and impartial juror in this case?

14        PROSPECTIVE JUROR:   No.

15        THE COURT:   I want to ask some questions to Luz.   Could

16   you pass the microphone back down to her, please?

17        Luz, your brother is a detective in the Rockford Police

18   Department?

19        PROSPECTIVE JUROR:   Yes.

20        THE COURT:   And I want to assure that if you and your

21   jurors deliberated on this case and you feel the government did

22   not sustain its burden of proof beyond a reasonable doubt, would

23   you feel embarrassed about that or have to explain that to your

24   brother or feel --

25        PROSPECTIVE JUROR:   No.   No.

Voir Dire

1    THE COURT:    And let me ask the same question to

2    Patricia.    Patricia, you have friends that are Rockford police

3    officers?

4          PROSPECTIVE JUROR:    Yes.

5          THE COURT:    And if you and your fellow jurors

6    deliberated on this case and you felt that the government failed

7    to sustain its burden of proof and you found the defendant not

8    guilty of one or all of these charges, do you feel that you

9    would have to somehow explain that to them or justify it to

10   them?

11         PROSPECTIVE JUROR:    No.

12         THE COURT:    All right.    Pass the microphone back up

13   there to Linda, please.

14         Okay, Linda.    I'll ask you the same question.    If you

15   after deliberation felt that the government failed to sustain

16   its burden of proof and you found the defendant not guilty,

17   would you have to justify that to your brother?    Would you feel

18   bad about it --

19         PROSPECTIVE JUROR:    No.

20         THE COURT:    -- like you let him down or anything like

21   that?

22         PROSPECTIVE JUROR:    No.

23         THE COURT:    Have you or an immediate family member ever

24   been involved as a party, witness, or otherwise in a civil or

25   criminal case?

Voir Dire

1    PROSPECTIVE JUROR:   No.

2    THE COURT:   Have you or an immediate family member ever

3  been the victim of a crime?

4    PROSPECTIVE JUROR:   Well, we had our -- where we farm,

5  the machine shed was broke into probably about 20 years ago.

6    THE COURT:   Was the person or persons who did this ever

7  apprehended?

8    PROSPECTIVE JUROR:   No.

9    THE COURT:   Do you feel it was handled appropriately by

10  the authorities?

11    PROSPECTIVE JUROR:   Yes.

12    THE COURT:   Have you or an immediate family member ever

13  been arrested for a criminal offense?

14    PROSPECTIVE JUROR:   No.

15    THE COURT:   Do you belong to any clubs or

16  organizations?

17    PROSPECTIVE JUROR:   Educational groups and church.

18    THE COURT:   Why do you own firearms?

19    PROSPECTIVE JUROR:   Protection, and my husband likes to

20  shoot at targets at the farm

21    THE COURT:   What kind do you have?

22    PROSPECTIVE JUROR:   I have no idea.  I mean, we have a

23  handgun, I know, in our safe, but other than that, I'm not -- I

24  don't shoot them.  Recreational shooting.  That's not my -- I do

25  have a FOID card, though.

**Voir Dire**

1          THE COURT:  Anything I don't know about you that I

2     should that bears upon your ability to serve as a fair and

3     impartial juror?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Could you pass the microphone down to

6     Elizabeth, please?

7          Good morning.  How old are you, Elizabeth?

8          PROSPECTIVE JUROR:  49.

9          THE COURT:  And where were you raised?

10          PROSPECTIVE JUROR:  Joliet.

11          THE COURT:  Where do you live now?

12          PROSPECTIVE JUROR:  Crystal Lake.

13          THE COURT:  How long have you lived in Crystal Lake?

14          PROSPECTIVE JUROR:  Since 1990.

15          THE COURT:  Do you live in a house there?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Who lives there with you?

18          PROSPECTIVE JUROR:  My husband and one son.

19          THE COURT:  How old is your son?

20          PROSPECTIVE JUROR:  He's 18.

21          THE COURT:  Goes to school?

22          PROSPECTIVE JUROR:  Senior in high school.

23          THE COURT:  What's your husband do for a living?

24          PROSPECTIVE JUROR:  A supervisor for Alro Steel in

25     Melrose Park.

Voir Dire

1          THE COURT:   How long has he been doing that?

2          PROSPECTIVE JUROR:   Ten, maybe twelve years.

3          THE COURT:   Do you work outside the home?

4          PROSPECTIVE JUROR:   I do.

5          THE COURT:   And what do you do?

6          PROSPECTIVE JUROR:   I'm a registered nurse.   I work at

7    Centegra Specialty Hospital in the in-patient behavioral health.

8          THE COURT:   How long have you been doing that?

9          PROSPECTIVE JUROR:   That particular department,

10   15 years.

11         THE COURT:   How far did you go in school?

12         PROSPECTIVE JUROR:   Diploma of nursing.

13         THE COURT:   Do you have any difficulty reading or

14   understanding English?

15         PROSPECTIVE JUROR:   No.

16         THE COURT:   I assume you have other children who live

17   outside the home?

18         PROSPECTIVE JUROR:   I have a 25-year old son who's a

19   teacher in St. Charles.

20         THE COURT:   Have you or an immediate family member ever

21   served in the military?

22         PROSPECTIVE JUROR:   No.

23         THE COURT:   Have you or an immediate family member ever

24   been involved as a party, witness, or otherwise in a civil or

25   criminal case?

Voir Dire

1    PROSPECTIVE JUROR:   No.

2    THE COURT:   Have you or an immediate family member ever

3    been the victim of a crime?

4    PROSPECTIVE JUROR:   No.

5    THE COURT:   Have you or an immediate family member ever

6    been arrested for a criminal offense?

7    PROSPECTIVE JUROR:   No.

8    THE COURT:   Do you belong to any clubs or

9    organizations?

10    PROSPECTIVE JUROR:   No.

11    THE COURT:   Can you promise me that you'll give the

12    defendant and the government a fair trial?

13    PROSPECTIVE JUROR:   Yes.

14    THE COURT:   Anything I should know about you that I

15    don't that bears upon your ability to serve as a fair and

16    impartial juror?

17    PROSPECTIVE JUROR:   My Facebook page would attest to

18    that I'm very pro legalization of medical marijuana.

19    THE COURT:   You're pro what?

20    PROSPECTIVE JUROR:   Legalization of medical marijuana.

21    THE COURT:   Does that have any bearing on your

22    ability --

23    PROSPECTIVE JUROR:   No, I don't think so.   I just had

24    to throw it out there.

25    THE COURT:    I'd rather know something that I don't need

Voir Dire

1    to know rather than not know something that I do need to know.

2    So, if there's something that's kind of bothering you and you

3    want to let me know, please advise me.    Okay, Elizabeth.    Thank

4    you very much.    Nice talking to you.

5                    Roger.    How old are you?

6                    PROSPECTIVE JUROR:    65.

7                    THE COURT:    And where were you raised?

8                    PROSPECTIVE JUROR:    Wonder Lake, Illinois.

9                    THE COURT:    Where do you live now?

10                   PROSPECTIVE JUROR:    Marengo, Illinois.

11                   THE COURT:    How long have you lived there?

12                   PROSPECTIVE JUROR:    Since 1979.

13                   THE COURT:    Live in a house?

14                   PROSPECTIVE JUROR:    Yes.

15                   THE COURT:    Who lives there with you?

16                   PROSPECTIVE JUROR:    My wife.

17                   THE COURT:    Does she work outside the home?

18                   PROSPECTIVE JUROR:    We have an office in the house that

19    she works from and administers my company.

20                   THE COURT:    How long has she been doing that?

21                   PROSPECTIVE JUROR:    About six years.

22                   THE COURT:    And what did she do before that?

23                   PROSPECTIVE JUROR:    She worked as a human resource

24    manager for a staffing company.

25                   THE COURT:    What's your company?

Voir Dire

1       PROSPECTIVE JUROR:   My company name?

2       THE COURT:   I don't need to know the name.   I need to

3   know what it does, though.

4       PROSPECTIVE JUROR:   It is a life safety company.   We

5   are a contractor.

6       THE COURT:   When you say life safety, what does that

7   mean?

8       PROSPECTIVE JUROR:   Mostly to do with fire alarm and

9   smoke control work, but we also do security work, installation

10  of and quality control for installations of systems.

11      THE COURT:   Security systems?

12      PROSPECTIVE JUROR:   At times, yes.

13      THE COURT:   Residential, commercial?

14      PROSPECTIVE JUROR:   Mostly commercial.

15      THE COURT:   How long have you been doing that?

16      PROSPECTIVE JUROR:   25 years.

17      THE COURT:   And what's your connection with firearms?

18  How is your business --

19      PROSPECTIVE JUROR:   I'm a firearms owner.   I target

20  shoot.   I hunt.   And I also have weapons for protection.

21      THE COURT:   Okay.   Is that connected with your company,

22  though?

23      PROSPECTIVE JUROR:   It is not.

24      THE COURT:   You belong to the NRA?

25      PROSPECTIVE JUROR:   Yes, I do.

Voir Dire

1    THE COURT:  And you're also --

2    PROSPECTIVE JUROR:  Township supervisor.

3    THE COURT:  Pardon me?

4    PROSPECTIVE JUROR:  A township supervisor in McHenry

5    County.

6    THE COURT:  I didn't know that, but that's good to

7    know.  I was going to ask you about concealed carry.  How did

8    you get the authorization to do that?

9    PROSPECTIVE JUROR:  Out of Utah and also out of

10   Florida.  Carry both cards.

11   THE COURT:  And did I ask you how long you owned your

12   business?

13   PROSPECTIVE JUROR:  I think you did.  25 years.

14   THE COURT:  Who lives at home with you?

15   PROSPECTIVE JUROR:  My wife.

16   THE COURT:  Do you have children?

17   PROSPECTIVE JUROR:  I do.

18   THE COURT:  Could you give me their ages, genders, and

19   occupations?

20   PROSPECTIVE JUROR:  Two daughters.  One's 44.  The

21   other is 42.  One is a stay-at-home part-time mom  Or I should

22   say part-time worker, not a part-time mom

23   THE COURT:  What is her part-time work?

24   PROSPECTIVE JUROR:  She works at Platt Hill Nursery in

25   retail.

Voir Dire

1        THE COURT:  All right.

2        PROSPECTIVE JUROR:  And the other daughter works for

3   Sangamon County.  She is in the health department working as an

4   inspector for the City of Springfield and also Sangamon County.

5        THE COURT:  All right.  How far did you go in school?

6        PROSPECTIVE JUROR:  High school.

7        THE COURT:  Where did you go to high school?

8        PROSPECTIVE JUROR:  Woodstock, Illinois.

9        THE COURT:  Have any difficulty reading or

10  understanding English?

11       PROSPECTIVE JUROR:  No.

12       THE COURT:  Have you or an immediate family member ever

13  served in the military?

14       PROSPECTIVE JUROR:  Yes.

15       THE COURT:  Who?

16       PROSPECTIVE JUROR:  Myself.

17       THE COURT:  What did you do?

18       PROSPECTIVE JUROR:  You asked MOS before.  34B40.

19  That's communications.

20       THE COURT:  For what branch?

21       PROSPECTIVE JUROR:  That's the Army.

22       THE COURT:  How long were in you the Army?

23       PROSPECTIVE JUROR:  I was in there two years.

24       THE COURT:  What years?

25       PROSPECTIVE JUROR:  '66 through '68.

Voir Dire

1      THE COURT:  Have you or an immediate family member ever

2  been involved as a party, witness, or otherwise in a civil or

3  criminal case?

4      PROSPECTIVE JUROR:  No.

5      THE COURT:  Have you or an immediate family member ever

6  been the victim of a crime?

7      PROSPECTIVE JUROR:  Yes.

8      THE COURT:  Tell me about that, please.

9      PROSPECTIVE JUROR:  Home break-in about 20 years ago.

10     THE COURT:  Were the person or persons who did this

11  ever arrested?

12     PROSPECTIVE JUROR:  They all were caught.

13     THE COURT:  And were they prosecuted?

14     PROSPECTIVE JUROR:  Yes, they were.

15     THE COURT:  And sentenced?

16     PROSPECTIVE JUROR:  Yes.

17     THE COURT:  Do you feel this situation was handled

18  appropriately by the authorities and the court system?

19     PROSPECTIVE JUROR:  Yes.

20     THE COURT:  Have you or an immediate family member ever

21  been arrested for a criminal offense?

22     PROSPECTIVE JUROR:  No.

23     THE COURT:  Do you belong to any clubs or organizations

24  other than the NRA?

25     PROSPECTIVE JUROR:  Yes.  AOPA.

Voir Dire

1    THE COURT:   What's that?

2    PROSPECTIVE JUROR:   That's a pilot organization.

3  Aircraft Owners and Pilots Association.

4    THE COURT:   You're a pilot?

5    PROSPECTIVE JUROR:   Yes, I am

6    THE COURT:   What do you fly?

7    PROSPECTIVE JUROR:   I'm not current, your Honor.

8    THE COURT:   Okay.   What did you used to fly?

9    PROSPECTIVE JUROR:   206 Cessna.

10    THE COURT:   Recreation?

11    PROSPECTIVE JUROR:   Some business, some recreation.

12    THE COURT:   Can you promise me that you'll give the

13  defendant and the government a fair trial?

14    PROSPECTIVE JUROR:   Yes.

15    THE COURT:   Anything I don't know about you that I

16  should that bears upon your ability to serve as a fair and

17  impartial juror?

18    PROSPECTIVE JUROR:   No.

19    THE COURT:   Okay.   Thank you.   Could you pass the

20  microphone over to Celia, please?

21    Celia, how old are you?

22    PROSPECTIVE JUROR:   I'm 67.

23    THE COURT:   And where were you raised?

24    PROSPECTIVE JUROR:   Winslow.

25    THE COURT:   And where do you live now?

Voir Dire

1      PROSPECTIVE JUROR:   Freeport.

2      THE COURT:   Do you live in a house?

3      PROSPECTIVE JUROR:   Yes.

4      THE COURT:   How long have you lived there?

5      PROSPECTIVE JUROR:   Three years.

6      THE COURT:   Where did you live before that?

7      PROSPECTIVE JUROR:   On the farm at Forreston.

8      THE COURT:   How long did you live on the farm?

9      PROSPECTIVE JUROR:   Forty.   Forty years.

10     THE COURT:   Okay.   Forty or four?

11     PROSPECTIVE JUROR:   Forty.

12     THE COURT:   Okay.   Who lives in your house in Freeport

13  with you?

14     PROSPECTIVE JUROR:   My husband.

15     THE COURT:   And what does he do for a living?

16     PROSPECTIVE JUROR:   He's retired, but we farmed and had

17  a construction business.

18     THE COURT:   Okay.   For how long?

19     PROSPECTIVE JUROR:   Long time.

20     THE COURT:   Many years.

21     PROSPECTIVE JUROR:   Yes.   Forty plus some.

22     THE COURT:   All right.   Do you help with the farming?

23     PROSPECTIVE JUROR:   Yes.

24     THE COURT:   Do you have any other jobs outside the

25  home?

Voir Dire

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Do you have children?

3          PROSPECTIVE JUROR:  We have five.

4          THE COURT:  Okay.  Ages, genders, and occupations.

5          PROSPECTIVE JUROR:  Okay.  Four girls and one boy.

6  Christine is 44.  Carlene is --

7          THE COURT:  I don't need to know the names.  Just tell

8  me their ages and occupations.

9          PROSPECTIVE JUROR:  Okay.  Their occupations, Chris

10  is -- well, 44.

11          THE COURT:  You can tell me the name if you want to,

12  but --

13          PROSPECTIVE JUROR:  I'm very personal.  Okay.  She's a

14  mom.

15          THE COURT:  A mom.  And how old is she?

16          PROSPECTIVE JUROR:  She's 44.

17          THE COURT:  Okay.

18          PROSPECTIVE JUROR:  And next one is 40.

19          THE COURT:  All right.  What does she do for a living?

20          PROSPECTIVE JUROR:  They work at Normal University with

21  foreign exchange students that come in.

22          THE COURT:  Okay.

23          PROSPECTIVE JUROR:  The next one is 42, and she is a

24  registered nurse at Corpus Christi, Texas.  And the next one is

25  forty --

Voir Dire

1          THE COURT:   In her 40s?

2          PROSPECTIVE JUROR:   Yeah.   He builds log homes in

3    Colorado.

4          THE COURT:   Okay.   Then I need one more daughter.

5          PROSPECTIVE JUROR:   Yeah.   And she's a youth minister

6    in Princeton, Wisconsin.

7          THE COURT:   How far did you go in school?

8          PROSPECTIVE JUROR:   High school.

9          THE COURT:   Do you have any difficulty reading or

10   understanding English?

11         PROSPECTIVE JUROR:   No.

12         THE COURT:   Have you or an immediate family member ever

13   been involved as a party, witness, or otherwise in a civil or

14   criminal case?

15         PROSPECTIVE JUROR:   No.

16         THE COURT:   Have you or an immediate family member ever

17   been the victim of a crime?

18         PROSPECTIVE JUROR:   No.

19         THE COURT:   Arrested for a crime?

20         PROSPECTIVE JUROR:   No.

21         THE COURT:   Do you belong to any clubs or

22   organizations?

23         PROSPECTIVE JUROR:   No.

24         THE COURT:   Can you promise me that you'll give the

25   defendant and the government a fair trial?

Voir Dire

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Anything I don't know about you that I

3  should know about you that bears upon your ability to serve as a

4  fair and impartial juror?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Okay.  Nice talking to you.

7          Cathy Jo or Cathy?

8          PROSPECTIVE JUROR:  Just Cathy.

9          THE COURT:  How old are you, Cathy?

10          PROSPECTIVE JUROR:  42.

11          THE COURT:  And where were you raised?

12          PROSPECTIVE JUROR:  Aledo, Illinois.

13          THE COURT:  And where do you live now?

14          PROSPECTIVE JUROR:  Wonder Lake, Illinois.

15          THE COURT:  Live in a house?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  For how long?

18          PROSPECTIVE JUROR:  We've lived there a little over

19  ten years.

20          THE COURT:  And who lives there with you?

21          PROSPECTIVE JUROR:  My husband and two children.

22          THE COURT:  Their genders, ages, and --

23          PROSPECTIVE JUROR:  My husband, too?

24          THE COURT:  Pardon?

25          PROSPECTIVE JUROR:  My husband's age, as well?

Voir Dire

1  THE COURT:  No, no.  Just your children.  How many

2  husbands do you have?

3  PROSPECTIVE JUROR:  Just one.  They are a girl who's

4  eight and a boy who's seven.

5  THE COURT:  Okay.  Let's get to your husband now.  Does

6  he work outside the home?

7  PROSPECTIVE JUROR:  Yes.

8  THE COURT:  What does he do?

9  PROSPECTIVE JUROR:  Teacher.

10  THE COURT:  What does he teach?

11  PROSPECTIVE JUROR:  PE.

12  THE COURT:  High school?

13  PROSPECTIVE JUROR:  Middle school.

14  THE COURT:  And how about you?

15  PROSPECTIVE JUROR:  I'm a teacher, as well.

16  THE COURT:  And what do you teach?

17  PROSPECTIVE JUROR:  I work as the curriculum lead

18  teacher for the district.

19  THE COURT:  The what?

20  PROSPECTIVE JUROR:  The curriculum lead teacher.

21  THE COURT:  What's that mean?

22  PROSPECTIVE JUROR:  I basically work for the assistant

23  superintendent of curriculum and assessment.

24  THE COURT:  Where did you get your degree?

25  PROSPECTIVE JUROR:  Bachelor's at Southern Illinois and

### Voir Dire

1    my Master's at Northeastern Illinois.

2           THE COURT:   How long has your husband been a PE

3    teacher?

4           PROSPECTIVE JUROR:   21 years.

5           THE COURT:   Okay.   And then how long have you worked

6    for the school district?

7           PROSPECTIVE JUROR:   I've worked for this district for

8    15 years.

9           THE COURT:   Do you have any difficulty reading or

10   understanding English?

11          PROSPECTIVE JUROR:   No.

12          THE COURT:   Have you or an immediate family member ever

13   served in the military?

14          PROSPECTIVE JUROR:   A grandfather in World War II and

15   an uncle in Vietnam

16          THE COURT:   What kind of jobs did they have, do you

17   know?

18          PROSPECTIVE JUROR:   Unh-unh.

19          THE COURT:   Have you or an immediate family member ever

20   been involved as a party, witness, or otherwise in a civil or

21   criminal case?

22          PROSPECTIVE JUROR:   No.

23          THE COURT:   Have you or an immediate family member ever

24   been the victim of a crime?

25          PROSPECTIVE JUROR:   No.

Voir Dire

1          THE COURT:  Have you or an immediate family member ever

2    been arrested for a criminal offense?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Can you tell me about that?

5          PROSPECTIVE JUROR:  I was arrested for suspected DUI.

6          THE COURT:  And what happened?  I don't need to know

7    the facts of the case.

8          PROSPECTIVE JUROR:  I was not convicted.

9          THE COURT:  Did you go to trial on it?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  The case was dropped, I assume?

12         PROSPECTIVE JUROR:  A plea.  I got like reckless

13   driving.

14         THE COURT:  So, you pled guilty to a traffic offense

15   instead of DUI.

16         PROSPECTIVE JUROR:  Um-hm

17         THE COURT:  How long ago was that?

18         PROSPECTIVE JUROR:  Thirteen years ago.

19         THE COURT:  Do you think that was handled appropriately

20   by the authorities?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Do you have any resentment against the

23   court system or the police --

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  -- because of that happening?  Do you

Voir Dire

1    belong to any clubs or organizations?

2              PROSPECTIVE JUROR:   My husband was arrested, too.

3              THE COURT:   Pardon?

4              PROSPECTIVE JUROR:   My husband was arrested, as well.

5              THE COURT:   For what?

6              PROSPECTIVE JUROR:   I think disturbing the peace.

7              THE COURT:   Disorderly conduct?

8              PROSPECTIVE JUROR:   Maybe, yeah.

9              THE COURT:   Where was that, and when was that?

10             PROSPECTIVE JUROR:   Our house, and it was probably 15

11   years ago, 14.

12             THE COURT:   And what happened as a result?   Was he

13   prosecuted?

14             PROSPECTIVE JUROR:   No.

15             THE COURT:   Charges dropped?

16             PROSPECTIVE JUROR:   Yes.

17             THE COURT:   Is there anything about that experience

18   that affects your ability to be a fair and impartial juror here?

19             PROSPECTIVE JUROR:   No.

20             THE COURT:   Do you feel it was handled appropriately by

21   the authorities?

22             PROSPECTIVE JUROR:   I still think they were wrong.

23   They came into our home, and like the music was playing loud

24   outside, and all of a sudden we could see people in our house,

25   and we felt like instead of coming around to the back and just

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1   saying turn your music down, they entered the home.  And so, I

2   still think they were wrong in that situation because it scared

3   us.  We thought somebody was in there.  And so, that's why my

4   husband was angry because pretty much we thought we were being

5   burglarized.

6           THE COURT:  Do you have any resentment toward the

7   police because this happened?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  Do you belong to any clubs or

10  organizations?

11          PROSPECTIVE JUROR:  Yes.  National Council of Teachers

12  of Mathematics and Student Council for Exceptional Children.

13          THE COURT:  Can you promise me that you'll give the

14  defendant and the government a fair trial?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Anything I know about you that I don't know

17  about you that bears upon your ability to serve as a fair and

18  impartial juror?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Figure I know enough --

21          PROSPECTIVE JUROR:  Just my line of work, though.  I do

22  like -- specifically, I'm a special educator for students

23  with -- most of my experience is with students with social,

24  emotional, and behavior disorders.

25          THE COURT:  Okay.  Would that affect your ability to be

**Voir Dire**

1   a fair and impartial juror here --

2        PROSPECTIVE JUROR:   No.

3        THE COURT:   -- do you think?  Okay, Cathy.  Nice

4   talking to you.

5        All right.  You know, I think I better take a break

6   here.  Folks, I'm going to let you leave the courtroom  I want

7   to advise you, though, that as jurors in this case, you're not

8   to discuss the case among yourselves or with anyone else or

9   permit anyone to discuss it in your presence.  Please feel free

10  to talk with the people that are with you about jobs, families,

11  current events, sports, any kind of casual conversation, but

12  please refrain from any conversation that bears upon anything

13  you know about the case so far.

14       Please do not -- or refrain from any media exposure

15  about this case.  I don't have any reason to believe there is

16  going to be any media coverage.

17       Do not make any independent investigation of the case

18  by reading materials or doing any research.  If anyone contacts

19  you or attempts to do so, either directly or indirectly, during

20  the break, please notify me immediately.  Let's come back at

21  11:00 o'clock.

22    (The following proceedings were had in open court, out of

23      the presence and hearing of the jury:)

24       THE COURT:   Tim, let's say ten after 11:00.  There's a

25  certain matter I have to take care of.

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1     All right.  Let's call Mr. Cistrunk up.  Mr. Cooper,

2  I'll appoint you as Mr. Cistrunk's attorney for this matter.

3  I've explained to Mr. Cistrunk this morning that he's been

4  summoned as a witness in this trial.  From what I know about the

5  case, it may expose him to some criminal liability or

6  prosecution.  That's not my call.  But there's that possibility.

7  I advised him of his right under the Fifth Amendment to refuse

8  to testify.  I also told him that he could waive that right and

9  he could agree to testify.  I asked him if he wanted to talk to

10  a lawyer about this decision, and he said he did, and he said he

11  didn't have the funds to hire a lawyer.  So, that's why I

12  invited you to come in.  Have you had a chance to talk to him

13  yet?

14     MR. COOPER:  I have not talked to him this morning, but

15  when I was appointed earlier, at the conclusion when the court

16  discharged me, the court indicated that I should probably talk

17  to him about this possibility.

18     I will say that I have talked to the government about

19  it somewhat.  I had a brief conversation.  Mr. Caver was kind

20  enough to call me I think late last week to ask me if I were

21  representing him so he didn't have any ethical problems.  And

22  so, I know a little bit about the situation.  But I had

23  previously talked with Mr. Cistrunk, and he had made known to me

24  his wishes.

25     THE COURT:  Okay.  And what are his wishes?

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1   MR. COOPER:  He does not wish to testify.  Any matters

2   that relate to this case he will take the Fifth Amendment.

3   THE COURT:  Okay.  Is that true, Mr. Cistrunk?

4   MR. CISTRUNK:  Yes, sir.

5   THE COURT:  And you've discussed this with Mr. Cooper?

6   MR. CISTRUNK:  Yes, sir.

7   THE COURT:  All right.  I don't think there's anything

8   else we need to take up with Mr. Cistrunk then.  Mr. Cistrunk,

9   I'd like you --

10   MR. CAVER:  Judge, I would make request.  I don't know

11   if Mr. Cooper would permit me to speak with Mr. Cistrunk in his

12   presence briefly.

13   THE COURT:  I don't see anything wrong with that.

14   MR. CAVER:  My client has requested that I --

15   THE COURT:  All right.  Why don't you step outside and

16   do that.  I'll wait right here for you.

17   (Brief pause.)

18   MR. KARNER:  Judge, can we be present for that, too?

19   THE COURT:  Certainly.  I'm not ordering you to be

20   present.  I'm saying I don't have any objection to it.

21   MR. KARNER:  Thank you.

22   DEFENDANT POKE:  I've got an objection to it, your

23   Honor.

24   THE COURT:  Hold on.  Let's -- wait, wait.  Let's come

25   back in.  Mr. Poke --

Voir Dire

1        MR. KARNER:  Well, Judge.  I'm sorry.  But I don't

2    think Mr. Poke has any standing to object.

3        THE COURT:  Well, maybe he does, maybe he doesn't, but

4    I'd like the attorneys to come back in.

5        MR. KARNER:  Can I ask Mr. Caver to come back in?

6        THE COURT:  Yes.

7    (Brief pause.)

8        THE COURT:  Mr. Caver, the government asked that they

9    be allowed to participate in the conversation.  I said I didn't

10   have any objection to it.  As they were walking out the door, I

11   said I'm not ordering you to allow him to be there, but I don't

12   have any objection as the judge in this case to do so.  But as

13   they were walking out, Mr. Poke said he had an objection.

14       MR. CAVER:  May I just have a moment, please?

15       THE COURT:  Sure.

16   (Brief pause.)

17       MR. CAVER:  Judge, with all due respect to the

18   government, Mr. Cistrunk is my witness.  He's under my subpoena.

19   I'm asking to have this time outside of the presence of the

20   government not for any untoward reason, but just because he's my

21   witness, and I've asked him to be here today.  We would object.

22       THE COURT:  But what is it about the fact that he's

23   your witness that insulates him from any contact by the

24   government?

25       MR. CAVER:  Well, it certainly wouldn't exclude it,

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1   Judge, but I plan to discuss my trial strategy with the defense

2   witness to impart upon him why it is we want him to tell the

3   truth.

4           MR. KARNER:  I guess he's free to reveal trial strategy

5   if he wants.  That doesn't control whether or not we're allowed

6   to be there.  That's Mr. Cistrunk's decision, not Mr. Caver or

7   the defendant's.

8           THE COURT:  Mr. Cistrunk, do you have any objection to

9   the government listening to your conversation?

10          MR. COOPER:  May I have a moment?

11          THE COURT:  Sure.

12      (Brief pause.)

13          MR. COOPER:  Your Honor, Mr. Cistrunk would prefer that

14  we talk only to the defense counsel at this time and not have

15  the government present.

16          THE COURT:  All right.  I'll allow Mr. Caver to talk to

17  him privately with you present in court, Mr. Cooper.  After

18  they're done, then the government can talk to him privately if

19  he wishes to talk with them, of course with your presence.

20          MR. CAVER:  And I have no objection to that.

21          THE COURT:  All right.

22          MR. CAVER:  Thank you.

23          THE COURT:  I'll come back at ten after 11:00.

24      (Brief recess.)

25          THE COURT:  Okay.  Back on the record.

Voir Dire

1      MR. CAVER:   Judge, thank you.   The reason we're here is

2   I am still meeting with Mr. Cistrunk.   Mr. Cistrunk's attorney,

3   Mr. Cooper, has requested to see a copy of the affidavit and a

4   copy of the alleged statement that's alleged to have been made

5   by Mr. Cistrunk to Special Agent Ivancich.

6           As the court has appointed Mr. Cooper to represent

7   Mr. Cistrunk, I think it would only be reasonable that the court

8   permit me to show him those limited two pieces of evidence of

9   the government's, under the circumstances, to be able for

10  Mr. Cooper to effectively represent his client to explain to him

11  what possible exposure he might face should he choose to

12  testify.   Mr. Karner has asked that I not show him either of

13  those two things, but I didn't want to show Mr. Cistrunk

14  anything or his attorney anything in violation of the court's

15  order before addressing the issue with the court.

16      MR. KARNER:   They're discovery materials, Judge.

17  Mr. Cistrunk has now informed the court he intends to assert the

18  Fifth Amendment privilege against self-incrimination.   So, he's

19  not a witness.   So, he stands in the position of just a regular

20  citizen to whom the discovery materials ought not be shown.

21      THE COURT:   But he could change his mind.   Maybe after

22  talking with Mr. Cooper, he wants to testify.

23      MR. KARNER:   He could change his mind.   That's true,

24  Judge.   I don't think that changes the issue of showing him the

25  discovery materials at this time when he's not a witness.

## Voir Dire

1     THE COURT:  Well, how is he going to evaluate whether

2  he wants to testify or not unless he sees those materials?

3     MR. KARNER:  Judge, presumably, he knows what he told

4  Agent Ivancich.  Presumably, he knows what's in the contents of

5  the affidavit because they say he signed it.  So, he's armed

6  with information.  I don't think it would be appropriate to show

7  him an ATF report or a potential exhibit when he's not a

8  witness.

9     MR. CAVER:  I have no objection if the government would

10 like to redact the entire statement or the entire report of ATF

11 Agent Ivancich, except to show what Mr. Cistrunk said.  Even the

12 government is arguing in its motion in limine, though, that the

13 statement that Mr. Cistrunk made was not against his penal

14 interest.

15     So, we have a witness who has been subpoenaed to

16 testify by the defense, who is here, who is ready to testify or

17 to plead the Fifth Amendment, but the government at the same

18 time is okay with my witness taking the Fifth at the same time

19 the government's even arguing that any statement that this

20 witness made wouldn't be against his penal interest and wouldn't

21 tend to incriminate him

22     THE COURT:  I'll allow Mr. Cistrunk to see the

23 affidavit.  What about do you need to redact something from

24 Agent Ivancich's report?  I know you don't want him to see

25 anything.  I'm going to allow him to see that part of the

**Voir Dire**

1    report -- or I think I've got a transcript of it, don't I?

2         MR. KARNER:  Yes.  I don't have committed to memory

3    what's in the report.  I'd have to go back and look at it,

4    Judge.

5         MR. CAVER:  Well, I have the report right here.

6         THE COURT:  Why don't you show it to Mr. Karner.  As a

7    matter of fact, the government's motion is a public record, and

8    I suppose most of what Mr. Cistrunk would see in the report, if

9    not all of it, has already been included in your motion.

10         MR. KARNER:  Well, our objection doesn't go to the

11    motion, Judge.  It goes to the ATF report and it goes to the

12    affidavit at this point.

13         THE COURT:  All right.  I understand.  I'll allow

14    Mr. Cistrunk to see the affidavit and also the report.

15         MR. CAVER:  Judge, may I just -- briefly just may I

16    hand up to the court so that the court knows exactly what I

17    intend to show Mr. Cistrunk, just so there's no confusion?

18         THE COURT:  Okay.  I've seen them both.

19         MR. CAVER:  Thank you.

20         THE COURT:  I've already seen them  I know what you're

21    going to give him

22         MR. CAVER:  Oh, you do.

23         THE COURT:  Yes.

24         MR. CAVER:  Okay.  And I'll just put on the record it's

25    Bates-stamped by the government 74811-000580581 and 582.  And

PDF created with pdfFactory trial version www.pdffactory.com

**Voir Dire**

1  then the defense has previously tendered in discovery a copy of

2  the affidavit by Mr. Cistrunk that is dated July 14th, 2011,

3  notarized by Rachel Hogan.  It's the only affidavit that's been

4  turned over in discovery.  And it's those four pages.

5  THE COURT:  All right.  Do you want to give that to

6  Mr. Cooper --

7  MR. CAVER:  Thank you.

8  THE COURT:  -- and he's going to discuss it with

9  Mr. Cistrunk?

10  MR. CAVER:  I appreciate it.

11  THE COURT:  Can we resolve this before we call the jury

12  back in?

13  MR. CAVER:  Oh, yes.  I think this will be very --

14  Mr. Cooper understands exactly what's going on.

15  THE COURT:  Well, he's right here.

16  MR. COOPER:  I'm here.  I've been listening.  I need a

17  couple minutes with my client.

18  THE COURT:  Sure.  I'll wait right here for you.

19  MR. COOPER:  Could I have just a moment with the

20  government?

21  (Brief pause.)

22  MR. KARNER:  I thought Mr. Cooper was going to come in,

23  but we lost him

24  (Brief pause.)

25  MR. COOPER:  Ready to go?

Voir Dire

1      THE COURT:  YES.

2      MR. COOPER:  I have had the opportunity with

3  Mr. Cistrunk to talk to Mr. Caver.  I've had an opportunity to

4  talk to the government.  I've had an opportunity to review the

5  pertinent documents.  At this time Mr. Cistrunk's decision

6  remains the same.  If asked to testify about the matters in

7  issue, he would take the Fifth Amendment.

8      THE COURT:  All right.  That leaves us with the

9  804(b)(3) hearing.  Mr. Cistrunk, I want you to remain -- I

10  can't anticipate all the ways this case may play out, but I want

11  you to remain in the city until we're done with this case, and

12  give us a means to contact you.  I don't know if you have a cell

13  phone or your aunt has a cell phone.  Yes, your aunt does.

14      Ma'am, would you give the CSO your cell phone number?

15  I think this trial may take three days, but at the end of the

16  trial, if you don't hear from us, you're free to do anything you

17  want, of course, and we'll advise you what happened.  But it may

18  be for some reason that I can't think of right now that your

19  presence will be required, we need to contact you, and bring you

20  into court.  All right?

21      MR. CISTRUNK:  Yes, sir.

22      THE COURT:  Fair enough?

23      MR. CISTRUNK:  Yes, sir.

24      MR. COOPER:  So, am I to remain then as his attorney

25  until the conclusion of the trial just in case?

Voir Dire

1    THE COURT:  Right.  Yes, please.

2    MR. COOPER:  All right.

3    THE COURT:  Thank you Alan.

4    MR. COOPER:  I will be available.

5    MR. CAVER:  Judge, I've also been provided by

6    Mr. Cistrunk the phone number of (XXX) XXX-XXXX.

7    THE COURT:  All right.  I'd like to have the 804(b)(3)

8    hearing at about -- I'll keep questioning the jurors until about

9    quarter after 12:00.  Let's start it then.  How long do you

10   think it will take?  Any idea?

11   MR. PEDERSEN:  Well, your Honor, in our motion in

12   limine, as you indicated, there are several facts that we've

13   alleged that we proffered.  If there's any of those facts that

14   the defendant doesn't dispute, maybe that would speed up the

15   process.

16   THE COURT:  I'll give you a moment or a few minutes

17   before we start to find out what you can agree to or stipulate

18   to.  You both agree it's the defendant's burden, though, to get

19   this evidence in.

20   MR. CAVER:  Yes, Judge.

21   THE COURT:  All right.  Okay.

22   MR. CAVER:  Thank you.

23   THE COURT:  You're welcome.  Do you want to take your

24   break now, Mr. Caver?

25   MR. CAVER:  Thank you.

Voir Dire

1        THE COURT:  We'll start at 11:30.

2    (Brief recess.)

3        THE COURT:  Bring the jury in, please, Tim

4    (The following proceedings were had in open court, in the

5        presence and hearing of the jury:)

6        THE COURT:  Folks, as you've seen, from time to time

7    things happen during the course of a case that requires our

8    attention to matters that need to be addressed outside of your

9    presence.  We realize that you're taking time away from your

10   families, your work, your home, your activities in order to be

11   with us today, and we are very sensitive to the fact that we

12   want to minimize any inconvenience to you.  And so, frequently,

13   we will have these hearings before you come to court in the

14   morning and after you leave at night and during breaks.

15        But I want you to know that even though you may be in

16   the jury room or you may be out in the hall and it doesn't seem

17   like anything's going on, believe me, we're working hard to

18   resolve this case and the issues it involves with due regard for

19   the rights of the parties and an orderly and fair disposition of

20   this case.

21        I want to talk to Candace now.  Candace, how old are

22   you?

23        PROSPECTIVE JUROR:   59.

24        THE COURT:  And where were you raised?

25        PROSPECTIVE JUROR:  Pecatonica.

Voir Dire

1       THE COURT:   Where do you live now?

2       PROSPECTIVE JUROR:   Caledonia.

3       THE COURT:   Do you live in a house?

4       PROSPECTIVE JUROR:   Yes.

5       THE COURT:   How long have you lived there?

6       PROSPECTIVE JUROR:   28 years.

7       THE COURT:   Who lives there with you?

8       PROSPECTIVE JUROR:   Husband.

9       THE COURT:   Do you have children?

10      PROSPECTIVE JUROR:   Yes.

11      THE COURT:   And what are their ages, genders, and

12  occupations?

13      PROSPECTIVE JUROR:   My daughter is 31, and she's a

14  student in the U.S. Marines, and my stepson is in sales, and

15  he's 42.

16      THE COURT:   What is your daughter studying?

17      PROSPECTIVE JUROR:   Neuroscience.  She's going for a

18  doctorate.

19      THE COURT:   And she's a member of the Marine Corps?

20      PROSPECTIVE JUROR:   She's kind of in between.  She's a

21  reservist, but she's just joined an active unit, and she'll be

22  in San Diego for two months.

23      THE COURT:   What about your husband?  What does he do?

24      PROSPECTIVE JUROR:   Owns a machine shop.

25      THE COURT:   How long has he been doing that?

Voir Dire

1       PROSPECTIVE JUROR:  Over 40 years.

2       THE COURT:  Do you work outside the home?

3       PROSPECTIVE JUROR:  Yes, I do.

4       THE COURT:  And what do you do?

5       PROSPECTIVE JUROR:  Customer service.

6       THE COURT:  And for how long?

7       PROSPECTIVE JUROR:  33 years.

8       THE COURT:  Tell me about your -- you had a little

9   stint with the Illinois State Police.

10      PROSPECTIVE JUROR:  Before I was married, I got into

11  the State Police as a cadet, and my husband now, my fiance then,

12  didn't want me in the State Police.  So, I opted out.

13      THE COURT:  All right.  And you have guns, firearms?

14      PROSPECTIVE JUROR:  Yes.

15      THE COURT:  For what reason?

16      PROSPECTIVE JUROR:  My husband shoots sporting clays,

17  trap, and hunts, and we also have it for self defense.

18      THE COURT:  You've served on a prior jury, a criminal

19  case, a DUI?

20      PROSPECTIVE JUROR:  Yes.

21      THE COURT:  You understand, Candace, that the charges

22  are different in that case and this case.  That was --

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  -- in state court.  This is in federal

25  court.  And so, the rules of evidence and other procedures,

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    protocols may be different.  And I want to get some assurance

2    from you that you won't allow your experience in that DUI case

3    to bleed over into this case and somehow affect your duty as a

4    juror in this federal trial.

5              PROSPECTIVE JUROR:   No, it won't.

6              THE COURT:   How far have you gone in school?

7              PROSPECTIVE JUROR:   Associate's degree?

8              THE COURT:   And what did you study?

9              PROSPECTIVE JUROR:   Business.

10             THE COURT:   Do you have any difficulty reading or

11   understanding English?

12             PROSPECTIVE JUROR:   No.

13             THE COURT:   Other than your daughter, have you or an

14   immediate family member ever served in the military?

15             PROSPECTIVE JUROR:   No.

16             THE COURT:   Other than a juror, have you or an

17   immediate family member ever been involved as a party, witness,

18   or otherwise in a civil or criminal case?

19             PROSPECTIVE JUROR:   No.

20             THE COURT:   Have you or an immediate family member ever

21   been the victim of a crime?

22             PROSPECTIVE JUROR:   Federal?

23             THE COURT:   Any kind of crime.

24             PROSPECTIVE JUROR:   Okay.  My husband's company was in

25   a federal case.

Voir Dire

1      THE COURT:  Tell me about that.

2      PROSPECTIVE JUROR:  He bought a machine on an online

3   auction out of New York and paid the money and never got his

4   machine and never got his money back, and he went to federal,

5   and they won, but he never got anything out of New York.

6      THE COURT:  So, he went into federal court and sued?

7      PROSPECTIVE JUROR:  Yes.

8      THE COURT:  To get the machine?

9      PROSPECTIVE JUROR:  Yeah, the machine or the money

10  back.

11     THE COURT:  Do you harbor any resentment against

12  federal authorities or the court system --

13     PROSPECTIVE JUROR:  No.

14     THE COURT:  -- for anything that happened there?

15     PROSPECTIVE JUROR:  It's a little irritating, but it

16  doesn't harbor any feelings.

17     THE COURT:  Have you or -- I wouldn't really call that

18  being a victim of a crime, although I appreciate you giving me

19  the information.  Any other situations in which you feel you've

20  been a victim of a crime?

21     PROSPECTIVE JUROR:  No.

22     THE COURT:  Have you or an immediate family member ever

23  been arrested for a criminal offense?

24     PROSPECTIVE JUROR:  No.

25     THE COURT:  Can you promise me that you'll give the

Voir Dire

1    defendant and the government a fair trial?

2           PROSPECTIVE JUROR:   Yes.

3           THE COURT:   Anything that I haven't asked you that I

4    should be asking you that bears upon your ability to serve as a

5    fair and impartial juror?

6           PROSPECTIVE JUROR:   No, I'm good.

7           THE COURT:   Okay.   Thank you.   Could you pass the

8    microphone over to Matthew for me, please?

9           Matthew, how old are you?

10          PROSPECTIVE JUROR:   35.

11          THE COURT:   And where were you raised?

12          PROSPECTIVE JUROR:   Dixon, Illinois.

13          THE COURT:   Where do you live now?

14          PROSPECTIVE JUROR:   Sterling.

15          THE COURT:   Live in a house?

16          PROSPECTIVE JUROR:   Yep.

17          THE COURT:   How long have you lived there?

18          PROSPECTIVE JUROR:   Seven years.

19          THE COURT:   Where did you live before that?

20          PROSPECTIVE JUROR:   Another house in Sterling.

21          THE COURT:   Who lives there with you?

22          PROSPECTIVE JUROR:   My daughter, part-time.

23          THE COURT:   How old is she?

24          PROSPECTIVE JUROR:   Six.

25          THE COURT:   I assume you were married?

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1      PROSPECTIVE JUROR:   Divorced.

2      THE COURT:   Divorced.  But you were married?

3      PROSPECTIVE JUROR:   Yeah.

4      THE COURT:   How long have you been divorced?

5      PROSPECTIVE JUROR:   A little over a year now.

6      THE COURT:   How long were you married?

7      PROSPECTIVE JUROR:   Six years.

8      THE COURT:   Any other children?

9      PROSPECTIVE JUROR:   No, just the one.

10     THE COURT:   What does your ex-wife do for a living?

11     PROSPECTIVE JUROR:   General clerk, CVS.

12     THE COURT:   How about you?  What do you do for a

13     living?

14     PROSPECTIVE JUROR:   Machinist.

15     THE COURT:   What kind of company do you work for?

16     PROSPECTIVE JUROR:   We mainly just remanufacture air

17     locks.

18     THE COURT:   Air locks for what?

19     PROSPECTIVE JUROR:   They're mainly in like companies

20     like ADM, their grain systems.  Some chemical industries,

21     some -- mainly corn.  You know, the corn industry.

22     THE COURT:   Right.  How long have you been doing that?

23     PROSPECTIVE JUROR:   Since '98.

24     THE COURT:   How far have you gone in school?

25     PROSPECTIVE JUROR:   High school.

Voir Dire

1      THE COURT:   Do you have any difficulty reading or

2  understanding English?

3          PROSPECTIVE JUROR:   No.

4      THE COURT:   You own some guns?

5          PROSPECTIVE JUROR:   Yeah.

6      THE COURT:   For what purpose?

7          PROSPECTIVE JUROR:   Mainly hunting.

8      THE COURT:   Have you or an immediate family member

9  served in the military?

10          PROSPECTIVE JUROR:   My brother.

11      THE COURT:   And when was he in the military, and what

12  branch was he in?

13          PROSPECTIVE JUROR:   The Army, and he got out two years

14  ago.  He was in for six years.

15      THE COURT:   What kind of job did he do?

16          PROSPECTIVE JUROR:   Mechanic.

17      THE COURT:   Have you or an immediate family member ever

18  been involved as a party, witness, or otherwise in a civil or

19  criminal case?

20          PROSPECTIVE JUROR:   No.

21      THE COURT:   Have you or an immediate family member ever

22  been the victim of a crime?

23          PROSPECTIVE JUROR:   No.

24      THE COURT:   Have you or an immediate family member ever

25  been arrested for a criminal offense?

Voir Dire

1    PROSPECTIVE JUROR:   A DUI.

2    THE COURT:   Who was that?

3    PROSPECTIVE JUROR:   Me.

4    THE COURT:   And when was that?

5    PROSPECTIVE JUROR:   About twelve years ago.

6    THE COURT:   And how did it resolve?

7    PROSPECTIVE JUROR:   I pled guilty.

8    THE COURT:   And what was your sentence?

9    PROSPECTIVE JUROR:   There wasn't one.

10   THE COURT:   Were you placed on court supervision or

11   probation?

12   PROSPECTIVE JUROR:   Yeah.  I think like court

13   supervision for two years.

14   THE COURT:   Is there anything about that experience

15   that affects your ability to be a fair and impartial juror in

16   this case?

17   PROSPECTIVE JUROR:   No.

18   THE COURT:   Do you harbor any resentment against the

19   court system or the law enforcement officers for what happened?

20   PROSPECTIVE JUROR:   No.

21   THE COURT:   Do you belong to any clubs or

22   organizations?

23   PROSPECTIVE JUROR:   No.

24   THE COURT:   Can you promise me that you'll give the

25   defendant and the government a fair trial?

Voir Dire

1      PROSPECTIVE JUROR:   Yes.

2      THE COURT:   Anything I need to know about you that I

3  don't that bears upon your ability to serve as a fair and

4  impartial juror?

5      PROSPECTIVE JUROR:   No.

6      THE COURT:   All right.   I'll give the parties a few

7  minutes.   Let's meet at sidebar.

8      (The following proceedings were had at the sidebar, out of

9      the presence and hearing of the jury:)

10      THE COURT:   Any follow-up questions?

11      MR. KARNER:   No.

12      MR. CAVER:   No, Judge.

13      THE COURT:   Challenges for cause?

14      MR. KARNER:   No.

15      MR. CAVER:   Judge, no.

16      THE COURT:   All right.   As to juror number one,

17  Patricia Brees, does the government accept or reject?

18      MR. KARNER:   Reject.

19      THE COURT:   Juror number two, Maurice Bowdry.   Does the

20  defense accept or reject?

21      MR. CAVER:   We accept.

22      THE COURT:   Government?

23      MR. KARNER:   We'll reject.

24      THE COURT:   As to juror number three, Thomas Wilson --

25      MR. CAVER:   Is there a reason?

Voir Dire

1    MR. KARNER:  I don't think we have to give a reason at

2    this point.  I object to collapsing -- if counsel is going to

3    advance an objection, they have the burden of showing a

4    systematic use first, and we're not going to agree to collapse

5    that analysis and offer a reason at this point.

6    THE COURT:  Thomas Wilson.  Does the government accept

7    or reject?

8    MR. KARNER:  We accept.

9    THE COURT:  Defense?

10   MR. CAVER:  We reject.

11   THE COURT:  Juror number four, does the government

12   accept or reject?

13   MR. KARNER:  Accept.

14   MR. CAVER:  We accept.

15   THE COURT:  Juror number five, does the defense accept

16   or reject?

17   MR. CAVER:  Accept.

18   THE COURT:  Government?

19   MR. KARNER:  Accept.

20   THE COURT:  Juror number six, does the defense accept

21   or reject?

22   MR. CAVER:  Accept.

23   THE COURT:  Government?

24   MR. KARNER:  Accept.

25   THE COURT:  Juror number seven, does the government

Voir Dire

1    accept or reject?

2              MR. KARNER:  We reject, Judge.

3              THE COURT:  Juror number eight, does the defense accept

4    or reject?

5              MR. CAVER:  We reject, Judge.

6              THE COURT:  Juror number nine, does the government

7    accept or reject?

8              MR. KARNER:  Accept.

9              THE COURT:  Defense?

10             MR. CAVER:  Accept, Judge.

11             THE COURT:  Juror number ten, does the defense accept

12   or reject?

13             MR. CAVER:  Accept, Judge.

14             MR. KARNER:  We reject.

15             THE COURT:  Juror number eleven, does the government

16   accept or reject?

17             MR. KARNER:  Accept.

18             THE COURT:  Defense?

19             MR. CAVER:  Accept.

20             THE COURT:  Juror number twelve, does the defense

21   accept or reject?

22             MR. CAVER:  Accept.

23             THE COURT:  Government?

24             MR. KARNER:  Accept.

25             THE COURT:  All right.  The defense has used two of

**Voir Dire**

1    their ten, the government's used four of their six?

2                MR. KARNER:   Yes.

3                THE COURT:   We have six jurors.   We'll call six more.

4    How do you propose -- when should I tell the jurors to come

5    back?

6                MR. KARNER:   Judge, I think it's looking less likely

7    that we're going to get to opening statements today.

8                MR. PEDERSEN:   We've already picked six.

9                MR. KARNER:   You think we are?

10               MR. CAVER:   Is the court going to pick two or three

11   alternates?

12               THE COURT:   Two.

13               MR. KARNER:   I almost think -- we'll still stay true to

14   the court's three-day schedule if we go to openings first thing

15   tomorrow morning and put our evidence on.

16               MR. CAVER:   I mean, my preference is to move as quickly

17   as we can.

18               THE COURT:   I'm going to have them come back at 4:00.

19               MR. KARNER:   4:00?

20               THE COURT:   4:00 o'clock.

21               MR. KARNER:   Okay.

22               MR. CAVER:   Is that okay?

23               MR. KARNER:   That's fine.   I hope we get to it.

24               THE COURT:   I'm going to stay optimistic.

25

## Voir Dire

1    (The following proceedings were had in open court, in the

2       presence and hearing of the jury:)

3              THE COURT:  All right.  I'll release the following

4    jurors.  Patricia Brees, Maurice Bowdry, Thomas Wilson,

5    Elizabeth Talarico, Roger Naylor, and Cathy McThenia.  Folks,

6    thank you very much for your time and your effort.  We

7    appreciate your assistance.

8              I'm going to ask the other jurors to stand and take an

9    oath to try this case as jurors.

10   (Jurors duly sworn.)

11             THE COURT:  Have a seat, folks.  I want to give you

12   some preliminary instructions.  As jurors in this case, you're

13   not to discuss the case among yourselves or with anyone else or

14   allow anyone to discuss it in your presence.  You must not read

15   any newspaper articles or listen to any radio or television

16   broadcasts relating to the case.

17             Do not make any independent investigation of the case

18   by reading materials, doing any research, attempting any

19   testing, or going to any location where any of the events in

20   this case took place.

21             If anyone contacts you or attempts to do so, either

22   directly or indirectly, report that to me appropriately.  And

23   when I say you're not to talk to anyone, that includes any other

24   person.  Close friends, spouses, any kind of confidante that you

25   may have.  And when I mean research, I mean any kind of

## Voir Dire

1    research.  That's reading materials, doing anything on the

2    Internet, participating in any kind of chat room or social

3    networking device.

4         There will be a time when you can fully discuss

5    everything you've seen and heard in this case, but that will

6    have to wait until after the evidence has been presented, I've

7    instructed you on the law, and I've released you to the jury

8    room to deliberate on your verdict.  I'll release you to

9    Mr. Ferguson.

10         All right.  Susan, would you please call six more

11   randomly selected names, please?

12         THE CLERK:  Mary C-s-e-n-a-r, row one, seat one.  Terry

13   Easley, E-a-s-l-e-y, row one, seat two.  Jennifer Sus, S-u-s,

14   row one, seat three.  Sonia Davis, D-a-v-i-s, row two, seat one.

15   Theresa Jones, J-o-n-e-s, row two, seat two.  Brenda Wilson,

16   W-i-l-s-o-n, row two, seat four.  Virginia Allen, A-l-l-e-n.

17         THE COURT:  Hold it.  Hold it.  Theresa, you should be

18   one seat down.

19         PROSPECTIVE JUROR:  Right here?

20         THE COURT:  Not Theresa.  You're Brenda.  Brenda, you

21   need to go one seat to your left.

22         Okay.  We're all set then, Susan.

23         THE CLERK:  Yes.

24         THE COURT:  Mary, first question is how do I pronounce

25   your last name?

PDF created with pdfFactory trial version www.pdffactory.com

### Voir Dire

1    PROSPECTIVE JUROR:  Csenar.

2    THE COURT:  Like the C wasn't there, I guess.  How old

3  are you?

4    PROSPECTIVE JUROR:  50.

5    THE COURT:  And where were you raised?

6    PROSPECTIVE JUROR:  I was born in Michigan.  My

7  formative years were in Colorado Springs, Colorado.

8    THE COURT:  Where do you live now?

9    PROSPECTIVE JUROR:  Crystal Lake.

10    THE COURT:  How long have you lived there?

11    PROSPECTIVE JUROR:  Since 2001.

12    THE COURT:  Do you live in a house?

13    PROSPECTIVE JUROR:  We do.

14    THE COURT:  Who lives in the house with you?

15    PROSPECTIVE JUROR:  My husband and two children.

16    THE COURT:  What are their genders and ages?

17    PROSPECTIVE JUROR:  I have a daughter that is 14, and I

18  have a son that is 11.

19    THE COURT:  Do you have any other children outside the

20  home?

21    PROSPECTIVE JUROR:  No.

22    THE COURT:  What's your husband do for a living?

23    PROSPECTIVE JUROR:  He is a wine consultant at Binny's.

24    THE COURT:  A wine consultant?  That sounds like a

25  great job.  I wonder what he does.

Voir Dire

1    PROSPECTIVE JUROR:  He just helps people choose their
2  wine at Binny's.
3    THE COURT:  How long has he been doing that?
4    PROSPECTIVE JUROR:  Probably nine months.
5    THE COURT:  What did he do before that?
6    PROSPECTIVE JUROR:  He was in sales.  He worked for a
7  company that helped high school athletes be recruited to
8  colleges.
9    THE COURT:  How long did he do that?
10    PROSPECTIVE JUROR:  Probably about a year.
11    THE COURT:  And what about before that?
12    PROSPECTIVE JUROR:  Different things.  But he did sales
13  of copiers, and he worked at Costco for awhile.
14    THE COURT:  How about you?  Do you work outside the
15  home?
16    PROSPECTIVE JUROR:  I do.
17    THE COURT:  And what do you do?
18    PROSPECTIVE JUROR:  I work for the Healthcare
19  Corporation of America, HCA, and they own a purchasing
20  cooperative, a group purchasing organization, and I work for the
21  nonacute care arm of that organization.
22    THE COURT:  How long have you been doing that?
23    PROSPECTIVE JUROR:  We were acquired.  So, I've been
24  with the company for twelve years.
25    THE COURT:  Your father worked at the Air Force

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    Academy?

2            PROSPECTIVE JUROR:   He did.

3            THE COURT:   And he was a carpenter, you say?

4            PROSPECTIVE JUROR:   He was a civil servant.   So,

5    around -- you know, that's a huge complex.   So, around the -- he

6    would build a platform when the president would come and speak

7    at the graduation commencement and do some maintenance, general

8    carpentry maintenance work.

9            THE COURT:   How far did you go in school?

10           PROSPECTIVE JUROR:   Some college.

11           THE COURT:   What did you study in college?

12           PROSPECTIVE JUROR:   Geology.

13           THE COURT:   Geology?

14           PROSPECTIVE JUROR:   Yeah.   Lived in Colorado.

15           THE COURT:   What were you going to do with it?

16           PROSPECTIVE JUROR:   I was going to work in the outdoors

17   in the mountains.   And then I worked part-time at a hospital.

18           THE COURT:   Do you have any difficulty reading or

19   understanding English?

20           PROSPECTIVE JUROR:   No.

21           THE COURT:   Have you or an immediate family member ever

22   served in the military?

23           PROSPECTIVE JUROR:   No.

24           THE COURT:   Have you or an immediate family member ever

25   been involved as a party, witness, or otherwise in a civil or

Voir Dire

1    criminal case?

2              PROSPECTIVE JUROR:   No.

3              THE COURT:   Have you or an immediate family member ever

4    been the victim of a crime?

5              PROSPECTIVE JUROR:   I've had a stereo stolen from my

6    car, and probably six years ago somebody rear-ended me, and when

7    we pulled over, I pulled over and they didn't.   So, the police

8    came, and I gave them a report.

9              THE COURT:   And nobody was ever apprehended for either

10   of these?

11             PROSPECTIVE JUROR:   No.

12             THE COURT:   Do you feel the situations were handled

13   appropriately by the authorities?

14             PROSPECTIVE JUROR:   Sure.   Not a lot of effort was put

15   into the hit and run, but I'm sure they figured they couldn't do

16   much about it.

17             THE COURT:   Do you feel any resentment toward law

18   enforcement?

19             PROSPECTIVE JUROR:   No.

20             THE COURT:   Have you or an immediate family member ever

21   been arrested for a crime?

22             PROSPECTIVE JUROR:   No.

23             THE COURT:   Do you belong to any clubs or

24   organizations?

25             PROSPECTIVE JUROR:   I belong to AAA.   I belong to the

Voir Dire

1     health club. But no -- I have a trade association for

2     healthcare materials management.

3          THE COURT: Can you promise me that you'll give the

4     defendant and the government a fair trial?

5          PROSPECTIVE JUROR: Yes.

6          THE COURT: Any questions I haven't asked you that I

7     should be asking you that bear upon your ability to serve as a

8     fair and impartial juror?

9          PROSPECTIVE JUROR: Just that I have business travel

10     this Thursday and Friday.

11          THE COURT: I'll keep that in mind.

12          PROSPECTIVE JUROR: Thank you.

13          THE COURT: I believe I'll have you out of here by

14     then, though.

15          Terry, how old are you?

16          PROSPECTIVE JUROR: 62.

17          THE COURT: And where were you raised?

18          PROSPECTIVE JUROR: Charlotte, Iowa.

19          THE COURT: And where do you live now?

20          PROSPECTIVE JUROR: Fulton, Illinois.

21          THE COURT: Live in a house?

22          PROSPECTIVE JUROR: Yes.

23          THE COURT: For how long?

24          PROSPECTIVE JUROR: Fifteen years.

25          THE COURT: Who lives there with you?

Voir Dire

1        PROSPECTIVE JUROR:   My husband.

2        THE COURT:   Do you have any children?

3        PROSPECTIVE JUROR:   Yes, three.

4        THE COURT:   And what are their ages, genders, and

5   occupations?

6        PROSPECTIVE JUROR:   I have a daughter that's 43, and

7   she works at the college.   And then I have a son that's 41.   He

8   works for Coca Cola.   And then I have a son that's 19, and he

9   works in a factory in Fulton.

10        THE COURT:   What about your husband?   What does he do

11   for a living?

12        PROSPECTIVE JUROR:   He's a service repairman.   He does

13   refrigerators.

14        THE COURT:   Okay.   What about you?   Do you work outside

15   the home?

16        PROSPECTIVE JUROR:   Yes.

17        THE COURT:   In what capacity?

18        PROSPECTIVE JUROR:   I work full time.

19        THE COURT:   What kind of job do you have?

20        PROSPECTIVE JUROR:   I work for a company that makes

21   plastics.   I'm supervisor.

22        THE COURT:   How long have you been doing that job?

23        PROSPECTIVE JUROR:   As supervisor about five years, but

24   I've been with the company twelve.

25        THE COURT:   How long has your husband been a service

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    technician?

2             PROSPECTIVE JUROR:   A year and a half.

3             THE COURT:   What did he do before that?

4             PROSPECTIVE JUROR:   We had a convenience store/gas

5    station.

6             THE COURT:   How long did you run that?

7             PROSPECTIVE JUROR:   Twenty years.

8             THE COURT:   Tell me about the situation with your son

9    and a bomb in the principal's yard.  What was that all about?

10             PROSPECTIVE JUROR:   He was just with some neighbor

11   kids, and they did -- I don't know -- made it out of a pop can,

12   put some stuff in it.  Then they drove to -- at night drove to

13   the principal's yard and rolled it in the front yard, and it

14   went off.

15             THE COURT:   Did they ignite it?  Did it set it off?

16             PROSPECTIVE JUROR:   Yes.

17             THE COURT:   And so, what happened to your son?  I

18   assume this is the 19-year old.

19             PROSPECTIVE JUROR:   Yes.  He was like 13 at the time.

20   He got questioned, of course.  He wouldn't tell on his friends.

21   So, they had told him that if he didn't, they'd be really hard

22   on him if they found out, but he still wouldn't say anything.

23   So, it all took two or three years, but they finally caught up

24   with them  And he wouldn't even tell us or talk to us about it.

25             THE COURT:   Was he ever taken to juvenile court on it?

Voir Dire

1    PROSPECTIVE JUROR:   Yes.

2    THE COURT:   And what was the disposition?

3    PROSPECTIVE JUROR:   He got -- he had to go to, I don't

4    know, juvenile jail or whatever.

5    THE COURT:   Detention?

6    PROSPECTIVE JUROR:   Yeah.   I think two weeks he spent

7    there.   And then he was on probation for I think a year and a

8    half, two years.

9    THE COURT:   Is there anything about that situation that

10   causes you to harbor any resentment against the court system or

11   the juvenile authorities or the police?

12   PROSPECTIVE JUROR:   Just the police.

13   THE COURT:   Okay.

14   PROSPECTIVE JUROR:   There was an incident at school

15   where somebody wrote on the bathroom walls that there was a bomb

16   going to go off or whatever on a certain day, and, of course, my

17   son with this thing, they call him down, and they said, "Will

18   you give us your cell phone," and he said, "Sure.   I don't care

19   because I didn't do it."   He gave it to them   He says, "Well,

20   you do know that whatever we see on this will not" -- you know,

21   on anything else it wouldn't matter, just what they're looking

22   for with the school.   Well, there was something else on the

23   phone.   So, they kept his phone, and they used that against him,

24   and this had to do with this bomb thing.   And we just felt that

25   we were very misled when they told us it wouldn't involve

PDF created with pdfFactory trial version www.pdffactory.com

**Voir Dire**

1      anything else, but it did.

2              THE COURT:  All right.  Are you going to be able to

3      judge the testimony of law enforcement officers and their

4      credibility in the same manner that you would judge any other

5      witness, or are you somehow biased against police?

6              PROSPECTIVE JUROR:  I'm not biased against police.  I

7      just think that we were misled.

8              THE COURT:  There's nothing about that incident that

9      will affect your ability to be a fair and impartial juror here

10     then?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  How far have you gone in school?

13             PROSPECTIVE JUROR:  Just twelve years high school.

14             THE COURT:  Do you have any difficulty reading or

15     understanding English?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Have you or an immediate family member ever

18     served in the military?

19             PROSPECTIVE JUROR:  I did have a sister that went

20     through basic training, and then she -- that's as far as she

21     went with it in the Army.

22             THE COURT:  Why did she leave?

23             PROSPECTIVE JUROR:  She was pregnant.

24             THE COURT:  Have you or an immediate family member ever

25     been involved as a party, witness, or otherwise in a civil or

## Voir Dire

1  criminal case other than this thing you've talked about with

2  your son?

3      PROSPECTIVE JUROR:   No.

4      THE COURT:   Have you or an immediate family member ever

5  been the victim of a crime?

6      PROSPECTIVE JUROR:   No.

7      THE COURT:   And other than the situation with your son,

8  have you or an immediate family member ever been arrested for a

9  criminal offense?

10      PROSPECTIVE JUROR:   No.

11      THE COURT:   Do you belong to any clubs or

12  organizations?

13      PROSPECTIVE JUROR:   No.

14      THE COURT:   Can you promise me that you'll give the

15  defendant and the government a fair trial?

16      PROSPECTIVE JUROR:   Yes.

17      THE COURT:   Anything that I don't know about you that I

18  should that bears upon your ability to serve as a fair and

19  impartial juror?

20      PROSPECTIVE JUROR:   No.

21      THE COURT:   Okay.   Thank you.   Could you pass the

22  microphone over to Jennifer, please?

23      Good morning, Jennifer.

24      PROSPECTIVE JUROR:   Good morning.

25      THE COURT:   Well, it just turned afternoon, I guess.

**Voir Dire**

1    Can you tell me how old you are?

2         PROSPECTIVE JUROR:   33.

3         THE COURT:   And where were you raised?

4         PROSPECTIVE JUROR:   St. Charles, Illinois, and Cape

5    Coral, Florida.

6         THE COURT:   Where do you live now?

7         PROSPECTIVE JUROR:   Belvidere.

8         THE COURT:   Live in a house?

9         PROSPECTIVE JUROR:   Yes.

10        THE COURT:   Who lives there with you?

11        PROSPECTIVE JUROR:   My parents.

12        THE COURT:   Do you have any children?

13        PROSPECTIVE JUROR:   No.

14        THE COURT:   Are you married?

15        PROSPECTIVE JUROR:   No.

16        THE COURT:   What do you do for a living?

17        PROSPECTIVE JUROR:   I'm a receptionist at a doctor's

18   office.

19        THE COURT:   How long have you been doing that?

20        PROSPECTIVE JUROR:   Twelve years.

21        THE COURT:   What about your folks?

22        PROSPECTIVE JUROR:   Both retired.

23        THE COURT:   What did your father retire from?

24        PROSPECTIVE JUROR:   Post office.

25        THE COURT:   Okay.   And what about your mom?

**Voir Dire**

1    PROSPECTIVE JUROR:  She was a secretary at various

2  offices, medical offices.

3    THE COURT:  How do I pronounce your last name?

4    PROSPECTIVE JUROR:  Sus.

5    THE COURT:  Just like it looks.

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  How far have you gone in school?

8    PROSPECTIVE JUROR:  Some college.

9    THE COURT:  What did you study?

10    PROSPECTIVE JUROR:  History.

11    THE COURT:  And do you have any difficulty reading or

12  understanding English?

13    PROSPECTIVE JUROR:  No.

14    THE COURT:  Have you or an immediate family member ever

15  served in the military?

16    PROSPECTIVE JUROR:  My father was in the Air Force.

17    THE COURT:  What kind of job did he have?

18    PROSPECTIVE JUROR:  I don't know.

19    THE COURT:  Have you or an immediate family member ever

20  been involved as a party, witness, or otherwise in a civil or

21  criminal case?

22    PROSPECTIVE JUROR:  No.

23    THE COURT:  Have you or an immediate family member ever

24  been the victim of a crime?

25    PROSPECTIVE JUROR:  No.

Voir Dire

1        THE COURT:   Arrested for a crime?

2        PROSPECTIVE JUROR:   I have a brother who was convicted

3    of a DUI.

4        THE COURT:   Do you harbor any resentment toward the

5    police authorities and the court system because of that

6    happening?

7        PROSPECTIVE JUROR:   No.

8        THE COURT:   Do you think it was handled appropriately?

9        PROSPECTIVE JUROR:   Yes.

10       THE COURT:   Do you belong to any clubs or

11   organizations?

12       PROSPECTIVE JUROR:   No.

13       THE COURT:   Can you promise that you'll give the

14   government and the defendant a fair trial?

15       PROSPECTIVE JUROR:   Yes.

16       THE COURT:   Anything else I should be asking you that

17   bears upon your ability to serve as a fair and impartial juror?

18       PROSPECTIVE JUROR:   No.

19       THE COURT:   Okay.   Thank you.   Nice talking to you.

20       Sonia.

21       PROSPECTIVE JUROR:   Yes.

22       THE COURT:   Can you tell me how old you are?

23       PROSPECTIVE JUROR:   I'm 52.

24       THE COURT:   And where were you raised?

25       PROSPECTIVE JUROR:   I was raised in Rock Falls,

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    Illinois.

2         THE COURT:   And where do you live now?

3         PROSPECTIVE JUROR:   In Sterling.

4         THE COURT:   Do you live in a house?

5         PROSPECTIVE JUROR:   Yes.

6         THE COURT:   How long have you lived in that house?

7         PROSPECTIVE JUROR:   Twelve years.

8         THE COURT:   And who lives there with you?

9         PROSPECTIVE JUROR:   My husband.

10        THE COURT:   What's your husband do for a living?

11        PROSPECTIVE JUROR:   He is just starting a part-time job

12   as an IT.   He's in school part-time right now, but he starts

13   full time next week, actually.

14        THE COURT:   And what was his job before this one?

15        PROSPECTIVE JUROR:   He was an IT manager for 28 years

16   at a factory that closed in Sterling.

17        THE COURT:   What do you do for a living?

18        PROSPECTIVE JUROR:   I am a customer service

19   representative.

20        THE COURT:   In a store or --

21        PROSPECTIVE JUROR:   No.   At a factory in town.

22        THE COURT:   How long have you been doing that?

23        PROSPECTIVE JUROR:   I've only been there a little over

24   a year.

25        THE COURT:   What about before --

Voir Dire

1    PROSPECTIVE JUROR:  And previous to that I was at the
2  same manufacturer that closed in our town, and I did that for 32
3  years, customer service.
4    THE COURT:  This is your second marriage?
5    PROSPECTIVE JUROR:  Yes.
6    THE COURT:  Your first husband is deceased, and he was
7  a police officer for three years?
8    PROSPECTIVE JUROR:  Yes.
9    THE COURT:  And that's in Rock Falls?
10    PROSPECTIVE JUROR:  Yes.
11    THE COURT:  How long were you married to him?
12    PROSPECTIVE JUROR:  To my first husband?
13    THE COURT:  Right.
14    PROSPECTIVE JUROR:  We were married 15 years.
15    THE COURT:  But as a police officer, that was before
16  you were married.
17    PROSPECTIVE JUROR:  Yes.  He was a paramedic when we
18  were married.
19    THE COURT:  All right.  Is there anything about the
20  fact that your first husband was a police officer that would
21  affect your ability to be a fair and impartial juror in this
22  case?
23    PROSPECTIVE JUROR:  Not at all.
24    THE COURT:  You'd be able to judge -- to evaluate the
25  credibility of the law enforcement officers just as you would

Voir Dire

1    any other witness?

2                PROSPECTIVE JUROR:   Yes.

3                THE COURT:   How far did you go in school?

4                PROSPECTIVE JUROR:   I graduated high school.

5                THE COURT:   Have any difficulty reading or

6    understanding English?

7                PROSPECTIVE JUROR:   No.

8                THE COURT:   Have you or an immediate family member ever

9    served in the military?

10                PROSPECTIVE JUROR:   My dad in World War II.   He was in

11    the Navy.

12                THE COURT:   What kind of job did he have?

13                PROSPECTIVE JUROR:   He didn't talk about it.   I don't

14    know.

15                THE COURT:   Have you or an immediate family member ever

16    been involved as a party, witness, or otherwise in a civil or

17    criminal case?

18                PROSPECTIVE JUROR:   No.

19                THE COURT:   Have you or an immediate family member ever

20    been the victim of a crime?

21                PROSPECTIVE JUROR:   No.

22                THE COURT:   Arrested for a crime?

23                PROSPECTIVE JUROR:   No.

24                THE COURT:   Do you belong to any clubs or

25    organizations?

## Voir Dire

1    PROSPECTIVE JUROR:   No.

2    THE COURT:   Can you promise me that you'll give the

3  defendant and the government a fair trial?

4    PROSPECTIVE JUROR:   Yes.

5    THE COURT:   Anything I don't know about you that I

6  should that bears upon your ability to serve as a fair and

7  impartial juror?

8    PROSPECTIVE JUROR:   No.

9    THE COURT:   Let me talk to Theresa then for a moment.

10    Theresa, how old are you?

11    PROSPECTIVE JUROR:   50.

12    THE COURT:   And where were you raised?

13    PROSPECTIVE JUROR:   Clinton, Iowa.

14    THE COURT:   Brenda, if you feel you need to stand up

15  and walk around, that's fine.

16    PROSPECTIVE JUROR:   I'm all right for now.

17    THE COURT:   Okay.   And where do you live now?

18    PROSPECTIVE JUROR:   I live in Fulton, Illinois.

19    THE COURT:   And how long have you lived there?

20    PROSPECTIVE JUROR:   20 years.

21    THE COURT:   Live in a house?

22    PROSPECTIVE JUROR:   Yes.

23    THE COURT:   Who lives there with you?

24    PROSPECTIVE JUROR:   My two children.

25    THE COURT:   You know, I forgot to ask Sonia whether you

Voir Dire

1    have children.

2              PROSPECTIVE JUROR:  Yes, I do.  I have one daughter.

3    She's 28, and she is an x-ray tech.

4              THE COURT:  Okay.  Thank you.

5              I'm sorry, Theresa.  Who lives in the house with you?

6              PROSPECTIVE JUROR:  My kids.

7              THE COURT:  And what are their ages, genders, and

8    occupations?

9              PROSPECTIVE JUROR:  They're twins, 17, boy, girl, and

10   they're juniors in high school.

11             THE COURT:  Okay.  Are you married?

12             PROSPECTIVE JUROR:  Going through a divorce, process of

13   a divorce.

14             THE COURT:  How long were you married?

15             PROSPECTIVE JUROR:  Seventeen years.

16             THE COURT:  And what did your husband do?

17             PROSPECTIVE JUROR:  Plant manager at JT Cullen.

18             THE COURT:  For how long?

19             PROSPECTIVE JUROR:  I believe 13 years.

20             THE COURT:  And what do you do for a living?

21             PROSPECTIVE JUROR:  I'm a dental assistant.

22             THE COURT:  How long have you been doing that?

23             PROSPECTIVE JUROR:  On and off for 17 years.  Took a

24   little time off after I had the twins.

25             THE COURT:  You have other children outside the home?

Voir Dire

1    PROSPECTIVE JUROR:  I have my oldest son that's 28
2  that's a police officer.
3    THE COURT:  In Clinton, Iowa?
4    PROSPECTIVE JUROR:  In Clinton.
5    THE COURT:  How often do you talk to him?
6    PROSPECTIVE JUROR:  We send text messages daily.  But
7  talk-talk, just --
8    THE COURT:  Does he talk about work at all?
9    PROSPECTIVE JUROR:  That's like rule of thumb.  We
10  don't discuss business.
11    THE COURT:  Pardon me?
12    PROSPECTIVE JUROR:  We don't talk shop.  I don't want
13  to know about his job.  So, no.
14    THE COURT:  All right.  If you were to deliberate with
15  the other jurors and you concluded that the government did not
16  sustain its burden of proof and you found the defendant guilty
17  of one or more of the charges against him, would you have to
18  somehow justify that to your son, or would you feel bad about
19  it --
20    PROSPECTIVE JUROR:  No.
21    THE COURT:  -- or put you in an uncomfortable or
22  awkward situation?
23    PROSPECTIVE JUROR:  Not at all.
24    THE COURT:  So, it wouldn't affect your ability to
25  serve as a fair and impartial juror here.

Voir Dire

1          PROSPECTIVE JUROR:   No.

2          THE COURT:   How far did you go in school?

3          PROSPECTIVE JUROR:   High school.

4          THE COURT:   Do you have any difficulty reading or

5     understanding English?

6          PROSPECTIVE JUROR:   No.

7          THE COURT:   Have you or an immediate family member ever

8     been involved as a party, witness, or otherwise in a civil or

9     criminal case?

10         PROSPECTIVE JUROR:   No.

11         THE COURT:   Have you or an immediate family member ever

12    been the victim of a crime?

13         PROSPECTIVE JUROR:   No.

14         THE COURT:   Arrested for a crime?

15         PROSPECTIVE JUROR:   My nephew has been.   I do have a

16    nephew that's in Pekin.

17         THE COURT:   And what did he do?

18         PROSPECTIVE JUROR:   Trafficking, weapons.

19         THE COURT:   Trafficking --

20         PROSPECTIVE JUROR:   Drugs.

21         THE COURT:   Drugs?

22         PROSPECTIVE JUROR:   Um-hm

23         THE COURT:   Well, this case involves drugs and weapons.

24    And, of course, these are just charges.   The defendant is

25    presumed to be innocent as he sits there at the counsel table.

Voir Dire

1   But do you think that the case against your nephew was handled
2   appropriately?
3               PROSPECTIVE JUROR:   I kind of stayed ignorant to that
4   whole thing.
5               THE COURT:   Pardon me?
6               PROSPECTIVE JUROR:   I kind of stayed ignorant to the
7   whole thing because that was not -- you know, those were his
8   issues.   So, I didn't -- you know, I would listen to what my
9   sister would say, but she was so anti-police.   So, I just kind
10  of -- because at that time that's when my son was going through
11  the law enforcement, as well.   So, I had to just kind of stay
12  partial and just listen -- just not listen.   So, usually when
13  she'd talk, I'd tune her out.
14              THE COURT:   Okay.   So, is there anything about that
15  experience that would affect your ability to be a fair and
16  impartial juror in this case?
17              PROSPECTIVE JUROR:   No.
18              THE COURT:   Do you belong to any clubs or
19  organizations?
20              PROSPECTIVE JUROR:   No.
21              THE COURT:   Can you promise me that you'll give the
22  defendant and the government a fair trial?
23              PROSPECTIVE JUROR:   Yes.
24              THE COURT:   Anything I don't know about you that I
25  should that bears upon your ability to serve as a fair and

Voir Dire

1    inpartial juror?

2              PROSPECTIVE JUROR:   No.

3              THE COURT:   Can you pass the microphone to Brenda,

4    please?

5              Brenda, where were you raised?

6              PROSPECTIVE JUROR:   Glenview.

7              THE COURT:   Where do you live now?

8              PROSPECTIVE JUROR:   Rockford.

9              THE COURT:   Live in a house?

10             PROSPECTIVE JUROR:   Yes.

11             THE COURT:   How long have you lived there?

12             PROSPECTIVE JUROR:   Three years.

13             THE COURT:   How old are you?

14             PROSPECTIVE JUROR:   54.

15             THE COURT:   Where did you live before you lived in the

16   house in Rockford that you live in now?

17             PROSPECTIVE JUROR:   I tried some house share things,

18   and they didn't work out.

19             THE COURT:   But always in Rockford?

20             PROSPECTIVE JUROR:   Um-hm  Well, no.  Well, yeah.  The

21   last six years.

22             THE COURT:   Where did you live before that?

23             PROSPECTIVE JUROR:   DeKalb.

24             THE COURT:   And did you have a house share arrangement

25   there, too?

Voir Dire

1    PROSPECTIVE JUROR:  No.  No.  I was just a renter in

2    these other situations.

3    THE COURT:  Okay.  I see.  Who lives in the house with

4    you?

5    PROSPECTIVE JUROR:  Nobody lives there with me.

6    THE COURT:  Do you have any children?

7    PROSPECTIVE JUROR:  Yes, I have four children.  My son

8    does IT in Michigan.  He's 32.  My daughter is 29.  She does

9    graphic design in San Francisco.  And my two youngest kids are

10   21 and 20, and they're both in college.

11   THE COURT:  What are they studying?

12   PROSPECTIVE JUROR:  The 21-year old is doing mechanical

13   engineering, and the 20-year old is doing music education.

14   THE COURT:  Are you married?

15   PROSPECTIVE JUROR:  Yes.

16   THE COURT:  How long have you been married?

17   PROSPECTIVE JUROR:  34 years.

18   THE COURT:  What does your husband do for a living?

19   PROSPECTIVE JUROR:  He's clergy.  United Methodist

20   clergy.

21   THE COURT:  You're both ministers?

22   PROSPECTIVE JUROR:  Yes.

23   THE COURT:  How long have you been doing that?

24   PROSPECTIVE JUROR:  I served parishes for 22 years, and

25   then I went back to school and got my counseling degree.  So, I

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    work now as a chaplain with hospice.

2            THE COURT:   All right.   And how about your husband?

3    How long has he been a minister?

4            PROSPECTIVE JUROR:   Since college.

5            THE COURT:   Same church?

6            PROSPECTIVE JUROR:   Oh, goodness.   No.   No.   In the

7    Methodist system, they move us around.

8            THE COURT:   Okay.   How far did you go in school?

9            PROSPECTIVE JUROR:   I have two graduate degrees.

10           THE COURT:   In what?

11           PROSPECTIVE JUROR:   One is the Master of Divinity for

12   ministry, and the other one is counseling.

13           THE COURT:   Do you have any difficulty reading or

14   understanding English?

15           PROSPECTIVE JUROR:   No.

16           THE COURT:   Do you own firearms?

17           PROSPECTIVE JUROR:   Yes.   They're mainly my husband's,

18   but he's teaching me how to fire a handgun.

19           THE COURT:   Why do you have them?

20           PROSPECTIVE JUROR:   Well, he has them for collector

21   reasons, hunting, target shooting, and I'll use them for target

22   shooting.

23           THE COURT:   Have you or an immediate family member ever

24   been involved as a party, witness, or otherwise in a civil or

25   criminal case?

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1        PROSPECTIVE JUROR:  No.

2        THE COURT:  Have you or an immediate family member ever

3  been the victim of a crime?

4        PROSPECTIVE JUROR:  Yes.  We had our house broken into

5  early in our marriage.  So, it was like 30 years ago.  And they

6  never found who did it.  We lost a lot of things.

7        THE COURT:  Do you believe that the case was handled

8  appropriately by the authorities?

9        PROSPECTIVE JUROR:  I don't really remember much about

10  that, other than making a report to the police.

11        THE COURT:  Do you harbor any resentment against the

12  police?

13        PROSPECTIVE JUROR:  No.

14        THE COURT:  Have you or an immediate family member ever

15  been arrested for a criminal offense?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  Do you belong to any clubs or

18  organizations?

19        PROSPECTIVE JUROR:  Yes.  Illinois Counseling

20  Association.

21        THE COURT:  Can you promise me that you'll give the

22  defendant and the government a fair trial?

23        PROSPECTIVE JUROR:  Um-hm

24        THE COURT:  Anything I don't know about you that I

25  should that bears upon your ability to serve as a fair and

Voir Dire

1    inpartial juror?

2        PROSPECTIVE JUROR:  No.

3        THE COURT:  Okay.  Thank you.

4        Parties meet me at sidebar, please.

5     (The following proceedings were had at the sidebar, out of

6      the presence and hearing of the jury:)

7        THE COURT:  Any follow-up questions?

8        MR. KARNER:  No.

9        MR. CAVER:  Just a couple.  I think it was Ms. Easley

10   who had some trouble with the son.

11        THE COURT:  I can't hear you.  You can talk loud,

12   Brendan.  Nobody can hear you.

13        MR. CAVER:  Number two had some trouble with her son

14   and that detective.  I was just going to ask a couple of

15   questions to make sure that he was okay.

16        THE COURT:  What would you like to know?

17        MR. CAVER:  I mean, I guess you covered most of it

18   about, you know, if she still -- if she harbors any resentment.

19        MR. KARNER:  I had -- along those same lines, I didn't

20   hear her unequivocally say that she wouldn't hold it against the

21   police.  So, I would like a commitment one way or the other.

22        THE COURT:  All right.  Same question?

23        MR. CAVER:  Yes.  And, you know, I guess I'd like to

24   know a little bit more the specifics about what was involved

25   with this telephone.  I guess her kid gave it to the police, and

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1    then they promised her that they wouldn't use anything that they

2    found.  I mean, just general questions about that, I guess.

3        (The following proceedings were had in open court, in the

4        presence and hearing of the jury:)

5            THE COURT:  Terry, would you take the microphone,

6    please?  Terry, as a result of this incident and experience with

7    your son, do you harbor any resentment toward the police as to

8    what happened?

9            PROSPECTIVE JUROR:  No.  We just felt we were misled at

10   the time.

11           THE COURT:  But that doesn't affect your ability to

12   evaluate the testimony of any law enforcement officers in this

13   case just as you would evaluate the testimony of any other

14   witness?  Am I correct in saying that?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Tell me about this cell phone situation.

17   Your son handed the police --

18           PROSPECTIVE JUROR:  Well, this is before they had

19   finalized the whole thing, this bombing thing.

20           THE COURT:  Now, this is the bombing, or is this

21   somebody writing something on the blackboard?

22           PROSPECTIVE JUROR:  And then at the school that they

23   had something written on the wall.

24           THE COURT:  But that was after the bombing situation,

25   wasn't it?

Voir Dire

1    PROSPECTIVE JUROR:  Yeah, but my son wasn't involved in

2    it, or they hadn't really settled the whole thing yet at that

3    time.  But they took his phone.  He had a picture on there of a

4    bomb thing that these kids made, and that kind of -- so, then

5    they kept the phone, and that was the deal.  He wasn't involved

6    in the thing at school.

7    THE COURT:  Is this experience going to affect your

8    ability to be a fair and impartial juror here?

9    PROSPECTIVE JUROR:  No.

10    THE COURT:  Okay.  Thank you.

11    PROSPECTIVE JUROR:  I should add this, also.  I had a

12    sister that was shot and killed by her husband years ago.  I

13    don't know if that -- and I don't feel that you should have

14    guns.

15    THE REPORTER:  Could you speak in the microphone?

16    PROSPECTIVE JUROR:  Oh, I'm sorry.

17    THE COURT:  You don't feel that that -- I think I heard

18    you say you don't feel that that would affect your ability to

19    serve as a fair and impartial juror here.

20    PROSPECTIVE JUROR:  No.

21    THE COURT:  You feel that situation was handled

22    appropriately by the authorities?

23    PROSPECTIVE JUROR:  Yes.  Yes, it was.

24    (The following proceedings were had at the sidebar, out of

25    the presence and hearing of the jury:)

**Voir Dire**

1    MR. CAVER:  I'm sorry.  I thought I heard her say I

2    don't feel that people should have guns.

3    MR. KARNER:  I think Mr. Caver is right.  I heard her

4    say the same thing.

5    (The following proceedings were had in open court, in the

6    presence and hearing of the jury:)

7    THE COURT:  Terry, I think when you talk, you kind of

8    use the microphone as a demonstrative device, and sometimes I

9    don't pick up everything you say.  But did you say you don't

10   think people should have guns?

11   PROSPECTIVE JUROR:  Yes.  In their homes I don't think

12   that they should.

13   THE COURT:  All right.

14   PROSPECTIVE JUROR:  Just because of what happened to my

15   sister.

16   THE COURT:  Okay.  Now, obviously, this case involves

17   someone with a gun.  At least those are the charges.  And

18   Mr. Poke is presumed innocent of those charges as he sits here

19   now.  But is the fact that you don't think people should have

20   guns going to affect your ability to evaluate the evidence,

21   gather the evidence, apply the law to the evidence, and then

22   discuss this case with your fellow jurors to determine whether

23   the government's met its burden?

24   PROSPECTIVE JUROR:  No.

25   THE COURT:  You'll be able to do all those things

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    without regard to your personal feelings about guns?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  All right.  Thank you.

4    (The following proceedings were had at the sidebar, out of

5      the presence and hearing of the jury:)

6           MR. CAVER:  Judge, may I just take a brief moment after

7    that, very brief, to talk to my client?

8           THE COURT:  Okay.

9    (Brief pause.)

10          MR. CAVER:  Thank you, Judge.

11          THE COURT:  Sure.  Any challenges for cause?

12          MR. KARNER:  Not from us.

13          MR. CAVER:  Judge, we would challenge number two for

14    cause because of the statement about the guns.

15          THE COURT:  That's Terry Easley?

16          MR. CAVER:  Yes.  It's only constructive possession,

17    but I just think that -- I think she's prejudiced against people

18    that have guns, legally or illegally.

19          THE COURT:  Okay.  Well, she told me that that wouldn't

20    affect her ability to serve as a fair and impartial juror.  I

21    believe her.  So, I'll deny the challenge for cause.

22          As to juror number one then, does the government accept

23    or reject?

24          MR. KARNER:  Number one we accept.

25          THE COURT:  Defense?  Csenar.

Voir Dire

1    MR. CAVER:  I'm sorry, Judge.  We reject.

2    THE COURT:  Juror number two, does the defense accept

3  or reject?

4    MR. CAVER:  Judge, we reject.

5    THE COURT:  Juror number three, does the government

6  accept or reject?

7    MR. KARNER:  Accept number three.

8    THE COURT:  Defense?

9    MR. CAVER:  We accept.

10   THE COURT:  Juror number seven, does the defense accept

11  or reject?

12   MR. CAVER:  I apologize.  I'm sorry.  One, two, and

13  three are seated in the front row, correct?

14   THE COURT:  Yes.

15   MR. CAVER:  I'm sorry.  When you say seven, I've got

16  the first seat in the second row closest to us in the purple.

17   THE COURT:  Right.

18   MR. CAVER:  Okay.  I'm sorry.  We would excuse

19  Ms. Davis.

20   MR. KARNER:  Which one is she?

21   MR. CAVER:  She's --

22   THE COURT:  Seven.

23   MR. KARNER:  Okay.

24   MR. CAVER:  Just so we're clear, she's the one sitting

25  in the back row with the purple sweater.

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1    THE COURT:  Okay.  Juror number eight, does the

2    government accept or reject?

3        MR. KARNER:  Juror number eight we accept.

4        THE COURT:  Defense?

5        MR. CAVER:  And that's Ms. Jones?

6        THE COURT:  Right.

7        MR. CAVER:  We accept.

8        THE COURT:  And juror number ten, does the defense

9    accept or reject?

10       MR. CAVER:  Accept.

11       THE COURT:  Government?

12       MR. KARNER:  We reject.

13       THE COURT:  All right.  So, all together the government

14   has used five of their six peremptory challenges, and the

15   defense has used five of their ten.

16       MR. KARNER:  Yes.

17       MR. CAVER:  Thank you, Judge.

18       THE COURT:  All right.  I'll excuse them, and then

19   we'll go into our hearing.

20   (The following proceedings were had in open court, in the

21       presence and hearing of the jury:)

22       THE COURT:  I'll excuse the following jurors.  Mary

23   Csenar, Terry Easley, Sonia Davis, and Brenda Wilson.  Thank

24   you, ladies, for all your help, for your assistance in trying

25   this case.  Brenda, you have to watch which doors you leave in

Voir Dire

1    this building.

2              PROSPECTIVE JUROR:   Pardon?

3              THE COURT:   You have to watch which doors you go out of

4    in this building.

5              All right.   Theresa and Jennifer, could you please

6    stand and raise your right hand?  I'll ask you to take oaths as

7    jurors in this case.

8         (Jurors duly sworn.)

9              THE COURT:   All right.   I'll place you in the competent

10   hands of Mr. Ferguson.   But again I want to advise you that as

11   jurors in this case, you're not to discuss the case among

12   yourselves or with anyone else or permit anyone to discuss it in

13   your presence.   You must refrain from any media exposure of the

14   case while it's in progress.   Do not make any independent

15   investigation of the case by reading materials, doing any

16   Internet research, talking to people, or doing any testing.   If

17   anyone attempts to contact you, either directly or indirectly,

18   about your service as jurors in this case, report that to me

19   immediately.

20             Folks, have a seat.   I'm going to break for the noon

21   recess.   We're going to stay here and do some work on this case,

22   but I'm going to allow you to leave the building.   Again I want

23   to admonish you that as jurors in this case, you're not to

24   discuss the case among yourselves or with anyone else or permit

25   anyone to discuss it in your presence.   Refrain from any media

1  exposure of the case while it's in progress.  I do not believe
2  this case will get any media coverage.
3          Do not make any independent investigation of the case
4  by reading materials, doing any research on the Internet or
5  otherwise, attempting any testing, or going to any location
6  where any of the events in this case took place.  I don't know
7  that you know where the events in this case took place, but if
8  anyone contacts you or attempts to do so, either directly or
9  indirectly, about your service in this case, report that to me
10  immediately.  I'll ask you to come back at 1:45.  Thank you,
11  folks.  We'll see you then.
12      (The following proceedings were had in open court, out of
13          the presence and hearing of the jury:)
14          THE COURT:  Have a seat, please.  All right.  Let's go
15  to the hearing on 804(b)(3).  Mr. Caver, it's your burden.  Call
16  your first witness.
17          MR. CAVER:  Thank you, Judge.  Judge, I --
18          THE COURT:  Well, first of all, let me ask you.  Are
19  there any things you can agree to before we call the witness?
20          MR. CAVER:  I think, Judge, we can.  I think we can
21  agree to much of it, actually, in terms of the facts.  If I
22  could just have a moment.
23          THE COURT:  Sure.  I'll give you all the time you need.
24          MR. CAVER:  Thank you.
25      (Brief pause.)

1      MR. CAVER:  Judge, I think we can stipulate to the

2   facts that would be before the court.  They've all been tendered

3   in discovery.

4      THE COURT:  Fine.  Tell me what that will be.

5      MR. PEDERSEN:  Your Honor, first of all, I believe

6   there's no objection for the court to consider the two exhibits

7   that I've marked as Government's Exhibits I-1 and I-2.

8   Government's Exhibit I-1 is a copy of Special Agent Ivancich --

9      THE COURT:  Why did you pick I?

10     MR. PEDERSEN:  Just because we already had trial

11  exhibits, and I don't want to get them mixed up with those.

12     THE COURT:  That's fine.  I just wondered why you

13  selected "I" out of all the letters of the alphabet.

14     MR. PEDERSEN:  So, I-1, your Honor, is the report that

15  Special Agent Ivancich prepared after conducting the telephone

16  interview of Daron Cistrunk that we referred to in our motion in

17  limine.  And I believe we have a stipulation that if Special

18  Agent Ivancich was called to testify, he would testify

19  consistent with the information contained in Government's

20  Exhibit I-1 regarding that telephone conversation and what he

21  was told by Daron Cistrunk.  And then I-2 is simply the

22  affidavit that was purported to have been made by Daron Cistrunk

23  on July 14th of 2011.

24     THE COURT:  All right.  And what about the transcript

25  of that?

1          MR. PEDERSEN:  Your Honor, it's my understanding that

2    in preparation for trial, the court was provided with a

3    transcript of the telephone conversation that we referred to in

4    our motion in limine, and it's my understanding that the

5    defendant has no objection to the court considering that

6    transcript as the evidence of that phone call.

7          THE COURT:  All right.

8          MR. PEDERSEN:  In addition, in our motion in limine, we

9    refer to the fact that Daron Cistrunk in his statement to

10   Special Agent Ivancich had stated that he obtained the gun at

11   issue when he initially came to Rockford, and he had been

12   robbed, and that he had reported a robbery to the Rockford

13   Police Department sometime in late July or August of 2010.  And

14   as we indicate in our motion in limine, I believe the defense is

15   stipulating, that if Special Agent Ivancich was called to

16   testify, he would testify that he had checked with the Rockford

17   Police Department, and there was no such report ever made by

18   Daron Cistrunk of any robbery.  I'm sorry?

19      (Off-the-record discussion between counsel.)

20         MR. PEDERSEN:  The stipulation is that there's no

21   report on file, not that Daron Cistrunk did not make the report.

22         THE COURT:  All right.

23         MR. PEDERSEN:  And other than that, I believe that's

24   all the evidence.

25         THE COURT:  Okay.  Now, what about the discrepancy

1    between --

2           MR. PEDERSEN:  Oh, that's right.

3           THE COURT:  -- the gun that was found in Mr. Poke's car

4    and the gun that -- I believe Mr. Cistrunk had some trouble

5    in --

6           MR. CAVER:  Judge, that's correct.  Mr. Cistrunk is by

7    no means an expert in firearms.  We would stipulate that the

8    firearm that Mr. Cistrunk was describing to Special Agent

9    Ivancich is different from the firearm that is alleged on the

10    indictment to have been constructively possessed by my client.

11           MR. PEDERSEN:  Well, I believe they agreed to stipulate

12    that the firearm does only hold eleven rounds of ammunition when

13    fully loaded rather than 17.

14           THE COURT:  All right.

15           MR. CAVER:  We would so stipulate.

16           THE COURT:  And what about the caliber?

17           MR. PEDERSEN:  That the firearm is the same firearm

18    described in the indictment, a .40 caliber handgun.

19           THE COURT:  And what did Mr. Cistrunk say it was, or

20    didn't he say anything?

21           MR. PEDERSEN:  He said it was a nine millimeter

22    handgun.

23           MR. CAVER:  That is our stipulation, Judge.

24           THE COURT:  All right.  I'll take argument then.

25    Mr. Caver.

1    MR. CAVER:  Thank you, Judge.  Are you asking for

2  argument?

3    THE COURT:  Yes, please.

4    MR. CAVER:  Thank you.

5    Judge, Daron Cistrunk had allegedly prepared this

6  affidavit.  The affidavit was intended to take responsibility

7  for --

8    THE COURT:  Did you say Mr. Cistrunk prepared it?

9    MR. CAVER:  Yes.  Or I'm sorry.  It was signed by

10  Mr. Cistrunk.  I think there's a factual dispute as to where it

11  was prepared.  But in any case, Mr. Cistrunk adopted it by his

12  signature and by having his signature --

13    THE COURT:  Well, that means something to me.  Was it

14  prepared and given to him, or did he fill it out and then sign

15  it?

16    MR. CAVER:  Judge, I don't know.  I think the

17  government's evidence -- the government may try to show that it

18  was prepared by somebody else.

19    THE COURT:  Well, see, those are the kind of things I'd

20  like to know.

21    MR. CAVER:  Sorry, Judge.

22    MR. PEDERSEN:  Judge, I mean, we don't know if he

23  prepared it or not.  The evidence is --

24    THE COURT:  But he knows.

25    MR. PEDERSEN:  Your Honor, I believe when the defendant

PDF created with pdfFactory trial version www.pdffactory.com

1  met with our office, he indicated that someone on his tier had

2  prepared the affidavit, and then Cistrunk signed it.

3        In addition, in his statement to Special Agent

4  Ivanich -- and that's the only evidence we know regarding how

5  this affidavit was prepared. In his statement to Special Agent

6  Ivanich, Daron Cistrunk indicated during that phone

7  conversation that he did not prepare the affidavit, but it was

8  brought to him and that he signed it in two places, and then he

9  took it to a notary, and it was notarized.

10      MR. CAVER: Judge, that is the stipulation. In the

11  defendant's proffer -- and I can read verbatim Special Agent

12  Ivanich wrote, I believe it was -- yes. In the 2-4-13 report

13  that Special Agent Ivanich claims that Mr. Poke said, quote, "I

14  did not write the affidavit. Some dude on my deck told me how

15  to do it and wrote it out for me," end quote.

16      THE COURT: All right. Thank you.

17      MR. CAVER: Thank you. And later Mr. Cistrunk received

18  that affidavit that had been so prepared, and he signed it and

19  notarized it, and it's our argument that by that signature and

20  by that notary that he adopted that statement as his own and

21  that the information, though it hadn't been written by his hand,

22  was information that he himself adopted.

23        That affidavit was then corroborated by the report of

24  Mr. Cistrunk to Special Agent Ivanich when Special Agent

25  Ivanich asked Mr. Cistrunk how he prepared to testify.

1    Mr. Cistrunk said he would be prepared to testify that the gun

2    was his at a trial.

3         The government cites in its motion in limine United

4    States v. Securus, 207 F.3d 412 and 417.  It's a Seventh Circuit

5    case from 2000.  People do not inculpate themselves unless

6    they're believing it to be true.  Mr. Cistrunk went a step

7    further.  He believed that it would have been a crime for him to

8    have possessed that firearm  This lends itself -- this lends

9    the statement, both of the affidavit and the oral statement

10   given to Special Agent Ivancich, that it was, in fact, reliable.

11   Mr. Cistrunk wouldn't have taken responsibility for possessing a

12   firearm that he knew to be involved in a federal criminal case

13   unless it was the truth.  Obviously, the unavailability is

14   uncontested.

15        And the government relies, also, on Roberts v. City of

16   Troy by arguing that because Cistrunk is alleged to have told

17   Special Agent Ivancich that he, quote, explained that he did not

18   have a gun permit or gun card and was afraid that if he reported

19   the gun was stolen --

20        THE COURT:  You're going to have to read a little

21   slower.

22        MR. CAVER:  I'm sorry.  That when he, quote, explained

23   that he did not have a gun permit or a gun card and was afraid

24   that if he reported the gun as stolen or missing, he would get

25   in trouble with the police, and cites Roberts v. City of Troy as

PDF created with pdfFactory trial version www.pdffactory.com

1    being of some weight when it comes to proving that Cistrunk

2    therefore could not have believed that possessing the firearm

3    could have placed him in jeopardy for criminal prosecution in

4    any other sense merely because Mr. Cistrunk discussed with

5    Special Agent Ivancich one manner in which Mr. Cistrunk may or

6    may not have been correct about tending to incriminate himself,

7    which we are not even conceding that.  The 60-day grace period

8    basically still could have landed Mr. Cistrunk in peril for a

9    deprivation of his liberty, even if it was only overnight, even

10   if it was through a preliminary hearing until it was discovered

11   that through a factual discrepancy maybe he wasn't an

12   out-of-state resident.  Maybe he was an in-state resident at the

13   time, and maybe that exception wouldn't have applied to him

14            But in any case, Roberts v. City of Troy I think is

15   misplaced here because just because they had the discussion,

16   Special Agent Ivancich and Mr. Cistrunk had the discussion about

17   one manner in which it would not have been an offense to possess

18   the firearm, there are any number of ways that it could have

19   been a crime, one of which would have been Mr. Cistrunk's

20   knowing possession -- knowing transfer to a felon a firearm

21   The government's alleging in their case-in-chief here that my

22   client knowingly possessed this firearm  There certainly could

23   have been all sorts of criminal implications with the conspiracy

24   of transferring firearms to known felons.  There could have been

25   implications in a drug conspiracy of some sort for Mr. Cistrunk.

1    For all we know, it could be but for prosecutorial discretion

2    the government could even have evidence against Mr. Cistrunk

3    that they could have prosecuted him with.  But there are all

4    sorts of ways that it could have been against Mr. Cistrunk's

5    penal interest to make the statements that he did.

6            Because this limited conversation doesn't exclude the

7    possibility of any other criminal liability, we would ask that

8    in addition to the reliability of the statements in that they

9    were made to an ATFE agent, as well as set forth in a notarized

10   statement in an affidavit, that we have met our burden and shown

11   that this exception should apply to the admission of these

12   statements, even given the unavailability of Mr. Cistrunk having

13   asserted his Fifth Amendment right to remain silent.

14           THE COURT:  Thank you.  Mr. Pedersen.

15           MR. PEDERSEN:  Well, your Honor, the burden is the

16   defendant's, and they still have not addressed all of the

17   inconsistencies between Daron Cistrunk's statement to Special

18   Agent Ivancich and the actual facts as we know them, if he

19   actually was in possession of that firearm.  But first --

20           THE COURT:  What are the inconsistencies?

21           MR. PEDERSEN:  Well, the fact that when he was speaking

22   to Special Agent Ivancich, he didn't even know what type of

23   caliber handgun it was.  He stated it was a nine millimeter

24   handgun when, in fact, it is a .40 caliber handgun.  He didn't

25   know how many rounds it held.  He thought it held 17.  It only

1   holds eleven.  He didn't even know the make or model of the gun.

2           He also stated that at the time -- well, he also stated

3   he didn't come forward or tell anyone that it was his gun at the

4   time because he was afraid he was going to get in trouble, that

5   it was against his -- and, therefore, it was against his penal

6   interest, and yet eight days later he signs an affidavit saying

7   it's his gun.  That's also inconsistent with his statement that

8   he didn't say anything about it being his gun.  In addition, he

9   said that he obtained --

10          THE COURT:  Well, why is that inconsistent?

11          MR. PEDERSEN:  Well, if he's saying that he didn't come

12   forward with the information that it was his gun at the time,

13   why a week later, why did he sign an affidavit saying it was his

14   gun?  What changed?  And there's no explanation for that.

15   That's just another inconsistency that I think is worth noting.

16          In addition, he said that he obtained the gun when he

17   initially came to Rockford in late July or early August of 2010

18   and that he reported -- and that he obtained the gun because he

19   had been robbed when he arrived in Rockford and that he reported

20   that robbery to the Rockford Police Department, and no robbery

21   report was ever -- the Rockford Police Department has no report

22   of him making such a robbery report on file.

23          In addition, he said after obtaining that gun in late

24   July or August of 2010, he only had the gun for a few weeks

25   before he had left it in the car that Dayton Poke had taken and

PDF created with pdfFactory trial version www.pdffactory.com

1    that then the gun -- he never saw it again.  That's also

2    inconsistent on the timing because if he obtained the gun in

3    July or August of 2010, this arrest occurred in July of 2011, a

4    year later.

5            He said that he signed the affidavit a month or two

6    after the defendant's arrest.  It was actually, as I said, eight

7    days after the arrest.

8            And then there's the recorded phone call between the

9    defendant and an individual known as Unc.  And during that phone

10   conversation that the court has a copy of the transcript, the

11   defendant makes numerous statements where he's trying to

12   persuade Unc to persuade Daron to sign a document that -- well,

13   specifically, we set it forth in our motion in limine, Page 5,

14   your Honor, a summary of that conversation.

15           The defendant told Unc that Daron just needed to meet

16   with Amy, and she would tell him what to do.  Amy Favors is the

17   defendant's girlfriend.  The defendant said that Daron just

18   needed his ID and go to the currency exchange and sign a little

19   piece of paper.  Defendant told Unc that he sent a letter to

20   Amy's house and that he made it out to himself and that

21   defendant told Unc to tell Daron that they already charged the

22   defendant with it, and they can't say it both ours.

23           All those statements are inconsistent with Daron

24   Cistrunk coming forward only because -- he would only tell this

25   statement that it was his gun only because it has to be truthful

1    because it's so against his penal interest.  The defendant

2    was -- during this phone conversation was trying to persuade

3    someone to persuade Daron into coming forward and signing

4    something on his behalf.

5            And then the evidence that we have, this phone

6    conversation took place on July 13th of 2011.  The very next day

7    Daron Cistrunk signs the affidavit.  And he indicated to Special

8    Agent Ivancich that he had gone to the currency exchange and

9    signed the affidavit, and it was notarized.

10           This is the defendant's burden to show that when this

11   witness is unavailable that there is sufficient reliability in

12   these statements for the court to admit without the government

13   having any opportunity to cross-examine the witness, and we

14   think they've fallen woefully short of that, your Honor.

15           There's numerous inconsistencies with Daron Cistrunk's

16   statement regarding his possession of that firearm  He didn't

17   know the caliber, the make, the model, how many rounds of

18   ammunition it held.  He claims that he purchased it a year prior

19   and that it was a year prior to when he actually could have

20   purchased it, if you follow his time frame.

21           For all those reasons, your Honor, we don't believe

22   that the defendant has met the burden to show that the testimony

23   that they're asking to admit as hearsay was against Daron

24   Cistrunk's penal interests or that -- and, in addition, that

25   that testimony meets the exception where the court could admit

PDF created with pdfFactory trial version www.pdffactory.com

1     it as a statement against Daron Cistrunk's penal interests.

2              So, we're asking that you deny their request to admit

3     that evidence because there are insufficient corroborating

4     circumstances to clearly indicate the trustworthiness of those

5     statements.

6              THE COURT:  Any reply?

7              MR. CAVER:  Judge, if I may briefly.

8              THE COURT:  Sure.

9        (Brief pause.)

10             MR. CAVER:  Judge, thank you.

11             THE COURT:  Sure.

12             MR. CAVER:  Mr. Cistrunk never lied about how he got

13    the affidavit, and I just want to make clear that that was

14    not -- that that was not an inconsistency.  The late July and

15    early August robbery that was claimed to have been committed by

16    Mr. Cistrunk, certainly we stipulate that the Rockford Police

17    didn't have any report of that robbery.  But anybody who's

18    worked with the Rockford Police knows that there are great

19    employees there, and there are some not so great employees.  And

20    on more than one occasion, I think the Rockford Police has been

21    mistaken and not taken reports and has had numerous other

22    explanations as to why reports aren't in places that they should

23    be.  So, again, that's not an inconsistency just because Daron

24    Cistrunk reported to the police.  I know I've personally made

25    phone calls to report issues to the Rockford Police where they

PDF created with pdfFactory trial version www.pdffactory.com

1    have declined to accept a report.  So, it is not at all

2    surprising that that may not have been there.

3            In terms of the timeline, with all due respect to

4    Mr. Cistrunk and everybody else who's going to testify in this

5    case, we may not always be dealing with the most cosmopolitan of

6    people.  And the fact that Mr. Cistrunk may have mistaken a

7    timeline about, you know, how long things -- how long time

8    elapsed, we had Mr. Cistrunk in here, if the court recalls

9    today, who didn't even remember what time he was supposed to be

10   in court this morning.  So, I think to suggest that somehow that

11   that means that Mr. Cistrunk is inconsistent or is somehow being

12   deceptive about that, I don't think that's what that

13   illustrates.

14           And while we're on that sort of line, I don't think

15   anybody has talked to Mr. Cistrunk when he's claimed that he is

16   an expert in firearms.  The difference between a nine millimeter

17   and a .40 caliber is -- they're more similar than some other

18   calibers could be.  A nine millimeter and a .40 caliber can be

19   very close.

20           THE COURT:  But it makes a difference when you have to

21   buy ammunition for it.

22           MR. CAVER:  Absolutely.  You're absolutely correct.

23   And sometimes -- well, on the street often ammunition is

24   purchased not by a description, but has sometimes been known to

25   be purchased by what actually fits in the firearm, and if

1   certain rounds fit in a firearm, then they'll purchase them

2           THE COURT:   Did this gun have bullets in it?

3           MR. CAVER:   It did.   And we would stipulate that the

4   firearm that was found had .40 caliber rounds.   I believe they

5   were Winchester rounds.   But no.   And we stipulate to that.   But

6   the point is that these inconsistencies to which the government

7   alludes, I don't think they're quite as glaring as the

8   government argues them to be.   Mr. Cistrunk is taking

9   responsibility for what's his.

10          And with respect to the jail tapes with Unc that are

11  referenced in the government's motion in limine, again, these

12  tapes don't illustrate that anything dishonest was happening.

13  Asking somebody to take responsibility and to own up to an

14  offense that is their responsibility is code on the street.   You

15  take responsibility for what's yours.

16          And the fact that this call was made and the government

17  uses it and paints it in a way that the defense disagrees with

18  is not only not surprising, but it's not what happened here, and

19  I don't think the government can show that that's what happened

20  here, that anybody was put up to lying about something not being

21  theirs.   Even Daron Cistrunk, when he spoke to Special Agent

22  Ivancich, told him he planned to testify that it was his gun, so

23  that there are indicia of reliability.

24          Judge, if I may just have a brief moment.

25          THE COURT:   Sure.

1       (Brief pause.)

2               MR. CAVER:   Thank you.   And, Judge, part of the

3       statement, Mr. Cistrunk's statement, that is, to Special Agent

4       Ivancich -- if memory serves -- I'm sorry.   May I just have a

5       moment?

6       (Brief pause.)

7               MR. CAVER:   Mr. Cistrunk told Special Agent Ivancich I

8       can't tell you what kind it was when I first got to Rockford.

9       It was about concerning the robbery.   I thought I recalled him

10      saying that he never fired it, and that's what I'm looking for,

11      Judge.   If you'd indulge me just for a moment.

12      (Brief pause.)

13              MR. CAVER:   I may be misremembering that, Judge.   I

14      don't think it does say that he never fired it.

15              But in any case, for those reasons, Judge, that's what

16      we would be requesting.   We believe that we have met the

17      requirements of the exception, and for those reasons we would

18      ask for both the statement to Special Agent Ivancich, as well as

19      the affidavit, to be admitted.

20              THE COURT:   All right.   I'll give you a decision before

21      the end of the day.

22              MR. CAVER:   Thank you, Judge.

23              THE COURT:   Court's in recess until 1:45.

24              MR. KARNER:   Judge, can we talk about witness

25      scheduling?

1          THE COURT:  Sure.

2          MR. KARNER:  We have three witnesses who came here at

3     12:45.  I take it since we've got six jurors to pick yet, four

4     regular and two alternate, that we're not going to get to

5     testimony today?

6          THE COURT:  I think that's probably fair.  Although, if

7     we've got time, I'd like you to go into opening statements.

8          MR. KARNER:  Okay.  My question is in order to salvage

9     some good will with the witnesses, may I -- but I don't want to

10    make the court mad, can I excuse them until tomorrow morning?

11         THE COURT:  Right.  Yes, you can.

12         MR. KARNER:  Okay.  Thank you.

13         MR. CAVER:  Judge, I'm sorry.  Just before you leave.

14    Does the court have a copy of Mr. Cistrunk's statement that he

15    gave, the report to Special Agent Ivancich?

16         THE COURT:  Isn't that I-2?

17         MR. CAVER:  Yes.  Okay.  I just wanted to make sure you

18    had it for your consideration.  Thank you, Judge.  Sorry.

19       (Whereupon, the within trial was recessed to 1:45 o'clock

20         p.m of the same day.)

21

22

23

24

25

1         **IN THE UNITED STATES DISTRICT COURT**
         **FOR THE NORTHERN DISTRICT OF ILLINOIS**
2               **WESTERN DIVISION**

3  **UNITED STATES OF AMERICA,**   )     **Docket No. 11 CR 50062**
                         )
4          **Plaintiff,**   )     **Rockford, Illinois**
                         )     **Monday, May 6, 2013**
5          **v.**         )     **1:45 o'clock p.m**
                         )
6  **DAYTON POKE,**           )
                         )
7          **Defendant.**   )

8                  **VOLUME 2**
              **TRANSCRIPT OF TRIAL**
9    **BEFORE THE HONORABLE FREDERICK J. KAPALA, and a jury**

10  **APPEARANCES:**

11  **For the Government:**     **HON. GARY S. SHAPIRO**
                       **Acting United States Attorney**
12                       **(327 S. Church Street,**
                       **Rockford, IL 61101) by**
13                       **MR. MARK T. KARNER**
                       **MR. JOSEPH C. PEDERSEN**
14                       **Assistant U.S. Attorneys**

15  **For the Defendant:**     **LAW OFFICE OF BRENDAN W CAVER, LTD.**
                       **(308 West State Street,**
16                       **Suite 97,**
                       **Rockford, IL 61101) by**
17                       **MR. BRENDAN W CAVER**

18  **Also Present:**          **MR. DANIEL IVANCICH**
                       **Special Agent, ATF**
19

    **Court Reporter:**       **Mary T. Lindbloom**
20                       **327 S. Church Street**
                       **Rockford, Illinois 61101**
21                       **(815) 987-4486**

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1    (The following proceedings were had in open court, out of

2       the presence and hearing of the jury:)

3           THE COURT:   Can we call the jury, in?

4           MR. CAVER:   Yes.

5           THE COURT:   Bring them in, Tim

6    (The following proceedings were had in open court, in the

7       presence and hearing of the jury:)

8           THE COURT:   All right.   Welcome back, everyone.

9           Susan, would you please call four more randomly

10   selected names, please?

11          THE CLERK:   Virginia Allen, A-l-l-e-n, row one, seat

12   one.   Kandie Bott, B-o-t-t, row one, seat two.   Martin Hadley,

13   H-a-d-l-e-y, row two, seat one.   Peggy Leverton,

14   L-e-v-e-r-t-o-n, row two, seat four.

15          THE COURT:   Good afternoon, Virginia.

16          PROSPECTIVE JUROR:   Good afternoon.

17          THE COURT:   You'll have to put that microphone in front

18   of your mouth so we can hear what you have to say.

19          PROSPECTIVE JUROR:   All right.

20          THE COURT:   Can you tell me how old you are?

21          PROSPECTIVE JUROR:   71.

22          THE COURT:   And where were you raised?

23          PROSPECTIVE JUROR:   In DeKalb.

24          THE COURT:   And where do you live now?

25          PROSPECTIVE JUROR:   DeKalb.

### Voir Dire

1    THE COURT:   Live in a house?

2    PROSPECTIVE JUROR:   Yes, sir.

3    THE COURT:   How long have you lived there?

4    PROSPECTIVE JUROR:   68 years.

5    THE COURT:   Who lives there with you?

6    PROSPECTIVE JUROR:   My husband and my brother.

7    THE COURT:   Okay.   What does your husband do for a

8    living?

9    PROSPECTIVE JUROR:   He's retired.

10   THE COURT:   Retired from what?

11   PROSPECTIVE JUROR:   Police officer.

12   THE COURT:   That's for NIU?

13   PROSPECTIVE JUROR:   Yes, sir.

14   THE COURT:   When I talked to you when you were in the

15   back of the room, I said security officer, but I guess NIU has a

16   police force?

17   PROSPECTIVE JUROR:   Yes, sir, it does.   It has the

18   police force, and there are security people there, also, but

19   they actually have their full police force.

20   THE COURT:   How long --

21   PROSPECTIVE JUROR:   But he's been retired 20 years.

22   THE COURT:   How long was he a police officer for NIU?

23   PROSPECTIVE JUROR:   20 years.

24   THE COURT:   I'll ask you a question that you've heard

25   before, and that is if you deliberated with your fellow jurors

## Voir Dire

1  and after examining the evidence in this case and the law that

2  applies to that evidence, you decide that the government has not

3  sustained its burden of proof and you find the defendant not

4  guilty of one or all of these charges, do you think that's

5  something you'd have to justify or explain to your husband or

6  that you'd feel awkward or uncomfortable about it?

7          PROSPECTIVE JUROR:  He wouldn't know my decision.

8          THE COURT:  Pardon me?

9          PROSPECTIVE JUROR:  He wouldn't know my decision.

10         THE COURT:  Well, your decision has to be unanimous.

11         PROSPECTIVE JUROR:  Okay.

12         THE COURT:  And so, if you acquitted the defendant,

13 he'd know that.

14         PROSPECTIVE JUROR:  I would have no problem

15         THE COURT:  All right.  Now, your son-in-law is a

16 retired lieutenant from the DeKalb Police Department.

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And your daughter works in the State's

19 Attorney's Office in Sycamore for DeKalb County.

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Well, what about them?  I'll ask you the

22 same question regarding them  You have a son-in-law who's in

23 law enforcement and a daughter who works in the State's

24 Attorney's Office, and it may be that you and your jurors may

25 find the defendant's not guilty of one or more of these charges.

Voir Dire

1    Does that put you in an uncomfortable or awkward position with

2    then?

3                PROSPECTIVE JUROR:   No, sir.

4                THE COURT:   Which brother -- you have a brother that

5    lives with you?

6                PROSPECTIVE JUROR:   Yes, sir.

7                THE COURT:   And what does he do for a living?

8                PROSPECTIVE JUROR:   He's retired from California, but

9    he works part-time at -- he's a security officer, an actual

10   security officer, not a policeman, at a factory in Naperville.

11               THE COURT:   And what job did he retire from?

12               PROSPECTIVE JUROR:   He had his own escrow business in

13   California.

14               THE COURT:   An escrow business for property?

15               PROSPECTIVE JUROR:   Yes, sir.

16               THE COURT:   Children?

17               PROSPECTIVE JUROR:   Five.   A female who lives in New

18   York, 50 years old, and works for -- do you want to know where

19   they work?

20               THE COURT:   Yes.

21               PROSPECTIVE JUROR:   Works for Citicorp.   She's voice of

22   America for Citicorp in New York.

23               THE COURT:   Actually, I don't need to know where they

24   work.   I just need to know what kind of job they have.

25               PROSPECTIVE JUROR:   Okay.   Daughter 49 works for the

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1  state -- you know, the attorney's office.  She's an advocate for

2  abuse victims.

3          THE COURT:  All right.

4          PROSPECTIVE JUROR:  Son 48, and has his own landscaping

5  business.  A son 46, and he has his own business, tobacco

6  business.  And a son 46, who has sports bars.

7          THE COURT:  He owns a sports bar.

8          PROSPECTIVE JUROR:  Um-hm  Many.

9          THE COURT:  Your son who's in the tobacco business,

10  does he raise tobacco or sell tobacco or process tobacco?

11          PROSPECTIVE JUROR:  He has a cigarette store, that kind

12  of tobacco.

13          THE COURT:  I see.  How far have you gone in school?

14          PROSPECTIVE JUROR:  Thirteen.  A freshman in college.

15          THE COURT:  Okay.  And what did you study in college?

16          PROSPECTIVE JUROR:  English.

17          THE COURT:  So, you don't have any problem reading or

18  understanding English?

19          PROSPECTIVE JUROR:  No, sir.

20          THE COURT:  Have you or an immediate family member ever

21  served in the military?

22          PROSPECTIVE JUROR:  My brother.  He was in the Marines,

23  but not immediate.

24          THE COURT:  And what kind of job did he have in the

25  Marines, do you know?

Voir Dire

1    PROSPECTIVE JUROR:   I don't know.

2    THE COURT:   Have you or an immediate family member ever

3    been involved as a party, witness, or otherwise in a civil or

4    criminal case?

5    PROSPECTIVE JUROR:   No.

6    THE COURT:   Have you or an immediate family member ever

7    been the victim of a crime?

8    PROSPECTIVE JUROR:   No.

9    THE COURT:   Arrested for a crime?

10    PROSPECTIVE JUROR:   No.

11    THE COURT:   Do you belong to any clubs or

12    organizations?

13    PROSPECTIVE JUROR:   The NRA.

14    THE COURT:   Right.

15    PROSPECTIVE JUROR:   And -- no, no.   Not really.

16    THE COURT:   Can you promise me that you'll give the

17    defendant and the government a fair trial?

18    PROSPECTIVE JUROR:   Yes.

19    THE COURT:   Anything I don't know about you that I

20    should that bears upon your ability to serve as a fair and

21    impartial juror?

22    PROSPECTIVE JUROR:   No.

23    THE COURT:   Would you prefer to be called Kandie or Kay

24    or --

25    PROSPECTIVE JUROR:   Kandie.

Voir Dire

1          THE COURT:   Kandie.   That's my daughter's name.

2          PROSPECTIVE JUROR:   It's a nice name.

3          THE COURT:   Yes.   Kandie, how old are you?

4          PROSPECTIVE JUROR:   67.

5          THE COURT:   And how far have you gone in school?

6          PROSPECTIVE JUROR:   Two years -- two and a half years

7    in a college.

8          THE COURT:   And what did you study?

9          PROSPECTIVE JUROR:   Theater and English.

10          THE COURT:   Do you have any difficulty reading or

11   understanding English?

12          PROSPECTIVE JUROR:   No, sir.

13          THE COURT:   Where were you raised?

14          PROSPECTIVE JUROR:   Marshalltown, Iowa.

15          THE COURT:   And where do you live now?

16          PROSPECTIVE JUROR:   Roscoe, Illinois.

17          THE COURT:   Live in a house there?

18          PROSPECTIVE JUROR:   Yes, sir.

19          THE COURT:   How long have you lived in that house?

20          PROSPECTIVE JUROR:   18 years.

21          THE COURT:   Who lives there with you?

22          PROSPECTIVE JUROR:   My husband.

23          THE COURT:   What does he do for a living?

24          PROSPECTIVE JUROR:   He's a senior designer for an

25   industry.

Voir Dire

1    THE COURT:   Okay.   And how long has he been doing that?

2    PROSPECTIVE JUROR:   35, 40 years.   I don't know

3    exactly.   I think he started in '72.

4    THE COURT:   What about you?  Do you work outside the

5    home?

6    PROSPECTIVE JUROR:   I'm retired now.

7    THE COURT:   From where?

8    PROSPECTIVE JUROR:   Beloit Corporation.   Beloit,

9    Wisconsin.

10   THE COURT:   What did you do for then?

11   PROSPECTIVE JUROR:   I was an administrative assistant,

12   executive secretary.

13   THE COURT:   How long did you do that?

14   PROSPECTIVE JUROR:   27 and a half years.   Then they

15   went under, you know.   Then I worked at a couple of other places

16   just for short times.

17   THE COURT:   But the same kind of job, though?

18   PROSPECTIVE JUROR:   Yes, sir.

19   THE COURT:   You have two close friends who are retired

20   police officers with the Rockford City Police Department.

21   PROSPECTIVE JUROR:   They're friends, but I wouldn't

22   call them close.   I don't tell them my secrets.

23   THE COURT:   Okay.   And then you've got a neighbor who's

24   a deputy sheriff.

25   PROSPECTIVE JUROR:   Yeah.   One friend who is a retired

## Voir Dire

1  policeman, and the neighbor is a deputy sheriff.

2  THE COURT: Okay. You've heard the same question that

3  I asked you when somebody has a connection with law enforcement,

4  and that is, you know, it may be that after sitting as a juror

5  in this case, you'll decide that the defendant is not guilty.

6  And so, I want to make sure that you wouldn't feel sheepish or

7  uncomfortable about telling your friend or your neighbor that

8  you were on a jury that found a defendant not guilty.

9  PROSPECTIVE JUROR: No. And I probably wouldn't see

10  them to tell them, anyway.

11  THE COURT: All right. Have you or an immediate family

12  member ever been involved as a party, witness, or otherwise in a

13  civil or criminal case?

14  PROSPECTIVE JUROR: No.

15  THE COURT: Have you or an immediate family member ever

16  been the victim of a crime?

17  PROSPECTIVE JUROR: No.

18  THE COURT: Arrested for a crime?

19  PROSPECTIVE JUROR: No.

20  THE COURT: Do you belong to any clubs or

21  organizations?

22  PROSPECTIVE JUROR: Yes. Rockford Photo Club, Rockford

23  Writers Guild, Stateline Mac Users Group, Paws Humane Society,

24  and Silver Sneakers.

25  THE COURT: What was the last one?

Voir Dire

1       PROSPECTIVE JUROR:  Silver Sneakers.

2       THE COURT:  Silver Sneakers?

3       PROSPECTIVE JUROR:  It's for us old people that can go

4   to the Y and have a free membership.

5       THE COURT:  Oh, that's great.

6       Can you promise me that you'll give the defendant and

7   the government a fair trial?

8       PROSPECTIVE JUROR:  Yes, sir.

9       THE COURT:  Any other things that I should know about

10  you that I don't that bears upon your ability to serve as a fair

11  and impartial juror?

12      PROSPECTIVE JUROR:  No, I don't think so.

13      THE COURT:  Okay.  Thank you, Kandie.  You can pass the

14  microphone back to Martin, please.

15      Martin, how old are you?

16      PROSPECTIVE JUROR:  44.

17      THE COURT:  And where were you raised?

18      PROSPECTIVE JUROR:  Polo, Illinois.

19      THE COURT:  Where do you live now?

20      PROSPECTIVE JUROR:  Sterling.

21      THE COURT:  How long have you lived in Sterling?

22      PROSPECTIVE JUROR:  Fifteen years.

23      THE COURT:  Live in a house there?

24      PROSPECTIVE JUROR:  Yes.

25      THE COURT:  Who's in the house with you?

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    PROSPECTIVE JUROR:  My wife and daughter.

2    THE COURT:  Do you have just one daughter?

3    PROSPECTIVE JUROR:  I have a son, too.

4    THE COURT:  Okay.  How old's your daughter?

5    PROSPECTIVE JUROR:  Nineteen.

6    THE COURT:  And does she go to school?

7    PROSPECTIVE JUROR:  Yeah, she's going to Indiana

8    Wesleyan.

9    THE COURT:  And your son, how old is he?

10   PROSPECTIVE JUROR:  He's 21, and he's a salesman for

11   Knie's Appliance.

12   THE COURT:  Does your wife work outside the home?

13   PROSPECTIVE JUROR:  Yes.  She works at -- she's a

14   manager at a deli in town.

15   THE COURT:  How long has she been doing that?

16   PROSPECTIVE JUROR:  Ten years.

17   THE COURT:  What about you?

18   PROSPECTIVE JUROR:  I work at Bay Valley Foods in

19   Dixon, and I do a little bit of farming on the side.

20   THE COURT:  How long have you worked -- what do you do

21   for Bay Valley Foods?

22   PROSPECTIVE JUROR:  Line operator.  We make soft serve

23   cheese for like Arby's and Taco Bell.

24   THE COURT:  How long have you been doing that?

25   PROSPECTIVE JUROR:  Ten years.

Voir Dire

1    THE COURT:   You have some guns at home?

2    PROSPECTIVE JUROR:   Yes.

3    THE COURT:   For what purpose?

4    PROSPECTIVE JUROR:   Just recreational.   Shooting
5  targets and hunting.

6    THE COURT:   How far have you gone in school?

7    PROSPECTIVE JUROR:   Twelfth grade.

8    THE COURT:   Do you have any difficulty reading or
9  understanding English?

10    PROSPECTIVE JUROR:   No.

11    THE COURT:   Have you or an immediate family member ever
12  been involved as a party, witness, or otherwise in a civil or
13  criminal case?

14    PROSPECTIVE JUROR:   No.

15    THE COURT:   Have you or an immediate family member ever
16  been the victim of a crime?

17    PROSPECTIVE JUROR:   No.

18    THE COURT:   Arrested for a crime?

19    PROSPECTIVE JUROR:   No.

20    THE COURT:   Do you belong to any clubs or
21  organizations?

22    PROSPECTIVE JUROR:   Just the farm bureau.

23    THE COURT:   Can you promise me that you'll give the
24  defendant and the government a fair trial?

25    PROSPECTIVE JUROR:   Yes.

**Voir Dire**

1        THE COURT:  Any other questions I haven't asked you

2 that I should be asking you that bear upon your ability to serve

3 as a fair and impartial juror?

4        PROSPECTIVE JUROR:  No.

5        THE COURT:  All right.  Thank you.  Can you pass that

6 microphone down to Peggy, please?

7        Good afternoon, Peggy.

8        PROSPECTIVE JUROR:  Hi there.

9        THE COURT:  How old are you?

10        PROSPECTIVE JUROR:  46.

11        THE COURT:  Where were you raised?

12        PROSPECTIVE JUROR:  Winslow, Illinois.

13        THE COURT:  Wasn't there somebody else here from

14 Winslow?

15        PROSPECTIVE JUROR:  Yeah, she's back there.  I didn't

16 know her before today.

17        THE COURT:  Where do you live now?

18        PROSPECTIVE JUROR:  McConnell, Illinois.

19        THE COURT:  And you live in a house?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  How long have you lived in that house?

22        PROSPECTIVE JUROR:  About 27 years.

23        THE COURT:  Who lives there with you?

24        PROSPECTIVE JUROR:  My husband and two children.

25        THE COURT:  Do you have any children outside the home?

Voir Dire

1    PROSPECTIVE JUROR:  No.

2    THE COURT:  What are the ages of your children?

3    PROSPECTIVE JUROR:  My daughter is 21.  My son is 17.

4    THE COURT:  Your son goes to school, I'm sure.

5    PROSPECTIVE JUROR:  Lena-Winslow.

6    THE COURT:  And your daughter?

7    PROSPECTIVE JUROR:  Attending Highland Community

8    College.

9    THE COURT:  What does your husband do for a living?

10   PROSPECTIVE JUROR:  Works at a car dealership in

11   Freeport in the service.  He's a service writer.

12   THE COURT:  And what about you?  Do you work outside

13   the home?

14   PROSPECTIVE JUROR:  I do.  I work at the same car

15   dealership.  I'm the administrative assistant to the owner.

16   THE COURT:  How long have you worked there?

17   PROSPECTIVE JUROR:  27 years.

18   THE COURT:  Your husband, too?

19   PROSPECTIVE JUROR:  Sixteen there, but he's been in the

20   auto business for about the same length I have.

21   THE COURT:  You own some guns?

22   PROSPECTIVE JUROR:  Yep.

23   THE COURT:  For what purpose?

24   PROSPECTIVE JUROR:  Hunting.

25   THE COURT:  What do you hunt?

Voir Dire

1    PROSPECTIVE JUROR:  Deer.

2    THE COURT:  How far have you gone in school?

3    PROSPECTIVE JUROR:  Twelfth grade.

4    THE COURT:  Have any difficulty reading or

5 understanding English?

6    PROSPECTIVE JUROR:  No.

7    THE COURT:  Have you or an immediate family member ever

8 served in the military?

9    PROSPECTIVE JUROR:  My father was in the Army.

10    THE COURT:  What kind of job did he have?

11    PROSPECTIVE JUROR:  He never spoke about it.  And I

12 have two nephews that were in the Navy.

13    THE COURT:  Do you know what kind of jobs they had?

14    PROSPECTIVE JUROR:  One nephew has been out for about

15 three years, and he was computer, and the other nephew is in

16 Texas right now, and he is maintenance.

17    THE COURT:  Martin, did I ever ask you if anybody in

18 your family has been in the military?

19    PROSPECTIVE JUROR:  I have a brother-in-law that

20 retired from the Air Force.

21    THE COURT:  What kind of job did he have?

22    PROSPECTIVE JUROR:  I'm not sure what it was.  It had

23 something to do with the jets.

24    THE COURT:  All right.

25    Peggy, have you or an immediate family member ever been

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    involved as a party, witness, or otherwise in a civil or

2    criminal case?

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  Have you or an immediate family member ever

5    been the victim of a crime?

6            PROSPECTIVE JUROR:  Yeah.

7            THE COURT:  Can you tell me about that?

8            PROSPECTIVE JUROR:  One of my sisters was molested.

9            THE COURT:  And was the person who did this caught?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  And what happened?  I assume it was a male.

12           PROSPECTIVE JUROR:  Jail.

13           THE COURT:  Went to jail?

14           PROSPECTIVE JUROR:  (Nodding.)

15           THE COURT:  Do you feel that matter was handled

16   appropriately by the authorities?

17           PROSPECTIVE JUROR:  It was about 40 years ago.  So, I'm

18   not real familiar with it, but yes.

19           THE COURT:  How long ago did you say?

20           PROSPECTIVE JUROR:  About 40 years ago.

21           THE COURT:  Does that affect your ability to serve as a

22   fair and impartial juror in this case?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  Have you or an immediate family member ever

25   been arrested for a criminal offense?

## Voir Dire

1    PROSPECTIVE JUROR:  No.

2    THE COURT:  Do you belong to any clubs or

3  organizations?

4    PROSPECTIVE JUROR:  I'm a member of the United

5  Methodist Church, and I serve on the township board.  I'm the

6  clerk.

7    THE COURT:  Can you promise me that you'll give the

8  defendant and the government a fair trial?

9    PROSPECTIVE JUROR:  Yes.

10    THE COURT:  Anything else you want to tell me that

11  bears upon your ability to serve as a fair and impartial juror?

12    PROSPECTIVE JUROR:  I don't believe so.

13    THE COURT:  Thank you.

14    Kandie, is there something else you wanted to say?

15    PROSPECTIVE JUROR:  You didn't ask me, but my husband

16  was in the National Guard before we were married.

17    THE COURT:  Okay.  Do you know what kind of job he did?

18    PROSPECTIVE JUROR:  I think maybe a grunt.

19    THE COURT:  Okay.

20    PROSPECTIVE JUROR:  You know, he was PFC or something.

21    THE COURT:  Virginia, did I ask you that military

22  question?

23    PROSPECTIVE JUROR:  Me?

24    THE COURT:  Yes.

25    PROSPECTIVE JUROR:  Yes.

## Voir Dire

1    (The following proceedings were had at the sidebar, out of

2        the presence and hearing of the jury:)

3            THE COURT:   Any follow-up questions?

4            MR. KARNER:   Not from us.

5            MR. CAVER:   No.

6            THE COURT:   Any challenges for cause?

7            MR. KARNER:   Not from us.

8            MR. CAVER:   No.

9            THE COURT:   As to juror number one, does the defense

10   accept or reject?  Or I'm sorry.   The government.

11           MR. KARNER:   We accept.

12           THE COURT:   Defense?  Virginia Allen.

13           MR. CAVER:   We reject.

14           THE COURT:   Juror number two, does the defense accept

15   or reject?  That's Kandie Bott.

16           MR. CAVER:   I'm sorry, Judge.   I apologize.   I'm

17   confused.

18           THE COURT:   Take a moment.

19           MR. CAVER:   May I just briefly?  I'm sorry.

20       (Brief pause.)

21           MR. CAVER:   Thank you, Judge.   Number two the defense

22   rejects.

23           THE COURT:   So, you're rejecting Allen and Bott, one

24   and two.

25           MR. CAVER:   That's correct, yes.

Voir Dire

1    THE COURT:  Juror number seven.  Does the government

2  accept or reject?

3    MR. KARNER:  Accept, your Honor.

4    THE COURT:  Defense?

5    MR. CAVER:  Reject.

6    THE COURT:  And juror number ten, does the defense

7  accept or reject?

8    MR. CAVER:  We reject.

9    THE COURT:  You've used up nine of your perenptories.

10    MR. CAVER:  Yes.

11  (The following proceedings were had in open court, in the

12    presence and hearing of the jury:)

13    THE COURT:  Ladies, you'll all be excused.  Martin, I

14  wasn't looking at you.  You'll be excused, too.  Thank you,

15  folks, for your time, your effort, and your trouble.  We

16  certainly appreciate the sacrifice you've made.

17    Susan, would you please call four more randomly

18  selected names?

19    THE CLERK:  Darsey Montgomery, M-o-n-t-g-o-m-e-r-y, row

20  one, seat one.  Karen Robbel, R-o-b-b-e-l, row one, seat two.

21  Edward Fujimoto, F-u-j-i-m-o-t-o, row two, seat one.  Brenda

22  Hoffman, H-o-f-f-m-a-n, row two, seat four.

23    THE COURT:  Darsey, how old are you?

24    PROSPECTIVE JUROR:  39.

25    THE COURT:  And where were you raised?

Voir Dire

1      PROSPECTIVE JUROR:   In Utah and in Colorado.

2      THE COURT:   Where do you live now?

3      PROSPECTIVE JUROR:   In Belvidere, Illinois.

4      THE COURT:   Do you live in a house?

5      PROSPECTIVE JUROR:   Yes.

6      THE COURT:   How long have you lived there?

7      PROSPECTIVE JUROR:   Nine and a half years.

8      THE COURT:   Who lives there with you?

9      PROSPECTIVE JUROR:   My husband and four girls.

10     THE COURT:   Do you have any children outside the home?

11     PROSPECTIVE JUROR:   No.

12     THE COURT:   What are the ages and occupations -- I

13     don't need to know what the ages are.  We'll talk about the

14     occupations.  We'll find out how old they are.

15     PROSPECTIVE JUROR:   Nineteen, and she just finished

16     beauty college.  So, she's not working.  And then 17, and she's

17     a student, and she is a waitress.  And the other two are 14 and

18     11, and they are students.

19     THE COURT:   You say your husband lives at home with

20     you?

21     PROSPECTIVE JUROR:   Correct.

22     THE COURT:   What does your husband do for a living?

23     PROSPECTIVE JUROR:   He's a maintenance technician.

24     THE COURT:   And how long has he been doing that?

25     PROSPECTIVE JUROR:   Five years.

Voir Dire

1       THE COURT:  What did he do before that?

2       PROSPECTIVE JUROR:  Maintenance on other machines, I

3 think, at other companies.

4       THE COURT:  What about you?  Do you work outside the

5 home?

6       PROSPECTIVE JUROR:  Yes.

7       THE COURT:  What do you do?

8       PROSPECTIVE JUROR:  I'm a school bus driver.

9       THE COURT:  How long have you been doing that?

10       PROSPECTIVE JUROR:  Six years.

11       THE COURT:  What about before that?  Did you work

12 outside the home?

13       PROSPECTIVE JUROR:  No.

14       THE COURT:  How far have you gone in school?

15       PROSPECTIVE JUROR:  A year in college.

16       THE COURT:  What did you study?

17       PROSPECTIVE JUROR:  Accounting.

18       THE COURT:  Do you have any difficulty reading or

19 understanding English?

20       PROSPECTIVE JUROR:  No.

21       THE COURT:  Have you or an immediate family member ever

22 served in the military?

23       PROSPECTIVE JUROR:  My grandfather in the Army and my

24 father in the Air Force.

25       THE COURT:  What kind of jobs did they have?

Voir Dire

1    PROSPECTIVE JUROR:  I'm not sure about my grandfather,
2    but my father was in aviation in the Air Force.
3    THE COURT:  Did he fly planes or work on planes?
4    PROSPECTIVE JUROR:  He worked in the cockpit of the
5    military planes.
6    THE COURT:  Have you or an immediate family member ever
7    been involved as a party, witness, or otherwise in a civil or
8    criminal case?
9    PROSPECTIVE JUROR:  No.
10   THE COURT:  Have you or an immediate family member ever
11   been the victim of a crime?
12   PROSPECTIVE JUROR:  No.
13   THE COURT:  Arrested for a crime?
14   PROSPECTIVE JUROR:  No.
15   THE COURT:  Do you belong to any clubs or
16   organizations?
17   PROSPECTIVE JUROR:  No.
18   THE COURT:  Can you promise me that you'll give the
19   defendant and the government a fair trial?
20   PROSPECTIVE JUROR:  Yes.
21   THE COURT:  Any other questions that I haven't asked
22   you that I should be asking you that bear upon your ability to
23   serve as a fair and impartial juror?
24   PROSPECTIVE JUROR:  No.
25   THE COURT:  All right.  Thank you.  Would you let me

Voir Dire

1    talk to Karen for a moment?

2              Karen, how old are you?

3              PROSPECTIVE JUROR:   59.

4              THE COURT:   How do you pronounce your last name?

5              PROSPECTIVE JUROR:   Robbel.

6              THE COURT:   Where were you raised?

7              PROSPECTIVE JUROR:   Rockford.

8              THE COURT:   Where do you live now?

9              PROSPECTIVE JUROR:   Winnebago.

10             THE COURT:   You live in a house?

11             PROSPECTIVE JUROR:   Yes, I do.

12             THE COURT:   For how long?

13             PROSPECTIVE JUROR:   30 years.

14             THE COURT:   And who lives there with you?

15             PROSPECTIVE JUROR:   My husband.

16             THE COURT:   And what's he do for a living?

17             PROSPECTIVE JUROR:   He's a retired firefighter.

18             THE COURT:   How long has he been retired?

19             PROSPECTIVE JUROR:   One year.

20             THE COURT:   And what department did he retire from?

21             PROSPECTIVE JUROR:   Rockford.

22             THE COURT:   How about you?  Do you work outside the

23    home?

24             PROSPECTIVE JUROR:   I am an elementary school teacher.

25             THE COURT:   And how long have you been doing that?

Voir Dire

1        PROSPECTIVE JUROR:  About 20 years.

2        THE COURT:  Where did you get your degree?

3        PROSPECTIVE JUROR:  Rockford College.

4        THE COURT:  Do you have any difficulty reading or

5    understanding English?

6        PROSPECTIVE JUROR:  No, I do not.

7        THE COURT:  Do you have any children?

8        PROSPECTIVE JUROR:  I have three.  My son is 34.  He is

9    an administrative assistant.  My other son is 30.  He is also a

10   Rockford firefighter.  And my daughter is a homemaker.  She's

11   29.

12       THE COURT:  Have you or anyone in your immediate family

13   ever served in the military?

14       PROSPECTIVE JUROR:  Yes.  My son served in the Navy for

15   four years.

16       THE COURT:  And what kind of job did he have?

17       PROSPECTIVE JUROR:  He was a firefighter on the boat.

18       THE COURT:  And was there somebody else?

19       PROSPECTIVE JUROR:  My son-in-law is in the Army.

20       THE COURT:  Right now?

21       PROSPECTIVE JUROR:  Right now.

22       THE COURT:  What kind of job does he have?

23       PROSPECTIVE JUROR:  He's a specialist in field

24   artillery.  And my nephew just got out of the Army.  He was a

25   helicopter mechanic.

Voir Dire

1        THE COURT:  Have you or an immediate family member ever

2  been involved as a party, witness, or otherwise in a civil or

3  criminal case?

4        PROSPECTIVE JUROR:  My husband served on a grand jury

5  for six months.  He was also called as a witness for various

6  calls through the department as a firefighter.

7        THE COURT:  Right.  Did you say -- how was he involved

8  in a case with that?

9        PROSPECTIVE JUROR:  To come as a witness to what

10  happened.

11        THE COURT:  Oh, I see.  All right.

12        Have you or an immediate family member ever been the

13  victim of a crime?

14        PROSPECTIVE JUROR:  No.

15        THE COURT:  Arrested for a crime?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  Do you belong to any clubs or

18  organizations?

19        PROSPECTIVE JUROR:  Nothing other than educational.

20        THE COURT:  Can you promise me that you'll give the

21  defendant and the government a fair trial?

22        PROSPECTIVE JUROR:  Yes.

23        THE COURT:  Any other questions that I haven't asked

24  you that I should be asking you that bear upon your ability to

25  serve as a fair and impartial juror?

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Okay.  Thank you.  Pass the microphone to

3   Edward, please.

4          Is it Fujimoto?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Edward, how old are you?

7          PROSPECTIVE JUROR:  71.

8          THE COURT:  And where were you raised?

9          PROSPECTIVE JUROR:  Seabrook, New Jersey.  Born in

10  California.

11         THE COURT:  And where do you live now?

12         PROSPECTIVE JUROR:  Rockford.

13         THE COURT:  Live in a house?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  And how long have you lived there?

16         PROSPECTIVE JUROR:  This house about 22 years.  Been in

17  Rockford for about 39.

18         THE COURT:  Who lives there with you?

19         PROSPECTIVE JUROR:  My wife and our oldest daughter.

20         THE COURT:  Does your wife work outside the home?

21         PROSPECTIVE JUROR:  No, she's retired.

22         THE COURT:  Retired from what?

23         PROSPECTIVE JUROR:  Well, mostly homemaker, but early

24  on she was a clerk, did some clerical.

25         THE COURT:  A clerk?

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1      PROSPECTIVE JUROR:   Clerical work for like Prudential.

2      THE COURT:   What do you do for a living?

3      PROSPECTIVE JUROR:   I'm a chemist.

4      THE COURT:   And how long have you been a chemist?

5      PROSPECTIVE JUROR:   Oh, since '64, I guess, or '65.

6      THE COURT:   And you say you have a daughter at home?

7      PROSPECTIVE JUROR:   Yes.

8      THE COURT:   And how old is she?

9      PROSPECTIVE JUROR:   She's 42.

10     THE COURT:   And does she work?

11     PROSPECTIVE JUROR:   Yes.

12     THE COURT:   As what?

13     PROSPECTIVE JUROR:   She's a dietary aide for Alma

14     Nelson or Alden Nursing Home.

15     THE COURT:   I assume you have other children outside

16     the home?

17     PROSPECTIVE JUROR:   Yes, I have two other daughters.

18     One's a teacher in the Rockford School District.  She's been

19     teaching since '94.  And I have a younger daughter.  She's 33,

20     and she's in California.  She's a teacher by trade, but now

21     she's into fashion design, and she's working for a company

22     called Lamp in a Box.

23     THE COURT:   You think you may know Meehan; is that

24     right?

25     PROSPECTIVE JUROR:   When I worked at Pierce Chemical, I

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1   thought he was working -- I thought the name sounds familiar.

2   We played some baseball together maybe.

3          THE COURT:  Is there anything about that relationship,

4   if it does exist, that would affect your ability to be a fair

5   and impartial juror?

6          PROSPECTIVE JUROR:  No.  I think if this is the Mike

7   Meehan I know, I think his father also sold me a car when he

8   worked at Strandquist.

9          THE COURT:  You don't hold anything against him, do

10  you?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  All right.  How far have you gone in

13  school?

14         PROSPECTIVE JUROR:  I got a Master's in chemistry.

15         THE COURT:  Do you have any difficulty reading or

16  understanding English?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Have you or an immediate family member ever

19  served in the military?

20         PROSPECTIVE JUROR:  Yes.  Not myself, but three

21  brothers.  Two were in the Army.  They retired as 89, which is

22  30 years.  And then I have a younger brother that was in the

23  Navy.  He was an officer for ten years.  And then I have --

24         THE COURT:  Let me ask you about your brothers.  What

25  kind of jobs did they do?

Voir Dire

1    PROSPECTIVE JUROR:  One was communication, microwave

2    communication.  The other one was in computers, in computer

3    programming.  And then the officer -- well, he was an officer in

4    the Navy.  And then I have one brother-in-law.  He was drafted,

5    and he fought in Vietnam  And then I have two nephews.  They're

6    both officers.  One's in the Marines, and the other is a -- he's

7    a commander, actually, of a nuclear sub.

8         THE COURT:  All right.  The brother-in-law who was in

9    Vietnam, what kind of job did he have, do you know?

10        PROSPECTIVE JUROR:  Well, he got drafted.  So, he was

11   just a foot soldier.

12        THE COURT:  And the Marine?

13        PROSPECTIVE JUROR:  Marines.  He's an officer.  He's at

14   the Pentagon right how.

15        THE COURT:  He's where?

16        PROSPECTIVE JUROR:  At the Pentagon.

17        THE COURT:  Is he involved in security or law

18   enforcement or anything like that?

19        PROSPECTIVE JUROR:  No.

20        THE COURT:  And then you have another brother or

21   another nephew?

22        PROSPECTIVE JUROR:  Yes.  He's a commander of a nuclear

23   sub.

24        THE COURT:  Okay.  Have you or an immediate family

25   member ever been involved as a party, witness, or otherwise in a

## Voir Dire

1    civil or criminal case?

2           PROSPECTIVE JUROR:   No.

3           THE COURT:   Have you or an immediate family member ever

4    been the victim of a crime?

5           PROSPECTIVE JUROR:   No.

6           THE COURT:   Arrested for a crime?

7           PROSPECTIVE JUROR:   No.

8           THE COURT:   Do you belong to any clubs or

9    organizations?

10          PROSPECTIVE JUROR:   Just the American Chemical Society.

11          THE COURT:   Can you promise me that you'll give the

12   defendant and the government a fair trial?

13          PROSPECTIVE JUROR:   Yes.

14          THE COURT:   Anything else I should know about you that

15   I don't that bears upon your ability to serve as a fair and

16   impartial juror?

17          PROSPECTIVE JUROR:   No.

18          THE COURT:   All right.   Could you pass the microphone

19   to Brenda, please?

20          Brenda, you've been here long enough, I think you know

21   all the questions.   I'm just going to write down the answers.

22          PROSPECTIVE JUROR:   That works.

23          THE COURT:   How old are you?

24          PROSPECTIVE JUROR:   47.

25          THE COURT:   And where were you raised?

Voir Dire

1        PROSPECTIVE JUROR:   Woodstock.

2        THE COURT:   And where do you live now?

3        PROSPECTIVE JUROR:   Huntley.

4        THE COURT:   How long have you lived there?

5        PROSPECTIVE JUROR:   24 years.

6        THE COURT:   Do you live in a house?

7        PROSPECTIVE JUROR:   Yes.

8        THE COURT:   And who's in the house with you?

9        PROSPECTIVE JUROR:   My husband.

10        THE COURT:   What's your husband do for a living?

11        PROSPECTIVE JUROR:   Cement mason.

12        THE COURT:   Pardon me?

13        PROSPECTIVE JUROR:   A cement mason.

14        THE COURT:   How long has he been doing that?

15        PROSPECTIVE JUROR:   33 years.

16        THE COURT:   What about you?  Do you work outside the

17   home?

18        PROSPECTIVE JUROR:   Yes.

19        THE COURT:   As what?

20        PROSPECTIVE JUROR:   I work for a court reporting

21   agency.

22        THE COURT:   How long have you been doing that?

23        PROSPECTIVE JUROR:   Two years.

24        THE COURT:   What did you do before that?

25        PROSPECTIVE JUROR:   I worked for a law firm

Voir Dire

1      THE COURT:  As what?

2      PROSPECTIVE JUROR:  Receptionist.

3      THE COURT:  Where was the law firm?

4      PROSPECTIVE JUROR:  Crystal Lake.

5      THE COURT:  What kind of work did they do?

6      PROSPECTIVE JUROR:  General practice.  Municipal.

7      THE COURT:  Have any criminal work?

8      PROSPECTIVE JUROR:  We were prosecuting attorneys for

9  several cities in the county.

10      THE COURT:  Obviously, this is a criminal case, and you

11  and your fellow jurors will have to decide the guilt or

12  innocence of a defendant.  Does that put you in any

13  uncomfortable or awkward position with your former employers?

14      PROSPECTIVE JUROR:  Not at all.

15      THE COURT:  You own some firearms?

16      PROSPECTIVE JUROR:  Yes.

17      THE COURT:  For what purpose?

18      PROSPECTIVE JUROR:  I have to say I just won them at a

19  raffle.

20      THE COURT:  So, you're not doing anything --

21      PROSPECTIVE JUROR:  No.

22      THE COURT:  Handguns or long?

23      PROSPECTIVE JUROR:  Shotguns, rifles.

24      THE COURT:  Well, congratulations.

25      And children?

## Voir Dire

1    PROSPECTIVE JUROR:   No.

2    THE COURT:   How far have you gone to school?

3    PROSPECTIVE JUROR:   Twelve years.

4    THE COURT:   Do you have any difficulty reading or

5    understanding English?

6    PROSPECTIVE JUROR:   No.

7    THE COURT:   Have you or an immediate family member ever

8    served in the military?

9    PROSPECTIVE JUROR:   No.

10   THE COURT:   Have you or an immediate family member ever

11   been involved as a party, witness, or otherwise in a civil or

12   criminal case?

13   PROSPECTIVE JUROR:   No.

14   THE COURT:   Have you or an immediate family member ever

15   been the victim of a crime?

16   PROSPECTIVE JUROR:   No.

17   THE COURT:   Arrested for a crime?

18   PROSPECTIVE JUROR:   No.

19   THE COURT:   Do you belong to any clubs or

20   organizations?

21   PROSPECTIVE JUROR:   No.

22   THE COURT:   Can you promise me that you'll give the

23   defendant and the government a fair trial?

24   PROSPECTIVE JUROR:   Absolutely.

25   THE COURT:   Anything else I should know about you that

## Voir Dire

1  I don't that bears upon your ability to serve as a fair and
2  impartial juror?
3          PROSPECTIVE JUROR:  No.
4          THE COURT:  Figure I know enough about you already.
5          PROSPECTIVE JUROR:  I think so.
6          THE COURT:  Parties meet me at sidebar, please?
7      (The following proceedings were had at the sidebar, out of
8      the presence and hearing of the jury:)
9          THE COURT:  Any follow-up questions?
10         MR. KARNER:  Not from us.
11         MR. CAVER:  Just briefly.  The lady who worked at the
12 law firm, usually private attorneys just do side prosecution for
13 basic traffic offenses.
14         THE COURT:  Yes.
15         MR. CAVER:  I just wanted to make sure that it was just
16 traffic offenses.
17         THE COURT:  I'll find out.  Who was that?  Brenda?
18         MR. CAVER:  In the light green shirt.
19     (The following proceedings were had in open court, in the
20     presence and hearing of the jury:)
21         THE COURT:  Brenda, this law firm that you worked at,
22 you say members of the firm were -- prosecuted for municipal
23 authorities?
24         PROSPECTIVE JUROR:  We were prosecutors for various
25 towns in the county.

Voir Dire

1    THE COURT:  Right.

2    PROSPECTIVE JUROR:  As in traffic petty offense.

3    THE COURT:  Right.  It wasn't any criminal offenses.

4    PROSPECTIVE JUROR:  No.  Just more traffic.

5    THE COURT:  All right.  Thank you.

6    (The following proceedings were had at the sidebar, out of

7    the presence and hearing of the jury:)

8    THE COURT:  Any challenges for cause?

9    MR. KARNER:  No.

10   MR. CAVER:  No.

11   THE COURT:  All right.  Juror number one, Darsey

12   Montgomery, does the government accept or reject?

13   MR. KARNER:  Accept.

14   THE COURT:  Defense?

15   MR. CAVER:  Accept.

16   THE COURT:  Juror number two, Karen Robbel, does the

17   defense accept or reject?

18   MR. CAVER:  Accept.

19   THE COURT:  Government?

20   MR. KARNER:  Accept.

21   THE COURT:  Juror number seven, Edward Fujimoto, does

22   the government accept or reject?

23   MR. KARNER:  Accept.

24   THE COURT:  Defense?

25   MR. CAVER:  Accept.

## Voir Dire

1        THE COURT:  And juror number ten, Brenda Hoffman.

2        MR. CAVER:  Accept, Judge.

3        MR. KARNER:  Accept.

4        THE COURT:  All right.  I'll excuse them  We'll go

5 into our alternates, and you each have one more peremptory

6 challenge, and then the ones you haven't used don't carry over.

7        MR. KARNER:  So, we only have one.

8        THE COURT:  You only have one for both alternates.  And

9 alternates will be seated in the order that they're selected.

10 In other words, if they're called to sit on the regular jury, it

11 will be the order that we accept them rather than the order that

12 they were called by Susan.

13        MR. CAVER:  All right.

14   (The following proceedings were had in open court, in the

15     presence and hearing of the jury:)

16        THE COURT:  All right, folks.  I'm going to ask you all

17 to take an oath as jurors to try this case.  Would you stand and

18 raise your right hand?

19   (Jurors duly sworn.)

20        THE COURT:  Okay.  Mr. Ferguson will take charge of

21 you.

22        Have a seat, folks.  We have a jury of twelve people,

23 but we have an additional task.  As I mentioned to you earlier,

24 we must select two alternate jurors.  Alternate jurors sit in

25 the jury box and receive evidence just as members of the primary

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1   jury.  If during the proceedings one of the members of the

2   primary jury becomes ill or incapacitated or is unable to

3   perform or is disqualified from performing his or her duties as

4   a juror, an alternate juror will be designated to serve in the

5   place of the excused juror.

6           With that in mind, Susan, would you please call two

7   more randomly selected names?

8           THE CLERK:  Betty Horn, H-o-r-n, row one, seat seven.

9   Thomas Dunn, D-u-n-n, row two, seat seven.

10          THE COURT:  Okay, Betty.  Did you get a microphone?

11          PROSPECTIVE JUROR:  I got a microphone.

12          THE COURT:  Can you tell me how old you are?

13          PROSPECTIVE JUROR:  64.

14          THE COURT:  And where were you raised?

15          PROSPECTIVE JUROR:  Dutchfield, Virginia.

16          THE COURT:  Where do you live now?

17          PROSPECTIVE JUROR:  Crystal Lake.

18          THE COURT:  Live in a house?

19          PROSPECTIVE JUROR:  Condo.

20          THE COURT:  How long have you lived there?

21          PROSPECTIVE JUROR:  Nineteen years.

22          THE COURT:  How long?

23          PROSPECTIVE JUROR:  Nineteen.

24          THE COURT:  Who lives there with you?

25          PROSPECTIVE JUROR:  Myself.

## Voir Dire

1    THE COURT:   Do you have any children?

2    PROSPECTIVE JUROR:   Two.

3    THE COURT:   And what are their ages, genders, and

4    occupations?

5    PROSPECTIVE JUROR:   Two girls.   38.   She works for

6    Chase Bank.   And the other one is 43, and she's a homemaker.

7    THE COURT:   What about your husband?

8    PROSPECTIVE JUROR:   Divorced.

9    THE COURT:   How long have you been divorced?

10   PROSPECTIVE JUROR:   26 years.

11   THE COURT:   And what did he do for a living?

12   PROSPECTIVE JUROR:   He worked for United Airlines.

13   THE COURT:   Do you work outside the home?

14   PROSPECTIVE JUROR:   Yes, I do.

15   THE COURT:   And what do you do?

16   PROSPECTIVE JUROR:   I'm a retail clerk.

17   THE COURT:   And how long have you been doing that?

18   PROSPECTIVE JUROR:   32 years.

19   THE COURT:   How far did you go in school?

20   PROSPECTIVE JUROR:   Twelfth grade and some college

21   classes.

22   THE COURT:   And what did you study in college?

23   PROSPECTIVE JUROR:   I took business law, real estate,

24   and early childhood education.

25   THE COURT:   Have any difficulty reading or

Voir Dire

1   understanding English?

2           PROSPECTIVE JUROR:   No.

3           THE COURT:   You have a connection with McHenry County.

4           PROSPECTIVE JUROR:   I served on a jury in McHenry

5   County at the Woodstock courthouse.

6           THE COURT:   All right.   And that was 20 years ago --

7           PROSPECTIVE JUROR:   Um-hm

8           THE COURT:   -- did you say?   What kind of case was it?

9           PROSPECTIVE JUROR:   Medical.

10          THE COURT:   So, it was a civil case.

11          PROSPECTIVE JUROR:   Yes.

12          THE COURT:   You understand that that case is very

13  different from the case that we're here on today.   And so, I

14  would want to make sure that you wouldn't let any of the things

15  that you learned in that case affect your ability to be a fair

16  and impartial juror in this case.

17          PROSPECTIVE JUROR:   No, I wouldn't.

18          THE COURT:   Other than a juror, have you or an

19  immediate family member ever been involved as a party, witness,

20  or otherwise in a civil or criminal case?

21          PROSPECTIVE JUROR:   No.

22          THE COURT:   Have you or an immediate family member ever

23  been the victim of a crime?

24          PROSPECTIVE JUROR:   Yes.

25          THE COURT:   Can you tell me about that?

Voir Dire

1          PROSPECTIVE JUROR:  Someone broke into our home while

2     we were on vacation.

3          THE COURT:  And when was that?

4          PROSPECTIVE JUROR:  In the seventies.

5          THE COURT:  Was that person ever caught?

6          PROSPECTIVE JUROR:  Yes.  It was three kids that lived

7     down the street from us.  They had to write us a letter of

8     apology, and they had to pay our deductible for our insurance to

9     replace the stolen items.

10         THE COURT:  Okay.  It sounds like it was a juvenile

11    case rather than a criminal case.

12         PROSPECTIVE JUROR:  Yeah.

13         THE COURT:  Do you feel it was handled appropriately by

14    the authorities?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Have you or an immediate family member ever

17    been arrested for a crime?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Do you belong to any clubs or

20    organizations?

21         PROSPECTIVE JUROR:  Yes.  I belong to First United

22    Methodist Church and Habitat for Humanity.

23         THE COURT:  Can you promise me that you'll give the

24    defendant and the government a fair trial?

25         PROSPECTIVE JUROR:  Yes.

Voir Dire

1      THE COURT:   Are there any questions that I haven't
2  asked you that I should be asking you that bear upon your
3  ability to serve as a fair and impartial juror?
4      PROSPECTIVE JUROR:   None that I know of.
5      THE COURT:   All right.   Could you pass that microphone
6  back to Thomas, please?
7      How old are you, Tom?
8      PROSPECTIVE JUROR:   59.
9      THE COURT:   Where were you raised?
10     PROSPECTIVE JUROR:   Oregon, Wisconsin.
11     THE COURT:   And where do you live now?
12     PROSPECTIVE JUROR:   Freeport.
13     THE COURT:   Do you live in a house?
14     PROSPECTIVE JUROR:   Yeah.
15     THE COURT:   And how long have you lived there?
16     PROSPECTIVE JUROR:   Eleven years.
17     THE COURT:   Who lives there with you?
18     PROSPECTIVE JUROR:   Wife and a daughter.
19     THE COURT:   How old's your daughter?
20     PROSPECTIVE JUROR:   Fourteen.
21     THE COURT:   Goes to school?
22     PROSPECTIVE JUROR:   Yes.
23     THE COURT:   Do you have any other children outside the
24  home?
25     PROSPECTIVE JUROR:   Two.

## Voir Dire

1  THE COURT:  And what are their ages, genders, and
2  occupations?

3  PROSPECTIVE JUROR:  A son 39, a pilot, commercial
4  pilot.  A daughter 24, bank teller.

5  THE COURT:  What do you do for a living?

6  PROSPECTIVE JUROR:  Farm manager.

7  THE COURT:  And how long have you been doing that?

8  PROSPECTIVE JUROR:  Seven years.

9  THE COURT:  What did you do before that?

10  PROSPECTIVE JUROR:  Truck driver.

11  THE COURT:  Does your wife work outside the home?

12  PROSPECTIVE JUROR:  Yes.

13  THE COURT:  As what?

14  PROSPECTIVE JUROR:  Retail clerk.

15  THE COURT:  How far did you go in school?

16  PROSPECTIVE JUROR:  Twelve.

17  THE COURT:  Do you have any difficulty reading or
18  understanding English?

19  PROSPECTIVE JUROR:  No.

20  THE COURT:  Have you or an immediate family member ever
21  served in the military?

22  PROSPECTIVE JUROR:  My father and my uncle.

23  THE COURT:  And your father, what branch of the Service
24  was he in?

25  PROSPECTIVE JUROR:  Army.

Voir Dire

1       THE COURT:   And what kind of job did he have?

2       PROSPECTIVE JUROR:   He was a cook.

3       THE COURT:   And your uncle?

4       PROSPECTIVE JUROR:   He's in the Navy.

5       THE COURT:   What did he do there?

6       PROSPECTIVE JUROR:   PT gunner.

7       THE COURT:   You have a nephew who's a detective for the

8  Department of Natural Resources?

9       PROSPECTIVE JUROR:   Yes.

10      THE COURT:   Now, it may be that after sitting as a

11  juror in this case, you would decide that the government did not

12  meet its burden of proof and that you would find the defendant

13  not guilty on one or more of the charges pending against him

14  Would that put you in an uncomfortable position with your

15  nephew?  In other words, would you feel that you had to explain

16  it to him or justify it to him?

17      PROSPECTIVE JUROR:   No.

18      THE COURT:   Do you own a gun?

19      PROSPECTIVE JUROR:   Yes.

20      THE COURT:   For what purpose?

21      PROSPECTIVE JUROR:   Hunting.

22      THE COURT:   What do you hunt?

23      PROSPECTIVE JUROR:   Anything.

24      THE COURT:   What kind of gun?

25      PROSPECTIVE JUROR:   I've got varmint guns for coyotes,

Voir Dire

1    rifles for deer, and shotgun for deer, turkeys, duck, geese.

2          THE COURT:   You served as a juror in a Stephenson

3    County criminal case?

4          PROSPECTIVE JUROR:   Yes.

5          THE COURT:   When was that?

6          PROSPECTIVE JUROR:   That was two years ago.   I was a

7    spokesperson for it.

8          THE COURT:   Was what?

9          PROSPECTIVE JUROR:   I was the head person.   They

10   elected me to be --

11         THE COURT:   Oh, the foreperson.

12         PROSPECTIVE JUROR:   Yes.

13         THE COURT:   What was the charge?

14         PROSPECTIVE JUROR:   What?

15         THE COURT:   What was the charge or the charges?

16         PROSPECTIVE JUROR:   Same as this.

17         THE COURT:   Same as this?

18         PROSPECTIVE JUROR:   Yes.

19         THE COURT:   Exactly the same?

20         PROSPECTIVE JUROR:   Yes.

21         THE COURT:   Well, I want to make sure that you

22   understand that that was a state case.   This is a federal case.

23   And even though the charges were similar, federal charges may be

24   different from the state charges and that the rules of evidence

25   are going to be different and the procedure is going to be

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    different.  And so, I want to make sure, Tom, that you don't let

2    your experience in that other case affect your ability to be a

3    fair and impartial juror in this case.

4            PROSPECTIVE JUROR:  No, it won't.

5            THE COURT:  Okay.  Other than a juror, have you or an

6    immediate family member ever been involved as a party, witness,

7    or otherwise in a civil or criminal case?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  Have you or an immediate family member ever

10   been the victim of a crime?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Have you or an immediate family member ever

13   been arrested for a crime?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Do you belong to any clubs or

16   organizations?

17           PROSPECTIVE JUROR:  NRA.

18           THE COURT:  Can you promise me that you'll give the

19   defendant and the government a fair trial?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Anything I haven't asked you that I should

22   be asking you that bears upon your ability to serve as a fair

23   and impartial juror?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  Parties meet me at sidebar, please.

Voir Dire

1          (The following proceedings were had at the sidebar, out of

2             the presence and hearing of the jury:)

3                    THE COURT:   Any other follow-up questions?

4                    MR. CAVER:   I would like to know what the verdict was

5      in the trial.

6                    MR. KARNER:   I don't think you do.   I haven't seen any

7      law on it, but I've always been taught from other judges that

8      that's not a fair question.

9                    THE COURT:   I'll ask.

10                    MR. KARNER:   Okay.

11          (The following proceedings were had in open court, in the

12             presence and hearing of the jury:)

13                    THE COURT:   Tom, what was the verdict in the trial that

14      you were a foreperson on?

15                    PROSPECTIVE JUROR:   Guilty.

16                    THE COURT:   On all charges?

17                    PROSPECTIVE JUROR:   All charges.

18                    MR. CAVER:   Okay.   Thank you.

19          (The following proceedings were had at the sidebar, out of

20             the presence and hearing of the jury:)

21                    THE COURT:   Any challenges for cause?

22                    MR. KARNER:   No.

23                    MR. CAVER:   No.

24                    THE COURT:   As to alternate juror number one, does the

25      government accept or reject?

Voir Dire

1     MR. KARNER:  Accept.

2     THE COURT:  Defense?

3     MR. CAVER:  Ms. Horn?

4     THE COURT:  Right.

5     MR. CAVER:  We accept.

6     THE COURT:  Alternate juror number two, does the

7     defense accept or reject?

8     MR. CAVER:  Reject.

9     (The following proceedings were had in open court, in the

10    presence and hearing of the jury:)

11    THE COURT:  Tom, you'll be excused.  Thank you very

12    much for your trouble, for your assistance.

13    Betty, I'm going to ask you to take an oath as a juror.

14    Would you raise your right hand?

15    (Juror duly sworn.)

16    THE COURT:  All right.  Have a seat.

17    Susan, would you call one more randomly selected name,

18    please?

19    THE CLERK:  Mary Volk, V-o-l-k, row two, seat seven.

20    THE COURT:  Mary, how old are you?

21    PROSPECTIVE JUROR:  65.

22    THE COURT:  You need to --

23    PROSPECTIVE JUROR:  65.

24    THE COURT:  Okay.  And where were you raised?

25    PROSPECTIVE JUROR:  Minnesota and Illinois.

## Voir Dire

1    THE COURT:  And where do you live now?

2    PROSPECTIVE JUROR:  Illinois.  Crystal Lake.

3    THE COURT:  Do you live in a house?

4    PROSPECTIVE JUROR:  Townhome.

5    THE COURT:  And who lives there with you?

6    PROSPECTIVE JUROR:  My dog.

7    THE COURT:  How old is she?

8    PROSPECTIVE JUROR:  My dog?

9    THE COURT:  I thought you said your daughter.  I'm glad

10   I didn't ask the occupation.

11   PROSPECTIVE JUROR:  My dog is almost nine.

12   THE COURT:  All right.  I won't ask the gender.

13   Do you have children outside the home?

14   PROSPECTIVE JUROR:  Yes.

15   THE COURT:  And what are their ages, genders, and

16   occupations?

17   PROSPECTIVE JUROR:  41, girl, teacher's aide.  39,

18   girl, flight attendant.  33, stay-at-home mom, tutor for

19   children.

20   THE COURT:  Your husband?

21   PROSPECTIVE JUROR:  He's deceased.

22   THE COURT:  How long has he been -- how long --

23   PROSPECTIVE JUROR:  Almost nine years.

24   THE COURT:  What did he do?

25   PROSPECTIVE JUROR:  He was a heavy equipment operator.

Voir Dire

1    THE COURT:   How far did you go in school?

2    PROSPECTIVE JUROR:   Twelfth grade and then a year of

3  secretarial school and a year of general classes at college.

4    THE COURT:   Okay.   Do you work outside the home?

5    PROSPECTIVE JUROR:   No.

6    THE COURT:   Have you worked in the last ten years?

7    PROSPECTIVE JUROR:   Yes.

8    THE COURT:   As what?

9    PROSPECTIVE JUROR:   Retail.

10   THE COURT:   Clerk?

11   PROSPECTIVE JUROR:   Yes.

12   THE COURT:   Do you have any difficulty reading or

13  understanding English?

14   PROSPECTIVE JUROR:   No.

15   THE COURT:   Have you or an immediate family member ever

16  served in the military?

17   PROSPECTIVE JUROR:   My father did.

18   THE COURT:   Okay.   What branch of the service did your

19  father serve?

20   PROSPECTIVE JUROR:   He was in the Navy, a lieutenant

21  commander.

22   THE COURT:   And then your husband?

23   PROSPECTIVE JUROR:   He served in Vietnam as a machine

24  operator, heavy equipment.

25   THE COURT:   You have a family friend who's an officer

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1   in the Elgin Police Department?

2             PROSPECTIVE JUROR:  Yes.  He's a detective.

3             THE COURT:  When you say a family friend, how close is

4   he to the family?

5             PROSPECTIVE JUROR:  Oh, we've known him since my kids

6   were little.  He grew up with my kids.  I also forgot to say I

7   have two nephews in the Springfield Police Department.  They're

8   undercover and a narcotics officer.

9             THE COURT:  Okay.  How often do you have contact with

10  this family friend from Elgin?

11            PROSPECTIVE JUROR:  It varies.  A couple times a year.

12            THE COURT:  When you have contact with him, does he

13  talk about his job?

14            PROSPECTIVE JUROR:  On occasion, but not no detail,

15  really.

16            THE COURT:  All right.  And how about your nephews?

17  How often do you have contact with them?

18            PROSPECTIVE JUROR:  I have contact with them through

19  the mothers.  So, not really that much.

20            THE COURT:  Not with them

21            PROSPECTIVE JUROR:  No.

22            THE COURT:  Do their mothers talk about their sons'

23  jobs?

24            PROSPECTIVE JUROR:  Occasionally.

25            THE COURT:  If you sat as a juror in this case and you

PDF created with pdfFactory trial version www.pdffactory.com

Voir Dire

1    determined that the government failed to meet its burden of

2    proof and that the defendant was not guilty of one of more of

3    these charges, would that put you in an uncomfortable or awkward

4    position in regard to either your family friend or the nephews

5    or their mothers?

6                PROSPECTIVE JUROR:   I don't think so.

7                THE COURT:   Do you feel like you'd have to justify or

8    explain?

9                PROSPECTIVE JUROR:   No.

10               THE COURT:   Would the fact that you have a family

11   friend who's an officer and nephews who are police detectives

12   affect in any way your ability to serve as a fair and impartial

13   juror in this case?

14               PROSPECTIVE JUROR:   No.

15               THE COURT:   Have you or an immediate family member ever

16   been involved as a party, witness, or otherwise in a civil or

17   criminal case?

18               PROSPECTIVE JUROR:   No.

19               THE COURT:   Have you or an immediate family member ever

20   been the victim of a crime?

21               PROSPECTIVE JUROR:   No.

22               THE COURT:   Arrested for a crime?

23               PROSPECTIVE JUROR:   No.

24               THE COURT:   Have you or an immediate family member --

25   I'm sorry.   Do you belong to any clubs or organizations?

Voir Dire

1    PROSPECTIVE JUROR:   No.

2    THE COURT:   Can you promise me that you'll give the

3    defendant and the government a fair trial?

4    PROSPECTIVE JUROR:   Yes.

5    THE COURT:   Any other questions I haven't asked you

6    that I should be asking you that bear upon your ability to serve

7    as a fair and impartial juror?

8    PROSPECTIVE JUROR:   No.

9    THE COURT:   Okay.   Thank you.

10    (The following proceedings were had at the sidebar, out of

11       the presence and hearing of the jury:)

12    THE COURT:   Any follow-up questions?

13    MR. KARNER:   No.

14    MR. CAVER:   No.

15    THE COURT:   Challenges for cause?

16    MR. KARNER:   No.

17    MR. CAVER:   No.

18    THE COURT:   Does the government accept or reject?

19    MR. KARNER:   We accept.

20    MR. CAVER:   Accept.   Are we just going to break 'til

21    4:00, Judge?

22    THE COURT:   No.   No.   I think I can get these jurors in

23    early.   Is it possible we could get one of your witnesses back

24    in?

25    MR. KARNER:   We were talking about that.   I don't think

PDF created with pdfFactory trial version www.pdffactory.com

## Voir Dire

1  so, Judge.  I cut them loose until tomorrow morning.  I'm sorry.

2  We can at least get opening statements in, and we'll be done

3  early tomorrow.

4          THE COURT:  Okay.  Gosh.  Would have beens, could have

5  beens.  You know, we could have had a witness or two on.  But

6  it's my fault.  I let them go.

7          MR. KARNER:  We'll still be done early tomorrow.

8          THE COURT:  Okay.

9      (The following proceedings were had in open court, in the

10         presence and hearing of the jury:)

11          THE COURT:  All right.  Mary, I'm going to ask you to

12  take an oath as a juror to try this case.

13      (Juror duly sworn.)

14          THE COURT:  The rest of you are welcome to stay around

15  and watch, if you want, but you'll be excused.  Thank you very

16  much for your time, your effort, your sacrifice.  I know it

17  takes a lot for people who interrupt their lives in order to

18  help us in court, but I think it's pretty obvious that we

19  wouldn't be able to run the criminal justice system if it

20  weren't for people that were willing to discharge their civic

21  duty as you have.  It was nice to meet you all.  I hope you have

22  a great day.

23      (The following proceedings were had in open court, out of

24         the presence and hearing of the jury:)

25          THE COURT:  All right.  I think I can get the jurors

PDF created with pdfFactory trial version www.pdffactory.com

1     back by 3:30. Can we be ready at 3:30 to open?

2            MR. KARNER: Yes, sir.

3            THE COURT: And then after opening -- I'll give my

4     preliminary instructions to the jurors, you can open, and then

5     we'll break 'til tomorrow morning at 9:00 o'clock.

6            MR. KARNER: Thank you.

7            MR. CAVER: Thank you.

8            THE COURT: Court's in recess.

9            MR. CAVER: Judge, was the court planning to rule at

10     all on the hearing we had?

11            THE COURT: Right. I'll have it uploaded by the end of

12     the day.

13            MR. CAVER: Okay. So, we won't know before we give our

14     opening.

15            THE COURT: Maybe not.

16            MR. CAVER: Okay. But the ruling is now, as it stands

17     now, I can't mention anything about that.

18            THE COURT: Right.

19            MR. CAVER: Okay. Thank you, Judge.

20            THE COURT: I'll have it to you before 5:00 o'clock.

21            MR. CAVER: I wasn't rushing the court. I just wanted

22     to be clear.

23            THE COURT: And maybe before. It just depends on how

24     much progress I can make.

25            MR. CAVER: Thank you.

1      (Brief recess.)

2          THE COURT: All right. The jury is assembled. May we

3  bring them in, please?

4      (The following proceedings were had in open court, in the

5       presence and hearing of the jury:)

6          THE COURT: Hello again, everyone.

7          Now that you have been sworn, I will give you some

8  preliminary instructions to guide you in your participation in

9  the trial. It is your duty to determine the facts in this case.

10  You will then have to apply the law to those facts. You must

11  follow my instructions on the law whether you agree with them or

12  not. Nothing I say or do during the course of the trial is

13  intended to indicate nor should it be taken by you as indicating

14  what I think your verdict should be.

15          The evidence from which you will find the facts

16  consists of the testimony of the witnesses, documents, and other

17  things received into the record as exhibits and any facts the

18  lawyers stipulate to or that the court may direct you to find.

19  A stipulation is an agreement between the parties that certain

20  facts are true. You may consider these facts in arriving at

21  your verdict.

22          From time to time during the case, I may give you

23  instructions on the law that you are to follow and apply in

24  deciding the case. Statements and arguments by the lawyers are

25  not evidence and must not be considered by you as evidence.

1    Also, objections to questions are not evidence and must not be

2    considered by you as evidence.

3           Lawyers have an obligation to their clients to make an

4    objection when they believe evidence is being offered improperly

5    under the rules of evidence.  You should not be influenced by

6    the objection itself.

7           If the objection is sustained, ignore the question and

8    do not speculate on what the witness might have said or what the

9    question implies.  If the objection is overruled, treat the

10   answer like any other.

11          If you are instructed that some item of evidence is

12   received for a limited purpose only, you must follow that

13   instruction.

14          Testimony that the court excludes, strikes, or tells

15   you to disregard is not evidence and must not be considered by

16   you as evidence.  You must erase such testimony from your mind.

17   Our system of law is based on the principle that a jury will

18   decide the case on the evidence and the law that is applicable

19   to the case, not allowing sympathy, prejudice, fear, or public

20   opinion to influence its decision.

21          There are two kinds of evidence, direct and

22   circumstantial.  Direct evidence is the direct proof of a fact,

23   such as the testimony of an eyewitness.  Circumstantial evidence

24   is the proof of facts from which you may infer or conclude that

25   other facts exist.  The law makes no distinction as to the

1   weight to be given either type of evidence.  I will give you

2   further instructions on these, as well as other matters, at the

3   end of the case, but remember you may consider both types of

4   evidence.

5          It will be up to you to decide which witnesses to

6   believe, which witnesses not to believe, and how much of any

7   witness' testimony to accept or reject.  I will give you some

8   guidelines for determining the credibility of witnesses at the

9   end of the case.

10          As you know, this is a criminal case.  There are

11  certain basic rules about a criminal case that you must keep in

12  mind.  A defendant is presumed innocent until proven guilty.

13  The superseding indictment against a defendant brought by the

14  government is only an accusation, nothing more.  It is not proof

15  of guilt or anything else.  A defendant, therefore, starts with

16  a clean slate.  The burden of proof is on the government

17  throughout the case.  The government must prove a defendant's

18  guilt beyond a reasonable doubt.  A defendant has no burden to

19  prove his innocence or to present any evidence.

20          Let me make a few comments about your conduct as

21  jurors.  During the trial you are not to discuss the case among

22  yourselves or with anyone else or permit anyone to discuss it in

23  your presence.  When you retire to the jury room at the end of

24  the case to deliberate on your verdict, you will discuss the

25  case with the other jurors, but outside of your deliberations,

1    you simply are not to talk to anyone about this case.   This
2    includes your fellow jurors, your spouses, members of your
3    family and friends, any close confidantes that you may have.
4    Any other person is prohibited from having any communication
5    with you about this trial outside the courtroom

6            When you are not in the courtroom, you must not allow
7    anyone to communicate with you about the case or give you any
8    information about the case.   If someone tries to communicate
9    with you or if you overhear or learn any information about the
10   case, you must report that to me promptly.   You may tell your
11   family and your employer that you are sitting on a jury so that
12   you can explain that you have to be here in court.   However, you
13   must not communicate with them about the case until you have
14   returned your verdict.

15           All of the information that you will need to decide the
16   case will be presented here in court.   You may not look up,
17   obtain, or consider information from any outside source,
18   including research regarding the individuals involved in the
19   case.

20           When I say you may not obtain or consider any
21   information from outside sources and may not communicate with
22   anyone about the case, I am referring to any and all means by
23   which people communicate or obtain information.   This includes,
24   for example, face-to-face conversations, doing research, reading
25   dictionaries, reference, or other written materials, watching or

1    listening to reports in the news media, and using any electronic

2    device or media, such as a cell phone, smart phone, iPhone,

3    BlackBerry, or similar device, a computer, the Internet, e-mail,

4    text messaging, chat rooms, blogs, social networking websites

5    like Facebook, Twitter, or YouTube, or any other source of

6    information or communication at all.

7            If you hear, see, or receive any information about the

8    case by these or any other means, report that to me immediately.

9    There are two reasons for these rules.  First, it would not be

10   fair to the parties in the case for you to consider information

11   or communicate information about the case to others.  Second,

12   outside information may be incorrect or misleading.

13           Do not make any independent investigation of the case

14   by attempting any testing or going to any location where any of

15   the events in this case took place.  If you recognize a witness,

16   advise the court security officer immediately.

17           Finally, do not form any opinion until all the evidence

18   has been presented, the attorneys have made their arguments, and

19   I have instructed you on the law you are to follow and apply in

20   making your decision.  Keep an open mind until you start your

21   deliberation at the end of the case.  If any juror violates any

22   of these rules, please report that to me immediately.

23           You may choose to take notes during the course of this

24   trial.  You do not have to take notes.  That is entirely up to

25   you.  I have no preference one way or the other.  You may use

1    your notes to refresh your memory at the appropriate time.  Your

2    notes are for your own use only, not for any other juror's use.

3    No one will be allowed to look at your notes.  You should rely

4    on your own memory of the evidence.  This is so even if you or

5    someone else's notes conflict with your memory.  I meant to say

6    this is so even if your notes or someone else's notes conflict

7    with your memory.  Just because a juror has taken notes does not

8    mean his or her memory of the evidence has any more weight or

9    significance than the memory of a juror who has not taken notes.

10        Until you retire to the jury room to deliberate on your

11   verdict, your notes will not leave this courtroom  At the end

12   of the trial when you are discharged from further service in the

13   case, your notes will be collected and destroyed.  No one will

14   be allowed to look at your notes before they are destroyed.

15        During the trial it may be necessary for me to confer

16   with the attorneys out of your hearing in respect to matters of

17   law and in respect to other matters that require consideration

18   by the court alone.  I will either send you back to the jury

19   room or listen to the attorneys in the courtroom, but not within

20   your hearing.

21        When such conferences occur, they will be conducted so

22   as to consume as little of your time as may be consistent with

23   an orderly and fair disposition of this case.  In order to

24   conserve juror time, we frequently have these conferences when

25   you are not in the courtroom at the beginning and the end of the

PDF created with pdfFactory trial version www.pdffactory.com

1  court day.

2        If at any time you cannot hear what is being said in

3  court, please let me know immediately by raising your hand or

4  getting my attention by some other means. I will have a

5  statement repeated, or I will have the court reporter read the

6  statement back to you. It is important that you hear everything

7  that is said.

8        Jurors are not permitted to ask questions of the

9  witness. Please do not talk among yourselves during proceedings

10  in court.

11        I also ask that you do not have any contact with the

12  lawyers in this case or with any of the parties or witnesses.

13  This includes any kind of conversation. I have asked the

14  lawyers not to communicate with you. So, if you see them around

15  the building and if they don't talk to you, please don't think

16  they are being rude, insensitive, impolite, or disrespectful.

17  They are merely following my instructions.

18        The trial will now begin. First the government will

19  make an opening statement. Next the defense attorney may, but

20  does not have to make an opening statement. Opening statements

21  are simply an outline to determine or to help you understand the

22  evidence. They are not evidence. They are not your instruction

23  on the law. The government will then call its witnesses, and

24  counsel for the defendant may cross-examine them Following the

25  government's case, the defendant may, if he wishes, call

PDF created with pdfFactory trial version www.pdffactory.com

### Karner - Opening Statement

1    witnesses whom the government can cross examine.  After all the

2    evidence has been presented, the attorneys will give their

3    closing arguments to summarize and interpret the evidence for

4    you, and I will instruct you on the law.  After that, you will

5    retire to deliberate on your verdict.

6              Please listen carefully to the witnesses when they

7    testify.  Although the court reporter is taking notes now, these

8    are not immediately available in a verbatim transcript, and,

9    therefore, you must remember the testimony for your

10   deliberations at the end of the case.

11             If you wish to take notes, the court security officer

12   will give you a notebook.  If you take a notebook, please write

13   your name on the cover and place them on your seat whenever you

14   leave the courtroom  Mr. Ferguson.

15   (Brief pause.)

16             THE COURT:  Mr. Karner, you may open.

17             MR. KARNER:  Thank you.

18             OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

19             MR. KARNER:  Your Honor, counsel, Joe, Dan, ladies and

20   gentlemen of the jury.  On a summer night in 2011, July of 2011,

21   two Rockford Police plain-clothes detectives found themselves in

22   the right place at the right time.  You see, they conducted a

23   traffic stop on the defendant, and they found him in possession

24   of multiple packets of crack cocaine, 1.2 grams of crack

25   cocaine, and they found him in possession with the tools of the

PDF created with pdfFactory trial version www.pdffactory.com

## Karner - Opening Statement

1    drug dealer's trade, a gun to protect his operation, his

2    inventory, and his proceeds, a cell phone to make sales calls

3    and market his business, and $260 in cash, the profits of the

4    drug dealer's trade.

5            By catching the defendant with these items, the

6    officers will present to you evidence that shows that the

7    defendant committed the crime of possessing with intent to

8    distribute cocaine base, another way of saying crack cocaine,

9    possession of a firearm as a felon, and possession of a firearm

10   in furtherance of a drug trafficking crime.

11           To understand a little bit about where defendant was

12   found with these items, he was stopped in a residential

13   neighborhood just a few miles from the courthouse in the

14   southeast quadrant of Rockford.

15           You're going to learn about some people, many people in

16   this case, one of whom, the most important of whom, is a veteran

17   Rockford detective named Maurice Pruitt.  Detective Pruitt saw,

18   heard, and felt the defendant do everything he could to distance

19   himself between himself and this evidence, giving you subtle

20   clues about what was in his mind at the time he encountered the

21   police because it was Detective Pruitt who saw the defendant

22   reach in an area where that handgun was.  It was Detective

23   Pruitt who ordered the defendant to stay in his car, and the

24   defendant refused.  It was Detective Pruitt who saw the

25   defendant quickly roll up his driver's side window, quickly

PDF created with pdfFactory trial version www.pdffactory.com

### Karner - Opening Statement

1   close it, and quickly lock the door, to do everything he could

2   to prevent those officers from going in and searching the inside

3   of his car.  And it was Detective Pruitt who heard the defendant

4   lie about the reason for pulling into a certain driveway.

5            And you're going to learn about the defendant, who at

6   the time on July 6th, 2011, was a convicted felon, and he was

7   alone in this car, and he was alone in that car with crack

8   cocaine and the tools of the drug dealing trade.

9            Now, how is it that we come to be here today.  On

10   July 6th Detective Pruitt was working plain-clothes.  He had a

11   windbreaker on that showed he was a police officer, but he was

12   in an unmarked car with his partner, Kevin Nordberg.  It was

13   shortly before 7:30 that night.  They were just on routine

14   patrol in southeast Rockford in their unmarked car.  They had

15   heard a call go out of an unrelated armed robbery very close to

16   them, and they found themselves facing northbound on 8th Street

17   at the intersection of 8th Street and 10th Avenue in Rockford.

18   And they came up to the stop sign, and as they were facing

19   northbound, they see a Chevy Impala cross the intersection from

20   them headed southbound coming towards them or facing towards

21   them on 8th Street.

22            Detective Nordberg recognized this car from an

23   unrelated investigation that he had conducted just as recently

24   as the night before.  And so, he made a mental note of that, and

25   he saw the car make a left-hand turn right in front of him and

PDF created with pdfFactory trial version www.pdffactory.com

### Karner - Opening Statement

1  go eastbound on 10th Avenue.  They decide to follow the car, and

2  they pulled in behind it and watched as the car quickly turned

3  into a residential driveway without signaling.  Well, that's a

4  traffic offense.  And so, they activated the squad car's lights,

5  and they began one of the dangerous tasks of being a police

6  officer, and that is approaching this car not knowing what was

7  ahead.

8  Detective Nordberg took up a tactical position at the

9  back of the car, while Detective Pruitt approached the driver's

10  side window.  And as he approached the driver's side window, he

11  saw the lone occupant, the defendant, in the driver's seat, and

12  he was bending over with his right shoulder as if to place

13  something underneath the driver's seat of the car.

14  He walked up, and the window was down, and the

15  defendant -- or I'm sorry -- yeah.  The defendant tried quickly

16  rolling up the window, while opening the door and trying to get

17  out of the car.  Pruitt, for his safety, told the defendant to

18  stay in the car.  The defendant said, "Why?  I'm just trying to

19  go in my house."  Well, as the police would learn later, that

20  was a lie.  He didn't live at this address.  Pruitt said,

21  "Please just stay in the car."  The defendant got out.

22  Well, the defendant's much taller than Officer Pruitt,

23  and Pruitt was on alert, and as the defendant got out of the

24  car, he saw a police officer's worst nightmare.  He saw the

25  barrel of that handgun underneath -- protruding a little bit out

### Karner - Opening Statement

1   from underneath the driver's seat of the car.  He alerted his

2   partner to what he saw.

3           And the defendant quickly closed the door and locked

4   the door so that he was trying to prevent Pruitt from getting

5   into the car.  Pruitt told him to face the car and stood between

6   the -- he positioned himself on one side of the defendant, using

7   the car as a way to corral the defendant on the other side, and

8   tried to get the defendant handcuffed.  And police officers will

9   tell you, especially experienced ones, they can tell when a

10  person's going to resist by the way they tense their muscles,

11  and he felt, Pruitt did, when he tried to handcuff the

12  defendant, the defendant tense his muscles, and he tried to

13  handcuff the defendant so that Detective Pruitt and his partner,

14  Nordberg, could be safe.  But the defendant wouldn't have any of

15  it.  He didn't flail.  He didn't try and strike the officers.

16  He tensed his muscles in a way to prevent him from being

17  handcuffed.

18          Nordberg came over to assist Pruitt, and it took both

19  of them to finally get the defendant handcuffed.  And even after

20  he was handcuffed, they asked for the keys to his car so they

21  could search it and recover the handgun, but defendant wouldn't

22  give it up.  Finally, after persistent request after persistent

23  request, the defendant gave up the keys and was secured in a

24  nearby squad car.

25          The officers searched the car, and what they found in

### Karner - Opening Statement

1    the center console were eight packets of crack cocaine, and what

2    they found underneath the driver's seat of the car -- and, your

3    Honor, this gun is unloaded and safe, I should inform the

4    court -- they found this handgun with the barrel sticking out

5    from underneath the seat.

6        The defendant had $260 in cash on him, and he had the

7    cellular phone on him. The investigators continued to

8    investigate the case, and they searched the phone for the

9    evidence of any text messages, and what they found were a series

10   of text messages that made it clear the person in possession of

11   that phone was a drug dealer because people sending messages to

12   this phone commented as recently as the day before the

13   defendant's arrest, one phone sent a text message to the

14   defendant's phone that said, "That was some good," and I'm using

15   their wording, "shit." Another text message said, "I will pay

16   you Friday night for sure, and if you have good shit, I'll buy

17   more, too." And yet another text message said, "All right. You

18   should do me a 40, though, if possible." And two others sent on

19   July 5th said, quote, "How much is the prices? I get paid

20   Friday. You front me?" And you will learn from an expert in

21   drug trafficking that to front is to advance or deliver drugs

22   with a promise of future payment, loan him drugs, because drug

23   users don't always manage their money properly.

24        That's the evidence you're going to hear presented

25   tomorrow. We expect to wrap up our case in one day. And then

PDF created with pdfFactory trial version www.pdffactory.com

**Caver - Opening Statement**

1  the case -- you'll get the case as a jury, and we'll ask that

2  you find the defendant guilty of all three charges in the

3  superseding indictment.  Thank you.

4         THE COURT:  Mr. Caver.

5         OPENING STATEMENT ON BEHALF OF THE DEFENDANT

6         MR. CAVER:  Thank you, Judge Kapala.  Mr. Poke,

7  counsel, Agent Ivancich.  This case is important about what

8  you're going to hear, just as it's important about what you're

9  not going to hear.  I want you to listen very carefully to the

10  evidence and testimony in this case.  The court will instruct

11  you on the law at the end.  There's some things that we're going

12  to talk about in this case that none of us want to have

13  information about, none of us really enjoy talking about.

14         One of the things that I would note that wasn't

15  mentioned by the government is some of the history about

16  Detective Pruitt.  Detective Pruitt is a veteran Rockford police

17  detective.  We're not going to make a big deal about it, I'm not

18  going to spend too much time on it, but you are going to hear

19  that Detective Pruitt was at one point disciplined for

20  dishonesty.

21         Why is that important as you sit here today?  Because

22  the life of a person is in your hands today and will be

23  throughout this case.  You sit in judgment.  You must listen to

24  the evidence and the testimony, and you also are going to be

25  charged by the court to make a determination of character.

**Caver - Opening Statement**

1    Mr. Poke was a victim of a crime and suffered serious

2    injury as a result.  He's lost a large portion of the

3    functioning of his arm  You're going to hear testimony from

4    Detective Pruitt, the same Detective Pruitt I told you about

5    before, and you're going to hear a story by Detective Pruitt

6    about how my client, given his physical limitations, was able to

7    do a number of things in a very short period of time.

8    You're also going to hear that Detective Pruitt didn't

9    care how the defendant, Mr. Poke, was pulled over and

10   questioned.  He didn't care how that happened.  But you're going

11   to hear that Detective Pruitt was going to make sure that

12   happened one way or the other.  You're going to hear that, sure,

13   the reason that Detective Pruitt is going to testify that he did

14   pull the car over was because he failed to use a turn signal to

15   turn into a driveway.  I want you to think about that.  This man

16   in Rockford, Illinois, was pulled over, according to Detective

17   Pruitt, because he didn't use a turn signal when he turned into

18   a driveway.  That's going to be part of the story that Detective

19   Pruitt is going to tell you.

20   Another part of the story is that in the span of a

21   period of time that it took Detective Pruitt to get out of his

22   vehicle shortly after Mr. Poke pulled into the driveway,

23   Mr. Poke was able to do a number of things.  With significant

24   limitations physically, Mr. Poke was able to put something in

25   the center console of the car.  Mr. Poke was able to reach down

PDF created with pdfFactory trial version www.pdffactory.com

### Caver - Opening Statement

1   and fiddle with the gun, the barrel of which was sticking out,

2   not the hand piece.  He was also able to roll up the window.

3   Whether he did it with his hand or he reached around with his

4   right hand, he was able to do all of these things in just a

5   couple of moment's time.  And I'm going to want you to listen to

6   that same Detective Pruitt I was telling you about before.  I

7   want you to listen very carefully to what he says.

8           You're also going to hear testimony from Detective

9   Pruitt, the same one I told you about before, concerning what

10  was found on the floorboard of that vehicle that night Mr. Poke

11  was pulled over for not using a turn signal to turn into a

12  driveway.  You're going to hear testimony from that same

13  Detective Pruitt that a cell phone was located, and it was not

14  located on him  In fact, you're going to see a photograph, and

15  you're not going to see any cell phone in that car.  You're

16  going to hear Detective Pruitt say a cell phone was recovered.

17          You're also going to hear that it's Rockford Police

18  policy and procedure not to touch anything on a crime scene, an

19  alleged crime scene, without first photographing it.  You're

20  going to hear from Rockford Police Detective David Cone.  David

21  Cone came and took more photographs at that scene.  You're going

22  to see those photographs, and you're not going to see those

23  photographs match the testimony of some of the other officers.

24  You're going to hear that the reports written do not match up to

25  what was photographed in that car on that floorboard on that

## Caver - Opening Statement

1   day.   You're going to hear that from this same Detective Pruitt

2   that I was telling you about before.

3           The government in this case and in any criminal case

4   has the burden of proof.  That means as Mr. Poke sits here

5   today, ladies and gentlemen, he is not guilty of anything.  The

6   government has to show you through credible witness testimony --

7   and that means credible witness testimony from everyone,

8   including police officers -- that Mr. Poke is guilty beyond a

9   reasonable doubt.  The government has this burden throughout the

10  entire case that you're going to hear.

11          What won't you hear about it?  You're going to hear how

12  clearly that same Detective Pruitt I was telling you about

13  before saw the barrel of a gun sitting on the floorboard of that

14  car.  You won't hear any scientific testimony about it.  You

15  won't hear about any fingerprints.  You won't hear about any

16  DNA.  This gun that apparently was being used in furtherance of

17  a drug trafficking conspiracy doesn't have any latent prints.

18  It doesn't have any prints at all.  It doesn't have any DNA on

19  it.

20          The burden of proof remains with the government, ladies

21  and gentlemen.  It's their job to show you beyond a reasonable

22  doubt that somebody committed a crime.  What you won't hear is

23  you won't hear anything from the government about how Mr. Poke

24  knew that there was a gun in that car.  You're going to hear

25  that the drugs belonged to Mr. Poke.  But, again, ladies and

### Caver - Opening Statement

1    gentlemen, the burden of proof requires evidence beyond a

2    reasonable doubt that Mr. Poke was guilty.  And you're not going

3    to hear one single piece of evidence that Mr. Poke ever touched

4    or knew that that gun was present in that car on July 6th, 2012.

5    And, yes, Mr. Poke does require the same burden of proof and the

6    same responsibility by the prosecution to prove this case beyond

7    a reasonable doubt, and if the prosecution doesn't do that, then

8    you cannot find Mr. Poke guilty of anything.

9            As I said before, this case is going to be as much

10   about what you hear as what you don't, and that same Detective

11   Pruitt that I was telling you about before and some of those

12   things that we don't want to talk about because we don't want to

13   acknowledge them, you're going to be hearing these things from

14   his mouth because he was the first one on the scene, and he was

15   the first one who was determined to pull Mr. Poke over,

16   regardless of how that happened.

17           You're going to hear that it's common knowledge in the

18   Rockford Police Department that there is a no chase policy.

19   You're going to hear that part of the policy and procedures of

20   the Rockford Police Department is that they don't chase people

21   in high speed chases.  They just don't.  And we can all

22   speculate as to why that's the case, but they have a no chase

23   policy.  You're going to hear that Mr. Poke knew that they had a

24   no chase policy.

25           The prosecution talks about that same Detective Pruitt

**Caver - Opening Statement**

1    I was telling you about before being at the right place at the

2    right time to catch a drug conspiracy right in the midst.

3    Ladies and gentlemen, I submit to you there's some people that

4    were born at night, but just not last night.

5              MR. KARNER:   Judge, I object.   It's argument.

6              THE COURT:   Overruled.

7              MR. CAVER:   You're going to hear Mr. Poke knew that

8    there was a no chase policy.   It's common knowledge.   Why would

9    Mr. Poke have stopped his car?   Why?   Why wouldn't he have just

10   driven off?   8th Street and 10th Avenue?   He could have gone

11   anywhere.   It doesn't add up.

12             You're going to hear that the drugs belonged to

13   Mr. Poke.   Mr. Poke had a history of using drugs, and they were

14   his.   You're not going to hear any evidence that Mr. Poke ever

15   handled or knew that that firearm was in that car on that day.

16             Please hold the government to its burden of proof

17   according to the law as the judge will instruct you, and I

18   believe at the conclusion of the evidence and testimony in this

19   case, each and every one of you will return the right verdict

20   and the only verdict that will be supported by the evidence,

21   which is a verdict of not guilty with respect to possession of a

22   firearm in furtherance of a drug conspiracy or possession of

23   that firearm   And I want you to listen very carefully when you

24   listen to the evidence from that same Detective Pruitt that we

25   talked about before.   Thank you.

1    THE COURT:   Mr. Karner, you have some stipulations?

2    MR. KARNER:   Judge, I'd ask leave to read those

3    tomorrow when we begin the evidence.

4    THE COURT:   All right.   Folks, I'm going to release you

5    'til tomorrow morning.   Again, until you retire to the jury room

6    at the end of the case to deliberate on your verdict, you must

7    not discuss the case among yourselves or with anyone else or

8    permit anyone to discuss it in your presence.   You must not read

9    any newspaper articles or listen to any radio or television

10   broadcasts relating to this case.

11   Do not make any independent investigation of the case

12   by reading materials, doing any research, attempting any

13   testing, or going to any location where any of the events in

14   this case took place.   If anyone contacts you or attempts to do

15   so, either directly or indirectly, about this case, report that

16   to me immediately.

17   I'll need you available to come into the courtroom at

18   9:00 o'clock tomorrow morning.   That's when we're going to start

19   with witnesses.   If you wish, you can come here a little

20   earlier.   The Clerk's Office provides complimentary coffee and

21   donuts and rolls for jurors.   They'll have that for you at 8:30

22   in a place indicated by Mr. Ferguson.   If you wish to take

23   advantage of that, you're welcome to come in and have a cup of

24   coffee on the Clerk's Office, but, if not, I certainly need you

25   here at 9:00 o'clock so we can start.   It's important for you

PDF created with pdfFactory trial version www.pdffactory.com

1    all to assemble at the times that we indicate so we don't have

2    to delay anything any more than we have to.

3            Have a nice night.  I'll see you tomorrow morning.

4    Leave your notebooks on your chairs whenever you leave, now and

5    every other time you leave the courtroom  The only time you'll

6    be allowed to take those out of the courtroom is when you are

7    released to deliberate, and then, of course, you'll need your

8    notes with you to aid you in your deliberation.

9        (The following proceedings were had in open court, out of

10        the presence and hearing of the jury:)

11            THE COURT:   9:00 o'clock.

12            MR. KARNER:   Yes, sir.  We'll be here.

13            I wanted to bring up a matter.  I think it was

14    inappropriate in opening statement for the defendant's lawyer to

15    bring up or to make an issue of the subjective motivation of

16    Detective Pruitt in doing the stop.  That's not relevant.

17            MR. CAVER:   With all due respect to the government, the

18    government's opening statement was replete with instances of my

19    client -- what was in my client's head, talking about the drug

20    conspiracy and what my client was thinking and why he was

21    possessing the things that he did.  I didn't object because I

22    didn't feel that I wanted to lose any credibility with the jury,

23    but let's call a spade a spade.

24            MR. KARNER:   Well, I don't know what that means, Judge,

25    but one of the elements -- my comments about what the defendant

PDF created with pdfFactory trial version www.pdffactory.com

1    was thinking and the circumstantial evidence of the defendant's

2    state of mind are elements of the offense.  Those are by

3    definition relevant.  180 degrees to talk about the subject of

4    motivation, which even in a suppression hearing is not relevant,

5    but especially in the trial is not relevant.  Total different

6    concepts.  Elements of the offenses versus not.

7            THE COURT:  Does it have some connection with the

8    credibility, the believability of the witness who testifies?

9            MR. KARNER:  No, Judge, and you've already made that

10   finding in the suppression hearing that it was credible.  No,

11   absolutely not.  The question is did they see a traffic signal

12   or not.  Both him and Nordberg will testify that no traffic

13   signal was made.  It's a question of fact of whether or not the

14   signal was made, not the officers' subjective intention.  That's

15   not relevant.

16           THE COURT:  All right.  Well, brief it for me, if you

17   wish, give me some authority, and I'll make a decision on this

18   going forward.  I will instruct the jury at the close of the

19   case that what is said during opening statements is not

20   evidence.  If you think this requires for me to admonish them to

21   tell them to disregard some part of Mr. Caver's opening

22   statement, I'll consider that.  I really don't know what relief

23   you're asking for at this point.

24           MR. KARNER:  To prevent any questioning, any further

25   comment from this point going forward.  For instance, going into

1    it with Detective Pruitt.

2         MR. CAVER:  So, to prevent any questioning whatsoever

3    concerning the reason why Detective Pruitt pulled over Dayton

4    Poke that evening?

5         MR. KARNER:  Well, he can go into the traffic stop, but

6    anything beyond that.  I mean, the failure to signal, any other

7    subjective motive.

8         MR. PEDERSEN:  The motive of the officer looking for a

9    traffic violation is irrelevant, and the tone of his opening

10   statement is that he's going to ask Detective Pruitt questions

11   about why he wanted to pull that car over beyond a traffic

12   violation.

13        THE COURT:  But wait.  He can ask him why he pulled him

14   over.  He pulled it over because he didn't signal before going

15   into a driveway.

16        MR. PEDERSEN:  Right, but the motive -- he wants to go

17   into the motive of why Detective Pruitt was looking for a

18   traffic violation, and that's not relevant to any of the issues

19   in this case.

20        MR. KARNER:  The reason this comes up, in the

21   transcript from the motion to suppress, Mr. Byrd was allowed to

22   question Detective Pruitt about his subjective motives.  You

23   know, I think he was cut off at some point, and I think my

24   objection was sustained, and we did have a discussion about the

25   subjective motive of the officer being irrelevant for the

PDF created with pdfFactory trial version www.pdffactory.com

1    purposes of the suppression issue before the court.  And if it's

2    irrelevant then, it's ten times irrelevant now.

3             THE COURT:  All right.  I believe that the subjective

4    motivation of the officer which prompted him to make the stop is

5    irrelevant, but the factual circumstances regarding the stop are

6    certainly admissible.

7             MR. KARNER:  Sure.

8             THE COURT:  But you have a different take on this,

9    Mr. Caver?

10            MR. CAVER:  Just briefly.  We have -- Detective Pruitt

11   was at the right place at the right time according to the

12   prosecution, the government, because he happened to be

13   investigating some sort of other crime.  I believe the testimony

14   is going to show that the reason this car was even on the radar

15   screen by the detectives was because of previous involvement.

16   The night before it had been surveilled, and that's why they

17   were looking at the car because they thought Clifford Horton

18   might be in the car.

19            MR. KARNER:  And that's only -- that's -- boy, I don't

20   know that the -- not to tell them their business, but, you know,

21   that's going into a dangerous area because that investigation --

22   and just so the court knows, we've instructed our witnesses

23   unless pressed by the defense not to volunteer the fact that,

24   yeah, that car first appeared on their radar in a murder

25   investigation.  Should that really be injected into this case?

1    MR. CAVER:  What the government is arguing is that the
2    subjective intent of the detective was irrelevant at the time
3    Mr. Poke was pulled over.  We can all pretend that fiction is
4    actually the case.  And if that's what the government is
5    requiring me to do, then -- and that's supported by the law and
6    that's the court's ruling, obviously I will abide by any ruling
7    of the court.  But to pretend that Mr. Poke was pulled over for
8    failing to signal in that vehicle to turn into that driveway, if
9    the court rules that that is required by the law and that there
10   will be no further questioning into that subjective motivation,
11   obviously I will abide by the court's ruling, but that's a
12   fiction.
13            THE COURT:  All right.  Well, we indulge ourselves in a
14   lot of fictions when we try criminal cases.  But my
15   understanding of the law is that the subjective motivation of
16   the officer for making the stop is irrelevant.  If you think
17   that I'm wrong about that or if you think there are exceptions
18   that apply to this case, I'll be glad to look at those.
19            MR. CAVER:  Thank you, Judge.
20            THE COURT:  You're welcome.
21        (Whereupon, the within trial was adjourned to Tuesday,
22        May 7, 2013, at 9:00 o'clock a.m.)
23
24
25