1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              WESTERN DIVISION

3    UNITED STATES OF AMERICA,     )    Docket No. 11 CR 50062
                                   )
4              Plaintiff,          )    Rockford, Illinois
                                   )    Tuesday, May 7, 2013
5         v.                       )    9:00 o'clock a.m
                                   )
6    DAYTON POKE,                  )
                                   )
7              Defendant.          )

8                        VOLUME 2
                   TRANSCRIPT OF TRIAL
9    BEFORE THE HONORABLE FREDERICK J. KAPALA, and a jury

10   APPEARANCES:

11   For the Government:          HON. GARY S. SHAPIRO
                                  Acting United States Attorney
12                                (327 S. Church Street,
                                   Rockford, IL 61101) by
13                                MR. MARK T. KARNER
                                  MR. JOSEPH C. PEDERSEN
14                                Assistant U.S. Attorneys

15   For the Defendant:          LAW OFFICE OF BRENDAN W. CAVER, LTD.
                                  (308 West State Street,
16                                 Suite 97,
                                   Rockford, IL 61101) by
17                                MR. BRENDAN W. CAVER

18   Also Present:               MR. DANIEL IVANCICH
                                  Special Agent, ATF
19
     Court Reporter:             Mary T. Lindbloom
20                                327 S. Church Street
                                  Rockford, Illinois 61101
21                                (815) 987-4486

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1      (The following proceedings were had in open court, out of

2      the presence and hearing of the jury:)

3      THE COURT:  This is 11 CR 50062, United States of

4  America v. Dayton Poke.  Case comes before the court for

5  continued jury trial.

6      I want to tack down one issue that we visited briefly

7  yesterday, and that is the issue regarding arguing the

8  subjective motivation of the officer for the stop.  We all agree

9  that it is irrelevant for purposes of resolving a motion to

10  suppress, but a trial puts that issue in a different context,

11  and there may be reasons for allowing it in.

12      Under the facts of this case, there may be very

13  compelling reasons, practical reasons, why the defendant does

14  not want it in, and Mr. Karner says the subjective motivation

15  may have something to do with a murder investigation.  Was it a

16  murder or a shooting investigation?

17      MR. KARNER:  Murder, Judge.

18      THE COURT:  And I don't know whether the defense wants

19  to go anywhere near that.  But what I'm telling you is it's

20  still open in my mind.  You ought to talk to your client about

21  whether you want to go into that.  If you do, I'll need some

22  authority for allowing it in.  But I'll let you take it from

23  there.

24      MR. CAVER:  Thank you, Judge.

25      THE COURT:  But, Mr. Caver, if you decide you want to

1    pursue that line of questioning, will you let me know as soon as

2    possible so I can start working on it?

3              MR. CAVER:  Yes, absolutely, Judge.

4         (Brief pause.)

5              MR. CAVER:  Judge, thank you very much.  I realize we

6    want to get started promptly at 9:00.  If there's a way that I

7    could work in -- if there's any way that the court could work in

8    a few moments to speak with my client about this issue because

9    it was an important issue.

10             THE COURT:  Do it right now.

11             MR. CAVER:  Thank you.

12             THE COURT:  Sure.

13        (Brief pause.)

14             MR. CAVER:  Thank you, your Honor.

15             THE COURT:  You're welcome.

16        (Brief pause.)

17             MR. CAVER:  Judge, I don't know if the government will

18   have any response.  I just wanted to place on the record

19   yesterday during jury selection in the first panel, Mr. Bowdry

20   was excused by a peremptory challenge by the government.  I just

21   wanted to put on the record, if it wasn't clear, Mr. Bowdry was

22   African-American, and he was the only African-American in that

23   panel, and I just wanted to make a record today if it was in any

24   way unclear.  I requested a reason other than the fact that a

25   peremptory challenge was being used.  The government, citing

1    case law, just declined to provide any nonracial reason why he
2    was excused, and I just want to make that clear today.
3              THE COURT:   Okay.   But it's also clear that you're not
4    making a Batson challenge.
5              MR. CAVER:   Well, without there being provided a race
6    neutral reason as to why Mr. Bowdry was excused, I suppose I am
7              THE COURT:   Well, I don't know how you can make it now.
8    We've got the jury picked and ready to come in.   I mean, we
9    could have addressed the issue and maybe resolved it while the
10   jury was still being impaneled, but it's a little late to bring
11   it up to me now.
12             MR. CAVER:   I understand, Judge.   And when we were at
13   sidebar yesterday, that was my intent by raising the question at
14   that time when the government declined to provide that reason.
15             THE COURT:   Okay.   Well, there's a -- the government
16   being required to provide a justification comes at the end of
17   the analysis.   There's a protocol that you go through in order
18   to get to that point, and you really foreclosed me being able to
19   do that.
20             MR. CAVER:   At this point all I'd like to do is make a
21   record that that is what happened, in case I was unclear in any
22   way about the race of the actual juror.   I think the most --
23             THE COURT:   That's fine, and I'm glad to put that on
24   the record, that the race of Mr. Bowdry was African-American.
25   But I don't know --

1    MR. CAVER:  In terms of a formal challenge to Batson,

2    then I suppose that is not what's being made at this time.

3    THE COURT:  All right.  That's all I need to know.

4    MR. CAVER:  Thank you, Judge.

5    THE COURT SECURITY OFFICER:  They're all set, your

6    Honor.

7    THE COURT:  All right.  Let's bring them in.

8    (The following proceedings were had in open court, in the

9    presence and hearing of the jury:)

10   THE COURT:  Good morning, everyone.  Nice to see you

11   all again.  We'll proceed with the trial.  Mr. Karner.

12   MR. KARNER:  Your Honor, may I read the stipulations

13   into the record, please?

14   THE COURT:  Certainly.

15   MR. KARNER:  Did the court want to instruct the jury on

16   a stipulation?

17   THE COURT:  I already did.

18   MR. KARNER:  Okay.  Stipulation Number One reads:  It

19   is hereby stipulated and agreed by, among, and between the

20   United States of America, by Gary S. Shapiro, United States

21   Attorney for the Northern District of Illinois, and Dayton Poke,

22   individually and through his attorney, Brendan Caver, as

23   follows.  That prior to July 6, 2011, the defendant, Dayton

24   Poke, had been convicted of a crime punishable by imprisonment

25   for a term exceeding one year, that is, a felony offense.  And

PDF created with pdfFactory trial version www.pdffactory.com

1    this was stipulated and agreed to by the parties.

2              Stipulation Number Two reads:  The United States of

3    America, by Gary S. Shapiro, United States Attorney for the

4    Northern District of Illinois, defendant, Dayton Poke,

5    personally and by his attorney, Brendan Caver, agree and

6    stipulate as follows.  Sarah Anderson is an expert in drug

7    analysis.  If called to testify, Sarah Anderson would testify to

8    the following.  She is a senior forensic scientist employed by

9    the Illinois State Police at the Rockford Forensic Science

10   Laboratory in Rockford, Illinois, and her duties include the

11   chemical analysis of substances to determine whether or not the

12   substance is or contains a narcotic or narcotic drug.

13             Ms. Anderson would further testify that she received

14   the mixtures contained in Government's Exhibit 7 in a sealed

15   plastic bag.  Ms. Anderson would testify that when she received

16   the mixtures contained in Government's Exhibit 7, they were

17   further contained in eight separate plastic bags.  Ms. Anderson

18   would testify that she performed a chemical analysis of the

19   mixture contained in one of the eight plastic bags contained in

20   Government's Exhibit 7 and determined that the mixture contained

21   cocaine base and had a total weight of approximately 1.2 grams.

22   Ms. Anderson would further testify she did not perform any

23   chemical analysis of the remaining seven bags contained in

24   Government's Exhibit 7.  Again, that's stipulated to by the

25   parties.

Nordberg - Direct

1      Stipulation Number Three reads:  It is hereby

2   stipulated and agreed by, among, and between the United States

3   of America, by Gary S. Shapiro, United States Attorney for the

4   Northern District of Illinois, and Dayton Poke, individually and

5   through his attorney, Brendan Caver, as follows.  That prior to

6   July 6, 2011, the Hi-Point Model JCP 40 S&W.40 caliber handgun

7   with serial number X744976 identified in the indictment had been

8   transported in interstate commerce.  And that's stipulated by

9   the parties.

10      May we call our first witness, your Honor?

11      THE COURT:  Yes, please.

12      MR. KARNER:  Call Rockford Police Detective Kevin

13   Nordberg.

14      (Brief pause.)

15      (Witness duly sworn.)

16      KEVIN NORDBERG, GOVERNMENT'S WITNESS, SWORN

17      DIRECT EXAMINATION

18   BY MR. KARNER:

19   Q.   Sir, would you tell us your name and spell your last name?

20   A.   It's Kevin Nordberg, N-o-r-d-b-e-r-g.

21   Q.   Are you employed?

22   A.   City of Rockford Police Department.

23   Q.   And what is your position with the City of Rockford Police

24   Department?

25   A.   Detective.

Nordberg - Direct

1   Q.   How long have you been a police officer?

2   A.   Eighteen years.

3   Q.   What is your job assignment right now?

4   A.   Gang crimes.

5   Q.   What are your responsibilities as a gang crimes detective?

6   A.   Mostly any gang-related crimes, violent type crimes,

7   anything that's affiliated with gang activity.

8   Q.   You investigate?

9   A.   Yes.

10   Q.   Okay.  I want to direct your attention to July 6th, 2011.

11   Were you working on that day?

12   A.   Yes, I was.

13   Q.   Were you assigned to work with a partner?

14   A.   Yes, I was.

15   Q.   Who was your partner on that day?

16   A.   Detective Pruitt.

17   Q.   Okay.  Now, do you recall what shift you were working?

18   A.   It was a 3:00 p.m to 11:00 p.m shift.

19   Q.   And that day were you assigned to work in a particular car?

20   A.   We were just working together in Detective Pruitt's car.

21   Q.   Okay.  And is that a marked squad car or an unmarked car?

22   A.   It's an unmarked car.

23   Q.   What kind of car was it?

24   A.   It's a Chevy Impala.

25   Q.   And so, it had no markings on the exterior that designated

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    it as a police car?

2    A.   That's correct.

3    Q.   Did it have emergency lights?

4    A.   Yes, it did.

5    Q.   Okay.   Where were the emergency lights?

6    A.   There's a light that you can stick on the dash, and there

7    are built-in lights on the front that flash, and then the rear

8    lights built into the tail light assembly.

9    Q.   Okay.   Now, as you began your shift that day, what type of

10   gear or clothing were you wearing?

11   A.   Wore a -- it's like a dark blue police raid vest.  It's a

12   bulletproof vest.  It's got Police here and has a badge on it,

13   and the back says Police on it, and then my duty belt, just

14   jeans and a shirt.

15   Q.   Okay.   Now, I want to direct your attention to approximately

16   7:25 in the evening.  Were you and Detective Pruitt in the

17   southeast quadrant of Rockford?

18   A.   Yes, we were.

19   Q.   Specifically near the intersection of 8th Street and 10th

20   Avenue?

21            MR. CAVER:   Objection.   Leading.

22            THE COURT:   It's preliminary.   I'll allow that question

23   to stand.

24   BY MR. KARNER:

25   Q.   Were you near 8th Street and 10th Avenue?

Nordberg - Direct

1    A.   Yes, we were.

2    Q.   What street were you actually on before you made a traffic

3   stop that day?

4    A.   We were on 10th Avenue. I'm sorry. 8th Avenue.

5    Q.   8th Avenue or 8th Street?

6    A.   I'm sorry. 8th Street.

7    Q.   Okay. Facing what direction?

8    A.   We were facing to the north.

9    Q.   And is there a stop sign at 8th Street and 10th Avenue?

10    A.   Yes, there is.

11    Q.   Now, did anything catch your attention when you were at that

12   intersection?

13    A.   Directly across 10th Street at the stop sign on the other

14   side was a silver Chevy Impala that was stopped at that stop

15   sign.

16    Q.   Now, you just said 10th Street. Do you mean 10th Street or

17   10th Avenue?

18    A.   10th Avenue. I'm sorry. 10th Avenue.

19    Q.   Okay. So, this car was on 8th Street?

20    A.   Yes, it was.

21    Q.   Facing out the opposite direction as your car?

22    A.   That's correct.

23       MR. CAVER: Objection. Leading.

24       THE COURT: Overruled.

25

Nordberg - Direct

1   BY MR. KARNER:

2   Q.   Well, could you tell what type of car it was?

3   A.   Yes.   It was a Chevy Impala.

4   Q.   All right.   And had you seen that car before?

5   A.   Yes.

6   Q.   Right around this time, did you receive any information

7   about a crime that had been committed?

8   A.   Yes, we did.

9   Q.   What did you learn?

10  A.   There had been a dispatch to the Quick Stop, which is

11  several blocks to the west, that there had been an armed robbery

12  there.

13  Q.   And when were you notified of that armed robbery in relation

14  to when you saw this Impala across 10th Avenue from you?

15  A.   It was a short time, within maybe ten seconds.

16  Q.   Okay.   So, when you see this Chevy Impala, what did you see

17  it do?

18  A.   At that point it was stopped at the stop sign, and it then

19  made a left-hand turn onto 10th Avenue.

20  Q.   Could you tell how many occupants it had?

21  A.   I could see that it had one occupant in it, just the driver.

22  Q.   When that Impala made the left turn right in front of you,

23  what action did you and Pruitt take?

24  A.   We pulled in behind the Impala.

25  Q.   Who was driving your unmarked squad?

PDF created with pdfFactory trial version www.pdffactory.com

## Nordberg - Direct

1  A.    Detective Pruitt was.

2  Q.    When you pulled in behind the Impala, where did you see it

3  drive to?

4  A.    It went just almost like halfway up the block, and then it

5  immediately turned into a driveway.

6  Q.    Now, when it made the turn into the driveway, had you or

7  Detective Pruitt made any signals to get it to stop?

8  A.    Not at that time, no.

9  Q.    Okay.   When it turned into the driveway, were you looking to

10  see if it activated its turn signal?

11  A.    We saw that it did not.

12  Q.    It did not?

13  A.    Did not.

14  Q.    Okay.   And when it did not activate its turn signal, what

15  action did you and Detective Pruitt take?

16  A.    Then we initiated a traffic stop on the silver Impala.

17  Q.    When you say you initiated a traffic stop, what do you mean?

18  What action did you take?

19  A.    Well, Detective Pruitt activated the emergency lights on the

20  squad.

21  Q.    Had the Impala already stopped by the time Pruitt activated

22  the squad car lights?

23  A.    It would have been very close to the same time.

24  Q.    Okay.   And after the emergency lights were activated, what

25  did you and Pruitt do?

Nordberg - Direct

1    A.   Detective Pruitt -- the car had pulled into a driveway, and

2    it was facing to the south, and Detective Pruitt pulled his

3    squad kind of behind the Impala at a slight angle, still kind of

4    on the sidewalk and the back end still out in the street.

5    Q.   And then what happened after you pulled into the driveway?

6    A.   We exited the squad and approached the Impala.

7    Q.   Okay.   Now, where did you see Detective Pruitt go?

8    A.   He went to the driver's side of the silver Impala.

9    Q.   Where did you go?

10   A.   To the rear passenger side by the trunk area.

11   Q.   What did you see as you went to the rear passenger side of

12   the Impala?

13   A.   I could see the driver was -- he was sitting in the driver's

14   seat, and he was making a motion with his right hand down below,

15   like toward the floorboard.

16   Q.   Now, the driver, did you eventually determine who he was?

17   A.   Yes.

18   Q.   Who was he?

19   A.   Dayton Poke.

20   Q.   Do you see Dayton Poke in court here this morning?

21   A.   Yes, I do.

22   Q.   Would you point him out and describe his appearance for the

23   court?

24   A.   He's the gentleman sitting there in the greenish shirt.

25            MR. KARNER:   May the record reflect an in-court

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    identification of the defendant?

2            THE COURT:   Yes, the record may so show.

3    BY MR. KARNER:

4    Q.   After you saw the defendant bend down with his right

5    shoulder, did you hear anything?

6    A.   Detective Pruitt was telling him to stay in the car.

7    Q.   Could you see whether or not the defendant was trying to get

8    out of the car?

9    A.   Yes, he was.

10   Q.   Did you hear anything else?

11   A.   As the defendant was attempting to get out of the car,

12   Detective Pruitt shouted what in police code is 1032, which

13   means gun.

14   Q.   Stop for second.  You said 1032.  He shouted it out?

15   A.   Yes.

16   Q.   1032 is a special code that's used among Rockford police

17   officers?

18   A.   Yes.

19            MR. CAVER:   I'm going to object to the leading again.

20            THE COURT:   Sustained.

21   BY MR. KARNER:

22   Q.   Well, explain exactly what 1032 is.

23   A.   1032 is a police code that we use.  It means gun.

24   Q.   Why do you need a code for gun?

25   A.   You don't often want to tip off people that we see what we

PDF created with pdfFactory trial version www.pdffactory.com

**Nordberg - Direct**

1   see, that kind of thing.

2   Q.   And he yelled it?

3   A.   Yes, he did.

4   Q.   Now, after he yelled it, what did you do?

5   A.   I started coming around to the driver's side of the vehicle.

6   Q.   What happened as you came around to the driver's side of the

7   vehicle?

8   A.   Mr. Poke was outside of the car.   He had got up and was

9   standing -- like the V part of the driver's door, he was

10   standing there with Detective Pruitt.

11   Q.   Now, did you ever hear the defendant explain why he drove

12   into that driveway?

13   A.   Yes, I did.

14   Q.   What did you hear him say?

15   A.   He said he was trying to get in his house.

16   Q.   After he got out of the car, what happened?

17   A.   He had closed the driver's door and was attempting to lock

18   it.

19   Q.   What action did you and Detective Pruitt take?

20   A.   Detective Pruitt had grabbed ahold of his left arm   I

21   grabbed ahold of his right arm

22   Q.   Why?

23   A.   We were going to secure him in handcuffs.

24   Q.   Did he comply?

25   A.   He was very tense.   It was really hard.   We had to force his

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    hands back.  And he was saying that he had been shot with an

2    AK-47.

3    Q.   Now, you said tense.  Describe what you mean.

4    A.   You could feel all his muscles were really tight in his arm,

5    and we really had to like force his arm back.  He was really

6    trying to keep us from doing that.

7    Q.   Okay.  And in your experience as a police officer, are you

8    familiar with people -- sensing that when people are resistant

9    to being handcuffed?

10   A.   Yes, I am

11   Q.   And how did you take this incident?  Was he unable to move,

12   or was he refusing to move?

13   A.   No, he was refusing to move.

14   Q.   Did it take both you and -- well, did one of you

15   individually handcuff the defendant, or did it take both of you?

16   A.   No, it took both of us.

17   Q.   Was the defendant asked for his keys?

18   A.   Yes, he was.

19   Q.   By whom?

20   A.   Detective Pruitt.

21   Q.   Did the defendant give up those keys immediately?

22   A.   Not immediately, no.

23   Q.   What happened?

24   A.   He had -- the keys were clenched in his fists, and we had to

25   kind of pry them out of his hands.

Nordberg - Direct

1    Q.    Okay.   Once you pried the keys out of his hands, was the

2    defendant secured in a squad car?

3    A.    Yes.

4            MR. CAVER:   Objection to the leading.

5            MR. KARNER:   I'll withdraw it, Judge.

6    BY MR. KARNER:

7    Q.    Okay.   We'll take it piece by piece.

8            After you got the keys, what happened?

9    A.    A patrol squad had shown up.   They have cages.   And he was

10   secured in that squad.

11   Q.    Before he was secured in that squad, did you obtain any item

12   of property from the officer whose squad the defendant was

13   secured in?

14   A.    Yes.   We got a plastic bag, which we got from the other

15   officer.

16   Q.    And that contained what?

17   A.    Well, it was empty at the time, and that's what we used to

18   collect the property.

19   Q.    And did you collect a specific item from an officer whose

20   squad car the defendant was secured in?

21   A.    Just the plastic bag.

22   Q.    Okay.   And then did you -- after the defendant was secured

23   in the squad car, did you search the defendant's car?

24   A.    Yes, I did.

25   Q.    And did you find any items of contraband in the car?

PDF created with pdfFactory trial version www.pdffactory.com

Nordberg - Direct

1    A.   Yes.

2    Q.   What did you find?

3    A.   In addition to the handgun, which was underneath the

4    driver's seat, in the center console was a small plastic baggie

5    that contained an amount of off-white, rocklike substance.  It

6    was in individual little baggies.

7              MR. KARNER:   May I approach the witness, your Honor?

8              THE COURT:   You don't have to ask permission to

9    approach.

10             MR. KARNER:   Thank you.

11   BY MR. KARNER:

12   Q.   I'm going to show you what's been marked as Government's

13   Exhibit 6.

14             MR. KARNER:   And again, Judge, this handgun has been

15   secured and is unloaded and cannot be fired.

16   BY MR. KARNER:

17   Q.   Would you look at Government's Exhibit 6 and tell us if you

18   recognize what's shown there?  And don't point it.

19   A.   Yes.

20   Q.   And 6A?

21   A.   Yes.

22   Q.   What is that?

23   A.   That is the handgun that was recovered from the vehicle.

24   Q.   And specifically you're referring to Government's Exhibit 6?

25   A.   That is correct.

Nordberg - Direct

1    Q.   And 6A, do you recognize that?

2    A.   Yes.   That is the magazine that was in the handgun.

3    Q.   Okay.   Are those items in substantially the same condition

4    as when you recovered them?

5    A.   Yes, they are.

6    Q.   Now, was that handgun loaded or unloaded when you recovered

7    it?

8    A.   Loaded.

9    Q.   Okay.   And which way was the barrel facing when you first

10   saw it?

11   A.   It was facing out from underneath the driver's seat.

12   Q.   Showing you Government's Exhibit 7 for identification, do

13   you recognize what that is?

14   A.   Yes, I do.

15   Q.   What is that?

16   A.   That's the small baggies of white substance that was

17   recovered from the center console.

18   Q.   And was the center console -- the lid closed or open when

19   you recovered it?

20   A.   It was closed.

21   Q.   When you first --

22   A.   Yes.

23   Q.   And is that -- have you seen this substance with these

24   physical characteristics before?

25   A.   Yes, I have.

Nordberg - Direct

1  Q.  Based on your training and experience, what did you believe

2  this to contain?

3  A.  Cocaine.

4  Q.  Is Government's Exhibit 7 in substantially the same

5  condition?

6  A.  Yes, it is.

7  Q.  As when you recovered it?

8        Now, you recovered some other items into evidence?

9        THE COURT:  Could I ask how the gun's been disabled?

10       MR. KARNER:  I'm sorry?

11       THE COURT:  Could I ask how the gun's been disabled?

12       MR. KARNER:  Yes, Judge.  The magazine has been taken

13  out.  There's a tie that's been put in the trigger guard and the

14  slide that prevents it from operating.

15       THE COURT:  All right.  Thank you.

16  BY MR. KARNER:

17  Q.  Did you also recover some other items?

18  A.  Yes, other items were recovered.  Yes.

19  Q.  Showing you Government's Exhibit 8 for identification, what

20  is that?

21  A.  That's the cash that was removed from Mr. Poke's pants

22  pocket.

23  Q.  And how much money was that?

24  A.  I believe it was $260.

25  Q.  Is that in substantially the same condition as when it was

Nordberg - Direct

1    recovered?

2    A.   Yes, it is.

3    Q.   And showing you Government's Exhibit 9 for identification,

4    what's that?

5    A.   That's a Sanyo Cricket cell phone that Mr. Poke had on his

6    person.

7    Q.   And you recovered that from who?

8    A.   From Mr. Poke.

9    Q.   And is Government's Exhibit 9 in substantially the same

10   condition?

11   A.   Yes, it is.

12   Q.   Now, were photographs taken both outside and inside the car?

13   A.   Yes, they were.

14   Q.   I ask you to flip through Government's Exhibits 10 through

15   18 and just flip through those and tell us if you recognize

16   what's shown there.

17           THE COURT:   Could we take a break?

18      (Brief pause.)

19           THE COURT:   Folks, technology does a lot of great

20   things for us, but sometimes it causes problems.

21           All right.   Sorry for the interruption.

22           MR. KARNER:   May I proceed?

23           THE COURT:   Yes, please.

24   BY MR. KARNER:

25   Q.   Now, the phone, did you personally take that off the

Nordberg - Direct

1    defendant, or did you get that from Officer Dodd?

2    A.  From Officer Dodd.

3    Q.  Now, the photographs I just showed you, Government's

4    Exhibits 10 through 18, are you familiar with what is shown in

5    those photos?

6    A.  Yes, I am

7    Q.  And do those photos fairly and accurately show the

8    conditions that you saw both outside and inside the car

9    immediately after the traffic stop?

10    A.  Yes.

11          MR. KARNER:  Your Honor, I'd move for the admission of

12    Government's 10 through 18 and ask leave to publish individually

13    to the jury.

14          THE COURT:  Any objection to their admission?

15          MR. CAVER:  No objection.

16          THE COURT:  As long as the exhibits are admitted, you

17    can publish them any time you see fit.

18          MR. KARNER:  Thank you, your Honor.

19      (Government's Exhibits 10 through 18 were offered and

20        received in evidence.)

21          MR. KARNER:  We would ask leave to show the witness and

22    the jury Government's Exhibit 10.

23    BY MR. KARNER:

24    Q.  Can you see Government's Exhibit 10?

25    A.  Yes.

Nordberg - Direct

1   Q.   What is that?

2   A.   It's a picture of the rear of the silver Impala.

3   Q.   Driven by the defendant?

4   A.   Yes.

5   Q.   Is that the position he parked the car in when he entered

6   the driveway?

7   A.   Yes, it is.

8   Q.   I'm showing Government's Exhibit 11.  What's shown there?

9   A.   That's the driver's side of the Impala driven by defendant.

10  Q.   That would have been the view that Detective Pruitt had, of

11  course farther away than Pruitt, but the side that Detective

12  Pruitt approached the defendant at?

13  A.   Yes, it is.

14  Q.   Government's Exhibit 12.  What's shown there?

15  A.   That's a photo taken from top down showing the handgun

16  sticking out from underneath the driver's seat.

17  Q.   Now, is that the position the handgun was in when you first

18  entered the car to search it?

19  A.   Yes, it is.

20  Q.   So, that was not manipulated by a police officer?

21  A.   No, it was not.

22  Q.   Showing you Government's Exhibit 15, what's shown there?

23  A.   That's kind of a direct under picture of the handgun as it

24  lays underneath the driver's seat.

25  Q.   And Government's Exhibit 17?

Nordberg - Direct

1    A.    That's the contents inside the center console, and it shows

2    the plastic baggie there that contained the cocaine.

3    Q.    Government's Exhibit 18?

4    A.    That's also the contents of the center console after it was

5    opened.

6              MR. KARNER:    Can I have a moment, your Honor?

7              THE COURT:    Yes.

8         (Brief pause.)

9              MR. KARNER:    We have no further questions.

10             THE COURT:    Mr. Caver.

11                         CROSS EXAMINATION

12   BY MR. CAVER:

13   Q.    At the time you left the scene of the armed robbery at the

14   Quick Stop, had you concluded your business there?

15             MR. KARNER:    Judge, I object.    That's a fact not in

16   evidence.    There's been no testimony that this witness went to

17   the scene of the armed robbery.

18             THE COURT:    I agree.    I believe he said he received a

19   radio transmission about it.

20             MR. CAVER:    Okay.

21   BY MR. CAVER:

22   Q.    Where were you parked when you initially saw the Impala?

23             THE COURT:    You can ask him if he came from it.

24             MR. CAVER:    Thank you.

25             THE COURT:    But Mr. Karner is right when he says the

Nordberg - Cross

1  question assumes facts not in evidence.

2  BY MR. CAVER:

3  Q.   Where were you parked?

4  A.   We were not parked.

5  Q.   You were driving?

6  A.   Yes.

7  Q.   Where were you driving on?

8  A.   In the area of 8th Street and 10th Avenue.

9  Q.   And why were you there?

10 A.   I'm sorry?

11 Q.   Why were you there?

12 A.   We were on patrol.

13 Q.   Okay.  And were you called at all to a scene?

14 A.   No, we were not.

15 Q.   Okay.  And so, you were just -- what is in the area of 8th

16 Street and 10th Avenue there?

17 A.   It is a residential area.

18 Q.   Okay.  Did you receive any dispatch?

19 A.   We were not dispatched, but we can hear the call go out for

20 the armed robbery.

21 Q.   Okay.  And so, at that point you didn't receive any call

22 saying that the suspects had been apprehended or anything?

23 A.   No.

24 Q.   And at that point you conducted a traffic stop?

25 A.   That's correct.

Nordberg - Cross

1   Q.   And that's when you saw the Impala, you saw it fail to

2   signal, and then it turned into the driveway?

3   A.   That's correct.

4   Q.   And how many occupants were in the vehicle?

5   A.   Just the driver.

6   Q.   And if you can approximate, in terms of the time that it

7   took for you to see the vehicle and then pull it over with your

8   lights, about how long did that take?

9   A.   Twenty seconds.

10  Q.   And in that 20 seconds, did you observe anything inside the

11  car?

12  A.   No.

13  Q.   And you were just taking up a position?

14  A.   I'm not understanding your question.

15  Q.   At that point were you just taking up a position to back up

16  Detective Pruitt?

17  A.   Are you saying had we already stopped the car then?

18  Q.   After you stopped the car --

19  A.   Okay.

20  Q.   -- what did you do?

21  A.   I approached the rear trunk area.

22  Q.   And was the reason for that to take a protective position

23  for Detective Pruitt?

24  A.   That is correct.

25  Q.   Okay.  And so, you say the 20-second time frame that you

PDF created with pdfFactory trial version www.pdffactory.com

### Nordberg - Cross

1    just gave was from the time that you observed the Impala until

2    the time that you stopped the vehicle in the driveway?

3    A.   That's correct.

4    Q.   When you took the items that the government just showed you

5    into evidence, did you recover a cell phone?

6    A.   Yes.

7    Q.   And was the cell phone also recovered from the vehicle?

8    A.   No, it was not.

9    Q.   Where was it recovered from?

10   A.   From Mr. Poke.

11   Q.   And at that time then you -- did you ever see the cell phone

12   in the car?

13   A.   No, I did not.

14         MR. CAVER:  Judge, if I may have a moment.

15         THE COURT:  Sure.

16   (Brief pause.)

17  BY MR. CAVER:

18  Q.   Detective --

19         MR. CAVER:  Judge, may I approach?

20         THE COURT:  You don't have to ask for permission to

21  approach a witness.

22  BY MR. CAVER:

23  Q.   Detective, I'm going to show you what I've previously marked

24  for identification as Defense Exhibits Number 1 and 2.  They're

25  two photographs.  Do you recognize these photographs?

Nordberg - Cross

1    A.   Yes, I do.

2    Q.   And what do they depict?

3    A.   Number 1 is the top down view of the driver's seat

4    floorboard area.

5    Q.   And do they fairly and accurately depict the scene as it

6    appeared on July 6th, 2011?

7    A.   Yes, they do.

8    Q.   And would you say that in those photographs the gun is more

9    toward the right or left side of the seat?

10   A.   More centered.

11   Q.   Okay.   So, not more toward the right or the left?

12   A.   No.   I believe more centered.

13   Q.   Thank you.

14          MR. CAVER:   Judge, I would ask -- I'd move for

15   admission of People's Exhibits Number 1 and 2.   Or Defense

16   Exhibits.   I'm sorry.

17          MR. KARNER:   No objection.

18          THE COURT:   You're moving for their admission?

19          MR. CAVER:   We're moving for their admission.   We are.

20          THE COURT:   And there's no objection?

21          MR. KARNER:   No objection.

22          THE COURT:   They are admitted.

23       (Defendant's Exhibits 1 and 2 were offered and received in

24       evidence.)

25

Nordberg - Cross

1  BY MR. CAVER:

2  Q.  Detective Nordberg, did you previously testify in a hearing

3  related to this matter?

4  A.  Yes, I did.

5  Q.  And were you asked this question and gave this answer?

6       MR. KARNER:  Can we have a page, counsel?

7       MR. CAVER:  60 and 61.

8  BY MR. CAVER:

9  Q.  Were you asked this question and gave this answer?

10    "Q. Now, do you recall there being a Sanyo Cricket cell

11    phone recovered from the front floorboard of that vehicle?

12    "A. I know there was a cell phone recovered. I don't know

13    from where."

14  A.  Yes.

15  Q.  Now, is there a reason that your memory would be better

16  today than it was on the date of your testimony for the motion

17  to quash and suppress?

18  A.  Yes.

19  Q.  What's that?

20  A.  I've reviewed reports and spoke with the officers.

21  Q.  So, your testimony today isn't based on an independent

22  recollection. It's based on your review of other officers'

23  reports?

24  A.  Well, I refreshed my memory on how it was recovered, the

25  cell phone was recovered.

Nordberg - Cross

1  Q.  So, when you testified in August of 2012, did you have the

2  benefit of the reports that had been prepared from the incident

3  from July of 2011?

4  A.  I had looked at Officer Pruitt's report.

5  Q.  Okay.  But today your memory is better about what happened

6  on that date almost two years ago than it was on the date of the

7  motion to suppress?

8  A.  That's correct.

9  Q.  And you have no other explanation for that other than the

10  fact that you've reviewed other officers' reports?

11  A.  Yes.

12  Q.  Thank you.

13          MR. CAVER:  Thank you, Judge.  Nothing further.

14          MR. KARNER:  Your Honor, I would just move to admit

15  Government's Exhibits 6, 7, 8, and 9.

16          THE COURT:  What about 6A?

17          MR. KARNER:  And 6A.

18          THE COURT:  Any objection?

19          MR. CAVER:  There's no objection, Judge.

20          THE COURT:  6, 6A, 7, 8, and 9 are admitted.

21      (Government's Exhibits 6, 6A, 7, 8, and 9 were offered and

22          received in evidence.)

23          MR. KARNER:  Okay.  We have no further questions of

24  Detective Nordberg.

25          THE COURT:  You may step down.

Dodd - Direct

1      (Witness excused.)

2          THE COURT:  Next witness, please.

3          MR. PEDERSEN:  The United States calls Richard Dodd.

4      (Brief pause.)

5      (Witness duly sworn.)

6          RICHARD DODD, GOVERNMENT'S WITNESS, SWORN

7                   DIRECT EXAMINATION

8  BY MR. PEDERSEN:

9  Q.   Could you state your name and spell your last name, please?

10 A.   Officer Richard Dodd, D-o-d-d.

11 Q.   How are you employed?

12 A.   With the City of Rockford Police Department.

13 Q.   How long have you been employed as a police officer with the

14 Rockford Police Department?

15 A.   About five years and three months.

16 Q.   What are your duties as a Rockford police officer?

17 A.   Patrol officer.

18 Q.   What does that involve?

19 A.   Handling calls, self-initiated duty.

20 Q.   Do you work a particular time shift, or does it vary?

21 A.   Right now I'm on a particular time shift, afternoons from

22 4:00 p.m to 2:00 a.m

23 Q.   Were you on that same time shift back in July of 2011?

24 A.   Yes, I was.

25 Q.   I'm going to call your attention to July 6th of 2011.  Were

Dodd - Direct

1    you working that evening?

2    A.   Yes, I was.

3    Q.   Did you receive a dispatch around 7:30 p.m that day to

4    respond to a traffic stop that occurred at XXXX XXXX XXXXXX in

5    Rockford?

6    A.   Yes.

7    Q.   And what did you observe when you arrived there?

8    A.   I observed a car pulled over in a driveway and officers in

9    the driveway around the vehicle.

10    Q.   Okay.  I'm going to show you Government's Exhibit 10, if we

11    could pull that up.  Is that the car that you saw pulled over in

12    the driveway at XXXX XXXX XXXXXX?

13    A.   Yes, it was.

14    Q.   And was there an individual who you had been told was the

15    driver of that vehicle, was he in custody at that time?

16    A.   Yes.

17    Q.   And where was he at in relation to the vehicle when you

18    arrived?

19    A.   I believe he was over on the driver's side more towards the

20    rear of the car.

21    Q.   Was he handcuffed at that time?

22    A.   Yes.

23    Q.   Do you see that individual in the courtroom today?

24    A.   Yes, I do.

25    Q.   Could you point to him and identify him by something that

Dodd - Direct

1  he's wearing?

2  A.  An olive green button-up shirt.

3       MR. PEDERSEN:  Your Honor, I'd ask that the record

4  reflect identification of the defendant, Dayton Poke.

5       THE COURT:  Yes.

6  BY MR. PEDERSEN:

7  Q.  When you arrived, were you assigned a specific task to

8  assist with the investigation?

9  A.  Yes, I was.

10  Q.  And what were you told to do?

11  A.  I was asked to have the defendant have a seat in the back of

12  my squad car.

13  Q.  And prior to placing him in your squad car, did you do

14  anything?

15  A.  Yes, I searched him

16  Q.  And when you searched him, what, if anything, did you find?

17  A.  I located a cell phone in one of his front pockets.

18  Q.  Do you recall what type of cell phone that was?

19  A.  It was a black Kyocera Sanyo cell phone.

20  Q.  And what did you do with the cell phone after you took it

21  out of the defendant's pocket?

22  A.  I put it into a clear plastic evidence bag.

23  Q.  And what did you do with that bag?

24  A.  I gave it to the detectives on scene.

25  Q.  Okay.  And do you recall who the detectives were on the

Dodd - Direct

1  scene?

2  A.   Detective Nordberg and a bunch of others.  I can't recall

3  them all.

4  Q.   Okay.  Was Detective Nordberg the one that you gave the cell

5  phone to?

6  A.   Yes, it was.

7  Q.   I'm going to show you what's been marked as Government's

8  Exhibit 9.  Could you take a look at that and tell me if you

9  recognize it?

10  A.   Yes, I do recognize it.

11  Q.   What is it?

12  A.   It's the cell phone I took off of the defendant.

13  Q.   Did you then -- after you had placed the defendant in your

14  squad car, were you then assigned to transport him to the Public

15  Safety Building in Rockford?

16  A.   Yes, I was.

17  Q.   Thank you, Officer.

18        MR. PEDERSEN:  I have no further questions.

19                     CROSS EXAMINATION

20  BY MR. CAVER:

21  Q.   Officer, you recovered the cell phone from the defendant?

22  A.   Yes, sir.

23  Q.   Did you make a report in this matter?

24  A.   No, sir.

25  Q.   Why not?

### Dodd - Cross

1    A.   I didn't feel one was necessary.

2    Q.   Okay.  Even though you had recovered the cell phone?

3    A.   Yes.

4    Q.   And was there anybody else present when you searched

5    Mr. Poke and you allegedly found this cell phone?

6    A.   I mean, within walking ten steps.

7    Q.   Anybody else observe you recover it from him?

8    A.   I don't recall.

9    Q.   Do you have any knowledge of anything else being recovered

10   from Mr. Poke's pockets that day?

11   A.   Not to my knowledge, no.

12   Q.   So, you took his cell phone and didn't do a report on that?

13   A.   Correct.

14   Q.   Did you think it was important that you had recovered the

15   cell phone?

16   A.   I search everybody before I put them in my car.  I don't do

17   a report every time.

18   Q.   Okay.  But that's not my question.  My question is do you

19   think it was important when you recovered the cell phone?

20   A.   No.

21   Q.   No.  Okay.  So, it wasn't an important piece of evidence?

22   A.   Not to my knowledge at that time.

23   Q.   Okay.  Thank you.

24         MR. PEDERSEN:  We have nothing further.

25         THE COURT:  You may step down, Officer.

Cone - Direct

1    (Witness excused.)

2         MR. KARNER:   Your Honor, the United States calls

3    Detective David Cone.

4    (Brief pause.)

5    (Witness duly sworn.)

6         DAVID CONE, GOVERNMENT'S WITNESS, SWORN

7                   DIRECT EXAMINATION

8    BY MR. KARNER:

9    Q.   Sir, would you tell us your name, please, and spell your

10   last name?

11   A.   Yes.   David Cone, C-o-n-e.

12   Q.   How are you employed?

13   A.   I am a detective with the Rockford Police Department

14   assigned to the identification unit there.

15   Q.   How long have you been a police officer?

16   A.   I'm in my 22nd year of service with Rockford.

17   Q.   And how long have you been in the identification unit?

18   A.   I have been there since July of 2005.

19   Q.   What are your responsibilities as a detective assigned to

20   the identification unit?

21   A.   My primary responsibilities are to respond to assist our

22   patrol unit in the collection, documentation, and gathering of

23   evidence in a number of different ways.

24   Q.   Okay.   Are one of your duties to recover latent fingerprints

25   and to try and make identification of latent fingerprints?

PDF created with pdfFactory trial version www.pdffactory.com

Cone - Direct

1   A.   It is, yes.

2   Q.   Have you received training in that area of forensic science?

3   A.   I have.

4   Q.   Would you describe the training for the ladies and gentlemen

5   of the jury?

6   A.   I have attended both a basic latent impression school and

7   also an advanced school, both of those 40-hour courses or

8   week-long schools each.

9   Q.   Okay.  And what percentage of your duties are devoted

10  towards fingerprint identification?

11  A.   I would say at least 10 to 20 percent, maybe 25 percent of

12  our everyday duties are devoted to latent print.

13  Q.   Have you previously testified as an expert in fingerprint

14  identification?

15  A.   I have.

16  Q.   Approximately how many times?

17  A.   I believe I've only testified as an expert one time in a

18  murder trial here in Rockford.

19          MR. KARNER:   Your Honor, I would tender Detective Cone

20  as an expert in fingerprint identification.

21          THE COURT:   Do you wish to voir dire the witness?

22          MR. CAVER:   No, Judge.   No objection.

23          THE COURT:   He may testify as an expert.

24          MR. KARNER:   Thank you.

25

Cone - Direct

BY MR. KARNER:

Q.   Sir, first of all, let's talk about how it's possible for a person to touch an item and leave their fingerprint.  Can you explain how that happens?

A.   Sure.   A fingerprint is made up of slightly over 98 percent water.   It's mainly an aqueous material that's secreted through perspiration.   You have pores within the ridge structure of your fingerprints or of your fingers.   That substance is subsequently placed or laid down on items that you might handle in your day-to-day activities.

Q.   What is by definition a latent print?

A.   A latent impression is a fingerprint impression that is not necessarily visible to the human eye.   A latent impression would require some type of processing to be seen with a human eye or potentially some type of oblique lighting situation.

Q.   It's a print of unknown origin?

A.   It is.

Q.   Okay.   Now, as an investigator, what process and tools do you use to attempt to locate latent prints on surfaces?

A.   We have several different techniques that we use.   Probably the most commonly used technique would be by use of dusting powders.   We also have chemical techniques that we use, as well, dependent upon the surface of the item that we're processing.

Q.   Okay.   And is there a way that you can, as an ID identification detective, obtain and preserve a latent print?

**Cone - Direct**

1    A.   Yes.

2    Q.   How?

3    A.   If we are processing with powders, we will use what we call

4    a lift, which is just basically a sticky side of a piece of tape

5    adhered to a background, which brings out the color in the

6    powder that we're using.  If we are using a chemical process,

7    most times we will photograph that latent impression from the

8    chemical makeup of the processing itself.

9    Q.   Okay.  We've talked about what a latent print is, how you

10   look for them, and how you preserve them  The last step is how

11   you make an identification between a person who leaves a known

12   print and identify that with or match it with a latent print.

13   A.   Correct.  In order for me to make an identification, I need

14   a latent impression of enough clarity and quantity of what we

15   call ridge detail in order to make that impression or that

16   comparison.

17        There are three levels of detail within a latent

18   impression.  The level one detail characterizes that impression

19   as either a loop, a whorl, or an arch.  I must have at least

20   that amount of detail in order to make a comparison on that

21   impression.

22        The other levels of detail deal with the ridge

23   structure itself, the way the ridges either end or bifurcate

24   into what we call minutiae, or the layperson will hear

25   oftentimes the word points being counted within a print.  So,

### Cone - Direct

1    again, I need enough quality and quantity of that ridge detail

2    in order to compare that to a known standard.

3    Q.   Well, but what exactly are you comparing a latent print

4    with, the ridges, the whorls, and all that detail you just

5    described?

6    A.   I would have to have a known inked impression to make that

7    comparison.   So, for example, if there was a suspect in a case

8    and I could pull an arrest card or ten-print card that has the

9    known inked impression, then I would compare that latent against

10    that known inked impression.

11    Q.   Now, in this case did you examine a firearm for the presence

12    of any latent prints suitable for identification?

13    A.   I did.

14    Q.   I'm going to show you two exhibits marked Government's

15    Exhibits 6 and 6A.   Just be careful not to point that gun at

16    anyone.

17    A.   Okay.

18    Q.   Do you recognize what those items are?

19    A.   I do.   This was a firearm brought to me by Detective

20    Nordberg in the identification unit on July 6th of 2011 at

21    approximately 9:00 o'clock in the evening.

22    Q.   Okay.   And why was that -- what responsibility -- let me

23    rephrase that.

24       What did you do with that handgun and that handgun

25    magazine?

Cone - Direct

1  A.   Detective Nordberg simply asked me to process the weapon for

2  any latent evidence that might be located there.  The first

3  thing I did in that process was obtain DNA samples from the

4  grips, trigger assembly, and a portion of the slide assembly of

5  the firearm  I also did the same with all the eleven live

6  rounds of ammunition.

7  Q.   Okay.  And you mentioned DNA.  You don't know if you

8  recovered DNA from the handgun or not.

9  A.   I do not, no.

10  Q.   And you're not trained in DNA analysis, are you?

11  A.   I am not.

12  Q.   Who conducts DNA analysis?

13  A.   Our state lab.  The Illinois State Police conduct that

14  analysis in their lab.

15  Q.   Okay.  In anticipation of your testimony, did you become

16  familiar with the policy of the Illinois State Crime Lab when it

17  comes to items of testing?

18  A.   I have, yes.

19  Q.   Okay.  And as an ID detective, you have a lot of dealings

20  with the Illinois State Crime Lab, don't you?

21  A.   Yes, we do.

22  Q.   Is there a high demand on DNA analysis?

23  A.   Without a doubt, absolutely.

24  Q.   As a result of that high demand, there are certain policies

25  limiting what items and what cases items are accepted for DNA

PDF created with pdfFactory trial version www.pdffactory.com

Cone - Direct

1   analysis?

2   A.   That is correct.

3           MR. CAVER:   I'm going to object to the relevance.

4           MR. KARNER:   Well, Mr. Caver said in his opening

5   statement that we weren't going to hear anything about DNA, and

6   I'm trying to talk about DNA.

7           THE COURT:   Overruled.

8   BY THE WITNESS:

9   A.   I'm sorry, Mr. Karner.   Could you repeat the question?

10  BY MR. KARNER:

11  Q.   Sure.   Are you aware of any policies in place with the

12  Illinois State Police Laboratory that does the DNA testing to

13  limit what types of items can or cannot be -- or will or will

14  not be tested?

15  A.   I am familiar with that, yes.

16  Q.   Explain the policy, the policy as it pertains to this case.

17  A.   Yes.   The policy in this case is the Illinois State Police

18  will not accept nor will they process DNA evidence on firearms

19  in possession cases.

20  Q.   Like this?

21  A.   Like this, yes.

22  Q.   Okay.   Now, did you examine 6 and 6A for the presence of any

23  latent prints?

24  A.   I did.

25  Q.   And how did you do that?

Cone - Direct

1    A.   In this particular case, I used a chemical process.   We

2    process these type of items using what basically is a Super Glue

3    technique.   So, it's a Super Glue processing followed by a

4    chemical rinse after that Super Glue technique is finished.

5           Once the items have dried from the chemical rinse, we

6    view them under an alternate light source, and that chemical

7    that we use to wash these particular items, if there's latent

8    evidence on those items, that will fluoresce under that

9    alternate light source.

10   Q.   When you did that, were you able to locate any latent prints

11   suitable for comparison on either the gun marked Government's

12   Exhibit 6 or the handgun's magazine marked Government's

13   Exhibit 6A?

14   A.   I did not.

15   Q.   Now, does that mean those items had never been touched by a

16   human being?

17   A.   Absolutely not.

18   Q.   What are the factors that influence your ability to recover

19   prints, latent prints, suitable for comparison?

20   A.   The biggest factor with firearms and latents, certainly, are

21   a huge exception to the rule to recover latents of comparable

22   value on firearms.   The biggest reason is the structure of the

23   gun, the fact that there are very few, if any, smooth, flat

24   surfaces with which to obtain a decent latent impression.

25          Most of the surfaces of firearms are handled at the

PDF created with pdfFactory trial version www.pdffactory.com

### Cone - Direct

1   grip, which in most cases is either synthetic or it's textured

2   and deeply grooved.  All of those surfaces break up the ridge

3   detail and make it impossible for me to make a comparison of any

4   sort.

5   Q.  Does temperature come into play?

6   A.  Temperature has an effect on the firearms, as well.  There

7   are numerous factors.  Friction will come into play when we're

8   dealing with firearms.  Firearms many times are drawn and put

9   back into holsters.  They're drawn and removed from waistbands.

10   Any type of frictional surface with those firearms.  Just

11   sliding around on a floorboard on a seat of a car will damage or

12   destroy latent evidence on these firearms, as well.

13   Q.  What about are you familiar with people either being

14   secretors or nonsecretors?

15   A.  I am  There is a small percentage, and I can't quote the

16   exact percentage, but there is a small percentage of individuals

17   who are what we call nonsecretors, in that they simply either do

18   not perspire or do not to a level of which to leave latent

19   impressions with which we can make a comparison to.

20   Q.  Can moisture affect the recovery of latent prints?

21   A.  Certainly.  Any adverse weather factors will affect a latent

22   impression, as well, yes.

23        MR. KARNER:  I have nothing further, Judge.

24

25

Cone - Cross

1    CROSS EXAMINATION

2    BY MR. CAVER:

3    Q.    Detective, I'm going to show you what I've marked previously

4    as Defense Exhibits Number 1 and 2.    Would you mind taking a

5    look at those briefly?

6    A.    Yes, sir.

7    Q.    Do you recognize those photos?

8    A.    I do not.

9    Q.    You do not?

10   A.    No, sir.

11   Q.    You've never seen those before?

12   A.    Not until today.

13   Q.    Okay.

14   A.    Yes, sir.

15   Q.    Detective, I am going to -- well, first of all, how many

16   firearms were recovered that day, if you know?

17   A.    There was only one firearm brought to me, and that was

18   brought to me by Detective Nordberg.

19   Q.    And do you know whether there were any other firearms

20   involved in the case?

21   A.    I have no idea.

22   Q.    Okay.    Detective, if you would humor me.    I don't want to

23   touch the firearm myself, but the barrel of this gun, as I stand

24   here, we're seated about three feet apart, and the gun is maybe

25   a foot and a half from either of us.    The barrel of that gun,

PDF created with pdfFactory trial version www.pdffactory.com

**Cone - Cross**

1    meaning the portion of the gun -- you know a lot about these

2    things.  I don't.  The portion of the gun that's in front of the

3    trigger --

4    A.   Yes.

5    Q.   -- with the hole in it, it looks like there's a ribbon of

6    metal that goes through the center of the gun.  Is that fair?

7    That goes the length of the barrel?

8    A.   A ribbon of metal.

9    Q.   A raised piece.  So, there's almost like a raised midpiece?

10   A.   Yes.

11   Q.   Okay.  And is that ridged?

12   A.   Yeah.  I mean, the barrel itself is ridged in several

13   different places.  Obviously, it's not a smooth, flat surface

14   for me.

15   Q.   Okay.  But the portion -- and I guess maybe I'm just trying

16   to describe this as best I can.  There's a portion of it that's

17   raised that goes the length of the barrel.  There's also a

18   portion above that part on the barrel of the firearm that

19   appears to actually be smooth, black metal; is that fair?

20   A.   Are you talking the barrel here?

21   Q.   Yes.

22   A.   Yes.

23   Q.   Okay.  And, actually, it goes roughly -- I'm sorry.  Would

24   you mind just picking it up for me?

25   A.   Okay.

Cone - Cross

1    Q.   And it looks like there's a ridged area maybe about three

2    inches directly above the grip of the gun.

3    A.   Here?

4    Q.   Yes.   Thank you.   And toward the front of the gun it looks

5    like -- is it fair to say maybe six inches of smooth area toward

6    the barrel of the gun on the top?

7    A.   There might be four inches there.   Four, four and a half.

8    Q.   Four inches?   Okay.   Four inches.

9         Okay.  Now, when you testified previously -- thank you.

10   You can put it down.   When you testified previously, you had

11   said that the reason why ridged or grooved surfaces, textured

12   surfaces don't hold latent prints well is because there's no --

13   well, you explain it, if you don't mind.

14   A.   Texturing on any surface breaks up the ridge detail of a

15   fingerprint.   So, in other words, if you look at your finger,

16   you can physically see the lines that run through your

17   fingertips.   Those are what we call ridges, and there are

18   thousands of them, and they flow in certain patterns, and that's

19   how we characterize or classify fingerprints, as well.

20        Any time that you have a surface that is textured or

21   not smooth by nature, that breaks up those ridges during the

22   chemical process and makes it nearly impossible to count your

23   ridges, to know whether there's a bifurcation, to know whether

24   there's an ending ridge.   In other words, to be able to make a

25   comparison.

Cone - Cross

1  Q.  So, it's fair to say then on a textured or a ridged surface,

2  such as the ridged surfaces we were discussing on this gun, it

3  would be very difficult to even recover a latent print from

4  those surfaces?

5  A.  A usable comparable latent, that's correct.

6  Q.  Anything that would have been of any evidentiary value?

7  A.  That is correct.

8  Q.  Now, the smooth surface, where we were talking toward the

9  barrel of the gun for about four inches toward the top of the

10  barrel that appeared to be a smooth metal surface, now, in terms

11  of a smooth surface like the glass on a cell phone or even a

12  smooth surface here, is it fair to say that it's much more

13  likely that you would find a latent print or even a full

14  fingerprint of evidentiary value if it were present?

15  A.  I would only make the argument that more than likely you

16  would not, only in that firearms are not typically handled by

17  the barrel.  No one picks up a firearm by the barrel.  We pick

18  up our firearms by the grips and the trigger.  So, although it

19  is feasibly possible, in this case this gun also has raised

20  ridges and some texturing in that area that you're describing in

21  front of the slide mechanism

22  Q.  If I may?

23  A.  In this area here is raised from here and could break up a

24  fingerprint.

25          MR. CAVER:  Judge, do you mind if I just run my finger

Cone - Cross

1  along it?

2          THE COURT:   Help yourself.

3          MR. CAVER:   Thanks.

4  BY MR. CAVER:

5  Q.   But you said it's fair that people don't typically handle

6  handguns by the barrel?

7  A.   Correct.

8  Q.   So, that's why you wouldn't typically find any sort of

9  evidentiary value in a fingerprint, or it's less -- I'm sorry.

10          So, it's less likely to find any fingerprints on them

11  simply by the fact that it's not common that they're handled by

12  the barrel?

13  A.   I would say that's correct.

14  Q.   Okay.  So, it looks like we've got a lot of raised areas on

15  this handgun.  Is that common among handguns, that significant

16  portions of them are textured or raised or ridged?

17  A.   It tends to be, yes.

18  Q.   So, it's typical then that you're not -- it's going to be

19  very difficult to find fingerprints on these firearms?

20  A.   It's extremely difficult to find a comparable latent

21  impression.  We find smudges, smears, other portions of ridges,

22  just not of the quality and quantity of detail with which I need

23  to make a conclusive comparison.

24  Q.   Okay.  Now, is there any sort of evidence that lends itself

25  to -- well, I'm going to start over.

Cone - Cross

1    When a person handles something with textured or ridged

2  surface and is not handling that surface with gloves, is it more

3  likely that any other sorts of evidence can be collected from

4  ridged or grooved surfaces?

5  A.   Certainly.

6  Q.   And what sort of evidence would that be?

7  A.   Biological evidence can be collected from any surface.   DNA,

8  blood, semen, anything along those lines.

9  Q.   So, because we're kind of taking a hit on the evidentiary

10  value of a firearm because it's got these surfaces, because it's

11  hard to find fingerprints, would that make it more important

12  then to search these sorts of items for other sorts of

13  evidentiary value?

14  A.   Well, and, again, that's part of our SOP with firearms.   Due

15  to the inability of locating the usable latent evidence, as I

16  explained earlier, we will swab areas that we believe to be

17  commonly handled by the firearm or by the person as it relates

18  to the firearm   And, again, many of these surfaces that we swab

19  are again those same surfaces that are textured that would be

20  very difficult for latent recovery to begin with.

21  Q.   And did you do that in this case?

22  A.   Yes.

23  Q.   And you had testified earlier that it's not the Illinois

24  State Police policy and procedure to test biological evidence

25  such as DNA in possession cases?

Cone - Cross

1   A.   That's correct, sir.

2   Q.   And does the Rockford Police ever contract with any other

3   agencies or corporations, for that matter, to test DNA evidence?

4   A.   I wouldn't have an answer for you there, sir.   I do not

5   know.

6   Q.   And you've been in the ID unit for approximately eight

7   years?

8   A.   Yes, since 2005.   Correct.

9   Q.   It's fair to say that you've been collecting biological

10  evidence such as DNA in those eight years?

11  A.   Absolutely.

12  Q.   And is it your testimony then that you're not aware of a

13  single instance in those eight years where the Rockford Police

14  has used any other agency besides the Illinois State Police to

15  do its biological evidence testing?

16  A.   Off the top of my head, not that I'm personally aware of.

17  Q.   If it was important, you could?

18  A.   Well, sure.   I mean, if I had an independent recollection of

19  a certain time where --

20  Q.   I'm sorry.   I'm sorry.   I should have been more specific.

21       If it was important to get that biological evidence

22  tested, you could do it with some sort of agency or some other

23  private corporation; is that fair?

24  A.   I wish I could answer that intelligently.   I don't know what

25  our protocols and procedures within our unit would be in

PDF created with pdfFactory trial version www.pdffactory.com

Cone - Cross

1    relation to that.  That would be a supervisory decision, not

2    only made by my supervisor, but probably, due to the cost

3    involved, would have to be made by his supervisor and up the

4    chain of command dependent upon the case.

5    Q.   So, it wouldn't be because it's not possible to be done.

6    A.   No.

7    Q.   It would be because it would be administrative decisions or

8    cost or some other --

9    A.   Well, yes.  Certainly it's beyond my scope of the decisions

10   that I make on a daily basis.

11   Q.   Above your pay grade?

12   A.   Yes.

13   Q.   Okay.  I understand.

14        In a possession case where a firearm is possessed, do

15   you believe -- as an expert witness, do you believe that it

16   would have been important to test that biological evidence?

17        MR. KARNER:   Judge, I object.  Relevance.

18        THE COURT:   Overruled.

19   BY THE WITNESS:

20   A.   I think at any point in time, whether it's the unit that I

21   work in, the police department I work for, the Illinois State

22   Police, there has to be at some point in time the ability to

23   triage.  There has to be a point where you just can't do any

24   more as a business, as an agency, as a department, or none of

25   the work would get done.

PDF created with pdfFactory trial version www.pdffactory.com

## Cone - Cross

1    So, I do believe -- because I know our unit triages, as

2    well, dependent upon cases.  That's just the world we live in,

3    and that's their set protocol and their policy, and that's what

4    we have to abide by.

5    Q.  And this case just wasn't important enough to test that

6    evidence.

7    A.  It's just beyond the scope of the Illinois State Police

8    policy.  That would be a question for the Illinois State Police,

9    I would think, as to what they feel the importance is of testing

10   possession cases as it relates to DNA.

11   Q.  But I'm asking you in the context of the Rockford City

12   Police.  Your department, other than with administrative

13   hurdles, could have made a decision, even though you may not

14   personally have made that decision.

15       MR. KARNER:  Judge, I object to the form of the

16   question.

17       THE COURT:  What's wrong with it?

18       MR. KARNER:  Argumentative.

19       THE COURT:  Well, I don't believe it's argumentative,

20   but I think we've gone past the point of relevance.

21       MR. CAVER:  Okay.  Thank you, Judge.  Judge, if I may

22   just have a moment.

23       (Brief pause.)

24   BY MR. CAVER:

25   Q.  Were you able to get prints off of the cell phone in this

Cone - Redirect

1    case?

2    A.   I'm not aware of a cell phone.

3    Q.   Okay.  So, you didn't test any cell phone?

4    A.   No cell phone was brought to me regarding this case, no.

5    Q.   Okay.

6           MR. CAVER:   Thank you, Judge.

7                    REDIRECT EXAMINATION

8    BY MR. KARNER:

9    Q.   You're aware that defendants can request testing?

10   A.   Yes.

11   Q.   Was there any request for DNA testing by the defense in this

12   case?

13   A.   Not to my knowledge.

14          MR. KARNER:   Nothing further.

15          THE COURT:   Anything more, Mr. Caver?

16          MR. CAVER:   Nothing, Judge.

17          THE COURT:   You may step down, Detective.

18          THE WITNESS:   Thank you, Judge.

19          THE COURT:   You're welcome.

20      (Witness excused.)

21          MR. PEDERSEN:   The United States calls Bruce Voyles.

22      (Brief pause.)

23      (Witness duly sworn.)

24

25

PDF created with pdfFactory trial version www.pdffactory.com

Voyles - Direct

1    BRUCE VOYLES, GOVERNMENT'S WITNESS, SWORN

2    DIRECT EXAMINATION

3    BY MR. PEDERSEN:

4    Q.  Could you state your name and spell your last name, please?

5    A.  It's Bruce Voyles, V-o-y-l-e-s.

6    Q.  How are you currently employed?

7    A.  I'm a detective with the Rockford Police Department.

8    Q.  How long have you held that position?

9    A.  Thirteen years.

10   Q.  How long have you been a police officer?

11   A.  Twenty years.

12   Q.  What's your current assignment?

13   A.  I'm assigned to the identification unit.

14   Q.  And how long have you been assigned there?

15   A.  Thirteen years.

16   Q.  Okay.  So, the entire time as a detective you spent in the

17   identification unit?

18   A.  Yes.

19   Q.  And what were your duties in that unit?

20   A.  I'm responsible for the processing and documentation of

21   crime scenes, examination of latent fingerprint evidence, as

22   well as examination of computer, cell phone evidence.

23   Q.  And just to be clear, for the purposes of your analysis, a

24   cell phone is basically a tiny computer?

25   A.  Correct.

Voyles - Direct

1    Q.    Okay.   It has the same type of processors and -- well, not

2    the same type, but a type of electronic processor similar to a

3    computer?

4    A.    Similar storage capabilities, correct.

5    Q.    And have you previously been called as a witness and been

6    qualified as an expert in the field of forensic examination of

7    computers?

8    A.    Yes.

9    Q.    And that would include cell phones?

10   A.    Correct, yes.

11   Q.    And you've done that on at least ten occasions?

12   A.    Approximately, yes.

13   Q.    Has that just been in state, or has that also been in

14   federal court, as well?

15   A.    State court.

16   Q.    And, in addition, as part of your training, have you been

17   certified by any associations?

18   A.    Yes.   I'm a certified forensic computer examiner through the

19   International Association of Computer Investigative Specialists.

20   Q.    And in order to become certified by that association, is

21   there any testing involved?

22   A.    Yes.

23   Q.    What is the testing involved?

24   A.    There are several.  For the initial certification, it's

25   several exams where hard drives are sent to you or media sent to

Voyles - Direct

1    you for examination, and there's questions and also peer review.

2    Q.   Once you become certified, is there any recertification

3    that's required?

4    A.   Yes, every three years we have to recertify.

5    Q.   And when was the last time that you were recertified?

6    A.   2011.

7            MR. PEDERSEN:   I would tender the witness as an expert

8    in the field of forensic examination of computers and cell

9    phones.

10           THE COURT:   Do you wish to voir dire the witness?

11           MR. CAVER:   No, Judge.   No objection.

12           THE COURT:   Any objection to him testifying as an

13   expert?

14           MR. CAVER:   No, Judge.

15   BY MR. PEDERSEN:

16   Q.   I'm going to call your attention to July 30th of 2012.   Were

17   you asked to examine a particular cell phone by another agency?

18   A.   Yes.

19   Q.   And do you recall the type of cell phone that you were asked

20   to examine?

21   A.   It was identified as a Sanyo cell phone as a Cricket

22   provider.

23   Q.   I'm going to show you what's been marked as Government's

24   Exhibit 9.   Do you recognize that exhibit?

25   A.   Yes, I do.

Voyles - Direct

1    Q.   What is it?

2    A.   This is the cell phone that I was asked to conduct an

3    examination of.

4    Q.   And you indicated that it was a Sanyo cell phone with a

5    Cricket provider.  You mean Cricket, that's the company that

6    provides the phone service?

7    A.   Yes, the cell phone service.

8    Q.   Is there a manufacturer that manufactures phones for Sanyo?

9    A.   Yes.  In this case Kyocera is the actual manufacturer of the

10   phone.

11   Q.   And on the back of the phone, is there an imprint that

12   indicates that it was made by Kyocera?

13   A.   Correct.

14   Q.   And Kyocera, is that spelled K-y-o-c-e-r-a?

15   A.   Yes.

16   Q.   And when you received the cell phone, was it in a sealed

17   condition in that bag?

18   A.   Yes, it was.

19   Q.   After you received the phone and were asked to examine it,

20   what did you do?

21   A.   I received a phone from the property and evidence division,

22   returned it to my office.  At that time I opened the package,

23   removed the battery compartment or the battery from the battery

24   compartment, and verified the identification number or MEID

25   number on the back of the battery as being the same as what was

PDF created with pdfFactory trial version www.pdffactory.com

## Voyles - Direct

1    written on the actual search warrant.

2    Q.   And when you did that, did you confirm it was the correct

3    phone?

4    A.   Yes.

5    Q.   What steps then did you take to examine the phone?

6    A.   Well, in this case, the phone actually also contained a

7    micro SD card for additional storage.   That was removed from the

8    phone, and I created a forensic image or a mirror copy of the

9    micro SD card.   That was examined separately from the phone.

10   The phone was attached to my department computer, and a software

11   program designed by the Paraben Company for cell phone

12   extraction was used to extract the text messages from the phone.

13   Q.   Now, are both of those programs that you used to examine the

14   memory card and the actual cell phone that you talked about, are

15   those software -- is that software generally accepted by others

16   in your field as the proper software to use when examining cell

17   phones?

18   A.   Yes.

19   Q.   Now, regarding the memory card, what information was

20   contained on the memory card?

21   A.   That type of device is used to store usually your photos,

22   videos, along those lines.   I believe a contact listing was also

23   stored on it.   A business card contact was stored on it in an

24   electronic manner.

25   Q.   What about on the cell phone when you used the Paraben

PDF created with pdfFactory trial version www.pdffactory.com

Voyles - Direct

1    software system?  What type of information are you able to

2    extract from the cell phone using that system?

3    A.   That I was able to extract the text messages, the multimedia

4    messages, as well as contact list call logs.

5    Q.   And when you used that software in this case, were you able

6    to extract text messages along with the contact list from the

7    phone?

8    A.   Yes, I was.

9    Q.   And when the software extracts that information, what

10   happens to the information after you extract it?

11   A.   Well, it allows me to prepare it into a report format.  In

12   this case it was in a PDF format.  All the information was

13   placed in a PDF format.  I then archived that to a CDR, as well

14   as the actual -- all the information that was extracted from the

15   phone.

16   Q.   And then did you place those compact disks in a sealed

17   evidence bag?

18   A.   Yes, I did.

19   Q.   I'm going to show you what's been marked as Government's

20   Exhibit 19.  Do you recognize that?

21   A.   Yes.

22   Q.   What is it?

23   A.   It's the CDR -- it's actually three CDRs containing the data

24   from the cell phone, as well as the data from the memory card,

25   the micro SD card from the cell phone.

### Voyles - Direct

1  Q.   And you said that there's a report that the software

2  generates that you put in PDF form  Is that just a type of file

3  that you can store on a disk or a computer?

4  A.   Yes.

5  Q.   And are you also able to print out hard copies then on paper

6  of that report?

7  A.   Yes.

8  Q.   I want to show you what's been marked as Government's

9  Exhibit 21.  Have you seen that before?

10  A.   Yes.

11  Q.   What is Government's Exhibit 21?

12  A.   It's a section, a printed section, of the PDF report that I

13  prepared from the acquired data from the cell phone.

14  Q.   And specifically Government's Exhibit 21, does that only

15  contain certain text messages that were generated by the report

16  that you created with the Paraben software?

17  A.   Yes.

18         MR. PEDERSEN:  I move to admit Government's Exhibit 21,

19  your Honor.

20         THE COURT:  Any objection?

21         MR. CAVER:  No, Judge.

22         THE COURT:  21 is admitted.

23     (Government's Exhibit 21 was offered and received in

24     evidence.)

25

Voyles - Direct

1    BY MR. PEDERSEN:

2    Q.   All right.   I'm going to show you the first page of

3    Government's Exhibit 21.   That's the cover sheet that is printed

4    out when you prepare the report; is that right?

5    A.   Correct.

6    Q.   Okay.   And then Page 2.   That shows certain blocks of

7    information; is that correct?

8    A.   Yes.

9    Q.   And each block has seven different headings?

10   A.   Yes.

11   Q.   It starts with date?

12   A.   Correct.

13   Q.   And then what are the other headings?

14   A.   Read, meaning that the text message had actually been read

15   by the recipient.

16   Q.   Okay.   Going back to date, what is date?

17   A.   Oh, I'm sorry.   That first one is July 5th, 2011, at

18   4:40 p.m.

19   Q.   All right.   We're going to have it blown up here for you so

20   you can -- there we go.   It's a little easier to read.

21            So, you said date.   That is a date and time, but what

22   does that indicate?

23   A.   Oh, I'm sorry.   The date and time that the message was

24   either read or received, depending on the following boxes.

25   Q.   The next line indicates read.   What does that mean?

Voyles - Direct

1    A.   That the message was read by the recipient.

2    Q.   The address line?

3    A.   Is the number that the message was sent to.

4    Q.   What if the message was received?  What would that address

5    line indicate?  Incoming message.  What would the number show?

6    A.   The number that it was sent from would be in that box.

7    Q.   Okay.  So, depending on whether the message was sent or

8    received, the address line would show the number that it either

9    was sent from or it was sent to?

10   A.   The other recipient it was supposed to, yes.

11   Q.   The next line indicates status.  What is that for?

12   A.   In this case if it had been -- none shows that there are no

13   errors in sending the message.  There would be a message if it

14   was saved as a draft or a failed communication.

15   Q.   The next line says type.  What does that mean?

16   A.   That's indicating that this was a sent message from the

17   phone to the recipient.

18   Q.   The next line, subject?

19   A.   Subject is usually -- it's a box that fills in with

20   multimedia messages or video or photo messages, if you put a

21   header, identifying the photo.

22   Q.   But text messages wouldn't have the subject?

23   A.   No, usually not.

24   Q.   And then body, what does that mean?

25   A.   That's the actual contents of the text message.

PDF created with pdfFactory trial version www.pdffactory.com

Voyles - Direct

1   Q.   All right.   Now, the way that the software program that you

2   use, the Paraben software, does it generate the report by the

3   date that the message was sent or received?

4   A.   Yes.   And then it does it in descending order.   So, the last

5   message received would be the first one indicated in the report.

6   The first message that was sent would be the last message in the

7   report.

8   Q.   So, reverse chronological order?

9   A.   Yes.

10  Q.   Now, Government's Exhibit 21 doesn't contain all the text

11  messages that you extracted using the Paraben software; is that

12  correct?

13  A.   Correct.

14  Q.   I'm going to start then with the last page, Page 16, and

15  work back and just go through the messages with you.   So,

16  starting on June 23rd, going forward to July 5th of 2011, the

17  first message would have been the one that we have indicated

18  here on Page 206 that's dated June 23rd of 2011 at 3:44 p.m?

19  A.   Yes.

20  Q.   And was that an outgoing message?

21  A.   That was a sent message from the phone to the address of

22  (XXX)-XXX-XXXX.

23  Q.   And what was the text?

24  A.   "This low."

25  Q.   The next message then?

PDF created with pdfFactory trial version www.pdffactory.com

Voyles - Direct

1    A.    Was a received message.  The type shows inbox.  So, that was

2    received by this phone from the address of (XXX)-XXX-XXXX, and

3    that indicates -- the content was "Ok."

4    Q.    And then going to the next page, on June 25th there was a

5    sent message, is that correct, at 8:06 a.m.?

6    A.    Yes.

7    Q.    And what was the text?

8    A.    "This my new number bro."

9    Q.    And the next message a few minutes later?

10   A.    Is a received message, "Hoo dis."

11   Q.    And then the next message actually is on the top of Page 15

12   there, but then also on Page 14 because it goes in reverse

13   order; is that right?

14   A.    Correct.

15   Q.    So, the text of the message was --

16   A.    "Low wit the good."

17   Q.    And that was what type of message?  That was a sent message?

18   A.    That was a sent message.

19   Q.    If we could go up to Page 14 then.  That indicates it was a

20   sent message?

21   A.    Yes.

22   Q.    All right.  Then if we could go to Page 12, and the message

23   at the bottom of the page there, that was a sent message on

24   June 26th of 2011?

25   A.    Yes.

Voyles - Direct

1   Q.   And you have to go to the next page, 13, to see what the
2   text was; is that correct?
3   A.   Yes.
4   Q.   And what was it?
5           THE COURT:   You're using 12 and 13.   I don't find them
6   on the copy of the exhibit that I have.   Where are you getting
7   those numbers?
8           MR. PEDERSEN:   It's the number -- I could give you
9   the -- it's just the numbers of the pages in order, your Honor.
10  But I could use the numbers on the actual pages.
11          THE COURT:   Would you do that for me, please?
12          MR. PEDERSEN:   Yes, I can do that.
13          MR. CAVER:   Judge, if I may, it would be easier for me
14  if we could just go by the number at the bottom of the page, if
15  that's possible.
16          THE COURT:   Right.   That's what we're going to use.
17          MR. CAVER:   Thank you.
18          MR. PEDERSEN:   That's fine.
19  BY MR. PEDERSEN:
20  Q.   All right.   So, now we're on Page 205 -- or I'm sorry --
21  Page 200 in Government's Exhibit 21.   The body of that text on
22  June 26th was "This daylow this new number."
23  A.   Yes.
24  Q.   Let me go to Page 199, the page above that.   On
25  June 26th the next message after that at 4:19.

Voyles - Direct

1    A.   Yes.  It's a received message by the phone.

2              THE COURT:   You know, I don't have a 199 in the copy

3    that I have.  You don't have a good copy, do you?

4              MR. PEDERSEN:  Yes, I do.

5              THE COURT:   I have two 200s, and I took one out, but I

6    don't have 199.

7              MR. PEDERSEN:  This has all the exhibits.  It's tabbed.

8              THE COURT:   Can I have this, or do you want it back?

9              MR. PEDERSEN:  Yes, you can have that.

10             THE COURT:   All right.  I'm with you.   199.

11   BY MR. PEDERSEN:

12   Q.   All right.  This is at 4:19.  Is that a reply from the same

13   address as the previous message at 4:19 p.m?

14   A.   Yes.  This was received by the previous address at 4:19.

15   Q.   It was received from the previous address?

16   A.   Yes.  It was, as you said, a response from that previous

17   sent message.  This one was coming back to the phone.

18   Q.   And what does it say?

19   A.   "Got it."

20   Q.   All right.  Then we'll go to the next page, which is 197,

21   and those are two messages that occurred on June 27th of 2011.

22   The first one was at 12:09 p.m and 13 seconds?

23   A.   Yes.

24   Q.   And that was what type of message?

25   A.   This was a received message from (XXX)-XXX-XXXX stating,

Voyles - Direct

1    "Who is this."

2    Q.   And then was there an attempt to reply?

3    A.   Yes.   It's showing failed.

4    Q.   Okay.

5    A.   And sent back to that same number, and it says, "Daylow."

6    Q.   All right.   Then the next page, 180, those are messages from

7    July 2nd of 2011; is that correct?

8    A.   Yes.

9    Q.   And the first message on that date?

10   A.   Is a sent message from the phone with the body of the text,

11   "U still want that," and it's sent to the address of

12   (XXX) XXX-XXXX.

13   Q.   What's the next message?

14   A.   That's a received message from that same address with the

15   body of the text, "What the 3.0 yea."

16   Q.   And then the next message after that is on both Page 180 and

17   179; is that right?

18   A.   Correct.

19   Q.   And that occurred just seconds later on July 2nd?

20   A.   Yes.

21   Q.   And that was a sent message?

22   A.   Yes.

23   Q.   And what was the text?

24   A.   "Ok."

25   Q.   And then the message after that, what time was that?

## Voyles - Direct

1  A.  That was on July 2nd, also, 2:24:20.  It was a received
2  message from the same address, "What u on yo way ok."
3  Q.  Then we go two pages up, 169.  On Page 169 the date is
4  July 5th of 2011 at 3:08 a.m is the first message?
5  A.  Yes.
6  Q.  And that was a what type of message?
7  A.  That was a received message.
8  Q.  What did the text indicate?
9  A.  To quote, "No trap.  She doesn't want to fuck someone else
10 just me.  I just wanted some shit but I'm broke."
11 Q.  And broke is on the next page; is that right?
12 A.  Yes.
13 Q.  Okay.  The message after that then, what type of message was
14 it, and what was said?
15 A.  That also is in the inbox.  So, it's a received one, saying,
16 "I get paid Friday.  You front me?"
17 Q.  And that was the same number as the previous message?
18 A.  Yes.
19 Q.  And then the next message after that?
20 A.  That is a sent message to the address of (XXX) XXX-XXXX, and
21 the body of the text is "Yes I got that's cool."
22 Q.  And the next message after that actually starts on the
23 previous page, 167?
24 A.  Yes.  168.
25 Q.  I'm sorry.  168.  And that is what type of message?

PDF created with pdfFactory trial version www.pdffactory.com

Voyles - Direct

1    A.   This is a received message from this same number.

2    Q.   Okay.

3    A.   Indicating the body of the text, "You sure?  How much is the

4    prices?"

5    Q.   Okay.   And the message that came in right after that message

6    from the same number was what?

7    A.   That's a sent message from this phone to that same address

8    indicating -- the body of the text is "$20."

9           THE COURT:  Let's take a break.  Folks, I'll release

10   you for our morning break.  Let's come back at 11:00 o'clock.

11   Again, I want to remind you that as jurors in this case, you're

12   not to discuss the case among yourselves or with anyone else or

13   permit anyone to discuss it in your presence.  Refrain from

14   exposing yourself to any media accounts of the trial while it's

15   in progress.  Do not do any independent investigation of the

16   case by doing any research, attempting any testing, attempting

17   any communication with any other person, including your fellow

18   jurors.  We'll see you in a few minutes.

19       (The following proceedings were had in open court, out of

20          the presence and hearing of the jury:)

21          THE COURT:  Detective Voyles, you understand you're not

22   to discuss your testimony with anyone.  We'll resume here at

23   11:00 o'clock.

24          MR. CAVER:  Judge, if I may, just a brief matter.  I

25   had subpoenaed Detective Joe Stevens to be here.  I know he

PDF created with pdfFactory trial version www.pdffactory.com

Voyles - Direct

1    worked last night.  I told him to be here at 11:00.  I know

2    since it's a late break, I told him I'd do everything I could to

3    try to get him a message if he wasn't going to be needed at

4    11:00 because he's trying to sleep.  Can I text him and ask him

5    to be ready after lunch so he can go home and get some sleep?

6            THE COURT:  You can put him on out of order, if you

7    want.

8            MR. CAVER:  So, even later.

9            MR. KARNER:  We're going to be done -- we'll be done

10   this morning.

11           MR. CAVER:  Oh, you will.

12           MR. KARNER:  Yes.

13           MR. CAVER:  Okay.  So, would 1:30 be okay if I told

14   Detective Stevens, or do you want me to have him -- because

15   he'll be here at 11:00, unless I --

16           THE COURT:  Why don't you tell him 2:00 o'clock.

17           MR. CAVER:  Be here at 2:00.  Thank you, Judge.

18       (Brief recess.)

19           THE COURT:  Bring the jury in, Tim

20       (The following proceedings were had in open court, in the

21       presence and hearing of the jury:)

22           THE COURT:  Okay, Mr. Pedersen.  You may continue.

23           MR. PEDERSEN:  Thank you.

24   BY MR. PEDERSEN:

25   Q.   When we broke, we were discussing several text messages back

PDF created with pdfFactory trial version www.pdffactory.com

## Voyles - Direct

1  and forth around 3:00 a.m in the morning between the phone

2  that's been marked as Government's Exhibit 9 and another number

3  (XXX) XXX-XXXX, and I want to pick up there.  The next message

4  that we left off at would have been on July 5th of 2011 at

5  3:18 a.m; is that correct?

6  A.   Yes.

7  Q.   And what type of message, and what was the text?

8  A.   It was a received message from that phone number.  The body

9  of the text is "Alright you should do me a 40 though if

10 possible."

11 Q.   What's the next message that is on both Page 167 and 168

12 then?

13 A.   It's a sent message to the same number stating simply, "Ok."

14 Q.   Is there another message that same date a couple minutes

15 later on Page 167?

16 A.   Yes.

17 Q.   What type of message, and what was the text?

18 A.   It's a sent message to the same number, and it indicates in

19 the body of the text, "How long?  Sleep."

20 Q.   Is there a reply to that message then?

21 A.   Yes.  The same number at the bottom of the text is "Sweet

22 were pickin some people and then gettin our car and come down

23 there real quick."

24 Q.   Is there a sent message then from the phone marked as

25 Government's Exhibit 9 to that same number then a few seconds

PDF created with pdfFactory trial version www.pdffactory.com

Voyles - Direct

1   later?

2   A.   Yes.  Simply -- the text simply stated, "Ok."

3   Q.   What's the next message then on Page 166?

4   A.   It's also on July 5th, same number again.  It's a received

5   message.  Body of the text is "Like mebbe like a half hour."

6   Q.   What's the next message?

7   A.   A sent message.  The text is simply "Ok."  Again to the same

8   address or phone number.

9   Q.   And that was just a few minutes later or a minute later,

10   3:22 a.m?

11   A.   Yes.

12   Q.   Okay.  And then also at 3:22 a.m, a few seconds later, is

13   there another received message?

14   A.   Yes.  It's a received message, again the same address

15   contact number.  The content of the text was "Like a half hour

16   ish."

17   Q.   Is there another message that's sent around that same time

18   from that same number?

19   A.   Yes.  Received a message.  The body of the text is "Cool.

20   I'll pay you Friday night for sure.  And if you have good shit

21   I'll buy more too."

22   Q.   And then on Page 165 was there a sent message to that same

23   number at 3:24 a.m?

24   A.   Yes.  And the content is simply, "Its good."

25   Q.   And the content you said was "Its good"?

Voyles - Direct

1    A.   Yes.

2    Q.   Then the next page, Page 161, are those two more messages

3    involving that same (XXX) XXX-XXXX number that you just

4    testified to several messages around 3:00 a.m on July 5th of

5    2011?

6    A.   Yes.

7    Q.   And what time were these messages?

8    A.   They're approximately 4:23 p.m and 4:40 p.m in the

9    afternoon of July 5th.

10   Q.   And what was the first -- the one at 4:23, what was the

11   text, what type of message?

12   A.   It's a received message with the content of the text "That

13   was some good shit."

14   Q.   And was there a reply to that message?

15   A.   Yes.  The body was simply "Ok."

16   Q.   And that was at 4:40 p.m?

17   A.   Yes.

18            MR. PEDERSEN:  I would move to admit Government's

19   Exhibit 19.  That was the three compact disks.

20            THE COURT:  Any objection to 19?

21            MR. CAVER:  No, Judge.

22            THE COURT:  Nineteen is admitted.

23        (Government's Exhibit 19 was offered and received in

24        evidence.)

25            MR. PEDERSEN:  I have no further questions.

Voyles - Cross

1      THE COURT:   Cross.

2                    CROSS EXAMINATION

3   BY MR. CAVER:

4   Q.   Detective Voyles, when you were working with the cell phone

5   in this case, did you ever conduct any fingerprint testing on

6   it?

7   A.   No, I did not.

8   Q.   And do you conduct fingerprint testing routinely as part of

9   your duties in the ID department?

10  A.   Yes, I do.

11  Q.   And would a large glass surface, such as the surface on the

12  cell phone recovered in this case that you tested, would that

13  lend itself well to residual fingerprints?

14  A.   Possibly.

15  Q.   Let me -- I'm sorry.  Let me ask this.  Is there any surface

16  that you can think of that would better retain fingerprints than

17  a large, unscratched glass surface?

18  A.   No.

19  Q.   Okay.  And that's pretty much -- that would be the gold

20  standard?  I mean, if there were going to be fingerprints on

21  something -- if there were fingerprints on a large glass

22  surface, they would be easily recovered?

23  A.   I can't say easily recovered, but it's probably one of the

24  better surfaces for fingerprints.

25  Q.   Now, Detective Voyles, Mr. Pedersen went over ad nauseam

**Voyles - Cross**

1    about the text messages.   Are you familiar with a pen register?

2    A.   Yes.

3    Q.   And what is a pen register?

4    A.   Are you talking security code pins?

5    Q.   I'm sorry.   Pen, p-e-n, register for determining what sorts

6    of phone numbers are used by what individuals?

7    A.   No, I'm not familiar with that.

8    Q.   Okay.   Are there ways to determine who the -- when you have

9    a cell phone, are there ways to determine through the phone

10   company to whom the cell phone is registered?

11   A.   Yes.

12   Q.   Okay.   And was that done in this case to your knowledge?

13   A.   Not to my knowledge.

14   Q.   Okay.   And so, you don't know whether this cell phone was

15   borrowed, for instance?

16   A.   I have no idea about ownership, no.

17   Q.   Okay.   Now, in terms of biometrics, to your knowledge does

18   this cell phone -- does it require a particular user to be able

19   to use the cell phone?

20   A.   I didn't find any kind of security devices on it, as far as

21   pin codes or access codes, no.

22   Q.   And in your background, training, and experience of working

23   with cell phones, have you ever found a cell phone to be quote,

24   unquote locked with like a pin code in order to be able to use

25   it?

PDF created with pdfFactory trial version www.pdffactory.com

**Voyles - Cross**

1    A.    Yes.

2    Q.    Okay.   When you recovered this phone, was it in any sort of

3    state that would have restricted its use in that manner?

4    A.    No.

5    Q.    So, if you or I had picked up that phone, we would have been

6    able to access most of the phone's functions without entering

7    some sort of biometric data, like a fingerprint or a pin number?

8    A.    Yes.

9    Q.    With that information, you can't sit here today to testify

10   the identity of any individual who sent any text message,

11   correct?

12   A.    No, I cannot.

13   Q.    And is it fair that you can't testify, even with the Paraben

14   report and the received text messages that that software

15   extracted from the cell phone, who read those text messages?

16   A.    No.

17   Q.    So, in terms of the user's identity at any given time, at

18   any period of time covered by the text messages recovered that

19   are reflected in that report, you can't tell who the user of the

20   phone was?

21   A.    Correct.

22   Q.    On Page 167 the government had showed you a text message.

23        MR. CAVER:   I'm asking the government if it would be so

24   kind to republish Page 167.

25

Voyles - Cross

1    BY MR. CAVER:

2    Q.   Do you have that in front of you?

3    A.   Yes, I do.

4    Q.   On Page 167, middle of the page, can you read the text

5    message that appears to be a received text message from

6    July 5th, 3:20 a.m.?

7    A.   The one with the contents, "Sweet were pickin some people

8    and then gettin our car and come down there real quick."

9    Q.   And that says our car?

10   A.   It says our car.

11   Q.   Not my car?

12   A.   No, it says our car.

13   Q.   Okay.

14          MR. CAVER:   Judge, if I may have a moment.

15       (Brief pause.)

16   BY MR. CAVER:

17   Q.   Just a couple more quick questions about the fingerprints.

18   When you look at a surface like this cell phone, is it possible

19   to see with the naked eye whether there are any fingerprints on

20   the surface if one is looking for that?

21   A.   Yes.

22   Q.   Okay.   And when you recovered the phone, in what state did

23   you receive the telephone?

24   A.   It was in a sealed package.

25   Q.   And when you removed the phone from that sealed package,

**Voyles - Cross**

1    what was first thing you did with the cell phone?

2    A.   Removed the back battery cover.

3    Q.   Okay.   Did you at any point look at the front glass when the

4    phone -- well, I'm sorry.   Was the phone powered on at the time

5    you received it or powered off?

6    A.   It was powered off.

7    Q.   And when it's powered off, was the screen black?

8    A.   Yes.

9    Q.   Okay.   And does that make it easier to see if there are

10   fingerprints on the glass than if the screen is somehow

11   illuminated?

12   A.   It could, yes.

13   Q.   And when you took it out of the packaging, you didn't notice

14   any fingerprints on it; is that correct?

15   A.   No, I did not.

16   Q.   Okay.   Thank you.

17        (Brief pause.)

18             MR. CAVER:   Just briefly, Judge.   One more question.

19             THE COURT:   Sure.   Ask all you want.

20             MR. CAVER:   Thank you.

21   BY MR. CAVER:

22   Q.   Detective, in your testing of the phone, did you ever have

23   an opportunity to look through, for instance, the settings page?

24   Some cell phones have a settings page where it lists the IP

25   address or the owner, anything of that nature?

Voyles - Cross

1    A.   I did look at the settings in the phone, yes.

2    Q.   And did it show any name or any registered owner?

3    A.   No.

4    Q.   Okay.  And the only identity that you're aware of that the

5    cell phone was associated with was that Cricket was the provider

6    and Sanyo was the producer?

7    A.   I'm sorry.  As far as --

8    Q.   The only identities associated with the phone were that it

9    was a Cricket service provider phone, meaning that it used the

10   Cricket service?

11   A.   It was identified that way, as well as the manufacturer, but

12   also the mobile identifier number and the ID number associated

13   with the phone.

14   Q.   Right.  Okay.  But that MEID was never associated with a

15   particular individual owning that ID, correct?

16   A.   Not on my part, no.

17   Q.   Okay.  Thank you.

18            MR. CAVER:  Nothing further.

19            MR. PEDERSEN:  Nothing further.

20            THE COURT:  You may step down.

21       (Witness excused.)

22            THE COURT:  Next witness.

23            MR. PEDERSEN:  Your Honor, we call Tracy Runyard.

24       (Brief pause.)

25            THE COURT:  Raise your right hand.

Runyard - Direct

1    (Witness duly sworn.)

2    TRACY RUNYARD, GOVERNMENT'S WITNESS, SWORN

3    DIRECT EXAMINATION

4  BY MR. PEDERSEN:

5  Q.  Good morning, ma'am  Could you state your name and spell

6  your last name, please?

7  A.  Tracy Runyard.  It's R-u-n-y-a-r-d.

8  Q.  How are you currently employed?

9  A.  Excuse me?

10  Q.  Where do you work?

11  A.  The jail.  The University of Illinois.

12  Q.  Are you assigned to a specific location where you perform

13  your duties?

14  A.  The jail, yes.

15  Q.  Okay.  The Winnebago County Jail?

16  A.  Um-hm

17  Q.  Is that a yes?

18  A.  Yes.

19  Q.  Sorry.  She has to type everything that you say down.  So,

20  she can't type if you don't respond yes or no.

21  A.  Okay.

22  Q.  And how long have you had that job?

23  A.  Six years.

24  Q.  And what do you do as a nurse at the Winnebago County Jail?

25  A.  I primarily do the intake window.

Runyard - Direct

1    Q.   What does that involve?

2    A.   Just book people and make sure that they're stable enough to

3    be in the facility.

4    Q.   And is there a certain procedure that you follow with each

5    inmate as they're brought in to intake them into the jail?

6    A.   There's a form that we fill out.

7    Q.   So, the procedure involves filling out a form  Is that

8    called a -- do you know what that form is called?

9    A.   Medical intake form

10   Q.   And are you the one that prepares it, if you're the one that

11   is conducting the intake?

12   A.   Yes.

13   Q.   And is that form kept by the jail then?

14   A.   Yes.

15   Q.   And the information that you put in the form, is it

16   important that you get accurate information?

17   A.   Yes.

18   Q.   Why is that?

19   A.   So that we can make sure that they're stable enough that

20   there's nothing wrong with them that we can't handle at the

21   jail.

22   Q.   Okay.  And then once the form is completed, is it retained

23   at the jail for future reference?

24   A.   Yes.

25   Q.   And do you have access to the forms then if you need them?

### Runyard - Direct

1    A.    Yes.

2    Q.    Were you working in your capacity as a nurse at the

3    Winnebago County Jail on July 6th of 2011?

4    A.    Yes.

5    Q.    Do you recall conducting an intake of an individual by the

6    name of Dayton Poke?

7    A.    Yes.

8    Q.    And was that around 11:00 p.m that evening?

9    A.    Yes.

10   Q.    Do you see that individual in the courtroom today?

11   A.    Yes.

12   Q.    Could you point to him and identify him just by an article

13   of clothing that he's wearing?

14   A.    A green shirt or a beige shirt.

15            MR. PEDERSEN:   Your Honor, I'd ask that the record

16   reflect identification of the defendant, Dayton Poke.

17            THE COURT:   Where is he sitting?

18            THE WITNESS:   Right there (indicating).

19            THE COURT:   I can't see where you're pointing.   At the

20   table?

21            THE WITNESS:   Yeah, sorry.

22            THE COURT:   There are six people sitting over there.

23            THE WITNESS:   Oh, sorry.   At the table right there

24   (indicating).

25            THE COURT:   All right.   The court acknowledges the

Runyard - Direct

1    in-court identification.

2          MR. PEDERSEN:   Thank you, your Honor.

3    BY MR. PEDERSEN:

4    Q.   And when you met with Dayton Poke on July 6th of 2011, did

5    you interview him and simultaneously prepare a medical intake

6    form?

7    A.   Yes.

8    Q.   And did you follow the same procedure that you just

9    described?

10   A.   Yes.

11   Q.   I'm going to show you what's been marked as Government's

12   Exhibit 20.   Do you recognize Government's Exhibit 20?

13   A.   Yes.

14   Q.   Is that the form that you prepared or a copy of the form

15   that you prepared when Dayton Poke was brought in on July 6th of

16   2011?

17   A.   Yes.

18   Q.   And does it contain accurate information as you received it

19   from Dayton Poke?

20   A.   Yes.

21   Q.   Did you accurately record the information that you received

22   from Dayton Poke?

23   A.   Yes.

24   Q.   Okay.

25          MR. PEDERSEN:   I would move to admit Government's

PDF created with pdfFactory trial version www.pdffactory.com

Runyard - Direct

1    Exhibit 20, your Honor.

2              THE COURT:   Any objection to 20?

3              MR. CAVER:   No, Judge.

4              THE COURT:   It will be admitted.

5       (Government's Exhibit 20 was offered and received in

6       evidence.)

7    BY MR. PEDERSEN:

8    Q.   I want to show you the first page of the form of

9    Government's Exhibit 20.   It consists of several numbered

10   questions; is that right?

11   A.   Yes.

12   Q.   Okay.   I want to call your attention to question 13.

13   A.   Okay.

14   Q.   What is that question?

15   A.   Medications that he currently uses.

16   Q.   Okay.   And is there a list of medications in the report?

17   A.   Yes.

18   Q.   And what does it say?

19   A.   Gabapentin and Norco.

20   Q.   What are those two types of medication for?

21   A.   Pain medications and for neuropathy.

22   Q.   I'm sorry?

23   A.   For pain medications and nerve function.

24   Q.   Okay.   Which one is for which?

25   A.   The Norco is for pain.   The gabapentin is mainly for nerve

PDF created with pdfFactory trial version www.pdffactory.com

Runyard - Direct

1    function.   It can be used for pain, as well.

2    Q.   And then I want to ask you about question 16.

3    A.   Yes.

4    Q.   Okay.   That indicates, "Can someone bring in your

5    medication," correct?

6    A.   Um-hm

7    Q.   And the answer is yes?

8    A.   Yes.

9    Q.   And then in the explanation it says -- what does it say

10   where it says explain?

11   A.   Has inhaler with.

12   Q.   Okay.

13   A.   Meaning he had his inhaler with him

14   Q.   Okay.   There's a back where it says, "Has inhaler," and

15   there's a backwards J, it almost looks like?

16   A.   It's a C with a line over it.   That means with.

17         THE COURT:   It means what?

18         THE WITNESS:   It means with.   It's a C with a line over

19   it.

20   BY MR. PEDERSEN:

21   Q.   That's shorthand?

22   A.   Right.

23   Q.   And do you recall seeing the inhaler?

24   A.   Yes.

25   Q.   Did you receive it from anyone?

Runyard - Direct

1    A.   Yes.

2    Q.   Who did you receive the inhaler from?

3    A.   The officer.

4    Q.   When the defendant was brought in?

5    A.   Yes.

6    Q.   All right.   Now, I want to call your attention to the next

7    page, question 29.   That question says, "Do you use drugs;" is

8    that right?

9    A.   Yes.

10   Q.   And what was the answer?

11   A.   "No."

12   Q.   Do you recall specifically whether or not you asked the

13   defendant that question?

14   A.   Yes, I did.

15   Q.   And do you remember him answering no?

16   A.   Yes.

17   Q.   And you indicated earlier that he told you that he was

18   taking prescribed medication.   One of them was what you called

19   Norco, and that was for pain?

20   A.   Yes.

21   Q.   And are you aware of any reactions or interactions there

22   could be for an individual who was taking Norco and then used

23   cocaine?

24   A.   Yes.

25   Q.   And what are those?

Runyard - Direct

1   A.   It's bad for the heart.  It can lead to heart issues, heart

2   attack.

3   Q.   And how severe could the interaction be?

4            MR. CAVER:   I'm going to objection to the relevance.

5            THE COURT:   I think it has to do with whether his

6   statement -- whether the defendant's statement that he doesn't

7   take cocaine is true or not.

8            MR. CAVER:   Well, I believe that there was some

9   establishment that Mr. Poke knew that -- may we have a sidebar?

10           THE COURT:   Sure.

11     (The following proceedings were had at the sidebar, out of

12        the presence and hearing of the jury:)

13           MR. CAVER:   I'm sorry.  I should have asked for the

14   sidebar before I went into my objection.  I don't think there's

15   been any establishment that Mr. Poke knew of this

16   contraindication.  So, I understand what the government's trying

17   to prove, the veracity of the statement that Mr. Poke answered

18   no when he was asked do you use drugs, but there's been no -- we

19   haven't established that Mr. Poke would have known about this

20   contraindication.

21           THE COURT:   He was prescribed the medication.  In the

22   instructions to the medication, I think the jury could

23   reasonably infer that there was some discussion of

24   contraindication, and I think the jury could reasonably infer

25   from the evidence that they have that the defendant knew that

PDF created with pdfFactory trial version www.pdffactory.com

Runyard - Direct

1    the use of Norco was contraindicated with the use of cocaine.

2            MR. CAVER:  But we haven't established that that was

3    included in any warnings that Mr. Poke was given about this

4    medication.

5            THE COURT:  It's not established completely, but I

6    think it's a reasonable inference that the jury can draw.

7            MR. CAVER:  Is the government seeking to have her

8    testify as an expert with these issues?  Because we'll stipulate

9    that she's an expert, but I think she should be qualified as an

10   expert if she's going to be testifying as to issues that go

11   beyond her individual treatment of this patient.

12           MR. PEDERSEN:  I mean, if you want me to go through her

13   qualifications, I can.  She said she's been a nurse there for

14   six years.

15           MR. CAVER:  All I'm saying is we'll stipulate if you

16   want to make her an expert and if you want her to testify about

17   medications generally and their contraindications, but I think

18   that's a necessary step.

19           MR. PEDERSEN:  Okay.

20           THE COURT:  All right.

21       (The following proceedings were had in open court, in the

22       presence and hearing of the jury:)

23   BY MR. PEDERSEN:

24   Q.   Okay.  I just want to ask you a few questions about your

25   education and experience.

Runyard - Direct

1    A.    Okay.

2    Q.    You have a nursing degree?

3    A.    Yes.

4    Q.    And where did you obtain that?

5    A.    Rock Valley College.

6    Q.    And how long did you study to obtain your nursing degree?

7    A.    Two years.

8    Q.    And how long have you been employed as a nurse?

9    A.    Eleven years.

10   Q.    As part of your training and experience as a nurse, are you

11   trained in certain interactions between medications and what

12   would be called as contraindications, indicating if you're

13   taking one medication, you shouldn't take a second medication?

14   A.    Yes.   And if we're ever unsure, there's a book that we have

15   that provides all those interactions, as well.

16               MR. PEDERSEN:   Your Honor, I would tender the witness

17   as an expert in the contraindications of medications, I guess,

18   for that limited purpose.

19               THE COURT:   Do you wish to voir dire the witness?

20               MR. CAVER:   We do not, and we would so stipulate,

21   Judge.

22               THE COURT:   Thank you.

23   BY MR. PEDERSEN:

24   Q.    So, I was asking you some questions about the interaction

25   between Norco and cocaine.   Is that a type of interaction that

Runyard - Direct

1    you in your training and experience are knowledgeable about?

2    A.   Yes.

3    Q.   And specifically regarding Norco, if someone that was taking

4    Norco used cocaine, you said there could be a type of

5    interaction involving heart problems?

6    A.   Correct.

7    Q.   And what type of heart problems could be caused by that

8    interaction?

9    A.   It can lead to a heart attack.  The cocaine speeds up the

10   heart, the Norco slows down the heart, and on too quick of a

11   change could lead to a heart attack.

12   Q.   And during your interview of the defendant, did he indicate

13   any complaints of heart problems?

14   A.   No.

15        MR. PEDERSEN:  If I could just have a moment.

16        (Brief pause.)

17        MR. PEDERSEN:  I have no further questions.

18                    CROSS EXAMINATION

19   BY MR. CAVER:

20   Q.   Nurse Runyard, I'm looking at the -- do you have the intake

21   form in front of you?

22   A.   No, I don't.

23   Q.   I'm going to hand you what's been previously marked as

24   Government's Exhibit Number 20.  It's the same intake form  And

25   I'm going to ask you to turn to Page 2 and Number 24.  Can you

Runyard - Cross

1    read that question?

2    A.    Do you have any pain complaints, current illness/injury, or

3    dental problems.

4    Q.    Okay.   And at the time that you completed this form,

5    Mr. Poke was prescribed Norco?

6    A.    Correct.

7    Q.    For pain?

8    A.    Um-hm.

9    Q.    But he reported to you that he wasn't having any pain.

10   A.    No current pain, correct.

11   Q.    Okay.   Did he tell you that he was taking his Norco?

12   A.    Yes.

13   Q.    Okay.   And do you know whether Mr. Poke knew of this

14   contraindication between Norco and cocaine?

15   A.    That I do not.

16   Q.    Okay.   So, you have no reason to believe sitting here today

17   that Mr. Poke even knew about the contraindication?

18   A.    No.

19   Q.    Okay.   And, in fact, under Number 29, the question that you

20   asked Mr. Poke is "Do you use drugs;" is that right?

21   A.    Correct.

22   Q.    And he had been taking his Norco; is that correct?

23   A.    Yes.   That's what he told me, yeah.

24   Q.    That is what he reported?

25   A.    Yes.

Runyard - Cross

1    Q.   Okay.   And under those medications, Norco -- and is it

2    gabapentin?

3    A.   Correct.

4    Q.   Is that right?

5    A.   Yes.

6    Q.   Tell me about that.

7    A.   Gabapentin?

8    Q.   Yes.

9    A.   It's used for neuropathy or pain related to.

10   Q.   Okay.   Does Norco make you -- does it affect your perception

11   at all?

12   A.   It can, yes.

13   Q.   And does gabapentin do the same thing?

14   A.   No.

15   Q.   No.   Okay.   But the Norco does.

16           And when you asked Mr. Poke if he used drugs, he told

17   you no, and you have an independent recollection of that; is

18   that correct?

19   A.   Yes.

20   Q.   And he was taking his Norco at the time?

21   A.   Correct.   We ask for anything other than prescription drugs.

22   Q.   Okay.   Well, so your previous testimony when the government

23   was asking the question that you asked him the question, "Do you

24   use drugs," and his answer was "No," that's not really the

25   question you asked him?

### Runyard - Cross

1    A.    We ask do you use drugs.  They say -- I mean, if they say

2    no, we don't consider their prescription medication drugs.

3    Q.    Okay.  So, what was the -- if you have an independent

4    recollection of asking the question and him providing the

5    answer, what was the exact question you asked him?

6    A.    Do you use any drugs.

7    Q.    Okay.  And Mr. Poke's neuropathy, is that related to his

8    arm?

9    A.    Right.

10   Q.    And on Page 1 of Government's Exhibit Number 20, line four,

11   can you just read that question for me, please?

12   A.    Which number?  I'm sorry.

13   Q.    I'm sorry.  Four.

14   A.    Any visible body deformities or other physical

15   abnormalities.

16   Q.    And when you examined him, did you observe multiple scars?

17   A.    Yes.

18   Q.    Okay.  And do you have an independent recollection of

19   Mr. Poke and seeing those scars?

20   A.    Yes.

21   Q.    And did you have a conversation at all about his neuropathy

22   as it was related to the injuries to his arm?

23   A.    Can you repeat the question?

24   Q.    Sorry.  It was inartfully phrased.

25         You have an independent recollection of seeing

**Runyard - Cross**

1    Mr. Poke's injuries; is that correct?

2    A.   Yes.

3    Q.   Did you have a discussion with him at all about the limited

4    use of his right arm?

5    A.   What he told me.

6    Q.   And what was that?

7    A.   Just that he had limited use of his arm

8    Q.   Okay.   And based on your background and training and

9    experience and qualifications as an expert, do you have any

10   knowledge of the injuries of Mr. Poke other than what you

11   observed?

12   A.   Can you rephrase a little?

13   Q.   Other than the injuries that you observed, do you have any

14   other knowledge of the nature or extent of Mr. Poke's injuries?

15   A.   Relating to his previous?   I mean, relating to the shooting?

16   Q.   Relating to his arm

17   A.   Okay.   Yes.

18   Q.   Okay.   And does that restrict Mr. Poke's movement in any way

19   that you know of?

20   A.   At the time, yes.

21   Q.   Okay.   And did it measurably restrict his movement?

22   A.   Yes.

23   Q.   And was it -- to what extent, if you know, did it restrict

24   his movement of that arm?

25   A.   That I don't remember.

Runyard - Cross

1   Q.   But it was significant?

2   A.   Um-hm

3   Q.   And the gabapentin does relieve pain associated with the

4   neuropathy; is that correct?

5   A.   Yes.

6   Q.   And based on the nature of Mr. Poke's injuries to his right

7   arm and the associated injuries, isn't it the case that you

8   believe that Mr. Poke is in pain pretty much constantly?

9   A.   I'm not able to say if he's in pain constantly or not.

10  Q.   When you filled out the form contained in Government's

11  Exhibit Number 20 and you were conducting your intake of

12  Mr. Poke, did he report to you that he was taking his medication

13  regularly?

14  A.   Yes.

15  Q.   Okay.   And if a person has pain associated with the

16  neuropathy of the sort that Mr. Poke suffers from, if they stop

17  taking their medication, is it common that they would then

18  experience pain?

19  A.   Yes.

20  Q.   And so, unless he was taking those drugs constantly, there's

21  a good chance that he would have been in pain?

22          MR. PEDERSEN:   Your Honor, calls for speculation.

23          THE COURT:   No, she's testifying as an expert.

24  BY THE WITNESS:

25  A.   I mean, I can't say what pain he has and what triggers his

**Runyard - Cross**

1  pain, when his pain comes and goes.  I mean --

2  BY MR. CAVER:

3  Q.   Okay.   But he suffers from neuropathy associated with the

4  injuries to his right arm, is that fair?

5  A.   Correct.

6  Q.   Okay.   What is neuropathy?

7  A.   It is the nerves causing pain due to an injury in that area.

8  Q.   And is it because those nerves are constantly firing pain

9  signals to the brain?

10  A.   Yes.   Or there's been an interruption in the nerve pathway,

11  yes.

12  Q.   Okay.   And gabapentin is one of the drugs that blocks those

13  signals from being sent to the brain?

14  A.   Yes.

15  Q.   So, if Mr. Poke does not take that medication, there's

16  nothing to block those signals from reaching the brain?

17  A.   Yes.

18  Q.   And, therefore, that would be what you and I would call a

19  sensation that would be what we call pain?

20  A.   Yes.

21  Q.   Okay.

22  A.   But it can be triggered by certain things, too, by use of or

23  other factors.

24  Q.   And what do you mean by that?

25  A.   Like how much they use that area, all the things like that

PDF created with pdfFactory trial version www.pdffactory.com

Runyard - Cross

1    that would trigger pain.

2    Q.   Okay.

3            MR. CAVER:   Judge, thank you.

4                    REDIRECT EXAMINATION

5    BY MR. PEDERSEN:

6    Q.   In your experience, when someone is prescribed a drug such

7    as Norco, is it the common practice in your field to explain to

8    that individual what other types of drugs that they should avoid

9    taking?

10   A.   No.

11   Q.   It's not?

12   A.   Unh-unh.

13   Q.   They wouldn't receive contraindications with the medication?

14   A.   They would receive that from the doctor who prescribed the

15   medications.

16   Q.   Okay.

17   A.   Because we don't prescribe the medications.

18   Q.   Right.   So, when he got the prescription for the Norco, the

19   doctor or someone or the pharmacist would have explained to

20   him --

21           MR. CAVER:   I'm going to object to Nurse Runyard's

22   knowledge of whether or not Mr. Poke received --

23           THE COURT:   She's saying what doctors do.   She's

24   testifying as an expert.   I think it's admissible.

25

PDF created with pdfFactory trial version www.pdffactory.com

Runyard - Redirect

BY MR. PEDERSEN:

Q.  Could you -- let me ask you the question again.

Would it be the common practice for the doctor prescribing the medication to explain to the patient to whom the medication is prescribed what other types of drugs they should avoid taking while taking that medication?

A.  Yes.

Q.  I want to ask you another question about the form that you helped prepare on Page 2, question 24.  That was the question where you asked, "Do you have any pain complaints, current illness/injury, or dental problems?"

A.  Yes.

Q.  And the defendant answered no, correct?

A.  Yes.

Q.  And then regarding the question for prescriptions, both these pages, they have inquiries -- or I'm sorry.  Starting on Page 1, question nine, right above that it says inquiry.  Is that -- those questions, are they in the form that you ask the individuals as you're preparing the intake form?

A.  Yes.

Q.  I mean, do you basically repeat what's written there?

A.  Yes.

Q.  So, you go through those questions in order, correct?

A.  Yes.

Q.  The first question that you asked regarding medications was

Runyard - Redirect

1    question 13, correct?

2    A.   Yes.

3    Q.   So, that question was, "Are you currently prescribed any

4    medications;" is that correct?

5    A.   Yes.

6    Q.   All right.  Then you go further you ask about if he's

7    taking -- on 19 do you take any -- well, first you ask, "Are you

8    currently under care for mental illness," and then you ask, "Do

9    you take your psychotropic medication," and the answer to that

10   was no, correct?

11   A.   Yes.

12   Q.   So, after you've asked those questions regarding medication,

13   later in question 29, right before you ask if the defendant in

14   question 27, "Do you drink alcohol," the answer is no, correct?

15   A.   Yes.

16   Q.   Then question 29 is "Do you use drugs?"

17   A.   Yes.

18   Q.   And you've already previously questioned the defendant at

19   that point about his prescription medication?

20   A.   Yes.

21   Q.   Okay.

22        MR. PEDERSEN:  If I could just have a moment.

23        (Brief pause.)

24        MR. PEDERSEN:  That's all the questions I have.  Thank

25   you.

Runyard - Recross

1    MR. CAVER:   Briefly.

2                    RECROSS EXAMINATION

3    BY MR. CAVER:

4    Q.   In reference to question number 24 and back to the

5    medication, does the gabapentin and the Norco completely halt

6    pain within the patient, if you know?

7    A.   That's not for me to -- I mean, I'm not sure if they would

8    have any pain outside of that.  It's up to the patient.

9    Q.   Do they kill the pain, or do they relieve it?

10   A.   That's what they're designed to do, yes.

11   Q.   I'm sorry?

12   A.   That's what they're designed to do, yes.

13   Q.   They're designed to kill the pain?

14   A.   Yes.

15   Q.   And so, a patient typically taking gabapentin with the

16   injuries such as Mr. Poke wouldn't feel any pain whatsoever?

17   A.   I can't say that.

18   Q.   Do you in your background, training, and experience working

19   at the jail, have you ever had patients under the influence of

20   medication who later give a different answer to the same

21   question asked of them earlier?

22   A.   Yes.

23   Q.   Okay.  Thank you.

24                    MR. PEDERSEN:  Nothing further.

25                    THE COURT:  Thank you for your help.

Reffett - Direct

1      THE WITNESS:  Yes.

2    (Witness excused.)

3      THE COURT:  Next witness.

4      MR. KARNER:  Call Detective Bob Reffett.

5    (Brief pause.)

6    (Witness duly sworn.)

7      ROBERT REFFETT, GOVERNMENT'S WITNESS, SWORN

8      DIRECT EXAMINATION

9  BY MR. KARNER:

10  Q.  Sir, would you tell us your name and spell your last name?

11  A.  It's Robert Reffett, R-e-f-f-e-t-t.

12  Q.  How are you employed?

13  A.  The City of Rockford Police Department.

14  Q.  How many years have you spent as a police officer?

15  A.  Just over 23 years.

16  Q.  What is your current job assignment?

17  A.  I'm a detective assigned to the Rockford narcotics unit.

18  Q.  How long have you been assigned to the narcotics unit?

19  A.  Almost eight years.

20  Q.  What are your duties as a detective in a narcotics unit?

21  A.  We handle primarily all narcotics investigations, ranging

22  anywhere from street level sales to larger investigations, wire

23  cases, overhears, cases like that.

24  Q.  What kind of training have you received as a narcotics

25  detective?

### Reffett - Direct

1    A.   Started back when I became a police officer going to the

2    Police Training Institute back in 1990, and then during the

3    course of my employment, I've attended several drug-related

4    classes, some of which are concealment areas within a vehicle,

5    criminal drug patrol, clandestine lab awareness, street crimes

6    and seminars, electronic countersurveillance or electronic

7    surveillance, indoor cannabis cultivation, undercover officer

8    training.  And there's been others, miscellaneous classes.

9    Q.   Are one of the investigative techniques you use as a

10   narcotics detective to execute search warrants?

11   A.   Yes.

12   Q.   Describe what it means to execute a search warrant.

13   A.   Search warrants are generally -- the majority of our search

14   warrants are done at residences where we've made a controlled

15   purchase of narcotics or cannabis, and we apply for a search

16   warrant, which gives us the authority to enter the house and

17   search for other illegal items.

18   Q.   Commonly known as a drug raid?

19   A.   Yes.

20   Q.   Now, you just mentioned another term, controlled purchase.

21   What's a controlled purchase?

22   A.   A controlled purchase is where we either use an informant or

23   an undercover officer, and it's basically we control the

24   purchase of the narcotics.  If it's with an informant, we meet

25   with them, we search them, make sure they don't have any money

PDF created with pdfFactory trial version www.pdffactory.com

### Reffett - Direct

1  or drugs on them  We supply them with money from our unit from

2  the police department, and we give them that money to go and

3  make the purchase of drugs for us.  From that point we follow

4  them to the residence or the location that we're going to

5  purchase the drugs.  We watch them leave us, go directly to the

6  house, come back.  They give us the drugs.  Then we apply for

7  the search warrant.

8  Q.  Going back to search warrants, approximately how many search

9  warrants have you participated in as a detective?

10  A.  Probably over 500 search warrants.

11  Q.  You mentioned controlled purchases with the use of an

12  informant.  How many times have you participated in making

13  controlled purchases of illegal drugs with using a confidential

14  informant?

15  A.  Probably well over 500.

16  Q.  And have you also made purchases of drugs working

17  undercover?

18  A.  Yes.

19  Q.  Approximately how many times?

20  A.  Probably between 50 and a hundred.

21  Q.  During the course of your career, have you interviewed drug

22  users who serve as informants so that you can gather

23  intelligence about how drug traffickers, particularly in

24  Rockford, conduct their trade?

25  A.  Yes.

Reffett - Direct

1    Q.   How many times?

2    A.   Probably spoken to individuals like that probably close to a

3    thousand times.

4    Q.   Okay.   And have you interviewed people who have been charged

5    with and later convicted of possessing with intent to distribute

6    or distributing illegal drugs?

7    A.   Yes.

8    Q.   Approximately how many times?

9    A.   Probably about the same.   Probably close to a thousand

10   times.

11   Q.   Prior to today did you testify as an expert in court on the

12   methods and the tools used by specifically crack cocaine dealers

13   to distribute crack cocaine?

14   A.   Yes.

15   Q.   Approximately how many times?

16   A.   I've testified in federal court probably five or six times

17   and then in state court probably 16 to 18 times as an expert

18   witness.

19         MR. KARNER:   Your Honor, I tender Detective Reffett as

20   an expert in the area of narcotics trafficking.

21         THE COURT:   Do you wish to voir dire the witness?

22         MR. CAVER:   No, Judge, and we have no objection.

23         THE COURT:   He may testify as an expert.

24   BY MR. KARNER:

25   Q.   Now, prior to today have you become familiar with a man

Reffett - Direct

1   named Dayton Poke?

2   A.   Yes.

3   Q.   Are you aware of his nickname?

4   A.   Yes.

5   Q.   What is it?

6   A.   Daylow.

7   Q.   Now, as far as the events on July 6th, 2011, though, you had

8   no participation in those events, did you?

9   A.   That's correct.

10  Q.   Now, let's talk about the physical characteristics of crack

11  cocaine.   Are you aware of what it looks like and how it's made?

12  A.   Yes.

13  Q.   Would you describe that for the jury, please?

14  A.   Crack cocaine is a form of cocaine.   Typically how we find

15  it, it's bagged up in like clear plastic sandwich baggie

16  corners, and the substance itself is typically an off-white

17  color.   It's kind of like a hard, chunky substance, almost

18  similar to like a soap or a wax.   It's kind of sometimes made of

19  that consistency.   Usually when it breaks apart, it breaks into

20  smaller little chunks.

21  Q.   Okay.   And are you aware of or familiar with the quantity of

22  drugs that are cocaine base, crack cocaine, that are sold on the

23  street level?

24  A.   The quantity?   I'm sorry.

25  Q.   Yes.

Reffett - Direct

1    A.   Typically we find that the crack cocaine that is purchased

2    in $20 bags.  It breaks down to approximately two-tenths of a

3    gram

4    Q.   Is the price -- well, what is the price that goes with a

5    20th of a gram?

6    A.   A 20th of a gram will go for $20.

7    Q.   And what is the price typically in Rockford, certainly

8    within the past five years, for a tenth of a gram?

9    A.   $10.

10   Q.   Are there other quantities that are available for street

11   purchase?

12   A.   Typically what we see are the ten and $20 bags.  Sometimes

13   there will be a little bit bigger bags.  The most profit is made

14   from the smaller bags, but the larger that you make the bags, it

15   sometimes can be a little bit safer for the drug dealers.  We

16   have found $50 bags.  That's not as popular, but we do come

17   across that occasionally.

18   Q.   And how are the various quantities packaged typically?

19   A.   Well, typically the quantities, we see them packaged in the

20   clear sandwich plastic baggies.  It's tucked down into the

21   corner.  The bag is twisted and then tied into a knot, and then

22   the excess is either torn or cut off.

23   Q.   I'm going to show you several items here.  First of all,

24   that middle item, Government's Exhibit 7 in front of you, would

25   you look at that, please, and tell us what you believe that to

Reffett - Direct

1   be based on your training and experience from its appearance?

2   A.   It appears to be crack cocaine.

3   Q.   In multiple packets?

4   A.   Yes.

5   Q.   Now, the way that that is packaged and broken down into

6   separate units, is that consistent or inconsistent with what a

7   street level dealer would possess?

8   A.   No, it's consistent.   The bags are a little bit larger than

9   a $20 bag, but it's consistent to what we see.

10   Q.   Okay.   Now, are you familiar with the role firearms play in

11   the street level distribution of cocaine base or crack cocaine?

12           THE COURT:   I didn't get that last question.   You said

13   is it consistent with a distributor or a user, and he says it's

14   consistent.   I think that's what I got.

15           MR. KARNER:   Well, can I ask the witness just to

16   clarify, Judge?

17           THE COURT:   Maybe we ought to ask the court reporter to

18   read it back just to make sure I'm right.

19           MR. KARNER:   Yes, sir.

20           THE COURT:   Mary, could you please read the question

21   that preceded the answer it's consistent?

22     (The record was read by the reporter as requested.)

23           THE COURT:   I was wrong.   Please proceed.

24   BY MR. KARNER:

25   Q.   Well, just so we're clear on that, if you found a person in

Reffett - Direct

1  possession of that, based on the way it's packaged and the

2  volume, is that consistent or inconsistent with an intent to

3  distribute?

4  A.  It is consistent with an intent to deliver, to distribute.

5  Q.  Okay.  Now, in your experience are you familiar with the

6  function of firearms in connection with street level

7  distributors or dealers of crack cocaine?

8  A.  Yes.  Frequently we find drug dealers in possession of

9  firearms.

10  Q.  Well, why?  What role do they serve?

11  A.  Basically for their safety, to protect their money, their

12  drugs, and to protect them sometimes from either the users or

13  from other drug dealers.

14  Q.  Because they can't report thefts or robberies to police,

15  right?

16  A.  That's correct.

17          MR. CAVER:  Objection.  Leading.

18          THE COURT:  Sustained.

19          MR. KARNER:  Okay.

20  BY MR. KARNER:

21  Q.  Well, is it a safe or a sensible practice for a drug

22  trafficker to report robberies or thefts to the police?

23  A.  No, we don't typically see that.

24  Q.  Why?

25  A.  Because they're dealing in illegal substances, and to report

PDF created with pdfFactory trial version www.pdffactory.com

Reffett - Direct

1    that they've been robbed of their illegal substances, that's

2    kind of like -- they don't typically do that.

3    Q.   Drug trafficking, specifically distribution of cocaine base.

4    Lucrative or not?

5    A.   It can be very lucrative.

6    Q.   Is it common or uncommon in your experience to find those

7    who distribute cocaine base to be in possession of a lot of

8    money?

9    A.   Yes.

10             MR. CAVER:   Objection to what's a lot.   Vagueness.

11             THE COURT:   Okay.   Well, that would be something you

12    could clear up on cross examination.   I'll overrule the

13    objection.

14    BY MR. KARNER:

15    Q.   And I realize it's not the Trump fortune here, but $260 in

16    combination with the amount of crack cocaine that's in front of

17    you and a handgun, is that consistent or inconsistent with an

18    intent to distribute?

19    A.   It's consistent.

20    Q.   Are you familiar with the role of cell phones to those who

21    distribute crack cocaine?

22    A.   Yes.

23    Q.   What's the role of a cell phone?

24    A.   It's communication.   It's communication used between the

25    dealer and the users.

## Reffett - Direct

1    Q.   Now, in your role in this case, did you examine some

2    printouts of text messages?

3    A.   Yes.

4    Q.   Let me just stop you there.   Before we go into the text

5    messages, how is crack cocaine ingested?

6    A.   It's smoked through a pipe or an object used to become a

7    pipe.

8    Q.   And in your experience, what types of objects are used as

9    pipes, crack cocaine pipes?

10    A.   We typically see -- we'll either find the glass tubes and

11    like the copper mesh inside them   They're just, you know,

12    probably three, four inches long, but it's just a small --

13    almost like a straw, but it's made out of glass.   Other ways

14    that we've seen, we've seen pieces of car antenna, other pieces

15    of small diameter pipe.   But probably the most common one we

16    come across are the glass pipes.

17    Q.   Okay.   Now, I want to show you the document I just handed

18    you, Government's Exhibit 21.   Have you seen that before?

19    A.   Yes.

20    Q.   Were you able to review the text messages that are in

21    Government's Exhibit 21 prior to today?

22    A.   Yes.

23    Q.   And in examining those text messages, was it -- in reading

24    those over, was it consistent or inconsistent that the possessor

25    of the phone from which these text messages were taken from had

PDF created with pdfFactory trial version www.pdffactory.com

### Reffett - Direct

1    an intent to distribute drugs versus was a simple user?

2    A.    The text messages indicated that the person in possession of

3    that phone was distributing the drugs.

4              MR. CAVER:    I'm going to -- never mind.    I'll withdraw.

5    BY MR. KARNER:

6    Q.    Let's go to Page 205 of that exhibit, if you could.    On the

7    second box from the top, it says, "Low wit the good."    Have you

8    heard -- do you know what the reference to the good means?

9    A.    Typically what we've seen is with the good, meaning -- a lot

10   of times it mean illegal drugs.

11   Q.    And good referencing the quality of those drugs?

12   A.    Yes.

13   Q.    And if we can go to Page 180 in the middle of the page, do

14   you see where I'm referring to?    "What the 3.0 yea."

15   A.    Yes.

16   Q.    Do you know what 3.0 means there?

17   A.    From my experience, what I would interpret that as being as

18   three grams or which commonly is known -- it can be right in the

19   weight of what they typically call an eightball.

20   Q.    Okay.    Now, are you familiar in the business of drug

21   trafficking with the term fronting or what it means to front

22   something?

23   A.    Yes.

24   Q.    What does it mean to front something?

25   A.    A lot of times, you know, people that are looking to

PDF created with pdfFactory trial version www.pdffactory.com

### Reffett - Direct

1    purchase, purchase narcotics, will ask to be fronted, and that's

2    to be given the drugs ahead of time before the payment, and then

3    later down the road that person will make the payment.

4    Q.   Are you familiar with the term 40?

5    A.   Yes.

6    Q.   What is a 40?

7    A.   Well, a 40 can also be -- is basically a quantity of drugs.

8    It could be two twenties, or it could be a little bit larger

9    bag, right around the weight of four-tenths of a gram

10   Q.   Now, does the quality, at least from the perception of a

11   crack cocaine user, does the quality of crack cocaine differ or

12   vary among street level dealers?

13   A.   It can vary.

14   Q.   And how is that possible for it to vary?  And when mention

15   is made of the quality of crack cocaine, what's that a reference

16   to?

17            MR. CAVER:   Objection.   Relevance.

18            THE COURT:   How is it relevant?

19            MR. KARNER:   Judge, it's relevant because some of these

20   text messages refer to some, for lack -- using that term shit

21   being good, and it puts those comments into context.

22            THE COURT:   I'll overrule the objection.

23            THE WITNESS:   I'm sorry.   Was I to go ahead?

24            THE COURT:   Yes.

25

Reffett - Direct

1    BY MR. KARNER:

2    Q.   What does it mean for the quality of crack cocaine to be

3    good, and what causes crack cocaine to vary in quality?

4    A.   Crack cocaine will vary in quality a lot of times in the

5    strength.   It's the amount of added items in with the cocaine,

6    whether it's a cutting agent or it's the actual making of the

7    crack cocaine.   Sometimes you will get a good batch.   Sometimes

8    you can get a bad batch, depending on how it's manufactured.

9    Sometimes it won't be a hard, chunky substance.   It will almost

10   be like a goo, a gooey, softer substance if it's bad.

11           MR. KARNER:   May I just have a moment, please?

12       (Brief pause.)

13   BY MR. KARNER:

14   Q.   Going back to Government's Exhibit 21, the series of

15   July 5th text messages, and they begin on Page -- actually, 170

16   there's one word.   Going from 170 all the way forward to 161,

17   can you explain the meaning of those texts as a group?

18   A.   All right.   Well, basically starting on July 5th at the

19   3:10:05 text message, a cell phone received a text message

20   saying, "I get paid Friday.   You front me?"   So, basically this

21   person at the 7786 number is asking the possessor of the

22   phone -- basically telling him he gets paid Friday and asking to

23   be fronted probably a quantity of drugs.

24           The possessor of the phone then sends a message saying,

25   "Yes I got that's cool."   Then the person at the 7786 number

## Reffett - Direct

1  sends to the possessor of the phone, "You sure? How much is the

2  prices?" The person possessing the phone then sends a message

3  back to the 7786 number, "$20." Then the 7786 number sends a

4  message back to the possessor of the phone saying, "Alright you

5  should do me a 40 though if possible." The possessor of the

6  phone sends a text back saying, "Ok."

7           Then going up to -- it's a continuation of the text.

8  Hang on a second. The possessor of the phone asks, "How long?"

9  Then says, "Sleep." He receives a message back from the 7786

10  number to the possessor of the phone, "Sweet were pickin some

11  people then gettin our car and come down there real quick." The

12  possessor of the phone sends a message back saying, "Ok."

13           The person at the 7786 number sends a message back to

14  the possessor of the phone, "Like mebbe like a half hour." The

15  possessor of the phone says a message back saying, "Ok." The

16  7786 number sends a message to the possessor of the phone, "Like

17  a half hour ish."

18           THE COURT: Well, he's just reading the text messages.

19  We can do that.

20           THE WITNESS: Okay.

21  BY THE WITNESS:

22  A.  I didn't know if you wanted the text messages or -- you know

23  what I'm saying? I'm trying to interpret the conversation.

24  BY MR. KARNER:

25  Q.  Well, what's the significance of that series of texts?

## Reffett - Direct

1  A.  Basically, the person at the 7786 number is arranging with

2  the possessor of the phone a narcotics transaction, and he's

3  asking for $40 worth of crack cocaine.

4  Q.  On the top of Page 166, in the body box, there's a comment,

5  "Cool.  I'll pay you Friday night for sure.  And if you have

6  good shit I'll buy more too."

7  A.  Yes, I see that.

8  Q.  What's the center of that message saying?

9  A.  The center of that message?  You mean the part of the text?

10  Is that what you're asking me?

11  Q.  Yes.

12  A.  That I'll pay you Friday night for sure, and if you have

13  good shit, I'll buy more too.

14  Q.  Good shit is a reference to what?

15  A.  The drugs.

16  Q.  And the quality?

17  A.  Yes.

18       MR. KARNER:  Nothing further.

19       THE COURT:  Mr. Caver.

20                  CROSS EXAMINATION

21  BY MR. CAVER:

22  Q.  And you don't know who was sending these text messages or

23  receiving them, for that matter, correct?

24  A.  No.  It's just obviously the text messages were found inside

25  the phone.

PDF created with pdfFactory trial version www.pdffactory.com

Reffett - Cross

1   Q.   What else does a 40 refer to?

2   A.   I'm sorry.

3   Q.   What else is a 40 commonly referred to?

4   A.   As far as in --

5   Q.   40 ounce beer?

6   A.   Yeah, I've heard beers referred to as 40s.  Yes.

7   Q.   Pretty common.

8   A.   I've heard it, yes.

9   Q.   Okay.  And in terms of the distinction between a drug dealer

10   and a drug trafficker, do drug dealers commonly share phones?

11   A.   The phone -- sometimes the phones will be passed from dealer

12   to dealer if they're working together.

13   Q.   And sometimes they're passed to people that aren't dealers;

14   is that fair?

15   A.   That the drug dealer would give his phone to just someone

16   else?

17   Q.   That when a phone is being used by multiple people, there's

18   no way that you know of as an expert witness in drug

19   transactions to determine whether or not that phone is

20   accessible to other people?

21   A.   I guess I wouldn't know that, if someone else has access to

22   that phone or not.

23   Q.   Okay.  And, in fact, you don't know that because -- well,

24   typically, is there any way to restrict phone use in cell phones

25   used by drug dealers?

Reffett - Cross

1  A.   You could have -- I mean, you could have a pass code set up

2  on your phone so that nobody could --

3  Q.   Is that common?

4  A.   In a lot of narcotics cases we come across where we're

5  arresting drug dealers, a lot of times we come across their

6  phones, and they're locked.

7  Q.   And do you have any knowledge as to whether or not this

8  phone that you took the messages from was locked in any way?

9  A.   I don't know.

10 Q.   And with drug addicts -- in this case do you know how much

11 crack cocaine was recovered?

12 A.   Yes.

13 Q.   Okay.  And the tested amount was, if you recall?

14 A.   From the lab report that returned?

15 Q.   How much of the drugs was tested in this case that's being

16 used?

17 A.   From what I saw in the reports, the lab report came back

18 that they tested -- they didn't say how much of the substance

19 they tested, but they tested up to 1.2 grams.

20 Q.   Okay.  And so, that would be six 20 bags?

21 A.   Well, you don't know because a lot of times we find with the

22 State Crime Lab is they will only test up to to reach the charge

23 that's being charged.

24 Q.   Maybe I didn't ask the question correctly.  Is 1.2 grams the

25 equivalent in the weight to six 20 bags?

Reffett - Cross

1    A.   I'm sorry.   Yes.

2    Q.   That's all I'm asking.

3    A.   Okay.   I'm sorry.

4    Q.   So, is that weight also consistent with a drug addict who

5    has access to money purchasing more than one 20 bag?

6    A.   I'm sorry.   What was that again?

7    Q.   Would having six 20 bags be consistent with a drug addict's

8    personal use?

9    A.   Typically when we find crack cocaine users, we typically

10   find them in possession of anywhere from like one to three bags

11   at a time.

12   Q.   And if they had access to money, they might have more?

13   A.   It's possible, yes, but typically that's what we find.

14   Q.   For instance, we're not talking about 20 or 30 bags here.

15   We're talking about the equivalent of the weight of six 20 bags;

16   is that fair?

17   A.   I'm sorry.   You're talking about the equivalent of six 20

18   bags?

19   Q.   In terms of the weight, 1.2 grams, we're talking about the

20   weight equivalent of six 20 bags; is that fair?

21   A.   Yes.

22   Q.   Okay.   So, is it totally out of the realm of possibility

23   then that six 20 bags, as opposed to one to three, could be

24   purchased by a user?

25   A.   It's possible, yes, but we don't typically see that.

Reffett - Cross

1    Q.   Okay.   And you said earlier that you see mostly smoking out
2    of glass pipes and that sort of thing.   Do you also know how
3    individual users use crack cocaine occasionally?
4    A.   As far as what?   I mean, as the manners in which they ingest
5    it?
6    Q.   Yes.
7    A.   Like I testified to, either glass pipes, small diameter
8    metal tube, such as an antenna piece, or a small pipe fitting.
9    That's typically what we see.
10   Q.   They might add it to other drugs, that sort of thing?
11   A.   I've heard of that before, but in the people that I've
12   talked to as far as users, I've never heard a user telling me
13   that they've added it to other things.
14   Q.   Okay.   But it's done.   For instance, you've never heard of
15   anybody adding crack cocaine, for instance, to another drug and
16   then using it together?
17   A.   As far as what other drug?
18   Q.   Marijuana.
19   A.   The only times that I've heard that is in cases where
20   someone has been arrested for possession with intent to deliver.
21   Q.   And tell me about that.
22   A.   Typically, people -- a lot of times we find in my experience
23   as an expert witness and the drug cases that I've handled, I've
24   heard of crack cocaine being added to cigars.   They call them
25   mac joints.   They say that they sprinkle it onto the marijuana

PDF created with pdfFactory trial version www.pdffactory.com

**Reffett - Cross**

1    cigarette and smoke the crack cocaine that way.

2           In the experience that I've had as 13 years basically

3    of doing drug work, most of the users -- almost all the users

4    I've ever talked to, they never bring that up.  The only people

5    that have ever brought that up to us are people that we have

6    charged with possession with intent to deliver as a defense.

7    Q.   But they're not rolling this joint.  They're not rolling it

8    to sell it.  They're rolling it to smoke it, right?

9    A.   Yes, that's what they say.

10   Q.   So, for personal use?

11   A.   That's what the people that we've arrested for possession

12   and intent have told us.

13   Q.   And that's all you really have to go on is what they tell

14   you, right?

15   A.   The people that we've charged with that tell us that.

16   Q.   For instance, you don't run into -- as an expert witness and

17   your background and training and experience, you don't often run

18   into people selling spliffs of marijuana with crack cocaine in

19   them for sale, correct?

20   A.   No.

21   Q.   On Page 205, talking about the Paraben report, the text

22   messages, okay?  At the top there where it says, "Low with the

23   good," do drug dealers typically refer to themselves in the

24   third person?

25   A.   Actually, yes.

Reffett - Cross

1   Q.   Because -- okay.  You have seen that?

2   A.   Yes.

3   Q.   Okay.  So, that's common?

4   A.   I mean, if you look at the text before that, the person's

5   asking who this is, and the response is "Low with the good."

6   Q.   Okay.  But in this case with these text messages, you

7   can't -- it's not common for an individual to speak of himself

8   in the third-party; is that fair?

9   A.   I guess that's up to the individual.

10  Q.   Okay.  And in your background, training, and experience in

11  your capacity as an expert witness, do you typically see

12  handguns held by the grip or by the barrel?

13  A.   I don't understand.  What do you mean?

14  Q.   When drug dealers carry weapons or use them for their

15  protection, as you testified earlier, do they typically hold

16  them by the grip of the firearm or by the barrel, if you know or

17  if you have any experience with it?

18  A.   I guess you could manipulate the handgun any way you want

19  depending on what you're doing with it.  I mean, if you're

20  taking it and -- if you're putting it in your waistband, you

21  would have it by the grip.  If you were putting it underneath a

22  seat, you could be grabbing it by the barrel.  I mean, it all

23  depends, I mean, what you're doing with it.

24  Q.   Okay.  Your testimony earlier was that drug dealers

25  typically protect themselves with firearms, to have a handgun at

PDF created with pdfFactory trial version www.pdffactory.com

**Reffett - Cross**

1   the ready.  Does it make -- in your background, training, and

2   experience, do you find it more common that people store the

3   firearm with the barrel ready to grab or with the grip ready to

4   grab?

5   A.   Are you talking about this case in specific?

6   Q.   Just in general.

7   A.   Just in general?  You can find a handgun in many different

8   positions when we recover them because when we recover them,

9   they may not be in the same place they were prior to us being

10  there.  You know what I'm saying?  A handgun could be put

11  anywhere once they detect law enforcement in the area of them

12  Q.   But a handgun that's being used for protection purposes, is

13  it fair to say that a handgun being used for those purposes is

14  best accessible if the grip is readily accessible, as opposed to

15  the barrel?

16  A.   Yeah, that would make sense.

17  Q.   Okay.

18        MR. CAVER:   May I just have a moment, Judge?

19      (Brief pause.)

20  BY MR. CAVER:

21  Q.   You had an opportunity to review all the text messages in

22  this case; is that correct?

23  A.   Yes.

24  Q.   And roughly how many phone numbers were involved in those

25  text messages?

Reffett - Cross

1   A.   You know, I'd have to go back through and look at it, the

2   entirety of the text messages that we recovered.  Offhand I was

3   looking -- when I was looking at the text messages and

4   deciphering the messages that appeared to be drug-related and

5   going from those phone numbers, I would say there's two or three

6   numbers that were different that appeared to be drug-related.

7   Q.   Okay.  So, two or three phone numbers?

8   A.   Yes.

9   Q.   Thank you.

10              MR. CAVER:  I have nothing further.

11                   REDIRECT EXAMINATION

12  BY MR. KARNER:

13  Q.   Are you familiar with any 40-ounce brand of beer out there

14  that costs $20?

15  A.   No.

16  Q.   In this case there's been a stipulation that the contents of

17  one bag was tested and found to be 1.2 grams of cocaine base.

18  If the other seven untested bags had the same -- roughly the

19  same weight and were cocaine base, would that be consistent or

20  inconsistent with an intent to distribute?

21              MR. CAVER:  Objection to the relevance.  The weight of

22  the tested material in the indictment is 1.2 grams.

23              MR. KARNER:  I'm asking him about the other seven bags,

24  though.

25              MR. CAVER:  Of what?

Reffett - Redirect

1      THE COURT:   Are you talking about the other seven bags

2  in Government's 7?

3      MR. KARNER:   Yes.

4      THE COURT:   Why do you think that's irrelevant?

5      MR. CAVER:   May we have a sidebar?

6      THE COURT:   Sure.

7      (The following proceedings were had at the sidebar, out of

8      the presence and hearing of the jury:)

9      THE COURT:   All right.   From what I understand of the

10  evidence, Government's 7 is a bag that contains individual bags

11  within it.

12      MR. KARNER:   Yes.

13      MR. CAVER:   Yes.

14      THE COURT:   And there are how many individual bags in

15  there?

16      MR. KARNER:   Total of eight.

17      THE COURT:   And from what I understand of the evidence,

18  and correct me if I'm wrong, one of these bags contains

19  1.2 grams?

20      MR. KARNER:   Yes.

21      THE COURT:   All right.   And what's your objection?

22      MR. CAVER:   It's my understanding the weight of the

23  crack cocaine that we were all talking about in the indictment

24  is 1.2 grams.   I understand there's a gross weight of more, but

25  asking him about the other bags with the implication that the

Reffett - Redirect

1   rest of the bags contained crack cocaine when that's not in

2   evidence, I object to it.

3           MR. KARNER:  It goes to the weight, and he's allowed

4   based on the appearance and the weight and the way it's

5   packaged --

6           MR. CAVER:  To testify that it's crack cocaine?

7           MR. KARNER:  No.

8           MR. PEDERSEN:  He can give an opinion on that, too.

9           MR. KARNER:  Yeah, he can give an opinion on that, but

10  also that it's consistent with an intent to distribute.

11          MR. CAVER:  My understanding was the stipulation was

12  that the weight of the drugs that we were talking about was

13  1.2 grams.

14          MR. KARNER:  Right.

15          MR. CAVER:  And the implication to go beyond that to

16  say it was more drugs, I object.

17          MR. KARNER:  Well, I think it's relevant based on the

18  appearance.  It just goes to the weight, Judge.  We don't have

19  to prove this quantity beyond a reasonable doubt.  It's going to

20  his opinion.

21          THE COURT:  What's the question you want to ask?

22          MR. KARNER:  If you were to learn that there was seven

23  untested bags that had the same contents -- that appeared to

24  have the contents that were the same, is that consistent or

25  inconsistent with an intent to distribute.

Reffett - Redirect

1    MR. CAVER:  I think the government has already asked

2    the question if the evidence contained within the plastic baggie

3    and the other baggies within it is consistent with an intent to

4    distribute.  The witness' answer was that it was.  I don't see

5    any reason for us to have to rehash that to ask the same

6    question.

7         THE COURT:  I'll allow Mr. Karner to ask that question.

8         MR. KARNER:  Thank you.

9    (The following proceedings were had in open court, in the

10       presence and hearing of the jury:)

11   BY MR. KARNER:

12   Q.  So, in Government's Exhibit 7, first of all, do all the

13   packets, the contents of the individual packets in Government's

14   Exhibit 7, do they all have the same physical characteristics?

15   A.  Yes, they do.

16   Q.  Okay.  And if you were to learn in that exhibit that only

17   one baggie had been tested, the contents of one baggie had been

18   tested -- so, there was seven untested, the contents of seven

19   untested bags -- would that change your opinion?  Does that

20   exhibit still -- does the possession of that exhibit show -- is

21   that consistent or inconsistent with an intent to distribute?

22   A.  It's consistent with intent to distribute.

23   Q.  Okay.  And then if you combine all that evidence -- the text

24   messages, the handgun, the cell phone, and the $260, in addition

25   to Government's Exhibit 7 -- is all that evidence consistent

Reffett - Recross

1    with an intent to distribute the possession of those items?

2    A.   Yes.

3                MR. KARNER:   Nothing further.

4                THE COURT:   Recross.

5                         RECROSS EXAMINATION

6    BY MR. CAVER:

7    Q.   What if that cell phone wasn't present?  Would that change

8    your opinion?

9    A.   No, it would not.

10   Q.   Why not?

11   A.   Because of the currency located, the $260, the handgun, the

12   drugs, the packaging of the drugs, the quantity of the drugs,

13   and the overall weight and the lack of a manner to ingest the

14   crack cocaine not being there, that would still render my

15   opinion as intent to distribute.

16   Q.   And what if the person didn't know about the gun, either?

17   Would that change your opinion?

18   A.   So, now we're not going -- the cell phone out and the gun

19   out?

20   Q.   I'll reask the question.

21                If there was no cell phone recovered on the person who

22   is alleged to have been dealing drugs and that person who is

23   alleged to have been dealing drugs didn't know about the

24   possession of a firearm, would it change your opinion?

25   A.   Based on the packaging of the cocaine, the amount of cocaine

Reffett - Recross

1    that was here, and the currency and the lack of a manner to

2    ingest the cocaine, I would still say that it is an intent to

3    distribute case.

4    Q.   Would you say that that would also, though, be consistent

5    with personal use?

6    A.   No.

7    Q.   And why?

8    A.   Because it's not typically what we find in a drug user.   In

9    typical drug users, we don't find the larger sums of cash.   With

10   a drug user we typically find them with one to three bags.

11   Usually the bags we find them with are $20 bags.   These bags are

12   larger.   They've got to be -- probably if one bag was tested and

13   it came up with a 1.2 lab weight, that means that they're

14   probably one gram bags.   Typically we don't find users with this

15   quantity of crack cocaine in their possession.

16   Q.   But it's not out of the realm of possibility?

17   A.   Well, I mean, the total -- I mean, if one bag weighs

18   1.2 grams and there's seven --

19   Q.   But the one bag is the only one that's tested.

20   A.   And weighed.

21   Q.   Right.

22   A.   I know, but there's seven other baggies in here.

23   Q.   Is it out of the realm of possibility that it could have

24   been --

25   A.   Highly unlikely.

## Reffett - Recross

1    Q.   But possible?

2    A.   I guess it would be possible, but highly unlikely.

3    Q.   Thank you.

4      (Brief pause.)

5   BY MR. CAVER:

6    Q.   The text messages that you reviewed talk about $20 bag.

7   There's one text message in there that talks about a $20 bag?

8    A.   Yes.

9    Q.   And that's not what you found, correct?

10    A.   These bags look to be larger.

11    Q.   Right.   So, the person who was sending the text messages

12   talking, as you say, about $20 bags would not have been -- would

13   not have had government's exhibit for sale; is that correct?

14   Those would not be consistent?

15    A.   That these bags would be?

16    Q.   Correct.

17    A.   These bags appear to be larger, but it's not to say that

18   that person was out of $20 bags.

19    Q.   But none that you know of were related to this case,

20   correct?

21    A.   That's correct.   These bags appear to be larger.

22    Q.   Right.   And those are the only drugs that were found and

23   related to this case, correct?

24    A.   The problem that we have with like this exhibit is it's

25   not -- the individual baggies aren't weighed out except for the

PDF created with pdfFactory trial version www.pdffactory.com

## Reffett - Recross

1    one being the 1.2.

2    Q.   Sure.   But you just testified that each of the bags appears

3    to be bigger than a typical --

4    A.   Than a 20 bag?

5    Q.   Right.

6    A.   Yeah, they appear to be bigger than $20 bags.

7    Q.   So, somebody sending text messages about $20 bags wouldn't

8    be selling these bags, correct?

9    A.   They may.

10   Q.   Well, the text messages wouldn't be referring to these bags;

11   is that correct?

12   A.   Well, we typically find that the $20 bags are two-tenths of

13   a gram bags.

14   Q.   Right.   And these bags are larger than that.

15   A.   Yes.

16   Q.   So, my question is the person talking about selling $20 bags

17   is not selling the bags that you have in front of you as $20

18   bags, correct?   In your background, training, and experience as

19   an expert witness in drugs.

20   A.   The only time that we found that the bags would be bigger

21   than a $20 bag like we're talking is somebody that's basically

22   trying to build a customer base.   They may sell --

23   Q.   But can I buy these bags on the street for $20?

24   A.   I guess that would be up to the seller, but typically they

25   go for more dollars.

Reffett - Further Redirect

1  Q.  Right.   And it's not common.

2  A.  Like I said, unless you're trying to build a customer base.

3  Q.  Okay.   Thank you.

4       MR. CAVER:   Nothing further.

5              FURTHER REDIRECT EXAMINATION

6  BY MR. KARNER:

7  Q.  Do drug dealers carry more than one quantity in units of

8  drugs to sell?

9  A.  Yes.

10  Q.  Is there anything difficult or would prohibit them from

11  breaking up with a razor blade the larger chunks into smaller

12  chunks?

13  A.  Yes, we've seen that.

14       MR. KARNER:   Nothing further.

15       THE COURT:   Anything more?

16       MR. CAVER:   No.   Thank you.

17       THE COURT:   You may step down, Detective Reffett.

18   (Witness excused.)

19       THE COURT:   Next witness, please.

20       MR. KARNER:   Judge, may we approach for scheduling?

21       THE COURT:   Sure.

22   (The following proceedings were had at the sidebar, out of

23       the presence and hearing of the jury:)

24       MR. KARNER:   Judge, that's our witnesses.   That's our

25  case.   We'd like the lunch hour just to review our notes and

1    make sure all the bases are covered.   But our expectation would

2    be after lunch to come back and rest.

3              THE COURT:   Mr. Caver, how many witnesses do you

4    anticipate calling?

5              MR. CAVER:   I anticipate calling two witnesses, Judge.

6              MR. KARNER:   Now, Detective Pruitt is here.   Can he be

7    released if the defense doesn't intend to call him?

8              MR. CAVER:   Oh, I'm sorry.   You're not going to call

9    Detective Pruitt at all?

10             MR. KARNER:   No.

11             MR. CAVER:   We're going to call Detective Pruitt then.

12   So, that's three witnesses.

13             THE COURT:   You're going to call Pruitt and who else?

14             MR. CAVER:   Pruitt, Stevens, and likely Mr. Poke.

15             THE COURT:   Detective Pruitt is here.

16             MR. KARNER:   He's here.   What time should I tell him to

17   report back to?

18             THE COURT:   Let's have him come back at 1:30.

19             MR. KARNER:   1:30?

20             THE COURT:   Yes.

21             MR. KARNER:   Yes, sir.

22             MR. CAVER:   Thank you, Judge.

23             THE COURT:   You're welcome.

24        (The following proceedings were had in open court, in the

25        presence and hearing of the jury:)

1    THE COURT:   Ladies and gentlemen, I'm going to release
2    you for lunch.   As jurors in this case, you're not to discuss
3    the case among yourselves or with anyone else or permit anyone
4    to discuss it in your presence.   You must refrain from being
5    exposed to any media accounts of the trial while it's in
6    progress.
7         Do not make any independent investigation of the case
8    by reading materials, doing any research, attempting any testing
9    or going to any location where any of the events in this case
10   took place.   If someone tries to contact you, either directly or
11   indirectly, please notify me immediately.   Let's come back at
12   1:30.
13       (The following proceedings were had in open court, out of
14       the presence and hearing of the jury:)
15       THE COURT:   Okay.   We'll see you in an hour.
16       MR. CAVER:   Thank you, Judge.
17       (Whereupon, the within trial was recessed to 1:30 o'clock
18       p.m of the same day.)
19
20
21
22
23
24
25

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   WESTERN DIVISION

3   UNITED STATES OF AMERICA,      )      Docket No. 11 CR 50062
                                   )
4                  Plaintiff,      )      Rockford, Illinois
                                   )      Tuesday, May 7, 2013
5          v.                      )      1:30 o'clock p.m
                                   )
6   DAYTON POKE,                   )
                                   )
7                  Defendant.      )

8                        VOLUME 2
                    TRANSCRIPT OF TRIAL
9       BEFORE THE HONORABLE FREDERICK J. KAPALA, and a jury

10  APPEARANCES:

11  For the Government:          HON. GARY S. SHAPIRO
                                 Acting United States Attorney
12                               (327 S. Church Street,
                                  Rockford, IL 61101) by
13                               MR. MARK T. KARNER
                                 MR. JOSEPH C. PEDERSEN
14                               Assistant U.S. Attorneys

15  For the Defendant:           LAW OFFICE OF BRENDAN W CAVER, LTD.
                                 (308 West State Street,
16                                Suite 97,
                                  Rockford, IL 61101) by
17                               MR. BRENDAN W CAVER

18  Also Present:                MR. DANIEL IVANCICH
                                 Special Agent, ATF
19
    Court Reporter:              Mary T. Lindbloom
20                               327 S. Church Street
                                 Rockford, Illinois 61101
21                               (815) 987-4486

22

23

24

25

1       (The following proceedings were had in open court, out of

2       the presence and hearing of the jury:)

3               THE COURT:  11 CR 50062, United States of America v.

4       Dayton Poke.  All parties present.  Case comes before the court

5       for a continued jury trial.

6               MR. KARNER:  Judge, we've moved for the admission of

7       our exhibits.  I think all the exhibits have been admitted that

8       we moved for.  With that, it's our intention to rest in front of

9       the jury when the jury returns.

10              There's one issue that comes up.  It concerns Detective

11      Pruitt.  The defense has informed us they want Detective Pruitt

12      to testify, which is fine, if he has some relevant testimony to

13      give for them  But as your Honor knows, it's improper to call a

14      witness strictly for the purpose of impeaching him  We'd like

15      to know what Mr. Caver's good faith basis is for calling

16      Detective Pruitt, what relevant evidence does he have to the

17      defense to call him as a witness.

18              MR. CAVER:  This detective is the lead -- was the lead

19      detective when this was a state case.  His name appears on the

20      probable cause statement, apparently because he was the one that

21      drafted it.  Under officer it says Detective Pruitt on the

22      probable cause statement.

23              Further, he was the first on the scene who claims to,

24      in the narrative report, have observed my client make all kinds

25      of motions with his injuries and his limited range of motion to

1    be able to do what Detective Pruitt says he does in a matter of

2    moments.   It is our contention that that would have been

3    difficult for Mr. Poke to have done it.

4            If the government thinks that I'm calling Detective

5    Pruitt or is asking the court to infer that it is my only

6    intention to call Detective Pruitt simply to impeach him, there

7    are reasons why I want him as an occurrence witness.   Frankly,

8    I'm shocked that the government didn't call Detective Pruitt in

9    its case-in-chief if for no other reason than to draw the

10   impeachment out before I had a chance to do it.   But that's the

11   government's case.

12           But there are certainly -- Detective Pruitt wrote a

13   several page report detailing the nature of Detective Pruitt

14   being the first on scene.   Detective Nordberg testified that he

15   was there to back Detective Pruitt up.   Detective Pruitt was the

16   first person on the scene to observe the inside of the vehicle

17   where the cell phone was not located.   We already have

18   conflicting testimony in the government's own case through

19   Officer Dodd that he personally recovered the cell phone from

20   Mr. Poke, yet the probable cause statement says that it was

21   clearly recovered from the floorboard of the vehicle.

22           These are significant factual disparities that I guess

23   I'm perfectly happy to explain to them now that we are where we

24   are in the case, but there is a good faith basis for me to call

25   Detective Pruitt.

1     MR. KARNER:  Well, I think Mr. Caver just proved my

2     point.  The probable cause statement -- Mr. Caver knows this --

3     it came out in the suppression hearing.  It will come out again.

4     The probable cause statement was typed by Detective Stevens, who

5     is also a defense witness.  Detective Stevens is going to

6     testify that he typed that probable cause statement, and he

7     put -- there were some errors in it, but Detective Stevens

8     wasn't -- he didn't show up at the scene until after the traffic

9     stop was conducted and after the defendant was secured in the

10    squad car.

11            Now, as to what Detective Pruitt's observations were,

12    Mr. Caver just said what I thought he would say, and that is

13    he's putting him on the stand, first of all, to describe

14    observations he made with the idea of knocking him down, to try

15    and impeach him to say, no, those weren't the observations he

16    made because there was too many observations in too short of a

17    time window.  That's calling a witness strictly for the purpose

18    of impeaching him  How does that advance his defense?

19            MR. CAVER:  There's inconsistency in the probable cause

20    statement, which on its face is purported to have been made by

21    Detective Pruitt.

22            MR. KARNER:  That's not true.  That's not true.  It's

23    not purported to be made by Detective Pruitt.  It has him

24    identified as a detective.

25            MR. CAVER:  The probable cause statement, in the header

1   information underneath the defendant's name and address is

2   officer name Detective M Pruitt, Number 154.  When I was a

3   state prosecutor, the probable cause statement is typically

4   prepared by the officer whose name appears in that line and is

5   reviewed by the sergeant whose name usually appears in the lines

6   below.

7           THE COURT:  Well, let's find out who made this one.

8           MR. CAVER:  I believe Detective Stevens did.

9           THE COURT:  All right.

10          MR. CAVER:  But there's an inconsistency.  If Detective

11  Stevens did make it and Detective Pruitt didn't have anything to

12  do with it, why does Detective Pruitt's name appear in that

13  line?

14          MR. KARNER:  Because he was the reporting officer.  He

15  was the officer who was listed as the person making the arrest.

16  Nowhere does this probable cause statement say or does any

17  Rockford police officer lead anyone to believe that Maurice

18  Pruitt typed this document.

19          THE COURT:  Detective Stevens is going to say that he

20  typed the probable cause statement?

21          MR. CAVER:  Yes.

22          MR. KARNER:  Absolutely.  Yes.

23          THE COURT:  Well, then you're not going to try to

24  convey to the jury that Pruitt typed the statement?

25          MR. CAVER:  That's what Detective Stevens is going to

1    testify to here at trial.

2              THE COURT:  Okay.

3              MR. CAVER:  At the motion to quash and suppress,

4    Detective Stevens testified -- if I could have a moment.

5         (Brief pause.)

6              MR. CAVER:  At the motion to quash and suppress,

7    Detective Stevens on Page 4, his testimony was questioned.

8         "Q. Okay.  During your involvement on the case, did you have

9         occasion to issue or draft a document known as a Rockford

10        police department probable cause statement?

11        "A. No."

12             THE COURT:  Well, who drafted it then?

13             MR. KARNER:  Stevens did, and he's going to testify to

14   that.  He made a mistake in that earlier testimony.

15             THE COURT:  All right.  Detective Pruitt's an

16   occurrence witness.  I don't think I can tell the defense that

17   they can't call him  Let's bring the jury in.

18        (Brief pause.)

19             THE COURT:  By the way, is Mr. Poke going to testify?

20             MR. CAVER:  Judge, I think we're going to wait to see

21   what the testimony is from the first two defense witnesses, but

22   I'm inclined at this point to think that he is.

23             THE COURT:  Well, let's take a brief recess, and you

24   can tell me --

25             MR. CAVER:  I appreciate that.

1　　　　　　　THE COURT:  -- before.

2　　　　　　　MR. KARNER:  Is it the schedule then to argue tomorrow?

3　　　　　　　THE COURT:  I don't know.  We'll see how fast we can

4　get through this.  Have you had a chance to look at the jury

5　instructions, Mr. Caver?

6　　　　　　　MR. KARNER:  Mr. Caver?

7　　　　　　　THE COURT:  Brendan, do you want to talk to me instead

8　of talking to him?

9　　　　　　　MR. CAVER:  I apologize.

10　　　　　　THE COURT:  Have you had a chance to look at the jury

11　instructions?

12　　　　　　MR. CAVER:  I have.

13　　(The following proceedings were had in open court, in the

14　　　presence and hearing of the jury:)

15　　　　　　THE COURT:  Good afternoon, everyone.  Mr. Karner.

16　　　　　　MR. KARNER:  Your Honor, the United States rests its

17　case.

18　　　　　　THE COURT:  Mr. Caver, how do you wish to proceed?

19　　　　　　MR. CAVER:  Judge, thank you.  At this time, Judge, I

20　have a motion.

21　　　　　　THE COURT:  And what's that?

22　　　　　　MR. CAVER:  For directed finding.

23　　　　　　THE COURT:  All right.  Well, let's send the jury out.

24　　(The following proceedings were had in open court, out of

25　　　the presence and hearing of the jury:)

1    MR. CAVER:   Judge, I was working all over the lunch
2  hour preparing the stipulation, preparing for my witnesses.   I
3  did not prepare the motion in writing for directed finding.   I
4  apologize to the court.   I can do it briefly, or I could either
5  do that or I could have it on file by the end of the day.
6    THE COURT:   All right.   Why don't you make your oral
7  motion and follow it up in writing.
8    MR. CAVER:   Thank you, Judge.
9    At this time, Judge, the facts taken in the light most
10 favorable to the government suggest nothing more than
11 circumstantial evidence.   The government has not shown --
12    THE COURT:   Well, wait, wait, wait.   Before we get too
13 far with that, what's wrong with circumstantial evidence?
14    MR. CAVER:   Judge, in the light most favorable to the
15 government, I would argue that the government has not shown its
16 case.
17    THE COURT:   I thought you said that the government's
18 case is based on circumstantial evidence.
19    MR. CAVER:   Well, it is, but there are also
20 inconsistencies with the government's circumstantial evidence.
21 There is no way to tie my client to the cell phone.   The
22 government, other than showing the mere fact that the gun --
23    THE COURT:   Wasn't it taken from his pocket?   I thought
24 that was the evidence.   It was retrieved from his shirt pocket.
25    MR. CAVER:   That was the testimony.   But in terms of

1    the text messages that's being used to show that this was a drug

2    trafficking conspiracy, Detective Reffett testified that he

3    based his opinion in part on the fact that the text messages

4    outlined the defendant explaining what the drug purchases were

5    for and explaining that the cell phone was used in order to

6    communicate regarding the sale of the drugs.

7           THE COURT:  Although when you asked him if you took the

8    cell phone out of the equation, he still had an opinion that the

9    evidence was consistent with drug trafficking.

10           MR. CAVER:  That is correct, but that's not -- it's not

11    the only piece of evidence that I'm relying on.  It's not just

12    the fact that the government can't tie the cell phones to my

13    client.  There's no DNA evidence.  The testimony was that even

14    the ridged surfaces that are typically present on a handgun of

15    this sort would have DNA evidence.  That was not tested.

16           The gun -- Detective Cone testified that guns are not

17    typically handled by the barrel, and in this case the photo

18    which has been admitted into evidence of the firearm as it was

19    apparently found on the floorboard of the vehicle was that the

20    barrel was sticking out, in which case it would not have been

21    likely that my client would have handled it in that manner, if

22    that's consistent with Detective Cone's testimony regarding guns

23    being handled by the barrel.

24           Judge, at this time I would make the motion for

25    directed finding based on the fact that taken in the light most

1    favorable to the government that it has not met its burden

2    beyond a reasonable doubt based on the inconsistencies and the

3    lack of evidence set forth by the government.

4              MR. KARNER:  We've proven every element of the charged

5    three offenses, Judge.

6              THE COURT:  Viewing the evidence in the light most

7    favorable to the government, I conclude that the record contains

8    sufficient evidence upon which a rational jury could find the

9    defendant guilty.  I'll deny the motion, and we'll bring the

10   jury back in.

11             MR. CAVER:  Thank you, Judge.

12             THE COURT:  Who's going to be your first witness?

13             MR. CAVER:  Detective Pruitt.

14       (The following proceedings were had in open court, in the

15         presence and hearing of the jury:)

16             THE COURT:  Nice to see you again, folks.  I missed you

17   while you were gone.

18             Mr. Caver, call your first witness.

19             MR. CAVER:  Thank you, Judge.  I would call Detective

20   Maurice Pruitt.

21       (Brief pause.)

22       (Witness duly sworn.)

23

24

25

Pruitt - Direct

1    MAURICE PRUITT, DEFENDANT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MR. CAVER:

4    Q.   Good afternoon, sir.   Would you please state your name and

5    spell it for the court reporter?

6    A.   Maurice Pruitt, M-a-u-r-i-c-e P-r-u-i-t-t.

7    Q.   Detective Pruitt, how are you currently employed?

8    A.   Detective, City of Rockford Police.

9    Q.   For how long have you been so employed?

10   A.   Twenty years.

11   Q.   Detective, were you on duty on July 6th of 2011?

12   A.   Yes.

13   Q.   What were you doing that day?

14   A.   I was patroling.

15   Q.   Were you with your partner?

16   A.   Yes.

17   Q.   And who was that?

18   A.   Detective Kevin Nordberg.

19   Q.   And when you and Detective Nordberg were on patrol, did you

20   notice anything happen out of the ordinary?

21   A.   We responded to a robbery that occurred at 7th Street/12th

22   Avenue, a Quik Mart store.   So, we responded to that area.

23   Q.   So, the reason that you were in that area was because you

24   received a call to respond there?

25   A.   We heard the broadcast and responded there on our own.

PDF created with pdfFactory trial version www.pdffactory.com

Pruitt - Direct

1    Q.  So, you were driving?

2    A.  Yes.

3    Q.  So, in response to that broadcast call, you decided to

4    appear there?

5    A.  Yes.

6    Q.  And after you appeared there, did you notice anything out of

7    the ordinary?

8    A.  Yes.  When we were -- we were on 8th Street at 10th Avenue

9    facing northbound.  There was a silver Chevy Impala on 8th

10   Street and 10th Avenue facing southbound.

11   Q.  Okay.  And what did you do next?

12   A.  Detective Nordberg brought to my attention that he

13   recognized the license plate to the car as being the same

14   vehicle that he and two other detectives were performing

15   surveillance on the night before.

16   Q.  Okay.  So, why did you pull the car over?

17   A.  The car made a left turn going eastbound on 10th Avenue.  I

18   also turned right, eastbound on 10th Avenue, got behind the car,

19   noticed as soon as I got behind the car that the car immediately

20   made a right turn into a driveway without using his turn signal.

21   Q.  Okay.  So, what happened next?

22   A.  I got out of the car.  I was the driver.  I start to

23   approach the driver's side window to the car.  As I'm

24   approaching the driver's side door, I could see the occupant

25   leaning over and rolling up his window, the driver's side window

## Pruitt - Direct

1  being rolled up quickly, and I could see him leaning over

2  underneath the seat with his right hand as though he was moving

3  something around.

4  Q.  And so, he was doing this at the same time?

5  A.  Yes.

6  Q.  Okay.  Do you know Dayton Poke?

7  A.  I don't know him personally.

8  Q.  Have you had any prior dealings with him professionally?

9  A.  No.  It's just I knew his name through previous police

10 investigations.

11 Q.  Do you know of any injuries that Mr. Poke has?

12 A.  I was aware of injuries he had from that particular day when

13 he mentioned he had been shot by with an AK-47.

14 Q.  Okay.  And from the time that you pulled the Impala over,

15 you exited the car, and you walked up to the side of the car to

16 observe Mr. Poke rolling up the window, about how long was that

17 period of time?

18 A.  It was within seconds.

19 Q.  When you approached the car, did Mr. Poke at some point open

20 the door?

21 A.  Yes, he attempted to open the door and step out, and I at

22 that point, the first time, I told him no, to stay in the car.

23 Q.  And at any point did you observe any cell phone on the

24 floorboard of the car?

25 A.  No.

## Pruitt - Direct

1    Q.   Do you have any reason to believe that -- well, strike that.

2           Approximately how many other officers would eventually

3  arrive and respond to the traffic stop?

4    A.   I don't know the exact number of officers that arrived.

5  Maybe four, four or five.

6    Q.   And did all of those officers at that point have access to

7  the scene?

8    A.   Yes.

9    Q.   And it wasn't restricted any way from detectives or

10  restricted from patrol officers, anything of that sort?

11    A.   As far as what part restricted?

12    Q.   The scene, in terms of the floorboard of the car.

13    A.   It was only -- Detective Nordberg was really the only person

14  that had dealings with the car.

15    Q.   But it wasn't, for instance, that -- nobody said, for

16  instance, only certain people can go by the car, that sort of

17  thing?

18    A.   Right.

19    Q.   That was not said?

20    A.   No.

21    Q.   Okay.  And in terms of the policy and procedure of the

22  Rockford Police when securing a scene, is it ever Rockford

23  Police policy to restrict the scene from anybody in that sort of

24  circumstance from certain types of officers?

25    A.   I don't quite understand.

Pruitt - Direct

1    Q.  I'll ask it again.  As part of your investigation, is it

2    ever Rockford policy to restrict the scene from any sort of

3    police officer, member of law enforcement, from being at that

4    scene?

5    A.  I can't say that I know the policy as far as restricting any

6    particular officer from being at the scene.

7    Q.  Okay.  And you did not write -- you did write a narrative

8    report in this case; is that correct?

9    A.  That's correct.

10    Q.  But you did not write any probable cause statement?

11    A.  That's correct.

12          MR. CAVER:  Judge, may I have a moment?

13    (Brief pause.)

14    BY MR. CAVER:

15    Q.  Detective Pruitt, when you were at the scene, were you

16    with -- from the time that you got to the scene, were you with

17    Mr. Poke the entire time?

18    A.  Yes.

19    Q.  And at what point -- did you ever hand him off, so to speak,

20    to any other officer, any other detective?

21    A.  I want to say he was escorted to Officer Dodd's patrol car,

22    but I also stayed with him during that time.

23    Q.  So, you were with him?

24    A.  Yes.

25    Q.  Okay.  So, you saw Mr. Poke up until the time that he was

## Pruitt - Direct

1    taken away and presumably taken to the Winnebago County Jail?

2    A.   No.   Only to the point from the scene to the Public Safety

3    Building, but not from the Public Safety Building to the jail.

4    Q.   Okay.   So, you were with him from the time that you first

5    saw him, you first saw him rolling up the window and doing

6    whatever he was with his right hand?

7    A.   Yes.

8    Q.   And then you were there until we was put in a squad car for

9    transport?

10   A.   Yes.

11        (Brief pause.)

12   BY MR. CAVER:

13   Q.   Detective Pruitt, if you know, who searched Mr. Poke that

14   day, his person?

15   A.   I don't know who searched him that day.   I don't know if it

16   was Officer Dodd prior to him transporting him to the Public

17   Safety Building or not.

18   Q.   But you don't know?

19   A.   I don't know.

20   Q.   And you didn't search him?

21   A.   No.

22   Q.   Okay.

23        MR. CAVER:   Thank you, Judge.   No further questions.

24        MR. KARNER:   Judge can we have just a minute, please?

25        (Brief pause.)

Stevens - Direct

1    MR. KARNER:  No questions, Judge.

2    THE COURT:  You can step down, Detective Pruitt.  Thank

3    you for your help.

4    (Witness excused.)

5    THE COURT:  Next witness, please.

6    MR. CAVER:  Judge, the defense calls Sergeant Joseph

7    Stevens.

8    (Brief pause.)

9    (Witness duly sworn.)

10    JOSEPH STEVENS, DEFENDANT'S WITNESS, SWORN

11    DIRECT EXAMINATION

12   BY MR. CAVER:

13   Q.   Good afternoon, sir.

14   A.   Hello.

15   Q.   Would you please state your name and spell it for the court

16   reporter?

17   A.   Joe Stevens, S-t-e-v-e-n-s.

18   Q.   Sergeant, how you currently employed?

19   A.   I'm a detective-sergeant with the Rockford City Police

20   Department assigned to the violent crime unit.

21   Q.   For how long have you been so employed?

22   A.   Nineteen years.

23   Q.   And were you on duty on July 6th of 2011?

24   A.   Yes.

25   Q.   And what were you doing that day?

PDF created with pdfFactory trial version www.pdffactory.com

### Stevens - Direct

1  A.  At that time I was a supervisor of the gang unit.  Our unit

2  had been assigned to night hours to assist patroling areas of

3  the city that we felt were hot, for lack of a better term

4  Q.  So, high crime areas?

5  A.  Yes.

6  Q.  And did you have an occasion to report to a traffic stop by

7  Detectives Pruitt and Nordberg?

8  A.  Yes.

9  Q.  And did you prepare a probable cause statement in reference

10  to that?

11  A.  I did, yes.

12  Q.  Okay.  And that probable cause statement, I'm going to show

13  you what's previously marked as Defense Exhibit Number 3.  Is

14  that the probable cause statement that you prepared in relation

15  to this case?

16  A.  Yes.

17  Q.  And in that probable cause statement, is there mention about

18  a cell phone being found on the floorboard of a car?

19  A.  Yes.

20  Q.  Okay.  And where did you get that information?

21  A.  I made an assumption when we were talking to the detectives.

22  There was a phone cord in the car.  When I typed this, I assumed

23  the phone was with the cord, and it was not.

24  Q.  Okay.  And so, at the time that you made that assumption,

25  there was no basis in fact for writing what you wrote in

Stevens - Direct

1    reference to the cell phone in that probable cause statement?

2    A.   Correct.

3    Q.   And is it important when you're writing a probable cause

4    statement to get the facts exactly as they're observed?

5    A.   Yes.

6    Q.   Okay.  And is it typical to write an entry in a probable

7    cause statement that's based solely on an assumption?

8    A.   I'm sorry.  I don't understand the question.

9    Q.   Is it typical to make an entry in a probable cause

10   statement, such as the one you made regarding the cell phone, is

11   it typical to make such a statement based on an assumption, as

12   opposed to an observation?

13   A.   No.

14   Q.   Did any other detective, as far as you know, tell you that

15   information?

16   A.   No.

17   Q.   And you had previously testified in this case on

18   August 31st, 2012; is that correct?

19   A.   Yes.

20   Q.   And it was your testimony at that time that you did not

21   prepare the probable cause statement?

22   A.   Yes.  The probable cause statement is a snapshot of the

23   incident prior to reports being written by the detectives and

24   the officers.  It's meant for the beginning of the arrest

25   process so that persons in the criminal justice field can view

Stevens - Direct

1    that statement and get a quick look at what the incident -- how

2    the incident occurred and what happened.

3            Frequently, there are many people who contribute facts

4    to the probable cause statement, and it's not meant for an all

5    encompassing, very detailed account of the incident.  It's meant

6    only for a snapshot so that those who are initially seeing the

7    process forward can get an idea of what happened.

8    Q.    Okay.  And for them to get an idea of what happened, it

9    would be important to get all of the facts correct based on

10   firsthand observations, as opposed to assumption, correct?

11   A.    Correct.

12   Q.    And so, your testimony at the motion to quash and suppress

13   was incorrect, and your testimony here today is the truth?

14   A.    Yes.

15   Q.    Okay.

16           MR. CAVER:  No further questions at this time.

17           MR. KARNER:  No questions, Judge.

18           THE COURT:  You may step down, Sergeant.

19       (Witness excused.)

20           MR. CAVER:  Judge, may I just have a moment with

21   Mr. Karner?

22           THE COURT:  Sure.

23       (Brief pause.)

24           MR. CAVER:  Judge, at this time I would ask to read

25   into the record a stipulation regarding comprehensive health

1  record prepared at the Winnebago County Jail.

2         THE COURT:  A what?

3         MR. CAVER:  A health record prepared at the Winnebago

4  County Jail that was prepared on July 15th of 2011 by Mr. Poke.

5         THE COURT:  It's a stipulation?

6         MR. CAVER:  Yes, Judge, it is a stipulation.

7         THE COURT:  Certainly.

8         MR. CAVER:  Thank you.

9         A stipulation regarding medical records.  It is hereby

10  stipulated to and agreed by, among, and between Dayton Poke,

11  individually and through his attorney, Brendan W Caver, and the

12  United States of America, by Gary S. Shapiro, United States

13  Attorney for the Northern District of Illinois, as follows.

14         The medical records from the Winnebago County Jail in

15  Rockford, Illinois, Bates stamped 74811-000789 through

16  74811-000791 are admissible, were created during medical

17  treatment of Dayton Poke, and were prepared and kept in the

18  ordinary course of business of the Winnebago County Jail and

19  were not prepared in anticipation or contemplation of

20  litigation.

21         The entry on page 74811-000790 referencing cocaine last

22  used on 7-6-11 under Section 16 was made by Dayton Poke on

23  July 15th, 2011.

24         So stipulated and agreed to on May 7th, 2013, by

25  counsel for the government, as well as Mr. Poke and myself.

1    Thank you.

2          THE COURT:  May I have the stipulation?

3          MR. CAVER:  Yes.

4          THE COURT:  Tim, can you get it for me?

5    (Said document was tendered to the court.)

6          MR. CAVER:  Judge, if I may have a moment?

7          THE COURT:  Tim, would you take the jury out, please?

8    (The following proceedings were had in open court, out of

9    the presence and hearing of the jury:)

10        THE COURT:  You're going to discuss with Mr. Poke

11  whether he wants to testify or not?

12        MR. CAVER:  That's right, Judge.

13        THE COURT:  All right.

14    (Brief pause.)

15        MR. CAVER:  Judge, at this time I think Mr. Poke and I

16  have had several conversations about whether or not he would

17  like to testify in this case.  We have seen how the case has

18  unfolded, and at this time it's Mr. Poke's decision that he does

19  not wish to testify.

20        THE COURT:  All right.  May I talk to Mr. Poke?

21        MR. CAVER:  Absolutely.

22        THE COURT:  Mr. Poke, you have the right to determine

23  whether you want to testify or whether you don't want to

24  testify.  If you don't testify, it cannot -- I'll instruct the

25  jury that it cannot be used in any way against you.

1    But you alone possess this right.  You should make this

2    decision after consulting with Mr. Caver.  He's an experienced

3    trial attorney, and he has much to offer you in the way of

4    advice.  But it's your case, your welfare is on the line, and

5    it's your decision to make.  And I want to make sure that the

6    decision that you've arrived at is made after what you consider

7    is your best interests and is not made by Mr. Caver.  Can you

8    give me that assurance?

9          DEFENDANT POKE:  Yes, sir.

10         THE COURT:  Has anyone forced, threatened, or coerced

11   you to decide not to testify?

12         DEFENDANT POKE:  Do the deduction of my three points

13   count?

14         THE COURT:  You're asking me a sentencing question, and

15   we don't need to talk about sentencing.

16         DEFENDANT POKE:  No, I'm just joking.  But no.

17         THE COURT:  Okay.  Nobody has forced, threatened, or

18   coerced you to decide not to testify?

19         DEFENDANT POKE:  No, sir.

20         THE COURT:  And this decision is a personal decision

21   made by you after consultation with Mr. Caver; is that correct?

22         DEFENDANT POKE:  Yes, sir.

23         THE COURT:  All right.  I'll find that the decision not

24   to testify is knowing and voluntarily made.  I'll bring the jury

25   in.  You can rest in front of the jury.  I'll send them out, and

1    we'll go through jury instructions.

2              MR. CAVER:  Thank you, Judge.

3              THE COURT:  All right.  Bring the jury back in, Tim

4        (The following proceedings were had in open court, in the

5        presence and hearing of the jury:)

6              THE COURT:   Mr. Caver, how do you wish to proceed?

7              MR. CAVER:   Judge, at this time the defense rests.

8              THE COURT:  All right.  Tim, take the jury out.

9              Folks, I want you to know that places like the YMCA and

10   Peak Fitness charge people a lot of money to put them through an

11   exercise routine like the one you've had this afternoon.  I want

12   you to know that we're not going to charge you a dime.  It's all

13   free.

14       (The following proceedings were had in open court, out of

15       the presence and hearing of the jury:)

16             THE COURT:  All right.  Jury instructions.

17             MR. CAVER:  Yes, Judge.

18             THE COURT:  All right.  Government's 1.  Any objection?

19             MR. CAVER:  I'm sorry, Judge.

20             THE COURT:  Any objection to Government's 1?

21             MR. CAVER:  No, Judge.

22             THE COURT:  Government's 1 will be given.

23   Government's 2.

24             MR. CAVER:  No objection.

25             THE COURT:  Government's 2 will be given.

Instructions Conference

1    Government's 3.

2          MR. CAVER: No objection.

3          THE COURT: Three will be given. Four.

4          MR. CAVER: No objection.

5          THE COURT: Four is given. Five.

6          MR. CAVER: No objection.

7          THE COURT: Five is given. Six.

8          MR. CAVER: No objection, Judge.

9          THE COURT: Six will be given. Seven.

10          MR. CAVER: No objection.

11          THE COURT: Seven is given. Eight.

12          MR. CAVER: No objection. That was number eight.

13          THE COURT: Right. I have a 9A and a 9B. I assume

14    you're withdrawing one.

15          MR. KARNER: I will, yes, Judge.

16          THE COURT: I suppose you should withdraw 9A.

17          MR. CAVER: 9A.

18          MR. KARNER: Yes, we'll withdraw 9A, Judge.

19          MR. CAVER: And we have no objection to 9B.

20          THE COURT: 9B will be given. Ten.

21          MR. CAVER: No objection. Although --

22          MR. KARNER: I don't think this really --

23          MR. CAVER: It's not really relevant.

24          MR. KARNER: -- is an issue.

25          THE COURT: Do you want to withdraw?

## Instructions Conference

1    MR. KARNER:  No.

2    MR. CAVER:  I mean, I don't even remember any testimony

3    about any -- well, about the attorneys interviewing witnesses.

4    But I suppose I don't have any strenuous objection one way or

5    the other.  If the government wants to give it, I don't have any

6    objection.  I just think it's confusing.

7    MR. KARNER:  I'll make it easy for the record.  We'll

8    withdraw it.

9    THE COURT:  All right.  Ten's withdrawn.  Eleven.

10   MR. CAVER:  No objection.

11   THE COURT:  Eleven is given.  Twelve.  Withdrawn?

12   MR. CAVER:  Is the government withdrawing?

13   MR. KARNER:  Yes.

14   THE COURT:  Twelve is withdrawn.

15   MR. KARNER:  Well -- yeah, withdrawn.  Yes.

16   THE COURT:  Thirteen.

17   MR. CAVER:  We're on 13, correct, Judge?

18   THE COURT:  Right.

19   MR. CAVER:  No objection.

20   THE COURT:  Thirteen is given.  Fourteen.  Withdrawn?

21   MR. KARNER:  Well, not really, Judge, because wouldn't

22   that apply to the text messages?

23   THE COURT:  Well, what testimony do we have of him

24   committing crimes other than the one charged in the indictment?

25   MR. KARNER:  Well, the text messages.  We're arguing

Instructions Conference

1    those were drug negotiations.

2         MR. CAVER:  That's not relevant to a consideration as

3    to whether or not he committed those crimes.  I mean, even in

4    the last portion, it says keep in mind the defendant is on trial

5    here for possessing with intent to distribute cocaine base.

6    Certainly, if that's part of your evidence against the defendant

7    about the charges of the indictment, we understand that, but I

8    mean, I don't -- we would object.

9         MR. KARNER:  Well, it's there for the protection of the

10   defendant, but if the defendant doesn't want it, we'll withdraw

11   it.

12        THE COURT:  Pardon me?

13        MR. KARNER:  If the defendant doesn't want it, we'll

14   withdraw it, Judge.

15        THE COURT:  Fourteen is withdrawn.

16        MR. CAVER:  Judge, may I just have a moment, please?

17        THE COURT:  Sure.

18     (Brief pause.)

19        THE COURT:  Mr. Caver, it looks like if you want it,

20   you can have it.  If you don't want it, they'll withdraw it.

21        MR. CAVER:  Yes.  I'm sorry, Judge.  We would ask for

22   it to be withdrawn and not provided.

23        THE COURT:  Fourteen is withdrawn.  Fifteen.

24        MR. KARNER:  Judge, this is going to have to be

25   modified because Carl McClary there is no stipulation to.  So,

PDF created with pdfFactory trial version www.pdffactory.com

### Instructions Conference

1    we'll have to resubmit under 15A eliminating the name Carl

2    McClary.

3                THE COURT:   Any objection to 15A with the deletion of

4    Carl McClary?

5                MR. CAVER:   No, no objection.

6                THE COURT:   Fifteen is withdrawn.   15A will be given,

7    and 15A will delete the name Carl McClary.

8                MR. KARNER:   We'll withdraw 16 because we never got to

9    the recorded conversation.

10               THE COURT:   Sixteen is withdrawn.   17.   Any objection?

11               MR. CAVER:   No objection.

12               THE COURT:   Seventeen will be given.   Eighteen.

13               MR. CAVER:   May I just have a brief moment, Judge?

14        (Brief pause.)

15               MR. CAVER:   No objection, Judge.

16               THE COURT:   Eighteen will be given.   Nineteen.

17               MR. CAVER:   No objection.

18               THE COURT:   Nineteen is given.   Twenty.   Why are we

19   talking about joint possession?   It may have had some relevance

20   if Cistrunk would have testified, but he didn't.

21               MR. KARNER:   Well, I'm trying to remember if it came

22   out that the car was not registered to him  I don't think it

23   was.   And that never came out one way or the other.   I have no

24   problem deleting the second paragraph, Judge.

25               THE COURT:   Mr. Caver, do you wish the second paragraph

PDF created with pdfFactory trial version www.pdffactory.com

Instructions Conference

1    in or out?

2            MR. CAVER:   I'm sorry.   If I may just have a moment.

3        (Brief pause.)

4            MR. CAVER:   Judge, we would ask for the second

5    paragraph to be deleted.   Judge, I don't believe we have any

6    legal basis to object to the first paragraph, given how the

7    government presented its case.

8            THE COURT:   All right.   I'll show 20 is withdrawn.

9    I'll ask the government to prepare a 20A which deletes the

10   second paragraph, and I will give 20A.   21.

11           MR. CAVER:   No objection.

12           THE COURT:   21 will be given.   22.

13           MR. CAVER:   No objection.

14           THE COURT:   22 is given.   23.

15           MR. CAVER:   No objection.

16           THE COURT:   23 is given.   24.

17           MR. CAVER:   No objection.

18           THE COURT:   24 is given.   25.

19           MR. CAVER:   No objection.

20           THE COURT:   25 is given.   26.

21           MR. CAVER:   No objection.

22           THE COURT:   26 is given.   27.

23           MR. CAVER:   No objection.

24           THE COURT:   27 is given.   28.

25           MR. CAVER:   No objection.

Instructions Conference

1    THE COURT:  28 is given.   29.

2    MR.  CAVER:  No objection.

3    THE COURT:  29 is given.   30.

4    MR.  CAVER:  No objection.

5    THE COURT:  30 is given.   31.

6    MR.  CAVER:  Judge, I'm sorry.   May I have just a quick

7    moment?

8       (Brief pause.)

9    MR.  CAVER:  Thank you, Judge.   Government's 31?

10    THE COURT:  Right.

11    MR.  CAVER:  No objection.

12    THE COURT:  31 will be given.   40.

13    MR.  CAVER:  I would just ask -- I don't think there was

14    any evidence as to whether the weapon was stolen or -- well,

15    there was evidence as to number five, but not number four.   I

16    would ask if we could strike number four and change the

17    numbering accordingly.

18    MR.  KARNER:  These are factors that are just meant

19    to -- this comes right of the instructions that were given

20    before.   It's not that --

21    THE COURT:  Okay.  Well, let me say this.   It's a

22    nonpattern instruction, and we already have an instruction for

23    the definition of furtherance.   Although, I would think that the

24    defense would want four in because if it was stolen, it seems to

25    me that it's telling us it's more likely in furtherance of a

PDF created with pdfFactory trial version www.pdffactory.com

Instructions Conference

1   drug trafficking crime.  If it's not stolen, it would be

2   evidence against or mitigate against it being used in drug

3   trafficking.

4           MR. CAVER:  Judge, if I may have a moment.

5           MR. KARNER:  Judge, I believe the commentary to the in

6   furtherance instruction suggests that this or one like it ought

7   to be given.

8           THE COURT:  May I see it, the commentary?

9           MR. KARNER:  I didn't bring it down with me.  I didn't

10  know that we would get to it this quick.

11          MR. CAVER:  Judge, I would ask that paragraph four be

12  removed, after consulting with my client.

13          THE COURT:  All right.  But you have no objection to 40

14  with four removed; is that correct?

15          MR. CAVER:  Correct.

16          MR. KARNER:  Okay.  We'll remove it, Judge.

17          THE COURT:  All right.  I'll show -- you'll withdraw

18  40A?

19          MR. KARNER:  I'm sorry.  Withdraw 40 and ask leave to

20  resubmit --

21          THE COURT:  40A without four.

22          MR. KARNER:  That's correct, Judge.

23          THE COURT:  41.

24          MR. CAVER:  Judge, we have no objection to 41.

25          THE COURT:  41 will be given.  42.

### Instructions Conference

1          MR. CAVER:  No objection.

2          THE COURT:  42 will be given.

3          MR. KARNER:  Judge, we're going to withdraw 43.  I

4  think it's redundant.

5          MR. CAVER:  Withdraw 42 or 43?

6          MR. KARNER:  43.  I think we already have the

7  possession of a firearm in furtherance.

8          THE COURT:  43 is withdrawn.

9          MR. KARNER:  Yes, Judge, because I think it's duplicate

10  to Government's 30.

11          THE COURT:  All right.  Any objection to the jury

12  verdict forms?

13          MR. CAVER:  No objection, Judge.

14          THE COURT:  All right.  I'd like the government to

15  prepare 14 clean copies.

16          MR. KARNER:  I'm sorry.  How many?

17          THE COURT:  Fourteen for the jurors and the alternates.

18          MR. KARNER:  15 clean copies.  One for your Honor?

19          THE COURT:  Yes, I'd like one, and I suppose you'd like

20  a couple.

21          MR. KARNER:  So, we need 17 clean copies.  And then do

22  you want me to submit an entire set of the corrected numbered

23  copies?

24          THE COURT:  No.  I'll just read a clean copy.

25          MR. KARNER:  Okay.  So, I'll go make the corrections on

Instructions Conference

1    17, clean copies.

2           THE COURT:   Actually, in order to file it, I'll need a

3    set with the correctly numbered copies, and I guess I'll read

4    from that.   So, you can just give that to me.

5           MR. KARNER:   Okay.   So, one set of correctly numbered

6    copies, 17 clean copies.

7           THE COURT:   Right.

8           MR. KARNER:   May I go do that and tender that now?

9           THE COURT:   Sure.

10          MR. KARNER:   That's going to take us some time, Judge.

11          THE COURT:   Yes, I know.   Well, I'll give you some time

12   to prepare your closing.

13          MR. KARNER:   Pardon?

14          THE COURT:   I'll give you some time -- that will give

15   you some time to prepare your closing.

16          MR. KARNER:   Yes.

17          THE COURT:   How much time do you think you'll need?

18          MR. KARNER:   Come back here at 3:30?

19          THE COURT:   How about 3:15?   3:20?   3:30.

20          MR. KARNER:   Okay.   Thank you.

21      (Brief recess.)

22          THE COURT:   All right.   There are just a couple small

23   details I wanted to tack down before I get the jury

24   instructions, and that is I assume that the parties wish all of

25   the exhibits that have been admitted in evidence will go back to

1   the jury room?

2           MR. PEDERSEN:  Judge, the only one that we're not going

3   to ask, as far as the government's exhibits, is Number 19.

4   Those were the three compact disks that Detective Voyles

5   testified about.  There's other information on the disks that is

6   not relevant for what was testified to.

7           THE COURT:  Well, they don't have any way to play it,

8   anyway.

9           MR. PEDERSEN:  Right.

10          MR. CAVER:  We don't have any objection to that.  We

11  would just ask that Defense 1 and 2 go back and Defense 4.

12          THE COURT:  What's Defense 4?

13          MR. CAVER:  Oh, I'm sorry.  We have the stipulation.

14  I'm sorry.  Just 1 and 2.

15          THE COURT:  All right.

16          MR. PEDERSEN:  Judge, what about the firearm?  Are we

17  going to send --

18          THE COURT:  Let me get this first.  You have no

19  objection to the optical disk not going back; is that correct?

20      (No response.)

21          THE COURT:  Mr. Caver?

22          MR. CAVER:  Yes, Judge.

23          THE COURT:  I need some answers on some of these

24  things.

25          MR. CAVER:  I apologize, Judge.

1    THE COURT:  The question is 19.  You don't have any

2  objection to that not going back.

3    MR. CAVER:  No, no objection.

4    THE COURT:  All right.  How about seven, the cocaine?

5    MR. CAVER:  Judge, well, if it's been admitted.  I

6  mean, we don't have any objection.

7    THE COURT:  It's been admitted.  The question is --

8    MR. CAVER:  The reasonable -- I mean, we don't have any

9  problem with it going back to the jury.

10    THE COURT:  All right.  What about the gun?

11    MR. CAVER:  Judge, if I may have a moment?

12    THE COURT:  Sure.

13  (Brief pause.)

14    MR. CAVER:  No, Judge, no objection.

15    MR. PEDERSEN:  Judge --

16    THE COURT:  Do you want the -- no objection to it going

17  back or not going back?

18    MR. CAVER:  No objection to it going back to the jury.

19    MR. PEDERSEN:  Judge, what we've done in the past when

20  there's a handgun and then ammunition, the ammunition is

21  included in Government's Exhibit 6A.  Typically, we do not send

22  that back to the jury.  If they request to see it, we make them

23  give us the gun, and then we'll give them the ammunition, so

24  they don't have the gun and the ammunition in the jury room

25    THE COURT:  Any objection to that procedure?

1    MR. CAVER:   Judge, there is no objection to that

2    procedure.

3          THE COURT:   Could I look at seven?  I'll just instruct

4    the jury not to tamper with -- not to tamper with seven.

5          You can put the instructions in any order you see fit,

6    but just put them in the order that you want them read.

7          MR. PEDERSEN:   I'll have Mr. Karner give Mr. Caver a

8    copy, as well.

9          MR. CAVER:   May I just have a second with Mr. Pedersen?

10         THE COURT:   Sure.

11       (Brief pause.)

12         MR. CAVER:   Judge, at this time I have told

13   Mr. Pedersen that my client has requested that we reopen the

14   proofs to admit a piece of evidence that was previously

15   disclosed to the government and previously stipulated to as far

16   as authenticity.  The reason that -- well, it is a drug test

17   from a year previous to the arrest.

18         What I've explained to Mr. Poke is that I did not feel

19   that that drug test, based on how the testimony came in, both in

20   the government's case-in-chief and the defense case, was

21   relevant to the issues that we were presenting to the jury.  So,

22   that's the basis for my motion to request to reopen the defense

23   case, to have the court consider whether or not that drug test

24   is relevant.

25         THE COURT:   What's the context of the drug test?

1    MR. CAVER:  Just to show, Judge, that my client --

2    THE COURT:  No.  Tell me how it was taken, why was it

3    taken, what form was it.

4    MR. CAVER:  It was taken as part of medical treatment

5    that was administered to him at SwedishAmerican Hospital.  It

6    was a -- I believe it was a blood test showing that he tested

7    positive for cocaine.

8    MR. PEDERSEN:  What was the date?

9    MR. CAVER:  Registration date was April 1st of 2010,

10   and it was a presumptive positive test for cocaine.

11   MR. PEDERSEN:  Judge, if we could have a moment to

12   consider that motion that the defendant has made, and then maybe

13   I could get Mr. Karner back up here and we can respond.

14   Initially, our position was that it's irrelevant because we

15   stipulated to the authenticity.  We said we'd be willing to

16   that.  But as to relevance, this test occurred a year and three

17   months prior to the arrest in this case, and the fact that he

18   had cocaine in his system at that time we don't believe has any

19   relevance to the issues that the jury has to decide.

20   THE COURT:  How is it relevant, Mr. Caver?

21   MR. CAVER:  Judge, it's our position that it shows that

22   Mr. Poke had a history of drug abuse and that he was a personal

23   user of cocaine.  The government is alleging in its indictment

24   that this was a possession with intent to deliver, and this

25   confirms that, in fact -- and it would go to corroborate my

PDF created with pdfFactory trial version www.pdffactory.com

1   argument that the drugs were for personal use that were found in

2   the car that day.

3           THE COURT:  Well, that assumes that drug dealers don't

4   use cocaine.

5           MR. CAVER:  Well, what my argument would be would be

6   that because this test shows that he did use drugs, that it's

7   confirmation and argument that I can say the cocaine was found

8   in the center console.  It was the car that was driven by

9   Mr. Poke.  And Mr. Poke takes responsibility for those drugs.

10  And look here.  We also have an April 2010 positive drug test

11  for cocaine that shows that he was using drugs at least

12  15 months prior to the time that the drugs were found in his car

13  and that, therefore, he had a history and a pattern of drug use

14  himself.  It would tend to confirm that the reason that the

15  drugs were in the car were for his use.

16          THE COURT:  All right.  But it doesn't negate the

17  possibility that he's a dealer.

18          MR. CAVER:  No, that's correct.  But at least it may

19  add something to my argument to suggest that the drugs were for

20  personal use.  That would be the reason.

21          MR. PEDERSEN:  Judge, maybe if there was some other

22  evidence that showed a history of cocaine use by the defendant,

23  but one test a year and three months prior to his arrest I don't

24  believe constitutes a history of drug use by the defendant.

25          THE COURT:  All right.  I think it goes to weight

1    rather than admissibility.  I'll allow it in.

2            MR. CAVER:  Okay.  Thank you, Judge.

3            THE COURT:  What form is this going to be then?  An

4    exhibit?

5            MR. CAVER:  It would just be the report itself.  I will

6    put a label on it for a defense exhibit.

7            MR. PEDERSEN:  We're going to have to prepare another

8    stipulation because he doesn't have a witness to introduce it.

9    We indicated that we would agree to the --

10           THE COURT:  Why don't you prepare another

11   stipulation --

12           MR. CAVER:  Okay.  Thank you, Judge.

13           THE COURT:  -- with that report.  And I'll read that to

14   the jury just before we close.

15           MR. CAVER:  Thank you, Judge.

16           MR. PEDERSEN:  Were there any other issues?

17           THE COURT:  No.  I think I'm all right.

18           MR. PEDERSEN:  Okay.  Thank you.

19           THE COURT:  See you at 3:30.

20      (Brief recess.)

21           THE COURT:  Back on the record.  I've had a chance to

22   receive the jury instructions.  Did you receive them?

23           MR. CAVER:  Judge, I did receive them  Sorry.  I

24   didn't get organized.  May I just have a brief moment?

25           THE COURT:  Do all the jury instructions have verdict

1    forms in then?  Tim, do your jury instructions have verdict

2    forms?

3            THE COURT SECURITY OFFICER:  Let me check.  I don't see

4    any.

5            THE COURT:  None?

6            THE COURT SECURITY OFFICER:  No.

7            THE COURT:  All right.

8            MR. CAVER:  Judge, we would agree that they are as we

9    discussed in conference.  Would the court like the exhibits now?

10            THE COURT:  Pardon me?

11            MR. CAVER:  Would the court like exhibits now?

12            THE COURT:  No.  We'll give them to Tim to take back.

13            MR. CAVER:  Very good.

14            THE COURT:  I would like -- oh, you're going to read

15    that stipulation.  After you get done with the stipulation, give

16    it to me, and I'll put it up here.

17            MR. CAVER:  Yes.  Thank you, Judge.

18            Judge, would you like me to read that when the jury

19    comes back?

20            THE COURT:  What?

21            MR. CAVER:  I'll read the stipulation when the jury

22    comes back?

23            THE COURT:  All right.

24            MR. CAVER:  Thank you.

25            THE COURT:  All right, Tim.  You can call the jury in.

1        By the way, the jurors will get hard copies of the

2    exhibits?

3        MR. KARNER:  Yes.

4        MR. CAVER:  Yes.

5        MR. KARNER:  We just have one set prepared, Judge.

6        THE COURT:  That's all right.  We just need one set of

7    exhibits to go to the jury.  They can pass that around.

8    (The following proceedings were had in open court, in the

9        presence and hearing of the jury:)

10       THE COURT:  Ladies and gentlemen, I'm going to reopen

11    the proofs in this case for one more stipulation that the

12    parties have.

13       Mr. Caver, would you please read that stipulation into

14    the record?

15       MR. CAVER:  Thank you, Judge.

16       This is a stipulation regarding medical records.  It is

17    hereby stipulated to and agreed by, among, and between Dayton

18    Poke, individually and through his attorney, Brendan W. Caver,

19    and the United States of America, by Gary S. Shapiro, United

20    States Attorney for the Northern District of Illinois, as

21    follows.

22       The laboratory results contained within Pages 21 and 22

23    of Dayton Poke's medical record from SwedishAmerican Hospital in

24    Rockford, Illinois, in regard to a positive cocaine test on

25    March 31st, 2010, with a run date of April 20th, 2010, are

1    authentic, true and accurate copies of the medical record on

2    file with SwedishAmerican Hospital in Rockford, Illinois, were

3    created during medical treatment of Dayton Poke, were prepared

4    and kept in the ordinary course of business of that hospital,

5    and were not prepared in anticipation or contemplation of

6    litigation.  They're admitted into evidence as Defense Exhibit

7    Number 3.  So stipulated and agreed to on May 7th, 2013, by

8    Mr. Poke, myself, and Mr. Karner from the United States

9    Attorney's Office.

10             THE COURT:  All right.  The defense rests then?

11             MR. CAVER:  The Defense rests.

12             THE COURT:  Tim, could you get the stipulation for me?

13             Ladies and gentlemen, you have heard all the evidence

14   in this case, but the trial has not ended.  At this time the

15   lawyers have the opportunity to make closing arguments.  During

16   closing arguments the attorneys have an opportunity to summarize

17   the evidence and suggest to you reasonable inferences to be

18   drawn from the evidence.  They may also suggest their version of

19   how the law applies to the facts in this case.  What the lawyers

20   say during closing argument is not evidence and should not be

21   considered by you as evidence.  After you have heard the

22   arguments, I will instruct you on the law, and then you will

23   retire to the jury room to consider your verdicts.

24             The government may close.

25             MR. PEDERSEN:  Thank you, your Honor.

## Pedersen - Opening Argument

### OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT

1

2 MR. PEDERSEN: Ladies and gentlemen, at the beginning

3 of this trial, we told you that the evidence would show that

4 this defendant, Dayton Poke, possessed crack cocaine with the

5 intent to distribute it, and he also possessed a firearm as a

6 convicted felon and in furtherance of the drug trafficking crime

7 of possessing crack cocaine with the intent to distribute on

8 July 6th of 2011, and that is exactly what the evidence in this

9 case has proven.

10 We have proven that the defendant committed those three

11 offenses as charged in the superseding indictment. We proved it

12 through eyewitness testimony, from police officers who testified

13 that they observed the defendant as the only occupant of a Chevy

14 Impala. They pulled in behind the car as it pulled into a

15 driveway, eventually searched the car, and found the defendant

16 as the only occupant in possession of both the gun and crack

17 cocaine.

18 We also proved it through stipulations that the parties

19 reached. There was a stipulation regarding the testing of

20 Government's Exhibit 7, the crack cocaine, that one of the bags

21 was tested of the eight bags, it weighed 1.2 grams, and that it

22 was crack cocaine.

23 We proved it through other stipulations, that the

24 firearm, Government's Exhibit 6, that that had previously

25 traveled in interstate commerce prior to the defendant

PDF created with pdfFactory trial version www.pdffactory.com

Pedersen - Opening Argument

1    possessing it on July 6th of 2001.  We also proved it through a
2    stipulation that the defendant prior to July 6th of 2011 was a
3    convicted felon.
4            We put on expert testimony.  You heard the testimony of
5    Detective Reffett, who testified regarding his opinion regarding
6    whether the amount of cocaine, given all the other evidence in
7    this case, was consistent with an individual possessing it, that
8    individual being the defendant, with the intent to distribute
9    it.  He also told you in his expert opinion how drug dealers
10   typically use guns to protect their drugs and their profits.
11           You also heard testimony from Tracy Runyard, the nurse
12   that conducted the intake of the defendant.  How the defendant
13   told her at the time he was arrested that he was not using
14   drugs.  She also told you that the defendant told her that he
15   was using Norco and that if he had been taking that medication
16   and used cocaine, that could cause a severe interaction and
17   heart problems and that the defendant, when she interviewed him,
18   reported no heart problems that he was experiencing.
19           The evidence in this case points to one and only one
20   set of verdicts, and those are verdicts of guilty on all three
21   counts.
22           I'd like to talk to you for a few minutes about some of
23   the instructions that I expect you will receive in this case.
24   One of the instructions that you'll hear is an instruction
25   regarding the difference between direct evidence and

PDF created with pdfFactory trial version www.pdffactory.com

Pedersen - Opening Argument

1    circumstantial evidence, and you'll be told, I believe, that

2    there is no difference in the weight that you must give either

3    of those two types of evidence. Both are good types of evidence

4    for you to consider.

5           Well, what's the difference between direct evidence and

6    circumstantial evidence. Well, consider you're walking or you

7    get off a subway car -- or I'm sorry -- you're riding on a

8    subway. You see someone get on the subway. And you see that

9    they're all wet. Well, you weren't outside, but I think you can

10   figure out that it was probably raining outside based on other

11   facts that you've observed. That's basically what

12   circumstantial evidence is.

13          Direct evidence is evidence from a witness that

14   actually saw something happen. What was an example of direct

15   evidence that we had in this case? The police officers who

16   testified that they saw defendant in the car, that they observed

17   a gun on the floor, those types of things. That's direct

18   evidence.

19          What's circumstantial evidence -- an example of

20   circumstantial evidence that you've heard in this case? One of

21   the examples of circumstantial evidence that you heard in this

22   case was what I just explained about the testimony from Nurse

23   Runyard. She testified that when doctors prescribe drugs such

24   as Norco, the pain medication, they explain the interactions

25   that are possible if you take other drugs while you're taking

### Pedersen - Opening Argument

1    it.  So, you can infer from that testimony reasonably that if a

2    doctor prescribed the defendant that medication, he explained to

3    him that certain drugs would have negative interaction.   That's

4    the type of circumstantial evidence that you can consider in

5    this case.

6              Now, when you were chosen as jurors, that took a long

7    time.   There were a lot of questions that you were asked.   One

8    question that you were not asked or one thing you were told not

9    to do was when you came into this courtroom and when you go back

10   to the jury room was to leave your common sense outside.   You

11   take it back there with you, and you use it when you evaluate

12   the testimony and the evidence you heard in this case.

13             Now, I anticipate when the defendant's attorney

14   addresses you, he will ask you to consider things that you

15   didn't hear, like, for instance, with the cell phone.   Well, you

16   didn't hear about any DNA evidence from the cell phone or any

17   fingerprints from the cell phone.   But I anticipate he's not

18   going to discuss the fact that you have other evidence that you

19   did hear regarding who possessed the cell phone, direct evidence

20   from Officer Dodd, who testified that he pulled the cell phone

21   out of the defendant's pocket.

22             So, we ask you to use your common sense when you're

23   listening to the arguments and evaluating the evidence in this

24   case.

25             I want to talk to you about some of the other

Pedersen - Opening Argument

1    instructions that you will receive.  One of those instructions

2    that you will receive explains to you what the definition of

3    knowledge is.  And, basically, knowledge is a person acts

4    knowingly if he realizes what he's doing and is aware of the

5    nature of his conduct and does not act through ignorance,

6    mistake, or accident.  In deciding whether the defendant acted

7    knowingly, you may consider all of the evidence, including what

8    the defendant did or said.

9          That means you can conclude that this defendant

10   possessed a gun in the car based on things that he did, like

11   trying to get out of the car when the officers were ordering him

12   to stay in the car or telling the officers, "I'm just trying to

13   go into my house," when he didn't live there.  Those are things

14   that -- that was something that he said or did.

15         So, those are the two examples of things that the

16   defendant did and said that show you his knowledge.  We don't

17   have to have -- we don't have to be inside the defendant's head,

18   per se.  You can look at what he said and what he did to

19   conclude whether or not he knew the gun was in the car and

20   knowingly possessed it.

21         As far as what possession means, that doesn't mean that

22   you have to own it.  A person possesses an object if he has the

23   ability and intention to exercise direction and control over the

24   object, either directly or through others.  A person may possess

25   an object even if he is not in physical contact with it and even

## Pedersen - Opening Argument

1    if he does not own it.  So, the fact that the gun was found on

2    the floor of the car doesn't mean he wasn't in possession of it

3    at the time the officers stopped the car.  He was exercising

4    control, and he could exercise direction over that object, the

5    gun, during the time that the officers observed him  Same thing

6    with the crack cocaine that was in the console of the car.

7         Now, in order to prove the first charge, possession of

8    cocaine base with the intent to distribute, there's certain

9    things that the government must prove.  First, we must prove

10   that he knowingly possessed cocaine base.  Well, that's what I

11   just talked about.  The knowingly and the possession.

12        Second, we have to prove that the defendant intended to

13   distribute the substance to another person.  We presented

14   evidence of that.  You heard the testimony of Detective Reffett,

15   the text messages regarding the defendant conducting

16   transactions involving drugs.

17        The next thing we have to prove is that the defendant

18   knew the substance was some kind of controlled substance.  And

19   we're not required to prove that the defendant specifically knew

20   that the substance was cocaine base.

21        What does distribute mean?  That simply means

22   delivering or transferring possession of the substance to

23   someone else or causing someone else to do that.  So, if he

24   possessed it with intent to distribute, he was possessing it

25   with the intent to give it to someone else.  That's what the

PDF created with pdfFactory trial version www.pdffactory.com

Pedersen - Opening Argument

1    government must prove.  Well, what evidence did we present

2    regarding the intent to distribute.

3              First of all, Government's Exhibit 7, the baggies

4    containing the crack cocaine.  There were eight individually

5    wrapped packages.  And you heard the testimony from Detective

6    Reffett that based on his training and experience and his

7    conversations with thousands of people who either distribute

8    drugs or use drugs, in his opinion this packaging was consistent

9    with possession with intent to distribute.

10             He further testified and you heard evidence that there

11   was no -- the car was searched, and the defendant's person was

12   searched, and there was nothing that the defendant had that he

13   could have used to ingest drugs.

14             Further, the defendant was in possession of a cell

15   phone.  Officer Dodd took it out of his pocket.  That cell phone

16   was searched, and certain text messages were extracted,

17   specifically a string of text messages the day before the

18   defendant was arrested.

19             Now, those messages started early in the morning on

20   July 5th of 2011, and there were several discussions during that

21   time between the defendant and the same individual at the phone

22   number (XXX) XXX-XXXX.  And you'll get a copy of these text

23   messages when you're deliberating back in the jury room  But as

24   Detective Reffett testified, these conversations involved

25   negotiations regarding the price, whether or not the defendant

Pedersen - Opening Argument

1    would front the drugs to the individual that he was selling them

2    to, meaning give them to him on credit, take them now and pay me

3    later.    And eventually at the end of the day, the defendant

4    received a message back from that same customer saying, "That

5    was some good shit," meaning those were some good drugs.    That's

6    the evidence that you can consider regarding the defendant's

7    possession of Government's Exhibit 7 with the intent to

8    distribute.

9            What other evidence do we have to show it's possession

10   with intent to distribute?  He had cash on his person, $260.

11   The jail intake form that I've talked about already, he told the

12   nurse he did not use drugs.   She asked him about prescriptions.

13   He explained that.   And when he was asked the second question do

14   you use drugs, he said no.   He also was taking that pain

15   medication that would have caused a severe interaction if he

16   used cocaine.

17           And as Detective Reffett testified, there was also a

18   gun present, which is common with individuals who traffic drugs

19   to protect their drugs and their profits.   And that firearm was

20   loaded.

21           Based on the evidence you've heard, we have proven

22   beyond a reasonable doubt that the defendant committed the

23   offense as charged in Count 1 of the superseding indictment.

24           On Count 2 the government must prove -- that's the

25   count regarding possession of a firearm by a felon.   The

## Pedersen - Opening Argument

1  government must prove certain things.  First, that the defendant

2  knowingly possessed the firearm, that at the time that he

3  possessed the firearm he had been convicted by a crime

4  punishable by a term of imprisonment exceeding one year.  Now,

5  the defendant has stipulated to that.  There's no argument about

6  that.

7          And that the possession was in or affecting commerce or

8  the firearm had been shipped or transported in interstate or

9  foreign commerce.  Again, there was a stipulation that the

10  firearm had previously been transported in interstate commerce.

11  But just so we understand interstate commerce, as I said, there

12  was a stipulation, but we don't have to prove how the firearm

13  traveled in interstate commerce, that the firearm's travel was

14  related to the defendant's possession of it, that he went

15  somewhere else and brought it back to this state, we don't have

16  to prove that, or that the defendant even knew before he

17  possessed it that it had traveled in interstate commerce.  So,

18  we've met that burden regarding interstate commerce through the

19  stipulation.

20          How did the defendant knowingly possess the firearm?

21  Well, as I said earlier, he pulled into a driveway after the

22  unmarked car pulled in behind him  He immediately made an

23  unsignaled turn into that driveway.  The officers pulled in,

24  turned their lights on.  He didn't live at that address.  Why

25  did he pull in there.  Because he knew he had a gun, and he was

### Pedersen - Opening Argument

1   hoping maybe the police would drive by.  He lied to the

2   detectives when he stated he lived there.  Why do that if you

3   weren't in possession of a firearm and you were a convicted

4   felon.

5           Both Detectives Nordberg and Pruitt saw the defendant

6   reaching under the driver's seat as they approached.  That's

7   exactly where the gun was found.  Government's Exhibit 12.  That

8   shows where the firearm was before it was moved.  That's where

9   the detectives first observed it when they looked in the

10  vehicle.  So, if the defendant was the only occupant, the driver

11  of that vehicle, he had to have seen it while he was in the car.

12  That's knowing possession.

13          He also did other things inconsistent with someone that

14  was not in possession of a firearm and consistent with someone

15  who possessed that gun.  He tried to distance himself by

16  disobeying the order of the police officer when he told him to

17  stay in the car.  He got out.  He refused to provide the keys

18  after he was handcuffed.  Why?  Because he knew the gun was in

19  the car, and he was hoping they wouldn't be able to get in

20  there.

21          So, all those facts point to one and only one

22  conclusion, that the defendant possessed the gun, Government's

23  Exhibit 6, on July 6th of 2011, and when he possessed that gun,

24  the evidence also shows that the defendant did so in furtherance

25  of a drug trafficking crime, that crime that we charged in

Pedersen - Opening Argument

1  Count 1, possession of crack cocaine with the intent to
2  distribute.
3        In order to prove that charge, we have to prove that
4  the defendant knowingly possessed a firearm in furtherance of
5  that crime, possession of cocaine base with the intent to
6  distribute.  How do we prove that?  Well, to prove in
7  furtherance of drug trafficking, we have to prove that the
8  possession of the gun furthers, advances, moves forward,
9  promotes, facilitates a drug trafficking crime.  What does that
10 mean.  Well, there's some factors that you can consider in
11 deciding whether or not the defendant's possession furthered his
12 drug trafficking crime.
13        One of the things is whether or not the defendant was
14 protecting his drugs or drug money from robbery in furtherance
15 of drug -- that equals in furtherance of drug trafficking.  As
16 Detective Reffett testified, that's consistent with his
17 experience that individuals who possess controlled substances
18 and money that they make from selling controlled substances need
19 protection because they're frequently robbed, and they can't
20 report those robberies because they'd have to tell the police
21 that they were committing illegal activities.
22        Some of the factors that you can consider in deciding
23 whether or not the defendant possessed that firearm in
24 furtherance of his drug trafficking activity -- and I'm going to
25 go through some of these factors, but I just want to let you

PDF created with pdfFactory trial version www.pdffactory.com

## Pedersen - Opening Argument

1    know that none of these factors in and of themselves are

2    dispositive, and you can decide what weight to give the factors.

3    But I will submit that when you look at all those factors that

4    the only conclusion you can reach is that the defendant

5    possessed that gun in furtherance of his drug trafficking

6    crimes.

7                The first factor you can consider is the type of drug

8    activity.   The accessibility of the firearm is the second

9    factor.   Next, the type of weapon.   Whether the defendant's

10   possession of the firearm was legitimate.   Whether the gun was

11   loaded.   The proximity of the gun to the drugs or profits.   And

12   the time and circumstances where the gun was found.   I'm going

13   to go through each one of those briefly.

14               First, the type of drug activity.   It was possession of

15   crack cocaine with the intent to distribute it.   He possessed

16   both the gun, Government's Exhibit 6, and the crack cocaine.   In

17   this vehicle the drugs were in the console, and the gun was just

18   on the floor below.

19               The text messages.   Again, they demonstrate that the

20   defendant was engaged in drug trafficking activity.   He was

21   making money.   He needed to protect his drugs and his money with

22   the gun.

23               The accessibility of the firearm   As I indicated, the

24   firearm was directly underneath the driver's seat in the same

25   spot where the officers testified that they saw the defendant

Pedersen - Opening Argument

1  reaching when they approached the car.  Readily accessible to

2  the defendant.

3          What type of weapon.  An automatic firearm at his

4  fingertips.  Whether the defendant's possession was legitimate.

5  Well, it wasn't.  He was a convicted felon at the time, and he's

6  prohibited from possessing firearms.  That factor weighs in

7  favor of finding that the defendant possessed it in furtherance

8  of his drug trafficking crime.

9          Whether it was loaded.  We know the gun was loaded, as

10  well.

11          The proximity to the drugs or profits.  There's some

12  blurriness on Government's Exhibit -- I believe this is

13  Government's Exhibit 15, but you can see where the console is,

14  and you can see the green towel below.  The console with the pop

15  bottle, that's where the drugs were found.  The gun directly on

16  the floor below.

17          The time and circumstances where the gun was found.

18  The defendant was found with the drugs and the gun at the same

19  time while he was attempting to evade the police when they

20  ordered him to stay in his car.

21          Also, those text messages the very day before he was

22  arrested, his customer replying back that the drugs he gave him

23  were good.

24          All of these facts point to one and only one

25  conclusion, that the defendant in this case, Dayton Poke, on

Caver - Closing Argument

1    July 6th of 2011, committed three crimes.  One, he possessed

2    crack cocaine with the intent to distribute it.  Two, he

3    possessed a firearm as a convicted felon.  And three, he

4    possessed that firearm in furtherance of a drug trafficking

5    crime that we've charged in Count 1 of the superseding

6    indictment.  We ask you to return the only verdicts in this case

7    that the evidence demands, and those are verdicts of guilty on

8    all three counts.

9              THE COURT:  Mr. Caver.

10             CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

11             MR. CAVER:  As we told you in opening statements, the

12   government bears the burden of proof to show beyond a reasonable

13   doubt that Dayton Poke committed any crime that day.  What the

14   government showed you in the jury instructions, as you will be

15   read in the jury instructions, is that you have to find that

16   Dayton Poke knowingly possessed a firearm

17             The government showed you through witness testimony

18   that there was a gun located in the car.  The government never

19   showed you one piece of evidence to suggest that Mr. Poke ever

20   knew that that gun was present in that car.

21             Furthermore, the witnesses that the government did

22   present, who explained to you why there would not be any

23   fingerprints located and why it wasn't an important enough case

24   in order to send DNA testing out, also never wrapped up how they

25   can show that Dayton Poke ever knew that gun was present in the

PDF created with pdfFactory trial version www.pdffactory.com

Caver - Closing Argument

1    car.

2        Mr. Poke takes responsibility for using drugs and being

3    a drug addict. The drugs were not the question on that date.

4    He was not selling drugs.

5        The government also showed you text messages. They

6    paraded them on the TV screen here just before you moments ago.

7    Again, what the government didn't do and where there is

8    reasonable doubt is the fact that Mr. Poke was never tied to any

9    one of those text messages. Mr. Poke, other than having the

10   phone, whether -- we're not sure whether it was on his person or

11   whether it was as was stated in the probable cause statement,

12   that it was on the floorboard of the car, we don't even know

13   whether Dayton Poke was the user of that phone at the time those

14   text messages were ever sent.

15       Reasonable doubt, ladies and gentlemen. The government

16   has failed to meet its burden of proof that Mr. Poke knew that

17   that gun was in the car or that he was the sender or recipient

18   of any one of those text messages. Reasonable doubt.

19       We heard from Detective Pruitt that based on what he

20   saw, he saw all of this happen in a very short period of time.

21   From the time that he got out of his squad car and he walked up

22   to Mr. Poke's car, that Mr. Poke was magically with one hand

23   rolling up the window as he was reaching down beneath the seat

24   fiddling with something underneath the seat. Even Detective

25   Pruitt didn't tell you that he saw Mr. Poke doing anything with

### Caver - Closing Argument

1    any gun or that he knew that there was anything that Detective

2    Pruitt observed to suggest that Mr. Poke knew that a gun was in

3    that car.

4            You heard from Detective Nordberg that his memory was

5    better today after getting his story straight by reading the

6    reports of the other detectives and officers, and it was better

7    today than it was during his testimony under oath back in

8    August.  Which story is it?

9            Officer Dodd told you that the cell phone was an

10   important piece of evidence, and that's why he didn't write a

11   report on it, yet the government seems to maintain that

12   possession of the cell phone was a linchpin of their case to

13   show that this is a drug trafficking crime.  But it wasn't

14   important enough for Officer Dodd to even so much as write a

15   report to clear up any inconsistency of where this phone was

16   found.  Was it found in the car?  Was it found on Mr. Poke?  In

17   any case, we haven't established that Mr. Poke was the user of

18   that phone at any time any of those messages were sent.

19           Detective Cone told you people don't typically handle

20   guns by the barrel.  As you've seen over and over again in the

21   photographs, the gun was sticking out from underneath the seat

22   by the barrel.  Detective Cone explained ad nauseam that gun

23   possession is typically -- guns are typically held by the grip.

24           Detective Voyles told you that fingerprints would have

25   been easily seen on that cell phone with the flat glass surface

## Caver - Closing Argument

1  when it was off and when the screen was black.  He told you

2  this.  They were visible.  And if they were present, he would

3  have seen them  But yet this phone that we don't know where it

4  came from, there were no fingerprints that Detective Voyles saw.

5         Mr. Poke is alleged by the government to have had his

6  hands all over these items, yet not one fingerprint is found,

7  even, as you will see with the gun, on the smooth part of the

8  barrel.  That was the only part that was sticking out from under

9  the seat.  It's almost just like they vanished.  How did that

10  happen?

11         Detective Reffett told you that there is no way -- he

12  confirmed that there was no way to determine who sent or who saw

13  those text messages because there's no way to track exactly who

14  sees the cell phone at the time that it's being operated or who

15  sends the message.  And Detective Voyles testified that there

16  was no security on the phone when he used it and when he

17  connected it to his computer system to download the information.

18         Detective Stevens.  He told you that his story at the

19  motion to quash and suppress was incorrect, and he wants you to

20  believe that he was telling the truth today, that he was the one

21  that wrote the probable cause statement.  Ladies and gentlemen,

22  there's some pretty glaring inconsistencies here between the

23  written reports and what happened in this case.  Officer Dodd is

24  saying that he got this phone from the person of Mr. Poke,

25  whereas the probable cause statement is saying that it was found

Caver - Closing Argument

1    on the floorboard of the car.  Detective Stevens acknowledged

2    today that he made an assumption, and he wrote an assumption in

3    an official report.  The only way that he had to believe that

4    that phone was found in the car was based on an assumption.

5    Well, is that really true?  There's no DNA.  There are no

6    fingerprints.  We have a discrepancy as to where the cell phone

7    came from

8           Mr. Poke is a drug addict and has used drugs at least

9    one time since March 31st of 2010.  Possession of the gun has to

10   be knowing.  It's not enough for the gun just to be present in

11   the car.  The government has to show you that Mr. Poke knew that

12   that gun was there, that he intended to distribute the cocaine.

13          Again, ladies and gentlemen, when Mr. Poke was found in

14   the vehicle, he got out, and there were drugs in the car, which

15   he takes responsibility for.  At no time did the government ever

16   show you that Mr. Poke intended to distribute those or any other

17   drugs.  The closest they get and the best that they get is the

18   testimony from Detective Reffett that that's typically what

19   happens.

20          Ladies and gentlemen, reasonable doubt.  It's not

21   enough to just say, well, that's what typical drug dealers do.

22   The government has not shown you in this case that he intended

23   to distribute any of those drugs.  The government has not shown

24   you any reason, other than personal use, that Mr. Poke had those

25   drugs in the car that day.

PDF created with pdfFactory trial version www.pdffactory.com

## Caver - Closing Argument

1    The government says as part of their argument to
2  corroborate the detective's story that there was no pipe found
3  with the drugs.  So, that indicates that he wasn't intending to
4  use it.  But, ladies and gentlemen, reasonable doubt.
5    Mr. Poke wasn't committing any crime that day when he
6  was driving down the street.  The government argues that it was
7  a failure to use a turn signal that even led the police to pull
8  him over.  He wasn't using drugs on that day, but that does not
9  sustain the government's burden to prove to you beyond a
10  reasonable doubt that the drugs were present in that car for any
11  other reason than Mr. Poke was a drug addict.
12    Ladies and gentlemen, because the government has failed
13  to show you the knowledge requirement to show that that gun was
14  present in this car, I ask that you return verdicts of not
15  guilty on each and every count in the indictment.
16    FINAL ARGUMENT ON BEHALF OF THE GOVERNMENT
17    MR. KARNER:  Ladies and gentlemen, a famous American
18  once said that to commit a crime -- when you commit a crime, the
19  earth is made of glass.  There is no such thing as concealment.
20    On July 6th, 2011, try as he might, this defendant was
21  unable to conceal the evidence of his crimes from two diligent,
22  ethical Rockford police officers who had focused their attention
23  on him  By possessing that handgun as a convicted felon, along
24  with the crack cocaine in the center console of his car, he
25  committed the crimes of possessing with intent to distribute

## Karner - Final Argument

1    cocaine base, possession of a firearm as a felon, and possession

2    of a firearm in furtherance of a drug trafficking crime.

3              Let's talk about knowing possession.  The evidence in

4    this case showed that this convicted felon, within inches of him

5    in a car that he occupied and occupied alone, had that loaded

6    handgun underneath the seat of his car.  Now, is this convicted

7    felon going to tell you what is on his mind, or is there direct

8    evidence of what is on his mind?  No.  The circumstances in this

9    case are what reveal what is in his mind.

10             The evidence, the circumstantial evidence, which

11   Mr. Pedersen read to you earlier, is considered under the law

12   equally with direct evidence.  The circumstances under which he

13   behaved and conducted himself reveal what he knows or what he

14   knew about that handgun.  And under the stress of the moment,

15   being followed by a squad car, he signaled a turn without -- or

16   he made a turn without signaling it.  And then what did he do?

17   He reached underneath -- or he reached with his right hand in

18   the area of where the handgun was found later to be protruding

19   from underneath the seat of the car.

20             At the same time, he's quickly rolling up the driver's

21   side window of the car at a time when he should be rolling down

22   the window.  I mean, the police officers had activated their

23   lights by this time.  He knew he was going to be contacted by

24   the police.  Why is he rolling up the window?  Why is he getting

25   out of the car when the police officer is telling him to stay in

Karner - Final Argument

1    the car for his safety?  The defendant disregarded those

2    instructions, got out of the car with the closed window, and

3    attempted to lock the door, and then wouldn't agree to be

4    handcuffed and wouldn't give up the keys to the car.  Think

5    about that.  Why is he doing his level best to put distance

6    between him and the car?  It's not because of the cocaine in the

7    center console.  The lid of that console concealed the drugs.

8    If he had just played it cool and stayed in the car, did as he

9    was told, worst case scenario he comes away with a traffic

10   ticket for not signaling the turn.  Best case scenario is he's

11   given a warning, and he goes on his way.

12          Why was it so important for that man to put distance

13   between himself and the car?  Why was it so important to the

14   defendant for those police officers not to look or get access to

15   the interior of the car?  Because, ladies and gentlemen,

16   Government's Exhibit 12 shows that he was concerned they were

17   going to see the handgun, as they did, because that handgun was

18   partially sticking out from the driver's seat.  And we know

19   Detective Pruitt saw it because as soon as he did, he called out

20   that alarm, that code 1032.  The only reason the defendant went

21   to such great lengths to put distance between himself and the

22   car is because he knew that handgun was there.

23          Then we hear this business about, well, he didn't

24   intend to distribute the cocaine that was found in the car.  He

25   was just a personal user.  Well, there's problems with that,

### Karner - Final Argument

1    too.   You have the packaging and the weight.   You have eight

2    packets.   The contents of one packet was tested, 1.2 grams of

3    just the one packet.

4         And Detective Reffett testified.   He's been doing this

5    a long time, and he has a lot of experience, and he told you

6    that the amount and the way that amount was divided up was

7    consistent with an intent to distribute.   Factor into that

8    equation the presence of the firearm, one of the tools of the

9    drug dealer's trade.   Consistent with an intent to distribute.

10   Because in his business, you can't call the police when you're

11   targeted for a robbery.   You got to handle business on your own,

12   and the way to handle that business is with a firearm

13        You've got a man with a gun, eight packets of crack

14   cocaine, and on top of that he's got $260.   Now, I understand.

15   That doesn't qualify him as an upper income earner.   But $260,

16   combined with the gun and the crack cocaine the way it was

17   packaged, consistent with an intent to distribute.

18        And then we have the cell phone.   That's the way that

19   deals are arranged, plans are made to distribute crack cocaine

20   in the crack business.   And we know that was used here.   I'll

21   get into the text messages in a minute.

22        And then the last thing we have is if he was going to

23   use that cocaine on that day, how was he going to get it into

24   his body?   There was no pipe there.   There's no evidence of

25   pipes.   What was he going to do?   How was he going to get that

PDF created with pdfFactory trial version www.pdffactory.com

### Karner - Final Argument

1  chunky material into his body if he was going to use it?  There

2  was no user materials to be found in that car.  How was he going

3  to do that?

4          We hear about the phone.  And, yeah, there were no

5  fingerprints on it.  That's true.  We're going to go into what

6  you heard about fingerprints and what you didn't hear about

7  fingerprints.  But the uncontradicted testimony is this, that

8  the phone was recovered by Officer Dodd from the pocket of the

9  defendant.

10         Now, how does that phone get into the defendant's

11  pocket if it was -- it had to have been touched.  Presumably

12  he's the one who put it in his pocket.  But if you need more, in

13  the texts on Page 197 of Government's Exhibit 21, the sender of

14  a text message texts the message, "Who is this," and the

15  possessor of that phone, the phone that was in the defendant's

16  pocket, says, "Daylow."  And what do we know about the

17  defendant's nickname?  Daylow.

18         So, you have the phone, the money, and then not only

19  the drugs, the firearm, you've got the text messages.  And go

20  through them  Don't take our word for it.  If you go through

21  those text messages, it's clear that the person who possessed

22  the defendant's phone, which is by reasonable inference the

23  defendant, was negotiating the sale of crack cocaine.  He didn't

24  have any other type of drug on him  He had crack cocaine.  And

25  it was just the day before.  And it was $20 is the price he

## Karner - Final Argument

1    quotes, which is the price of two-tenths of a gram of crack

2    cocaine.  And it was a customer who was complimenting him on the

3    quality of drugs previously sold.  Read through these text

4    messages, and it's clear.  The only inference that be can be

5    drawn is that the defendant intended to distribute that cocaine,

6    that crack cocaine.

7            Now, we also have the defendant's admission on the day

8    of his arrest to Tracy Runyard that he didn't use drugs.  Now,

9    they say, well, but we've got some records.  We've got him

10   self-reporting nine days after his arrest the defendant's own

11   self-serving statement, yeah, I used drugs on July 6th.  Well,

12   that's nine days after his arrest, nine days after he learns

13   that he's been arrested and what he's being charged with, and

14   he's in defense mode.

15           And as we heard from Detective Reffett, how do people

16   charged with intent to distribute often defend themselves?  By

17   claiming personal use.  That's nine days after his arrest.  Did

18   he use cocaine in 2010 at some point pursuant to that

19   stipulation?  Sure.  Sure.  It was in his blood.  Has the

20   defendant used cocaine in the past?  I guess so.  But the bottom

21   line is this.  The evidence shows that the drugs, the crack

22   cocaine that he was found with on July 6th, are drugs that he

23   intended to distribute because he had no way of ingesting them,

24   and his phone shows that's the business he was engaged in.

25           Let's talk about Detective Pruitt and some of the

Karner - Final Argument

1    things that were said about police officers here.  You know, I

2    started out with a quote about the world being made of glass and

3    how there's no concealment.  Well, using that metaphor, you

4    shouldn't also throw stones, either, if you're a defendant in

5    this case because some things were said in opening statement

6    that weren't proven.  And opening statements are not evidence.

7    You met Detective Pruitt this afternoon.

8            One of the things the defense lawyer said -- and,

9    please, don't take any of my comments as a criticism to him

10   He's an honorable attorney, and he's representing his client.

11   And I don't mean to attack him in any way, shape, or form  But

12   he made some mistakes here.  He said in opening statement that

13   Detective Pruitt, you were going to hear some sinister things

14   about him  And that's a very serious matter to accuse a person

15   of something and then not back it up.

16           Well, Detective Pruitt came in here today, held his

17   head up high, and he told you what he saw and what he did.  He

18   told you about seeing the Impala not signal a turn.  He told you

19   about going up to the driver's side of that car and seeing the

20   defendant reach over with his right side as if to place

21   something underneath the driver's seat.  And he also told you

22   about seeing the driver's side window roll up.  That part,

23   except for the window, which Nordberg couldn't see, was

24   corroborated by Detective Nordberg.  And Detective Pruitt was

25   never impeached with that.  And all these things we heard about,

## Karner - Final Argument

1    some misconduct, there is no evidence of that.  He was never

2    impeached with that.  That doesn't exist in this trial.  And

3    Detective Pruitt was called by the defense in this case.

4              Now, we hear about Detective Stevens.  Did he make a

5    report -- did he make a mistake, draw an improper assumption in

6    a PC statement?  Sure.  But so what.  That doesn't mean the

7    defendant didn't possess a gun here.  It didn't mean the crack

8    cocaine wasn't possessed or wasn't possessed with the intent to

9    distribute.  It was a mistake, just like the defense lawyer made

10   in his opening statement.  People make mistakes.  It doesn't

11   mean they're lying to you.  It doesn't mean they're bad

12   character.  People make mistakes.

13             The defense lawyer told you in his opening statement

14   you're not going to hear anything about fingerprints.  Well,

15   yeah, you did.  You heard about the science of fingerprints.

16   And contrary to what TV tells us, fingerprints aren't always

17   found on objects touched.  There are a lot of variables involved

18   in determining whether a crime scene detective can recover

19   prints suitable for comparison.  The attempt was made on the

20   gun, and it was unsuccessful, through no fault of anyone's.  The

21   attempt wasn't made on the phone because it's an obvious point.

22   The phone was found in his pocket with text messages identifying

23   the possessor of the phone by the same nickname as the

24   defendant's.  There was no need to fingerprint the phone here.

25             And then there's DNA.  Was the handle swabbed for DNA?

### Karner - Final Argument

1    Yes.  The Illinois State Crime Lab you heard has a policy that

2    prohibits or forbids the testing of DNA in cases like this.  But

3    you also heard -- and let me just stop right here and tell you

4    this.  The government here has the burden of proving all of the

5    elements of the offense beyond a reasonable doubt, and that's

6    the way it should be, and that's the Constitution.  It's the

7    cornerstone of our government, and by all means you are

8    obligated to hold us to our burden.  The defense has no burden

9    of proving or doing anything here.  But the defense could have

10   requested DNA testing in this case, and they didn't.  And

11   because they could have and didn't, you can't draw an inference

12   either way about why DNA testing wasn't done here.  It wasn't

13   done here?  It wasn't done here.  You can't draw an inference

14   either way.

15           It's been a long day, ladies and gentlemen.  I'm going

16   to sit down.  And we've noticed that you've paid attention to us

17   throughout the course of these proceedings.  You've given both

18   parties a fair day in court.  I'm sure you're going to hold us

19   to our burden of proof, as you should.  We've met that burden of

20   proof, folks.  The evidence in this case, the evidence that we

21   brought you, proved beyond a reasonable doubt that the defendant

22   is guilty of all three charges in the superseding bill of

23   indictment.

24           THE COURT:  Folks, you will each receive a copy of the

25   jury instructions, and you may read them along with me.

### Charge

1     Members of the jury, I will now instruct you on the law

2     that you must follow in deciding this case.  I will also give

3     each of you a copy of these instructions to use in the jury

4     room   You must follow all of my instructions about the law,

5     even if you disagree with them   This includes the instructions

6     I gave you before the trial, any instructions I gave you during

7     the trial, and the instructions I am giving you now.

8     As jurors, you have two duties.  Your first duty is to

9     decide the facts from the evidence that you saw and heard here

10     in court.  This is your job, not my job or anyone else's job.

11     Your second duty is to take the law as I give it to you, apply

12     it to the facts, and decide if the government has proved the

13     defendant guilty beyond a reasonable doubt.

14     You must perform these duties fairly and impartially.

15     Do not let sympathy, prejudice, fear, or public opinion

16     influence you.  In addition, do not let any person's race,

17     color, religion, national ancestry, or gender influence you.

18     You must not take anything I said or did during the

19     trial as indicating that I have an opinion about the evidence or

20     about what I think your verdict should be.

21     The charges against the defendant are in a document

22     called a superseding indictment.  You will have a copy of the

23     superseding indictment during your deliberations.  The

24     superseding indictment in this case charges that the defendant

25     committed the crimes of possessing with intent to distribute

### Charge

cocaine base, possessing a firearm as a felon, and possessing a firearm in furtherance of a drug trafficking crime. The defendant has pled not guilty to the charges.

The superseding indictment is simply the formal way of telling the defendant what crimes he's accused of committing. It is not evidence that the defendant is guilty. It does not even raise a suspicion of guilt.

The defendant is presumed innocent of each and every one of the charges. This presumption continues throughout the case, including your deliberations, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case. The defendant is never required to prove his innocence. He is not required to produce any evidence at all.

You must make your decision based only on the evidence that you saw and heard here in court. Do not consider anything you may have seen or heard outside of court, including anything from the newspaper, television, radio, the Internet, or any other source. The evidence includes only what the witnesses said when they were testifying under oath and the exhibits that I allowed into evidence and the stipulations that the lawyers agreed to. A stipulation is an agreement that certain facts are

## Charge

1    true or that a witness would have given certain testimony.

2    Nothing else is evidence.

3        The lawyers' statements and arguments are not evidence.

4    If what a lawyer said is different from the evidence as you

5    remember it, the evidence is what counts.  The lawyers'

6    questions and objections, likewise, are not evidence.  A lawyer

7    has a duty to object if he thinks a question is improper.  If I

8    sustained objections to questions the lawyers have asked, you

9    must not speculate on what the answers might have been.  If

10    during the trial I struck testimony or exhibits from the record

11    or told you to disregard something, you must not consider it.

12        Give the evidence whatever weight you decide it

13    deserves.  Use your common sense in weighing the evidence and

14    consider the evidence in light of your own everyday experience.

15        People sometimes look at one fact and conclude from it

16    that another fact exists.  This is called an inference.  You are

17    allowed to make reasonable inferences, so long as they are based

18    on the evidence.

19        You may have heard the terms direct evidence and

20    circumstantial evidence.  Direct evidence is evidence that

21    directly proves a fact.  Circumstantial evidence is evidence

22    that indirectly proves a fact.  You are to consider both direct

23    and circumstantial evidence.  The law does not say that one is

24    better than the other.  It is up to you to decide how much

25    weight to give to any evidence, whether direct or

1    circumstantial.

2          Do not make any decision simply by counting the number

3    of witnesses who testified about a certain point.  You may find

4    the testimony of one witness or a few witnesses more persuasive

5    than the testimony of a larger number.  You need not accept the

6    testimony of the larger number of witnesses.  What is important

7    is how truthful and accurate the witnesses were and how much

8    weight you think their testimony deserves.

9          A defendant has an absolute right not to testify or

10    present evidence.  You may not consider in any way the fact that

11    the defendant did not testify or present evidence.  You should

12    not even discuss it in your deliberations.

13          Part of your job as jurors is to decide how believable

14    each witness was and how much weight to give each witness'

15    testimony.  You may accept all of what a witness says or part of

16    it or none of it.  Some factors you may consider include the age

17    of the witness, the intelligence of the witness, the witness'

18    ability and opportunity to see, hear, or know the things the

19    witness testified about, the witness' memory, the witness'

20    demeanor, whether the witness had any bias, prejudice, or other

21    reason to lie or slant the testimony, the truthfulness and

22    accuracy of the witness' testimony in light of the other

23    evidence presented, and inconsistent or consistent statements or

24    conduct by the witness.

25          You have heard evidence that before the trial a witness

**Charge**

1    made a statement that may be inconsistent with his testimony

2    here in court.   You may consider an inconsistent statement made

3    before the trial only to help you to decide how believable a

4    witness' testimony was here in court.

5         You have heard testimony that the defendant made a

6    statement to a Rockford police officer.   You must decide whether

7    the statement -- whether the defendant actually made a statement

8    and, if so, how much weight to give to the statement.   In making

9    these decisions, you should consider all of the evidence,

10   including the defendant's personal characteristics and

11   circumstances under which the statement may have been made.

12        You have heard witnesses John Richardson, Dave Cone,

13   Robert Reffett, and Sarah Anderson, namely, who gave opinions

14   and testimony about certain subjects.   You do not have to accept

15   each witness' opinions.   You should judge this witness opinions

16   and testimony the same way you judge the testimony of any other

17   witness.   In deciding how much weight to give to these opinions

18   and testimony, you should consider the witness' qualifications

19   and how he or she reached his or her opinions and the factors I

20   have described for determining the believability of testimony.

21        If you have taken notes during the trial, you may use

22   them during deliberations to help you remember what happened

23   during the trial.   You should use your notes only as aids to

24   your memory.   The notes are not evidence.   All of you should

25   rely on your own independent recollection of the evidence, and

**Charge**

1   you should not be unduly influenced by the notes of other

2   jurors.   Notes are not entitled to any more weight than the

3   memory or impressions of each juror.

4         In deciding your verdict, you should not consider the

5   possible punishment for the defendant who is on trial.   If you

6   decide that the government has proved the defendant guilty

7   beyond a reasonable doubt, then it will be my job to decide on

8   the appropriate punishment.

9         A person acts knowingly if he realizes what he is doing

10  and is aware of the nature of his conduct and does not act

11  through ignorance, mistake, or accident.   In deciding whether

12  the defendant acted knowingly, you may consider all of the

13  evidence, including what the defendant did or said.

14        A person possesses an object if he has the ability and

15  intention to exercise direction or control over the object,

16  either directly or through others.   A person may possess an

17  object even if he is not in physical possession or physical

18  contact with it and even if he does not own it.

19        Once you are all in the jury room, the first thing you

20  should do is choose a foreperson.   The foreperson should see to

21  it that your discussions are carried on in an organized way and

22  that everyone has a fair chance to be heard.   You may discuss

23  the case only when all jurors are present.

24        Once you start deliberating, do not communicate about

25  the case or your deliberations with anyone except other members

## Charge

1   of your jury.  You may not communicate with others about the

2   case or your deliberations by any means.  This includes oral or

3   written communications, as well as any electronic method of

4   communication, such as a telephone, cell phone, smart phone,

5   iPhone, BlackBerry, computer, text messaging, instant messaging,

6   the Internet, chat rooms, blogs, websites, or services like

7   Facebook, MySpace, LinkedIn, YouTube, Twitter, or any other

8   method of communication.

9         If you need to communicate with me while you are

10  deliberating, send a note through the court security officer.

11  The note should be signed by the foreperson or by one or more

12  members of the jury.  To have a complete record of this trial,

13  it is important that you do not communicate with me except by a

14  written note.  I may have to talk to the lawyers about your

15  message.  So, it may take some time to get back to you.  You may

16  continue your deliberations while you wait for my answer.

17        Please be advised that transcripts of trial testimony

18  are not available to you.  You must rely on your collective

19  memory of the testimony.

20        If you send me a message, do not include the breakdown

21  of any votes you may have conducted.  In other words, do not

22  tell me that you are split six/six or eight/four or whatever

23  your vote happens to be.

24        Verdict forms have been prepared for you.  You will

25  take these forms with you to the jury room  I will read the

### Charge

1     verdict forms to you. You do not have the verdict forms. The

2     only set that you'll have is the set that I have in my hand.

3     The verdict forms read as follows. We, the jury, find the

4     defendant, Dayton Poke, not guilty of possessing with intent to

5     distribute cocaine base as charged in Count 1 of the superseding

6     indictment.

7           The next jury form states: We, the jury, find the

8     defendant, Dayton Poke, guilty of possessing with intent to

9     distribute cocaine base as charged in Count 1 of the superseding

10     indictment.

11           The next verdict form states: We, the jury, find the

12     defendant, Dayton Poke, not guilty of possessing a firearm as a

13     felon as charged in Count 2 of the superseding indictment.

14           The fourth verdict forms states: We, the jury, find

15     the defendant, Dayton Poke, guilty of possessing a firearm as a

16     felon as charged in Count 2 of the superseding indictment.

17           The next verdict form states: We, the jury, find the

18     defendant, Dayton Poke, not guilty of possessing a firearm in

19     furtherance of a drug trafficking crime as charged in Count 3 of

20     the superseding indictment.

21           The last verdict form says: We, the jury, find the

22     defendant, Dayton Poke, guilty of possessing a firearm in

23     furtherance of a drug trafficking crime as charged in Count 3 of

24     the superseding indictment.

25           When you have reached unanimous agreement, your

**Charge**

1   foreperson will fill in, date, and sign the appropriate verdict

2   forms.  Each of you will sign it.  Advise the court security

3   officer once you have reached a verdict.  When you come back to

4   the courtroom, I will read the verdicts aloud.

5          The verdict must represent the considered judgment of

6   each juror.  Your verdict, whether it is guilty or not guilty,

7   must be unanimous.  You should make every reasonable effort to

8   reach a verdict.  In doing so, you should consult with one

9   another, express your own views, and listen to your fellow

10  jurors' opinions.  Discuss your differences with an open mind.

11  Do not hesitate to reexamine your own view and change your

12  opinion if you come to believe it is wrong, but you should not

13  surrender your honest beliefs about the weight or effect of

14  evidence just because of the opinions of your fellow jurors or

15  just so there can be a unanimous verdict.  The twelve of you

16  should give fair and equal consideration to all the evidence.

17  You should deliberate with a goal of reaching an agreement that

18  is consistent with the individual judgment of each juror.  You

19  are impartial judges of the facts.  Your sole interest is to

20  determine whether the government has proved its case beyond a

21  reasonable doubt.

22          The superseding indictment charges defendant in Count 1

23  with possession of cocaine base in the form of crack cocaine

24  with intent to distribute.  In order for you to find the

25  defendant guilty of this charge, the government must prove each

**Charge**

1    of the three following elements beyond a reasonable doubt.   One,

2    the defendant knowingly possessed cocaine base, and, two, the

3    defendant intended to distribute the substance to another

4    person, and, three, the defendant knew the substance was some

5    kind of controlled substance.   The government is not required to

6    prove that the defendant knew the substance was cocaine base.

7            If you find from your consideration of all the evidence

8    that the government has proved each of these elements beyond a

9    reasonable doubt as to the charge you are considering, then you

10   should find the defendant guilty of that charge.   If, on the

11   other hand, you find from your consideration of all the evidence

12   that the government has failed to prove any one of these

13   elements beyond a reasonable doubt as to the charge you are

14   considering, then you should find the defendant not guilty of

15   that charge.

16           Cocaine base is a controlled substance.

17           The superseding indictment charges the defendant in

18   Count 2 with possessing a firearm as a felon.   In order for you

19   to find the defendant guilty of this charge, the government must

20   prove each of the three following elements beyond a reasonable

21   doubt.   One, the defendant knowingly possessed a firearm, and,

22   two, at the time of the charged act, the defendant had been

23   convicted of a crime punishable by a term of imprisonment

24   exceeding one year, and, three, such possession was in or

25   affecting commerce or the firearm had been shipped or

**Charge**

1    transported in interstate or foreign commerce.

2         If you find from your consideration of all the evidence

3    that the government has proved each of these elements beyond a

4    reasonable doubt as to the charge you are considering, then you

5    should find the defendant guilty of that charge.  If, on the

6    other hand, you find from your consideration of all the evidence

7    that the government has failed to prove any one of these

8    elements beyond a reasonable doubt as to the charge you are

9    considering, then you should find the defendant not guilty of

10   that charge.

11        In or affecting commerce in interstate or foreign

12   commerce includes commerce between any place in a state and any

13   place outside of that state.  The terms do not include commerce

14   between places within the same state, but through any place

15   outside the state.  This requirement is satisfied if the firearm

16   traveled in interstate or foreign commerce prior to the

17   defendant's possession of it.

18        A firearm has traveled in interstate or foreign

19   commerce if it has traveled between one state and any other

20   state or country or across a state or national boundary line.

21   The government need not prove how the firearm traveled in

22   interstate commerce, that the firearm's travel was related to

23   the defendant's possession of it, or that the defendant knew

24   that the firearm had traveled in interstate commerce.

25        The superseding indictment charges the defendant in

### Charge

1    Count 3 with possession of a firearm in furtherance of a drug

2    trafficking crime. In order for you to find the defendant

3    guilty of this charge, the government must prove each of the

4    three following elements beyond a reasonable doubt. One, the

5    defendant committed the crime of possessing with intent to

6    distribute cocaine base as charged in Count 1 of the superseding

7    indictment, and, two, he knowingly possessed a firearm, and,

8    three, his possession of the firearm was in furtherance of

9    possessing with intent to distribute cocaine base as charged in

10    the superseding indictment.

11    If you find from your consideration of all the evidence

12    that the government has proved each of these elements beyond a

13    reasonable doubt as to the charge you are considering, then you

14    should find the defendant guilty of that charge. If, on the

15    other hand, you find from your consideration of all the evidence

16    that the government has failed to prove any one of these

17    elements beyond a reasonable doubt as to the charge you are

18    considering, then you should find the defendant not guilty of

19    that charge.

20    During means at any point within the offense conduct

21    charged in Count 1 of the superseding indictment.

22    A person possesses a firearm in furtherance of a crime

23    if the firearm furthers, advances, moves forward, promotes, or

24    facilitates the crime. The mere presence of a firearm at the

25    scene of a crime is insufficient to establish that the firearm

## Charge

was possessed in furtherance of the crime.  There must be some connection between the firearm and the crime.

Firearm means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive, the frame or receiver of any such weapon, any firearm muffler or firearm silencer, any destructive device.

In determining whether a gun was possessed in furtherance of a drug crime, you may consider the type of drug activity that was being conducted, accessibility of the firearm, the type of weapon, whether the defendant's possession of the firearm was legitimate or illegal, whether the gun was loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun was found.  No one factor is dispositive.  It is up to you to determine the weight, if any, to accord any of these factors.

With respect to Count 3, it is not necessary for the government to prove that the drug trafficking crime alleged in that count was the sole or principal purpose for defendant's possession of the firearm  A person may have several different purposes for possessing a firearm  The government must prove beyond a reasonable doubt, however, that a significant purpose of the defendant's possession of the firearm was to further the drug trafficking crime.

A person distributes a controlled substance if he delivers or transferred possession of the controlled substance

PDF created with pdfFactory trial version www.pdffactory.com

1    to someone else.

2           Attorneys Karner, Pedersen, and Caver, have I omitted

3    any instructions that I advised counsel in the instruction

4    conference I would give in this case?

5           MR. KARNER:   No, your Honor.

6           MR. CAVER:   No, Judge.

7           THE COURT:   Are there any objections to the

8    instructions as given by the court other than those expressed

9    during the instructions conference?

10          MR. KARNER:   No, your Honor.

11          MR. CAVER:   No, Judge.

12          THE COURT:   Tim, would you take an oath, please?

13       (Court security officer duly sworn.)

14          THE COURT:   All right.   Folks, I'm going to release you

15   to deliberate on your verdict.   I want to talk to you about a

16   few other matters.   The exhibits will be gathered and will be

17   presented to you.   There are certain exhibits that were admitted

18   into evidence that are not being sent back to you in the jury

19   room, but they are still evidence in the case.   One of these is

20   the Government's Exhibit 19, which is the optical disks.   You

21   have the written text messages in Government's Exhibit 21.   I

22   don't think there's any reason you'd need the optical disk, but

23   if for some reason you think you do, send that request out to

24   me, and we'll consider it.

25          Also, we're not going to send back Government's

1   Exhibit 6A.  That's the magazine with the bullets.  When I send

2   people back to the jury room to deliberate, I don't want them to

3   have a firearm and bullets.  But if for some reason you think

4   you need the bullets, let me know, and I'll consider that

5   request and let you know.

6           MR. KARNER:  I'm sorry to interrupt, your Honor, but

7   can we have a sidebar, please?

8           THE COURT:  Sure.

9       (The following proceedings were had at the sidebar, out of

10          the presence and hearing of the jury:)

11          MR. KARNER:  I'm sorry to bring this up now.  I

12  understand the court's order about what items you're going to

13  allow back, and I'd just ask you to respectfully reconsider.

14  Because apparently there's a Department of Justice policy that

15  we're supposed to object to guns or loaded firearms, and I

16  understand you're going to send an unloaded firearm, but also

17  drugs back to the jury.  I wasn't aware of that.

18          THE COURT:  I'm not sending them back.

19          MR. KARNER:  Oh, you're not --

20          THE COURT:  Oh, no.  I am  That's right.  I am

21          MR. KARNER:  Respectfully, I'd ask you to reconsider,

22  but it's your courtroom

23          MR. CAVER:  Judge, can I just talk to my client real

24  quick?

25          THE COURT:  Sure.

1    (Brief pause.)

2         MR. CAVER:   Judge, at this time we would ask for the

3    jury to see the evidence.  We would like it to go back.

4         THE COURT:   I'll send it back.  I'll instruct them not

5    to tamper with the envelope.

6         MR. KARNER:   Okay.  My conscience is clear.

7    (The following proceedings were had in open court, in the

8         presence and hearing of the jury:)

9         THE COURT:   Folks, for obvious reasons, I do not want

10   you to open the Exhibit Number 7.  That's the plastic envelope

11   containing the crack cocaine.  If there is some reason you feel

12   that you need to open that envelope, let me know, and I'll

13   consider your request.

14        You may take your notes with you and your copy of the

15   jury instructions.  You may write on your jury instructions,

16   circle words, underline phrases.  They're for your own use to

17   use as you see fit.  We will assemble the exhibits and send them

18   to you.  You will also receive a copy of the stipulations to

19   which the parties have agreed.  We will give you a copy of the

20   superseding indictment.

21        Again, during your deliberations, you must not

22   communicate with or provide any information to anyone by any

23   means about this case.  You may not use any electronic device or

24   media, such as a telephone, cell phone, smart phone, iPhone,

25   BlackBerry, or computer, the Internet, any Internet service, or

1    any text or instant messaging service, or any Internet chat

2    room, blog, or website, such as Facebook, MySpace, LinkedIn

3    YouTube, or Twitter, to communicate with anyone any information

4    about this case or to conduct any research about this case until

5    after I accept your verdict.

6          If you separate -- for example, one or more of you have

7    to leave the room for any reason -- suspend deliberations until

8    you all are together again.  The bathrooms are outside the jury

9    deliberation room  If one of you has to use the restroom, stop

10    talking about the case.  You only can deliberate on this case

11    when you all are together in the room

12          Mr. Ferguson, please escort the jury to the jury room

13    to deliberate on their verdict and advise me when the jury is

14    ready to report its verdict.  Betty and Mary, you stay at your

15    chairs, please.

16    (The following proceedings were had in open court, out of

17        the presence and hearing of the jury:)

18          THE COURT:  All right.  Betty and Mary, I'm going to

19    conditionally release you from further jury service in this

20    case.  That is, you may leave the courthouse and go about your

21    business, but if a member of the primary jury becomes ill or

22    incapacitated or is unable to perform or is disqualified from

23    performing his or her duties as a juror, you may be called back

24    to deliberate with the other jurors.

25          So, please leave a telephone number with the court

1    security officer at which he can reach you.  He will call you

2    either to tell you that you must come back to the courthouse to

3    continue your jury service or to tell you that the case has been

4    concluded and that your service as a juror is no longer

5    required.

6              With that in mind, please remember that until you are

7    called by the court security officer, you must not discuss the

8    case with anyone else or allow anyone to discuss it in your

9    presence.  You must not read any newspaper articles or listen to

10   any radio or television broadcasts relating to this case.  Do

11   not make any independent investigation of the case by reading

12   materials, attempting any testing, or going to any location

13   where any of the events in this case took place.  If anyone

14   contacts you or attempts to do so, either directly or

15   indirectly, about this case, report that to me immediately.

16             I'm going to provide you each with a certificate of

17   appreciation.  I know it's just a piece of paper, but it does

18   represent our sincere gratitude to you for the time and effort

19   and sacrifice that you made in serving as jurors in this case.

20             But remember, you're not in the jury room, but you're

21   under the same kinds of prohibitions and directions that the

22   jury is.  Mr. Ferguson will call you, I promise, either to tell

23   you that you have to come back to court to serve as a juror or

24   that the case has ended, and once the case has ended, you're on

25   your own.  You can talk to anybody about this.  But please

1    remember to leave your cell phone numbers with Mr. Ferguson.

2           Okay.  Thank you, ladies.  Nice to meet you.  Just

3    leave your notes on your chair, if you have notes, and your jury

4    instructions.

5        (Brief pause.)

6           MR. CAVER:  Your Honor, may I ask just briefly?  How

7    late do you think the jurors might stay this evening?

8           THE COURT:  You know, I'm just going to give them time

9    to get settled back there, and then I'm going to ask them

10   whether they want to stay and order dinner or whether they want

11   to come back tomorrow morning.

12          MR. CAVER:  Thank you.

13          THE COURT:  So, if you'll just stay in the courtroom,

14   I'm going to give them about 20 minutes, and then I'm going to

15   put that question to them  And if they want to go home, they'll

16   go home.  I'll admonish them about the same things that we've

17   been talking about, certain restrictions under which they have

18   to operate.

19          MR. CAVER:  Okay.

20          THE COURT:  I want to make sure we assemble everything

21   we give to the jury.  Do you have a copy of the indictment for

22   them, Mr. Pedersen?

23          MR. PEDERSEN:  Mr. Karner is grabbing that.

24          THE COURT:  All right.  Here are the verdict forms,

25   Tim  Here are the stipulations.  Five stipulations?  Is that

PDF created with pdfFactory trial version www.pdffactory.com

1    correct?

2         MR. CAVER:   Yes, five.   And, Judge, I believe it's

3    Defendant's Exhibits 1 through 3.

4         THE COURT:   All right.   Do you have the defense

5    exhibits?

6      (Brief pause.)

7         MR. CAVER:   I think we had a stipulation regarding the

8    authenticity of the SwedishAmerican Hospital records.   We also

9    had --

10        THE COURT:   Right.   I've got that here.

11        MR. CAVER:   And then we also had the stipulation

12   regarding the use of drugs that was reported to the jail nurse

13   at the Winnebago County Jail on July 15th of 2011.   That was

14   nine days after the arrest.   And then we had the third

15   stipulation that I had moved to reopen the proofs with.   And so,

16   there should be three stipulations.   Actually, all of the

17   substantive evidence of the SwedishAmerican Hospital stipulation

18   that was previously entered into is contained within the second

19   stipulation.

20        THE COURT:   Okay.   Wait.   As far as that stipulation

21   regarding SwedishAmerican Hospital, I had put a note on it that

22   says wait on this in case the parties may use it because they

23   may not want to use it.   So, that's why I kept it in.

24        MR. CAVER:   And that's why it's not -- I see.   Then we

25   are only putting in two.   The one is regarding the jail.

1    THE COURT:   You mean -- when you say we, you mean you
2    and Mr. Poke?
3         MR. CAVER:   Yes.   It's only the two stipulations.   The
4    first was regarding the Winnebago County Jail admission by
5    Mr. Poke to use cocaine on July 15th, 2011, and then the second
6    one is the one that we had to reopen the proofs to enter.
7         THE COURT:   The first one was what, did you say?
8         MR. CAVER:   The Winnebago County Jail.
9         THE COURT:   Right.   You have that, Tim
10        MR. CAVER:   We had stipulated that Mr. Poke made the
11   entry into the Winnebago County Jail medical record that he had
12   previously used cocaine.
13        THE COURT:   Cocaine last used on 7-6-11.
14        MR. CAVER:   Correct.
15        THE COURT:   Okay.   I've got that.
16        MR. CAVER:   And then the one that we reopened the
17   proofs with, which was a SwedishAmerican Hospital medical
18   record.
19        THE COURT:   Does Tim have that one?
20        MR. CAVER:   I handed it to the court previously.
21        THE COURT:   Why don't you go look.
22        MR. CAVER:   And then the one you are holding, Judge, we
23   are not using, and I'll just make my record that that one that
24   you are holding is -- all of the information contained in that
25   stipulation is fully contained within the stipulation that we've

1   entered that's here.

2           THE COURT:  Well, the one I'm holding will not go back

3   to the jury.

4           MR. CAVER:  Correct.  And I'll take it back or you can

5   keep it, whichever you prefer.

6           THE COURT:  I'll keep it.

7           MR. CAVER:  Okay.  Thank you.

8           MR. KARNER:  Judge, one matter we didn't discuss.  We

9   never explicitly dealt with the forfeiture allegation.

10          MR. PEDERSEN:  Well, we do it after -- if there's a

11  conviction, then if the defendant wishes -- if the defendant

12  wishes to have the jury determine the forfeiture, then we could

13  go forward at that time.  So, he needs to make that decision.

14          THE COURT:  You're seeking to forfeit the gun, the

15  bullets --

16          MR. KARNER:  Yes.

17          THE COURT:  -- and the money?

18          MR. KARNER:  I don't think the money is in there, just

19  the gun.

20          THE COURT:  Would you talk to Mr. Poke and see if he

21  has any dispute as to whether the gun and bullets should be

22  forfeited?

23          MR. CAVER:  Judge, the gun and bullets were never

24  Mr. Poke's, and so the forfeiture allegation, unless the real

25  owner of the gun comes forward, we are not contesting that.

1          THE COURT:   So, he has no objection to the forfeiture

2     of the gun and bullets.

3          MR. CAVER:   No.   He never owned them

4          MR. PEDERSEN:   Well, so, specifically, though, he's --

5     if the jury finds him guilty of the offenses involving the

6     firearm, he's not requesting a further finding by the jury as to

7     forfeiture.

8          THE COURT:   That's what he tells me.

9          MR. CAVER:   That is correct.

10          MR. PEDERSEN:   Okay.

11          THE COURT:   One last question I have.   Do either of the

12     parties wish the jurors to be polled?

13          MR. CAVER:   Yes, Judge.

14          MR. KARNER:   Not us.

15          MR. PEDERSEN:   Not on behalf of the government.

16          THE COURT:   Just stay in the neighborhood.

17          MR. CAVER:   I'm not going home.

18          THE COURT:   All right.

19        (Whereupon, deliberations commenced at 4:45 o'clock p.m)

20        (The following proceedings were had in open court, out of

21          the presence and hearing of the jury, at 5:55 o'clock p.m:)

22          THE COURT:   All right.   We're on the record.   It's been

23     indicated to me by the court officer that the jury has reached a

24     verdict.   May I bring the jury in, please?

25          MR. CAVER:   Yes.

1    (The following proceedings were had in open court, in the

2       presence and hearing of the jury:)

3          THE COURT:  All right.  Folks, it's been indicated to

4    me by the court security officer that the jury has reached a

5    verdict.  May I ask who your foreperson is?

6          THE FOREPERSON:  I am

7          THE COURT:  It's Brenda.

8          THE FOREPERSON:  Yes.

9          THE COURT:  Brenda, all the jurors have unanimously

10   reached a verdict on each of the counts; is that correct?

11         THE FOREPERSON:  Yes.

12         THE COURT:  Would you hand the verdicts to the court

13   security officer, and I'll read them?

14      (Said documents were tendered to the court.)

15         THE COURT:  The verdicts are as follows.  We, the jury,

16   find the defendant, Dayton Poke, guilty of possession with

17   intent to distribute cocaine base as charged in Count 1 of the

18   superseding indictment, signed by the foreperson and all the

19   members of the jury.

20         The next verdict form reads:  We, the jury, find the

21   defendant, Dayton Poke, guilty of possessing a firearm as a

22   felon as charged in Count 2 of the superseding indictment,

23   signed by the foreperson and all of the jurors.

24         And the last verdict form reads:  We, the jury, find

25   the defendant, Dayton Poke, guilty of possession of a firearm in

PDF created with pdfFactory trial version www.pdffactory.com

1    furtherance of a drug trafficking crime as charged in Count 3 of

2    the superseding indictment.

3           Ms. Montgomery, were those and are those now your

4    verdicts?

5           A JUROR:  Yes.

6           THE COURT:  Ms. Robbel, were those and are those now

7    your verdicts?

8           A JUROR:  Yes.

9           THE COURT:  Ms. Sus, were those and are those now your

10    verdicts?

11           A JUROR:  Yes.

12           THE COURT:  Ms. Cortinez, were those and are those now

13    your verdicts?

14           A JUROR:  Yes.

15           THE COURT:  Ms. Burke, were those and are those now

16    your verdicts?

17           A JUROR:  Yes.

18           THE COURT:  Ms. Gray, were those and are those now your

19    verdicts?

20           A JUROR:  Yes.

21           THE COURT:  Mr. Fujimoto, were those and are those now

22    your verdicts?

23           A JUROR:  Yes.

24           THE COURT:  Ms. Jones, were those and are those now

25    your verdicts?

1          A JUROR:   Yes.

2          THE COURT:   Ms. Zimmerman, were those and are those now

3   your verdicts?

4          A JUROR:   Yes.

5          THE COURT:   Ms. Hoffman, were those and are those now

6   your verdicts?

7          A JUROR:   Yes.

8          THE COURT:   Ms. Sextonson, were those and are those now

9   your verdicts?

10         A JUROR:   Yes.

11         THE COURT:   Mr. Landis, were those and are those now

12  your verdicts?

13         A JUROR:   Yes.

14         THE COURT:   Okay.  Thank you very much, folks.  That

15  concludes your service as jurors in this case.  Have a good

16  night.

17    (The following proceedings were had in open court, out of

18      the presence and hearing of the jury:)

19         THE COURT:   All right.  I will enter a judgment of

20  guilty on the jury's verdict.  Post-trial motions will be filed

21  within 14 days.  I will order a presentence investigation and

22  set the matter for sentencing.

23         Dayton, in connection with the presentence

24  investigation, you will be interviewed by a probation officer.

25  During your interview, you must be truthful in any answer you

1    may give.  If you are not truthful, you could commit obstruction

2    of justice under the sentencing guidelines and have additional

3    points added to the offense level to be established in your

4    case.  Your lawyer should be present during any interview.

5           I'll order the defense to file any objections to the

6    report before the sentencing hearing.  I urge the parties to

7    read the time deadlines set out in the sentencing hearing order

8    and strictly comply with them

9           I'll set this case for sentencing on August 29th at

10    2:30.  Is that date convenient for the parties?

11           MR. KARNER:  Yes, sir.

12           MR. CAVER:  If I may have a moment?

13    (Brief pause.)

14           MR. CAVER:  That would be fine, Judge.

15           THE COURT:  All right.  So ordered.

16           Defendant's remanded.  Court's in recess.

17           MR. KARNER:  Judge, should we wait around for the

18    exhibits to be returned, or does the court want to keep them?

19           THE COURT:  I'll get the exhibits, and I'll have them

20    brought back to you.

21           MR. KARNER:  Okay.  Thank you.

22    (Which were all the proceedings had in the above-entitled

23       trial on the days and dates aforesaid.)

24

25

1   I certify that the foregoing is a correct transcript from

2 the record of proceedings in the above-entitled matter.

3

4

5 _____
 Mary T. Lindbloom
6 Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com