```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             WESTERN DIVISION

 3      UNITED STATES OF AMERICA,    )       Docket No. 11 CR 50062
                                     )
 4                    Plaintiff,     )       Rockford, Illinois
                                     )       Monday, August 19, 2013
 5               v.                  )       10:30 o'clock a.m.
                                     )
 6      DAYTON POKE,                 )
                                     )
 7                    Defendant.     )

 8                          TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE FREDERICK J. KAPALA
 9
        APPEARANCES:
10
        For the Government:         HON. GARY S. SHAPIRO
11                                  Acting United States Attorney
                                    (327 S. Church Street,
12                                   Rockford, IL  61101) by
                                    MR. MARK T. KARNER
13                                  Assistant U.S. Attorney

14      For the Defendant:         LAW OFFICE OF BRENDAN W. CAVER, LTD.
                                    (308 West State Street,
15                                   Suite 97,
                                     Rockford, IL  61101) by
16                                  MR. BRENDAN W. CAVER

17      Court Reporter:            Mary T. Lindbloom
                                    327 S. Church Street
18                                  Rockford, Illinois  61101
                                    (779) 772-8309
19

20

21

22

23

24

25
```

 1              THE CLERK:  11 CR 50062-1, U.S.A. v. Dayton Poke.

 2              MR. KARNER:  Good afternoon, your Honor.  Mark Karner

 3      on behalf of the United States.

 4              MR. CAVER:  Brendan Caver on behalf of Dayton Poke, who

 5      is present.

 6              THE COURT:  Case comes before the court on the

 7      defendant's motion for substitution of appointed counsel.  In

 8      determining whether this motion should be granted, I have to

 9      consider the timeliness of the motion, I have to adequately

10      inquire into the defendant's motion, and I have to decide

11      whether the conflict, if it exists, is so great that it results

12      in a total lack of communication preventing an adequate defense

13      or if the attorney representing the defendant is not doing

14      something that a minimally competent attorney would not do or

15      do.

16              And so, Mr. Poke, I'll ask you to tell me

17      specifically -- first of all, as to timeliness, it's not set for

18      trial.  It's set for sentencing.  The sentencing is not until

19      Thursday, August 29th, and so that the timeliness weighs in

20      favor of granting the motion.  The most --

21              MR. KARNER:  I'm sorry to interrupt, but I think your

22      Honor mentioned last court appearance that --

23              THE COURT:  We would continue it.

24              MR. KARNER:  Right.

25              THE COURT:  Right.  Right.  The most important inquiry,

1    though, is to whether any conflict that exists is so great that

2    it results in a total lack of communication preventing an

3    adequate defense.

4         So, Mr. Poke, I'm going to ask you to tell me what

5    specifically Mr. Caver is not doing that you think he should do

6    or that he's doing that you think he shouldn't do that enures to

7    your detriment.  And, by the way, if you don't want to talk with

8    the government present, I'll ask Mr. Karner to step out until

9    you finish.

10        MR. CAVER:  And that's actually one of the requests

11   that I was going to make of the court.  I understand the

12   government has filed an objection to Mr. Poke's motion, but I

13   feel like unless the government is excused, there may be a lack

14   of candor.

15        THE COURT:  The government's always been cooperative

16   that way.

17        MR. KARNER:  Yes, sir.  Judge, I'd just like some

18   guidance from the court.  I'm supposed to be down in front of

19   Judge Mahoney at 11:00.  Do you want me to wait up here outside

20   the courtroom?  Should I go down to Judge Mahoney's courtroom

21   and come back after that?

22        THE COURT:  Why don't you wait out here.  Why don't you

23   let Judge Mahoney -- why don't you step out and let Judge

24   Mahoney's clerk know that you're detained here.

25        MR. KARNER:  I think their staff already has graciously

1    done so.

2          THE COURT:  All right.  Why don't you just wait

3    outside, and I'll have Mr. Ferguson come and get you when we're

4    concluded.

5          MR. KARNER:  Yes, sir.

6    (Whereupon, Mr. Karner left the courtroom.)

7          THE COURT:  All right.  Dayton.

8    DEFENDANT POKE:  Well, I'm just --

9          THE COURT:  Pull that microphone in front of you and

10    talk into it so that I can hear what you have to say.

11          DEFENDANT POKE:  Well, I feel like it's my right that I

12    get to challenge the things that's in my PSI, as far as my

13    criminal history, and I'm entitled to file a motion for my

14    mitigated sentence and --

15          THE COURT:  Okay.  That's way too broad.  I need to

16    know specifically what Mr. Caver is refusing to do that he

17    should do or that he's doing that you don't want him to do.

18    Don't just say I want him to look into my criminal history.

19    Don't just say I want mitigation.  I can't make a decision based

20    upon those things.  Tell me specifically what he's doing or not

21    doing.

22          DEFENDANT POKE:  I mean, he refusing to challenge my

23    prior convictions and refusing to file the motion for my

24    mitigated factors.

25          THE COURT:  Well, you just said the same thing what you

1      told me before.  You just repeated what you told me before.

2              DEFENDANT POKE:  My mental health evaluation, the

3      post-traumatic stress, I'm entitled to file a motion for a

4      departure.  He refusing to do that, and he refusing -- how can I

5      say it.  Challenge me getting my -- for the government

6      cooperation.  I mean, at least mention it.  He was saying he

7      couldn't mention it or something.  You know, these are all the

8      things I want brought up at my sentencing, and he's saying he's

9      not entitled to do it.

10             THE COURT:  Okay.  What prior criminal history is there

11     that you think should be challenged?

12             DEFENDANT POKE:  The drug convictions that the

13     government's using to career me and the prior convictions that

14     they using to armed career me.

15             THE COURT:  Okay.  Three things.  Mr. Caver, Mr. Poke

16     said you're refusing to challenge -- I think what he's saying is

17     those criminal convictions which the government is going to use

18     as a predicate for having him declared an armed career criminal

19     or a career offender.

20             MR. CAVER:  Judge, if I can start out, what I think

21     Mr. Poke is referring to is the last time we were in court I

22     came to see Mr. Poke prior to the court calling the case.  We

23     had a discussion that came on the heels of my visiting him at

24     MCC.

25             What I think -- and Mr. Poke can correct me if I'm

1    wrong.  What I believe -- and this is why I asked the government

2    to step out.  I believe that what Mr. Poke is alleging is based

3    on about a ten-minute long conversation we had immediately prior

4    to court, where Mr. Poke had waited until after our in-person

5    meeting to rapid-fire ask a series of questions, most of which I

6    genuinely did feel were not relevant to his case based on having

7    about ten minutes to think about them.

8         The reason that I went to see him in person was so that

9    we could discuss the PSR and we could talk about my strategy to

10   proceed both on a written list of objections to what was in the

11   PSR, as well as a sentencing memo included in which we would

12   consider each of the sentencing guidelines that made him -- that

13   resulted in the guideline calculation as set forth in the

14   presentence report.

15        Our original conversation at MCC got side-tracked with

16   an issue of case law, which I think -- I had thought we had

17   later clarified by my sending Mr. Poke a brief about the issue

18   of case law.  When we came back and we had the meeting here

19   before court, apparently it wasn't fully resolved, and that led

20   into a series of these questions for which I was unprepared in

21   large part because I hadn't gone through the PSR with him to

22   ensure that he understood what my plan was.

23        With that predicate -- that's a long lead into the

24   answer to your question -- there may be issues with criminal

25   convictions that we can challenge.  To be honest with the court,

1    I didn't see anything upon my first review.  Once Ms. Taborski

2    reviewed the criminal history and she secured certified copies

3    of convictions, I was unclear as to what particular vehicle I

4    would use to challenge a prior criminal conviction for the

5    purposes that Mr. Poke is stating he wishes to have them

6    challenged.  Certainly I will continue in my research if that is

7    necessary in order to determine the legal basis upon which I can

8    challenge a prior criminal conviction.

9          The criminal convictions can only be challenged in

10   limited circumstances, and as far as I read the presentence

11   report, those circumstances do not exist here.  If Ms. Taborski

12   is correct and Mr. Poke's criminal history is correct, if those

13   convictions have been entered and they have been appropriately

14   researched, there's going to have to be a good faith basis for

15   me to challenge that, which at least upon my first review I did

16   not see.

17          THE COURT:  Mr. Poke.

18          DEFENDANT POKE:  I mean, the conversations that we had

19   at MCC when I asked him to challenge the priors, his words was

20   the PSR is not wrong, the government's not wrong, and you

21   qualify for whatever time that they saying that you eligible to

22   get.

23          THE COURT:  Okay.  But what Mr. Caver is telling me,

24   that he's researched it, he's looked into it, he's reviewed it,

25   and that you do qualify for career offender or career criminal.

1    If you qualify, you qualify.  If you don't, you don't.

2         I don't think you should be sentenced as either a

3    career offender or an armed career criminal -- I think those are

4    the terms we're talking about -- if you're not.  And if you

5    don't qualify, I won't sentence you there.  But if you are, you

6    are.  I wish you weren't for your sake, but if you are, you are.

7         If you can show me what specifically Mr. Caver isn't

8    doing or where he's wrong, I'll look into it.  I'll consider it.

9    I'll research it.

10   DEFENDANT POKE:  Well, I explained to him like the

11   aggravated batteries, just how it was written in the indictment,

12   provoking -- assaulting or provoking.  If that's written in the

13   indictment, the state says it can't be used because it's not a

14   violent offense and wasn't no weapon involved.  And that kills

15   two of the convictions right there that they trying to use.  And

16   I researched it myself.

17        And then with the Buchmeier, with the discharging of

18   parole, they can't use them prior convictions as predicates for

19   armed career -- I'm for sure they're armed career, but I ain't

20   sure with the career.  But we would never know if we don't try

21   to challenge these things.  I can't just accept his word for it

22   because this should have got researched before he even came to

23   see me.  I mean, at least look into it.  But it never got looked

24   into.  But I looked into it myself, and I explained to him that

25   it doesn't apply to me.  Just because I got prior convictions

1    don't mean them convictions qualify for the armed career or the

2    career.

3             THE COURT:  Are there other offenses that would qualify

4    you or other convictions that you have that would qualify you

5    for either career offender or armed career criminal besides the

6    aggravated battery?

7             DEFENDANT POKE:  The drug case and the robbery.  But I

8    was discharged off parole for them charges, and it states with

9    the Buchmeier if I was discharged off parole and my rights was

10   restored, then them cases can't be used.

11            THE COURT:  Well, no, that can't be right.  If you're

12   discharged from parole, that vacates the conviction?

13            DEFENDANT POKE:  And my rights was restored, them

14   convictions can't be used as armed career.

15            THE COURT:  That doesn't sound right to me.

16            DEFENDANT POKE:  That's what the government explained

17   to you last week.  Remember?  That's how he was explaining it.

18   I mean, I ain't explaining it to the T, but that's how the

19   Buchmeier work.

20            If I discharge off parole, they send -- a letter was

21   sent out saying that my rights is restored.  Now, the letters

22   was misleading, I guess.  Got convicted felonies (sic) thinking

23   their rights is restored to possess a firearm.  So, 'til they

24   correct the letter up to 2004, they saying the prior convictions

25   before then that you discharged off parole can't be used.

1          THE COURT:  What about Buchmeier, Mr. Caver?

2          MR. CAVER:  Judge, I think what the government was

3     explaining and I think what Mr. Poke is explaining is that if

4     there was a conviction that was based upon an erroneous belief

5     by the Illinois Department of Corrections letter stating that

6     one's rights had been restored and the defendant can show that

7     that conviction was as a result of that erroneous belief, that

8     in certain circumstances a conviction may not be able to be

9     used.  I don't believe that that applies to Mr. Poke's

10    situation.  I don't have a letter from the Illinois Department

11    of Corrections.  It is not a similar case to Buchmeier, as far

12    as I have been shown.

13         This kind of goes also to a couple of issues that

14    Mr. Poke raised with regard to the mental health treatment.  One

15    of the questions -- and I don't mean to unnecessarily prolong

16    things, but for the court's information, one of the questions

17    was was I going to be able to challenge for a downward departure

18    based upon the fact that Mr. Poke had been found to be mentally

19    ill or mentally incompetent, and he asked me would you be able

20    to do that, and I said no, and here's why, because we don't have

21    a physician who has explained that you are eligible or that

22    you've been found mentally ill or mentally eligible in order to

23    look for a departure from the guidelines on that basis.

24         Certainly there are mental health issues that are

25    referenced in the PSR, but not -- Mr. Poke wanted me to go into

1    sort of a hypothetical, well, if he was, what could we discuss

2    if he was diagnosed mentally ill.  And there again, it wasn't a

3    situation that applied to Mr. Poke, and what I wanted to do was

4    ground ourselves in what could apply to Mr. Poke so that I could

5    be most prepared in order to prepare for the court that written

6    list of objections in the sentencing memo to be able to argue in

7    sentencing.

8           THE COURT:  Do you have to have a psychiatrist

9    diagnosis to qualify for a mental illness for a departure

10   request?

11          MR. CAVER:  No, I don't think so.  I think it can be

12   argued.  I think I could make a good faith basis to argue that

13   what's contained in the PSR could qualify him under the correct

14   circumstances.  But, again, what we were discussing was

15   something that didn't apply to him.  I can't argue that he has a

16   finding of mental illness if that hasn't been found by a

17   licensed physician.  I can argue --

18          THE COURT:  That's what I'm asking.  What about if it

19   was a clinical psychologist who found that he was mentally ill,

20   decided that he was mentally ill?

21          MR. CAVER:  Well, that may be, but that hasn't been

22   found here.  The diagnosis in the PSR is that he has this

23   history, but --

24          DEFENDANT POKE:  No.  It states that I was diagnosed

25   with post-traumatic stress and personality disorder.

```
 1            MR. CAVER:  And that's what I'm saying.  What is
 2    contained in the PSR can be argued.  What we were discussing was
 3    a hypothetical that I was mentally ill.  Well, mental illness
 4    and being mentally ill are different things.  Mr. Poke may
 5    suffer from some mental illness, and that can be argued, but the
 6    conversation that we were having was in the context is if he
 7    were diagnosed to be something other -- something in addition to
 8    what was contained in the PSR.
 9            THE COURT:  Okay.  Well, the question to you is are you
10    willing to look into this issue and, if there's a good faith
11    basis to argue it, bring it to my attention during his
12    sentencing hearing?
13            MR. CAVER:  Yes.
14            THE COURT:  And as far as the aggravated battery,
15    what's the -- Mr. Poke made some comments about the aggravated
16    battery not qualifying as predicate offenses for career offender
17    or armed career criminal.
18            MR. CAVER:  I believe that Mr. Poke's criminal history
19    would still qualify him.  But when he did mention Buchmeier, he
20    mentioned the insulting or provoking nature.  I would be happy
21    to look into that, if we can have an opportunity to go through
22    for me to explain to him why those were calculated in the
23    criminal history first.  If that doesn't resolve the reason why
24    Mr. Poke has a concern about why those are counted and why those
25    are considered in the PSR, absolutely I'd be happy to discuss
```

1    that with him.

2            The first -- and I apologize to the court if -- the

3    first step that I wanted to take was to have an opportunity to

4    explain to Mr. Poke what was contained in the presentence report

5    and why.  I think it is premature to be pursuing just any avenue

6    before I at least have a good faith ability to go through the

7    presentence report with him.

8            Certainly there can be a lot of independent research

9    that can be done by Mr. Poke in his situation, but I think it

10   would be much more helpful to me as the attorney and certainly

11   much more targeted to be able to go through each page of the

12   presentence report, explain to Mr. Poke what's contained in the

13   presentence report and why to see if that doesn't answer any of

14   his questions.  I think that that's probably the reason why the

15   court wants me to go through the presentence report with him, so

16   that I'm not researching endlessly every potential issue that

17   Mr. Poke could possibly come up with that might be related to

18   the case.

19           THE COURT:  Mr. Poke, you have a robbery conviction --

20           DEFENDANT POKE:  Yeah.

21           THE COURT:  -- and two drug convictions that would

22   qualify you for -- let me talk -- that would qualify you for

23   career offender or armed career criminal, but you're saying that

24   those don't count because of this Buchmeier case.  Is that where

25   you're at with that?

1          DEFENDANT POKE:  Yes.  And I understand what he's

2     saying about he don't have the letter.  That's why they got the

3     mailbox exception rule.  Because, I mean, I'm thinking he was

4     going to research all these things, and by him being a

5     professional lawyer at this, I ain't think I would have to

6     provide him as much information as I did about these things

7     because, I mean, he probably should have did this sometime

8     before in his life, challenge the prior conviction.

9          THE COURT:  But Mr. Caver has to make a good faith

10    effort or has to make his arguments in good faith.  In other

11    words, he has to be reasonably certain in his professional

12    opinion that the arguments carry some weight.  He's licensed as

13    an attorney, and his license is not unfettered.  It has certain

14    bounds.  It has certain restrictions.  His license requires him

15    not to make frivolous arguments to the court.

16          I'm sure he will appreciate any help you can give him,

17    but, you know, there are hundreds of arguments he could make

18    that don't make sense, that are frivolous, and what he's telling

19    me, I think, is that he doesn't want to spend his time on

20    frivolous arguments when he could be spending his time focusing

21    on arguments that do have merit, that do have weight, that can

22    help you.

23          DEFENDANT POKE:  I understand that, your Honor, but he

24    never had no arguments.  Everything we talking about as good

25    faith, he just came up with that in the last week.  Everything

1    that we talking about I brought to his attention.

2            His thing is you qualify for 30 years.  Let's go in

3    here.  I'm going to argue for you to get the 30 years, and

4    that's that.  That's not that, you know what I'm saying.  I

5    mean, that's how he wanted to handle it, and that ain't how you

6    handle -- the PSI is for me to challenge the things in there

7    that I feel ain't right.

8            THE COURT:  He's telling me today that he's going to

9    look into any basis for challenging these predicate convictions.

10   He's told me today that he's going to look into this mental

11   health issue that you've got and request a variance, if there's

12   a basis for it.

13           As to the mitigation for cooperation, what's that

14   about?  You think you should get some mitigation for cooperating

15   with the government.  Is that --

16           DEFENDANT POKE:  Yeah.

17           THE COURT:  And, Mr. Caver, are you willing to argue

18   for mitigation if there's cooperation with the government?

19           MR. CAVER:  There was cooperation with the government,

20   and to the extent that that's possible, yes.  This is one of

21   those issues that was brought up in our second discussion with

22   the 5K1.1 motion, which was explained to me.  I explained I

23   can't file a Rule 5K1.1 motion.  I am certainly happy to look

24   into Mr. Poke having cooperated with the government.

25           The government decided categorically that whatever

1    information Mr. Poke had provided to them in the proffer was not

2    going to result in them filing a 5K1.1 motion, but to the extent

3    that cooperation can be used as mitigation at sentencing, I will

4    be happy to look into that, again once I've had an opportunity

5    to look at the presentence report with Mr. Poke.  If Mr. Poke

6    doesn't want to go through the presentence report with me, I

7    understand that.

8         DEFENDANT POKE:  I mean, we can go through it, but, I

9    mean, the only thing in there is my criminal history, which is

10   what I want to challenge, the mental health which is what I want

11   to challenge, and my indictments, my supersede indictment and my

12   first original indictment, you know.

13        My whole thing is I was just trying get everything done

14   and over with.  I mean, it was going to take us -- he came to

15   see me two weeks before sentencing.  So, I mean, it wasn't going

16   to be enough time for him to go over these things and challenge

17   them.  I understand he's saying he's going to do it now.  So, I

18   mean, if he's going to do it, then, you know, I mean, we can

19   continue working.  But if he's just saying he's going to look

20   into this stuff and he don't, then we going to be back at square

21   one.

22        MR. CAVER:  Your Honor, if I may respond.  I went to

23   see Mr. Poke two days after I received the presentence report.

24   After having reviewed the presentence report preliminarily, not

25   in exhaustive detail to prepare for the sentencing, but in

1    enough detail to be able to speak with him about the presentence

2    report.  I got it within two days.  That was a month before the

3    sentencing hearing.  That was going to be plenty of time for me

4    to speak with him.

5            My concern here is that I thought the communication

6    issues between Mr. Poke and I had been resolved.  There are

7    issues here, your Honor, that suggest to me that Mr. Poke has a

8    vehement distrust of me and believes that I am not doing what he

9    needs to be done.  There were comments made in that meeting at

10   the MCC which concerned me greatly that Mr. Poke has no trust in

11   me as an attorney.  If that's the case, that goes far beyond

12   things that I'm going to be looking into with regard to the

13   presentence report.

14           And the other concern that I have is I don't think

15   Mr. Poke understands my obligation as an attorney to the extent

16   that he believes that as his attorney, I do dictate the

17   strategy, although I invite any input that he would like to

18   give.  I encourage input from the client, not only because it

19   gives the client an opportunity to be heard, but in the event

20   that I missed something, it's a backstop to have my client

21   telling me, hey, what about this possible angle.  I'll be frank

22   with the court.  I encourage that sort of communication.

23           But if that communication is not happening and the

24   client distrusts the attorney, then it's very difficult for an

25   attorney to work as the attorney.  It would be another thing

1    entirely as stand-by counsel or as somebody who was not in

2    charge of the case, but the lack of communication here is what I

3    don't believe is going to be resolved, unless I'm very surprised

4    about what happens today.

5            THE COURT:  Okay.  Well, that's the big question,

6    whether there's sufficient communication that you can present an

7    adequate defense.  That's what I need to know.  That's the

8    bottom line of this whole hearing.  Are you communicating with

9    Mr. Poke in such a way that you can present an adequate defense,

10   or is there no communication?

11           MR. CAVER:  To be frank with the court, I believe that

12   I had resolved -- what I did after that meeting at MCC is I

13   attempted to resolve his immediate concern about the issue that

14   prevented us from continuing that meeting further to go through

15   the PSR.  I genuinely believed that we had resolved the

16   communication issue with respect to that until the meeting here

17   before court on the 9th.

18           Based on the communication that we had in the meeting

19   in person that had not been resolved, had not been addressed, I

20   thought, well, okay, maybe we can finesse this, maybe we can get

21   over this.  Those, in addition to the statements that were made

22   and the comments that were made on the 9th, leave a serious

23   doubt in my mind as to whether or not Mr. Poke is willing to

24   communicate with me to the extent that's necessary to do so, so

25   that first he feels like he has been represented adequately and,

1    second, so that feels -- so that he is actually --

2            THE COURT:  What are these statements?  You can't put

3    them on the record?

4            MR. CAVER:  Well --

5            DEFENDANT POKE:  I think Mr. Caver is asking the court

6    for me to give him a hug, say I'm sorry or something.

7            THE COURT:  To what?

8            MR. CAVER:  Indeed not.

9            THE COURT:  No, I didn't hear what he said.

10           MR. CAVER:  He said I'm asking you for him to give me a

11   hug.

12           THE COURT:  Oh, no.

13           MR. CAVER:  And I'm not.  That's okay.

14           THE COURT:  You can hug him if you want.

15           DEFENDANT POKE:  Well, you want me to say I'm sorry,

16   I'm sorry, Mr. Caver, for the things I said at MCC.

17           MR. CAVER:  No, Judge.  The comment specifically was

18   that -- and I would provide it in chambers, if you wanted to,

19   but essentially that I am working with the government, in

20   conjunction with the government, toward the prosecution of

21   Mr. Poke.

22           DEFENDANT POKE:  I mean, excuse me.  Not to cut him

23   off.  I mean, I don't have no other reason to think that if I'm

24   asking him let's go in here and argue I'm not eligible for

25   30 years and he's telling me, well, the government and the PSI

1    say you qualify.  So, I can't go in there and argue that you're

2    not eligible for it.

3              THE COURT:  But that's right.  He's not here to tell

4    you -- he's here to advise you as the way things are, not as how

5    you'd like them to be.  Sometimes an attorney is doing his or

6    her job when they give you bad news.  They can't always give you

7    good news.

8              DEFENDANT POKE:  I mean, no.  I ain't always looking

9    for good news, but, I mean, I just want what I'm entitled to.  I

10   mean, I'm already getting railroaded.  I should be at least able

11   to challenge the -- at least be able to challenge it so I can

12   have some appeal rights or something because if I don't mention

13   it now and I go down, I ain't going to never be able to mention

14   it.

15             THE COURT:  No, that's not true.  If Mr. Caver is found

16   to be ineffective, you can raise that as an issue on appeal.  If

17   he's not doing something that a minimally competent attorney

18   would do and it's enured to your detriment, it's caused you some

19   prejudice, that's a ground, that's an issue you can bring up to

20   the Court of Appeals, and the Court of Appeals will resolve it.

21   And if they found that he has been incompetent and that has

22   worked to your prejudice, they'll send the case back to me, and

23   we'll do it with another attorney.

24             DEFENDANT POKE:  I mean, you know, I understand all

25   that, but, your Honor, I'm just doing what I'm supposed to do.

1    We ain't talking about months here.  We're talking about the

2    rest of my life.  So, I supposed to fight as hard as I can.

3    And, you know, at this point in time, with the numbers, I can't

4    just accept whatever Mr. Caver tell me right now.  I mean, I'm

5    sorry.  We got to research this, and we got to go off into this.

6    I mean, if he ain't going to fight, I'm going to fight.  I'm

7    going to force him to fight for me.  We just ain't going to go

8    in here and say I agree to that.

9            THE COURT:  Well, the question I have for you is can

10    you continue to communicate with Mr. Caver.

11            DEFENDANT POKE:  Yeah.  I mean, I been showing him

12    facts.  Everything that I show him that he said he couldn't do,

13    now he's saying he's doing it.  So, he can now, or he can look

14    into it.  So, evidently, I think I put up a good argument.

15            MR. CAVER:  And, again, I want to just be crystal

16    clear.  That is not what I'm saying.  I am not saying that we

17    will make those arguments.  What I'm saying is that I will

18    determine whether or not there is a good faith basis to make

19    every particular argument, and if there is and if it is

20    supported by the law and the facts in this case that that will

21    be made if it's strategically appropriate.

22            What I am concerned -- and this comes back to the heart

23    of the matter -- is that there's a -- I think there's a

24    fundamental disconnect between what the attorney's role is in

25    representing a client and what Mr. Poke wants the attorney's

1    role to be.  Here Mr. Poke almost draws a contrast that "I'm

2    just doing my job here," he says, as if to draw a contrast that

3    his attorney isn't doing his job.  I'm the attorney.  I am doing

4    my job, as well.  My job is bounded within the law and in the

5    facts of this case, and if there is some disagreement with the

6    role of the attorney, then certainly I think that makes

7    communication much harder.

8         DEFENDANT POKE:  Well, I guess we ain't going to be

9    able to communicate then.

10        THE COURT:  All right.  I'll find that there's a total

11   lack of communication preventing an adequate defense.  I'll

12   grant the defendant's motion.  I'll substitute Mr. Caver for

13   another attorney.

14        Susan, can we do that now, or does there have to be

15   some notification from the Federal Defender?

16        THE CLERK:  To have somebody come over?

17        THE COURT:  No, no.  'Til we find out who the new

18   attorney is.

19        THE CLERK:  It will probably take some time.

20        THE COURT:  All right.  Tim, you can have Mr. Karner

21   come back in.

22        (Whereupon, Mr. Karner re-entered the courtroom.)

23        THE COURT:  I'll take this off for sentencing on

24   August 29th.  I'll set this for status on August 30th.  At that

25   time I'll have Mr. Poke's new attorney appear.

1          Mr. Karner, I've granted the motion.  Mr. Poke does not

2    need to be here on the 30th.  All we're going to do is schedule

3    this for a sentencing date.

4          MR. KARNER:  I'm sorry, Judge.  What date is this set

5    for?

6          THE COURT:  I'll set it for August 30th.  I'll ask

7    Mr. Poke's new attorney to appear on that date, and at that time

8    we'll schedule it for another sentencing hearing.

9          MR. KARNER:  What time on the 30th?

10         THE COURT:  9:00 o'clock on my status call.

11         MR. KARNER:  And did your Honor already name an

12   attorney?

13         THE COURT:  No.  I was asking Susan.  We don't know the

14   attorney unless the Federal Defender has to tell us something.

15         But, again, I'll tell you, Mr. Poke.  You don't get an

16   attorney because the attorney won't argue what you want him or

17   her to argue.  They have to have a good faith reason to do it.

18   They have to know in their heart that there's a good basis for

19   doing it.  They will not and they cannot and they should not

20   make arguments that are not well founded in the law and the

21   facts.  And as I've said, your attorney is not appointed to give

22   you good news.  Sometimes your attorney is doing his or her job

23   when they give you bad news.  But we'll see you -- I'll see the

24   attorney on August 30th.  We'll find out what the new sentencing

25   date will be.

 1          MR. KARNER:  Yes, sir.

 2          DEFENDANT POKE:  Your Honor, can I ask a question?

 3     Them facts, them things that I'm asking to be argued, am I

 4     entitled to have them things argued?

 5          THE COURT:  No.  No.  That's just what I told you.

 6     This is the third time that I told you.  Just because you want

 7     things argued doesn't mean they should be argued.  There has to

 8     be a good faith basis to do it.  It has to be well founded in

 9     the law or in the facts.  Just because you dream up some theory

10     doesn't mean the attorney has an obligation to argue it.  The

11     attorney has to look at it and review it and in his or her heart

12     know that there's a sound basis for doing so.  If there's not a

13     sound basis, they are violating their oath as an attorney by

14     bringing that argument or that issue to the court.

15          DEFENDANT POKE:  But my prior convictions, that's not

16     made up.  Like, I'm trying to get a right understanding.  So,

17     you telling me that me challenging my prior convictions, that's

18     like something that you don't supposed to do?  That's what I'm

19     asking.

20          THE COURT:  You can do it if there's a reason for doing

21     it.

22          DEFENDANT POKE:  Yeah, and I gave reasons, right?

23          THE COURT:  But -- I don't know.  And I'm not making

24     that call right now.  But there may be a good reason for it.  If

25     there is, we can count on your attorney to do it.  If there

1    isn't, then your attorney cannot do it, shouldn't do it, would

2    be violating his or her oath as an attorney if they did.

3          You can make suggestions.  You can give cases.  You can

4    make arguments to your attorney.  You can discuss it.  You can

5    give him or her all the facts and law that pertain to it.  But

6    at the end of the day, if the attorney decides that argument

7    should not be made, then it shouldn't be made, and you cannot

8    force the attorney to do it.  That's not the way --

9          DEFENDANT POKE:  I mean, if he looked into it, your

10    Honor.  It never got looked into.  None of this stuff never got

11    looked into.

12          THE COURT:  Well, he was telling me that he was going

13    to look into it.

14          DEFENDANT POKE:  After sentencing?

15          THE COURT:  You want him off the case.

16          DEFENDANT POKE:  After sentencing?

17          THE COURT:  Huh?

18          DEFENDANT POKE:  I mean, we going for sentencing on the

19    29th.  He's going to do it afterwards?  I mean --

20          THE COURT:  Well, I'm sure your attorney will look into

21    it.

22          DEFENDANT POKE:  All right.  Thank you.  I appreciate

23    it.

24          THE COURT:  You're welcome.

25          DEFENDANT POKE:  I ain't here to give the court a hard

1    time.  I just want what I'm entitled to.

2              THE COURT:  You're not giving me a hard time at all.

3    At least I don't perceive it that way.

4              That's all.  Court's in recess.

5         (Which were all the proceedings had in the above-entitled

6         cause on the day and date aforesaid.)

7         I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.

9

10

11   _____
     Mary T. Lindbloom
     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25