```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           WESTERN DIVISION

 3    UNITED STATES OF AMERICA,    )      Docket No. 11 CR 50062
                                   )
 4                  Plaintiff,     )      Rockford, Illinois
                                   )      Monday, May 5, 2014
 5           v.                    )      2:30 o'clock p.m.
                                   )
 6    DAYTON POKE,                 )
                                   )
 7                  Defendant.     )

 8                        TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE FREDERICK J. KAPALA
 9
      APPEARANCES:
10
      For the Government:          HON. ZACHARY T. FARDON
11                                 United States Attorney
                                   (327 S. Church Street,
12                                  Rockford, IL  61101) by
                                   MR. MARK T. KARNER
13                                 Assistant U.S. Attorney

14    For the Defendant:           LAW OFFICE OF TINA LONG RIPPY
                                   (216 N. Court Street,
15                                  Rockford, IL  61103) by
                                   MS. TINA LONG RIPPY
16
      Also Present:                MS. JENNIFER TABORSKI
17                                 Probation Department

18    Court Reporter:              Mary T. Lindbloom
                                   327 S. Church Street
19                                 Rockford, Illinois  61101
                                   (779) 772-8309
20

21

22

23

24

25
```

1          THE CLERK:  11 CR 50062-1, U.S.A. v. Dayton Poke.

2          MR. KARNER:  Good afternoon, your Honor.  Mark Karner

3     on behalf of the United States.

4          MS. RIPPY:  Good afternoon, your Honor.  Tina Rippy on

5     behalf of Mr. Poke, who is present here today.

6          THE COURT:  Good afternoon.  Show Mr. Poke appears.

7          Case comes before the court to resolve the question of

8     whether the defendant should be classified as an armed career

9     criminal.  This case has taken two aspects.  One is the

10    Buchmeier aspect, which deals with the burglary, and the other

11    is whether mob action qualifies as a predicate offense.  Is that

12    where we're at right now?

13         MR. KARNER:  Yes.

14         THE COURT:  All right.  Let's take the Buchmeier

15    question first.  Anything you wish to add in addition to what

16    you presented?

17         MS. RIPPY:  Yes, your Honor.  At this time I would like

18    to submit this to the court.  Your Honor, this is a declaration

19    that was submitted in the Southern District of Illinois district

20    court case United States v. Burnett, which is a case from the

21    Seventh Circuit that I cite in my second supplemental

22    memorandum, and this is a declaration from the chief of the

23    parole division specifically with regard to the Buchmeier -- the

24    discharge letters that come out at the Illinois Department of

25    Corrections and the administrative directives.

1          The most relevant portion of this declaration is on

2      Page 2, paragraph six, and I think this responds to one of the

3      government's -- something that the government mentioned in their

4      response to my second supplemental memorandum, that it is not

5      the practice of IDOC or the individual officers within the

6      parole division to maintain copies of these discharge letters in

7      the files of the releasees, and, therefore, that's why when we

8      look at Mr. Poke's master file or any of the files coming out of

9      the IDOC facilities that these -- any discharge letters are in

10     there.  That's I think illustrative of -- and it goes directly

11     to the burden of proof.  It's on point as to how we can meet

12     that burden of proof.

13          Mr. Poke also, your Honor, brought to my attention some

14     information with regard to his knowledge of these letters.

15          MR. KARNER:  Well, Judge, I'm going to object to

16     counsel relaying anything -- any information given to her by her

17     client.  She's free to put him on the witness stand to testify,

18     but for her to proffer it I don't think is appropriate under

19     these circumstances.

20          THE COURT:  All right.

21          MS. RIPPY:  Well, I wasn't going to.

22          THE COURT:  Okay.

23          MS. RIPPY:  So, I didn't get to finish.  But no, I was

24     not going to.  I mean, Mr. Poke is free to testify to this

25     information.

Poke - Direct

1          THE COURT:  Do you want to put him on?

2          MS. RIPPY:  I think that would be appropriate.  If your

3     Honor needs further clarification as to these letters --

4          THE COURT:  All right.

5          MS. RIPPY:  -- that's what we're here for today.

6          THE COURT:  Face me and raise your right hand as best

7     you can.

8       (Defendant duly sworn.)

9          THE COURT:  Attorney Rippy.

10          MS. RIPPY:  Thank you, Judge.

11                DAYTON POKE, DEFENDANT HEREIN, SWORN

12                      DIRECT EXAMINATION

13     BY MS. RIPPY:

14     Q.  Mr. Poke, we're here today to talk about the discharge

15     letters that you received from the Illinois Department of

16     Corrections.  And do you recall receiving any discharge letters

17     from the Department of Corrections?

18     A.  Yes, I do.

19     Q.  And which specifically discharge letters do you recall

20     receiving?

21     A.  The first one in 2002 -- or what's that?  One.  I can't

22     really remember the exact year.

23     Q.  Do you recall which conviction that concerned?

24     A.  That's the robbery conviction.

25     Q.  Okay.

Poke - Direct

1    A.  And I received another one in 2005, and I received my last

2    one in 2007.

3    Q.  Okay.  And the letter that you received in 2005, do you

4    recall which conviction that was concerning?

5    A.  That was the 2001 drug conviction and the 2001 aggravated

6    battery conviction.

7    Q.  And what did you do with those letters, if anything?

8             THE COURT:  All right.  Well, I'm confused.  I thought

9    we were talking about the burglary.

10            MS. RIPPY:  There's a robbery conviction.  There's no

11   burglary conviction, your Honor.

12            THE COURT:  There's a robbery conviction from --

13   amended charge of robbery.  That was from 1998.

14            MS. RIPPY:  And it was discharged in 2001.  And that's

15   pursuant to the PSR.

16            THE COURT:  All right.  And that's the first letter he

17   talked about.

18            MS. RIPPY:  Correct, your Honor.

19            THE COURT:  And the second letter he talked about is

20   what?

21            MS. RIPPY:  The possession with intent to deliver.

22   That's a 2002 conviction discharged in 2005, and that's

23   01 CF 1860.  I believe he also mentioned a letter he received

24   with regard to the aggravated battery conviction.  That was also

25   discharged in 2005.  Then the last --

Poke - Direct

1          THE COURT:  No.  Wait a minute.  I'm still on the -- he

2    received the letter, but the offense -- he was sentenced in 2001

3    on the possession with intent to deliver; is that right?

4          MS. RIPPY:  I believe that these were sentencings -- my

5    information from the PSR is that the 01 CF 1860 case and the

6    01 CF 2297 case were both sentenced in 2002.  I can direct your

7    Honor to the paragraph.  Paragraph 64 and paragraph 65, your

8    Honor.

9          THE COURT:  All right.  65 is aggravated battery.

10         MS. RIPPY:  That's correct, your Honor.

11         THE COURT:  But my understanding is the government has

12   abandoned its claim that the aggravated battery is a predicate

13   offense.

14         MR. KARNER:  That's right.

15         THE COURT:  So, we don't have to worry about that one

16   then.

17         MS. RIPPY:  Okay.

18         THE COURT:  All right.

19         MS. RIPPY:  We can move on then to the '04 case.

20         THE COURT:  But he's saying he received his letter in

21   2005 on both of those.

22         THE WITNESS:  They ran them charges together.  If you

23   look in the PSI, I discharged on the same day for both of them.

24   They turned that charge into like one sentence, which would have

25   been six years.

Poke - Direct

 1            THE COURT:  All right.  Okay.  I'm with you.

 2            MS. RIPPY:  Okay.  And then the last letter that he

 3    talked about was the 04 CF 1596 case, and that is paragraph 67,

 4    your Honor.  And I believe he testified that he received that in

 5    2007.

 6            THE COURT:  That was a 2004 conviction.

 7            MS. RIPPY:  Correct, your Honor.

 8            THE COURT:  Okay.

 9            MS. RIPPY:  Thank you, your Honor.

10    BY MS. RIPPY:

11    Q.  Mr. Poke, what did the letter -- if you recall, what did the

12    letter say that you received with regard to your robbery

13    conviction?

14    A.  I can't quote it word by word, but, you know, just letting

15    me know that my rights was restored and I completed -- I

16    discharged off parole, and I never -- I had no further

17    obligations to the Department of Corrections for their rules and

18    something about a license.  I think they was referring to a

19    driver's license or something.  I can't quote it word for word.

20    Q.  And you mentioned that you received a letter in 2005.  Do

21    you recall generally what that letter said?

22    A.  I mean, basically the same thing, you know what I'm saying.

23    The first one said from the 2001 conviction, but I know I

24    received these letters because I was returned back to the

25    Department of Corrections to finish my parole time, and for me

Poke - Direct

```
 1    to move on with a current sentence or get released, they notify
 2    me.  So, in 2005 when I discharged, they had to inform me the
 3    discharges of those -- I had to be discharged from them
 4    conditions to move on to get my good time for the current charge
 5    that I was serving time on.
 6    Q.  So, what did you do at the time with the discharge letter
 7    that you received?
 8    A.  The 2005 one, I took it to my counselor so she can log it in
 9    that I been discharged off my past case so I can receive my good
10    time for my current case and that my security level dropped so I
11    can be able to go to a lesser security facility.
12    Q.  And the letter that you received in 2007, what generally do
13    you recall about that letter?
14    A.  I ain't even -- I don't even remember reading it.  I
15    received it, but I don't -- you know, I just put it in my
16    property and left the jail.  But I was also serving -- violated
17    my parole on that time, so I finished parole in jail at that
18    time, too.
19          So, upon finishing my parole inside the facility, they
20    had give me this paper, which is a drop slip to everybody who
21    got to notify me or get in contact with me for their own
22    personal reason, as far as like the parole officer notify me,
23    the property officer notify me, or whatever during my discharge.
24    And I received this drop slip right here where the parole
25    officer signed it, the assistant warden.  You know, just various
```

Poke - Direct

1   people saying that they did their duty before my final discharge

2   date.

3   Q.  Where were you located in 2007 when you were discharged?

4   A.  Western Illinois Correctional Center.

5   Q.  Okay.  Do you have any other information about the letters

6   that you received?

7   A.  I mean, like what?  I mean, I ain't understanding the

8   question.

9   Q.  Well, like what you did with them or any information as to

10  where they might be today?

11  A.  Man, I mean, I can't tell you, you know.  I ain't never had

12  no stable place to live.  So, going in and out of jail, you know

13  what I'm saying, whatever I have at that time, it would be a

14  loss.  I'd never see it again.  So, you know, there's a lot of

15  things I couldn't keep track of, let alone a piece of paper that

16  I know would be important to me at this time, you know what I'm

17  saying.  I mean, at the time it didn't have no value to me.

18  Q.  Now, you've had an opportunity to review some documents that

19  you received from the Logan Correctional Facility; is that

20  correct?

21  A.  Yes, ma'am.

22  Q.  And --

23       MS. RIPPY:  If I might just have a moment, your Honor.

24       (Brief pause.)

25

Poke - Direct

1          MS. RIPPY:  Might I approach, your Honor?

2          THE COURT:  Sure.

3     BY MS. RIPPY:

4     Q.  Mr. Poke, I'm showing you --

5          MR. KARNER:  Can I see what counsel's showing the

6     witness?

7        (Said document was tendered to counsel.)

8          MR. KARNER:  Judge, I object to counsel showing the

9     witness a copy of a form letter.

10          MS. RIPPY:  Judge, he's already testified that he

11    received the discharge letters.  I'm just going to show him the

12    samples that we received and ask if he ever -- which one of

13    these that he received, if he recalls.

14          MR. KARNER:  There's a lacking of foundation to do

15    that.

16          MS. RIPPY:  Well --

17          THE COURT:  Well, maybe she's trying to establish a

18    foundation.

19          MR. KARNER:  And I think she should -- I agree, Judge.

20    She can try to establish it without showing the witness the

21    exhibit first.

22          THE COURT:  I thought she said he received a letter.

23          THE WITNESS:  Yes, I explained that.

24          THE COURT:  Mr. Poke, don't talk unless you're asked a

25    question.

Poke - Direct

```
 1            MR. KARNER:  That's true, Judge, but he's unable to go
 2     into any more specifics, and to show him this exhibit would be
 3     for an improper purpose.
 4            THE COURT:  What's the improper purpose?
 5            MR. KARNER:  Well, first of all, it's leading, and it's
 6     hearsay.  He hasn't been able to adequately describe the exhibit
 7     independently of the exhibit to suggest that it's more likely
 8     than not this letter was the letter he received.
 9            THE COURT:  I'll overrule the objection.  You can show
10     him the letter.
11            MS. RIPPY:  Thank you, your Honor.
12            THE COURT:  You'll have to mark it as an exhibit.  Do
13     you have a copy for me?
14            MS. RIPPY:  It's attached to my second supplemental
15     sentencing memorandum, your Honor.  There's a series of three
16     letters, but I'm only going to show him the first two.
17            THE COURT:  Okay.  Which one are you going to show him?
18            MS. RIPPY:  I'm going to show him the one that is
19     identified as the pre-2004 and the one that is identified as the
20     2004 to 2009.
21            THE COURT:  All right.  Which one are you going to show
22     him?  Both of them?
23            MS. RIPPY:  Both of them, yes, if I may.
24            THE COURT:  Yes.
25            MS. RIPPY:  Thank you, your Honor.
```

Poke - Direct

1    BY MS. RIPPY:

2    Q.  Mr. Poke, I'm showing you two letters.  One is identified as

3    document number 154 pre-2004, and the other one is identified as

4    document number 154 2004 to 2009 and ask you to please review

5    those.  Do you recall seeing any one of these letters or

6    anything like these documents?

7    A.  Yeah, they look similar.  They look familiar, I mean.

8    Q.  Okay.

9    A.  I mean, they both look the same, you know what I'm saying.

10   You won't be able to tell the difference in them unless you read

11   them.  So, I, you know, can say -- I mean, I received them.

12   Q.  You read the documents when you received them, correct?

13   A.  I mean, I scanned through it.

14   Q.  Okay.

15   A.  I scanned over it.  I didn't like read it word for word.

16   Q.  Okay.  Which one of these did you receive or which -- let me

17   rephrase that.

18          Did you receive any letter that looks like these sample

19   letters that you have reviewed?

20   A.  Yes, I did.

21   Q.  Okay.  Which letter did you receive that looks like these

22   sample letters, if you can recall?

23   A.  I mean, I could say I received both of them, but I mean, the

24   only way you can tell the difference from the documents if you

25   read them.  As far as me just looking at them, it don't matter

Poke - Direct

1    which one you put in front of me, I can say I received both of
2    them because the only way you can tell the difference if you
3    read it and understood the language in it that was switched,
4    and, like I said, I just scanned through them when I received
5    it.  I ain't read it word for word.  So, just looking at both of
6    the documents, you know, I could say I received both of them.
7    Q.  Okay.
8    A.  But if you ask me did one of them say something different
9    from the other one.
10              MS. RIPPY:  Judge, I have nothing further.
11              THE COURT:  Mr. Poke, did you receive these letters in
12   the mail?
13              THE WITNESS:  Yes.
14              THE COURT:  Where did you live in 2001 when you
15   received the letter for the robbery conviction?  What was your
16   address?
17              THE WITNESS:  I can't remember it at the time.
18              THE COURT:  What about 2005 when you received the
19   letters for the possession with intent to deliver and the
20   aggravated battery.  Where did you live?
21              THE WITNESS:  At that time I was living in the
22   Department of Corrections.
23              THE COURT:  And you received them in the Department of
24   Corrections.
25              THE WITNESS:  Yes.

Poke - Cross

1              THE COURT:  And in the 2007 letter where were you

2     living?

3              THE WITNESS:  In the Department of Corrections.

4              THE COURT:  Okay.  Mr. Karner.

5                         CROSS EXAMINATION

6     BY MR. KARNER:

7     Q.  Prior to today you read over the two exhibits that your

8     counsel just showed you on the witness stand, correct?

9     A.  Yeah.

10    Q.  You discussed the issue of what a Buchmeier letter is with

11    your counsel, correct?

12    A.  Yes, I have.

13    Q.  And you studied what it means to receive a Buchmeier letter,

14    correct?

15    A.  Yes.

16    Q.  Okay.  Now, you were convicted of aggravated battery as a

17    juvenile, correct?  Or I guess at age 18?

18    A.  I'm not understanding your question.  Which conviction is

19    you referring to?

20    Q.  In 1997 you were convicted of aggravated battery, were you

21    not?

22    A.  I mean, allegedly.

23    Q.  Do you remember if you were convicted of aggravated battery

24    in 1997?

25    A.  I mean, what you consider conviction?

Poke - Cross

1    Q.  Sir, would you just answer my question?

2    A.  I mean, what you consider a conviction, though?  I mean --

3    Q.  Well, you were sent to the Illinois Department of

4    Corrections for two years in 1997, correct?

5    A.  Yes, I was.

6    Q.  And you were sent there because you were convicted of

7    aggravated battery, weren't you?

8    A.  I mean, what's a conviction?

9    Q.  What is your understanding of why you were sent to the

10   Illinois Department of Corrections in 1997?

11   A.  I mean, could it be called something else?

12   Q.  What is your understanding of why you were sent to serve

13   two years in prison in 1997?

14   A.  Because I pleaded guilty to a charge.

15   Q.  And the name of that charge was aggravated battery?

16   A.  Yes.

17   Q.  Now, following your stint in the Department of Corrections,

18   you were released on mandatory supervised release, correct?

19   A.  Yes.

20   Q.  Did you receive a restoration of rights letter after you

21   completed that term of supervised release?

22   A.  Yes, I did.

23   Q.  What address did you receive that at?

24   A.  In Sheridan.

25   Q.  And what month?

Poke - Cross

```
 1    A.  Sheridan Correctional Center.

 2    Q.  And what month?  Sir, I'm not --

 3          MR. KARNER:  Judge, I'd object to the witness using

 4    documents.

 5          THE WITNESS:  I mean, that's 20 years ago.

 6          MR. KARNER:  Judge --

 7          THE COURT:  Take the documents away.

 8          MR. KARNER:  I was just going to ask permission to do

 9    that.

10          THE WITNESS:  Can my lawyer get them?  Can I give them

11    to my lawyer?

12          THE COURT:  Ms. Rippy, can you take the documents,

13    please?

14    BY MR. KARNER:

15    Q.  I'm going to start again.  When you completed your term of

16    supervised release for the aggravated battery conviction in

17    1997, what address did you receive the restoration of rights

18    letter you claim to have received?

19    A.  In the Department of Sheridan Correctional Center.

20    Q.  What month did you receive it?

21    A.  Sometime at the end or the middle '98.

22    Q.  What month did you receive it?

23    A.  I mean, I don't know the exact month.

24    Q.  Who was your parole officer?

25    A.  I don't know.
```

Poke - Cross

1    Q.  You don't have a copy of that letter, do you?

2    A.  No, sir.

3    Q.  What do you claim the letter said?

4    A.  I mean, saying my rights was restored.

5    Q.  How did the letter differ from the letters you've identified

6    this afternoon?

7    A.  From the early -- from 1994 to 2004, it was only one letter.

8    Q.  Did the letter differ that you received in 1998?

9    A.  What you mean differed?  I mean, I don't -- what you -- was

10   it different?

11   Q.  Did the 1998 letter have any different wording than the

12   letter you claim to have received in 2001 or '2, 2005, or 2007?

13   A.  I just scanned through it.  I ain't read it word for word.

14   Q.  So, the truthful answer to my question is you don't know?

15   A.  I just scanned through it.  I ain't read it word for word.

16   Q.  Do you know if it contained any differences?

17   A.  Difference from what letter?  Which letter are you talking

18   about?

19   Q.  Well, we'll take -- the letter you received in 19, you say,

20   98 --

21   A.  Yeah.  Different from what?

22   Q.  -- was it different from the wording of the letter that you

23   claim to have received in 2001 or '2?

24   A.  I mean, I just scanned through it.  I don't know it word for

25   word.

Poke - Cross

1    Q.  Do you know if it contained any differences?

2    A.  Man, they said my rights was restored, and I completed

3    parole, I'm discharged, and I got the right to obtain a license.

4    Q.  Are you done?

5    A.  I mean --

6    Q.  Now will you answer my question?

7    A.  I just did.

8    Q.  No.  My question, sir, is what were the -- was the letter

9    you received in 1998 differently worded than the letter you

10   received in 2001 or '2?

11   A.  I wouldn't know.  I just scanned through it.

12   Q.  Okay.  When were you released from Sheridan Correctional

13   Center 1998?  What month?

14   A.  I wasn't released in '98.  I was released in '99.

15   Q.  What month?

16   A.  January 25th.

17   Q.  Now, do you recall the date that you were convicted of

18   robbery?

19   A.  What's a conviction?

20   Q.  The robbery that we've talked about or that you talked about

21   today with your attorney.

22   A.  I pleaded guilty to a charge.

23   Q.  Do you know what charge you pled guilty to?

24   A.  I pled guilty to a robbery.

25   Q.  And do you recall what month?

Poke - Cross

1   A.  June, July, summertime.  Sometime around there.

2   Q.  When were you placed on parole for that charge?

3   A.  In '99.

4   Q.  Who was your parole officer?

5   A.  I mean, it could have been you.  I don't know.

6   Q.  And when you claimed you received the restoration of rights

7   letter, what address do you claim you received it at?

8   A.  I was in Logan Correctional Center.

9   Q.  Who wrote the letter?

10   A.  Who wrote it?  What you mean?  The prisoner review board

11   sent it to you.

12   Q.  Okay.  And what person wrote the letter?  Who signed the

13   letter at the bottom?

14   A.  I mean, I got a drop slip with somebody's signature on it, a

15   parole officer, saying that they did their duty in notifying me

16   that they sent me a letter.  I can't read the handwriting.

17   Q.  Do you know who wrote that letter, sir?

18   A.  It ain't written.  It's a print-out copy that they send out

19   to everybody from the prisoner review board.

20   Q.  Do you recall who the author of the letter was?

21   A.  I mean, I got a drop slip with a parole officer's signature

22   on it saying that they notified me of their duties.

23   Q.  Okay.  Now will you answer my question?

24   A.  I just did.

25   Q.  Who wrote the letter to your knowledge?

Poke - Cross

```
 1    A.  I mean, what you mean who wrote the letter?  It's a copy
 2    printout that they send out to everybody who discharge off
 3    parole.
 4    Q.  Who signed the letter?
 5    A.  I assume a parole officer.
 6    Q.  Do you know the probation officer's name?
 7    A.  I got a drop slip over there that counsel got saying that
 8    they notified me of the letter.
 9    Q.  As you sit right there, do you know the name of the parole
10    officer who signed that letter?
11    A.  I can't read it.
12    Q.  So, the truthful answer to my question is --
13    A.  I can't understand the handwriting.
14    Q.  Is the truthful answer to my question, no, I don't know who
15    wrote the letter?
16    A.  So, you going to force some words in my mouth?  That's what
17    you going to make me say?
18    Q.  Is the truthful answer that you don't know who wrote the
19    letter?
20    A.  No, that ain't the truthful answer.
21    Q.  Well, tell us who did.
22    A.  A parole officer with his signature on the drop slip over.
23    Q.  And what's his or her name?
24    A.  She can hand it to you, and you can read it out.  I can't
25    understand the writing on it.
```

Poke - Cross

```
 1    Q.  Who was your parole officer in 1999?

 2    A.  Man, I don't know.  I don't remember his name.

 3    Q.  What address were you paroled to in 1999 or 2000?

 4    A.  I can't remember at this time.

 5    Q.  What address were you paroled to following your aggravated

 6    battery conviction in 1998?

 7    A.  I can't recall at this time.

 8    Q.  You can't recall that address, either?

 9    A.  No.  I got some documents over there with it, though.  I can

10    get it and show it to you, if that's all right with the judge.

11    Q.  Now, did you ever discuss your claim that you received this

12    restoration of rights letter following your robbery conviction

13    with your parole officer?

14    A.  Excuse me?

15    Q.  Do you understand my question?

16    A.  No.

17    Q.  You claimed to have received a restoration of your rights

18    letter sometime in 1998.  Did you discuss that with your parole

19    officer?

20    A.  No, I discussed it with the prisoner review board.

21    Q.  And you don't recall who your parole officer was in 2000?

22    A.  You just made that date up.  2000 what?  What year?

23    Q.  You were on parole -- I'm sorry.  You were released on

24    parole in 1999.  Who was your parole officer?

25    A.  I told you I don't remember, man.
```

Poke - Cross

1   Q.  And you don't recall the wording, the exact wording of that

2   letter, do you?

3   A.  No, sir.

4   Q.  Once you got that letter, what did you think you could do?

5   A.  I mean, whatever the law provided me to do at that time.

6   Q.  So, what did you think you were free to do?

7   A.  I was a free man to do whatever that the law entitled me to

8   do.

9   Q.  Like what?

10   A.  I mean, whatever I was entitled to.  I mean, I ain't know

11   the law at that time.  So, I can't tell you specifically exactly

12   what I thought I can do at that time.

13   Q.  Well, what did you think you could do after receiving this

14   letter that you could not do before you got the letter?

15   A.  I thought that I can do whatever a person that's free with

16   rights had the right to do.

17   Q.  And why didn't you think you could do that before you

18   received that letter?

19   A.  Because I was on parole, and it was limits to the things I

20   can do on parole.

21   Q.  Like what?

22   A.  Like on parole I couldn't possess a pit bull, being a felony

23   (sic) on parole.

24   Q.  So, after this letter, you realized you could own a pit

25   bull?

Poke - Cross

1    A.  Yeah.

2    Q.  What other changes?

3    A.  I mean, I couldn't leave the state, you know what I'm

4    saying.  That's a civil right, right?  I couldn't leave the

5    state.  I couldn't -- I didn't have my own free will to move

6    about from state to state or house to house without permission

7    from somebody.

8    Q.  What other rights did you believe were restored by this

9    letter?

10   A.  I mean, the rights that was entitled to me at the time.  I

11   mean --

12   Q.  Well, be more specific.  You told me about the pit bull.

13   You've told us about not being able to leave the state.  What

14   else?

15   A.  I mean, you -- I mean, I wasn't thinking about what all

16   exactly that I can -- you know what I'm saying?  Like who sit

17   down and just name down all the stuff they can do, or who go

18   find out all the stuff that they can do once they discharge off

19   parole.  You just free, and you're entitled to do what you can

20   do as a free man or whatever the law provides you to do at that

21   time.

22   Q.  So, what other benefits did you get from that letter other

23   than possessing a pit bull and being able to leave the state?

24   A.  The other benefits that I got from that letter was telling

25   me that my rights was restored.

Poke - Cross

1    Q.  Can you be any more specific, sir?

2    A.  Like what?  I just named a few things.

3    Q.  Can you name any others?

4    A.  No.  Do you got something in mind?

5    Q.  Now, you were convicted of possessing with intent to deliver

6    one to 15 grams of cocaine in 2002, correct?

7    A.  I signed a plea.

8    Q.  So, you went to prison in 2002, correct?

9    A.  Yeah.

10   Q.  And you went to prison on a charge of possessing with intent

11   to deliver cocaine, correct?

12   A.  Yeah.

13   Q.  And you were released on parole when?

14   A.  You say 2000 and when.  Two?

15   Q.  When were you released on parole for that offense?

16   A.  Which offense?

17   Q.  Possession with intent to deliver cocaine.

18   A.  Which one?

19   Q.  The first one.

20   A.  I mean, give me a -- can I get an exact date?

21   Q.  No.  You can answer my question.

22   A.  Which conviction?  I mean --

23   Q.  The first possession with intent to deliver cocaine case.

24   When were you placed on parole?

25   A.  I mean, if you ain't telling me what year, which one you

Poke - Cross

1    talking about, can you be more specific, sir?

2    Q.  You can't -- you don't recall.  Is that your answer?

3    A.  No.  I'm asking you to be more specific.

4    Q.  Your first possession with intent to deliver, do you recall

5    when you were released on parole?

6    A.  When?  As a juvenile?  I mean --

7    Q.  As an adult.

8    A.  Are you talking about the 2001 conviction?

9    Q.  Well, do you recall what address you were paroled to for

10   your first possession with intent to deliver cocaine case?

11   A.  I mean, can you be more specific?  Like the 2001 plea or --

12   Q.  I can be specific.  Do you recall what address you were

13   paroled to for your first possession with intent to deliver

14   cocaine?

15   A.  No.

16   Q.  No.  And you don't recall your parole officer?

17   A.  No, sir.

18   Q.  Do you recall what month you were paroled?

19   A.  On which charge, sir?

20   Q.  Possession with intent to deliver cocaine.

21   A.  Which year, sir?

22   Q.  Your first one.

23   A.  What?  2004?  That release?  That discharge?  Or that

24   release date?

25   Q.  Do you recall my question?

Poke - Cross

1    A.  I mean, if you ain't giving me nothing specific, you leave

2    me no other choice but to guess which one you're talking about.

3    Q.  Do you know the answer to my question?

4    A.  2004?  I mean, it's so many of them, you got to be specific.

5    Q.  Do you recall what the letter said that you supposedly

6    received after successfully -- or being discharged from parole?

7    A.  I was discharged from parole, my rights was restored, and

8    I'm entitled to a license.

9    Q.  Okay.  How was that letter -- was the letter the same or

10   different from the letter you claim to have received in 1998 for

11   the robbery?

12   A.  I ain't read it word for word.

13   Q.  Do you know?

14   A.  It was familiar from the other ones that I received.

15   Q.  Do you know if it was the same or not?

16   A.  It was similar to the other ones I received.

17   Q.  So, you don't know if it was the same or not?

18   A.  It got -- it had to be the same.  I mean, it said all the

19   same things the first one I received said.

20   Q.  So, is that your answer?  That it was the same?

21   A.  No.  Similar to the first one I received.

22   Q.  Who were you living with when you were first paroled on that

23   offense?

24   A.  Sister.

25   Q.  Which sister?

Poke - Cross

1   A.  I can't recall at this time.  I don't know.

2   Q.  Do you know who your parole officer was?

3   A.  No.

4   Q.  Do you know what happened to that letter?

5   A.  I can't recall.

6   Q.  Did you ever violate -- when you were initially released on

7   supervised release for this cocaine offense, did you violate

8   parole for that time?

9   A.  Yes, sir.

10  Q.  How many times?

11  A.  How many times can you violate on a charge?

12  Q.  Do you know how many times you violated, sir?

13  A.  I mean, you only can violate once on one charge.

14  Q.  Do you know how many times you were released and then

15  returned to the Department of Corrections during your term of

16  supervised release?

17  A.  Like four.

18  Q.  Same question with respect to the robbery.  Do you know how

19  many times you were returned to the Department of Corrections

20  during your term of supervised release?

21  A.  Hold on.  You made it seem -- the first question you made it

22  seem like you was asking me for all the violations.  Now you're

23  making it seem like you asking me for one specific charge.  So,

24  is that one specific charge you're talking about for the first

25  question you asked me?

Poke - Cross

1    Q.  Do you know how many times you were returned to the

2    Department of Corrections for aggravated battery for -- I'm

3    sorry -- for the robbery.  Do you know how many times -- would

4    you listen to my question, please?

5    A.  Is you talking about all the convictions, or is you talking

6    about one specific charge for that time, for the first question.

7    Let's go back to the first question when I said four.

8    Q.  On the robbery -- following your conviction for robbery and

9    which you were sentenced to three years in the Department of

10   Corrections, how many times after you were placed on supervised

11   release --

12           THE WITNESS:  Judge, I object to him harassing the

13   witness.

14           THE COURT:  You're not being harassed.  Just answer his

15   questions.

16           THE WITNESS:  I mean, he's not being specific.  He's

17   trying to trip me up here and make it seem like he's asking me a

18   specific number for all the times and then turn around and made

19   it seem like he was asking me for that one specific conviction,

20   when ain't no way I can violate four times for no one

21   conviction.  I've been back to the penitentiary for violations

22   maybe four or five times.  So, for each conviction I've been

23   back one time for violating parole.

24   BY MR. KARNER:

25   Q.  So, you claim you only violated parole once when you were

Poke - Cross

1    sentenced on the robbery conviction?

2    A.  Once on each conviction.

3    Q.  Okay.  Now, with respect to your second aggravated battery

4    conviction in 2002, when were you released on parole?

5    A.  2004.

6    Q.  Who was your parole officer?

7    A.  I don't know.

8    Q.  What address were you paroled to?

9    A.  I don't remember at that time.

10   Q.  What month do you claim you received -- or do you claim you

11   received a restoration of rights letter following that

12   conviction?

13   A.  In 2005.

14   Q.  What month?

15   A.  I can't recall.

16   Q.  Where is that letter now?

17   A.  I have no idea.

18   Q.  How did that letter differ, if at all, from the previous

19   letters you received?

20   A.  I wouldn't be able to tell you, sir.

21   Q.  Now, with respect to your second conviction for possessing

22   with intent to deliver cocaine, do you recall when you were

23   released on parole for that offense?

24   A.  2006.

25   Q.  What house were you released to or residence?

Poke - Cross

1     A.  I can't recall.

2     Q.  Who was your parole officer?

3     A.  I do know that one.  Adotta.  Adotta, if I'm pronouncing it

4     correctly.

5     Q.  Who do you claim you were living with then?

6     A.  I was living with my uncle.

7     Q.  What's your uncle's name?

8     A.  John Lester.

9     Q.  Where does he live now?

10    A.  He currently moved back to Gary, Indiana.

11    Q.  How did the letter you received -- well, did you receive a

12    letter in 2000 -- well, after you were paroled?

13    A.  Yeah.  I was incarcerated.

14    Q.  How did the letter differ, if at all, from the prior letters

15    you received?

16    A.  It looked the same to me.

17    Q.  Did you discuss that letter with your parole officer?

18    A.  I discussed it with the prisoner review board.

19    Q.  Did you ever discuss it with your parole officer?

20    A.  No.  I discussed it with the prisoner review board.

21          MR. KARNER:  I have no further questions, Judge.

22          THE COURT:  Redirect?

23          MS. RIPPY:  Nothing further, your Honor.

24          THE COURT:  You may step down, Mr. Poke.

25          (Defendant excused.)

```
1              THE COURT:  Any other testimony?

2              MS. RIPPY:  No, your Honor.  I would -- I don't recall

3     if I asked your Honor to take judicial notice of the affidavit

4     that I had provided.  Sorry.  I can't recall if I did that

5     already.  But I would like your Honor to take judicial notice of

6     the declaration of Jesse Montgomery.

7              THE COURT:  Declaration of what?

8              MS. RIPPY:  I'm sorry?

9              THE COURT:  Declaration of what?

10             MS. RIPPY:  Jesse Montgomery.  It's the declaration

11    that I handed -- that I provided to your Honor in United States

12    v. Burnett.

13             THE COURT:  Well, I don't think that's something I take

14    judicial notice of.  I think it's something that you offer into

15    evidence.

16             MS. RIPPY:  Well, I think, your Honor, this is a

17    document that was filed in a case at the Southern District of

18    Illinois.  It's a court document.

19             THE COURT:  Oh, I see.

20             MS. RIPPY:  It's an official court document.

21             MR. KARNER:  I don't object, for whatever value it has.

22             THE COURT:  All right.  Thank you.

23             Yes, I will receive it into evidence.

24             MS. RIPPY:  Thank you, your Honor.

25             MR. KARNER:  Judge, I'd like a brief opportunity to
```

1    present some rebuttal testimony.  Some of the testimony that the

2    defendant offered frankly doesn't ring true.  We didn't

3    anticipate that he would say some of the things he said.

4           And so, I would like an opportunity to bring someone in

5    from the Illinois Department of Corrections because, number one,

6    the letters did change over time, and they changed dramatically.

7    And second of all, I'd like the opportunity to bring in his

8    parole officers during those respective sentences to rebut some

9    of the factual assertions he made on the witness stand.

10    MS. RIPPY:  Well, your Honor, I'm not sure what value

11    some of that is.  These are discharge letters.  They're not

12    provided when the detainee is released on parole.  They're

13    provided later when there's a max out, when the releasee is

14    maxed out and discharged from their commitment to the Department

15    of Corrections.

16    MR. KARNER:  Well, they'll have the overall effect of

17    showing that the defendant was untruthful.

18    THE COURT:  When can you get these people into court?

19    MR. KARNER:  I don't know.  I'm going to start that

20    process as soon as I get back to my office.  I would think at

21    least a week, Judge.

22    THE COURT:  All right.  Let's set this for continued

23    hearing on May 16th at 10:00 o'clock.

24    MS. RIPPY:  If I may, your Honor.

25    MR. KARNER:  I'm sorry.  Did you give me a time, Judge?

```
 1              THE COURT:  10:00 o'clock.

 2              MR. KARNER:  10:00 o'clock.

 3              MS. RIPPY:  10:00 o'clock, your Honor?  Yes, that would

 4     be fine.

 5              THE COURT:  All right.  We'll see you then.

 6              MS. RIPPY:  Thank you.

 7              MR. KARNER:  Thank you.

 8          (Which were all the proceedings had in the above-entitled

 9          cause on the day and date aforesaid.)

10          I certify that the foregoing is a correct transcript from

11     the record of proceedings in the above-entitled matter.

12

13

14     _____
       Mary T. Lindbloom
       Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```