```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            WESTERN DIVISION

 3    UNITED STATES OF AMERICA,      )      Docket No. 11 CR 50062
                                     )
 4                  Plaintiff,       )      Rockford, Illinois
                                     )      Friday, May 30, 2014
 5             v.                    )      9:30 o'clock a.m.
                                     )
 6    DAYTON POKE,                   )
                                     )
 7                  Defendant.       )

 8                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE FREDERICK J. KAPALA
 9
      APPEARANCES:
10
      For the Government:            HON. ZACHARY T. FARDON
11                                   United States Attorney
                                     (327 S. Church Street,
12                                    Rockford, IL  61101) by
                                     MR. MARK T. KARNER
13                                   Assistant U.S. Attorney

14    For the Defendant:            LAW OFFICE OF TINA LONG RIPPY
                                     (216 N. Court Street,
15                                    Rockford, IL  61103) by
                                     MS. TINA LONG RIPPY
16
      Also Present:                  MS. JENNIFER TABORSKI
17                                   Probation Office

18    Court Reporter:               Mary T. Lindbloom
                                     327 S. Church Street
19                                   Rockford, Illinois  61101
                                     (779) 772-8309
20

21

22

23

24

25
```

```
 1                THE CLERK:  11 CR 50062-1, U.S.A. v. Dayton Poke.

 2                MR. KARNER:  Good morning, your Honor.  Mark Karner on

 3      behalf of the United States.

 4                MS. RIPPY:  Good morning, your Honor.  Tina Rippy on

 5      behalf of Mr. Poke, who is standing next to me in custody.

 6                THE COURT:  Show Mr. Poke appears.

 7                This case comes before the court for a continued

 8      sentencing hearing.  The pretrial services report indicates that

 9      Mr. Poke is taking medications.  He's taking two inhalers,

10      albuterol, and also naproxen.  Are you still taking those

11      medications?

12                DEFENDANT POKE:  Yes.  Yes, sir.

13                THE COURT:  And did you take them today?

14                DEFENDANT POKE:  I took the amitriptyline and the

15      gabapentin.

16                THE COURT:  And what are those for?

17                DEFENDANT POKE:  The amitriptyline is for mental health

18      reasons, and the gabapentin is for my nerve pain.  I got copies

19      of the medications.

20                THE COURT:  That's all right.  I don't need to see

21      them.  But they were prescribed by a doctor?

22                DEFENDANT POKE:  Yes.

23                THE COURT:  A physician?

24                DEFENDANT POKE:  Yes.  Here's the whole report here

25      with the medication.
```

```
 1              THE COURT:  Keep them right there in your packet.
 2              Are there any other medications you're taking besides
 3    the ones we've mentioned and the ones you've mentioned?
 4              DEFENDANT POKE:  I take another pain med, naproxen.
 5              THE COURT:  Right.  I mentioned that one.
 6              DEFENDANT POKE:  Oh, yeah.  But I ain't take that
 7    today.
 8              THE COURT:  All right.  Is there anything about those
 9    medications that affects your ability to think or reason or make
10    decisions?
11              DEFENDANT POKE:  No, sir.
12              THE COURT:  Is there anything about those medications
13    that affects your ability to understand what we're doing this
14    morning?
15              DEFENDANT POKE:  No sir.
16              THE COURT:  Is there anything about those medications
17    that affects your ability to communicate with Ms. Rippy about
18    your case?
19              DEFENDANT POKE:  No, sir.
20              THE COURT:  All right.  Have you consumed any other
21    drugs or alcohol in the past 24 hours?
22              DEFENDANT POKE:  No, sir.
23              THE COURT:  All right.  I think it would be helpful to
24    recap the sentencing materials.  There is a presentence
25    investigation report, a government 851 notice, defendant's
```

1    sentencing memorandum, the government's response to that, a

2    supplemental sentencing memorandum by the defendant, the

3    government's response to that, a second supplemental sentencing

4    memorandum and the government's response to that, the United

5    States argument regarding defendant's eligibility to be

6    sentenced as an armed career criminal and the defendant's

7    response to that, and also a supplemental report from the

8    probation office dated May 29th, 2014.

9            Mr. Poke, have you had a chance to review those

10   materials with Attorney Rippy?

11           DEFENDANT POKE:  Somewhat.

12           THE COURT:  Okay.  Well, I want you to -- if you need

13   to take some time here and go over them with her, I'll be glad

14   to let you do so.

15           DEFENDANT POKE:  I mean, yes, I would like to.  It's up

16   to her.

17           THE COURT:  All right.  Have a seat and review them

18   with her.

19       (Brief pause.)

20           THE COURT:  All right.  Ready to proceed?

21           MS. RIPPY:  Yes.  Thank you, your Honor.  We've had an

22   opportunity to go through the sentencing memorandum at this

23   time.

24           THE COURT:  All right.  You've gone through it before

25   this date, though, haven't you?

1          MS. RIPPY:  I beg your pardon?

2          THE COURT:  You've reviewed it with him before this

3    date?

4          MS. RIPPY:  Oh, yes.  On many occasions.

5          THE COURT:  Let me ask you this.  Is there any

6    objection to forfeiting the firearm and ammunition?

7          MS. RIPPY:  No, your Honor.

8          MR. KARNER:  And I have -- I'm sorry.  I should have

9    filed it earlier, but I've got the motion for preliminary order

10   of forfeiture on my desktop, and I'd ask leave to file that

11   later today.

12         DEFENDANT POKE:  Excuse me, your Honor.  I didn't

13   understand the question.

14         THE COURT:  The government's asked that the ammunition

15   and the gun be forfeited.

16         All right.  Other than the guidelines calculations and

17   your objection to the designation of the defendant as an armed

18   career criminal, does the defense have any dispute as to the

19   factual findings and conclusions contained in the presentence

20   report and accompanying materials?

21         MS. RIPPY:  No, your Honor.

22         THE COURT:  Same question to the government.

23         MR. KARNER:  No, your Honor.

24         THE COURT:  I want to bring up one matter, and that is

25   in regard to paragraph 53.  That paragraph has to do with the

1    charge of robbery to which the defendant was convicted, and it

2    says that his parole was discharged on June 8th, 2001, but I

3    don't think that's exactly correct.  I think that should read

4    that he was released from custody on 2001.  Is that correct?  I

5    have the document that Mr. Poke presented, I believe it was at

6    our last hearing, showing his discharge from Logan, and it shows

7    that he was discharged, and the box marked parole is not marked.

8            MR. KARNER:  I'd have to review the documents.

9            THE COURT:  Attorney Rippy, can you enlighten me on

10    that?

11            MS. RIPPY:  If I just may have one moment.

12            THE COURT:  Jen, can you speak to that, please?

13            MS. TABORSKI:  Yes, your Honor.  Actually on that date

14    the sentence expired, and he was discharged from the Illinois

15    Department of Corrections.

16            THE COURT:  Right.

17            MS. RIPPY:  I believe you're correct, your Honor.

18    Mr. Poke was released from custody when his sentence was

19    discharged on that date.

20            THE COURT:  All right.  I will adopt the factual

21    findings and conclusions contained in the presentence report and

22    accompanying materials.  The presentence report and accompanying

23    materials and the transcript of these proceeding will stand as

24    my factual findings and conclusions.

25            As to the defendant's designation in the presentence

1    investigation report as an armed career criminal and his

2    designation as a career offender, the defendant does have

3    objections.  I've reviewed the documents.  I've reviewed our

4    discussion on this.  If the parties will have a seat, I'll share

5    my reasoning with you.

6         In this case there have been several different

7    objections and arguments concerning whether the defendant

8    qualifies for an enhanced penalty under 18 U.S.C. Section

9    924(e), which is often referred to as the Armed Career Criminal

10   Act or ACCA.  This provision, if applicable, would mandate a

11   statutory minimum sentence of 15 years' imprisonment and a

12   maximum term of life imprisonment on Count 2, which is the

13   defendant's conviction for being a felon in possession of a

14   firearm in violation of 18 U.S.C. Section 922(g).  Without the

15   enhanced penalty, Count 2 would be subject to a statutory

16   maximum sentence of ten years.  I note, however, that this

17   determination does not impact the calculation of the career

18   offender provision under the guidelines or otherwise change the

19   applicable advisory guidelines range in this case.

20        A defendant is designated as an armed career criminal

21   under Section 924(e) if he has three previous convictions for a

22   violent felony or a serious drug offense or both committed on

23   different occasions.  Although I will discuss in greater detail

24   the definitions later, it is sufficient for now to mention that

25   the terms violent felony and serious drug offense are each

1    specifically defined in the statute, and whether a particular

2    past offense qualifies under those definition sections is often

3    the key inquiry or dispute that arises in ruling on an ACCA

4    objection.

5            Here the probation officer found in the presentence

6    investigation report that the defendant qualified as an armed

7    career criminal.  I note before proceeding any further that this

8    finding does result in a potential enhancement under

9    Section 4B1.4 of the guidelines, but in this case, as noted in

10   paragraph 45 of the presentence investigation report, that

11   section did not have any impact on the final guidelines

12   calculation.  Thus, the only effect of the ACCA determination

13   for our purposes is to determine the statutory sentencing range

14   that is applicable for the defendant's conviction on Count 2.

15           The probation officer found that the defendant had a

16   total of five predicate offenses, two serious drug offenses and

17   three violent felonies.  Specifically, the probation officer

18   relied on the defendant's convictions for possession with intent

19   to deliver one to 15 grams of cocaine from case number

20   01 CF 1860, possession with intent to deliver one to 15 grams of

21   cocaine from case number 04 CF 1596, aggravated battery from a

22   juvenile case, number 94 J 122, robbery from case number

23   98 CF 125, and aggravated battery from case number 01 CF 2297.

24           In its most recent submission, which was filed on

25   April 28th as docket entry 162, the government has withdrawn its

1    contention that the two aggravated battery convictions could be
2    used as predicate offenses for purposes of the ACCA.
3    Accordingly, the court will not consider those two offenses for
4    purposes of determining whether the defendant is an armed career
5    criminal, and to the extent the defendant was challenging those
6    predicate offenses in his original sentencing memorandum, that
7    objection is sustained.

8          In the government's same submission, however, it
9    maintains that the defendant still qualifies as an armed career
10   criminal and argues that his felony conviction for mob action
11   from case number 08 CF 2628 also qualifies as a violent felony
12   for purposes of the ACCA.  Therefore, in total, there are now
13   four potential predicate offenses, the two controlled substance
14   offenses, the robbery, and the mob action, and the defendant
15   will qualify as an armed career criminal so long as at least
16   three of those four convictions qualify as predicate offenses
17   under the ACCA.

18         The court will address each of these offenses, as well
19   as the parties' objections and arguments, from all of the
20   written submissions and various court hearings that have been
21   held so far.  Because these arguments were never presented in
22   one coherent written submission, but rather have come to the
23   court's attention in a rather piecemeal fashion, the parties
24   should pay close attention and alert me right away if I happen
25   to miss an argument that has previously been raised.

1        I will start with the two controlled substance

2   offenses.  The probation officer determined that these two

3   offenses each qualified as a serious drug offense for purposes

4   of Section 924(e).  The term serious drug offense is defined in

5   Section 924(e)(2)(A) in relevant part as an offense under state

6   law involving manufacturing, distributing, or possessing with

7   intent to manufacture or distribute a controlled substance for

8   which a maximum term of imprisonment of ten years or more is

9   prescribed by law.  According to the presentence investigation

10   report, both of these convictions were for possession with

11   intent to deliver between one to 15 grams of cocaine, which is a

12   Class 1 felony under Illinois law, as set forth in 720 ILCS

13   570/401(c)(2).  A Class 1 felony is punishable by a sentence of

14   imprisonment of not less than four years and not more than 15

15   years, as set forth in 730 ILCS 5/5-1, 5-4.5-30.  Thus, on its

16   face these two convictions meet the definition for a serious

17   drug offense for the purpose of 924(e).  The defendant, however,

18   raises a couple of objections to using these controlled

19   substance offenses as predicate offenses for purposes of the

20   ACCA.

21        Regarding 01 CF 1860, in his supplemental sentencing

22   memorandum which was filed on February 21st as docket entry 143,

23   the defendant challenges this conviction and objects to the

24   details of that conviction, as set forth in paragraph 64 of the

25   presentence investigation report.  The presentence report shows

1    that the original charge was for a possession with intent to

2    deliver one to 15 grams of cocaine within a thousand feet of a

3    church and that the defendant pled guilty to an amended charge

4    of possession with intent to deliver one to 15 grams of cocaine.

5    In his objection the defendant argues that his memory of the

6    charge is that he pled guilty to possession only and not to

7    intent to deliver.

8              If that were true, then the defendant's conviction

9    would be a Class 4 felony under 720 ILCS 570/402(c) and would

10   not qualify under the definition of a serious drug offense for

11   purposes of Section 924(e) because the maximum sentence would be

12   less than ten years.  However, my review leads me to conclude

13   that defendant's memory is not accurate.  In its response to the

14   supplemental sentencing memorandum, the government submitted a

15   certificate of conviction showing that the defendant was

16   convicted of possession with intent to deliver a controlled

17   substance, a Class 1 felony, in violation of 720 ILCS

18   570/401(c)(2).  Based on this submission, the court overrules

19   the defendant's objection and finds that the conviction is

20   accurately recited in the presentence investigation report.

21             At a previous hearing the defendant continued to press

22   this issue in a pro se capacity without his counsel's

23   assistance.  He argued that he pled guilty to possession only

24   and that his plea was somehow changed or forged after it had

25   been entered and signed by him.  In support of this contention,

1    the court received in evidence several documents at the

2    defendant's behest, including the bill of indictment, the

3    judgment, the defendant's plea of guilty, and the docket sheet

4    from case number 01 CF 1860.

5          The court has reviewed all of these documents, and

6    while there clearly was an amendment on the face of the

7    indictment by striking the reference to within a thousand feet

8    of a church, there is no evidence of an amendment to a charge of

9    mere possession.  Moreover, I note that the defendant's guilty

10   plea clearly references the case number and describes the charge

11   as a Class 1 felony as amended on indictment face.  Accordingly,

12   although the court previously indicated that it would not be

13   considering this pro se argument, the court nevertheless

14   concludes for the sake of completeness that this objection is

15   without merit and is overruled.

16         The defendant's other argument concerning his

17   controlled substance offenses, 01 CF 1860 and 04 CF 1596, is

18   based on the Seventh Circuit's en banc decision in Buchmeier v.

19   United States, 581 F.3d 561.  As the parties are aware, this

20   decision provides certain circumstances in which a defendant's

21   prior conviction cannot be used to support an enhanced sentence

22   under the ACCA.  Specifically the court held that the statutory

23   definition for the term crime punishable by imprisonment for a

24   term exceeding one year, which is set out in 18 U.S.C. Section

25   921(a)(20), contains an exception for any conviction in which

1    defendant had received a restoration of civil rights.

2         Relying on Buchmeier and its progeny, the defendant

3    argues in his second supplemental memorandum, which was filed on

4    April 9th as docket entry 154, that he would have received a

5    restoration of rights letter similar to the one at issue in

6    Buchmeier at the end of his sentence for case number 04 1596

7    and, therefore, that this conviction cannot count as a predicate

8    offense for purposes of Section 924(e).

9         Notably in that same written submission, the defendant

10    took the position that he did not have his rights restored for

11    case number 01 CF 1860 because he was incarcerated at the time

12    of the expiration of that sentence, but he has since testified

13    at a previous hearing that he did receive a letter in 2005

14    informing him that his rights had been restored from the 01 CF

15    1860 conviction.

16         Accordingly, it appears that the defendant is now

17    contending that neither one of the controlled substance offenses

18    should qualify him as an armed career criminal.  This argument

19    is without merit.  The definition for a serious drug offense in

20    Section 924(e)(2)(A) does not rely on the term crime punishable

21    by imprisonment for a term exceeding one year that was analyzed

22    in the Buchmeier opinion.  That term is only found in Section

23    924(e) as part of the definition for the term violent felony.

24    Thus, the Buchmeier opinion and the restoration of rights

25    exception contained in Section 921(a)(20) has no bearing on

1    whether the defendant's prior controlled substance offenses

2    qualify as serious drug offenses for purposes of Section 924(e).

3         In fact, the Seventh Circuit has recognized this

4    distinction in footnote two in the case of Gant v. United

5    States, 627 F.3d 677.  Accordingly, based on the plain language

6    of the statute and the Seventh Circuit's reasoning in Gant, the

7    court overrules any objection based on Buchmeier to using the

8    two controlled substance offenses as predicate offenses for

9    purposes of applying an enhanced penalty under the ACCA.

10        Based on the foregoing, the court finds that the two

11   controlled substance offenses identified in paragraph 45 of the

12   presentence investigation report, case numbers 01 CF 1860 and

13   04 CF 1596, qualify as serious drug offenses under Section

14   924(e) and count as two of the three predicate offenses needed

15   to support an enhanced sentence under the Armed Career Criminal

16   Act.

17        I would also note at this point in the hearing that

18   these two same controlled substance offenses form the basis for

19   the career offender enhancement under Section 4B1.1 of the

20   guidelines, as set out in more detail in paragraph 44 of the

21   presentence investigation report.  Because that enhancement only

22   requires two prior felony convictions for either a crime of

23   violence or a controlled substance offense, the defendant

24   qualifies as a career offender regardless of how the court rules

25   on the remaining objections to using the defendant's robbery and

1    mob action convictions as predicate offenses for purposes of the

2    ACCA.  Therefore, the advisory guidelines range in this case,

3    which is driven by the career offender enhancement, will not

4    change no matter how the court rules on the ACCA issue.

5          There was one final issue I think is appropriate to

6    address now before moving away from the controlled substance

7    offenses.  In his second supplemental memorandum, the defendant

8    raises a motion for a new trial as to his Section 922(g)

9    conviction in Count 2 and argues that this conviction should be

10   vacated as a result of the Buchmeier decision.  The court agrees

11   that the Buchmeier issue comes into play with respect to a

12   conviction under Section 922(g)(1) because that section utilizes

13   the term crime punishable by imprisonment for a term exceeding

14   one year that is defined in Section 921(a)(20).  However, this

15   argument fails for a number of reasons.

16         First, it is procedurally improper to raise a motion

17   for new trial in a sentencing memorandum, and, in any event, the

18   motion is untimely.  Under Federal Rule of Criminal Procedure

19   33(b)(2), any motion for a new trial grounded on any reason

20   other than newly discovered evidence must be filed within

21   14 days after the verdict.  Here the motion, if you can call it

22   a motion, is well outside that time period.

23         The defendant argues briefly without any explanation

24   that his motion is based on newly discovered evidence.  The

25   court disagrees.  To the extent defendant received these various

1    restoration of rights letters as he has alleged and testified to

2    at a previous hearing, that information was available to him

3    before the trial ever began.  The fact that the defendant may

4    have recently obtained evidence to support this claim does not

5    show that it is newly discovered.  It merely shows that

6    defendant did not exercise due diligence in obtaining the

7    evidence.

8         In any event, if the court overlooked the untimeliness

9    of the motion, it also fails on the merits.  At the trial the

10   defendant stipulated to the fact that he had a prior conviction

11   for purposes of the Section 922(g) charge.  Accordingly, the

12   jury was presented with sufficient evidence to find that element

13   of the offense.

14        Moreover, even if the court were to accept all of the

15   defendant's arguments and find that he had his rights restored

16   as to both controlled substance offenses, the robbery

17   conviction, and the aggravated battery convictions, the court

18   would still find that the defendant had at least one prior

19   felony conviction based on his 2009 conviction for mob action in

20   case number 08 CF 2628.

21        The defendant's own exhibits attached to his second

22   supplemental memorandum shows that the Illinois Department of

23   Corrections changed the letter they sent in response to the

24   Buchmeier decision in order to expressly provide that the

25   recipient was still prohibited from possessing any firearm or

1    firearm ammunition, thereby showing that the exception set forth

2    in Section 921(a)(20) and discussed in Buchmeier was

3    inapplicable.

4          Because the defendant's term of probation for this mob

5    action conviction would not have expired until after the

6    Buchmeier decision had been issued and the Illinois Department

7    of Corrections changed its letter, the mob action conviction

8    would support the defendant's instant Section 922(g) conviction

9    even if the defendant were somehow allowed to withdraw the

10    stipulation.  Accordingly, for all these reasons, the

11    defendant's motion for a new trial is denied.

12          Turning back to the armed career criminal issue, the

13    parties dispute whether the defendant's prior convictions for

14    robbery and mob action qualify as violent felonies for purposes

15    of Section 924(e).  The term violent felony is defined in

16    Section 924(e)(2)(B) in relevant part as any crime punishable by

17    imprisonment for a term exceeding one year, that (i) has as an

18    element the use, attempted use, or threatened use of physical

19    force against the person of another or (ii) is burglary, arson,

20    or extortion, involves use of explosive, or otherwise involves

21    conduct that presents a serious potential risk of physical

22    injury to another.

23          As for the robbery conviction, there is no dispute that

24    the defendant's crime was punishable by a term of imprisonment

25    exceeding one year in that it was a Class 2 felony under

1    Illinois law, and the defendant received a sentence of three

2    years in the Illinois Department of Corrections.  Likewise,

3    there is no dispute that the crime has as an element the use,

4    attempted use, or threatened use of physical force against

5    another person.  And for that proposition I would refer the

6    parties to United States v. Lewis, 405 F.3d 511.

7         Accordingly, it would appear that this conviction

8    qualifies as a violent felony and could be used as a predicate

9    offense for purposes of the ACCA.  However, defendant objects to

10   this offense being used as a predicate offense based on the

11   Buchmeier issue.  As I noted earlier, the term crime punishable

12   by imprisonment for a term exceeding one year, which is used in

13   the statutory definition of the term violent felony, is further

14   defined in Section 921(a)(20), and we know from Buchmeier that

15   if the defendant received a restoration of his civil rights

16   following that conviction without an express prohibition against

17   firearms, that conviction would not qualify and could not be

18   used to enhance the defendant's sentence under Section 924(e).

19        This Buchmeier argument was first raised by counsel in

20   the defendant's second supplemental sentencing memorandum after

21   it had previously been raised by the defendant only in a pro se

22   capacity.  In that written submission, the defendant conceded

23   that he could not produce an actual copy of the restoration of

24   rights letter that he claims to have received from the Illinois

25   Department of Corrections following his discharge from parole

1    for the robbery conviction.

2         Nevertheless, the defendant argued that the letter at

3    issue in the Buchmeier case was a standard letter utilized by

4    the Illinois Department of Corrections from the early 1990s

5    through 2004 and that it was standard procedure for the Illinois

6    Department of Corrections to send this letter to a defendant

7    upon the completion of his sentence in accordance with

8    Administrative Directive 04.5.150.  I'm sorry.  I may have

9    misread that.  The number is 04.50.150.  Therefore, the

10   defendant argued when he was discharged from parole on his

11   robbery conviction on June 8th 2001, he would have received a

12   letter identical to that received by Buchmeier.

13        In United States v. Burnett, 641 F.3d 894, the Seventh

14   Circuit held that Section 921(a)(20) sets an objective standard

15   and concluded that the effect of a restoration of rights letter

16   like the one at issue in Buchmeier does not depend on whether

17   the recipient reads or understands the communication.  Based on

18   this binding authority, the court agrees that a defendant could

19   meet his burden of showing by a preponderance of the evidence

20   that his rights were restored by reference to the standard

21   practice and procedure of the IDOC, as the defendant has

22   attempted to do in this case.  Unfortunately, a close review of

23   the evidence presented here does not show that defendant

24   received a restoration of rights letter following his robbery

25   conviction.  If anything, the evidence presented indicates that

1    the defendant would not have been a recipient of the standard

2    issue letter from the IDOC.

3            The pre-2004 sample letter provided by defendant as an

4    exhibit to his second supplemental memorandum clearly shows that

5    the letter is concerning -- and I quote from the subject line --

6    discharge from parole/mandatory supervised release.  The

7    concluding paragraph of the sample letter also shows the nature

8    of the communication, and it reads:  We take this opportunity to

9    congratulate you on your successful completion of your

10   supervision and wish you continued success.

11           Clearly, this letter is designed to be sent to a

12   defendant who at the time of the receipt was on parole or

13   mandatory supervised release and had successfully completed that

14   portion of their sentence.  This finding is consistent with the

15   cited administrative directive, 04.50.150, which provides upon

16   notification of discharge, the appropriate parole supervisor

17   shall ensure the releasee is notified of restoration of his or

18   her rights.  And I'll highlight the fact that the directive

19   includes the term parole supervisor and releasee.

20           The problem for the defendant is that he did not

21   successfully complete his parole on the robbery conviction, a

22   fact that he admitted at a previous hearing.  Indeed the

23   presentence investigation report shows that the defendant was

24   returned to the Illinois Department of Corrections custody on

25   December 28th, 2000, prior to the date of his final discharge.

1    Under those circumstances, the administrative directive

2    04.50.150 would not have applied to the defendant, and it would

3    not have made any sense for the Illinois Department of

4    Corrections to send the defendant a letter congratulating him on

5    the successful completion of his parole after that parole had

6    been revoked.

7         Now, I note that there may have been some confusion

8    because of the fact that paragraph 53 of the presentence

9    investigation report shows parole discharge on June 8th, 2001.

10   However, as we have seen, this was a mistake.  Furthermore, the

11   court accepted into evidence at the defendant's request a

12   document from the Logan Correctional Center which is referred to

13   as a drop slip.  This document shows that as of June 8th, 2001,

14   defendant was a resident of the Logan Correctional Center and

15   that he was being discharged from custody and released at the

16   lobby desk at 9:18 that morning.  This document clearly shows

17   that the defendant was in custody on that date and was not on

18   parole at that time.  In fact, the box marked paroled was not

19   marked.  Instead the box marked discharged was designated.

20        Based on all of the objective evidence presented, the

21   court finds that the defendant has not met his burden of showing

22   that he received a restoration of rights letter similar to the

23   one at issue in Buchmeier following his robbery conviction.  The

24   only other evidence presented on this issue was the defendant's

25   own testimony, which the court did not find credible for a

1    number of reasons.

2           At the previous hearing, the defendant testified that

3    he received the first of several discharge letters from the

4    Illinois Department of Corrections in 2002 concerning his

5    robbery conviction.  However, as we know, the defendant's parole

6    for the robbery conviction was revoked in 2000, and he was

7    released from custody in 2001.  So, the defendant could not even

8    recall the correct year that he would have received this

9    discharge letter.

10          Moreover, defendant could not adequately explain from

11   his own memory what was contained in the discharge letter that

12   he allegedly received or provide a good explanation for why he

13   did not keep a copy of the discharge letter.  In addition, when

14   asked by the court how he received the discharge letter related

15   to his robbery conviction, the defendant testified that he

16   received the letter in the mail, but he could not explain where

17   he was living at the time.

18          As noted earlier, the defendant's parole was revoked,

19   and he was in custody until the date of his discharge on

20   June 8th, 2001.  It is likely that any discharge documentation

21   that the defendant may have received would have been delivered

22   to him in prison or in person at the time of his discharge from

23   prison and not mailed to him.

24          Finally I note that defendant testified that he also

25   received a discharge letter in 2005 concerning his drug

1    conviction in case number 01 CF 1860 and that he received it

2    while he was in IDOC custody.  It does not make any sense that

3    the defendant would receive a letter advising him of the

4    restoration of his civil rights at a time when he was

5    incarcerated, and, in any event, this testimony is inconsistent

6    with the argument presented in the second supplemental

7    memorandum where the defendant took the position that he did not

8    have his rights restored for case number 01 CF 1860 because of

9    his incarceration.

10          Based on all the inconsistencies and inaccuracies

11    regarding these alleged discharge letters, as well as the

12    court's observation of the manner and demeanor of the defendant

13    while he was testifying, the court finds that the defendant's

14    testimony was not truthful.  It appears that the defendant has

15    little regard for the truth and is willing to say whatever he

16    thinks is in his best interests at the time.

17          Therefore, based on the totality of all the evidence

18    presented on this issue, the court finds that the defendant has

19    not established that his rights were restored following his

20    robbery conviction.  As such, the conviction qualifies as a

21    violent felony for purposes of Section 924(e).

22          Because the defendant now has at least three predicate

23    offenses, the court finds that the defendant does qualify for an

24    enhanced sentence under the Armed Career Criminal Act as set

25    forth in Section 924(e), and any objection to the application

1    for this enhancement is overruled.

2         Having found that the defendant qualifies as an armed

3    career criminal, the court need not reach the government's

4    contention that the defendant's conviction for mob action also

5    qualifies as a violent felony for purposes of Section 924(e).

6    However, for the sake of completeness, the court will briefly

7    address this issue.

8         The offense of mob action is set out in 720 ILCS

9    5/25-1.  It provides in relevant part that a person commits mob

10   action when he engages in the knowing or reckless use of force

11   or violence disturbing the public peace by two or more persons

12   acting together and without authority of law.  Mob action, as it

13   was charged in case number 08 CF 2628 under subsection (a)(1) is

14   a Class 4 felony and thus is punishable by a term of

15   imprisonment exceeding one year.  That crime does not have as an

16   element the use, attempted use, or threatened use of physical

17   force against the person of another, and it is not one of the

18   offenses specifically listed under Section 924(e)(2)(B)(ii).

19        Accordingly, the court must apply a categorical or a

20   modified categorical approach to determine whether consistent

21   with the Supreme Court decision in Begay this offense fits under

22   the catch-all definition of otherwise involves conduct that

23   presents a serious potential risk of physical injury to another.

24        Initially the court notes that a mob action conviction

25   can be committed in either a knowing or reckless manner.

1    Because a reckless offense would not qualify as a violent felony

2    following Begay, the court finds that this statute is divisible

3    and will apply the modified categorical approach.  This allows

4    the court to look to additional materials in the judicial

5    record, such as the charging document, for the limited purpose

6    of determining under which part of the statute the defendant was

7    convicted.

8         Here the indictment, which was provided as an exhibit

9    to the government's submission on this issue, clearly shows that

10   the defendant was charged with a knowing violation of subsection

11   (a)(1) of the statute, and the certificate of conviction

12   provided shows that he was convicted of that subsection.

13        Thus, the court must now determine whether a knowing

14   violation of that portion of the mob action statute is

15   categorically a violent felony.  On this issue the court finds

16   the Seventh Circuit's opinion in United States v. Cole, 298 F.3d

17   659, highly persuasive.  In that case the court considered

18   whether an Illinois mob action offense was a crime of violence

19   for purposes of the career offender provisions, but as we all

20   know, the definitions for crime of violence under the guidelines

21   and violent felony under the ACCA are very similar, and the case

22   law addressing these definitions can be used interchangeably.

23        In Cole the court was not concerned about the

24   distinction between a knowing violation and a reckless violation

25   because the case law at the time, which was before the Begay

1    decision, allowed for the possibility that reckless crimes could

2    qualify as a crime of violence.  The court did find the statute

3    divisible in a different way, however, and concluded that the

4    mob action statute encompassed both violent and nonviolent

5    offenses.  Specifically the court distinguished between the

6    violent offense of the use of force or violence disturbing the

7    peace of two or more persons set forth in subsection (a)(1) and

8    the nonviolent offense of assembly of two or more persons to do

9    an unlawful act, as set forth in subsection (a)(2).

10           Once the court determined that the defendant's mob

11   action conviction fell under the terms of section (a)(1) and

12   posed a serious potential risk of physical injury to another,

13   the court concluded that the conviction was a crime of violence.

14   Here, based on Cole, the court finds that the defendant's mob

15   action conviction qualifies as a violent felony and thus can be

16   used as another predicate offense for the ACCA.

17           The court recognizes that Cole is not directly on

18   point, and, in fact, the Seventh Circuit looked to the actual

19   conduct involved in that case, whereas this court is now

20   forbidden from doing so under the categorical approach.  Thus,

21   to be clear, the court is not looking to the fact that the

22   indictment charges the defendant with engaging in a physical

23   altercation, even though both sides point to that same fact and

24   then draw different conclusions as to how much risk of harm an

25   altercation involves.

1        Instead the court finds that the mob action statute

2    necessarily requires the use of force or violence in disturbing

3    the peace, and the court believes that this type of conduct,

4    generally speaking, is conduct that poses a serious potential

5    risk of physical injury to another.  Any time force or violence

6    is used, especially in a group or mob setting, there is a strong

7    possibility that the force or violence will impact either

8    directly or indirectly another person and could cause that

9    person to suffer a physical injury.

10       Based on this conclusion, the court now finds that the

11   defendant has four predicate offenses for purposes of the ACC,

12   and he clearly qualifies for the enhanced penalties under

13   Section 924(e) for his conviction on Count 2.

14       As a final note on this issue, in his supplemental

15   memorandum the defendant generally challenges the propriety of

16   using arrest reports and other information contained in the

17   presentence investigation report for determining under the

18   categorical approach whether his prior convictions qualify as

19   predicate offenses for purposes of the Armed Career Criminal

20   Act.  This objection is overruled, however, as the court has not

21   used the arrest reports or other descriptions in the presentence

22   investigation report to determine the particular facts

23   underlying the defendant's convictions.  Rather he has only

24   looked to the fact of conviction and the elements of the statute

25   of conviction for each of the three predicate offenses.

1         At the previous sentencing hearing, the defendant

2    indicated that he wished to challenge the career offender

3    designation because he wanted to contest everything.  The court

4    pointed out that this generic type of objection was not helpful.

5    So, after taking an opportunity to consult with his counsel, the

6    defendant indicated that he wanted to challenge the career

7    offender provisions based on what he called the categorical

8    approach as set out in Taylor v. United States, 495 U.S. 575.

9    This objection is without merit and is overruled.

10        Under the categorical approach, the court looks to the

11   statutory elements of the defendant's past criminal convictions

12   instead of the defendant's actual conduct.  Here the defendant

13   is challenging whether his two previous convictions for

14   possession with intent to deliver one to 15 grams of cocaine

15   qualifies as a controlled substance offense as that term is used

16   in Section 4B1.1(a) and as defined in Section 4B1.2(b).  That

17   term is defined as an offense under federal or state law

18   punishable by imprisonment for a term exceeding one year that

19   prohibits the manufacture, import, export, distribution, or

20   dispensing of a controlled substance or a counterfeit substance

21   or the possession of a controlled substance or a counterfeit

22   substance with intent to manufacture, import, export,

23   distribute, or dispense.

24        I note that this definition is slightly different and,

25   in fact, is easier to meet than the definition of a serious drug

1    offense for purposes of the ACCA.  Nevertheless, as the court

2    mentioned earlier when discussing the defendant's objections to

3    the armed career criminal enhancement, the defendant's prior

4    drug convictions are Class 1 felonies, and thus the court finds

5    that they are punishable by imprisonment for a term exceeding

6    one year.  Those offenses also categorically involve the

7    possession with intent to distribute cocaine, which is a

8    controlled substance.

9           Accordingly, applying the categorical approach, the

10   court finds that the defendant's two prior drug offenses qualify

11   as controlled substance offenses for purposes of the career

12   offender guideline, and the defendant's objection to the career

13   offender guideline designation is overruled.

14          Although not raised by either party, the court notes

15   for the record what appears to be a miscalculation in

16   paragraph 44 of the presentence investigation report, which is

17   the section dealing with the career offender enhancement under

18   Section 4B1.1.  That paragraph correctly indicates that the

19   applicable guideline range in this case is determined under the

20   provisions of subsection (c)(2) because of the defendant's

21   Section 924(c) conviction.  Under that subsection, the final

22   guideline range is the greater of either, A, the mandatory

23   minimum consecutive penalty as required by Section 924(c), which

24   in this case is 60 months, added to both the minimum and maximum

25   of the otherwise applicable guideline range determined for the

1    counts of conviction other than Section 924(c), the Section

2    924(c) count, or, B, the guideline range determined using the

3    table in subsection (c)(3).

4         In paragraph 44 of the presentence investigation

5    report, the otherwise applicable guideline range for Counts 1

6    and 2 is listed as 100 to 125 months, which then results in a

7    total range of 160 to 185 months for purposes of Subsection

8    (c)(2)(A) after the addition of the 60 months required by

9    Section 924(c).

10        However, this is incorrect.  The term otherwise

11   applicable guidelines range is specifically defined in

12   Application Note 3C to Section 4B1.1 and says that when the

13   counts of conviction, other than the Section 924(c) count,

14   qualifies the defendant as a career offender, then the otherwise

15   applicable guidelines range for those counts is the guidelines

16   range determined for those counts under Section 4B1.1(a) and (b)

17   or, in other words, the applicable range under the normal career

18   offender provisions.

19        What that means in this case is that the defendant's

20   otherwise applicable guideline range is actually 262 to 327

21   months based on a total offense level of 34 and a criminal

22   history category of six after the application of the

23   enhancements from Section 4B1.1(b).  When you add the mandatory

24   consecutive 60 months to this range, the total range then

25   becomes 322 to 387 months for purposes of subsection (c)(2)(A).

1    Ultimately, however, the range under the table in subsection

2    (c)(3) is still the greater range, and, therefore, the

3    presentence investigation report properly concludes that the

4    total guideline imprisonment range in this case is 360 months to

5    life.

6              Therefore, I will adopt the guidelines calculations

7    contained in the presentence report.  I am using the sentencing

8    guidelines manual effective November 1st, 2013, and the

9    guidelines imprisonment range in this case is 360 months to

10   life.

11             As to the remaining 3553(a) considerations do the

12   parties have any evidence?

13             MR. KARNER:  The government does not.

14             THE COURT:  Any evidence, Ms. Rippy?

15             MS. RIPPY:  No, the defense does not, your Honor.

16             DEFENDANT POKE:  Yeah, we do got evidence.

17             THE COURT:  Okay.

18             DEFENDANT POKE:  For the guidelines.

19             THE COURT:  No.  I'm talking about other than the

20   guidelines.  I'm talking about the other 3553(a) considerations.

21             DEFENDANT POKE:  But I do got some questions, if I

22   can -- if this is the time to talk now.

23             THE COURT:  No.  You should talk them over with your

24   attorney.

25             DEFENDANT POKE:  Huh?

1          THE COURT:  You should talk those over with your

2    attorney.

3          DEFENDANT POKE:  Your Honor, I mean, she don't do no

4    work.  Me talking to her, I mean, honestly, it ain't no good

5    because she's not -- it seem like we're not on the same page.

6          THE COURT:  All right.  And I'm sure she'll take some

7    time with you and address your concerns.

8          DEFENDANT POKE:  I tried it already.  I would just

9    speak for myself.

10          THE COURT:  All right.

11          DEFENDANT POKE:  I think I'm pretty competent enough to

12    do that.

13          THE COURT:  Mr. Karner, do you have any argument?

14          MR. KARNER:  Yes, I do briefly, Judge.

15          Your Honor, as we stand here today and reflecting on

16    the defendant's prior history of criminality, I don't know that

17    the defendant has any more insight into his own wrongdoing and

18    the responsibility of his wrongdoing today as when he was first

19    arrested so many years ago.  He's a grown man.  He's had the

20    opportunity of a lot of court services and a lot of life

21    experiences.

22          The man was shot because of a lifestyle he chose.  He

23    chose -- he has chosen a criminal lifestyle, and that no doubt

24    contributed to his getting shot.  But he came close to dying,

25    and that still didn't shake him up enough to want to respect the

1    law and conform his conduct to the requirements of the law.  As

2    he's demonstrated up until this very day, he has no insight into

3    his own criminality.

4         And one of the disturbing things about Dayton Poke is

5    that when he was in custody in this case, both before and

6    post-trial, at a time when he should be on his best behavior, he

7    was abusive both physically and I guess mentally abusive to the

8    people who worked in the jails and the correctional staff.  They

9    had the misfortune of crossing paths with this guy.

10        He's got a terrible criminal history.  I know your

11   Honor has gone through it extensively.  He's had the benefit of

12   court services.  He's had the benefit of leniency.  And he's

13   shrugged his shoulder on that and turned his head away from that

14   and gone on to continue his life of lawlessness.

15        He has absolutely no rehabilitative potential.  He's

16   shown no remorse into his conduct.  He's taken no accountability

17   for his conduct.  He's here because of his actions, not because

18   of any of the decisions or comments made by the team of lawyers

19   that has represented him since day one.

20        He has shown no regard for the court's authority and

21   treated these court proceedings as kind of a game, a chess

22   match, where he just tries to throw anything up there to evade

23   responsibility for his conduct, his misconduct.  And with that,

24   Judge, his behavior and his way of thinking has left this court

25   with precious few alternatives but to impose a substantial

1    sentence of imprisonment.

2            THE COURT:  Attorney Rippy.

3            MS. RIPPY:  At this time, your Honor, I would like a

4    few minutes with Mr. Poke just to confer with him about this.

5            THE COURT:  Sure.

6            MS. RIPPY:  Thank you.

7            THE COURT:  Mr. Poke, you said that you would like to

8    speak for yourself.  I will give you an opportunity to do that

9    as soon as your attorney has made her argument.

10            DEFENDANT POKE:  Can I ask you about the -- you never

11   gave me my response on the Moncrieffe v. Holder case.

12            THE COURT:  Your what?

13            DEFENDANT POKE:  When you said the category approach

14   earlier, I think you misquoted a case law that I said.  I said

15   Moncrieffe v. Holder last time to challenge my priors.  You said

16   some other case.

17            THE COURT:  The case that you told me was --

18            DEFENDANT POKE:  Moncrieffe v. Holder.

19            THE COURT:  -- Taylor v. United States.

20            DEFENDANT POKE:  Excuse me?

21            THE COURT:  Taylor v. United States.

22            DEFENDANT POKE:  Taylor, yeah, the category approach,

23   and I also told you Moncrieffe v. Holder, and you said you was

24   going to took at it for me.

25            THE COURT:  I did take a look at it.  I'll take a look

1    at it again.  Let's take a five-minute recess.

2        (Brief recess.)

3        THE COURT:  All right.  I've reviewed Moncrieffe again.

4    It's not directly applicable to either career offender or armed

5    career criminal designations, and I don't believe it adds

6    anything to what I've already said referencing Taylor.

7        So, with that, I'll take your argument.

8        MS. RIPPY:  Your Honor, other than what I've already

9    included in our sentencing memorandums, I don't have anything

10   further than that.  I know Mr. Poke would like to speak to your

11   Honor.

12       DEFENDANT POKE:  Yeah, I'd like to talk.

13       THE COURT:  All right.  Mr. Poke, you have an

14   opportunity to address the court.

15       DEFENDANT POKE:  Yes, I will.  I will.

16       THE COURT:  I'll be glad to hear anything you have to

17   say.

18       DEFENDANT POKE:  Yeah.  Okay.  First, I had filed two

19   motions, an Equal Protection Clause motion that I never got no

20   response on, and I also filed a motion for ineffective

21   assistance of counsel I never got no response on that I done ask

22   my counsel about, but she failed to give me copies of the actual

23   filing with document numbers, you know what I'm saying, that I

24   would like you to order her to give to me or whatever happened

25   with that.

1                    MS. RIPPY:  I have copies available on the counsel

2        table for Mr. Poke today.

3                    DEFENDANT POKE:  Okay.  I need them today, you know

4        what I'm saying.

5                    THE COURT:  You want to sit down and look at them?

6                    DEFENDANT POKE:  Huh?

7                    THE COURT:  Do you want to sit down --

8                    DEFENDANT POKE:  No.  I just need it, you know, for my

9        appeal.  I'm getting my appeal together, you know what I'm

10       saying.

11                   All right.  You say Moncrieffe v. Holder don't apply to

12       me, but it stipulates that you got -- you determine is it a

13       felony or not by the Controlled Substance Act text.

14                   So, it ain't up to the jury, it ain't up to the

15       prosecutor, and it ain't up to you to decide was the 1.2 grams a

16       felony or not.  It's up to the Controlled Substance Act, which

17       the government got me at -- they got me at 41(b)(1)(C), which

18       states it should be a two-year maximum in the case of Schedule I

19       and II controlled substance if there's no drug amount on the

20       indictment.

21                   Now, I got 1.2 drug amount on the indictment, which

22       classified me as 41(b)(4).  It can't be 41(b)(1)(D) because the

23       drug amount don't carry no maximum of five years.  So,

24       therefore, my drug amount is a misdemeanor, and I supposed to be

25       able to argue this at sentence.  So, by that being a

1    misdemeanor, there's no drug trafficking which the 60 months

2    that you adding onto the time, you know what I'm saying.

3              THE COURT:  Which offense are you talking about?

4              DEFENDANT POKE:  Huh?

5              THE COURT:  Which offense are you taking about?

6              DEFENDANT POKE:  The predicate offense.

7              THE COURT:  Well, there are --

8              DEFENDANT POKE:  The 1.2 grams, which you're using to

9    career me with.

10             THE COURT:  Right.  There are four predicate offenses.

11   Which one are you talking about?  Can you give me a number?

12             DEFENDANT POKE:  Count 1.

13             THE COURT:  Count 1 of the -- oh, that's not a

14   predicate offense.

15             DEFENDANT POKE:  I mean, I'm sorry.  I'm sorry.  The

16   offense, whatever, Count 1.  I'm talking about Count 1, 1.2

17   grams, of my indictment.

18             THE COURT:  All right.

19             DEFENDANT POKE:  So, by that not being a felony under

20   United States v. -- Moncrieffe v. Holder, Supreme Court ruling,

21   there is no drug trafficking, and there's no additional 60

22   months.  And it also states that the state law got to interact

23   with the federal law, which is the -- the prior two drug cases

24   that you using, you're saying them felony offenses, but under

25   the Controlled Substance Act under Lopez v. Gonzales, United

1    States Supreme Court ruling, states a conviction under state law

2    constitute a felony punishable under the Controlled Substance

3    Act only if it's prescribed conduct punishable as a felony under

4    the federal law.

5              THE COURT:  Do you have a cite you want to put on the

6    record for that?

7              DEFENDANT POKE:  Yeah.  Lopez v. Gonzales.

8              THE COURT:  Okay.  Is there a --

9              DEFENDANT POKE:  G-o-n --

10             THE COURT:  No, no, no.  Is there a citation to it?

11             DEFENDANT POKE:  Citation?

12             THE COURT:  Right.  That tells me what court it's from

13   or --

14             DEFENDANT POKE:  A Supreme Court ruling.

15             THE COURT:  Is there a cite?

16             DEFENDANT POKE:  Yeah.  It's a cite, you know.

17             MS. RIPPY:  Mr. Poke has the cite at 549 U.S. 47, I

18   believe.

19             DEFENDANT POKE:  And with all that then said, that

20   should put my guidelines at a level 14 because without the two

21   drug offenses which makes the 922(g) go to a level 24, which

22   makes the Count 1 to go to 30 years to life, I mean, this right

23   here stops all of that, you know what I'm saying?  You all took

24   a misdemeanor case and took it to 30 years to life, and I'm

25   trying to see how it got there when the law states that I should

1    be at a level 14, 37 to 46 months, because the two prior drug

2    cases, you can't use that because them considered misdemeanors,

3    and then the offense that I'm found guilty on, that's considered

4    a misdemeanor, and I'm saying like how ain't nobody

5    understanding the law.  Everybody just going around the law and

6    not applying the law.

7         This stuff apply to me.  And everybody keeps saying

8    that it don't apply, but ain't nobody showing me or giving me no

9    case law as how it don't apply.  I'm trying to see how a

10    misdemeanor, which the law considers a misdemeanor, go from

11    18 months.  For my Count 1, the max on it is 18 months.  How did

12    that get from 30 to life?  I'm asking.

13         THE COURT:  Well, that's a contention you can take up

14    with the Court of Appeals.

15         DEFENDANT POKE:  The Court of Appeals.  But I mean, you

16    sentencing me right now.  These are sentencing, you know what

17    I'm saying, challenges.  I'm asking you how Moncrieffe v. Holder

18    don't apply to me.  And it got all these stipulations in here

19    about my situation that they saying that you ain't allowed to

20    do, but we doing it -- but we still going on doing it today.

21    So, I feel like, man, what's up with the law.  Can I get

22    sentenced --

23         THE COURT:  First of all, Moncrieffe is an immigration

24    case.

25         DEFENDANT POKE:  It got something to do with

1    immigration, but also it's talking about the felony charges that

2    count.  This stuff ain't over in Mexico that they talking about.

3    They talking about the stuff here that's considered with the

4    federal and the state.  They determine what's going on with us

5    with the immigration laws and saying what apply to me apply to

6    him.  I mean, I got clearly understanding of this -- I mean,

7    this is my life here.  So, you know, I didn't read it like a --

8    you know what I'm saying.  I ain't trying to put no stress on

9    the court.  I just want the court to sentence me by what the law

10   prescribe and not by the court's own personal feelings.

11            THE COURT:  All right.  I promise you I'll sentence you

12   in accordance with the law as I understand it.  If you and I

13   have a disagreement as to how the law applies in this case or

14   the effect of the law, then that's something that you can

15   certainly bring to the Court of Appeals' attention, and I'll

16   advise you of your rights to do that after we get done with

17   this.

18            DEFENDANT POKE:  All right.  But, you know, I still --

19   I mean, can I get an answer about -- you know what I'm saying?

20   I still need to -- because I'm trying to figure out is we going

21   by the law or is we going by our own personal feelings.  I

22   understand I got a Court of Appeals, but this says I supposed to

23   challenge this at sentencing.

24            THE COURT:  I promise you I'll follow the law as I

25   understand it.

1          DEFENDANT POKE:  So, what?  This the part when I

2     apologize?

3          THE COURT:  Well --

4          DEFENDANT POKE:  I mean, I'm trying to see like -- is

5     there anything else after this?

6          THE COURT:  You can say anything you want to say.

7          DEFENDANT POKE:  Okay.  You know, well, I apologize to

8     my family, you know what I'm saying.  I thank Mark Karner for

9     bringing me over here and brightening me with all this nice

10     knowledge over here that I done learn.  I know how to apply it

11     now, you know what I'm saying.

12          I'd like to apologize for my family.  I'd like to

13     apologize to the marshals and they families and everybody else

14     that became a victim of, you know what I'm saying, of the

15     government authority, you know what I'm saying.  Because you

16     turn on the TV every day, it's only -- it's mostly the federal

17     government or people that's working for the government is the

18     ones committing all the crimes.  I mean, the big crimes.  They

19     just don't get caught.  When they do it, they do it over a

20     certain amount of years, you know, and they get a slap on the

21     wrist.

22          Here it is me, you know what I'm saying, a black man,

23     that went through a lot in my life.  I ain't chose to get shot.

24     I ain't chose to go -- if I had a choice, I would have been a

25     lawyer.  I would have been a better lawyer than Mark Karner.

1   And he's standing look like -- look at me, like this what I

2   supposed to go through, like.  Don't nobody want to go through

3   what I went through, you know what I'm saying.  I'm happy that I

4   made it to be here.

5         And sometimes you get at a point of your life that you

6   got to learn self control when you ain't taught it.  When you

7   just in the jungle and you fighting to live every day and then

8   you put a person in jail and you just say, hey, be nice, I mean,

9   you got to teach -- you got to reprogram a person.  That's what

10  being in jail about.  Program.  And people don't change over

11  night.  It take time.

12        So, for everybody look for me to just come in here and

13  be like I'm this nice guy, I'd be lying to myself.  But at the

14  same time I have worked on myself, you know what I'm saying.  I

15  got -- while I've been fighting my case, I also been doing other

16  things, you know.  I'm trying to go to school.  I got my test

17  scores, you know what I'm saying.  I got certificates.  I'm in

18  drug class right now.  And you know I constantly file lawsuits

19  on you all.  So, you know that's work.

20        And, I mean, once a person get to a certain age, he --

21  I mean, you grow out of what you used to do, you know what I'm

22  saying.  And then you all taking my prior cases that I was

23  manipulated in the state, ain't no -- not to cop out to charges,

24  knowing that you all was going to bring me over here and take a

25  couple of fights, aggravated fights, small drug amounts, and

1    say, man, this guy needs to be in jail for 30 years, you know

2    what I'm saying.  I ain't understanding it.

3            They say it's fair, the justice system fair, but, I

4    mean, I hope I get some today, you know what I'm saying, some

5    fairness, you know.  I mean, there really ain't too much I can

6    say, you know what I'm saying.  You know, I apologize to the

7    court if they don't like how I talk or how, you know what I'm

8    saying, I've been presenting myself, you know what I'm saying,

9    but as you see, I did get better.  At least I am trying, you

10   know what I'm saying.  And I'll continue trying, no matter what

11   happen today.  You know, I guess that's it, man.

12           THE COURT:  Okay.  Why don't you have a seat.

13           I have considered the presentence --

14           MS. RIPPY:  Your Honor, if I may.

15           THE COURT:  Sure.

16           MS. RIPPY:  Pardon my interruption.  Mr. Poke indicated

17   that he would like your Honor to take account of some classes

18   that he's completed and he's been participating in, if I may.

19           THE COURT:  All right.  Sure.

20           MR. KARNER:  I have no objection to the admission of

21   those exhibits.  I think they should just be marked, though.

22           THE COURT:  Could you mark them as Defendant's

23   Sentencing Exhibits 1 and 2?

24           DEFENDANT POKE:  Do you need the copy of -- was I

25   supposed to add my mental health records up in there or --

1          THE COURT:  I'll get you a copy before you leave.

2          DEFENDANT POKE:  I'm saying do I suppose to give you

3     the medical records, too.

4          THE COURT:  No.

5          DEFENDANT POKE:  Oh, okay.

6          MS. RIPPY:  I'm not sure if we are at a number for

7     defense exhibit.

8          THE COURT:  I think it's Sentencing Exhibit -- mark it

9     A and B.

10     (Said documents were tendered to the court.)

11          THE COURT:  I'll ask my minute clerk to make copies of

12     these, and then I'll give you the originals back.

13          DEFENDANT POKE:  All right.  I appreciate it.

14          THE COURT:  I've considered the presentence report and

15     accompanying materials.  I've considered the written submissions

16     and arguments of the parties, as well as the statement of the

17     defendant.  I've considered the sentencing guidelines

18     calculations and all of the other sentencing factors contained

19     in Section 3553(a).

20          Among those factors are the nature and circumstances of

21     the offense and the history and characteristics of the

22     defendant.  I also recognize the need for the sentence imposed

23     to reflect the seriousness of the offense, to promote respect

24     for the law, and to provide just punishment for the offense, to

25     afford adequate deterrence to criminal conduct, to protect the

1    public from further crimes of the defendant, to provide the

2    defendant with needed educational or vocational training,

3    medical care, or other correctional treatment in the most

4    effective manner, and the need to avoid unwarranted sentence

5    disparities among defendants with similar records who have been

6    found guilty of similar conduct.

7          I believe that the guidelines calculations in this case

8    provide an accurate starting point to evaluate the Section

9    3553(a) factors.  The guideline range has incorporated the facts

10   that the offense involved 1.2 grams of cocaine base and that the

11   defendant is an armed career -- or sorry -- that the defendant

12   is a career offender and that he is an armed career criminal.

13   I'm sorry.  The guidelines -- as I said, the guidelines range

14   doesn't have anything to do with the fact that he's an armed

15   criminal.  I think it's just the fact that he's a career

16   offender.

17         All right.  In mitigation, the defendant has an

18   acknowledged history of drug and alcohol abuse and is willing to

19   participate in treatment.  Also according to the defendant, his

20   family is aware of his arrest and prosecution and remains

21   supportive.  He's expressed remorse for what he's done.

22         There are significant aggravating factors in this case.

23   The defendant has admittedly been unemployed since 1995.

24   Despite having served prior terms of incarceration, the

25   defendant has continued to recidivate.  He's used alias names.

1    He was convicted of juvenile criminal and traffic offenses for

2    which criminal history points were not assigned.  He has a

3    history of noncompliance with juvenile probation, parole, and,

4    in fact, he committed a serious traffic offense six days after

5    being released on parole.  He's failed to comply with the

6    conditions of conditional discharge and court supervision.

7         Despite his criminal record, the defendant persists in

8    selling drugs and carrying firearms to facilitate his drug

9    dealing.  I have no doubt in my mind that if the defendant

10   perceived that another person is interfering with his drug

11   business, he would not hesitate to use his firearm, which we all

12   know could result in catastrophic consequences not only to other

13   people, but to himself.  I've witnessed how volatile and

14   incendiary he is when he ripped off his shirt in the courtroom

15   and how he's acted during these proceedings.  His past criminal

16   behavior is violent and antisocial.  He has no regard for

17   authority, the law, societal standards of behaviors, or the

18   rights or welfare of other people.  He's extremely incorrigible.

19        He has not complied with the rules and regulations of

20   the places where he has been incarcerated.  As a couple

21   representative examples, we see from the presentence report that

22   during the time he was in the McHenry County Jail, we see the

23   deputy then spoke with the counselor, who advised that the

24   defendant was discussing his issues with masturbation and had

25   advised her that he had been doing well, as he had not

1    masturbated in a few days.  She stated that she did not comment,

2    and there were very few minutes -- and that there very few

3    minutes of awkward silence before the defendant stated, "But

4    there are no cameras in here.  So, I can do it in here," and he

5    then proceeded to remove his penis from his pants.

6         At another point, it shows that the defendant actively

7    resisted the officers' attempts as they tried to gain control of

8    him.  A few minutes later, the officers were able to secure

9    control of the defendant and escorted him into isolation, and

10   the defendant told the officers, "I am going to kill one of you

11   before I leave.  That is my goal."

12        Since the defendant's been at the MCC, the defendant

13   stated in the presence of Lieutenant Croll, "I will kill you and

14   motherfuckin' kids, Croll.  I promise that.  Chicago is a small

15   place," and he would make it happen.

16        At another point at the MCC, the officer stated, "I

17   arrived at Inmate Poke's cell, and he was standing in front of

18   his bed masturbating.  I told him to put his clothes back on,

19   but he did not stop his actions."

20        These and the other reports from the incarcerating

21   institutions paint a picture of a person who is depraved and

22   pernicious.

23        In both his sentencing memorandum and supplemental

24   sentencing memorandum, the defendant asks the court to impose a

25   sentence in the 15 to 20 year range based on the Section 3553(a)

1    factors.  Not only is this requested sentence well below the

2    advisory guidelines range, which is 360 to life, given the

3    defendant's status as a career offender and his 924(c)

4    conviction, but it is also at odds with the mandatory minimum

5    sentence as I have determined are applicable in this case.

6         Because there is no basis to go below the statutory

7    minimum sentence in this case, the minimum sentence the court

8    can impose is a total of 20 years, which would be 15 years on

9    the Section 922(g) offense and a consecutive five-year sentence

10   on the Section 924(c) conviction.

11        Accordingly, although the court cannot impose a

12   sentence of only 15 years, the court will consider the

13   defendant's request as a motion for a downward variance to a

14   sentence of 20 years' imprisonment.

15        Defendant raises several arguments in support of his

16   request for a variance.  For instance, the defendant generally

17   argues that this sentence would reflect the seriousness of the

18   offense, promote respect for the law, provide just punishment,

19   afford adequate deterrence, and protect the public from further

20   crimes of the defendant.  While there is no doubt that a

21   sentence of 20 years would be significant, I do not find that it

22   would be sufficient for a defendant who qualifies as a career

23   offender.

24        My sentencing analysis takes into consideration the

25   defendant's designation as a career offender.  In order to

1    qualify as a career offender, a defendant must be convicted of a

2    felony that is either a crime of violence or a controlled

3    substance offense.  In this case the defendant's conviction for

4    possession with intent to distribute cocaine base, a controlled

5    substance offense, which by itself qualifies the defendant as a

6    career offender, that drug conviction, coupled with the Section

7    851 notice applicable in this case, normally carries with it a

8    wide sentencing range of anywhere from zero to 30 years.

9            However, in Title 28, Section 944(h), Congress directed

10   the Sentencing Commission to assure that the guidelines specify

11   a sentence to a term of imprisonment at or near the maximum term

12   authorized for certain categories of offenders, which the

13   Sentencing Commission has since dubbed career offenders.  Given

14   this congressional intent, the court finds that the defendant

15   deserves a substantial sentence for his felony drug conviction.

16   Indeed, if the court were to consider the guideline range that

17   would have been applicable if the defendant did not possess a

18   firearm at all, he would still be looking at an advisory

19   imprisonment range of 262 to 327 months on Count 1, given the

20   relatively small amount of drugs that were actually recovered.

21           Given this otherwise applicable range, the court finds

22   that a sentence significantly higher than the 20-year minimum is

23   appropriate in this case in order to accurately take into

24   account all of the defendant's current convictions.

25           In his supplemental sentencing memorandum, the

1    defendant asks the court to consider the degree to which his

2    sentencing range is increased because of the career offender

3    designation and the enhancement under the Armed Career Criminal

4    Act.  This argument carries little weight in my opinion,

5    especially in a case like this where the career offender

6    designation provides an accurate assessment of the defendant's

7    lengthy criminal history.

8            As the government points out in its response, the

9    defendant has been convicted of numerous juvenile, traffic, and

10   criminal offenses in his lifetime, including two previous felony

11   drug offenses.  Rather than learning from any of these mistakes,

12   the defendant has continued to engage in a life of crime and has

13   a total of 25 criminal history points or nearly twice the amount

14   needed for the highest criminal history category of six and is

15   properly characterized in every sense of the term as a career

16   offender.

17           There is a good reason the defendant is characterized

18   as a career offender.  He is a longstanding, chronic, and

19   inveterate criminal.  In his first sentencing memorandum, the

20   defendant states a sentence in the 15 to 20 year range would

21   remove Mr. Poke from society for a lengthy period of time while

22   still giving him an opportunity to rehabilitate and return to

23   society a good and productive citizen.  But the defendant has

24   had many opportunities to reform his way, but has steadfastly

25   refused to do so.

1          I'm encouraged to see these exhibits that the defendant

2     has presented in the sentencing hearing this morning.  I hope he

3     has reformed his ways.  I hope he has decided that the cost of

4     continuing the life that he's led so far is not worth the

5     benefit in doing so and that he'll change his life around.

6     However, from everything that I've seen about him and I've

7     witnessed and I've reviewed and I've considered, he hasn't made

8     that move.  He hasn't made that decision.  He hasn't come to

9     that monumental point in his life where things are going to be

10    different.  Therefore, the court declines to ignore the career

11    offender designation which the defendant unfortunately has

12    brought upon himself.

13         The defendant also argues in his sentencing memorandum

14    that his difficult upbringing and lack of parental guidance as a

15    youth supports a sentence below the guidelines range.  He

16    brought that to my attention again this morning.  In particular,

17    the defendant notes that his life has always included gangs,

18    guns, selling or using drugs, and violence, and that he first

19    started selling drugs on the street corner at the age of ten.

20         The defendant does acknowledge, however, that this

21    upbringing affords him no excuse or justification for his

22    misconduct.  I agree with him on that point.  There are many

23    people who grew up in that same neighborhood, experienced those

24    same horrible events in their lives, but still grew up to be

25    hardworking, productive members of society that don't break the

1    law, that don't get put into prison.

2         The court will certainly keep these considerations in

3    mind as part of its Section 3553(a) analysis, but the court

4    declines to impose a sentence below the advisory guidelines

5    range on account of his difficult childhood.  Under Section

6    5H1.12 of the guidelines, lack of guidance as a youth and a

7    disadvantaged upbringing are factors that were not ordinarily

8    relevant in determining whether to grant a departure from the

9    guidelines.  Although the Seventh Circuit has made clear in

10   cases such as United States v. Schroeder, 536 F.3d 746, that the

11   concept of departures has been rendered obsolete in post-Booker

12   sentencing, the district court may apply those departure

13   guidelines by way of analogy in analyzing the Section 3553(a)

14   factors.

15        The court is also obligated to consider the policy

16   statements of the Sentencing Commission as part of its Section

17   3553(a) analysis, including Section 5H1.12.  Here the court

18   agrees with that policy statement and with the defendant's

19   candid acknowledgment that a defendant's difficult upbringing

20   should not be used as a crutch or an excuse for criminal conduct

21   committed as an adult.  This is especially true in a case like

22   this one where the defendant's involvement in drug trafficking

23   may have helped create similar difficulties for other children

24   in the community.

25        The defendant also asks the court to consider his

1    medical issues in determining an appropriate sentence.  The

2    defendant reports that he is in poor health, has been shot or

3    otherwise seriously injured on a number of occasions, and that

4    he has pain 24 hours a day seven days a week.  The defendant

5    also reports a history of post-traumatic stress disorder,

6    antisocial personality disorder, and anxiety attacks.

7           The court will consider these characteristics of the

8    defendant, but finds that this does not warrant a sentence below

9    the advisory guidelines range.  The policy statement contained

10   in Section 5H1.4 of the guidelines manual provides that a

11   defendant's physical condition may be relevant in determining

12   whether a departure is warranted if the condition is present to

13   an unusual degree and distinguishes the case from the typical

14   cases covered by the guidelines.

15          Likewise, the policy statement in Section 5H1.3

16   suggests that mental and emotional conditions could be relevant

17   in determining whether a departure was warranted if the

18   conditions are present to an unusual degree and distinguish the

19   case from the typical cases covered by the guidelines.

20          I agree with both of these policy statements and here,

21   by way of analogy to the 3553(a) factors, the court finds that

22   none of the defendant's medical issues or mental health issues

23   are so out of the ordinary or present to such an unusual degree

24   as to distinguish the defendant from the typical cases covered

25   by the guidelines.

1        Moreover, the defendant has not presented any argument

2   or evidence to show that the Bureau of Prisons would not be able

3   to provide the defendant with any appropriate medical or mental

4   healthcare while he's incarcerated.

5        Accordingly, the court declines to impose a sentence

6   below the advisory guidelines range on account of the

7   defendant's medical and mental health conditions.

8        The court also points to the fact that during the

9   course of these offenses, the firearm was never discharged and

10  that he did not make any attempt to use the firearm during his

11  arrest.  These would certainly be aggravating factors, but in

12  the court's view, the absence of an aggravating factor does not

13  equate to a justification for a downward variance.

14       The defendant also argues that the court should

15  consider his cooperation with the government as part of its

16  3553(a) analysis, including the fact that he signed a proffer

17  agreement and met with the government.  In response to this

18  argument, the government argues that the defendant should not be

19  rewarded for his proffer interview because some of that

20  information provided by the defendant was untruthful, and none

21  of the information has provided assistance to the government in

22  any ongoing investigation.

23       The court recognizes that it can consider a defendant's

24  cooperation even in the absence of a 5K1.1 motion from the

25  government, but in this case the court finds that the defendant

1    is not entitled to any reduction in his sentence on that basis.

2    I credit the government's assessment of the cooperation that was

3    provided, as it is in the best position to evaluate the proffer

4    interview, and the court is unwilling to give any credit to a

5    defendant who provides untruthful information.  However, I will

6    give some mitigating consideration to the defendant because of

7    what he terms assistance to the government.  But for all these

8    reasons, the court declines to impose a sentence below the

9    advisory guidelines range based upon the defendant's

10   cooperation.

11        Finally, the court has considered the defendant's

12   willingness to participate in treatment for substance abuse and

13   anger management issues.  As I said, I hope that the defendant

14   follows through, and I give him credit for having the intention,

15   and the court will make a recommendation to the Bureau of

16   Prisons that he be allowed to participate in such programs while

17   incarcerated.  This factor, however, is not sufficient to

18   warrant a sentence below the advisory guidelines range.

19        In view of the foregoing, I have determined that a

20   sentence within the guideline range is the most appropriate

21   sentence in this case.  I conclude that a sentence sufficient

22   but not greater than necessary to comply with the purposes set

23   forth in paragraph two of Section 3553(a) is as follows.

24        Probation is not authorized in this case.  I have

25   determined that the total term of incarceration for all the

1    counts of conviction should be for 420 months.  To structure my

2    sentence, to get there, I break the sentence down as follows.

3            The defendant is hereby committed to the custody of the

4    United States Bureau of Prisons to be imprisoned for a total

5    term of 360 months on Count 1 and 180 months on Count 2.  Those

6    terms are to be served concurrently, and both are to be served

7    consecutively to a 60-month sentence on Count 3.

8            I will note that the defendant's designation as an

9    armed career criminal was not a factor in arriving at this

10   sentence.  If the defendant was determined not to be an armed

11   career criminal, I would still have imposed a total sentence of

12   420 months.  My sentence would have been broken down as follows.

13   360 months on Count 1 and 120 months on Count 2 to be served

14   concurrently and both consecutive to a 60-month sentence on

15   Count 3, for a total term of 420 months.  I chose this

16   particular sentence within the guideline range based on those

17   considerations which I have previously stated.

18           I will recommend to the Bureau of Prisons that the

19   defendant be placed in a facility which can provide him with a

20   residential drug abuse treatment program and allow him to

21   participate in counseling which will assist the defendant in

22   dealing with anger management and mental health issues.

23           Upon release from imprisonment, the defendant shall

24   serve a term of supervised release of five years on each of

25   Counts 1, 2, and 3.  They're to be served concurrently.  The

1    defendant shall comply with the standard conditions contained in

2    the supervised release order and shall also comply with the

3    following conditions.

4         The defendant shall not possess a firearm, ammunition,

5    destructive device, or any other dangerous weapon.  The

6    defendant shall cooperate in the collection of DNA as directed

7    by the probation officer.  The defendant shall participate in a

8    mental health evaluation and treatment program deemed

9    appropriate by the probation office.  The defendant shall

10   participate in any substance abuse counseling program deemed

11   appropriate by the probation department.  In addition, the

12   defendant shall submit to one drug test within 15 days of

13   release from imprisonment and random drug tests thereafter

14   conducted by the United States Probation Office not to exceed

15   three tests per week or 104 tests per year.  The defendant is

16   ordered to refrain from operating a motor vehicle without a

17   valid driver's license and statutorily mandated insurance.

18        In regard to a fine, I've considered the factors

19   contained in Section 3572 and Guideline Section 5E1.2.  The

20   court declines to impose a fine in this case because defendant

21   is unable to pay a fine and is not likely to be able to do so.

22        I'll order the defendant to pay a special assessment of

23   $100 on each count.  That is due immediately, for a total of

24   $300.  If the special assessment is not paid in full during the

25   term of incarceration, then during his term of supervised

1    release and as an additional condition of that supervised

2    release, the defendant shall pay to the Clerk of Court at least

3    10 percent of the defendant's gross earnings minus federal and

4    state income tax withholding until the special assessment is

5    paid.

6            Attorney Rippy, have I addressed all your arguments,

7    including your arguments in mitigation?

8            MS. RIPPY:  Yes, your Honor.

9            THE COURT:  I'll enter a preliminary order of

10   forfeiture forfeiting the defendant's right, title, or interest

11   in the firearms or ammunition involved in this offense.

12           Do the parties know of any reason other than those

13   already presented why the sentence should not be imposed as

14   stated?  Mr. Karner?

15           MR. KARNER:  No, your Honor.

16           THE COURT:  Ms. Rippy?

17           MS. RIPPY:  No, your Honor.

18           THE COURT:  I will enter a judgment of conviction and

19   order the sentence imposed as stated.

20           Mr. Poke, you have a right to appeal the adjudication

21   of guilt in this case, as well as the sentence imposed by me.

22   In this case you have entered into a -- I'm sorry.  Strike that.

23           Any notice of appeal must be filed within 14 days of

24   the entry of judgment.  You or your attorney may file a notice

25   of appeal.  If you so request, the clerk will prepare and file a

1    notice of appeal in your behalf.  If you are unable to pay

2    appeal costs, you have a right to ask for permission to appeal

3    in forma pauperis.  If you are unable to afford an attorney, the

4    Court of Appeals may appoint an attorney to represent you on

5    appeal at no cost to you.  Ms. Rippy will remain your attorney

6    on appeal unless the Court of Appeals appoints another attorney

7    to represent you on appeal.

8           DEFENDANT POKE:  Can you make sure she put in my

9    appeal?

10          THE COURT:  Pardon me?

11          DEFENDANT POKE:  Can you make sure she put in my direct

12    appeal?  I'm just getting it on record because if it don't get

13    on record, they're going to say I never asked for it.

14          THE COURT:  Attorney Rippy, will you make sure that he

15    files a proper notice of appeal?

16          MS. RIPPY:  Yes, your Honor, I will.

17          DEFENDANT POKE:  I have another request.  Can I request

18    to go to Pekin, Illinois?

19          THE COURT:  I'll make the request.  Or I'll make the

20    recommendation.

21          DEFENDANT POKE:  I got another question.  Honestly,

22    though, seriously, though --

23          THE COURT:  We can't hear you from back there.

24          DEFENDANT POKE:  I understand, Judge, that you feel

25    like you doing your job.  But, you know, we going to be

1    realistic here, though, you know what I'm saying.  We're going

2    to bring this down under earth terms, you know what I'm saying.

3    You know, I can't do nothing but accept the 35 years, but

4    actually in your mind do you really think a 1.2-gram user drugs,

5    which I didn't provide the evidence that I used, that's worth

6    35 years to you, honestly?  You know what I'm saying.

7           I just want to hear it because, I mean, it been so

8    much -- see, most of these people don't know the law, you know

9    what I'm saying, but unfortunately I know the law, you know what

10   I'm saying, and everything that was did in here was against the

11   law.  No matter what my criminal history is or what I did in

12   them jails don't determine what goes on in this courtroom.  What

13   determines in this courtroom is the law, not your personal

14   feelings, you know what I'm saying.

15          So, you know, I'm trying to figure -- I knew I was

16   going to get that time, but this is what I'm trying to figure.

17   If they got you here to uphold the law and protect my rights,

18   you know what I'm saying, I mean, you ain't doing a good job at

19   it because, I mean, clearly, you know, no disrespect, but I'm

20   saying I put stuff in black and white.  The government ain't

21   supplied nothing.

22          It's like basically he got everything granted on a

23   friend basis.  So, I'm thinking like is your -- do you think his

24   friendship is more important than your reputation as being

25   truthful, uprighteous, and a role model?  Not for just Rockford.

1    For the whole United States.  I mean, for the whole Illinois.

2    Because you is a federal judge, and for you to handle this

3    situation like this, it was unjust.

4          I mean, you all disregarded the law to the fullest, you

5    know what I'm saying.  And I came in here with everything I had

6    that I read.  Even I supported new case laws on the ruling.  And

7    even today you got the President, you got the Attorney General

8    talking about these tough sentences on drug convictions, and

9    here I come in here with 1.2 grams, and you give me 35 years.

10   Come on, man.  They going to look at this like it ain't

11   realistic with the appellate court, you know what I'm saying.

12         I mean, you know, I thought today we was going to come

13   in here, the circus was going to stop, you know what I'm saying.

14   Come on, man.  This is circus court, and that shouldn't be

15   allowed here.  It shouldn't, though, honestly, you know what I'm

16   saying.  We should have handled everything in a professional

17   manner.

18         Don't look at me as my past.  Look at me as the future.

19   Look at what I know now, you know what I'm saying.  Everything

20   that I did I was forced to do because you all was trying to put

21   me in predicaments to where I couldn't prepare a proper defense

22   to fight this case by putting me in Ogle County, by putting me

23   in McHenry County.  But when you put me in a place where I can

24   read, there's no problem with me with the staff, you know what

25   I'm saying.  So, I mean, that's part of my right.  That's like

1   the Eighth Amendment, right?  And so many other rights been

2   violated, you know what I'm saying.

3         So, from the beginning to the end, you know what I'm

4   saying, you deny everything that I presented.  Like, you ain't

5   grant one thing.  And then you tell me to -- if I need some --

6   did file my own pro se motions -- you started me with the motion

7   for new counsel.  And then when I filed motions, you strike them

8   saying that I got counsel, but I done showed you counsel, she's

9   not competent to handle her own affairs, let alone mine.  She

10  can't answer any question that you put up here.  No disrespect.

11  But I'm saying if we're going to have people in here upholding

12  the law, they should not just go to school to get a degree.

13  They should actually know the law.

14        Because I know they feel a little disrespected because

15  a street person -- like everything that's all said about me,

16  came in here and made you all look bad because I was presenting

17  facts of the law, and I was quoting everything right, and I know

18  what I'm talking about, and the only answer that you can give

19  was no answers, you know what I'm saying.  And then to look over

20  that, you know what I'm saying.  I mean, you know what I'm

21  saying.

22        I don't want to throw the race thing up in here.  I

23  don't want to be like, man, you all doing this because I'm

24  black, you know what I'm saying.  I didn't even bring that in

25  the courtroom.  I brought the law in here, and you all still

1    disregarded it, you know what I'm saying.  I mean, just man to

2    man, I'm trying to see like by me knowing the law, I really like

3    think like what's in your head, you know what I'm saying,

4    because --

5         THE COURT:  Okay.  Well, let me answer the best way I

6    can.  First of all, the sentence that I passed down in this case

7    and my rulings in this case, my conduct in this case is in no

8    way connected with a relationship that I have with Mr. Karner.

9    Mr. Karner is a good lawyer.  I have the utmost respect for him

10   and his ability as an attorney and as an Assistant United States

11   Attorney.  I've known him for a long period of time.  I can

12   honestly say I don't have any social relationship with him at

13   all.  I don't think I've ever been with him in a social setting.

14   The only time I've ever seen him is incidental contact and the

15   times that I see him in court.

16        I've said this many times, but I think the worst part

17   of my job is sentencing.  It's the thing that I dislike.  I take

18   no pleasure in looking a man in the eye and telling him that I'm

19   going to order him to go to prison for a long period of time,

20   for any period of time.  I don't feel worthy to tell a person

21   that I'm going to take part of his life away from him.

22        But this is a part of my job.  It's a duty that's been

23   imposed on me, a duty that I accept when I took the oath as a

24   judge, and I give very serious and sober and deep approach when

25   I'm looking at sentencing.  I'm sorry this happened to you.  I

1    wish it didn't happen to you.  I wish your life was different.

2         DEFENDANT POKE:  Yeah.  I mean, unfortunately, I'm

3    black.  So, no, it wasn't going to be different.  And then for

4    you to -- I mean, for you to look me in my eye and tell me that,

5    you know what I'm saying, you really sorry, the career wasn't

6    even mandatory.  It was advisory.  That was advisory.  That's

7    like you ain't even really have to do that.  The career is

8    the -- when you say -- really want to say F me, you know what

9    I'm saying.  That's advisory.  Don't no place in the world

10   career people for 1.2 grams and small drug amounts.

11        And then I even point that out to you in the Moncrieffe

12   v. Holder case, and you still say okay, deal with that in

13   appeal.  But I already knew you was going to give me all the

14   time and make me fight to come back.  But I got four kids, man.

15   This case is only 37, 46 months.  All this stuff, unnecessary

16   stuff that you all did, it's preventing me from going home to

17   take care of my function.

18        You all might don't think I'm changed, but I changed

19   because guess what.  I'm not tearing this place up.  I'm talking

20   to you.  And for you to -- I mean, I understand the sentence,

21   but my whole problem is -- because this is a lot of more people

22   coming in here behind me that don't know the law, you know what

23   I'm saying.  And everything that you all deal with this case

24   from the beginning to the bottom been sloppy and unprofessional.

25        So, for you to -- I mean, for you to hand down that

1    sentence and for you to know the law, I mean, I'm trying to like

2    really -- because I don't know you.  So, I'm trying to really

3    figure out like -- because you ain't sentence me because of the

4    law.  You sentence me from your own personal feelings.  And I'm

5    trying to see like why, though.  I ain't did nothing to you.  It

6    ain't -- the sentence didn't have to be that harsh.

7    Twenty years was too much because it's only a case that carries

8    ten year max.  It's been supersized, you know what I'm saying.

9            So, okay.  Twenty I would have said, you ain't -- but

10   35?  That means you ain't -- like I came in here, and you know

11   what I'm saying, showed you all that I ain't no idiot and made

12   Mr. Beavis and Butthead over there, you know what I'm saying,

13   look unprofessional.  I apologize.  I apologize.  Don't attack

14   me.

15           But I'm just saying.  Come on, man.  You know what I'm

16   saying?  Like can I get -- man to man can I get a real, a real,

17   you know what I'm saying.  Because this time I'm going to

18   meditate on for a long time, you know what I'm saying.  I'm

19   going to be back.  I'm going to continue fighting.  But I got to

20   see how a judge like you thinking.

21           With all this stuff that's going on TV, with the way

22   that you sentence me and you still sentence me.  So, it couldn't

23   have been about a law.  I'm trying to see like is it because of

24   my race, or is it because it's a friendship going on here.

25   That's the only two reasons.  Because every day and on the radio

1    all day you hear stop these tough sentences.  I've been

2    sentenced like a kingpin.  I got more time than the majority of

3    MCC with people that come in here with kilos.  I seen a person

4    walk out this same courtroom with 500 pounds of marijuana and

5    leave out of here with five years.  But you look at a person

6    like me, 1.2 grams, that I could have came up here and blew it

7    out his hand and it wouldn't have been no case.  35 years?  I

8    see 15 years for the gun.  That's reasonable.  That's some

9    common sense.  Anything else after that was unhuman.

10            THE COURT:  All I can tell you is that my sentence has

11   nothing to do with Mr. Karner.  It has nothing to do with the

12   fact that you're an African-American.  It has everything to do

13   with my best effort at analyzing and following the directives

14   and considerations contained in Section 3553(a) of the criminal

15   code.

16            DEFENDANT POKE:  Right.  I understand.  I ain't going

17   to hold the court up no more, you know what I'm saying.  But I'd

18   just like to speak my feelings in my mind.  But man to man, me

19   to you, that you know I know everything you said was a lie.

20   Everything that you said, you know what I'm saying, you're a

21   liar.  And for the future, we both need to work on being better

22   people.

23            THE COURT:  Court's in recess.

24        (Which were all the proceedings had in the above-entitled

25        cause on the day and date aforesaid.)

1      I certify that the foregoing is a correct transcript from

2   the record of proceedings in the above-entitled matter.

3

4

    _____
5   Mary T. Lindbloom
    Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25