1                  IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      WESTERN DIVISION

3    UNITED STATES OF AMERICA,   )      Docket No. 11 CR 50062
                          )
4               Plaintiff,   )      Rockford, Illinois
                          )      Friday, November 6, 2015
5            v.          )      1:30 o'clock p.m.
                          )
6    DAYTON POKE,              )
                          )
7              Defendant.   )

8                 TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE FREDERICK J. KAPALA
9

    APPEARANCES:
10

    For the Government:        HON. ZACHARY T. FARDON
11                         United States Attorney
                          (327 S. Church Street,
12                           Rockford, IL  61101) by
                          MR. JOSEPH C. PEDERSEN
13                          Assistant U.S. Attorney

14    For the Defendant:        MR. FRANKLIN C. COOK
15                          (P.O. Box 237,
                           Freeport, IL  61032)

16    Also Present:             MS. JENNIFER TABORSKI
                          Probation Office
17

    Court Reporter:          Mary T. Lindbloom
18                          327 S. Church Street
                          Rockford, Illinois  61101
19                          (779) 772-8309

20

21

22

23

24

25

1          THE CLERK:  11 CR 50062, U.S.A. v. Dayton Poke.

2          MR. PEDERSEN:  Good afternoon, your Honor.  Joe

3     Pedersen on behalf of the United States.

4          MR. COOK:  Good afternoon, your Honor.  Frank Cook on

5     behalf of the defendant, Dayton Poke.

6          THE COURT:  Good afternoon.

7          Case comes before the court for a continued sentencing

8     hearing for resentencing upon remand by the Seventh Circuit

9     Court of Appeals.  The parties ready to proceed?

10         MR. COOK:  Your Honor, I was speaking to Mr. Poke a few

11    minutes ago.  He's indicated that he no longer wants me involved

12    in the case.

13         THE COURT:  Why is that, Mr. Poke?

14         DEFENDANT POKE:  I mean, because I'm asking him to

15    argue some of the things that the appellate court mentioned in

16    my resentencing, you know what I'm saying, for me a lesser

17    sentence, and he saying he refusing to do that.  So, I mean,

18    under my right, I'm entitled to argue a lesser sentence.  That's

19    what I'm back for.  And mention some of the things that I feel

20    are relevant to my sentence.  And as my lawyer, that's his job,

21    but, I mean, he's saying he's refusing to do it.

22         THE COURT:  What issues are those, Mr. Cook?

23         MR. COOK:  The issue really has to do with the scope of

24    the remand, your Honor.  I have absolutely no problem arguing

25    for a reduced sentence within the scope of the remand.

```
 1            THE COURT:  Well, what issues are you talking about,
 2    Mr. Poke?
 3            DEFENDANT POKE:  I mean, just some of the things that
 4    they mention -- refer to in the Robert Presley case, you know
 5    what I'm saying, and taking it to count.  As far as they
 6    stipulating the cost of an inmate being in the BOP, that you
 7    should take that into consideration, and the PSI and the
 8    government with my lawyer in --
 9            THE COURT:  What do you mean the PSI and the
10    government?  What's that mean?
11            DEFENDANT POKE:  I mean, they all supposed to get
12    together and take in consideration the costs of a federal inmate
13    before sentencing, as they say in Presley.  They referring to
14    Presley to take that in account in my sentence.
15            THE COURT:  It was the costs, and what was the first
16    thing that you mentioned?
17            DEFENDANT POKE:  Which part?
18            THE COURT:  No.  About the things you wanted to bring
19    up.
20            DEFENDANT POKE:  Oh, the 35 -- some of the 3553(a).
21            THE COURT:  No, no.  You said costs because it was
22    brought up in Presley.
23            DEFENDANT POKE:  I did.
24            THE COURT:  Was there another issue in Presley that --
25            DEFENDANT POKE:  I mean, just the hard sentencing, the
```

1    aging out of the federal inmate.

2              THE COURT:  Age.  All right.

3              DEFENDANT POKE:  I mean, under them circumstances, I

4    was wondering ain't that entitled to a supplemental sentencing

5    memorandum?  I mean, the --

6              THE COURT:  Nobody's asked for a supplemental

7    sentencing memorandum.

8              DEFENDANT POKE:  But that's what I've been trying to

9    talk to him about.  That was the whole purpose of asking for the

10   continuance so we can talk about this, but he never came to see

11   me yesterday, and we just talked in a bullpen for about five

12   minutes, and I was trying to explain to him these some of the

13   things that I want to add in because these some of the things

14   that they mentioned for you to take into consideration during

15   the sentence.

16             THE COURT:  So, you want Mr. Cook to address age and

17   cost.

18             DEFENDANT POKE:  I mean, yes.  And, I mean, I wanted to

19   do a little more research with my lawyer so we can, you know

20   what I'm saying, be prepared when we came in here, you know what

21   I'm saying, for me to be able to explain it better because they

22   don't got no access to no computer in Ogle County.  So, I want

23   to sit down with him and explain some of these things and get a

24   couple of days to do some research so we can get a clear

25   understanding, but he --

1          THE COURT:  What research do you need to do on age and

2    cost?

3          DEFENDANT POKE:  I mean, to prepare a proper

4    supplemental sentencing memorandum.

5          THE COURT:  On age and cost?

6          DEFENDANT POKE:  I mean, and a few other things that

7    they mention up in here as far as --

8          THE COURT:  I want to know all the things that you want

9    argued that Mr. Cook --

10         DEFENDANT POKE:  And as far as me being a low level

11   drug dealer and how that refer to the hard sentencing that you

12   gave me, and I'm entitled to argue for a lenient sentence, you

13   know what I'm saying, whether I'm a career, even though I got

14   the career or the armed career provision and how they explain

15   that in certain situations criminals will be -- it will arouse

16   for certain criminals to be sentenced at 30, 30 years or

17   35 years, but they explain that in my case this ain't a case of

18   such situation.

19         THE COURT:  I don't understand what you just said.

20         DEFENDANT POKE:  They saying that in my case the 1.2 --

21         THE COURT:  Who's they, first of all?

22         DEFENDANT POKE:  The appellate court.  They explaining

23   in my appeal that a person in my situation, I mean, that's just

24   too much time.

25         THE COURT:  No, they didn't say it's too much time.

1    They sent it back down here for me to consider your sentence in

2    light of some new issues that they wanted to address.  They

3    never said that your sentence was too high.  I didn't read it in

4    the opinion, anyway.

5              DEFENDANT POKE:  Huh?

6              THE COURT:  They never said that 420 months was too

7    high.

8              DEFENDANT POKE:  I mean, if they tell you to take in

9    consideration of the Presley case and they arguing the amount of

10   time, they explain that the amount of time that we receiving --

11   and in Presley they stipulated that that was a harsh sentence

12   and why they felt it was a harsh sentence.  And then in my

13   situation they was asking you to take in account and

14   consideration what they said in Presley.

15             THE COURT:  Well, harsh sentence does not equate to an

16   improper sentence.  Sometimes a harsh sentence is what's

17   required in a case.

18             DEFENDANT POKE:  And that's what they said in this, and

19   they say my case ain't one of them.

20             THE COURT:  No, they didn't say that.

21             DEFENDANT POKE:  At the last part where it says:  Some

22   criminal commits acts of such evil as to arouse righteous

23   indignation that demands heavy punishment without regard to

24   deterrence, but the defendant in this case is a small-bore drug

25   dealer, charged with possession of only 1.2 grams of crack with

1    intent to sell.  The district court need to consider whether

2    concerns of deterrence, either special, deters the defendant

3    from committing crimes upon his release from prison, or general,

4    his punishment as a deterrent to others who might consider

5    committing similar crimes, warrant a sentence of 420 months.

6           THE COURT:  All right.  That's included in your issue

7    regarding being a low level drug dealer, I think.

8           DEFENDANT POKE:  Excuse me?

9           THE COURT:  What you -- the issue that you've just

10    outlined is included in the issue that you described as being a

11    low level drug dealer.

12           So, we've got three issues that you want to raise.

13    Age, cost of incarceration, and being a low level drug dealer.

14           DEFENDANT POKE:  Yeah.

15           THE COURT:  All right.

16           DEFENDANT POKE:  And is you familiar with the Johnson

17    case?

18           THE COURT:  Well, there's a lot of Johnson cases.

19           DEFENDANT POKE:  The armed career.  I don't got the

20    case in front of me.  I referred it to my lawyer.

21           THE COURT:  Right.  We already talked about that,

22    though --

23           DEFENDANT POKE:  I mean, that's --

24           THE COURT:  -- when we were in court last time, and

25    that's not part of the resentencing.  You've been designated as

1    an armed career criminal.  That was never brought up at the

2    prior sentencing.  And so, it's not part of the remand.

3            DEFENDANT POKE:  I mean, but by being a retroactive

4    case -- I mean, by me being back for resentence, that don't

5    apply to me as retroactive for the Seventh Circuit?

6            THE COURT:  Well, we're not -- that issue's already

7    been resolved in your case.  That's already been set.  You don't

8    need to address that again.

9            DEFENDANT POKE:  So, even though the laws change, the

10   guidelines got amended, and new case law has came out, and

11   they're retroactive, you saying by me being resentenced, don't

12   none of that apply to me?

13           THE COURT:  Well, that case didn't come out since

14   you've been arrested -- since you've been --

15           DEFENDANT POKE:  That case was just ruled --

16           THE COURT:  Since you've been sentenced.

17           DEFENDANT POKE:  Yeah, that case was just decided a few

18   months ago.

19           MR. COOK:  Your Honor, I believe Johnson v. United

20   States was a Supreme Court decision earlier this year that dealt

21   with what was called the residual clause of the armed career

22   offender statute and determined that that was unconstitutional.

23   It was unconstitutionally vague.  That's the Johnson decision.

24           DEFENDANT POKE:  I mean, if I would have -- if he was

25   willing on working with me, we could have sat down and got some

1    of this stuff situated.  I understand you all want to get the

2    sentence over with, but, you know, I just want everything that

3    I'm entitled to, you know what I'm saying.  This is my life on

4    the line.

5          THE COURT:  But none of your predicate convictions were

6    based upon the residual clause.  So, Johnson doesn't apply to

7    you.

8          DEFENDANT POKE:  I mean, as far as they saying Johnson

9    is unconstitutionally vague.

10          THE COURT:  But the part that's vague is the residual

11    clause.  None of your predicate offenses were based upon the

12    residual clause.  So, that's inapplicable.  Johnson is

13    inapplicable to your situation.

14          DEFENDANT POKE:  I mean, Johnson stipulates as far as

15    what's considered actually violent and what's not considered

16    violent, and some of my -- one of my predicates that's used, the

17    language of the potential risk, without us really doing the

18    research --

19          THE COURT:  I'm telling you that the Johnson case is

20    based upon the vagueness of the residual clause in predicate

21    offenses, and none of your predicate offenses were based on that

22    residual clause.

23          DEFENDANT POKE:  Okay.  You know, I just want to put it

24    on the record, you know what I'm saying.

25          THE COURT:  That's fine.  Age, cost, and being a low

1     level drug dealer.  I'll allow you to bring that up in this

2     proceeding.

3                 DEFENDANT POKE:  I mean --

4                 THE COURT:  Mr. Cook, I'll allow you to argue those

5     issues.

6                 DEFENDANT POKE:  I mean, with no research or us even to

7     make our findings stronger.

8                 THE COURT:  I'll let you talk to Mr. Cook now about it.

9     I don't know that there's any research that needs to be done.

10    But I'll leave that to you, Mr. Cook.

11                MR. COOK:  Your Honor, my understanding of things --

12    and if I'm wrong, I would apologize -- is that with the scope of

13    the remand, as defined by the decision here, we're basically

14    looking at, as far as the guidelines are concerned, the 360

15    months on up to life.  But that is basically the guideline

16    sentencing range that I have to deal with under the scope of the

17    remand.  And I think the issues that Mr. Poke is bringing up all

18    factor into that and, in fact, are touched upon by Judge Posner.

19    It's just a question of whether we can go under 360, as far as

20    the guidelines are concerned.

21                THE COURT:  Okay.  But Judge Posner did touch upon the

22    Presley case.  He does mention age.

23                MR. COOK:  And that was going to be part of my

24    argument.

25                THE COURT:  Okay.  But I will allow you to argue how

1    age is implicated, how the cost of incarceration is implicated,

2    and how Mr. Poke being a low level drug dealer is implicated

3    here.  And so, we'll go forward on those.  I'll give you some

4    time to talk to Mr. Poke, and maybe we can still --

5              DEFENDANT POKE:  I mean, your Honor, if he like -- if

6    he don't want to do it, it ain't no reason to force him because,

7    I mean, you know, I want my situation did properly.  I don't

8    want it did out of frustration or anger.  I mean, I'm looking at

9    a lot of time, you know what I'm saying.

10             THE COURT:  All right.  You don't have to worry about

11   Mr. Cook feeling any resentment or umbrage or not giving his

12   full attention or efforts to arguing these cases.  He's a

13   lawyer.  He has a very good reputation.  He has dealt with these

14   cases many times in the past.  He can represent you very well in

15   arguing your position regarding these three extra issues.

16             DEFENDANT POKE:  I understand that, but when I told him

17   to come talk to me so we can be prepared for these arguments,

18   everything that I was saying, he shot it down.  He told me it

19   don't apply to me.  He told me it's irrelevant.  But then --

20             THE COURT:  Okay.  Well, I'm telling you right now that

21   I'll allow you to bring those things up.  And so, you can talk

22   to him right now.

23             DEFENDANT POKE:  But that's what I'm saying.  The time

24   that we been waiting for court, we could have sat down and came

25   up with a better -- not a rush job, not a rush job issue.  I

1    mean, you gave us a continuance 'til today.  I just not seen

2    him.  I mean, what was the continuance for if I wasn't going to

3    see him.

4            THE COURT:  I'll let you talk to him right now.  Let's

5    see how far we can get.

6            DEFENDANT POKE:  I mean, he don't want to do it, your

7    Honor.  I mean, he clearly told me he don't want to do it.

8            THE COURT:  He didn't say that.

9            DEFENDANT POKE:  He did say that.  He told me that

10   downstairs.

11           THE COURT:  He didn't say that.  He said that he

12   thought it was beyond the scope of the remand.  He has a good

13   point.  He has a good argument.  But I've said that I'm going to

14   allow you to present those.  And so, he's willing to argue those

15   points for you.

16           All right.  Talk to Mr. Poke, and let's see how far we

17   can get.  Hopefully we can still salvage the afternoon.

18       (Whereupon, a recess was taken at 1:50 p.m., after which the

19       hearing was resumed at 2:10 p.m.)

20           THE COURT:  All right.  Back on the record.

21           I should clarify in our discussion about Johnson that

22   when I said none of the offenses that form the predicate for the

23   armed career criminal designation of Mr. Poke involved the

24   residual clause, I was talking about the two controlled

25   substances offenses and the robbery, and those would be the

1    three offenses.  There was some discussion about mob action, but

2    the mob action is surplus to the ACC designation.

3              All right.  Where are we at?

4              MR. COOK:  I think we're ready to proceed, your Honor.

5              THE COURT:  All right.  Ready to go, Mr. Poke?

6              DEFENDANT POKE:  Yes.  I have no choice.

7              THE COURT:  We left off when we were in court regarding

8    the sentencing materials.  I think I listed all of those for

9    you.  Do the parties agree that all those materials are

10   appropriate for me to use for purposes of sentencing?

11             MR. PEDERSEN:  Yes, your Honor.

12             MR. COOK:  Yes, your Honor.

13             THE COURT:  Are there any other written materials I

14   should consider at the present time?

15             MR. PEDERSEN:  Your Honor, I have copies of -- in

16   relation to the 3553(a) factors, I have copies of three

17   sentencing -- or I'm sorry -- trial exhibits that I was going to

18   refer to, Government's Exhibits 12, 13, and 21.

19             THE COURT:  During the trial of this case?

20             MR. PEDERSEN:  Yeah, they were admitted at trial.

21             THE COURT:  That would be something you'd bring up

22   during the evidence portion, I believe.

23             MR. PEDERSEN:  Okay.  That's fine.

24             THE COURT:  Any other written materials?

25             MR. COOK:  No, your Honor.

```
 1          THE COURT:  Mr. Poke, at the original sentencing

 2    hearing, you acknowledged that you read and reviewed the

 3    materials that were presented at the original sentencing hearing

 4    and that you discussed them with your attorney.  Have you

 5    discussed them with Mr. Cook?

 6          DEFENDANT POKE:  Somewhat.

 7          THE COURT:  Well, tell me what you haven't discussed.

 8          DEFENDANT POKE:  I mean, we discussed the things that

 9    you sent us back there to discuss.

10          THE COURT:  Well, I listed all those things when we

11    were in court yesterday, and I want to make sure you've

12    discussed those with Mr. Cook.

13          DEFENDANT POKE:  Yes.

14          THE COURT:  All right.  And you've read and reviewed

15    the supplemental report dated August 29th, 2015?  That's the new

16    report that was submitted since your last sentencing.  And also

17    the bond sheet for case number 01 CF 1860.  Have you reviewed

18    and discussed those with Mr. Cook?

19          DEFENDANT POKE:  No, sir.

20          THE COURT:  Well, you ought to do that.

21          MR. COOK:  I believe the supplemental was the

22    October 29th.

23          THE COURT:  October 29th, 2015.

24          MR. COOK:  I think you said August.

25          THE COURT:  Oh, I'm sorry.
```

1          MR. COOK:  That's the things that I gave you.

2          DEFENDANT POKE:  You gave them to me.  We ain't

3    discussed it, though.

4          MR. COOK:  All right.

5          THE COURT:  Well, why don't you sit down and talk about

6    it.  I can wait.

7       (Brief pause.)

8          DEFENDANT POKE:  Yeah.  Yeah, we did.  We mentioned it.

9          THE COURT:  All right.  So, do you need any more time

10   to look at those?

11         DEFENDANT POKE:  No.

12         THE COURT:  All right.  Does the defense have any

13   objections to or comments on the proposed or discretionary

14   conditions or special conditions of supervised release?

15         MR. COOK:  Your Honor, the one -- I mean, in terms of

16   what the government has proposed?

17         THE COURT:  Pardon me?

18         MR. COOK:  What the government has proposed?

19         THE COURT:  Right.

20         MR. COOK:  I guess looking at it in terms of on the out

21   date that we're talking about here, I kind of question whether

22   there should be a restriction on binge drinking.  I don't know

23   that that's necessarily illegal.  It could probably lead to poor

24   behavior on occasion.  I don't know that there's been any real

25   indication that there is that concern at work now and even less

 1    reason to think that it could be a concern --

 2            THE COURT:  I'm not going to impose that condition.

 3            MR. COOK:  Okay.  I also question to notify any

 4    employer of the risk of future crimes based on the nature of the

 5    defendant's offense.  Here again when you look at it down the

 6    road there, I don't know that that's something that's really

 7    needed to accomplish anything and could be counterproductive in

 8    terms of preventing employment.

 9            THE COURT:  Which one is that?

10            MR. COOK:  It's on Page 4 towards the bottom.  It's the

11    last bullet point.

12            THE COURT:  I'm not going to impose that one.

13            MR. COOK:  And just as a general proposition, the -- I

14    think it's right above that one where the defendant shall not

15    possess a firearm, ammunition, destructive device.

16            THE COURT:  I think that's duplicative of mandatory

17    condition number one.

18            MR. COOK:  Right.

19            THE COURT:  So, I won't impose that one, either.

20            MR. COOK:  That was it.

21            THE COURT:  All right.  At the original sentencing

22    hearing, we did make a correction to the presentence

23    investigation report, and just so it's clear, it's a minor

24    correction, but on paragraph 53 we amended that to show that on

25    June 8th, 2001, the defendant's sentence was discharged, not

1    that his parole was discharged.

2           All right.  Do the parties have any dispute as to the

3    factual findings and conclusions contained in the presentence

4    report with that correction?

5           MR. PEDERSEN:  No, your Honor.

6           MR. COOK:  No, your Honor.

7           THE COURT:  I will adopt the factual findings and

8    conclusions contained in the presentence report as corrected and

9    the accompanying sentencing materials.  The presentence report

10   as corrected and the accompanying sentencing materials and the

11   transcript of these proceedings will stand as my factual

12   findings and conclusions.

13          The parties agree that the guidelines calculations have

14   already been -- the guidelines calculations issues have already

15   been resolved?

16          MR. COOK:  Yes, sir.

17          MR. PEDERSEN:  Yes, your Honor.

18          THE COURT:  In the previous sentencing hearing, I used

19   the sentencing guideline manual in effect on November 1st, 2013.

20   Even if I used the sentencing guideline manual effective

21   November 1st, 2015, I believe the final total guidelines

22   imprisonment range would be the same.

23          Jennifer, do you concur?

24          MS. TABORSKI:  Yes, your Honor.

25          THE COURT:  Therefore, I will adopt the results of the

1    guidelines calculations contained in the presentence

2    investigation report.  The advisory guidelines imprisonment

3    range for this case is 360 months to life.  In addition, I find

4    that the supervised release range for Count 1 is six years, for

5    Count 2 is two to five years, and for Count 3 is two to five

6    years.

7            As to the remaining 3553(a) considerations, do the

8    parties have any evidence?  Mr. Pedersen?

9            MR. PEDERSEN:  Your Honor, it's evidence that was

10   already admitted at trial, but I have copies of Government's

11   Exhibits 12, 13, and -- or I'm sorry -- 12, 15, and 21.

12           THE COURT:  Have you shared those with Mr. Cook?

13           MR. PEDERSEN:  I've given him copies.  I have no

14   further evidence.

15           THE COURT:  You're going to reference these in your

16   argument?

17           MR. PEDERSEN:  Yes.

18           MR. COOK:  I was uncertain what factors these exhibits

19   might relate to.

20           MR. PEDERSEN:  The nature and circumstances of the

21   offense.

22           THE COURT:  Do you have any other evidence,

23   Mr. Pedersen?

24           MR. PEDERSEN:  No, your Honor.

25           THE COURT:  Mr. Cook, do you have any evidence?

1          MR. COOK:  No.

2          THE COURT:  Argument, Mr. Pedersen?

3          MR. PEDERSEN:  Your Honor, we believe a sentence within

4    the guideline range would be appropriate considering all the

5    3553(a) factors.  Specifically in relation to the nature and

6    circumstances of the offense, this case involved the defendant

7    possessing with intent to distribute eight individually wrapped

8    baggies containing approximately 1.2 grams of crack cocaine at

9    the same time he was in possession of a loaded .40 caliber gun

10   underneath the floorboard of the car he was driving when he was

11   stopped by Rockford police officers.  Photographs of the handgun

12   that the defendant --

13         THE COURT:  Underneath the seat, isn't it?  The

14   floorboard is --

15         MR. PEDERSEN:  I'm sorry.  Underneath the seat on the

16   floorboard.  Sorry.  Correct.

17         And he was driving that vehicle that's depicted in

18   Government's Exhibits 12 and 15.  That's a photograph of where

19   the gun was in the vehicle at the time he was stopped by police

20   officers.

21         In addition, the officers recovered the defendant's

22   cell phone at that time containing text messages that reflected

23   that he was involved in street level drug sales, and those text

24   messages were introduced at trial as Government's Exhibit 21.

25         After the defendant was stopped, he didn't comply with

1    the officer's commands to stay in the car.  He got out of the

2    car, attempted to lock the car and prevent the officers from

3    accessing it, refused to give them the keys, and he had to be

4    forcibly taken to the ground and have the keys taken away from

5    him.

6              In addition, as to the nature and circumstances of the

7    offense and the defendant's history and characteristics, the

8    defendant has never taken any responsibility for his actions in

9    this case, specifically as to his possession of the crack

10   cocaine and the firearm with the intent to distribute it -- or

11   the possession of the crack with intent to distribute it or his

12   possession of the firearm.

13             The defendant, as far as his history and

14   characteristics, he has a total of 25 criminal history points,

15   almost double the amount that would be necessary to place him in

16   the highest criminal history category, and that's not counting

17   some of his convictions for traffic offenses for which he didn't

18   receive any criminal history points or his juvenile

19   adjudications for serious crimes, as well.

20             As the presentence report shows, starting with

21   paragraph 48, the defendant's criminal history began as a

22   juvenile.  He was 15 years old when he was adjudicated for

23   aggravated battery, and that started a series of serious

24   offenses that he's committed all the way through the offense in

25   this case.

1          So, as far as the direction from the appellate court on

2   remand for the court to consider whether or not a lengthy

3   sentence is necessary for deterrence, either specific or

4   general, for this defendant and characterizing the defendant as

5   a small-bore drug dealer, that's correct.  He was only arrested

6   with a small amount of crack cocaine.  But he was arrested

7   committing a violent offense, possession of the firearm in

8   furtherance of a drug trafficking crime.  He was convicted of

9   that offense, meaning that he possessed the gun in furtherance

10   of the drug trafficking crime.

11          There is no other reason for the defendant or no other

12   possible way that he could have used the firearm in furtherance

13   of his drug trafficking crime other than a violent fashion.  The

14   gun wasn't used to help manufacture the crack cocaine or mix

15   crack together and use it to stir the cocaine.  It was possessed

16   to protect the defendant's drugs and the money that he had on

17   his person, and that's what the jury convicted the defendant of.

18          The defendant has a serious criminal history, as I

19   indicated.  He also has a serious history of not complying with

20   orders of the court or with rules while he's incarcerated.

21   Specifically as to not complying with orders of the court, from

22   the time the defendant was first adjudicated as a juvenile when

23   he was 15 until this offense, there's an unbroken chain of the

24   defendant being arrested for an offense, convicted, placed on

25   some type of either court supervision or parole, and then

1    violating those conditions by committing new offenses, in many

2    cases either additional drug trafficking crimes or violent

3    crimes such as aggravated battery, paragraph 51 of the

4    presentence report; robbery, paragraph 53; possession of a gun,

5    paragraph 61; possession with intent to distribute cocaine,

6    paragraph 64; aggravated battery, paragraph 65; paragraph 67,

7    possession with intent to distribute; and then paragraphs 68 and

8    69, while he was on parole for possession with intent to

9    deliver, he committed two driving offenses and was sentenced to

10   county jail time.

11        While he was on court release for the driving while

12   revoked charge, he committed a new offense of mob action for

13   which he was convicted and sentenced to jail, and while he was

14   on probation for that offense, he committed a new offense of

15   possession of cocaine with intent to distribute, and while that

16   case was pending, he committed this offense, hence the unbroken

17   chain of the defendant committing offenses from the time he was

18   15 until he committed the offense in this case, where it was a

19   pattern of committing an offense, being placed under some type

20   of court supervision or parole, and continually violating it by

21   committing new crimes.  The defendant needs a long sentence for

22   specific deterrence to ensure and to protect the public from

23   future crimes of this defendant.

24        In addition, as I indicated, he has a long history of

25   violating rules while he's in custody, including the presentence

 1    report outlines numerous violations, many serious and violent

 2    violations, in paragraphs 73 to 78.  The supplemental report

 3    contains the underlying basis.  The May 29th, 2014, contains the

 4    reports of those violations.

 5            And then as of October 29th of 2015, the special report

 6    that was provided to the court detailed three new Bureau of

 7    Prison discipline incidents since he was sentenced in this case,

 8    and two of those violations involved allegations of the

 9    defendant stalking female staff members and making very vulgar

10    comments to members and then also -- or I'm sorry -- staff

11    members intended to intimidate them.  In addition, he told one

12    of the female staff members that he loved her, again a form not

13    meant -- not taken in a way where it was appreciated.  It was

14    more taken as a form of aggression from the defendant, after he

15    had been instructed not to do so.

16            THE COURT:  A form of what did you say?  A form of what

17    from the defendant?

18            MR. PEDERSEN:  Aggression and intimidation.

19            DEFENDANT POKE:  I object to that, your Honor.  That

20    ain't what the report says.

21            MR. PEDERSEN:  Your Honor, I would ask that the

22    defendant be instructed if there's an objection to be made, he

23    has an attorney, that his attorney could make the objections.

24            THE COURT:  I agree.

25            MR. PEDERSEN:  Your Honor, you have a defendant

1      standing before you that has clearly demonstrated that he is in

2      great need of a sentence that is of sufficient length to ensure

3      that he is deterred from committing additional conduct, and

4      based on the defendant's history of repeated violations of court

5      orders, repeated history of failing to comply with simple rules

6      of pretrial incarceration, a sentence within the guideline range

7      would be appropriate to ensure that the guideline -- I'm

8      sorry -- that the sentencing factor of deterrence is

9      sufficiently addressed, and, therefore, we're requesting that

10     the court impose a sentence within the guideline range of 360

11     months to life.

12            THE COURT:  Thank you.

13            Mr. Cook, argument.

14            MR. COOK:  Your Honor, with regard to the factors to be

15     taken into account here, I think in light of the appellate

16     decision, the two things that kind of stand out as particularly

17     relevant at this point is factor (2)(B), to afford adequate

18     deterrence to criminal conduct and then also (a)(6), the need to

19     avoid unwarranted sentence disparities among defendants with

20     similar records who have been found guilty of similar conduct.

21            As Mr. Poke was described in that decision as a

22     small-bore drug dealer, the description seems accurate.  We're

23     talking about the crime of conviction here, the drug related

24     crime of conviction here, is 1.3 grams, and that has landed him

25     in a sentencing range of 360 months on the low end, even though

1    30 years is the maximum sentence to be imposed for that

2    particular drug offense.  I can't help but think that if we

3    weren't talking about armed career offender or the gun charge

4    here and we were only going to be sentencing him in light of the

5    statutory minimums and maximums, we would not be getting him up

6    to that 30-year mark in this case and that that would be saved

7    for people who are not small-bore drug dealers, but rather

8    kingpins and beyond.  And therein lies the tension here between

9    the sentence he's received and what others have received for

10   similar or for greater offenses.

11          And one I'm personally familiar with is Robert Presley.

12   I was involved with Presley's trial.  I saw all that evidence

13   unfold there.  And he was certainly depicted as a major player

14   in the heroin trade in Rockford, and yet he ends up -- and was

15   involved in pretty dramatic shootouts.  They had the AK-47 that

16   was hidden in his pants, guns all over the place.  And he, from

17   what I understand, is in the same sentencing range as is

18   Mr. Poke, and I believe -- I'm not certain of this, but I

19   believe he ended up with 360 months ultimately upon remand in

20   that case.  I think that disparity is kind of hard to justify, I

21   think, and I believe Judge Posner was hitting the nail on the

22   head pretty well with how harsh this particular sentence is with

23   regard to this particular defendant.

24          The idea of deterrence, too.  I mean, one of the things

25   I've noticed over the 25 years or so that the U.S. Attorney's

1    Office has been involved in the drug trade in Rockford is it

2    continues.   Typically I've noticed -- I've had the sense that

3    what happens is people get arrested, and it just ends up

4    creating job opportunities in an ongoing drug market.   Either

5    there's new people recruited, new organizations come in to fill

6    the void created by law enforcement, and it just goes on and on

7    and on.   And any sentence that is imposed on Mr. Poke,

8    Mr. Presley, or any number of others that I've dealt with over

9    the years I don't think is deterring that business from going

10   on.   And here again it's something that Judge Posner recognized

11   in his decision.

12          So, ultimately it comes down to what do we need to be

13   concerned about with Mr. Poke at the tail end of the sentence.

14   At what point does he cease to be a sufficient concern to the

15   public to justify the expense of continuing to keep him

16   incarcerated.   I think here again Judge Posner had it right in

17   terms of the statistics that he was citing, that we've known

18   forever that the older these people get, the older these

19   defendants get, the less likely it is they're going to

20   participate in the kind of crime that's landed them here in the

21   first place.   I don't think there's a whole lot of reason to

22   think Mr. Poke's going to be any different in that regard; that

23   as time goes on, he's going to be less inclined to get involved

24   in this.

25          And, you know, admittedly, there's been disciplinary

1   issues at various facilities he's been involved in, and there's

2   nothing to say that that's not going to change down the road,

3   that there could become an awakening here where he realizes that

4   the way he has behaved has not served him well, and I think a

5   sentence of the lengths we're talking about here, even on the

6   low end, would be more than adequate to provide that opportunity

7   to unfold.

8           I don't see any reason why it should be beyond the

9   minimum established under the guidelines, and to some extent I

10  think it's hard to justify even that minimum, given the

11  disparity between his conduct on the offense of conviction and

12  that of others who have landed themselves in similar guideline

13  ranges.  For that reason I would encourage the court to impose a

14  sentence as low as possible in this case and assure that at some

15  point in the future Mr. Poke is able to return to society as a

16  productive member.

17          THE COURT:  Thank you.

18          Mr. Poke, you have an opportunity to address the court.

19  As I said the last time we had a sentencing hearing, you're not

20  required to say anything.  You're not -- I'm not ordering you to

21  do so.  You're under no obligation.  But you do have the right

22  to say something in your own best interests that you see fit.

23  We call that a statement in allocution.  And so, if you wish to

24  make a statement and make a part of this record information that

25  you think will help me arrive at a fair sentence in this case,

1    I'd like to hear from you now.

2              DEFENDANT POKE:  Judge, first I want to elaborate --

3              THE COURT:  Okay.  Pull that in front of you so I can

4    hear what you have to say.

5              DEFENDANT POKE:  I want to elaborate on the

6    disciplinary shot first that I received that the government's

7    talking about.  And he's right.  The light have hit me why I

8    want to change.  And beside that --

9              THE COURT:  What did you say?

10             DEFENDANT POKE:  That my lawyer's right when he said

11   that somewhere down the line I would want to change.  It already

12   happened because the shot that I caught was the stalking ticket

13   of me constantly putting in call-outs and asking them to get me

14   psychological help and admit me in programs, and for me

15   constantly doing it, they wrote me a stalking shot for asking

16   for help, you know.

17             I ain't perfect, but I can try to help better myself.

18   You know, some things the court and the BOP take out of content,

19   you know what I'm saying, instead of relaying the message the

20   way it is, you know.  But it seems like no matter what I do,

21   even when I try to better myself, I'm doing wrong, you know what

22   I'm saying.  You know, I apologize for the things I did in the

23   past.  You know, some of the things when you're young, you ain't

24   really familiar what's wrong.  You just going with what you was

25   taught.  You know, I had poor guidance, you know what I'm

1    saying.  I ain't proud of the things that I did.

2            And I'm wishing I can get back to the community and

3    help stop some of the crimes in the Rockford area and talk to

4    some of the kids that's going through what I went through, you

5    know.  It's hard out there when you don't got no parents at all

6    and you trying to make it in life.  Even if a person sits you

7    down and talk to you and explain to you that the path that

8    you're going down, it's the wrong path, but sometimes it's hard

9    to hear it and understand when you're in a forceful situation

10   when you're dealing with the streets.

11           You know, it's easy for a person that ain't lived my

12   lifestyle to say you can just stop, you know what I'm saying.

13   But a person can tell you to stop, but don't put you in a

14   situation that help you learn how to stop, you know what I'm

15   saying.  And, you know, I can say that I ain't know how to

16   change my lifestyle to stop when you so caught up in it.  But,

17   you know, now that I'm older, I sit down and I reflect the

18   lifestyle that I'm living, and I see the things on TV, and, you

19   know, it look crazy to me because I used to be that way.

20           But as time go on, you grow out of it, and you mature,

21   and you realize that, you know, I'm proud to be alive right now

22   and happy to be alive, that I was able to make it.  A lot of

23   kids and people in my situation didn't make it.  So, even though

24   I got a 35-year sentence, you know, I kind of still feel like

25   I've won because I'm still alive to tell my story to other

1    people to make them change their lives, you know.

2          I can't -- I can't -- you know, I ain't trying to force

3    the court to do nothing, but if I did get a second chance, I'm

4    pretty sure I could use my lifestyle and what I been through to

5    deter the rest of the kids in the crime that's going on out in

6    the streets because, I mean, there's no guiding.  There's nobody

7    out there to really tell them that and show them that the road

8    that they're going down going to lead exactly where I'm at right

9    now because everybody they can talk to is either dead or in jail

10   for the rest of their life, you know what I'm saying.

11         So, you know, I'd like to apologize to the court, you

12   know what I'm saying, the government, my family, and everybody

13   who I been a nuisance to, you know.  And I just wish I can get a

14   chance so I can give other people a chance to see the truth of

15   the road that they're going down that just going to leave them

16   in a similar situation like me.

17         THE COURT:  Thank you.  Why don't you all have a seat.

18   I'll share my thoughts with you.

19         I have considered the presentence report and

20   accompanying materials.  I've considered the evidence and the

21   arguments made by the government and the defendant, as well as

22   the statement of the defendant.  I've considered the sentencing

23   guidelines calculations and all of the other sentencing factors

24   contained in Section 3553(a).

25         Among those factors are the nature and circumstances of

1    the offense and history and characteristics of the defendant.  I

2    also recognize the need for the sentence imposed to reflect the

3    seriousness of the offense, to promote respect for the law, and

4    to provide just punishment for the offense, to afford adequate

5    deterrence to criminal conduct, to protect the public from

6    further crimes of the defendant, and to provide the defendant

7    with needed educational or vocational training, medical care, or

8    other correctional treatment in the most effective manner, and

9    the need to avoid unwarranted sentence disparities among

10   defendants with similar records who have been found guilty of

11   similar conduct.

12           I have paid special attention to the directives of the

13   Court of Appeals in its order requiring a resentence.  I, of

14   course, have the utmost respect for the authority and dignity of

15   the Court of Appeals and take very seriously their orders,

16   instructions, and suggestions.

17           I believe the guidelines calculations in this case

18   provide an accurate starting point to evaluate the 3553(a)

19   factors.  In its opinion the Seventh Circuit concluded that the

20   420-month prison sentence that was previously imposed appears to

21   involve an accidental double counting based on a failure to

22   consider the apportionment option found in Section 5G1.2(e) of

23   the guidelines manual.  I fault myself for not explaining my

24   guidelines calculations better, but I can say unequivocally that

25   I knew that the final guidelines imprisonment range was 360

1    months to life, and I knew that a total sentencing of 360 months

2    on all of the counts of conviction, including Count 3, would

3    have been a within guideline sentence.

4           Indeed, as reflected in Pages 29 to 31 of the

5    transcript from the May 30th, 2014, hearing, the court attempted

6    to explain the somewhat cumbersome options laid out in

7    subsection (c) of Section 4B1.1 of the guidelines for

8    calculating the total guidelines range for a career offender who

9    also had a Section 924(c) conviction.  In the process of doing

10   so, I corrected a miscalculation that was contained in the

11   presentence investigation report regarding the proper

12   calculation of the otherwise applicable guideline range as that

13   term is used in Section 4B1.1(c)(2)(A) and ultimately concluded

14   that the range under the table in Subsection (c)(3) was the

15   greater range, which led to my finding that the total guideline

16   imprisonment range in this case is 360 months to life.

17          However, I concluded that a sentence above the low end

18   of that range was the most appropriate sentence in this case

19   based on my consideration of all of the Section 3553(a) factors.

20   It was merely an unfortunate coincidence that the sentence

21   imposed was precisely 60 months above the low end of that range

22   and apparently gave the appearance of a mistake.

23          As to the 3553(a) factors other than the guidelines, at

24   the original sentencing hearing the court thoroughly considered

25   the applicable factors and addressed the defendant's arguments

1    in mitigation.  I have reviewed the transcript from the original

2    sentencing hearing in preparation for today, and rather than

3    repeating everything that I previously stated, I believe it is

4    appropriate to reiterate by reference the reasons I gave to

5    support the sentence I imposed at the previous sentencing

6    hearing, including those factors in aggravation and mitigation I

7    referred to.  I note that today Mr. Poke has again apologized

8    for what he's done.  During the course of what I am about to

9    say, I will attempt to clarify and emphasize portions of those

10   remarks, and of course I will address additional matters.

11          At the original sentencing, I discussed the defendant's

12   behavioral issues as part of my analysis under Section 3553(a),

13   and from this review I concluded that the defendant was

14   extremely incorrigible and noted several instances in which the

15   defendant has not complied with the rules and regulations of the

16   places where he has been incarcerated.  But in doing so, I

17   believe I understated defendant's reprehensible behavior while

18   in custody.  His record while in detention is replete with

19   incidents of insolent and insubordinate remarks to staff and

20   refusing to follow lawful orders.  Multiple times he has

21   threatened other inmates and has threatened the staff and their

22   family members, including their children, with physical harm and

23   with death.  Specifically, he told staff members in the

24   Department of Corrections that he was going to kill their

25   children.  Kill their children.  He has struck a corrections

1    officer with a bag that was thrown at her, and he has fought

2    with corrections officers.

3            An alarming and disturbing aspect of the defendant's

4    characteristics is that sometimes he follows through on his

5    threats.  On April 10th, 2013, in the McHenry County Jail, the

6    defendant refused to be moved from his cell to segregation and

7    used his dinner tray in an attempt to cause damage.  He refused

8    to relinquish his tray and announced that the guards were going

9    to have to come in and get it from him and threatened to fight

10   anyone who entered the cell.  In his words, "I can't wait 'til

11   this door opens.  Somebody going to get fucked up today."

12   Following through on this threat, he fought with officers who

13   entered his cell.

14           I note parenthetically that in the course of this

15   confrontation, the defendant stated, "I don't care which one of

16   you motherfuckers open this door, dude or bitch.  I'm going to

17   kill you first chance I get.  All you white fucks deserve to

18   die, anyway.  I'm going away for life.  I got nothing to lose.

19   It may not be someone on this shift, but one of your friends is

20   going to die.  You treat me like an animal.  That's just how I'm

21   going to act.  First chance I get I'm going to break someone's

22   neck.  I'm going to look you right in the eyes while I kill one

23   of you.  If I beat this rap, I gonna come back here and kill as

24   many of you fucks as I can and go back to the joint.  I'll teach

25   you motherfuckers a lesson.  You are going to remember me.  I'm

1    going to fuck this shit up.  I'm going to destroy everything I

2    touch.  It might not be today or tomorrow.  One of you will not

3    be paying much attention, and that's when I'm going to break

4    your fucking neck."

5            It is apparent that the defendant is a person who

6    seethes with hate and malevolence.  Multiple times he has

7    engaged in sexually inappropriate and aberrant behavior in the

8    presence of corrections staff, including females, as well as

9    non-corrections counselors.  Multiple times the defendant has

10   damaged or threatened to damage the property of his places of

11   confinement.

12           During his allocution at the original sentencing

13   hearing, the defendant stated he had worked on himself, that he

14   was trying to go to school and that he was in a drug class.  The

15   defendant stated further that, quote, "Once a person gets to a

16   certain age, you grow out of what you used to do," close quote,

17   and he explained that he had been trying to better himself.  In

18   fact, the defendant even promised that he would continue trying

19   no matter what happened at the sentencing hearing.  Despite

20   these promises and assurances, the defendant has continued to

21   misbehave while in prison, and his actions speak much louder

22   than his words.

23           The defendant's recent disciplinary history with the

24   Bureau of Prisons is included in the October 29, 2015,

25   supplemental report prepared by the probation officer, and it

1    shows two additional incidents of misconduct since the date of

2    the original sentencing hearing.  In August 2015, even after the

3    defendant's case had been remanded from the Seventh Circuit and

4    I assume he knew he would be coming back for a resentencing, the

5    defendant still could not abide by the prison's rules.

6    According to the incident report, Officer Holmes notified the

7    defendant about the unsanitary conditions in his cell, namely,

8    having his window covered and objects on top of the inmates'

9    lockers.  Despite this warning, while Officer Holmes was making

10   rounds in the unit, the defendant's cell still appeared to be

11   untidy and/or unsanitary.  At the disciplinary hearing, the

12   defendant initially stated, "Our room was in clean," before

13   declining any further comment.

14          Standing in isolation, this incident might not give the

15   court much pause, but it takes on additional significance given

16   the defendant's volatile history.  If the defendant cannot

17   follow even the simplest of rules while in prison, the court has

18   doubts that he would be able to follow the rules of society once

19   he is released.

20          In June of 2015, during the time when the defendant

21   knew his case was on appeal and although he knew my original

22   sentence was based in part upon his misbehavior while he was in

23   custody, at a time when he should have been on his best

24   behavior, the defendant was found guilty of stalking.  According

25   to the disciplinary file, the defendant was found in the

1    psychology area without authorization.  When Lieutenant Long

2    explained to the defendant that he had been counseled about not

3    going to that area, the defendant became angry and began to

4    argue, at which point Lieutenant Long told the defendant that he

5    was not to go to that area.  In response the defendant stated,

6    "I'll go where I want and stick my dick where I want."

7         This incident is another example in a long line of

8    incidents in which the defendant acts out based on his own

9    impulses and without regard to societal norms.  It seems to me

10   that the defendant truly thinks he is above the law and that the

11   rules don't apply to him and that he can do whatever he wants

12   whenever he wants.  I believe the defendant's antisocial

13   behavior is so entrenched in the defendant's nature and

14   disposition that I have serious doubts about his ability to ever

15   be rehabilitated and function appropriately in a civilized

16   society.  The defendant simply cannot control his base urges,

17   even if his conduct is offensive or hurtful to other people, and

18   he shows no signs of being able to reform his ways.

19        As I said at the previous sentencing hearing, I found

20   the defendant to be extremely incorrigible, and the defendant's

21   conduct since then has reaffirmed this conclusion.  I believe

22   the defendant is absolutely addicted to his antisocial behavior

23   and needs to be incarcerated for a lengthy period of time in

24   order to properly protect the public from further crimes of the

25   defendant and to dissuade him from continuing his criminal and

1    antisocial behavior.

2           In addition to his blatant disregard for the rules of

3    society, I find that the defendant also has no respect for the

4    welfare and safety of other people.  Despite being shot multiple

5    times over the course of his life and having firsthand knowledge

6    of the pain and suffering that comes as a result of that type of

7    violence, the defendant himself carried a firearm while he was

8    dealing drugs.  This gun was not just for show.  I have no doubt

9    that the defendant would have willingly used that gun.  He would

10   have willingly used deadly force if he felt that there was a

11   threat to himself, his drugs, or his drug proceeds.

12          This callous disregard for the potential suffering of

13   other people is the ultimate hypocrisy, given the defendant's

14   history of gunshot wounds.  Even though he is personally and

15   intimately aware of the pain and suffering which is caused by

16   being shot, he is perfectly willing to inflict that type of

17   horrific injury on another person.

18          At the original sentencing hearing, after describing

19   some particularly violent threats the defendant has made in the

20   past, I had determined that this defendant is a person who is

21   depraved and pernicious, and I have no reason to change that

22   conclusion now.

23          Also, there is no basis to change my conclusion that

24   the defendant's classification as a career offender provides an

25   accurate assessment of the defendant's lengthy criminal history.

1  Indeed the court previously noted that the defendant, who has 25

2  criminal history points, is properly characterized in every

3  sense of the term as a career offender.  As Mr. Pedersen points

4  out, 25 criminal history points is almost double those points

5  that are required to establish a criminal history category of

6  six, and, in addition, there were juvenile and criminal

7  offenses, as well as serious traffic offenses, for which

8  criminal history points were not assigned.

9        This designation as a career offender had a strong

10  impact on the sentence previously imposed in this case and was

11  one of the primary reasons the court imposed a within guidelines

12  sentence.  The court continues to believe that the defendant's

13  status as a career offender, which is reserved for repeat

14  offenders who have not been deterred from committing additional

15  serious crimes despite prior sentences for either crimes of

16  violence or controlled substance offenses, provides a strong

17  basis for a sentence that is above the low end of the guideline

18  range.

19        The court's sentence is based upon more than the

20  defendant's conduct as a drug dealer.  It is also supported by

21  his violent and harmful behavior.  From the time he stabbed his

22  stepbrother at the age of 15 to the mob action he committed when

23  he was 29 to the incidents of threats and violence while the

24  defendant has been in custody on these charges, he has

25  demonstrated a propensity to engage in violent behavior, and it

1    is alarming and disturbing that such a person carries a firearm

2    in furtherance of his drug trafficking activities.

3          If anything, the career offender enhancement does not

4    fully capture the seriousness of the defendant's criminal

5    history, and a sentence above the low end of the guidelines

6    range is necessary in my opinion to properly account for the

7    defendant's actual history and characteristics.  There are good

8    reasons above and beyond his two drug offenses why the defendant

9    is described as a career offender.

10         He began selling drugs at the age of ten.  He was first

11   brought into the court system at the age of 15 when he stabbed

12   his stepbrother in the back with a butcher knife.  In a month he

13   will be 37 years old, yet he has never held legitimate

14   employment in his entire adult life.  The defendant's history of

15   violating criminal laws is long and contemptible.

16         On March 30th, 1994, he was placed on juvenile

17   probation for aggravated battery.  Less than six months later he

18   committed the offense of resisting law enforcement, reckless

19   driving, and driving without a driver's license.  On those

20   offenses he was placed with the Indiana Boys School on official

21   probation.  He was released from official probation on June

22   20th, 1995.

23         Less than two months later he committed the offense of

24   possession with intent to deliver one to 15 grams of cocaine.

25   On that offense he was committed to the Illinois Juvenile

1    Department of Corrections.  He was released from the Juvenile

2    Department of Corrections on May 9th, 1996.

3            Just ten months later he committed another aggravated

4    battery.  He was sent to adult prison on that offense.  He was

5    released on parole December 3rd, 1997.

6            Just six days after his release on parole, he drove an

7    uninsured vehicle without a valid driver's license.  Just

8    49 days after that, after committing those offenses, he

9    committed a robbery.  For the third time he was sent to the

10   Illinois Department of Corrections.

11           I may have that wrong.  I think that was the second

12   time he was committed to the Illinois Department of Corrections.

13   No, that's right.  He was committed to the Juvenile Department

14   of Corrections on September 11th, 1995.  He was committed to the

15   adult Department of Corrections for the aggravated battery.

16   That was on June 19th, 1997.

17           He was released on parole January 25th, 1999, and just

18   four and a half months later he committed obstructing justice,

19   which involved flushing a baggie with an off-white rock

20   substance down the toilet.

21           During the next ten months on three separate occasions,

22   he drove an automobile with a suspended driver's license.

23           Then on April 25th, 2000, he committed offenses of

24   unlawful use of weapons and possession of a firearm without a

25   firearm owner's identification card.

1          Within the next 15 months, on two separate occasions he
2     committed the offense of driving with a suspended license and
3     fleeing to elude a police officer, which involved nearly
4     striking a police officer with a vehicle.
5          Then on July 31st, 2001, less than eight months after
6     committing the offense of fleeing to elude a police officer, he
7     committed another possession with intent to deliver one to 15
8     grams of cocaine, which involved yelling at a police officer
9     that she was a white racist motherfucker and stated, "I'd kill
10    you if these cuffs weren't on," and said, "I'll spit in your
11    motherfucking face, you ho ass bitch."  On this offense the
12    defendant was sent to prison for a fourth time.
13         It is important to note what while the defendant was
14    out on bond for this case and just 43 days after being out on
15    bond -- or after committing the offense of possession with
16    intent to deliver drugs, he committed an aggravated battery for
17    which he received his fifth prison sentence.
18         He was released from prison after serving the jail
19    sentences for possession with intent to deliver and aggravated
20    battery on March 18th, 2004.  Just two months later he committed
21    another offense of driving while license suspended, and just
22    nine days after that he committed his third possession with
23    intent to deliver one to 15 grams of cocaine.  For that offense
24    he was given his sixth prison sentence.
25         He was released from prison on March 14th, 2006.

1    Within the next 28 months he committed two separate offenses of

2    driving while license revoked, as well as felony mob action.

3    Then three years later he committed the instant offense.

4           The defendant has had the benefit of juvenile

5    probation, official probation at the Indiana Boys School, adult

6    probation, conditional discharge, and parole.  He has received

7    counseling at the Sinnissippi Counseling Center in Oregon,

8    Illinois.  He has been sentenced to prison six times, yet none

9    of these have effected a change in the defendant's criminal

10   behavior.  The defendant incessantly persists in committing

11   crimes.

12          The criminal laws which govern society mean nothing to

13   him.  He makes his way through life by continually and

14   chronically violating the law to facilitate his own aberrant

15   lifestyle.  As he frankly admitted to the probation officer, a

16   normal life for him has, for the most part, always included

17   gangs, guns, selling or using drugs, and violence.

18          The defendant's criminal behavior is an ingrained

19   component of his character, and I am convinced that unless there

20   is some astonishing and unlikely transformation -- I should say

21   astonishing transformation, which I believe is unlikely,

22   although gang activity may subside, his life will be pervaded by

23   guns, selling or using drugs, and violence until the day he is

24   disabled from committing crimes or dies.  Despite my misgivings,

25   I can only hope that a lengthy prison sentence will be that

1   transformative agent that dissuades the defendant from

2   committing further crimes once he is released from custody.

3        At this point the court must also address the concerns

4   that were raised by the Seventh Circuit in its opinion in this

5   matter, as well as similar issues raised by the court's decision

6   in United States v. Presley.  In particular, the court will

7   address the defendant's age at the time of his expected release

8   and whether a sentence above the low end of the guidelines range

9   is necessary to meet the sentencing goals of incapacitation,

10  general deterrence, and specific deterrence.  In this regard,

11  the court will also discuss the high discount rate that occurs

12  when dealing with lengthy sentences, and I will also consider

13  the anticipated costs of incarceration.  I make these comments

14  with the highest regard for the authority and dignity of the

15  Court of Appeals.  The guidance and directives to this and other

16  courts contained in the Court of Appeals' decision is well taken

17  by me.

18       As for defendant's age, although I did not explicitly

19  consider that factor during the original sentencing hearing, I

20  recognize that the sentence I imposed would keep the defendant

21  incarcerated into his sixties.  When I originally imposed the

22  sentence in this case, the defendant had already served over two

23  and a half years in pretrial custody.  Therefore, by my

24  calculations, with no good time credits earned, the defendant

25  would be released around July 2046 and would be a little older

1    than 67 and a half years at that time.

2          His current projected release date on the Bureau of

3    Prisons website is listed as September 23rd, 2045.  So, it

4    appears that he has already earned some good time credit to

5    reduce -- or he has already been given some good time credit to

6    reduce his total term.  Nevertheless, even if the defendant was

7    able to earn the maximum amount of good time credit, a

8    proposition that does not seem very likely in my opinion, he

9    would still be 62 years old at the time of his release.

10          In the Seventh Circuit's opinion in this case, the

11    court states that being an armed drug dealer is a young man's

12    career and something that a man would be unlikely to resume in

13    his fifties, let alone in his late sixties or early seventies.

14    The Court of Appeals references a statistic showing that

15    defendants in their sixties accounted for only 1.18 percent of

16    persons entering federal prisons in 2012 for drug offenses.

17    Those same statistics become slightly higher, but still under

18    2 percent if the court considers other possible offenses, such

19    as violent offenses and weapons offenses rather than limiting

20    the type of offense to drug offenses.  This higher statistic

21    would be appropriate in this case given that the defendant's

22    criminal activity in the past has not been limited to only drug

23    offenses.

24          In any event, the court is not convinced that these

25    generalized statistics provide an accurate prediction of this

1    defendant's likelihood to recidivate.  As the Seventh Circuit

2    was careful to note, an unlikely outcome is not synonymous with

3    an impossible outcome.  Indeed the 2012 data provided by the

4    Bureau of Justice statistics shows when looking at the actual

5    number of inmates rather than percentages that there were 320

6    prisoners entering federal prison for drug offenses who were

7    between the ages of 61 and 70 years old and 37 more if you also

8    count those who entered prison at 71 or older.

9         Another study cited by the Seventh Circuit showed that

10   15 percent of inmates released after the age of 50 were

11   rearrested within three years of their release.  I am well aware

12   that it is impossible to predict exactly what will happen when

13   the defendant is released from custody.  And although I

14   recognize that on average a defendant is less likely to commit

15   violent or drug-related offenses in his sixties, based on this

16   particular defendant's history and characteristics, and despite

17   Mr. Poke's statement today that he has grown and matured, I

18   believe that he will be among the small percentage of aging

19   inmates who do recidivate.  Therefore, I continue to conclude

20   that a sentence above the minimum guideline range is the most

21   appropriate sentence in this case.

22        On that note, I would refer the parties to the case of

23   United States v. Bullion, 466 F.3d 574.  In that case the

24   defendant argued that since the tendency to commit crimes,

25   violent and otherwise, diminishes with age, a 58-year old need

1    not be given a 22-year sentence in order to be kept out of

2    circulation until he is safe.  The Seventh Circuit rejected the

3    defendant's argument stating, "That may well be true of the

4    average 58-year old, but given the defendant's unusually violent

5    criminal history and the fact that even an elderly person has

6    enough strength to pull the trigger of a shotgun, the district

7    court should certainly worry about what the defendant might do

8    in his seventies.  The curious implication of the defendant's

9    argument is that no violent criminal should be kept in prison

10   beyond the age of say, 70, but that there should be no limit for

11   white collar criminals since their physical capacity to commit

12   their preferred types of crime does not diminish with age."

13        Although I recognize that Mr. Poke's history of violent

14   offenses is not as serious as that of the defendants in Bullion,

15   I believe Mr. Poke's overall chronic, persistent, and serious

16   criminal behavior, in and out of custody, makes the reasoning in

17   Bullion applicable to this case.

18        I believe that this defendant, who is considered both a

19   career offender and an armed career criminal and has numerous

20   prior convictions involving either controlled substance offenses

21   or violent offenses, among other things, is not entitled to a

22   great reduction of his sentence because of his age.  Unless he

23   makes some dramatic change in his life, which again I consider

24   unlikely, I believe that this defendant would tend to return to

25   a life of crime once he is released from prison and that he

1    would still have the capacity and propensity to commit any

2    number of offenses.

3            As previously noted, the defendant has never had

4    legitimate employment during his entire adult life.  His

5    vocation in life is crime.  Accordingly, the defendant's age

6    does not alter my conclusion that an above the low end of the

7    guidelines range is warranted here.

8            I would like to spend a moment discussing Section

9    3553(a)(6), which requires a sentencing court to consider

10   unwarranted sentence disparities.  As the Seventh Circuit has

11   noted on many occasions in cases such as United States v.

12   Boscarino, 437 F.3d 634, "Sentencing disparities are at their

13   ebb when the guidelines are followed, for the ranges are

14   themselves designed to treat similar offenders similarly."

15           Because it usually takes some time for a criminal

16   defendant to build up the necessary criminal history to be

17   classified as a career offender, I believe that many defendants

18   who are similar to this defendant and are facing an advisory

19   guideline range of 360 months to life imprisonment will be in

20   their thirties, such that a within guideline sentence for a

21   career offender will often result in a sentence which keeps the

22   defendant incarcerated into his sixties.

23           Moreover, I believe that such a sentence is actually

24   consistent with the intent of Congress that is expressed in

25   Title 28, Section 994(h), which, as I discussed at the previous

1    sentencing hearing, was the impetus for the career offender

2    guideline calculation.  In view of the foregoing, in the case of

3    Mr. Poke, his sentence should be among -- above the minimum

4    guideline imprisonment range.

5            Turning next to the Seventh Circuit concern with what

6    it refers to as the high discount rate that criminals tend to

7    have, I recognize that an increase in punishment when

8    considering a lengthy sentence does not necessarily lead to an

9    increase in general deterrence.  However, aside from a brief

10   mention at the original sentencing hearing of the need for the

11   sentence imposed to afford adequate deterrence to criminal

12   conduct, my analysis did not focus on or specifically rely on

13   this particular factor.

14           As I have stated today, the sentence imposed in this

15   case was based largely upon the nature and circumstances of the

16   offense and the history and characteristics of the defendant,

17   the need to provide just punishment for the offenses of

18   conviction, the need to protect the public from further crimes

19   of the defendant, and to specifically deter Mr. Poke from

20   committing crimes in the future.

21           The studies cited by the Seventh Circuit indicate that

22   the exact rate at which offenders discount prison time to be

23   served in the future is unknown.  So, although there might be

24   some minimal additional deterrent effect gained by the increase

25   in punishment, it was not critical to my analysis or even

1    possible to determine the exact amount of deterrence.  So, I

2    assume for the sake of argument that as I pass sentence in this

3    case, there will be a negligible amount of general deterrence

4    that would accrue as a consequence of the later years of the

5    defendant's sentence.

6          Finally, although not mentioned in this case, the

7    Seventh Circuit did discuss in the Presley opinion the need for

8    the court to consider the cost of incarceration.  I did consider

9    the cost of incarceration in this case.  It is noted in the

10   presentence investigation report, and, of course, I am sensitive

11   to it.  I am also concerned with the rising costs associated

12   with aging prisoners.  I recognize that the costs of

13   incarceration may be high, but it is necessary in some

14   situations to make these expenditures, and I believe this is one

15   of those circumstances.  Therefore, my consideration of the cost

16   of incarceration does not alter my previous determination that a

17   term of imprisonment above the minimum guideline range is

18   appropriate here.

19         In view of the foregoing, I have determined -- in view

20   of the foregoing and in consideration of the guidance and

21   directives contained in the opinion of the Court of Appeals, I

22   have determined that a sentence within the guideline range is

23   the most appropriate sentence in this case.  I conclude that a

24   sentence sufficient but not greater than necessary to comply

25   with the purposes set forth in paragraph two of Section 3553(a)

1    is as follows.

2         Probation is not authorized in this case.  I have

3    determined that the total term of imprisonment for all of the

4    counts of conviction should be 400 months.  I structure that

5    sentence as follows.  The defendant is hereby committed to the

6    custody of the United States Bureau of Prisons to be imprisoned

7    for 340 months on Count 1 and 180 months on Count 2.  These

8    sentences are to be served concurrently.  I will impose a

9    sentence of 60 months on Count 3 to be served consecutively to

10   the concurrent sentences on Counts 1 and 2, with, of course,

11   credit for any time he has previously served on these offenses.

12   I choose this particular sentence within the guideline range

13   based upon those considerations which I previously stated.

14         In view of the defendant's substance abuse and mental

15   health issues, I will recommend to the Bureau of Prisons that

16   the defendant be assigned to a facility which can provide him

17   with a residential drug abuse assistance program and counseling

18   program which will assist the defendant in dealing with his

19   anger management and mental health issues.

20         In regard to a fine, I have considered the factors

21   contained in Section 3572 and Guideline Section 5E1.2.  The

22   court declines to impose a fine in this case because the

23   defendant is unable to pay a fine and is not likely to be able

24   to do so.  The defendant shall pay a special assessment of $100

25   on each count of conviction for a total of $300.  That is due

1    immediately.  He's to be given credit for any amounts previously

2    paid toward his special assessment, although I do not believe he

3    has made any payments.

4         In view of the specific facts and circumstances of this

5    case, I believe continuing court oversight would benefit the

6    defendant and the community.  I have determined that upon

7    release from imprisonment, the defendant shall serve a term of

8    supervised release of six years on Count 1, five years on

9    Count 2, and five years on Count 3.  These supervised release

10   terms shall all be served concurrently.

11        As to the mandatory conditions of supervised release,

12   I'll order that the defendant not commit another federal, state,

13   or local crime.  The defendant shall cooperate in the collection

14   of a DNA sample at the direction of the United States Probation

15   Office, if he has not already provided a DNA sample with respect

16   to this case.  The defendant shall submit to a drug test within

17   15 days of release on supervised release and not more than 104

18   periodic drug tests per year thereafter for use of a controlled

19   substance.  The defendant shall pay the special assessment

20   imposed.

21        As to the discretionary conditions, I believe the

22   following conditions should be imposed as they serve to support

23   the defendant's rehabilitation and reintegration into the

24   community and facilitate supervision by the probation officer

25   and in doing so encourage the defendant to comply with the law

1    and deter him from committing future crimes.

2           As a condition of supervised release, the defendant

3    shall not knowingly leave the Northern District of Illinois

4    without the permission of the court or probation officer.  The

5    defendant shall report to the probation officer as directed by

6    the court or probation officer.  The defendant shall follow the

7    instructions of the probation officer.  The defendant shall

8    notify the probation officer at least ten days prior to any

9    change in residence or employer.

10          As further conditions, the defendant shall permit the

11   probation officer to visit the defendant at home between the

12   hours of 6:00 a.m. and 10:00 p.m. or at work upon prior notice

13   to the defendant and confiscate any contraband in plain view of

14   the officer.

15          As an additional condition, the defendant shall notify

16   the probation officer within 72 hours of being arrested or

17   questioned by a law enforcement officer, and the defendant shall

18   not enter into any agreement to act as an informer or special

19   agent of a law enforcement agency without the permission of the

20   court.

21          I believe the following additional conditions should be

22   imposed on the basis that they serve to ensure that the

23   defendant is engaged in lawful pursuits rather than criminal

24   activity in light of the defendant's history and

25   characteristics.

1          The defendant shall not knowingly visit places where

2     controlled substances are illegally sold, used, distributed, or

3     administered, and the defendant shall not meet, communicate, or

4     otherwise interact with a person whom the defendant knows to be

5     engaged or planning to engage in criminal activity unless

6     granted permission to do so by the probation officer.

7          Furthermore, I believe the following conditions should

8     be imposed on the basis that it will serve to support the

9     defendant's rehabilitation and provide him with needed substance

10    abuse treatment, particularly in light of the defendant's

11    history of self-reported substance abuse problem and also his

12    mental health issues.  I'll order as a condition of supervised

13    release that the defendant shall participate in a substance

14    abuse and mental health evaluation and participate in any

15    treatment program approved -- program or programs approved by

16    the United States Probation Office.

17         Finally, I'll order -- I believe the following

18    condition should be imposed on the basis that it serves to

19    ensure that the defendant pays the special assessments imposed,

20    while taking into consideration the defendant's ability to pay

21    such amounts.  I'll order the defendant to pay any remaining

22    balance of the special assessments at a rate of not less than

23    10 percent of the defendant's gross earnings minus federal and

24    state income tax withholding, unless the defendant demonstrates

25    that he lacks the ability to pay the amounts at such rate.

1          Mr. Cook, have I addressed all of your arguments,

2     including your main arguments in mitigation?

3          MR. COOK:  Yes, your Honor.

4          THE COURT:  Do the parties know of any reason other

5     than those already expressed why the sentence should not be

6     imposed as stated?  Mr. Pedersen?

7          MR. PEDERSEN:  No, your Honor.

8          MR. COOK:  No.

9          THE COURT:  I will enter a judgment of conviction and

10    order the sentence imposed as stated.

11         Mr. Poke, you have a right to appeal the adjudication

12    of guilt in this case, as well as the sentence imposed by me.

13    Any notice of appeal must be filed within 14 days of the entry

14    of judgment.  You or your attorney may file a notice of appeal.

15    If you so request, the clerk will prepare and file a notice of

16    appeal in your behalf.

17         If you are unable to pay appeal costs, you have a right

18    to ask for permission to appeal in forma pauperis.  If you are

19    unable to afford an attorney, the Court of Appeals may appoint

20    an attorney to represent you on appeal at no cost to you.

21    Mr. Cook will remain your attorney on appeal unless the Court of

22    Appeals appoints another attorney to represent you on appeal.

23         Defendant's remanded to the custody of the United

24    States Marshal.  Court's in recess.

25         DEFENDANT POKE:  Judge, I got a question, if I can.  I

1    want to put on record to object on some of the --

2              THE COURT:  No, no.  That's not a question.  You say

3    you're going to object.

4              DEFENDANT POKE:  Well, some of the things that you said

5    wasn't accurate.

6              THE COURT:  Okay.  Well, you're going to have to

7    discuss those with Mr. Cook then and take any action you think

8    is appropriate.

9              DEFENDANT POKE:  Some of the things that you read off,

10   they wasn't accurate, as far as my history and my convictions.

11             THE COURT:  All right.  That's all.  You've had your

12   chance to make a statement in allocution.  I passed the

13   sentence.  If there's anything else we need to do in this case,

14   you can do that in a form of a motion through your attorney.

15   Court's in recess.

16        (Which were all the proceedings had in the above-entitled

17         cause on the day and date aforesaid.)

18        I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20

21   _____

     /s/ Mary T. Lindbloom
22
     Official Court Reporter
23

24

25